**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Pamela Julian,<br><br>        Plaintiff,<br><br>v.<br><br>Swift        Transportation        Company Incorporated, et al.,<br><br>        Defendants. | No. CV-16-00576-PHX-ROS<br><br>**ORDER** |

Plaintiffs are a group of approximately 10,000 truck drivers who worked as "trainee drivers" for Defendant Swift Transportation Co. of Arizona, LLC.  Plaintiffs were not paid for attending the first day of a mandatory three-day orientation nor were they paid for many hours during a behind-the-wheel training period.  Swift seeks summary judgment that Plaintiffs were not entitled to pay for the first day of orientation.  Both parties seek summary judgment regarding Plaintiffs' unpaid hours during the behind-the-wheel training period.

## BACKGROUND

The parties have filed cross-motions for summary judgment, requiring the facts be viewed in different ways depending on which motion is being evaluated.  *See Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  Only Swift moved for summary judgment regarding the first day of orientation, meaning the facts regarding that issue must be viewed in the light most favorable to Plaintiffs.  Both parties moved for summary judgment regarding the alleged unpaid hours during behind-

the-wheel training, requiring the Court view the facts relevant to that issue in the light most favorable to each party, depending on which motion is being assessed. Fortunately, many background facts are undisputed. Therefore, the following represents the undisputed facts unless otherwise noted.

Swift "provides long-haul transportation services . . . throughout the continental United States and Canada." (Doc. 26 at 8). Swift operates at least 18,000 trucks and has at least 14,000 drivers. (Doc. 26 at 8); (Doc. 193 at 22). To ensure an adequate supply of qualified drivers, Swift maintains a large driver training program.[1] At any given time, Swift has more than 1,000 individuals participating in its driver training program. (Doc. 157 at 9).

In general, Swift's driver training program consists of three parts. First, trainees attend a three-day orientation at one of Swift's "terminals." During that orientation trainees learn about Swift and what is expected of them as drivers. (Doc. 192-5 at 5). Second, trainees spend four to six weeks in "behind-the-wheel training with an assigned mentor hauling and delivering freight as part of a two-driver team." (Doc. 191 at 6). Third, after completing the behind-the-wheel training period, trainees take a written test, performance test, and road test. (Doc. 157-2 at 3). If the trainees complete the orientation, behind-the-wheel training, and pass the tests, they are entitled to work as solo drivers. The present suit focuses on aspects of the orientation and behind-the-wheel training.

## A. Three Days of Orientation

At the time Plaintiffs applied to work for Swift, most applications were submitted online. (Doc. 157-2 at 2). Once Swift received an application, it conducted a preliminary review and "[i]f the application [was] approved," Swift contacted the individual and told him to report to a Swift terminal for three days of orientation. (Doc. 157-2 at 2). Swift has not explained what it meant for an application to be "approved" but Swift is adamant that

---

[1] Individuals who wish to become truck drivers must obtain a commercial driver's license. That requires attending a training program and passing state-mandated tests. This case does not involve that type of training program. Instead, this case involves Swift's training program for individuals who already possess a commercial driver's license but have less than three months of driving experience. (Doc. 161-1 at 7).

it did not mean the applicant had been "hired" at that point. Rather, Swift contends the preliminary "approval" merely indicated the applicant should appear at a terminal for more processing and possible hiring. It is undisputed, however, that the preliminary "approval" often meant Swift had confirmed the applicant possessed some of the required qualifications to work as a driver.

Once an individual was "approved," Swift sent the individual an email containing "the details about the orientation." (Doc. 192-1 at 23, 34). An example of that email shows Swift promised to reimburse the individual for travel to the orientation's location and that Swift would pay for his hotel room and provide a lunch each day of the orientation. The individual was directed to bring his Class A Commercial Driver's Licenses, pen and paper, medical examination reports, and his Social Security Card. (Doc. 192-1 at 34). The email stressed the individual should bring "clothing–enough for 7-14 days" and to "[b]e prepared to leave from orientation for up to 6 weeks for training with mentor!!" (Doc. 192-1 at 34). The email also warned the individual that if Swift discovered "alcohol/drugs" or "a person of the opposite sex" in his hotel room, the individual would be "*terminated* and sent home immediately." (Doc. 192-1 at 34) (emphasis added).

The email did not state whether the individual would be compensated for attending the orientation. During depositions, some plaintiffs stated they did not expect to be paid. But other plaintiffs have submitted declarations stating they were told by Swift employees that they would be paid "for all three days of orientation."[2] (Doc. 192-1 at 23); (Doc. 192-1 at 38); (Doc. 192-1 at 65); (Doc. 192-1 at 85). Attendance at all three days was mandatory. (Doc. 192-1 at 23).

The three-day orientation followed a standard format. The first day began at 7:00

---

[2] Swift argues the Court should "strike" the declarations stating Swift promised compensation for all three days. Swift argues it "had no chance to depose [the] declarants" and Plaintiffs engaged in "deliberate sandbagging . . . to create a sham issue of fact." (Doc. 197 at 10). In support of this request, Swift cites a case from the Tenth Circuit that addressed the prohibited practice of attempting to defeat a motion for summary judgment by submitting an affidavit that contradicts prior deposition testimony. In the Ninth Circuit, that is known as the "sham affidavit rule." *Nelson v. City of Davis*, 571 F.3d 924, 928 (9th Cir. 2009). That rule has no application here because it is undisputed the declarations do not conflict with prior deposition testimony. Accordingly, Swift's request to strike the declarations under the "sham affidavit rule" is denied.

a.m. with a "Welcome Vid[eo]." (Doc. 192-12 at 2). The day then proceeded with a safety message and explanations of Swift's "Expectations & Code of Conduct." (Doc. 192-12 at 2). During these initial presentations, Swift conducted a "Whiteboard discussion and brainstorm" about the meaning of Swift's slogan "Delivering a Better Life." (Doc. 192-11 at 10). That presentation explained the slogan was meant to illustrate Swift's intent to "Deliver a Better Life to four big groups of people: Employees, Customers, Communities and Shareholders." (Doc. 192-11 at 12). Each of those groups was then discussed in more detail, with special emphasis placed on the unique attributes of Swift and the benefits of working for Swift.

After the "Whiteboard discussion," Swift played videos on topics such as "Driver Wellness" and "Driver Qualifications" while individuals completed drug screenings, physicals, and road tests. Every individual was required to complete a drug screening but some individuals were not required to get a physical or complete the road test. The first day ended at approximately 3:45 p.m. after presentations regarding "Safe Work Methods" and "Haz-Mat Training." (Doc. 192-12 at 2). Individuals were not paid for any portion of the first day because, in Swift's view, no one had been "hired" at that time.

Swift explains it did not compensate individuals for the first day because it was a "qualification day." (Doc. 192-5 at 6). According to Swift, the activities on the first day consisted only of those that "qualify [individuals] to go work for another carrier." That is, "everything [individuals] do on day 1 is something they can use elsewhere as well." (Doc. 192-5 at 6). Plaintiffs have a different view of the first day. According to one plaintiff, all the information covered on the first day "was related to Swift, its history and its policies." (Doc. 192-1 at 13). That information was not something he could use "when working for some other employer." (Doc. 192-1 at 13). Another plaintiff describes the first day as "focused on reinforcing Swift's rules and expectations, on-time deliveries, and customer service policies." That plaintiff claimed he would not be able to use the information he received on the first day "for [his] own benefit when working for some other employer." (Doc. 192-1 at 24). Viewed in the light most favorable to Plaintiffs, the majority of the

first day involved Swift-specific information.

The second and third days of orientation covered additional topics such as Swift's history, how drivers would be paid, Swift's policies regarding inappropriate conduct, and how drivers should plan their trips. (Doc. 192-12 at 2). Swift considered the individuals "employees" as of the start of the second day and paid the trainees for the second and third days. Swift explains it compensated the trainees for the second and third days because those days covered Swift-specific information. (Doc. 192-5 at 7).

**B. Behind-the-Wheel Training**

At some point during the three days of orientation each trainee was assigned a "mentor" to work with during the four to six weeks of behind-the-wheel training. Trainees began working with their mentor immediately after the end of orientation. Swift expected trainees would spend the behind-the-wheel training period driving as much as possible while also preparing to take the final tests that would qualify them to work as solo drivers. Trainees were tasked with "learning by observing the mentor, helping him, and studying written training materials." (Doc. 192-1 at 51-52). Each trainee and his mentor worked as a driving team, meaning one individual drove while the other rested.[3] (Doc. 159-2 at 35, 46).

