**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Pamela Julian, | No. CV-16-00576-PHX-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| Swift Transportation Company Incorporated, et al., | |
| Defendants. | |

Plaintiffs believe they should have been paid for attending the first day of a three-day orientation to become drivers for Swift Transportation Co. of Arizona, LLC. Plaintiffs also believe they should have been paid for the time they spent studying during their behind-the-wheel training period. There are genuine disputes of material fact whether Swift should have paid Plaintiffs for the first day of orientation but Plaintiffs are entitled to summary judgment that the time they spent studying should have been compensated.

## BACKGROUND

Individuals wishing to work as drivers for Swift submitted applications online. If Swift "approved" an application, it contacted the individual and told him to report to a Swift terminal for a three-day orientation. Swift paid for the individual's travel to the terminal and paid for the individual's hotel room during the orientation. When telling an individual where to report, Swift also told him to bring extra clothing and "[b]e prepared to leave from orientation for up to 6 weeks for training with mentor." Swift warned the individuals attending the orientation that they might be "terminated and sent home

immediately" if they did not comply with all of Swift's policies. Swift promised to pay some individuals for all three days but did not make this promise to everyone. Thus, while some individuals arrived at the orientation expecting to be paid for all three days, others arrived expecting they would be paid only for the second and third days.

The parties disagree on what occurred during the first day of orientation. According to Swift, "most" of the first day was "spent on drug tests, driving tests, and medical exams." Those tests were necessary to ensure the individuals were legally qualified to work as drivers. (Doc. 216 at 12). Plaintiffs agree some time was spent on those tasks but assert the majority of the first day was spent on "Swift-specific" information, such as Swift's "Expectations & Code of Conduct," the meaning of Swift's motto, and the role drivers play in accomplishing Swift's goals. (Doc. 213 at 11). There are genuine disagreements about what occurred on the first day but, viewed in the light most favorable to Swift, a reasonable jury could conclude the first day was primarily focused on ensuring the individuals were qualified to work as drivers.

The record does not establish whether Swift promised individuals long-term employment prior to the first day of orientation. In support of their view that individuals attended orientation believing it was the first stage of long-term employment, Plaintiffs point to Swift's communications with the individuals before they arrived at orientation. Those communications included a warning that non-compliance with Swift's policies might lead to "termination," seemingly indicating the individuals had already been hired.[1] In addition, some individuals attending the first day had recently completed the "Swift Academy" to obtain their commercial driver's license. Those individuals were expecting to have the tuition for that program taken out of their subsequent paychecks. (Doc. 207 at 12). Thus, those individuals likely expected the orientation was simply the start of permanent employment. The parties have not, however, identified the formal promises, if any, made to those individuals nor have the parties identified the percentage of individuals

---

[1] Swift now argues its communications used "termination" to refer to "termination from the orientation rather than from employment." (Doc. 216 at 14). Swift does not cite any evidence supporting this interpretation.

- 2 -

1 attending the first day of orientation who came from the Swift Academy.

2 In support of its view that the individuals attended orientation without expectation of long-term employment Swift points to a communication where Swift informed individuals prior to the first day that it held "new applicants" to the same standards it held its employees. Swift cites that reference to "applicants" as evidence it did not view the attendees at the first day as already employed by Swift. Swift also points to evidence that "approximately 25-30% of those who start Swift's orientation are not hired." (Doc. 216-4 at 2). Swift admits it "hired" the individuals as of the second day of orientation. Therefore, up to 30% of the individuals who reported for the first day of orientation were immediately disqualified and did not attend the second day of orientation. The fact that 30% of the individuals did not progress to the second day supports Swift's position that the first day was a continuation of the application process.

Once Plaintiffs completed their three-day orientation, they began their behind-the-wheel training with a mentor. During that training, Plaintiffs were expected to study materials provided by Swift to prepare for three Swift-specific tests. Those tests were administered at the end of the behind-the-wheel training and Plaintiffs had to obtain passing scores to remain working for Swift. It is undisputed that Swift instructed Plaintiffs "that during their time on the road, whenever legally possible, they must be on duty, not driving and engaged in the learning process; actively studying." (Doc. 216-5 at 16). Swift explains its intent was for Plaintiffs to study only during "paid 'on duty' time." (Doc. 216-5 at 17). Swift states it never instructed Plaintiffs to study while they were logged as "sleeper berth." There is admissible evidence, however, that Plaintiffs studied while logged as "sleeper berth." (Doc. 159-2 at 110-111). And there is admissible evidence that Plaintiffs' mentors knew such studying was taking place. (Doc. 159-2 at 110-111). Accordingly, based on the parties' briefing, the present disagreement is not whether Plaintiffs studied while logged as "sleeper berth," but whether Plaintiff should have been paid for that time.

