James A. Bloom (AZ SBN 026643)
Joshua Konecky (CA SBN 182897)
*Admitted pro hac vice*
Nathan Piller (CA SBN 300569)
*Admitted pro hac vice*
SCHNEIDER WALLACE
COTTRELL KONECKY LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Tel: (415) 421-7100
Fax: (415) 421-7105
jkonecky@schneiderwallace.com
npiller@schneiderwallace.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Pamela Julian, on her own behalf, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>Swift Transportation, Inc. and Swift Transportation Co. of Arizona, LLC.,<br><br>Defendants | Case No.: 2:16-CV-00576-ROS<br><br>**PLAINTIFFS' RESPONSE RE SWIFT'S SHORT LIST OF CASES**<br><br>Judge: The Honorable Roslyn O. Silver |

On January 15, 2020, Defendant Swift filed a document captioned "Short List of Cases Re: FLSA Final Certification" (Dkt. 251). Plaintiffs understand from the Court's comments at the status conference on January 14, 2020, that they can respond to this filing by Swift. Plaintiffs respectfully present their response below:

## PLAINTIFFS' RESPONSE

During the status conference on January 14, 2020, Swift responded to the Court's inquires, not by grappling with the common evidence, but rather by arguing that the collective action should not proceed to trial because Plaintiffs had not yet moved for "final certification." The next day, Swift filed a document containing various case citations that purportedly support its novel proposition that plaintiffs must move for final certification in an FLSA collective action. As discussed below, there are several reasons why Swift is mistaken.

**First**, under Ninth Circuit authority, there is simply no "final certification" requirement. Rather, a collective action may proceed to trial so long as Plaintiffs are "similarly situated" within the meaning of section 216(b) of the FLSA. Here, Plaintiffs have established that they are similarly situated on multiple occasions, both before and after this Court's first order granting conditional certification.

**Second**, Swift's request to decertify the collective action at this late stage is untimely under the operative scheduling order, which set a deadline for motions to decertify that passed over a year ago.

**Third**, Swift waived its right to challenge the propriety of the collective action by failing to move for decertification before the deadline.

**Fourth**, Swift in fact made an untimely motion for decertification that the Court nonetheless considered, and then denied. (Dkt. 222 )

**Fifth**, Swift's reliance on *Rodriguez v. SGLC, Inc.*, 2012 U.S. Dist. LEXIS 163710 (E.D. Cal. Nov. 15, 2012), is misplaced because it is contradicted by later Ninth Circuit precedent. *Rodriguez* also is easily distinguished. Unlike in that case, Plaintiffs here have presented substantial evidence demonstrating that they meet the "similarly situated" standard, and in fact the Court has made collective-wide rulings based on the common evidence.

**Sixth**, the remaining issues for trial are well suited for collective adjudication because they rise and fall with Swift's common policies. Indeed, the Court has already determined that the issues remaining for trial can proceed on a collective basis, after considering full briefing from the parties on this very issue.

Plaintiffs address these reasons in more detail below

## I. Swift's request for decertification is untimely under the Court's Scheduling Order

At the outset of this case, the parties proposed a schedule pursuant to Rule 16(b), requiring that "any motion to decertify… be filed no later than 60 days following the close of discovery." *See* Dkt. 32, at 4. Following a scheduling conference, the Court set a schedule requiring dispositive motions be filed by December 8, 2017, and any motion to decertify be filed by January 8, 2018. *See* Dkt. 36 at 4. On August 30, 2017, the Court granted Plaintiffs' motion for conditional certification (Dkt. 103), after which more than 9,500 trainees opted-in to this case to recover the minimum wages denied to them. The Court then accommodated a new scheduling proposal from the parties and extended various deadlines, including defendant's deadline to file any motion to decertify the collective to September 14, 2018. *See* Dkt. 121, at 4. As the Court later observed, "Swift's deadline for filing a motion to decertify was generous in that it was set for three months after the close of discovery." *See* Order, Dkt. 220, at 8.

On August 10, 2018, a month before the deadline to file a motion to decertify, Swift moved for summary judgment, seeking collective adjudication of the claims of more than 9,500 opt-in plaintiffs in one fell swoop, based on arguments that its uniform policies purportedly were lawful. *See* Dkt. 157. While the motion was pending, Swift requested an extension of its deadline to file the motion for decertification. *See* Dkt. 171. Swift contended that it would be more "efficient" to get a collective ruling on the merits before making its motion for decertification. *See id*. at 7. The Court declined Swift's request, reasoning that any "perceived inefficiency stems from the schedule [Swift] repeatedly proposed." *See* Dkt. 176 at 1-2. Afterwards, Swift chose not to move for decertification before the deadline.