Part of the behind-the-wheel training was ensuring trainees knew how to comply with the governing Department of Transportation ("DOT") regulations regarding the logging of time. Pursuant to DOT regulations, all truck drivers are required to track their time using an "electronic logging device," which is sometimes referred to as the "Qualcomm." 49 C.F.R. 395.8(a)(1)(i) (requiring truck drivers use electronic logging devices). Using that device, trainees had to log their time in one of four statuses: Driving, On Duty Not Driving, Off Duty, or Sleeper Berth. 49 C.F.R. § 395.8(b). In general, time spent at the driving controls had to be logged as "driving," time spent performing other work (e.g., fueling, trip planning) had to be logged as "on duty not driving," time where no

---

[3] A mentor was required to observe his trainee's driving for the first 50 hours of driving. After that, the two would transition into a team approach where one individual drove and the other rested. (Doc. 159-2 at 31).

work was being performed had to be logged as "off duty," and time spent in the truck's sleeper berth had to be logged as "sleeper berth."

The DOT regulations impose a complicated scheme regarding the maximum amount of time a driver can log in the "driving" or "on duty not driving" statuses. 49 C.F.R. § 395.3. Somewhat simplified, a driver cannot be logged as "driving" or "on duty not driving" for more than "70 hours in any period of 8 consecutive days." 49 C.F.R. § 395.3(b)(2). In addition, a driver cannot be logged as "driving" for more than 11 hours "during a period of 14 consecutive hours after coming on duty." 49 C.F.R. § 395.3(a). After exhausting one's available driving time, a driver must take "10 consecutive hours off duty." *Id.*

According to Plaintiffs, Swift assigned deliveries to the trainees and their mentors that had very "tight delivery deadline[s]," which required the trainees and mentors drive right up to the maximum hours allowed by the DOT regulations. (Doc. 192-1 at 15). Those delivery deadlines meant the trucks were moving as much as legally possible. Because a mentor and his trainee could each drive up to 11 hours per day, it was technically possible for a truck to remain in motion 22 hours each day. In fact, if a mentor wished to exhaust the "70 hours within 8 days" limit as soon as possible, a truck could remain in motion for 22 hours a day for up to 6 days straight.

Some plaintiffs describe their trucks as "moving almost 24/7." (Doc. 192-1 at 15); (Doc. 192-1 at 26). One plaintiff, being slightly more precise, states the truck was in motion for "22 hours per day." (Doc. 192-1 at 50). According to some plaintiffs, the only times their trucks were not moving involved "pre- and post-trip inspections, refueling, a 30-minute rest break, and other road stops here and there." (Doc. 192-1 at 16). The length of the refueling and road stops was unpredictable and one plaintiff states he never knew "when we would get back out on the road." (Doc. 192-1 at 16-17). For some plaintiffs this meant the truck did not stop for them to use restrooms. One plaintiff explains he "ended up having to relieve [himself] using plastic bottles that [his] mentor kept in the truck for that purpose." (Doc. 192-1 at 27). Another plaintiff explains his mentor's desire

to stop as little as possible meant the plaintiff and his mentor "urinated off of off ramps" instead of taking the time to stop at locations with restrooms. (Doc. 192-1 at 42). Even the relatively rare times the trucks stopped, Plaintiffs were required to "stay ready and engaged" because at any moment they "could be asked to fuel the truck or do repairs on the truck." (Doc. 192-1 at 46).

Declarations from certain plaintiffs paint a consistent picture of working, or being ready to be called upon to perform work, around the clock. Mentors and trainees were effectively living out of the trucks. During one trainee's five weeks of behind-the-wheel training, he was on the road for all but three days. For those three days, he was required to wait in a hotel while his mentor visited his family. (Doc. 192-1 at 16). Another trainee describes his behind-the-wheel training as lasting four to six weeks. During that period, he was on the road and living out of the truck for all but two days. (Doc. 192-1 at 27).

Mentors and trainees were compensated differently. Mentors were paid based on each mile driven, whether by the mentor or by the trainee. (Doc. 159-2 at 49). Trainees were paid $9.50 per hour for all time they logged as "driving" and minimum wage for all time they logged as "on duty not driving."[4] (Doc. 159-2 at 13). Swift did not pay trainees for any time they logged as "off duty" or "sleeper berth." (Doc. 159-2 at 14).

To comply with the DOT regulations regarding maximum driving time and minimum rest time, Plaintiffs spent substantial periods of time in the sleeper berth while their mentors drove. A "forensic review" of driver logs showed "[t]rainees were logged as 'sleeper berth' for more than 10 hours on 64% of their workdays, more than 12 hours on 47% of their workdays, and more than 15 hours on 27% of their workdays." (Doc. 191 at 40).

During the many hours Plaintiffs were logged as "sleeper berth," they claim they were subject to interruptions, up to "8 to 10 times per day." (Doc. 192-1 at 68). For

---

[4] The exact details were slightly more complicated. The applicable minimum wage was based on a trainee's "terminal state location or [his] state of residence." (Doc. 159-2 at 13). Thus, if the applicable minimum wage was more than $9.50, a trainee would be paid the minimum wage for all time logged as "driving" and "on duty not driving." In addition, a trainee might be paid for time logged "off duty" during a truck breakdown. In that event, a trainee would receive $50 per day. (Doc. 191 at 8).

example, one plaintiff states his truck "would often arrive at the shipper while [he] was supposed to be asleep." (Doc. 192-1 at 19). Upon arriving, he had to leave the sleeper berth and "accompany [his] mentor to the shipping office." (Doc. 192-1 at 19). Another plaintiff explains his "truck would often receive alerts on the truck's electronic 'Qualcomm' system that required [his] prompt response." (Doc. 192-1 at 31). Those alerts required he "get out of the sleeper berth and get on the phone." (Doc. 192-1 at 31). And another plaintiff recounts a situation where he was in the sleeper berth when his truck needed a repair. That required he leave the sleeper berth and complete the repair. (Doc. 192-1 at 47).

Plaintiffs' "sleeper berth" time was the time Plaintiffs used to study and prepare for the final tests. (Doc. 192-1 at 43, 50). Swift concedes Plaintiffs spent time studying while they were logged as "sleeper berth." (Doc. 191 at 32). Swift believes such studying was not "compensable" but Swift's own witnesses were not completely clear when describing why studying time was not compensable. One Swift employee witness explained that whether trainees would be compensated for studying was "totally up to [the trainees]." When trainees were "sitting up in front studying, they [could] be on duty not driving." In that situation, the trainees would be paid for their time. "But when [trainees were] in the sleeper berth, they do as they wish when they're in the back; that's their time," meaning studying time in the sleeper berth was not compensable. (Doc. 185-2 at 5). Another Swift employee witness explained a trainee should be "on duty" when he was "using [Swift's training materials] book to reference something [he was] doing . . . as a work function." But trainees "taking their personal time . . . to read through the [training materials]" was not compensable. (Doc. 159-2 at 166-167).

### C. Procedural History

In December 2015, Plaintiff Pamela Julian filed the present suit on behalf of herself and other individuals who had gone through Swift's three days of orientation and behind-the-wheel training. According to the complaint, Swift's compensation scheme resulted in trainees receiving less than minimum wage for all hours worked. After Swift answered the

complaint, the Court certified a collective action covering all individuals "currently or formerly employed by Swift as a Trainee . . . at any time from January 6, 2014 to the present." (Doc. 103 at 10). Notice was disseminated and, eventually, over 10,000 individuals filed consents to join the collective action. (Doc. 140 at 2). In August 2018, Plaintiffs and Swift filed cross-motions for summary judgment.

## ANALYSIS

Plaintiffs believe the Fair Labor Standards Act ("FLSA") entitles them to pay for the first day of orientation, any hours in excess of eight they were required to log as "sleeper berth," time spent studying or performing other work while logged as "sleeper berth," and short breaks of 5 to 20 minutes that were logged as "off duty."[5] The Court will address each contention in turn.

### I.     First Day of Orientation

Swift seeks summary judgment that Plaintiffs were not entitled to pay for the first day of orientation. Swift offers two arguments. First, job applicants are not entitled to be paid and Swift did not hire anyone until the end of the first day of orientation. (Doc. 157 at 19). Second, individuals need not be compensated for certain types of "training" and the first day of orientation qualified as a non-compensable type of training. (Doc. 157 at 20). Based on the present briefing, there are genuine disputes of material fact that prevent Swift from prevailing on either argument.

### A. When Individuals Were Hired

The text of the FLSA is of little help for determining when, exactly, Plaintiffs were hired. Under the FLSA, an employer must pay minimum wage to each "employee." 29 U.S.C. § 206(a). The FLSA defines "employee" as "any individual employed by an employer" and the term "employ" is defined as "to suffer or permit to work." 29 U.S.C.

---

[5] It is undisputed Plaintiffs did not have written contracts of employment with Swift. *But see Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 69 (2013) (minimum wage under the FLSA cannot be "modified by contract"). In addition, there was no collective bargaining agreement in place. *But see* 29 C.F.R. § 541.4 ("While collective bargaining agreements cannot waive or reduce the [FLSA's] protections, nothing in the [FLSA] or the regulations in this part relieves employers from their contractual obligations under collective bargaining agreements.").