## ANALYSIS

Plaintiffs believe they should have been paid for the first day of orientation because,

in their view, the first day of orientation was devoted almost entirely to Swift-specific information. Plaintiffs also argue they should have been paid for the time they spent studying while logged as "sleeper berth" because the studying was a necessary part of their job and Swift either knew or should have known that they were studying while logged as "sleeper berth." Swift believes both of these issues should be resolved via a trial.

### I. There are Disputes of Fact When Plaintiffs Became Employees

Determining when Plaintiffs became "employees"—and thereby entitled to be paid under the Fair Labor Standards Act ("FLSA")—requires an evaluation of the "economic reality" of the parties' relationship as of the first day of orientation. *Hale v. State of Ariz.*, 993 F.2d 1387, 1393 (9th Cir. 1993). As explained in the prior Order, the Ninth Circuit has used different multi-factor tests for determining employment status. (Doc. 207 at 10). But an unpublished Ninth Circuit decision addressing a factual scenario very similar to the present one appears to be the best guidance available.

In *Nance v. May Trucking Company*, 685 Fed. Appx. 602 (9th Cir. 2017), the Ninth Circuit addressed whether truck drivers should have been compensated for attending "a mandatory, three-day, orientation program." *Id.* at 604. In the panel's view, the crucial facts for resolving that issue were that the drivers attended "the three-day orientation without expectation of pay" and the drivers were "not guaranteed work upon completion of the program." *Id.* Based on those facts, the orientation was the trucking company's "method of ascertaining its drivers' training and abilities." *Id.* Thus, the "orientation program [was] a job application process" and the drivers were not entitled to pay. *Id.* at 604-05.

Focusing on the same two factors of "expectation of pay" and "job prospects upon completion," there are genuine disputes of fact regarding the FLSA's application to the first day of orientation. Regarding Plaintiffs' "expectation of pay," some Plaintiffs were promised pay but others were not. In fact, some Plaintiffs attended the first day knowing they would not be paid. (Doc. 216-2 at 6). The present record does not explain what attendees generally believed regarding their entitlement to pay. In other words, the present

- 4 -

record does not disclose whether each side has cherry-picked individuals who were promised pay or individuals who knew they would not be paid. None of the individuals have been examined and cross-examined in front of a fact-finder regarding their expectations. And because there are more than 10,000 Plaintiffs, reliance on a cold record to determine the veracity of a few individuals' expectations is especially inappropriate.

As for "job prospects upon completion," the evidence viewed in the light most favorable to Swift shows there are also disputes of material fact regarding those expectations. As explored in the Court's prior Order, some of Swift's communications with Plaintiffs can be read as indicating that attendance at the orientation was merely the first day of long-term employment. But those communications did not explicitly promise long-term employment and a reasonable jury might conclude those communications did not implicitly promise such employment. In addition, up to 30% of the individuals who attended the first day of orientation were immediately dismissed. If accurate, that supports Swift view that the first day was primarily aimed at determining individuals' eligibility to work and was not merely the first day of expected long-term employment.

Viewed in the light most favorable to Swift, there are genuine disputes of fact regarding the two factors the court of appeals invoked in *Nance*. Beyond those two factors, there are also disputes of fact regarding other aspects of the first day that prevent summary judgment. For example, there are disputes of fact regarding what happened on the first day. Swift had a model schedule for the first day but the actual contents of that day appears to have varied from terminal to terminal. (Doc. 216-5 at 11). Some Plaintiffs described the first day of orientation as involving no activities beyond basic qualification tests.[2] In contrast, other Plaintiffs testified the first day largely tracked Swift's model schedule.[3] A

---

[2] As described by one Plaintiff, the first day consisted of "nothing" beyond sitting around and taking "a drug test and -- and a physical." (Doc. 216-2 at 20). Another Plaintiff testified similarly that the first day only involved completing "tax papers and . . . documents," along with taking a drug test and physical. (Doc. 216-2 at 11).