Now, in a last-ditch effort to avoid a trial on whether its common policies that deny its employees minimum wage, Swift submits a short list of cases in what appears to be another untimely request for decertification—just a day after the trial schedule was set and the Court ordered the parties to begin preparing their pretrial submissions. Swift's "eleventh hour" request violates the Rule 16 scheduling order and should be rejected.

## II. Swift waived its right to oppose the propriety of certification by failing to move for decertification before the deadline

In all of the parties' multiple joint scheduling proposals and proposed amendments, and the Court's scheduling orders themselves, the procedural mechanism for challenging the propriety of certification consistently was designated as a motion for decertification. Not once did Swift suggest that there be any other vehicle for challenging the propriety of collective action certification—until now. But, the deadline for moving to decertify has long since passed.

Given Swift's failure to avail itself of the designated procedural mechanism for challenging certification, Swift has waived its arguments in opposition to the propriety of certification. *See, e.g., Teed v. JT Packard & Assocs., Inc.*, 2009 WL 667183, at *1 (W.D. Wis. Mar. 10, 2009) ("The [defendants'] failure to [submit a motion to decertify the FLSA class by the deadline for decertification] operates as a waiver.... In other words, ... defendants have waived their right to decertify the FLSA class."); *Smith v. Metro Sec., Inc.*, No. CV 18-953, 2019 WL 6701311, at *6 (E.D. La. Dec. 9, 2019) ("Even if they had included decertification in their [post-trial] motions, Defendants had likely already waived this issue by failing to move to decertify the collective action before trial. When this Court certified the class, the order specifically stated that the Court would 'revisit the issue *should Defendant* choose to file a motion to *decertify* following a discovery period.'"); *Serrano v. Republic Servs., Inc.*, 2017 WL 2531918, at *18 (S.D. Tex. June 12, 2017) ("The Court FINDS that Republic's motion to decertify the class, raised after Plaintiffs have rested their case, was not timely filed and the request was waived."); *Mygrant v. Gulf Coast Rest. Grp., Inc.*, 2019 U.S. Dist. LEXIS 161911, at *16 (S.D. Ala. Sep. 23, 2019)

("…the option to seek decertification is a right granted a defendant for its own protection and, like most such rights, it may be waived by the defendant…").

### III. The *Rodriguez* case is inapposite because Plaintiffs have carried their burden to demonstrate the propriety of certification

Swift cites *Rodriguez v. SGLC, Inc.*, 2012 U.S. Dist. LEXIS 163710 (E.D. Cal. Nov. 15, 2012), apparently to argue that the claims of more than 9,500 opt-in plaintiffs should be decertified and dismissed from this case, merely because Plaintiffs did not bring a formal motion for "final certification." As discussed below, *Rodriguez* is an outlier decision, not selected for publication in the Federal Supplement, and does not cite any law to support the proposition that the plaintiffs must make a motion for final certification for the Court to maintain a collective action. Rather, *Rodriguez* cites *Myers v. The Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010), which merely holds that a collective action "may be 'de-certified' if the record reveals that [the class members] are not [similarly situated]…" *Rodruguez*, 2012 U.S. Dist. LEXIS 163710, at *12. Ironically, *Myers* actually contradicts the notion that there is somehow a "final certification" requirement under the FLSA. *Myers*, 624 F.3d at 555. In *Myers*, the Second Circuit reasoned that "'certification' is neither necessary nor sufficient for the existence of a representative action under FLSA, but may be a useful 'case management' tool for district courts to employ in 'appropriate cases.'" *Id*. Below, Plaintiffs further discuss *Meyers* and the rich body of case law showing there is no requirement for the plaintiffs to make a motion for final certification to maintain a collective action.