§203(e)(1); 29 U.S.C. § 203(g). When applying these vague definitions, courts have adopted "expansive interpretation[s]" meant "to effectuate the broad remedial purposes of the [FLSA]." *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754 (9th Cir. 1979). Accordingly, "whether an employer-employee relationship exists does not depend on isolated factors but rather upon the circumstances of the whole activity." *Boucher v. Shaw*, 572 F.3d 1087, 1091 (9th Cir. 2009). In other words, "economic reality rather than technical concepts" is what matters for determining whether an individual was an "employee" entitled to compensation. *Hale v. State of Ariz.*, 993 F.2d 1387, 1393 (9th Cir. 1993).

The Ninth Circuit has outlined factors a court might use in some contexts when deciding if an employment relationship existed. For example, the Ninth Circuit believes six factors are helpful for differentiating between employees and independent contractors. *See, e.g.*, *Real*, 603 F.2d at 754 (9th Cir. 1979) (listing six factors). Those factors, however, do not necessarily translate to other situations. Hence, in a case involving labor by prisoners, the Ninth Circuit held the six factors did not provide a "useful framework" because the dispute was not whether the individuals were employees or independent contractors. *Hale v. State of Ariz.*, 993 F.2d 1387, 1394 (9th Cir. 1993). Rather than relying on the six factors, the Ninth Circuit looked to the "totality of the circumstances" and concluded the "relationship between prison and prisoner" was not "an employer-employee relationship as contemplated by the FLSA." *Id.* at 1395.

The Ninth Circuit does not appear to have identified a particular test for determining when an employment relationship comes into existence for purposes of the FLSA.[6] But the Ninth Circuit came close to doing so in an unpublished decision involving a situation very similar to the present case. In *Nance v. May Trucking Company*, 685 Fed. Appx. 602 (2017), the plaintiffs were truck drivers who were suing their employer for unpaid wages.

---

[6] Swift argues courts across the country have "uniformly held that job applicants are not employees under the FLSA." *Saini v. Motion Recruitment Partners, LLC*, No. SACV1601534JVSKESX, 2017 WL 1536276, at *5 (C.D. Cal. Mar. 6, 2017). Accepting that proposition does not materially help the analysis because the present dispute is not deciding if job applicants should be deemed employees. Rather, the present dispute is identifying when job applicants become employees.

One of the plaintiffs' claims was that they had not been paid for attending a three-day orientation program. As described by the panel, the first day of orientation consisted of "driving and skills tests." *Id.* at 605. The second and third days consisted of "tax and administrative paperwork in a classroom setting" as well as training on "safety policies and regulatory standards." *Id.* The employer described the three days as its "method for ascertaining its drivers' training and abilities," apparently arguing the plaintiffs were not hired prior to the completion of the three days. *Id.* The panel accepted the employer's view that the individuals were not hired before completion of the orientation.

In the panel's view, the three-day orientation program was "a job application process, albeit a lengthy one." *Id.* at 604-05. That conclusion was based on two aspects of the orientation program. First, the plaintiffs attended "without expectation of pay other than travel and lodging expenses." *Id.* at 605. Second, the plaintiffs were "not guaranteed work upon completion of the program." *Id.* While the relevant inquiry undoubtedly was the "economic reality" of the situation, the panel apparently concluded "expectation of pay" and "guarantee of work" were the most relevant factors for determining when the plaintiffs were hired. Applying those two factors here, and looking to other evidence indicative of economic reality, there is a genuine dispute of fact when Plaintiffs were hired.

Addressing first the issue of expectation of pay, Swift argues there must be an "express or implied" agreement for compensation.[7] (Doc. 197 at 9). There is evidence Swift promised at least some plaintiffs they would be paid for all three days of orientation.

[7] In 1996, the Ninth Circuit concluded an individual was not an employee by relying almost exclusively on the fact that he "had neither an express nor an implied agreement for compensation." *Williams v. Strickland*, 87 F.3d 1064, 1067 (9th Cir. 1996). As pointed out by the dissent in that case, the focus on an express or implied agreement for compensation conflicts with Supreme Court guidance. In *Tony and Susan Alamo Foundation v. Secretary of Labor*, the Supreme Court concluded individuals qualified as employees under the FLSA even though the individuals believed they were "volunteering" their services. 471 U.S. 290, 300 (1985). In that case, one individual had testified "no one ever expected any kind of compensation and the thought [of compensation] is totally vexing to my soul." *Id.* The Supreme Court concluded such "protestations, however sincere, cannot be dispositive." *Id.* The relevant inquiry was not the employees' or employer's expectations but the "economic reality" of the relationship. *Id.* at 301. Pursuant to *Tony and Susan Alamo Foundation*, an individual can be an employee despite neither the employer nor employee believing compensation would ever be paid. Thus, the Ninth Circuit's reliance on an "express [or] implied agreement for compensation" as a crucial factor is dubious.

While Swift believes that evidence should be ignored, Swift has not offered a viable basis for doing so. Accordingly, unlike the plaintiffs in *Nance*, some plaintiffs in this case expected to be paid.

As for being guaranteed a job at the end of the orientation, Swift has not offered evidence regarding the number of individuals, if any, who attended the first day but were then told not to return for the second and third. The only available evidence, viewed in the light most favorable to Plaintiffs, indicates individuals attended the orientation expecting a job at the end. That evidence includes the email containing instructions for attending the orientation. The email advised the recipient to bring enough clothing to the orientation so he could immediately begin the behind-the-wheel training. (Doc. 192-1 at 34). The email also threatened the recipient might be "terminated" if he did not comply with Swift's policies. (Doc. 192-1 at 34). Swift has not explained how a mere job applicant could be "terminated" if he did not comply with Swift's policies.

Further evidence that Swift promised jobs at the end of orientation comes from the training program Swift operated for individuals to obtain their commercial driver's license. That program, known as "Swift Academy," included a "tuition program" that was "designed to help [an individual] earn [his] Class A CDL with nearly no upfront cost." (Doc. 192-7 at 6). The tuition program provided Swift would "cover the upfront cost of tuition" and individuals would then repay the tuition "through installments out of [their] paycheck[s]" when they began "earning . . . income as a Swift Driver." (Doc. 192-7 at 6). In light of this structure, individuals could have believed they were guaranteed a job with Swift once they completed "Swift Academy." In that situation, a graduate of "Swift Academy" likely did not think of himself as a job applicant at the time he attended orientation.

The promise of compensation and the expectation of permanent employment are likely sufficient to defeat Swift's motion for summary judgment regarding the first day of orientation. But even beyond those considerations, other evidence supports the view that the first day of orientation was not merely part of the job application process.

According to Swift, the first day was devoted to ensuring individuals were qualified to work as drivers. Some individuals, however, were not required to take a physical or complete the road test. And while every individual was required to take a drug test, the drug testing form itself was ambiguous regarding the employment relationship at that time. According to the drug testing form, Swift planned to use the results "in connection with making a decision concerning my application for employment and/or *a decision concerning my continued employment at Swift*." (Doc. 192-13 at 6) (emphasis added). An individual filling out that form could reasonably conclude he had already been hired.

One of Swift's internal manuals also indicated individuals were hired as of the first day of orientation. That manual provided the following explanation why some individuals were not required to complete a road test during orientation: "*Newly hired* inexperienced drivers who have successfully completed a formal truck driver training program to obtain their CDL within the previous 91 days or less are not required to take a [road test] during orientation."[8] (Doc. 192-6 at 4) (emphasis added). Swift does not explain why this manual referred to "[n]ewly hired" individuals if, at the relevant time, the individuals were merely job applicants.

In sum, the evidence viewed in the light most favorable to Plaintiffs establishes there are genuine disputes of material fact regarding whether Plaintiffs were promised compensation, whether Plaintiffs were guaranteed a job, and how Swift itself viewed Plaintiffs as of the first day of orientation. Swift's first argument in support of not paying for the first day of orientation must be rejected.

**B. First Day of Orientation as Non-Compensable Training**

In addition to arguing individuals were not hired until the end of the first day of orientation, Swift offers an alternative argument that the first day of orientation consisted only of activities that should be classified as non-compensable "training." Swift claims the

---

[8] A few pages later, the manual explains that if an individual is required to complete a road test, and that individual performs inadequately, "the evaluator should notify Driver Development and or safety so that a decision can be made to determine the status of the *applicant*." (Doc. 192-6 at 7) (emphasis added). Swift has not explained the conflicting references.

first day of orientation was equivalent to the situation presented in the seminal Supreme Court case involving unpaid trainees, *Walling v. Portland Terminal* Co., 330 U.S. 148 (1947).

As recently described by the Ninth Circuit, *Portland Terminal* involved a suit by the Department of Labor "against a railroad for failing to pay its trainees minimum wages under the FLSA." *Benjamin v. B & H Education, Inc.*, 877 F.3d 1139, 1143 (9th Cir. 2017). "The railroad provided a week-long practical training course to the trainees, who were all prospective yard brakemen." *Id.* The trainees were not paid for attending the course and only after completing that course were the trainees "certified" such that they could be hired by the railroad. *Id.* The Supreme Court concluded the trainees did not qualify as employees of the railroad based on a "number of factors" such as the trainees "did not displace regular employees," their work "sometimes impeded the railroad's business," and the trainees "never expected remuneration for the training period." *Id.* Of particular importance, the Supreme Court analogized "the trainees to students in an educational setting" and emphasized "students are not employees" entitled to compensation. *Id.* at 1144.