[3] One Plaintiff described the first day as the attendees being placed "into a room and we basically stayed in that room all day while we had a drug testing, DOT physical, and then basically watched some PowerPoints, [and] watched some videos." (Doc. 216-2 at 81). Another Plaintiff described the first day as consisting of attendees rotating between computers, drug testing, and watching "insanely boring videos." Those videos were "how the company got started and just a little bit of background on SWIFT . . . the owner of

fact-finder must determine what *actually* occurred on the first day and whether the "economic reality" of that day is that of employee-employer or applicant-employer.

The uncertainty regarding what occurred on the first day, together with the uncertainty regarding Plaintiffs' expectations regarding pay and long-term employment, means the Court cannot resolve the compensability of the first day as a matter of law. This aspect of Plaintiffs' claim must go to trial.

## II. Studying Was Compensable

Plaintiffs believe they should have been paid for the time they were logged as "sleeper berth" but were studying in preparation for the Swift-specific final tests. It is undisputed Swift, and Plaintiffs' mentors, stressed to Plaintiffs the importance of studying and preparing for the final tests. (Doc. 216-2 at 174). It is also undisputed some Plaintiffs studied during the behind-the-wheel training, including while they were logged as "sleeper berth." Swift did not require Plaintiffs spend a specific amount of time studying but neither did Swift prohibit Plaintiffs from studying while they were logged as "sleeper berth."

In the previous Order the Court concluded the correct approach to Plaintiffs' studying time was to evaluate the studying under 29 C.F.R. § 785.27.[4] (Doc. 207 at 30).

---

SWIFT and what his dream was kind of thing. (Doc. 216-2 at 108).

[4] In the previous summary judgment proceedings, Swift argued it did not need to compensate Plaintiffs for studying because "Swift conditioned its offer of employment to [Plaintiffs] on their successfully completing the training program, including passing all the final tests." (Doc. 207 at 28). Swift cited cases from the First and Sixth Circuits that held employers could require new hires obtain EMT certifications or attend an OSHA safety course to remain employed. (Doc. 207 at 29). The Court concluded those cases were not applicable because "unlike the EMT certifications or OSHA safety course . . . Plaintiffs could not complete the tests before applying to work for Swift." (Doc. 207 at 30). Swift now claims the Court misunderstood the facts and it only requires individuals take the tests if they have "not successfully completed a driver training program at another motor carrier or [have] less than three months experience behind the wheel." (Doc. 216 at 16). In other words, Swift argues the "precondition[s]" in the other cases are "indistinguishable from Swift's precondition." (Doc. 216 at 16). But the preconditions in the other cases remain ones involving independent certifications while Swift's precondition is either experience at other carriers or passage of Swift's tests. Extending the reasoning by the First and Sixth circuits to general "experience" or employer-specific testing would create an inappropriately broad exemption to general FLSA requirements. Under Swift's reasoning, an employer could argue *all* studying in advance of employer-specific testing is non-compensable because it is merely an alternative to a set amount of experience. Neither the First nor Sixth circuit cases reach this far and Swift has not offered any other authority supporting such an evasion of the normal requirement that employer-specific studying be compensated.

- 6 -

That regulation provides:

> Attendance at lectures, meetings, training programs and similar activities need not be counted as working time if the following four criteria are met:
>
> (a) Attendance is outside of the employee's regular working hours;
>
> (b) Attendance is in fact voluntary;
>
> (c) The course, lecture, or meeting is not directly related to the employee's job; and
>
> (d) The employee does not perform any productive work during such attendance.

In 2009, the Department of Labor issued an Opinion Letter addressing whether "time spent outside normal working hours" studying for employer-required "training programs, seminars, and classes is compensable hours worked under the Fair Labor Standards Act." 2009 WL 649017. Citing many previous Opinion Letters, the 2009 letter concluded "[t]he particular circumstances determine whether time spent studying for the training programs outside the classroom after normal work hours is compensable." In general, however, studying "not required by the employer" is not compensable. For example, if "employees voluntarily do extra work at home on their own to bolster their ability," the time spent on that extra work is not compensable. But if extra work at home "is a requirement of a compensable training class," employees must be paid for that extra work. *Id.* Importantly, an employer cannot "sit back and accept the benefits" of studying off-the-clock. *Id.* "The mere promulgation of a rule against [studying while off-the-clock] is not enough. Management has the power to enforce the rule and must make every effort to do so." *Id.* (quoting 29 C.F.R. § 785.13).