In the meantime, it is noteworthy that Swift's *Rodriguez* case also is distinguishable on the facts. In *Rodriguez*, the plaintiffs "offered no evidence" to allow the court to assess the propriety of collective treatment after conditional certification. *Id*. at *12. In contrast, Plaintiffs here have provided extensive evidence after the close of discovery to demonstrate that they are "similarly situated." As the Court has observed on multiple occasions, the record continues to demonstrate the propriety of proceeding as a collective action. For example, on August 10, 2018, two months after the close of discovery, the parties submitted cross-motions for summary judgment. Both Plaintiffs and Swift sought a ruling the merits of Swift's uniform

policies that covered the entire collective. *See* Dkt. Nos. 157, 159. Plaintiffs submitted 36 exhibits, including deposition excerpts from Swift's own corporate designee witnesses, Swift's common policies, and testimony from several opt-in plaintiffs. *See* Dkt. Nos. 192-3 through 192-38. Then, on September 7, 2018, in its Order denying Swift's request for an extension of its deadline to file a motion for decertification, the Court reasoned that "the record now demonstrates that Defendants had a number of uniform policies regarding trainees. In light of those policies, there is no basis, at present, to believe a motion to decertify might succeed." *See* Order, Dkt. 176, at 2.

On December 28, 2018, the Court granted Plaintiffs' motion for summary judgment, holding that Swift could not deduct more than 8 hours of the trainees' pay per day for purported sleep time, based on the extensive common evidence submitted with the motion (including Swift's uniform policies). *See* Dkt. 207 (36-page order citing evidence). In its subsequent Order of May 30, 2018, the Court observed that "given Swift's own arguments regarding certain uniform policies, there is very little chance decertification would be appropriate regarding all issues." *See* Order, Dkt. 220, at 9. On December 27, 2019, the Court granted Plaintiffs' motion for damages attributable to sleep time in excess of 8 hours per day, again for the entire collective, based in part on Swift's standardized Department of Transportation log data. *See* Order, Dkt. 246.

The Court has not only found liability and damages for a substantial component of Plaintiffs' case on a collective basis, but it also has ruled that the issues left remaining after the summary judgment rulings are suitable for collective adjudication. By way of background, the Court's May 31, 2018 Order called for full briefing on how some of the remaining aspects of Plaintiffs' case could be tried on a collective basis. *See* Order, Dkt. 220, at 9, 12. Thereafter, Plaintiffs filed an 18-page statement regarding their trial plan for the remaining issues. *See* Statement, Dkt. 225. Swift filed 15 pages of briefing in opposition, *see* Dkt. 231, and Plaintiffs filed a reply brief. *See* Dkt. 233. In its Order regarding Plaintiffs' trial plan, the Court observed that "[t]he parties have long disagreed on whether this case could proceed to trial on a collective basis. The Court called for Plaintiffs to explain how certain issues would be tried

on a collective basis. Plaintiffs explained their plains." *See* Dkt. 246, at 10. The Court went on to hold that Plaintiffs' explanations were sufficient, and that the remaining collective action claims would proceed to trial. *See id.* at 11-12.

And, despite the Court's previous rulings denying Swift's requests to file an untimely motion for decertification, the Court in fact did take under submission and rule on a fully-briefed motion for decertification. *See* Defendant's Motion to Require Plaintiffs to Provide Trial Plan Re Orientation Pay Claim, Or, In the Alternative, to Decertify the Class with Respect to that Claim, Dkt. 222 (emphasis added). The Court denied Swift's motion on December 27, 2019. *See* Order, Dkt. 246, at 11-12. Thus, the Court has not only ruled on the propriety of a collective action trial for the remaining issues, but it also has ruled on, and denied, Swift's motion for decertification. Swift's suggestion that the propriety of certification still must be addressed is out of touch with the procedural history of this case.

### IV. There is no "final certification" requirement under the FLSA

Swift cites a list of cases, apparently for the proposition that the FLSA requires "final certification" before a collective action may proceed to trial. With the exception of *Rodriguez*, however, Swift's cases merely stand for the unremarkable proposition that the Court has ongoing discretion to decertify a collective action if the record no longer shows that the employees are similarly situated. Only *Rodriguez* contains dicta that "final certification" is necessary.

This dicta in *Rodriguez* is contradicted by recent Ninth Circuit precedent. In *Campbell v. City of L.A.*, 903 F.3d 1090, 1101-02 (9th Cir. 2018), the Ninth Circuit reasoned that while defendants may move for decertification at the close of discovery, there is no statutory requirement that collective actions be finally certified, as under Rule 23. *See id.* ("As noted, neither 'certification' nor 'decertification' appears in text of section 216(b). The terms have instead been adopted from Federal Rule of Civil Procedure 23, which governs class actions in federal court. The underlying assumption of that appropriation seems to be that collective and class actions, which to a degree resemble one another, must be handled in procedurally parallel ways. That assumption is unfounded… 'Decertification' is another appropriation — and

another misappropriation — from the Rule 23 context… the term implies that a district court has some threshold role in creating a collective action. But, once more, section 216(b) does not provide for any 'certification' process in the ordinary sense. Under section 216(b), workers have a 'right' to bring or join a collective action, and may create the collective action of their own accord by filing opt-in forms.")