While Swift argues the attendees at the first day of orientation should be considered "trainees" of the sort contemplated by *Portland Terminal*, the factors invoked by the Supreme Court in that case do not map neatly onto the facts presented here. Unlike the trainees in *Portland Terminal*, during the first day of orientation Plaintiffs did not impede Swift's business. Also, at least some of the plaintiffs attest that Swift promised them compensation for the first day. Moreover, viewed in the light most favorable to Plaintiffs, the first day of orientation was not similar to a general "educational setting." Instead, the first day of orientation covered a variety of Swift-specific information, such as instruction on Swift's history, its corporate slogan, and its corporate goals. Based on the present briefing, there is a genuine dispute of material fact whether attendees at the first day of orientation qualified as "trainees" not entitled to pay.

## II. Behind-the-Wheel Training Disputes

The parties' second dispute involves the compensation scheme adopted by Swift for

the behind-the-wheel training period. The parties have three disputes regarding this scheme: whether Plaintiffs were entitled to pay for any hours in excess of eight in which they were logged as "sleeper berth"; whether Plaintiffs were entitled to compensation for tasks or studying performed in logged as "sleeper berth"; and whether Plaintiffs are entitled to compensation for breaks lasting 5 to 20 minutes. Before resolving these disputes, the Court will first address the relevance of the DOT regulations.

### A. Compensation Scheme and DOT Regulations

As explained earlier, Swift compensated Plaintiffs based on how Plaintiffs and their mentors recorded Plaintiffs' time in the logs required by the DOT regulations. Plaintiffs were paid for time logged as "driving" or "on duty not driving" but were not paid for time logged as "off duty" or "sleeper berth." Swift admits this compensation scheme was derived from the DOT regulations. Those DOT regulations, however, have little or no bearing on FLSA matters.

The Western District of Arkansas recently addressed a similar situation where an employer was attempting to use the DOT regulations as justifying its compensation scheme. *Browne v. P.A.M. Transp., Inc.*, No. 5:16-CV-5366, 2018 WL 5118449, at *3 (W.D. Ark. Oct. 19, 2018). In that court's view, the DOT regulations and the regulations promulgated by the Department of Labor ("DOL") are aimed at separate concerns:

> [The DOT regulations] are a different set of regulations from the DOL regulations under discussion, promulgated pursuant to different statutes, and concerned with different policy aims. The DOT regulations aim to make our roads safe, while the DOL regulations aim to provide workers adequate compensation. If the DOT prohibits commercial truck drivers from driving for more than 14 hours in a 24-hour period while the DOL requires their employers nevertheless to pay them for at least 16 hours in that same period, then this Court sees nothing inconsistent or inharmonious about that state of affairs. It would simply be a cost of business that the federal government has seen fit to impose on employers of commercial truck drivers in order to ensure an adequate level of road safety and driver compensation.

*Id.* The *Browne* court's conclusion that the DOT regulations provide no meaningful guidance regarding matters of compensation is correct.

The federal government has a long history of regulating truck drivers. "Since 1935, federal law has regulated the hours of service of truck drivers operating in interstate commerce." *Owner-Operator Indep. Drivers Ass'n, Inc. v. United States Dep't of Transportation*, 840 F.3d 879, 883 (7th Cir. 2016). The current DOT regulations regarding how many hours an individual may drive, and how long he must rest before driving again, are "intended to promote highway safety by reducing accidents related to driver fatigue." *Id.* at 885. There is no indication in the DOT regulations that they are meant to address matters of compensation. In fact, according to guidance issued by the Federal Motor Carrier Safety Administration (the entity responsible for the DOT regulations), the DOT regulations "do not address questions of pay." Guidance Q&A, *available at* https://www.fmcsa.dot.gov/regulations/title49/section/395.2. More particularly, "[t]he fact that a driver is paid for a period of time does not always establish that the driver was on-duty for the purposes of [the DOT regulations] during that period of time. A driver may be relieved of duty under certain conditions and still be paid." *Id.* If the entity responsible for the DOT regulations does not believe those regulations should be relied on for making compensation decisions, it seems quite unlikely they should be.

Swift derives some support for invoking the DOT regulations in connection with driver pay from a decision by the District of Nebraska. In *Petrone v. Werner Enterprises, Inc.*, the plaintiffs were truck drivers who were claiming they had not been paid minimum wage. No. 8:11CV401, 2017 WL 510884, at *1 (D. Neb. Feb. 2, 2017). The employer in that case had based its compensation scheme on the DOT regulations. In reviewing that scheme, the *Petrone* court reasoned the DOT regulations were useful for determining compensable time. According to *Petrone*, "[t]he language of the DOT regulations . . . clarifies the meaning of" the DOL regulations regarding when driversty are entitled to pay. The *Petrone* court did not, however, explain why the language of the DOT regulations, which were promulgated by a separate agency and meant to address entirely different concerns, was a proper basis for clarifying the DOL regulations. Moreover, the *Petrone* court did not address the fact that the entity responsible for the DOT regulations has

explicitly stated its regulations should not be used for compensation decisions. The *Petrone* court's unexplained conflation of the DOT and DOL regulations is not persuasive.

Guidance by the entity responsible for the DOT regulations, as well as the simple fact that the DOL and DOT deal with entirely different areas of concern, establish the *Browne* court has the better view that DOT regulations have little or no bearing on matters of compensation. Accordingly, reliance on the DOT regulations as dispositive for purposes of compensation matters would be inappropriate. In resolving the parties' disputes, the proper focus is the DOL regulations, the only regulations that address matters of compensation.

## B. Compensating Plaintiffs for Time in Excess of Eight Hours

According to Plaintiffs, the primary flaw in Swift's compensation scheme was that Plaintiffs were not paid minimum wage for time logged as "sleeper berth" in excess of eight hours during each 24 hour period. In other words, Plaintiffs concede they are not owed compensation for up to eight hours of time logged as "sleeper berth" each day, assuming they were not called upon to perform work during those eight hours. Plaintiffs argue the applicable regulations imposed eight hours as a bright-line limit such that all time logged as "sleeper berth" in excess of eight hours should have been compensated. Swift counters that a different regulation applied and application of that regulation means "sleeper berth time of any length [was] not compensable." (Doc. 177 at 13). Thus, taken to its logical end, Swift believes it was free to confine employees to sleeper berths for as long as it wished and it was not required to pay any compensation for that time.

The section of the FLSA requiring payment of a minimum wage states, in relevant part:

> Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at . . . $7.25 an hour.

29 U.S.C. § 206(a). The parties concede this statutory text is ambiguous and argue the Court should look to the DOL's regulations for guidance. The parties' briefing assumes

the Court's sole task is to choose between two DOL regulations: 29 C.F.R. § 785.22 or 29 C.F.R. § 785.41. Plaintiffs believe § 785.22 applied while Swift believes § 785.41 applied.

According to Plaintiffs, § 785.22 applied to their time in behind-the-wheel training because they were "on duty" for days at a time. Section 785.22, titled "Duty of 24 hours or more," provides:

> a) General. Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep. If sleeping period is of more than 8 hours, only 8 hours will be credited. Where no expressed or implied agreement to the contrary is present, the 8 hours of sleeping time and lunch periods constitute hours worked.

> (b) Interruptions of sleep. If the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked. If the period is interrupted to such an extent that the employee cannot get a reasonable night's sleep, the entire period must be counted. For enforcement purposes, the Divisions have adopted the rule that if the employee cannot get at least 5 hours' sleep during the scheduled period the entire time is working time.

Pursuant to this regulation, Plaintiffs argue Swift was free to have Plaintiffs logged as "sleeper berth" for more than eight hours per day. But when Plaintiffs logged more than eight hours as "sleeper berth," Swift could not deduct more than "8 hours from hours worked." That means Plaintiffs believe they were entitled to receive minimum wage for at least 16 hours each day.

Swift believes § 785.22 is the wrong regulation.[9] Swift points to 29 C.F.R. § 785.41 as the regulation that speaks directly to the present dispute. That regulation, titled "Work performed while traveling," provides:

> Any work which an employee is required to perform while traveling must, of course, be counted as hours worked. An employee who drives a truck, bus, automobile, boat or airplane, or an employee who is required to ride therein as an assistant or helper, is working while riding, except during bona

---

[9] At oral argument Swift stated § 785.22 was meant to apply only to employees "who are on call." As pointed out by Plaintiffs' counsel, there is a separate regulation dealing with "on call" situations. 29 C.F.R. § 785.17.

fide meal periods or when he is permitted to sleep in adequate facilities furnished by the employer.

Swift adopts a literal reading of this regulation and argues *all* time Plaintiffs were "permitted to sleep" in the sleeper berth was properly excluded from Plaintiffs' compensation. Under this reading, Swift was free to require Plaintiffs remain in the sleeper berth for an unlimited number of hours and no compensation was owed for those hours.