In the present case, even viewing the facts in the light most favorable to Swift, Plaintiffs studied while logged as "sleeper berth" and Swift (through Plaintiffs' mentors) knew of that work. Swift attempts to avoid liability by claiming it had "a compliant study-time policy of requiring studying to be logged as compensable on-duty time." (Doc. 216 at 21); (Doc. 216-2 at 166). But even accepting that as true, Swift has not provided any

explanation why it was permissible to "sit back and accept the benefits" of Plaintiffs' uncompensated studying. 29 C.F.R. § 785.13. Notwithstanding a formal policy, Swift had an obligation to prohibit uncompensated work. Swift has not pointed to any evidence of its efforts to do so. Plaintiffs are entitled to summary judgment that time spent studying while logged as "sleeper berth" was compensable.

This ruling will likely have very minimal impact on Swift's liability. Under the Court's previous ruling that much of the time logged as "sleeper berth" should have been compensated, Plaintiffs will be required to establish they studied during the time they were correctly logged as "sleeper berth." That is, they were studying during the permissible eight-hour period.

### III. Remaining Course of this Litigation

The parties have submitted a joint statement outlining the remaining issues in this case. Before addressing the parties' submission, it is important to explore Swift's behavior in effectively consenting to the collective trial of some issues.

In the Case Management Report submitted very early in this case, Plaintiffs explained they planned to seek conditional certification of this case as a collective action. (Doc. 31 at 4). Swift responded that it planned on "opposing conditional certification and if unsuccessful, later moving to decertify the class." (Doc. 31 at 13). Based on the parties' representations, the Court issued a Rule 16 Scheduling Order that included case management deadlines, including deadlines for Plaintiffs to seek conditional certification and for any motion to decertify. (Doc. 36 at 4). Swift's deadline for filing a motion to decertify was generous in that it was set for three months after the close of discovery.

Plaintiffs filed their motion for conditional certification by the Court-imposed deadline. (Doc. 60). The Court granted that motion in August 2017. (Doc. 103). Because the certification changed the contours of the litigation, the Court extended most of the case management deadlines, including the deadlines for completing all discovery and for Swift's motion to decertify. (Doc. 121). After the extension, Swift's motion to decertify was due no later than September 14, 2018. (Doc. 121 at 4).

In August 2018, the parties filed cross-motions for summary judgment. On August 28, 2018, Swift moved to extend the deadline for its motion to decertify. (Doc. 171). That motion argued Swift could not "meaningfully brief whether decertification [would be] appropriate" until the Court resolved the cross-motions for summary judgment. After hearing from Plaintiffs, the Court denied Swift's request. The Court pointed out that Swift had proposed the initial schedule and had not previously identified any disagreement with it. More importantly, the Court observed Swift's own motion for summary judgment argued all Plaintiffs were similarly situated in that they had been subject to certain uniform policies. Given that, the Court noted there was no reason to believe a motion to decertify could succeed and it would be inappropriate to extend the deadline for Swift to file a baseless motion. (Doc. 176 at 2). The Court's denial of Swift's request to extend the deadline was made prior to the September 14, 2018 deadline. Accordingly, if Swift still thought decertification was appropriate, it could have filed a motion to decertify. Swift chose not to do so.

Despite this history, Swift now states it plans on filing a motion to decertify at some unidentified time in the future. Swift has not explained why it did not file its motion by the applicable deadline and it appears Swift has long known the grounds on which it now claims it will seek decertification. A motion to decertify would likely delay final resolution of this litigation and, given Swift's own arguments regarding certain uniform policies, there is very little chance decertification would be appropriate regarding all issues. That being said, it appears that some aspects of Plaintiffs' damages cannot be resolved on a collective basis. That does not mean, however, that formal decertification is necessary.

Returning to the parties' joint statement regarding the issues that remain pending, the parties seem to agree the Court must resolve the following:

> 1. The amount of damages owed to each Plaintiff for the time they were logged as "sleeper berth" in excess of 8 hours per day.
>
> 2. The amount of damages owed to each Plaintiff for the time spent studying while logged as "sleeper berth."

- 9 -

     3.  Whether the first day of orientation was compensable.

     4.  Whether Plaintiffs were able to get five uninterrupted hours of sleep and the adequacy of the sleeper berth.

     5.  Whether Swift's compensation practices were adopted in good faith.

The Court will address each of these issues.

### 1. Determining Sleeper Berth Damages

Having ruled Plaintiffs are entitled to pay for sleeper berth hours in excess of eight, the only remaining issue is the amount of damages owed to each Plaintiff. Plaintiffs retained David Breshears, a forensic account, to present expert evidence regarding the proper calculation of these damages. Breshears calculated the damages "on an employee-by-employee and workweek-by-workweek basis." (Doc. 215 at 4). Swift now claims it "disputes that Mr. Breshears' calculation is an accurate basis for proving minimum wage damages, and reserves the right to challenge Mr. Breshears' testimony and opinion under *Daubert* or otherwise." (Doc. 215 at 5). Swift has not, however, identified any dispute regarding damages that must proceed to trial. That is, Swift seems to believe Breshears' calculations are inaccurate but it has not offered any explanation for that belief.