Courts across the country have similarly held and/or reasoned that there is no "final certification" requirement under the FLSA. *See, e.g., Metro Sec., Inc.*, 2019 WL 6701311, at *7 ("…the FLSA does not require a strict two-step 'certification' process, but rather, requires only that the plaintiffs affirmatively provide consent (opt in), unlike under Rule 23 (opt out), and that they be 'similarly situated…' If a court, such as this one, does use the two-step process, the conditional certification *is* certification, and '[a] decertification decision would be a *revision* of the original order.') (emphasis in original); *Myers*, 624 F.3d at 555 (citing *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 174 (1989)) ("…while courts speak of 'certifying' a FLSA collective action, it is important to stress that the 'certification' we refer to here is only the district court's exercise of the discretionary power, upheld in *Hoffmann–La Roche,* to facilitate the sending of notice to potential class members… Thus 'certification' is neither necessary nor sufficient for the existence of a representative action under FLSA, but may be a useful 'case management' tool for district courts to employ in 'appropriate cases.'"); *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 536 (3d Cir. 2012) ("…the 'conditional certification' is not really a certification. It is actually 'the district court's exercise of [its] discretionary power… to facilitate the sending of notice to potential class members,' and 'is neither necessary nor sufficient for the existence of a representative action under [the] FLSA.'") (citations omitted); *Escobar v. Whiteside Const. Corp.*, 2008 WL 3915715, at *3 (N.D. Cal. Aug. 21, 2008) ("Certification is called 'conditional' during the first stage because the opposing party could always (successfully) move for decertification.").

**V.     The *Rodriguez* case is a flawed outlier that does not dictate a contrary result**

*Rodriguez*, which was not selected for publication in the Federal Supplement, and is accessible only via online repositories, presumes without analysis of the statute or applicable

case law, that FLSA plaintiffs are obligated to make a motion for "final certification" to carry their burden to establish that they are "similarly situated" under the FLSA, even where defendants fail to make a motion for decertification. *See Rodriguez*, 2012 U.S. Dist. LEXIS 163710, at *12. *Rodriguez* cites no authority for its novel proposition that the plaintiffs need to seek final certification to carry their burden.

On the contrary, the weight of authority shows that the onus is on the defendant to raise the issue on a motion for decertification. *See, e.g.*, *Malamphy v. Abundant Life Home Health Agency, Inc.*, 2017 U.S. Dist. LEXIS 107055, at *13 (M.D. Fla. May 4, 2017) ("…it is incumbent on the Defendants to file a motion for decertification… Given the Defendants' failure to file such a motion, the issue of class decertification is not properly before the Court."); *Leuthold v. Destination Am.*, 224 F.R.D. 462, 467-68 (N.D. Cal. 2004) ("…the party opposing class certification may move to decertify the class… the impetus for reaching the more stringent factual analysis is a motion to decertify the class filed by defendants. It would be unusual to reach the latter inquiry upon motion of the plaintiffs."); *Jarosz v. St. Mary Med. Ctr.*, 2014 U.S. Dist. LEXIS 133218, at *18 n.4 (E.D. Pa. Sep. 22, 2014) (observing that the defendant "did not cite any case law supporting the position that a plaintiff must move for final FLSA certification or risk waiver.").

*Rodriguez* also is inapposite because it appears to have reached its decision based on the lack of evidence in the record showing that the plaintiffs in that case were similarly situated. *See Rodriguez*, 2012 U.S. Dist. LEXIS 163710, at *12. Here, by contrast, and as discussed above, Plaintiffs have repeatedly presented robust evidence, after the close of discovery, that they are similarly situated. Moreover, insomuch as the *Rodriguez* decision did not conduct any analysis as to what evidence was or was not in the record, or what would need to be in the record for the plaintiffs to be similarly situated, it provides no guidance here. *See Rodriguez*, 2012 U.S. Dist. LEXIS 163710, at *12.

The *Rodriguez* decision also does not provide meaningful guidance as to when a court should take it upon itself to decertify a collective when the defendant has not made such a

motion. *Id.* at *3 (decertifying collective in the course of ruling on the plaintiffs' motion for leave to submit evidence).