When seeking to apply regulations, the first task is to "determine whether the regulation[s] [are] ambiguous." *Bassiri v. Xerox Corp.*, 463 F.3d 927, 931 (9th Cir. 2006). This requires the Court "interpret the regulation[s] as a whole, in light of the overall statutory and regulatory scheme, and not . . . give force to one phrase in isolation." *Campesinos Unidos, Inc. v. U.S. Dep't of Labor*, 803 F.2d 1063, 1069 (9th Cir. 1986). The Court must "read the regulations in harmony" and "where possible," the regulations "should be read so as not to create a conflict." *Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006, 1016 (9th Cir. 2017). This holistic approach means that even when a seemingly straightforward regulation "viewed in isolation" might appear to dictate a certain result, the Court must consider whether that reading makes sense in the larger regulatory context. *See, e.g.*, *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1092 (9th Cir. 2013) (rejecting reading of single regulation that was contrary to "obvious import" of larger regulatory scheme).

The overall statutory and regulatory scheme of the FLSA consists of an attempt to protect workers from employers who would otherwise take advantage of their employees. The FLSA was aimed at remedying "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." *Douglas v. Xerox Bus. Servs.*, LLC, 875 F.3d 884, 887 (9th Cir. 2017). In addition, the FLSA hoped to protect "workers from poverty by preventing employers from paying substandard wages in order to compete with one another on the market." *Marsh*, 905 F.3d at 615. The parties' competing regulatory interpretations must be viewed with this overarching scheme and purpose in mind.

Dealing first with Swift's proposed interpretation, Swift believes § 785.41 allowed it to designate as non-compensable any period of time when the employee was "permitted to sleep."[10] The language of § 785.41, viewed in isolation, would appear to authorize this approach because the plain language of § 785.41 contains no limit on the amount of uncompensated time. Swift contends that, provided an employee was "permitted to sleep," an employer would not be required to compensate the employee no matter how long he was confined in the sleeper berth. That literal reading of § 785.41 is in significant tension with the larger statutory and regulatory context.

Under Swift's reading of § 785.41, an employer could pay an employee for one hour of work each day and then confine him to the sleeper berth for 23 uncompensated hours. Being confined to the sleeper berth for such an extended period likely would be detrimental to the "health . . . and general well-being" of that employee. *Douglas*, 875 F.3d at 887. While it is possible § 785.41 was meant to allow for such practices, there are obvious reasons to doubt such a draconian and employer-friendly interpretation.[11] Swift's view that § 785.41 must be read in complete isolation is misguided.

In addition to conflicting with the underlying purpose of the FLSA, Swift's reading of § 785.41 would create unnecessary conflict with § 785.22. In general, pursuant to § 785.22 an employer need not pay an employee for a period of sleep, provided that period is limited to no more than eight hours.[12] Swift would have the Court read § 785.41 as

---

[10] This regulation might have originally been aimed at employees who travel on an incidental basis and not at employees, such as truck drivers, whose entire jobs consist of extended periods of travel away from home. The District of Oregon rejected this reading, relying on the language of § 785.41 lacking such a limitation. *Nance v. May Trucking Co.*, No. 3:12-CV-01655-HZ, 2014 WL 199136, at *7 (D. Or. Jan. 15, 2014). Here, Plaintiffs have not argued § 785.41 should be limited to incidental travel and the Court need not address that possibility.

[11] At oral argument, the Court asked defense counsel about Swift's reading of § 785.41. The Court first asked whether Swift believes § 785.41 means "that under all circumstances . . . truckers could not be paid while they're asleep." Swift responded "Yes, Your Honor." The Court then pressed further by asking if Swift's position was "that no matter what happens, under every circumstance, where [individuals are] in the sleeper berth, they don't get paid." Swift's counsel seemed to agree but focused on the alleged reality that drivers are unlikely to spend extended periods of time in sleeper berths.

[12] This regulation contemplates employees who are "on duty" for 24 hours or more. Swift claims Plaintiffs were not on duty for 24 hours because, pursuant to DOT regulations, drivers cannot be "on duty" for that length of time. As explained earlier, DOT regulations do not control matters of compensation that are governed by DOL regulations. Swift has

creating a special exception from § 785.22 for truck drivers. That reading would mean employers of truck drivers could designate an unlimited amount of time as non-compensable sleeping time while other employers could designate no more than eight hours. Swift has not provided any reason why the DOL would single out truck drivers in this manner. And with no indication the DOL meant to impose a uniquely harsh regime on truck drivers, the better path is to reject Swift's reading of § 785.41 and see if there is a possible harmonious reading of the two regulations.

Plaintiffs propose reading § 785.41 and § 785.22 as working together. Doing so results in similar sleeping time limitations being placed on all employers, including employers of truck drivers. This reading of § 785.41 allows for employers of truck drivers to deduct eight hours of sleeping time but that deduction is, pursuant to § 785.22, limited to eight hours. This reading gives effect to the language in both regulations.[13] Moreover, it is consistent with the "overall statutory and regulatory" scheme aimed at protecting employees' health and well-being. *Campesinos Unidos, Inc. v. U.S. Dep't of Labor*, 803 F.2d 1063, 1069 (9th Cir. 1986).

Because the regulations can be harmonized, there may be no need to resort to other sources of interpretation. At the very least, however, the strict limits imposed by § 785.22 and the lack of any limit imposed by § 785.41 creates an ambiguity in how the two regulations should apply to the present case. Assuming the regulations are ambiguous, the Court must look to guidance issued by the DOL. But before examining that guidance, it is

not provided any meaningful arguments that, under the governing DOL regulations, Plaintiffs did not qualify as "on duty" for 24 hours during the behind-the-wheel training period. The governing regulations regarding "on duty" and "off duty" indicate Plaintiffs were "on duty" for 24 hours or more. *See* 29 C.F.R. §§ 785.15, 785.16. In short, Plaintiffs were confined to the worksite (the truck), were not able to "use the time effectively for [their] own purposes" because they were not entitled to "leave the job" and were not provided a "definitely specified hour" when they would resume driving. 29 C.F.R. § 785.16.

[13] At oral argument, Swift argued that reading § 785.22 and § 785.41 together renders § 785.41 "superfluous." But that is not accurate. Under § 785.22, an employer and employee "may agree to exclude" a sleeping period. If there is "no expressed or implied agreement," the employer must pay an employee for a sleeping period. Section 785.41 provides a special limitation that an employer can always deduct a sleeping period for truck drivers. Thus, unlike other situations covered by § 785.22, the application of § 785.41 means there is no need to inquire into whether an employer and a truck driver have an express or implied agreement regarding compensation for sleeping time.

- 21 -

important to outline some background principles regarding deference to agency expertise.

In general, the Supreme Court has recognized federal administrative agencies issue two types of "rules." First, when an agency follows the "three-step procedures for so-called 'notice-and-comment rulemaking'" the end result is a "legislative rule." *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015). Those rules "have the force and effect of law." *Id.* Second, an agency might issue a rule without following the "notice-and-comment" procedure. The end result in that situation is an "interpretive rule." *Id.* at 1204. Such rules "do not have the force and effect of law and are not accorded that weight in the adjudicatory process." *Id.*

The two regulations at issue in this case were not "promulgated pursuant to notice-and-comment" but "were created to inform the public of the positions that the Administrator of the Wage and Hour Division would take in enforcing the FLSA." *Perez v. Am. Future Sys., Inc.*, No. CV 12-6171, 2015 WL 8973055, at *5 (E.D. Pa. Dec. 16, 2015). Thus, the two regulations are "interpretive rules" and "non-binding." *See Brigham v. Eugene Water & Elec. Bd.*, 357 F.3d 931, 940 (9th Cir. 2004). That means the regulations are entitled to a lower "level[] of deference" than the amount of deference often accorded to regulations.[14] *Tablada v. Thomas*, 533 F.3d 800, 806 (9th Cir. 2008). The lower level of deference is derived from the Supreme Court decision *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). That deference—now referred to as "*Skidmore* deference"—requires regulations be given "a measure of deference proportional to [their] power to persuade." *Id.*

Over time, *Skidmore* deference has evolved into a complicated multi-factor test for determining the appropriate amount of deference. Under that test, the weight given to an interpretive rule "is a function of that interpretation's thoroughness, rational validity, and

---

[14] This is not entirely accurate. The Supreme Court has noted the absence of the "administrative formality" of "notice-and-comment" does not preclude application of the higher level of deference known as "*Chevron* deference." *See United States v. Mead Corp.*, 533 U.S. 218, 231 (2001). *See also Barnhart v. Walton*, 535 U.S. 212, 222 (2002) (noting, again, *Chevron* deference does not depend on "notice-and-comment" formalities). For present purposes, however, the Court need not delve into when *Chevron* deference might apply to the DOL regulations.

consistency with prior and subsequent pronouncements." *The Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1068 (9th Cir. 2003). The weight also depends on "the logic[ ] and expertness of [the] agency decision, the care used in reaching the decision, as well as the formality of the process used." *Id.* Presumably applying *Skidmore* deference, the Ninth Circuit has repeatedly looked to the DOL regulations for assistance in resolving compensation disputes. *Brigham*, 357 F.3d at 940 n.16 (citing cases). The present case, however, does not require an analysis of the proper application of *Skidmore* deference to the DOL regulations. Instead, the parties have a disagreement about a different type of deference involving agency interpretations of ambiguous regulations.