Plaintiffs will be directed to file a motion seeking the amount of damages for the excess time Plaintiffs were logged as "sleeper berth." Swift can counter with whatever arguments they believe appropriate. Assuming Swift disputes Plaintiffs' assessment of damages, Plaintiffs can file a reply.

### 2. Studying Time Damages

Plaintiffs are entitled to damages for time they spent studying while logged as "sleeper berth." Given that Plaintiffs will already be compensated for any hours in excess of eight in which they were logged as "sleeper berth," it is unclear whether Plaintiffs will be entitled to any additional compensation. But assuming some additional compensation is owed, Plaintiffs will need to prove the amount of time each individual studied materials during the eight hours he was appropriately logged as "sleeper berth." Plaintiffs will be

required to file a statement outlining how they propose proving the amount of liability for each class member. Swift will be allowed to respond and Plaintiffs reply.

### 3. First Day of Orientation

As set out earlier, the compensability of the first day of orientation must proceed to trial. At present, this issue appears to be one that can be proven on a collective basis.

### 4. Uninterrupted Sleep and Adequacy of Sleeper Berth

Whether individuals were able to get five hours of uninterrupted sleep seems likely to require individualized inquiries. Plaintiffs will be required to file a statement outlining how they propose proving liability for each class member under this theory.

The adequacy of the sleeper-berth appears to present an issue of law, not of fact. Plaintiffs have not focused on this issue during this case and it is unclear why they did not move for summary judgment on this issue. Plaintiffs will be required to file a statement outlining how they plan on proving the inadequacy of the sleeper berth facilities.

### 5. Good Faith of Compensation Policies

Because Swift had uniform compensation policies applicable to all Plaintiffs, Swift's good faith in adopting those policies can be resolved in a single proceeding. Therefore, this issue will be resolved at trial along with any other issue that can be resolved on a collective basis.

### IV. Request to Extend Case Management Deadlines

On April 26, 2019, the parties filed a "Joint Stipulation to Request Re-Setting Pretrial Schedule." (Doc. 219). According to that document, Swift plans on filing a motion pursuant to 28 U.S.C § 1292(b) to certify for interlocutory appeal the Court's order "holding sleeper berth time to be compensable." Thus, the parties requested the Court impose deadlines for filing and briefing that motion. The parties also requested the Court reset the deadlines for all pretrial submissions.

The parties' proposal for briefing Swift's motion for interlocutory appeal will be granted but the case will not be stayed pending submission of that briefing. Thus, Plaintiffs will be required to file their motion regarding sleeper berth damages as well as their

statement regarding studying time, uninterrupted sleep, and adequacy of the sleeper berth. The deadline for pretrial submissions will be vacated and reset in a later order once the Court resolves the appropriate scope of the trial.

Accordingly,

**IT IS ORDERED** the Motion for Summary Judgment (Doc. 213) is **DENIED IN PART and GRANTED IN PART**.

**IT IS FURTHER ORDERED** the Stipulation to Request Re-Setting Pretrial Schedule (Doc. 219) is **DENIED**.

**IT IS FURTHER ORDERED** the deadline for submission of pretrial documents is **VACATED** to be reset by later order.

**IT IS FURTHER ORDERED** no later than **June 10, 2019**, Swift shall file its motion regarding interlocutory appeal. Plaintiffs shall file their opposition no later than **June 17, 2019**, and Swift shall file its reply no later than **June 24, 2019**.

**IT IS FURTHER ORDERED** no later than **June 10, 2019**, Plaintiffs shall file a motion requesting damages be awarded based on time in the sleeper berth in excess of eight hours. The response and reply shall be filed in compliance with the local rules for motion practice.

**IT IS FURTHER ORDERED** no later than **June 10, 2019**, Plaintiffs shall file a statement of no more than twenty pages addressing how they plan to prove the studying time damages as well as the amount of uninterrupted sleep and the adequacy of the sleeper berth facilities. The response and reply shall be filed in compliance with the local rules for motion practice.

Dated this 30th day of May, 2019.

Honorable Roslyn O. Silver
Senior United States District Judge