Finally, even assuming *arguendo* the unsupported and incorrect premise that the plaintiffs need to bring a motion for final certification in an FLSA collective action, *Rodriguez* does not address the question of *when* this most occur.  For example, *Rodriguez* does not explain why such a requirement would have to be satisfied through a pre-trial motion. Indeed, "final certification" (if it actually was required) could just as easily be confirmed after trial.

For these reasons, there is no basis for Swift to rely on the inapposite and sparsely reasoned *Rodriguez* decision to either (a) excuse its previous failure to bring a timely motion for decertification, or (b) hoist upon Plaintiffs an obligation to move for "final certification," after they already have demonstrated on multiple occasions that they are similarly situated.

**VI.     The issues remaining for trial are well-suited for collective adjudication**

As discussed above, the Court has already ruled on the propriety of collective adjudication for the issues remaining to be tried, following full briefing. Out of an abundance of caution, however, Plaintiffs summarize below why the remaining issues are well-suited for adjudication in a collective action trial.

<u>First 8 Hours of Sleeper Berth Time</u>: To not pay Plaintiffs for the eight-hour sleeping period, Swift carries the burden to demonstrate that its policies meet the "bona fide sleeping period" exemption under 29 C.F.R. § 785.22. *See* Order, Dkt. 246 (citing *Flores v. City of San Gabriel*, 824 F.3d 890, 897 (9th Cir. 2016) for the proposition that the burden of proving exemption is on employer). That regulation requires Swift prove four propositions to meet the exemption: 1) Swift and Plaintiffs expressly or impliedly agreed to exclude a sleeping period; 2) the sleeping period was "regularly scheduled"; 3) Swift provided "adequate sleeping facilities"; and 4) Plaintiffs were able to "usually enjoy an uninterrupted night's sleep" which means "at least 5 hours' sleep during the scheduled period." 29 C.F.R. § 785.22.

The first three of these elements will hinge on Swift's admittedly common policies, including common representations to trainees regarding their pay, routing and scheduling policies (or lack thereof), its standardized sleeper berth facility, and its uniform policy of

having trainees attempt to rest in a moving truck. Indeed, Swift concedes that these three elements "can be shown on a collective basis." *See* Joint Status Report, Dkt. 248, at 6, fn. 1. Plaintiffs' Statement Re Trial Plan provides a thorough analysis of how these three elements will be adjudicated on a collective basis with common evidence. *See* Dkt. 225, at 3-12.

Swift, however, contends that the fourth element pertaining to sleep interruptions is not suitable for collective treatment.[1] Swift is wrong. As a starting point, Swift has admittedly failed to keep records reflecting when trainees' sleep is interrupted. Rather than maintaining timesheets or other timekeeping records showing sleep interruptions, Swift maintains DOT logs, which show only when Trainees are logged as "driving"; "on duty not driving"; "off duty"; and "sleeper berth." The logs do not have a separate designation indicating that sleep has been interrupted. Nor has Swift identified any form or procedure by which trainees can report sleep interruptions and/or submit records of the interruptions to Swift for payment. After all, Swift has maintained throughout this litigation that 29 C.F.R. § 785.22 simply does not apply. It should come as no surprise that Swift has not shown that it established any procedures tailored to ensuring compliance with the regulation's requirement that the entire sleeping period be paid when sleep interruptions are not sufficiently minimized.

As this Court reasoned in its Order granting Plaintiffs' motion for summary judgment on damages, where an employer fails to keep adequate time records, a burden shifting framework applies to ensure that employees are not punished for the employer's failure to keep adequate records. *See* Order, Dkt. 246, at 7. In this burden-shifting framework, employees can show that they performed work for which they were improperly compensated "as a matter of just and reasonable inference," using reasonable estimates and representative testimony. *See id*. (citing *Anderson v. Mt. Clemens*, 328 U.S. 680 (1946)). Once employees do so, the burden shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn

---

[1] Swift must prove all four elements to meet the exemption. Thus, even assuming *arguendo* that the "interruptions" element was too individualized to be addressed on a collective basis, this would not preclude adjudication of the exemption based on Swift's inability to satisfy any one of the other three elements.

from the employee's evidence. *Id.* (citing *Mt. Clemens*, 328 U.S. at 687-88). If an employer is unable "to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.*

To demonstrate that they were improperly compensated as a matter of "just and reasonable inference," Plaintiffs will present representative testimony from opt-in plaintiffs and admissions from Swift's mentors. Plaintiffs also will present expert testimony from their designated trucking expert regarding the impracticality of obtaining restful sleep in a moving truck. This evidence will establish that interruptions were so regular as to preclude a sufficiently uninterrupted night's sleep in the moving truck as a matter of routine,[2] shifting the burden to Swift to negative the reasonableness of the inferences drawn from the representative testimony.