When a regulation is ambiguous, a court should "defer to an agency's interpretation of an ambiguous regulation unless that interpretation is plainly erroneous or inconsistent with the regulation, or there is reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Indep. Training & Apprenticeship Program v. California Dep't of Indus. Relations*, 730 F.3d 1024, 1034 (9th Cir. 2013). This type of deference is largely derived from the Supreme Court decision *Auer v. Robbins*, 519 U.S. 452 (1997). That deference—now referred to as "*Auer* deference"—imposes a demanding standard. As recently stressed by the en banc Ninth Circuit, under *Auer* deference a court should "defer to the agency's interpretation of its [ambiguous] regulation unless an alternative reading is *compelled* by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation." *Marsh v. J. Alexander's LLC*, 905 F.3d 610, 624 (9th Cir. 2018).

*Auer* deference can be based on a variety of sources indicating an agency's view of the proper interpretation of its regulations. For example, the Ninth Circuit recently applied *Auer* deference based on an agency's opinion letters and an amicus brief filed by the agency. *Marsh*, 905 F.3d at 632. Whether a source is a proper basis for *Auer* deference depends on the circumstances, with some sources being entitled to "great judicial deference" while others are not. *Compare Bassiri v. Xerox Corp.*, 463 F.3d 927, 933 (9th Cir. 2006) (holding DOL opinion letter was entitled to "great judicial deference") *with*

*California Pub. Utilities Comm'n v. Fed. Energy Regulatory Comm'n*, 879 F.3d 966, 975 (9th Cir. 2018) (rejecting reliance on a position advanced by an agency in litigation because it appeared to be "no more than a *post hoc* rationalization . . . to defend past agency action against attack").

To summarize, the regulations at issue in the present case are interpretive rules that are entitled at least to *Skidmore* deference. If those regulations are ambiguous, the DOL's interpretation of those regulations are subject to *Auer* deference. And *Auer* deference requires acceptance of the DOL's interpretation unless "an alternative reading is *compelled* by" other evidence. *Marsh*, 905 F.3d at 623. With that framework in mind, the proper interpretation of the DOL regulations is straightforward.

The two regulations, § 785.22 and § 785.41 are, at best, ambiguous when it comes to the present situation. That ambiguity raises the possibility of *Auer* deference. Thus, the Court must determine if the DOL has issued statements regarding the regulations' proper interpretation. As evidence of DOL's interpretation, Plaintiffs have provided two opinion letters as well as the DOL's Internal Handbook. Only the opinion letters are an appropriate basis for *Auer* deference but they are sufficient to require acceptance of Plaintiffs' position.

In 1964, the DOL issued an opinion letter addressing compensation of "truck drivers resting in the truck's sleeping berth." 1964 DOLWH LEXIS 166. That letter provided, in relevant part

> As indicated in section 785.22 of the bulletin on Hours Worked . . . bona fide weal [sic] periods and bona fide sleeping periods may be excluded from hours worked where truck drivers and helpers are on trips away from home for a period of 24 hours or more. The bona fide sleeping period is limited to a maximum of 8 hours in computing hours worked. If the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked. Unless the employee can get at least 5 hours of sleep during the scheduled sleeping period, the entire time must be counted as working time. If the trip is less than 24 hours, all time on duty on the truck is hours worked even though some of the time is spent in the sleeping berth.

*Id.* This language shows DOL interpreted the language of § 785.22 as covering truck drivers. And truck drivers, just like other employers, cannot have more than eight hours

deducted for sleeping time. In 1966, the DOL issued another opinion letter reaching the same conclusion.

The 1966 letter addressed "whether [DOL] considers a truck driver as being off duty while sleeping aboard a truck in motion on sleeper equipment provided by the employer." The letter stated, in relevant part:

> As indicated in Section 785.22 of the enclosed bulletin on Hours Worked, bona fide sleeping periods may be excluded from hours worked where truck drivers and helpers are an [sic] trips away from facilities for a period of 24 hours or more provided adequate sleeping facilities are furnished by the employer. The bone [sic] fide sleeping period is limited to a maximum of 8 hours in computing hours worked. If the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked. Unless the employee can gut [sic] at least 5 hours of sleep during the scheduled sleeping period, the entire time must be counted as working time.

1996 DOLWH LEXIS 248. This letter again shows DOL's interpretation is that § 785.22 requires truck drivers be treated the same as other employees.

DOL opinion letters routinely serve as a basis for *Auer* deference. *See, e.g.*, *Bassiri v. Xerox Corp.*, 463 F.3d 927, 933 (9th Cir. 2006). And while these particular opinion letters are more than fifty years old, Swift has not cited any authority establishing the age of opinion letters, standing alone, prevents a court from relying on them when invoking *Auer* deference.[15] Swift does complain, however, that the opinion letters should not be followed for a variety of unconvincing reasons. Swift begins by presenting an incorrect view of black-letter law regarding deference to agencies.

According to Swift, opinion letters "do not warrant . . . deference." (Doc. 197 at 14). In support of this claim, Swift cites a statement by the Supreme Court that "opinion letters . . . do not warrant *Chevron*-style deference." *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000). But no one is claiming opinion letters are entitled to "*Chevron*-style deference." The relevant deference doctrine is *Auer* deference. And there is no question

---

[15] The Supreme Court has refused to defer to an agency's interpretation of its own ambiguous regulation when the "agency's announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158 (2012). Swift does not make a similar argument here.

that opinion letters have routinely been the basis for *Auer* deference. Thus, Swift's initial claim that opinion letters are entitled to no deference is incorrect.

After failing to grasp which deference doctrine applies to opinion letters, Swift then argues the opinion letters should not be followed because they "did not address or even acknowledge the existence of Section 785.41." (Doc. 197 at 15). Swift does not explain why the omission of § 785.41 from the opinion letters prevents reliance on the letters. Nor does Swift provide any authority precluding *Auer* deference merely because another regulation was not referenced. As the agency responsible for promulgating and enforcing the regulations, it is safe to assume the DOL was aware of § 785.41 at the time of the opinion letters.[16] Given that § 785.41 provides no limit on the amount of sleeping time that can be deducted, it is natural the opinion letters would only cite the regulation that does impose a limit. The opinion letters' failure to cite a regulatory provision that would not have provided guidance in answering the inquiries does not mean the Court should ignore the opinion letters.

Swift's final argument against deference to the opinion letters is that the language of the letters involves "trips away from 'home' or 'facilities' for 24 hours or more." But, according to Swift, § 785.22 "does not apply to being away from home or facilities for 24 hours but being **on duty** for 24 hours." Thus, the opinion letters allegedly "create de facto a new regulation" by acting "under the guise of interpreting" § 785.22. (Doc. 177 at 17). This argument is derived from the decision in *Petrone v. Werner Enterprises*, No. 8:11CV401, 2017 WL 510884 (D. Neb. Feb. 2, 2017). But again, the analysis in that decision is not convincing.

The *Petrone* court concluded the opinion letters were of no assistance because they "conflict[ed] with the plain language of the regulation[s]." *Id.* at *8. The first opinion letter referred to "trips away from home for a period of 24 hours or more" and the second letter referred to "trips away from facilities for a period of 24 hours or more." This language, according to the *Petrone* court, "suggests that a driver or assistant is on duty any

---

[16] Both § 785.22 and § 785.41 appear to have been promulgated on November 29, 1955. 55 Fed. Reg. 10309.

time the driver or assistance is away from home for 24 hours or more, even though no such language exists in § 785.22 or elsewhere." *Id.* at 8. The *Petrone* court believed the opinion letters effectively created a new regulation covering the additional situation of drivers or assistants away from home for more than 24 hours, instead of interpreting the existing regulations addressed only to drivers or assistants who were on duty for 24 hours.

The *Petrone* court apparently feared the opinion letters created a new regulation because the letters deemed an employee "on duty" any time he was away from home for more than 24 hours. The plaintiffs in *Petrone* were not arguing that is what the opinion letters did and there is no explanation why the *Petrone* court read the opinion letters in such a strange way. As recited at the start of each opinion letter, the letters addressed truck drivers who were required to sleep in their trucks, sometimes while the trucks remained in motion. The opinion letters indicated those contexts reflected the drivers were "away from home" for more than 24 hours and the drivers should be considered as "on duty" for 24 hour periods such that § 785.22 allowed for no more than an eight hour unpaid sleeping period. There simply is no indication in the opinion letters that they were meant to redefine "on duty" status as covering every time a driver is away from home. The *Petrone* court's fear that the opinion letters imposed an entirely new regulation wrests imprecise language in the letters out of context.