Representative testimony is well-accepted in wage-and-hour collective action cases as a form of common proof, of both liability and damages. *See, e.g., Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1047 (2016); *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1277 (11th Cir. 2008) (holding that representative testimony could rebut on a collective basis the employer's allegedly individualized defenses to liability, based on the testimony of seven out of 1,424 plaintiffs); *Henry v. Lehman Commercial Paper, Inc.*, 471 F.3d 977, 992 (9th Cir.2006); *McLaughlin v. Ho Fat Seto*, 850 F.2d 586, 589 (9th Cir. 1988); *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 67 (2d Cir. 1997) ("[I]t is well-established that the Secretary may present the testimony of a representative sample of employees as part of his

---

[2] Swift's own witnesses admitted in their depositions that interruptions to their sleep and/or the sleep of the Trainees they supervised was routine. *See, e.g.,* Plaintiffs' Separate Statement of Facts, Dkt. 160, at Fact No. 70 (citing Myers Depo. at 87:5-9, 87:19-24 [Trainees inform him of sleep interruptions "all the time" because they are "par for the course. There's no way around that."]; *id.* at 86:16-87:24; Bellew Depo. at 110:18-25 ["There's numerous things, a reason why it is hard to sleep, for the student and the mentor."]; *id.* at 111:6-17 ["I always kept my – one eye open, you know, sleep like a marine, as they'd say… It's kind of scary sometimes."]; Gridley Depo. at 110:23-111:5; Crosby Depo. at 160:16-161:22 ["the highways are pretty bad… you may be bouncing three feet off that bed."]). Moreover, Ten of the eleven opt-in plaintiffs who sat for deposition in this case testified that they routinely were interrupted and unable to get restful sleep while in the sleeper berth of a moving truck. *See* Plaintiffs' Separate Statement of Facts, Dkt. 160, at Fact No. 71.

proof of the prima facie case under the FLSA."); *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 701 (3d Cir. 1994) ("Courts commonly allow representative employees to prove violations with respect to all employees."); *Secretary of Labor v. DeSisto*, 929 F.2d 789, 792 (1st Cir. 1991) ("It is well established that not all employees need testify in order to prove the violations or to recoup back wages.").

Here, Swift has struggled to identify any evidence to rebut Plaintiffs' representative testimony and other evidence showing that their sleep is interrupted routinely in the moving trucks. At the status conference, Swift's only rebuttal to the evidence summarized above was to observe that Plaintiffs had not presented a statistical analysis regarding their sleep interruptions. But as shown above, it is not Plaintiffs' burden to present a precise statistical analysis where, as here, the employer has not kept adequate records, or even attempted to monitor the extent of sleep interruptions at all, for that matter.

Determining damages attributable to the first 8-hours of sleeper berth time also is well-suited for collective adjudication. Indeed, it will be a mathematical calculation using Swift's partial DOT driver log and compensation data, and reasonable extrapolation. The calculations will follow the same methodology as that presented in Plaintiffs' motion for summary judgment on damages attributable to unpaid "sleeper berth" time in excess of eight hours per day, which the Court granted. *See* Dkt. 246, at 10.

<u>First Day of Orientation</u>: As the Court observed, the question of whether the first day of orientation is compensable depends upon the circumstances of the whole activity. *See* Dkt. 246 at 12; Dkt. 207 at 10. While factors regarding the trainees' expectations of pay and prospects for continued employment after orientation are important, the Court noted that "[d]eciding the compensability of the first day of orientation [] will not be resolved based solely on the two factors." Dkt. 246 at 12. Rather, the central inquiry is the "'economic reality' of the parties' relationship." Dkt. 246 at 12; Dkt. 220 at 4 (quoting *Hale v. State of Ariz.*, 993 F.2d 1387, 1393 (9th Cir. 1993)). The entirety of the parties' relationship must be assessed. *Id*.