With no basis for ignoring the opinion letters, the Court must follow their view of the applicable regulations unless some other view is "*compelled* by the regulation's plain language" or other indications of agency intent.[17] *Marsh v. J. Alexander's LLC*, 905 F.3d 610, 624 (9th Cir. 2018). The opinion letters indicate that truck drivers, just like all other employees, are subject to § 785.22 when they are on duty for 24 hours or more. No other

---

[17] Plaintiffs also argue the Court must defer to the DOL's Field Operations Handbook. In 2011, the Ninth Circuit noted "it does not appear to us that the [DOL Field Operations Handbook] is a proper source of interpretive policy" because "[t]he handbook itself says that it 'is not used as a device for establishing interpretative policy.'" *Probert v. Family Centered Servs. of Alaska, Inc.*, 651 F.3d 1007, 1012 (9th Cir. 2011). The recent en banc decision in *Marsh* deferred to the handbook but only because the DOL had adopted the handbook's interpretation in an amicus brief. 905 F.3d at 627. Strangely, Swift also asks the Court to defer to the Handbook, at least in part. (Doc. 177 at 14 n.7) (claiming the Court can consider the Handbook's guidance on "adequate sleeping facilities"). Given the decision in *Probert*, the Court will not look to the Handbook at all.

interpretation is "*compelled*" by the regulatory language. Therefore, the Court concludes Swift was entitled to deduct no more than eight hours per day as time Plaintiffs were allowed to sleep.[18]   Plaintiffs' motion for summary judgment on this issue will be granted while Swift's motion on this issue will be denied. This means Plaintiffs are also entitled to compensation for time spent in the passenger seat but logged as "off duty."

### C.  Compensating Plaintiffs for Time Spent Studying or Other Calls to Duty While in Sleeper Berth

Plaintiffs believe they should have been compensated for time they spent studying written materials while logged as "sleeper berth." Plaintiffs also believe they are entitled to compensation for time logged as "sleeper berth" but they were called upon to perform tasks. Swift seeks summary judgment regarding both theories.

#### 1.  Compensation for Studying

Swift seeks summary judgment that it was not obligated to pay Plaintiffs for time spent studying materials for the tests Swift would administer at the end of the behind-the-wheel training period. Swift cites a number of cases where an employer was not required to compensate employees for time spent studying. Those case, however, do not apply to the present situation and Swift is not entitled to summary judgment on this issue.

Swift argues it was not required to compensate Plaintiffs for time spent studying because Swift "conditioned its offer of employment to [Plaintiffs] on their successfully completing the training program," including passing all the final tests. (Doc. 157 at 26). Swift believes Plaintiffs would only be offered a permanent job upon passing the tests and "'studying' is not compensable if it is done to satisfy a condition of the employment offer."

---

[18] These conclusions may or may not conflict with the holding in the unpublished decision, *Nance v. May Trucking Company*, 685 Fed. Appx. 602 (9th Cir. 2017). There, the plaintiffs were truck drivers seeking compensation for time "spent in the sleeper berth of a moving truck." *Id.* at 605. The panel affirmed the grant of summary judgment in favor of the employer. The panel provided no analysis other than citing § 785.41 after stating "the district court properly relied on the persuasive authority of federal and state regulations saying drivers are not entitled to compensation for time they are permitted to sleep in the berths of moving trucks." *Id.* The decision does not identify the amount of sleeping time that was at issue. There was no indication the DOL opinion letters were cited to the panel. In addition, the panel provided no explanation whether § 785.22 and § 785.41 needed to be reconciled. In short, unpublished opinions are of very little use and *Nance* does not dictate an outcome here.

(Doc. 157 at 27). Swift cites a few cases adopting a version of this rule.

Swift first cites *Bienkowski v. Northeastern University*, 285 F.3d 138 (1st Cir. 2002). In that case, the plaintiffs were campus police officers. When the plaintiffs were hired, they were told they had "to receive and retain certification as Massachusetts-registered [emergency medical technicians ("EMTs")] within one year of their appointment as probationary police officers." *Id.* at 139. Certification as an EMT required the plaintiffs complete "approximately 110 hours of classroom work as well as 10 hours of in-hospital observation time, practical exams, and written exams." *Id.* The plaintiffs were paid for the time they spent working as police officers but were not paid for the time they spent obtaining their EMT certifications. The plaintiffs later sued their employer, arguing they were entitled to pay for the time spent obtaining the certifications. The First Circuit held the plaintiffs were not entitled to additional compensation.

According to the First Circuit, the FLSA requires individuals "be compensated only for their activity as workers, rather than as students." *Id.* at 141. Obtaining EMT certifications was similar to activities by students and, therefore, not compensable. Crucially, the First Circuit noted that rather than allowing the plaintiffs to complete their certifications while already working, the employer could have made "the successful attainment of an EMT certificate a precondition of employment." *Id.* at 141. And the First Circuit saw no reason to require an employer pay additional wages merely because the employer allowed individuals to work while seeking to satisfy a basic requirement of the job.

Swift also cites a similar case from the Sixth Circuit, *Chao v. Tradesmen Int'l, Inc.*, 310 F.3d 904 (6th Cir. 2002). In that case, the employer required all employees complete an "Occupational Safety and Health Administration ('OSHA') 10-hour general construction safety course" either before being hired or within sixty days of starting work. *Id.* at 905. The Department of Labor filed suit, arguing the time employees spent attending the OSHA course should have been compensated. The Sixth Circuit disagreed, concluding the employer was not "liable for overtime pay for time its employees spend as students,

rather than as workers." *Id.* at 910. Adopting the same reasoning as in *Bienkowski*, the Sixth Circuit held "We do not see why the employer should be penalized for allowing a potential employee to begin earning income while striving to meet certain prerequisites for the job when the employer could just as easily withhold employment until successful completion of all the job requirements." *Id.* at 910.

*Bienkowski* and *Tradesmen* may be accurate statements regarding the compensability of time individuals spend obtaining attending classes or studying to obtain certain job qualifications. But those cases have no application here. In the present case, Swift required Plaintiffs pass Swift-specific tests after the behind-the-wheel training program. Importantly, unlike the EMT certifications or OSHA safety course at issue in the other cases, Plaintiffs could not complete the tests before applying to work for Swift. Thus, the reasoning by the First and Sixth Circuits—that an employer should not be penalized for allowing an individual to work while obtaining a job qualification the employer could have imposed from the start—has no application here.

Instead of Swift's approach, the correct approach to the time Plaintiffs spent studying is based on 29 C.F.R. § 785.27. That regulation identifies when time spent on educational or training activities is compensable. *See, e.g.*, *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1010 (N.D. Cal. 2010) (noting § 785.27 determines "whether the training time should be counted as working time"). The regulation provides,

> Attendance at lectures, meetings, training programs and similar activities need not be counted as working time if the following four criteria are met:
>
> (a) Attendance is outside of the employee's regular working hours;
>
> (b) Attendance is in fact voluntary;
>
> (c) The course, lecture, or meeting is not directly related to the employee's job; and
>
> (d) The employee does not perform any productive work during such attendance.

29 C.F.R. § 785.27. The language of the regulation is not a perfect fit for a situation involving studying instead of attendance at a meeting or training program. But in 2009 the

DOL issued an opinion letter, applying this regulation to a situation where employees attended training programs but were told they had to "read and/or study selected material and be prepared to discuss [that] material during the next class." 2009 WL 649017, at *1. The DOL concluded "the time spent outside the classroom and after normal work hours completing required assignments, such as the required reading and studying of materials . . . is compensable hours worked." *Id.*

The parties have not addressed the DOL opinion letter. If that opinion letter is entitled to *Auer* deference, Plaintiffs may be entitled to judgment as a matter of law regarding studying time. For present purposes, however, the only issue is whether Swift is entitled to summary judgment regarding studying time.[19] Swift is not.

## 2. Compensation for Interruptions

Swift seeks summary judgment that Plaintiffs are not entitled to compensation for any time Plaintiffs were logged as "sleeper berth" but were called upon to perform work tasks. Swift believes the DOT regulations required Plaintiffs accurately record their time and Swift was entitled to rely on the manner in which Plaintiffs did so. Thus, Swift claims it cannot be liable for merely following the DOT-mandated time logs generated by Plaintiffs. Swift invokes a case from 1981 involving how much an employer must know before it can be liable for violating the FLSA.