     At trial, Plaintiffs will present evidence that all orientations followed the same structure and addressed predominantly Swift-specific, rather than general vocational subject matter and were primarily for Swift's benefit.  There are several sources of common evidence that will be at the disposal of the fact-finder at trial to answer these questions, including Swift's common orientation schedules, PowerPoint presentations from the first day of orientation, and admissions from Swift employees regarding what occurs on the first day. *See* Ps' Sep. Stmt. (Dkt. 214) at ¶¶ 25-28, 30.  Moreover, Swift's Person Most Knowledgeable Witness designated on the subject of orientation testified that the materials and curriculum Swift presents to Trainees at orientation are standardized across all of Swift's locations. *See* Exhibit 5 to Declaration of Joshua Konecky in Support of Plaintiffs' Motion to Facilitate Notice (Dkt. 60-2), Deposition of Jack Workman at 16:12-17:4; 22:14-23:4; 30:18-32:3.  Thus, there should be no dispute that this evidence is common to the Collective.

     There also will be substantial common evidence at the factfinder's disposal when it comes to the factors regarding the trainees' expectations of pay and prospects for continued employment after orientation. Indeed, the Court has cited common communications Swift made to Trainees that could reasonably be interpreted to implicitly promise pay for the first day of orientation and employment thereafter. *See Julian v. Swift Transportation Co. Inc.*, 2019 WL 2303249 (D. Ariz. May 30, 2019). These common communications "included a warning that non-compliance with Swift's policies might lead to 'termination,' seemingly indicating the individuals had already been hired" by the first day of orientation. *Id.* at *1.  The same common message threatening "termination" also included instructions to the Trainees before the first day of orientation to bring "clothing—enough for 7-14 days" and to "[b]e prepared to leave from orientation for up to 6 weeks for training with mentor!!" *See* Ps' Sep. Stmt. (Dkt. 214) at ¶ 21.

     The common evidence also includes representations to individuals who had completed "Swift Academy" before the first day of orientation that tuition for the program would be taken out of their subsequent paychecks. *Julian*, 2019 WL 2303249, at *1. But Swift's common representations go beyond those who attended Swift Academy.  Indeed, Swift represents to

the general public on its website that there is "no upfront cost" to attend Swift Academy because the cost of tuition will be deducted from future pay. *See* Ps' Sep. Stmt. (Dkt. 214) at ¶ 22. The Court observed at summary judgment that these communications seemed to indicate that "the individuals had already been hired" by the first day of orientation, and that Trainees who received the Swift Academy promise "likely expected the orientation was simply the start of permanent employment." *Id*. at *1.

Moreover, without explicitly promising pay or employment on the first day of orientation, Swift's common communications still "can be read as indicating that attendance at the orientation was merely the first day of long-term employment." *Julian*, 2019 WL 2303249, at *3. Indeed, the Court denied Plaintiffs' motion for summary judgment of the orientation pay claim because "a reasonable jury might conclude [Swift's] communications did not implicitly promise such employment," not because the claim was incapable of class-wide adjudication. *See id*.

In addition, Plaintiffs will present representative testimony from Trainees regarding their expectations of pay and job prospects after orientation.

### VII. Swift's call for decertification would irrationally require more than 9,500 separate jury trials to vindicate the trainees' minimum wage rights

There are more than 9,500 opt-in plaintiffs before the Court. The Court already has made class-wide determinations regarding liability and damages in their favor. As discussed above, the remaining issues will rise and fall with Swift's admittedly common policies. Under the circumstances, decertification would create the inequitable result of leaving the more than 9,500 trainees—who worked for Swift day and night and around the clock, while away from home for weeks on end—with no means of vindicating their minimum wage rights, aside from more than 9,500 separate jury trials. This absurd outcome would not only unduly strain judicial resources, but it also would likely operate to preclude many or most trainees of a realistic opportunity for vindicating their meritorious claims.

//

//

Respectfully submitted,

Dated: January 17, 2020

SCHNEIDER WALLACE
COTTRELL KONECKY LLP


By:   /s/ *Nathan Piller*
      NATHAN PILLER

PLAINTIFFS' RESPONSE RE SWIFT'S SHORT LIST OF CASES
15

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2020, I electronically filed the foregoing document with the Clerk of the Court using the Court's CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

Dated:  January 17, 2020             /s/ *Nathan Piller*
                                     Nathan Piller (SBN 300569)
                                     SCHNEIDER WALLACE COTTRELL
                                     KONECKY WOTKYNS LLP