In *Forrester v. Roth's I. G. A. Foodliner, Inc.*, the Ninth Circuit addressed an employer's possible liability for not paying an employee overtime. 646 F.2d 413, 414 (9th Cir. 1981). That employee never included the overtime hours on his timesheet nor did he "mention any unpaid overtime work to any store official prior to" suing. *Id.* The Ninth Circuit concluded the employer could not be liable for unpaid overtime because there was no evidence the employer "knew or should have known" the employee was working overtime. *Id.* Under the FLSA, an employer will not be liable if "the acts of an employee prevent an employer from acquiring knowledge" regarding the amount of work being

---

[19] Plaintiffs' opposition to Swift's motion for summary judgment on this issue seeks "summary adjudication" in Plaintiffs' favor. (Doc. 192 at 26). Seeking summary judgment in an opposition brief is improper.

performed.  *Id.*  The Ninth Circuit noted, however, that an employer could not "escape responsibility by negligently maintaining records . . . or by deliberately turning its back on a situation."  *Id.*

Courts have struggled with the proper application of *Forrester* in light of regulations that allow for employer liability based on actual or constructive knowledge of FLSA violations.  *See, e.g.*, *Lillehagen v. Alorica, Inc.*, No. SACV 13-0092-DOC, 2014 WL 6989230 (C.D. Cal. Dec. 10, 2014).  The best reading of *Forrester* and the governing regulations is that *Forrester* merely imposed a requirement that an employer have some reason to know uncompensated work was being performed.  *Id.* at 19.  "Thus, employers who have some reason to believe that the employees are working without compensation must take action to ensure that employees are being properly compensated.  The employer cannot 'sit back' and assume that employees will bring each unaccounted-for hour to its attention, even if the employer has a general policy that employees should report all the hours they work."  *Id. Cf. Campbell v. City of Los Angeles*, 903 F.3d 1090, 1102 (9th Cir. 2018) (noting FLSA case was premised on unwritten policy "discouraging the reporting of overtime" but acknowledging plaintiffs had "official obligation to report overtime accurately").

At present, there are disputes of fact whether Swift either knew or should have known that Plaintiffs were performing work while logged as "sleeper berth."  Given the extreme amounts of time Plaintiffs logged as "sleeper berth," it is possible Swift should have known Plaintiffs were performing work during some of those times.  For example, Plaintiffs were required to assist their mentors when the truck arrived at its destination. Some plaintiffs recount having to exit the sleeper berth to accompany their mentors into an office to complete paperwork.  If Swift was aware of when those deliveries were being made, yet knew Plaintiffs were logging that time as "sleeper berth," it is possible Swift either knew or should have known that the plaintiffs were not being properly compensated. That level of knowledge would be enough, notwithstanding Plaintiffs' alleged failure to keep accurate logs.  *See Small v. Univ. Med. Ctr.*, No. 2:13-CV-0298-APG-PAL, 2018 WL

3795238, at *51 (D. Nev. Aug. 9, 2018) (noting an "employee's failure to notify an employer of uncompensated time only becomes an issue if it is established that the employer had no knowledge or reason to know the employee was working and not being compensated"). According, Swift is not entitled to summary judgment on this theory.

### 3. Compensation for Breaks of 5 to 20 Minutes

A final dispute involves Plaintiffs' theory that they were not compensated for short breaks of between 5 to 20 minutes. (Doc. 159 at 33). Plaintiffs' motion for summary judgment contains only one line of argument on this point. Swift argues this issue was not raised earlier in the case and Swift had no meaningful notice that Plaintiffs were seeking to recover for uncompensated breaks. Determining whether the theory was properly raised requires looking at Plaintiffs' earlier filings in detail.

The complaint alleged Swift failed "to compensate its hourly, non-exempt trainee truck drivers . . . for work Swift suffers and permits them to perform." (Doc. 1 at 1). The complaint does not contain any references to uncompensated short breaks. Instead, the complaint focuses on Swift's failure to compensate Plaintiffs "for time spent 'sleeping' in excess of 8 hours per day." (Doc. 1 at 2). The parties' "Joint Proposed Case Management Plan" was similar. In that document, the parties agreed the general issue was alleged "uncompensated, off-the-clock work," and in particular the amount of time Plaintiffs spent in the sleeper berths. (Doc. 31 at 3). The Court discussed some aspects of the case with the parties at the Rule 16 Conference but there was no mention of short breaks.

The first meaningful identification of the exact claims at issue came when Plaintiffs filed their motion for conditional certification. That motion contained a bullet-point list identifying the claims Plaintiffs were pursuing. That list alleged Swift had not compensated Plaintiffs for 1) time spent riding in the passenger seat; 2) time in excess of eight hours spent in the sleeper berth; 3) time spent in the sleeper berth when Plaintiffs were not able to get at least 5 hours of uninterrupted sleep; 4) time spent in the sleeper berth despite Plaintiffs having no agreement with Swift that such time would not be compensated; 5) time spent performing productive work, "including but not limited to

studying" while logged as "sleeper berth" or "off duty"; and 6) time spent at the first day of orientation. (Doc. 60 at 10). That motion did not reference uncompensated short breaks. The reply in support of the motion reiterated that "the policies challenged by Plaintiff[s]" were the ones identified in the motion. (Doc. 67 at 10-11). The Court's Order granting conditional certification identified the claims Plaintiffs were making with no mention of uncompensated short breaks. (Doc. 103 at 3-4).

On August 10, 2018, Plaintiffs filed their motion for summary judgment. (Doc. 159). That motion stated Plaintiffs were seeking to hold Swift liable for not paying Plaintiffs "for time logged . . . as 'off duty' during rest breaks of 5-20 minutes." (Doc. 159 at 2). Swift's opposition to the motion claimed it had never been aware that Plaintiffs were asserting such a theory. Swift argued it had no "opportunity to conduct discovery as to" that theory. (Doc. 177 at 8). Swift also filed a motion pursuant to Federal Rule of Civil Procedure 56(d), requesting time "to conduct relevant discovery" if the Court allowed Plaintiffs to assert the short breaks theory. (Doc. 190). Swift's arguments prompted Plaintiffs to explain they were not asserting a separate claim based on uncompensated short breaks. Rather, Plaintiffs stated the short breaks were "merely a small component" of the overall minimum wage claim. (Doc. 198 at 18). Moreover, Plaintiffs argued the short breaks theory was disclosed in connection with their expert's report.[20] (Doc. 159-3 at 235).

If Plaintiffs wished to recover for uncompensated short breaks, they had to "put [Swift] on notice" that the short breaks were at issue. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000). That required Plaintiffs either identify the short breaks theory in the complaint or "make known during discovery their intention to pursue recovery on" that theory. *Id.* Here, the complaint contained no indication that short breaks were at issue. Plaintiffs' subsequent filings failed to identify Swift's policy regarding short breaks as amongst "the policies" Plaintiffs were challenging. (Doc. 67 at 10-11). Plaintiffs point to their expert report as identifying the uncompensated short breaks as one of "seven

---

[20] That expert report identified the uncompensated short breaks as resulting in a total of $318 additional unpaid wages due. (Doc. 159-3 at 235). Given that amount, it is unclear why the parties are expending resources in litigating this issue.

different scenarios" the expert addressed. (Doc. 159-3 at 235). But the expert's statement, standing alone, was not sufficient to put Swift on notice. In light of the consistent failure to identity uncompensated short breaks as at issue, it was not reasonable for Plaintiffs to believe they could place Swift on notice by way of a few lines in their expert's report. The portion of Plaintiffs' motion regarding short breaks will be denied and Plaintiffs will not be allowed to pursue compensation for uncompensated short breaks in this case.

## III.    Summary and Future Proceedings

Plaintiffs are entitled to compensation for all hours in excess of eight in which they were logged as "sleeper berth." Plaintiffs are not, however, entitled to seek compensation for short breaks. These conclusions leave an unknown number of remaining disputes. Based on the discussion during oral argument, two of the remaining disputes may be susceptible to summary judgment based on additional briefing. First, Plaintiffs believe the undisputed facts will establish they are entitled to compensation for the first day of orientation. And second, Plaintiffs believe the undisputed facts will establish they are entitled to compensation for all time spent studying. Assuming these are purely legal issues and Plaintiffs continue to believe a motion for summary judgment is appropriate, Plaintiffs will be required to file another motion for summary judgment addressing these two issues.

Finally, the parties will be required to confer and submit a joint statement listing the remaining issues and how they propose resolving those issues. In doing so, the parties should explain which issues are susceptible to collective treatment and which are not. *Cf. Campbell v. City of Los Angeles*, 903 F.3d 1090, 1116 (9th Cir. 2018) (noting "individualized damages calculations [are not] inherently inconsistent with a collective action"). For those issues, that are not susceptible to collective treatment, the parties should set forth their proposals for resolving those issues. In particular, the parties should address how each plaintiff's damages will be determined.

Accordingly,

**IT IS ORDERED** the Motion for Summary Judgment (Doc. 157) and Motion for Extension of Time (Doc. 190) are **DENIED**.

**IT IS FURTHER ORDERED** the Motion for Summary Judgment (Doc. 159) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** no later than **January 18, 2019**, if Plaintiffs believe there are no genuine disputes of material fact regarding the first day of orientation and time spent studying, Plaintiffs shall file a motion for summary judgment addressing those two issues. The response and reply shall be submitted as required by Local Rule 56.1.

**IT IS FURTHER ORDERED** no later than **February 1, 2019**, the parties shall submit a joint statement addressing the other issues remaining in this suit.

Dated this 28th day of December, 2018.

Honorable Roslyn O. Silver
Senior United States District Judge