James A. Bloom  (AZ SBN 026643)
Joshua G. Konecky (CA SBN 182897)
Nathan B. Piller (CA SBN 300569)
SCHNEIDER WALLACE
COTTRELL KONECKY LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Tel:  (415) 421-7100
Fax:  (415) 421-7105
jbloom@schneiderwallace.com
jkonecky@schneiderwallace.com
npiller@schneiderwallace.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Pamela Julian, on her own behalf, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Swift Transportation, Inc. and Swift Transportation Co. of Arizona, LLC.,<br><br>Defendants | Case No. 3:16-cv-02816 JCS<br><br>**DECLARATION OF JOSHUA KONECKY IN SUPPORT OF PLAINTIFFS' MOTION FOR REASONABLE ATTORNEYS' FEES AND COSTS**<br><br>Judge: The Honorable Roslyn O. Silver |

I, Joshua G. Konecky, declare as follows:

1.      I am a partner at Schneider Wallace Cottrell Konecky LLP and counsel of record for Plaintiffs in the above-captioned case.  I am familiar with the file, the documents, and the history related to this case.  The following statements are based on my personal knowledge and review of the files and, if called on to do so, I could and would testify competently thereto. I am submitting this Declaration in support of Plaintiffs' motion for reasonable attorneys' fees and costs in connection with the proposed collective action settlement.

## CONTENTS AND STRUCTURE OF THIS DECLARATION

2.      This declaration is organized into several parts.  In the first part, I provide a summary of the total lodestar of Plaintiffs' Counsel in this case and the total out-of-pocket costs incurred.  I then go on to provide a summary of our experience and expertise in class and collective action litigation, including FLSA and other wage-and-hour cases.  I also provide documentation and a discussion of our billing rates showing that they are within the market range of hourly rates charged by attorneys of comparable skill and experience, working on similar matters.  This includes various federal and state court orders that have repeatedly approved our firm's rates as reasonable over the past decade.  In addition, I provide an overview of our firm's billing practices.

3.      Next, I describe how we allocated the work in this case to achieve maximum efficiency while avoiding unnecessary work and duplication of efforts.  I then provide a summary breakdown of the lodestar by individual biller. To provide a further explanation of how the work we preformed was necessary to achieve the results in this case, I then provide a chronological breakdown focusing on the specific work projects and corresponding lodestar at each stage of the case.

4.      I also discuss the very real and practical need for law firms, such as ours, to receive their full lodestar and an appropriate multiplier in cases such as this.  In this litigation, we devoted extensive resources to achieve substantial benefits for the Collective, in the face of considerable contingent risk, upfront costs, delays and other

difficulties inherent in pursuing complex collective action cases.  I further discuss the substantial value of the settlement to the Collective, and the risks and uncertainties confronting the plaintiffs and us in achieving the settlement.  Finally, I provide documentation to account for the out-of-pocket costs we incurred in this case.

## SUMMARY OF FEES AND COSTS SOUGHT

5.     Plaintiffs are seeking a total attorneys' fee award of $4,666,666.67, plus reimbursement of actual out-of-pocket costs of $308,153.88.  As of September 16, 2020, the total lodestar for my law firm in prosecuting and resolving the collective claims in this action was approximately $2,740,335.75.

6.     As of September 16, 2020, this fee award would result in a multiplier of 1.7 on our combined lodestar.  In addition, our total combined lodestar of $2,740,335.75 does not include the work we have performed and will perform after September 16, such as completing the final settlement drafting and approval motions, and working with the Settlement Administrator and communicating with Collective Members.  I would therefore anticipate that the final multiplier would be somewhat lower, after all this work is completed.

7.     In addition, Plaintiffs' counsel is together seeking reimbursement of $308,153.88, for their actual, out-of-pocket costs.  **Exhibit C** to this Declaration is a ledger of the reasonable out-of-pocket costs incurred by our firm in prosecuting this case.  These amounts are described more fully below.

## EXPERIENCE OF COUNSEL

8.     I now provide background on the primary attorneys from my firm who were assigned to this case and the basis for the billing rates our firm charges for their work.  In separate declarations, my co-counsel provide similar information for their respective firms.

9.     Schneider Wallace Cottrell Konecky LLP is regarded as one of the leading private plaintiff's firms in civil rights and employment class actions.  In November

DECLARATION OF JOSHUA KONECKY
ISO PLAINTIFFS' MOTION FOR REASONABLE ATTORNEYS' FEES AND COSTS

2012, the Recorder listed our firm as one of the "top 10 go-to plaintiffs' employment firms in Northern California."  In 2013, the Daily Journal named me as one of the leading labor and employment lawyers in California, and I have been on the Northern California Super Lawyers list each year since 2011.  Our partners and attorneys have litigated major class actions, have won several prestigious awards, and sit on important boards and committees in the legal community.  More details on the work, experience and accomplishments of the firm can be found at schneiderwallace.com.  Attached as **Exhibit A** to this Declaration is a firm resume showing some of our major cases over the past several years.

10.     My practice has involved the representation of plaintiffs under the Fair Labor Standards Act (FLSA), Title VII of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act of 1990 (ADA), and state labor and civil rights laws.  I personally have been lead counsel and/or have actively participated as plaintiffs' counsel in many class actions that have achieved significant and beneficial results for the class.  A representative list of these cases appears on my curriculum vitae, which is attached as **Exhibit B** to this Declaration. I also have participated actively in three class action trials, all of which resulted in liability findings in favor of the Plaintiff class (one of which was reversed on appeal).

11.     I received my Juris Doctor degree from New York University School of Law in May 1995.  From 1995 to 1997, I served as a judicial law clerk for the Honorable Lawrence K. Karlton, Chief Judge Emeritus for the Eastern District of California. Before joining Schneider Wallace, I litigated national disability rights class actions at Disability Rights Advocates in Oakland, California, as well as employment discrimination and minimum wage-and-hour class actions at the public interest law firm of Goldstein, Borgen, Dardarian & Ho, also in Oakland.  I am a former Skadden Public Interest Law Fellow and a U.S. Fulbright Scholar in Argentina.

12.     I am currently on the Board of Directors of Legal Aid At Work, a non-profit law center that works to protect the rights and working conditions of low income

DECLARATION OF JOSHUA KONECKY
ISO PLAINTIFFS' MOTION FOR REASONABLE ATTORNEYS' FEES AND COSTS

employees.  I also am on the advisory board of Directors of Disability Rights Advocates, a not-for-profit law organization that litigates class actions to improve access for people with disabilities.  I also am a member of the National Employment Lawyers Association and the California Employment Lawyers Association.

13.     My role in this case consisted of: directing the work of the attorneys and staff in our firm; developing our litigation and settlement strategy; supervising and editing the drafting of the original and amended complaints; supervising document review and analyzing key documents; preparing for and taking one of the Rule 30(b)(6) depositions; preparing the named Plaintiff for deposition and defending her in deposition; planning and editing motions and mediation briefs, as well as drafting particular portions of such documents; consulting with experts; leading and participating in the settlement discussions; drafting settlement documents; appearing in Court; and providing information and advice to the opt-in plaintiffs.  My billing rate is $925 an hour.

14.     Nathan B. Piller is a sixth-year associate at our firm. He was the primary attorney working on this case.  Mr. Piller earned his Juris Doctor from University of California, Berkeley School of Law (Boalt Hall) in May 2014. While at Boalt, he received the distinction of "high honors" in several courses, served as Editor in Chief of the Berkeley Journal of Entertainment and Sports Law, and represented low-income families in appeals hearings before the Social Security Administration while working as a law clerk for the East Bay Community Law Center.  He graduated *summa cum laude* from the University of California Los Angeles, where he also worked as a radio broadcaster.

15.     Mr. Piller is an exceptionally skilled and effective class action litigator.  I have worked with numerous lawyers over the past 20 years.  I can confidently say that Mr. Piller's skills well exceed those of any other attorney with his years of experience that I have ever worked with.  This case is exemplary of Mr. Piller's skills, vision, and commitment toward prosecuting class and collective action cases to safeguard the wage

and hour rights of employees.  He was critical at every stage, from developing the winning legal arguments out of a murky legal landscape, to taking corporate-level depositions, to presenting oral argument on important motions, to working with dozens of witness in the trial preparations and with Defense counsel on the pretrial submissions. This case would not have succeeded to the high level it did without Mr. Piller's dedication, leadership, and exceptional work product.

16.    I entrusted Mr. Piller to perform difficult and complex tasks that ordinarily would be handled by partners or more senior attorneys with higher billing rates. For example, Mr. Piller deposed five of Defendants' six witnesses designated pursuant to FRCP 30(b)(6), deposed 9 supervisors and trainers, deposed two Trainee declarants proffered by Swift, and defended the depositions of several opt-in plaintiffs witnesses. In addition, Mr. Piller worked with Plaintiffs' expert witnesses, David Breshears and John Levickas, in connection with compiling their expert reports.  Mr. Piller also took a lead role in supervising the paralegals who assisted in the plaintiff outreach and declaration drafting process, as well as the document review process.  In addition, Mr. Piller did the oral argument at the hearing on the parties' cross motions for summary judgment in December 2018 and the hearing in January 2020 regarding trial management, burdens of proof, evidence, and other complex issues.

17.    Mr. Piller also worked with the named plaintiff to draft discovery and discovery responses.  In addition, Mr. Piller performed extensive outreach to the Collective in this case, including interviewing Collective Members and drafting declarations on their behalf.  He also performed legal research and composed the initial drafts of the briefing we submitted in connection with major motion practice, including Plaintiffs' motions for conditional certification, summary judgment, and damages.  Mr. Piller also assisted with document review. Further, Mr. Piller prepared mediation briefing, gave the opening statement in the joint session of the mediation and conducted other tasks to prepare for mediation, including preparing damages analyses and a compilation of declarations from potential Trainee trial witnesses.

18.     Mr. Piller recorded approximately 2,228 hours through September 16, 2020 in this case.  Our firm's 2020 billing rate for Mr. Piller's work is $680 per hour. I believe it is well deserved, particularly given Mr. Piller's demonstrated skill-level, penchant for doing partner-level work, and rigorous experience in employment class action litigation.

19.     Leslie H. Joyner is a twelfth-year associate at Schneider Wallace. She billed approximately 151 hours to this case through September 16, 2020.

20.     Ms. Joyner earned her Juris Doctor from Lewis and Clark Law School in May 2008. Ms. Joyner's practice has focused on complex litigation in federal and state courts, including wage and hour violations, discrimination claims, consumer rights, employment class actions and consumer class actions. Prior to joining our firm, Ms. Joyner worked as an associate at a firm specializing in employment and other class action work, where she was pivotal in obtaining certification in numerous actions and played an integral role in recovering millions of dollars in payments to class members. Ms. Joyner also worked as a member of the Los Angeles City Attorney's Complex Litigation Division, where her practice included active involvement in the prosecution of major financial institutions and national corporations engaged in fraud and other unlawful conduct against California consumers.

21.     I can attest to Ms. Joyner's advanced level of knowledge and facility in employment class actions, and the high value her efforts and analysis brought to the litigation and ultimate resolution of this case.  Ms. Joyner defended Trainee depositions, conducted legal research, communicated with members of the Collective, and also spent significant time drafting motions in limine. Ms. Joyner's 2020 billing rate for this case is $775 per hour.

22.     Sarah McCracken received her Juris Doctorate from UC Hastings College of the Law in 2016 and has been a member of the California Bar since December 2016.  Following law school, she served as a judicial law clerk to the Honorable Nancy J. Koppe of the District of Nevada.  She then worked at Centro Legal de la Raza, where

she specialized in eviction defense, for approximately three years.  She has been an associate at Schneider Wallace Cottrell Konecky LLP since April 2020.  Ms. McCracken's work on this case included drafting oppositions to Defendants' motions in limine, interviewing and preparing declarations of Collective Members, drafting the mediation brief, and participating in the mediation. Ms. McCracken's 2020 billing rate is $680 per hour.  She recorded approximately 124 hours in this case through September 16, 2020.

23.     Kenneesha A. Johnson received her Juris Doctorate from Southern University Law Center in 2017 and has been a member of the Louisiana Bar since October of 2017 and the Texas Bar since April of 2020. During her time in law school she served as a law clerk, research assistant and secretary of the Student Bar Association. After becoming a licensed attorney for the state of Louisiana, she served as a public defender where she conducted extensive research and motion practice, and managed a heavy caseload. Ms. Johnson's work on this case included conducting interviews with Collective Members in preparation for trial testimony and working with them to prepare sworn declarations. Ms. Johnson billed approximately 141 hours on this case at a billing rate of $625 per hour.

24.     Lauren Looney received her Juris Doctorate from Tulane Law School in 2018 and has been a member of the Texas Bar since October of 2019.  She worked in litigation management at a third party administrator before joining Schneider Wallace in March 2020. Ms. Looney spent approximately 51 hours in this case conducting client intakes and drafting declarations. Ms. Looney's rate for this case is $550 per hour.

25.     Moises Jrade is a staff attorney and outreach specialist at our firm. He is a 1995 graduate of Nova Southeastern University Shepard Broad Law Center and was admitted to the Florida Bar in 1996.  Mr. Jrade conducted extensive outreach to the Collective and performed a key role in working with the opt in plaintiffs to prepare their declarations. His substantial efforts in this regard were instrumental in enabling Plaintiffs to present a robust and thorough compendium of persuasive Collective

Member declarations in support of Plaintiffs' successful motion for conditional certification, as well as in opposition to Defendants' motion for summary judgment.  As a matter of billing judgment, Mr. Jrade's billing rate for this case is $350 per hour.

## COUNSEL'S BILLING RATES ARE BASED ON THE PREVAILING MARKET RATES AND HAVE BEEN REPEATEDLY APPROVED BY THE COURTS

26.     This portion of my declaration documents the reasonableness of the billing rates charged by my firm in this case.

27.     Our lodestar for this case is based on our law firm's customary rates for 2020.  We set the billing rates of our attorneys and paralegals/law clerks through a process of continual monitoring of prevailing market rates charged by both defense and plaintiffs' law firms, for individuals with similar levels of skill and experience who are doing comparable work as our attorneys and staff.  We gather this information from surveys, the review of other fee applications, and conversations with attorneys.  We set the billing rates for our firm to be consistent with the prevailing market rates in the private sector for attorneys and staff of comparable skill, qualifications and experience.

28.     Federal and state courts have consistently approved the rates charged by Schneider Wallace. Attached to this Declaration are several such Orders.  *See, e.g.*, **Exhibit H,** *Nevarez v. Forty Niners Football Co., LLC*, Case No. 16-CV-07013-LHK (N.D. Cal. July 23, 2020) (approving 2019 rates); **Exhibit I,** *Shaw v. AMN Services LLC et al..*, No. 3:16-cv-02816-JCS (N.D. Cal. May 31, 2019) (approving 2018 rates); **Exhibit J**, *Knapp v. Art.com, Inc.*, No. 3:16-cv-00768-WHO (N.D. Cal. October 24, 2018) (approving 2018 rates); **Exhibit K**, *Janssen v. Square, Inc.*, Case No. CGC-16-549980, Superior Court of California, County of San Francisco, Order dated September 26, 2018 (approving 2018 rates); **Exhibit L**, *Bartoni v. American Medical Response*, Case No. RG08382130 Superior Court of California, County of Alameda, Order dated September 17, 2019 (approving 2018 rates after contested fee petition); **Exhibit M**, *Marine v. Interstate Distributor Co.*, Case No. RG07358277, Superior Court of

California, County of Alameda, Order dated November 19, 2016 (approving 2016 rates); **Exhibit N**, *Villalpando v. Exel Direct Inc.*, 2016 WL 7740854, at *1 (N.D. Cal. Dec. 12, 2016) (approving 2016 rates and observing that "the hourly rates of Lead Counsel Schneider Wallace Cottrell Konecky [] have consistently and recently been approved as reasonable by the courts."); **Exhibit O**, *Carnes v. Atria Senior Living Inc.*, Case No. 14-cv-02727-VC, ECF 115, at 4-5 (N.D. Cal. July 12, 2016); **Exhibit P**, *Meza v. S.S. Skikos, Inc.*, Case No. 3:15-cv-01889-TEH, ECF 58, at 4 (N.D. Cal. May 25, 2016); **Exhibit Q**, *Jeter-Polk v. Casual Male Store, LLC*, Case No. EDCV 14-891-VAP (DTBx), ECF 60, at 17 (C.D. Cal. June 29, 2016); **Exhibit R**, *Perez, et al., v. rue21*, Case No. CISCV167815. Superior Court of California, County of Santa Cruz, Order filed March 22, 2013 (approving 2013 rates); **Exhibit S,** *Williams, et al. v. H&R Block Enterprises, Inc.*, Case No. RG08366506, Superior Court of California, County of Alameda, Order filed November 8, 2012 (approving 2012 rates); **Exhibit T** *Ortiz, et al., v. Home Depot U.S.A., Inc.*, Case No.: 5:09-cv-03485-LHK (N.D. Cal.), Order filed February 2, 2012 (approving 2011 rates); **Exhibit U**, *Bond-Hatch v. Quest Diagnostics, Inc.*, Case No. CGC-06-450274, Superior Court of California, County of San Francisco, Order filed April 28, 2011 (approving 2011 rates); **Exhibit V**, *Wren v. RGIS Inventory Specialists*, 2011 WL 1230826, at *22 (N.D. Cal. 2011) (approving 2010 rates); **Exhibit W**, *National Federation of the Blind v. Target Corporation*, Case No. C 06-01802 (N.D. Cal.), Order filed August 3, 2009 (approving 2009 rates in a contested fee petition); **Exhibit X**, *Chery v. City College of San Francisco*, Case No. C 04-4981 WHA (N.D. Cal.) (approving 2006 rates).

29.     Over the years, there are many other decisions approving our firm's rates using either a lodestar-multiplier approach and/or a percentage of the recovery approach with a lodestar-multiplier cross-check.

30.     Although I have more limited information about attorney rates charged by attorneys doing work in Phoenix in particular, it appears from our recent research that our firm's rates are also comparable to and within the range of rates approved by courts

DECLARATION OF JOSHUA KONECKY
ISO PLAINTIFFS' MOTION FOR REASONABLE ATTORNEYS' FEES AND COSTS

in the District of Arizona and charged by attorneys for complex civil litigation performed in the Phoenix area. For instance, in *ThermoLife Int'l LLC v. Am. Fitness Wholesalers LLC*, 2020 U.S. Dist. LEXIS 60871 (D. Ariz. Apr. 7, 2020), the Court found that hourly rates of $690 (associate) and $890 (lead partner) are "reasonable" and supported by case law. *Id*. at *18, *22. Further, counsel in *ThermoLife* averred that these rates are reasonable and within the range of prevailing market rates, based on his considerable experience in the Phoenix market. *See* **Exhibit D,** attached hereto, *ThermoLife*, No. 18-cv-04189-PHX-JAT (D. Ariz. Jan 24, 2020) Dkt. No. 36-1, Declaration of Cole Schlabach at ¶ 12 (attesting that "[a]s an attorney practicing [] in the Phoenix area I am familiar with the prevailing market rates in Phoenix, Arizona. I have consulted with other attorneys with regard to the prevailing market rates in Phoenix, Arizona, and have reviewed fee applications submitted by various law firms Phoenix, Arizona.").

31.     As another example, the plaintiffs' attorneys in the case of *Smilovits v. First Solar, Inc*., reported hourly rates ranging from $650 to $1,325 for partners and from $250 to $630 for other attorneys. *See* **Exhibit E**, attached hereto, *Smilovits v. First Solar, Inc*., No. 2:12-cv- 00555 (D. Ariz. Apr. 24, 2020), Dkt. Nos. 718-1, 719. The Court granted the fee application. **Exhibit F**, attached hereto, *Smilovits v. First Solar, Inc*., No. 2:12-cv- 00555 (D. Ariz. June 30, 2020), Dkt. No. 731.

32.     Similarly, in the case of *Di Donato v. Insys Therapeutics Inc*., Phoenix-based attorneys reported rates that were set based in part upon "market rates for practitioners in the field", ranging from $400 to $690 per hour for associate attorneys and $920 per hour for a partner admitted to practice in 1995. *See* **Exhibit G**, attached hereto, No. 16-cv-00302-PHX-NVW (D. Ariz. Sept. 10, 2020), Declaration of Johnston De F. Whitman, Jr., Dkt. No. 411-3 at ¶ 6, Ex. A.

## ALLOCATION OF WORK AND EXERCISE OF BILLING JUDGMENT

33.     As indicated above, the work we did over the course of this litigation was necessitated by the difficulty and complexity of the case and the Defendants' continuous

opposition to the case at every stage.  We needed to undertake significant discovery, depositions, motion practice and trial preparation to obtain the leverage ultimately needed to negotiate a favorable settlement. We had to litigate against two separate and tenacious law firms, one of which is the well-resourced national law firm Littler Mendelson, PC.  Plaintiffs had to face multiple experienced attorneys from these firms throughout the case.

34.     We staffed the case as efficiently as we could in light of the difficulty of the case and the vigorous defense presented. For example, I am the only partner from Schneider Wallace who billed time on this case.  In addition, Mr. Piller was the primary associate staffed on this case and did the lion's share of brief writing, taking and defending depositions, written discovery, and oral argument.

35.     In sum, Mr. Piller took 16 depositions of Swift's witnesses and defended 7 depositions of Collective Members.

36.     Having Mr. Piller as the dedicated associate on the case benefited the institutional memory on the matter and increased efficiency, particularly in light of the fact that he could take on projects commonly handled by more experienced attorneys and partners, as discussed above.

37.     During discrete periods of time, we also had several staff attorneys with lower billing rates working on document and ESI review.  Several of these attorneys also participated more in Collective outreach and drafting Collective Member declarations in support of Plaintiffs' motion for conditional certification, in opposition to Defendants' motion for summary judgment, and in preparation for mediation and trial.  In addition, Leslie Joyner helped to cover Collective Member depositions, when the schedule was tighter.

38.     I generally assigned the initial drafting of complaints and written discovery to Mr. Piller, with my editing after the initial drafts.  I also assigned initial drafting of the briefing on the motions in the case to Mr. Piller (including the motions for conditional certification, summary judgment and damages), although I also contributed to this

DECLARATION OF JOSHUA KONECKY
ISO PLAINTIFFS' MOTION FOR REASONABLE ATTORNEYS' FEES AND COSTS

drafting process due to the complexity of the issues and the importance of the motion to the case.

39.     I was the only partner from our firm who took or defended depositions in this case.  I took the deposition of Victor Malchesky, one of Defendants' six witnesses designated to speak on behalf of the company pursuant to FRCP 30(b)(6). I also defended the deposition of Ms. Julian.  I wanted to personally attend to this first deposition because Ms. Julian was the named Plaintiff and first to put herself on the line by stepping forward publicly to initiate the case.  Defending this first plaintiff deposition also helped to make sure I had a firm handle on the types of questions that defense counsel would be asking such that I could better develop an overall strategy for Mr. Piller and Ms. Joyner in their defense of the subsequent Collective Member depositions. Mr. Piller defended 7 Collective Member depositions, and Ms. Joyner defended 2 Collective Member depositions.

40.     With respect to the settlement negotiations, Mr. Piller took the lead in conducting the damages analyses, including working with our damages expert. I took the lead in communications with the mediators and opposing counsel, but Mr. Piller also handled many of these necessary communications.

41.     Overall, we tried to assign as much work as we could to attorneys with lower billing rates when feasible and appropriate.  For example, we assigned staff attorneys with lower billing rates to perform document review of Defendants' document production, conduct class outreach, and work with Collective Members to prepare sworn declarations.

42.     And, as discussed above, Mr. Piller was assigned extensive partner-level work, while billing at a rate significantly lower my rate.

## BILLING PRACTICES AND LODESTAR

43.     Lawyers and staff at Schneider Wallace Cottrell Konecky LLP record their time in tenth-of-an-hour increments, and do so as contemporaneously as possible with the expenditure of the time.

44.     The following chart provides a summary of the billing rates and hours worked by the attorneys and paralegals/law clerks at our firm **through September 16, 2020**.  This chart contains the hours and lodestars *after* removing all billing entries by the 11 attorneys and 20 non-attorney staff who contributed to the case but recorded fewer than 25 hours.

|  | HOURS | BAR DATE | HOURLY RATE | TOTAL |
|---|---|---|---|---|
| ***Partners*** |  |  |  |  |
| Joshua Konecky, Partner | 436.8 | 1996 | $925 | $404,040.00 |
| ***Associates*** |  |  |  |  |
| Leslie Joyner, Associate | 151.1 | 2009 | $775 | $117,102.50 |
| Nathan Piller, Associate | 2,228.3 | 2014 | $680 | $1,515,244.00 |
| Sarah McCracken, Associate | 124.5 | 2016 | $680 | $84,660.00 |
| Kenneesha Johnson, Associate | 141.1 | 2017 | $625 | $88,206.25 |
| Lauren Looney, Associate | 51.1 | 2019 | $550 | $28,105.00 |
| ***Paralegals & Law Clerks*** |  |  |  |  |
| Moises Jrade, Law Clerk | 362.8 | 1996 (Florida) | $350 | $126,980.00 |
| Talal Al-Hindi, Talal, Law Clerk | 147.4 | n/a | $350 | $51,590.00 |
| Elvira Barajas, Paralegal | 86.6 | n/a | $300 | $25,980.00 |
| Thomas Barnett, Paralegal | 311 | n/a | $350 | $108,850.00 |
| Lourdes Castro, Paralegal | 213.5 | n/a | $250 | $53,375.00 |
| Elizabeth Cheung, Paralegal | 51 | n/a | $250 | $12,750.00 |
| Linda Currid, Paralegal | 44.2 | n/a | $300 | $13,248.00 |

| | | | | |
|---|---|---|---|---|
| Eugenia Gueorguieva, Paralegal | 50.4 | n/a | $300 | $15,120.00 |
| Marks, Sam, Paralegal | 51.6 | n/a | $300 | $15,480.00 |
| Christie Mosley, Paralegal | 58.5 | n/a | $250 | $14,625.00 |
| Lauren Roseman, Paralegal | 216.6 | n/a | $300 | $64,980.00 |
| **TOTAL HOURS & LODESTAR:** | **4,726.5** | | | **$2,740,335.75** |

45.     We can provide complete, detailed billing records in the event the Court requests them, but would request the opportunity to redact attorney-client privileged information and any other privileged information.

## BREAKDOWN OF LODESTAR AND SUMMARY OF WORK PERFORMED CORRESPONDING TO EACH MAJOR TIME PERIOD IN THE LITIGATION

46.     To help illustrate the work that reasonably had to be done at each phase of the case to achieve the excellent settlement result on behalf of the Collective, I now summarize the amount of time spent (and corresponding lodestar) during each major time period of the case.

*Case Investigation and Filing the Complaint: September 2015 to December 29, 2015*

47.     In the Fall of 2015, we began investigating complaints from Named Plaintiff Julian that Swift had failed to pay her minimum wage for time spent during her training period. We spent significant time speaking with Named Plaintiff Julian and analyzing the information and documentation she provided, to ascertain the legal merit of the complaints as well as the extent to which they presented issues that were suitable for collective adjudication.  We also conducted thorough research regarding Swift and its operations, to identify the responsible entities.  This commitment to the pre-litigation process was well worth the effort because it enabled us to home in on pertinent policies and practices and to develop a solid legal strategy from the start.

48.     Our investigation indicated that Swift was denying its trainee truck drivers minimum wage by, *inter alia*, not paying them for extensive time logged as "sleeper berth. In addition to being tethered to the truck during this time, Trainees also do their required study and help the mentor with other work tasks while in the sleeper berth.

49.     In the course of investigating the claims, we also conducted research and evaluated the legal landscape regarding similar claims based on unpaid "sleeper berth" time.  Our research and evaluation indicated that minimum wage claims based on unpaid sleeper berth time carried significant risk.  When the Complaint was filed, there was no appellate authority addressing the compensability of sleeper berth time.  The only decision within the Ninth Circuit held that, "as a matter of law, time spent in the sleeper berth, simply because the truck is moving, is not compensable." *Nance v. May Trucking Co.*, 2014 U.S. Dist. LEXIS 5520, at *23 (D. Or. Jan. 15, 2014).  The District Court in *Nance* relied on the Department of Labor (DOL) Regulation 29 C.F.R. § 785.41, which provides that an employee is "working while riding, except during bona fide meal periods or when he is permitted to sleep in adequate facilities furnished by the employer." *Id.* at *21-23.

50.     Despite these challenges, we began drafting the initial complaint. The drafting process was meticulous, requiring further legal research, multiple interviews with Named Plaintiff Julian, and follow-up research regarding Swift and its operations.

51.     On December 29, 2015, we filed Ms. Julian's complaint alleging that Swift knew or had reason to know that its Trainees were not being paid minimum wage under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"), including for time spent logged as sleeper berth. Complaint (Dkt. 1) at ¶¶ 4, 27-35.

52.     During this first stage of the case, we billed approximately **<u>13 hours</u>**, for a lodestar of approximately **<u>$10,707</u>**.

*<u>Pre-Certification Discovery and Preparation of the Motion for Conditional Certification: December 30, 2015 to January 5, 2017</u>*

53.     On February 26, 2016, the parties stipulated to transferring this case from

the District of Delaware to the District of Arizona. Dkt. 11.  Thereafter, the parties litigated Swift's motion to dismiss Plaintiff's overtime claim. On May 31, 2016, the Court dismissed Plaintiff's overtime claim based on the FLSA's overtime exemption for employees governed by the DOT hours of service regulations. *See* Order (Dkt. 25) (citing 29 U.S.C. § 213(b)).  While Swift's motion was successful, litigating the motion assisted us in further vetting the value of the claims at an early stage.

54.     Following resolution of the pleadings, the parties conducted early written discovery. Plaintiff served sets of requests for production of documents and targeted interrogatories seeking production of Swift's corporate policies and procedures, organizational structure, and records of hours worked and compensation data for trainees. The discovery was focused at developing a sufficient factual record for Plaintiffs to prevail on their forthcoming motion conditional certification. Swift made a limited production of documents in response.

55.     In October 2016, we spent time meeting and conferring with Swift's counsel to request that Swift supplement its document production. Our efforts proved to be time well-spent, as the meet-and-confer resulted in Swift's production of hundreds of pages of additional policy documents, including the standard "Student Driver Paperwork," instructional material used in driver orientation, employee handbooks, and other materials documenting Swift's common training requirements that proved important in demonstrating that the propriety of collective action treatment.

56.     In December of 2016, we took the depositions of five witnesses designated by Swift pursuant to Fed. R. Civ. Proc. 30(b)(6): Carl DiCharo, Victor Malchesky, Jack Workman, Joshua Grow, and Sarah Koogle. We reviewed and analyzed hundreds pages of documents produced by Swift and prepared detailed outlines in preparation for the depositions. In the depositions, Swift's witnesses gave testimony elucidating the company's common compensation and operational policies relevant to the minimum wage claims. The testimony was important in establishing the existence of systemic policies and practices that Plaintiffs alleged were causing the denial of minimum wage

DECLARATION OF JOSHUA KONECKY
ISO PLAINTIFFS' MOTION FOR REASONABLE ATTORNEYS' FEES AND COSTS

on a collective-wide basis, despite the counter-arguments and individualized evidence Swift proffered.

57.     In the meantime, we conducted interviews with other similarly situated Swift trainees, who corroborated Plaintiff Julian's experiences. This work proved to be well worth the effort, as many of these individuals filed consents to join the action as party plaintiffs and others submitted sworn declarations in support of the motion for conditional certification.  The interviews also helped us get a clearer picture of the conditions on the ground.  By December 28, 2016, eighteen individuals had filed consents to join. *See* Ntc. of Filing, Dkt. 59.

58.     During this second stage of the case, we billed approximately **459 hours**, for a lodestar of approximately **$252,067**.

*Motion for Conditional Certification and Further Merits Discovery: January 6, 2017 to January 18, 2018*

59.     On January 6, 2017, Plaintiffs filed their motion for conditional certification. *See* Mtn., Dkt. 60. Preparing the motion for conditional certification was a time-consuming task that required the involvement of partners, associates, and paralegals alike. It involved work tasks ranging from interviews with opt-in plaintiffs to document review, to legal research. We worked with several opt-in plaintiffs to prepare and finalize declarations attesting to their experiences working for Swift, which we submitted with the motion. Dkt. 60-10. We also conducted substantial legal research and prepared the supporting papers.

60.     On February 21, 2017, Swift filed its Opposition briefing, which consisted of two separate briefs: one opposing certification and the other opposing equitable tolling. *See* Dkt. Nos. 64-65. The opposition briefing was supported by declarations from Swift's corporate representatives and Swift truck drivers. *See* Dkt. 65-2.

61.     To prepare Plaintiffs' reply briefing, we took the depositions of two of Swift's truck driver witnesses who had submitted declarations in opposition to the motion for conditional certification. Deposing these witnesses demanded attorney time

for preparation, travel, and taking the actual depositions, but the undertaking was worthwhile. For instance, Swift's trainee declarant provided testimony supporting Plaintiffs' contentions on the merits that they were effectively "on duty" while in the moving truck, even if they were logged as off-duty under DOT Regulations. *See* Reply (Dkt. 67) at 6:16-19, 8:15-16 (Trainee testifying that "in my mind I was driving even though I was in the passenger seat" and agreeing that he was "living in the truck" while training).  As another example, Swift's mentor declarant admitted that he suspected trainees were performing work while logged as "sleeper berth" but did not stop it. *Id.* at 10:22-24. Plaintiffs filed their reply briefing on March 13, 2017. Dkt. 67.

62.     While the motion for conditional certification was under submission, the parties conducted further discovery on the merits. Swift issued requests for production of documents and interrogatories on each of the twenty-one Trainees who had opted-in to date. The opt-in plaintiffs provided sworn responses and documents in response. For instance, Plaintiff Julian produced more than 700 pages of documents. Our extensive work interviewing the opt-in plaintiffs and assisting with their discovery responses served as valuable preliminary preparation for subsequent depositions. The documents produced by the opt-in plaintiffs also were helpful in the merits phase of the case. For instance, Plaintiff Julian produced DOT driver log records showing extensive unpaid time logged as "sleeper berth."

63.     Between July and November of 2017, Swift took the depositions of eleven opt-in plaintiffs.  We devoted substantial time to thoroughly preparing each of these Collective Member witnesses, including with in-person preparation sessions and mock deposition questioning.  Counsel for Swift conducted lengthy questioning of the declarants. The extensive preparation was well worth the effort, as the Collective Members provided thorough testimony in the face of Swift's often unrelenting questioning.

64.     We took the depositions of nine Swift supervisors and trainers, including mentors, driver leaders, and a human resources representative. Traveling, preparing for,

and taking the depositions themselves was time-consuming, but these efforts produced evidence helpful to Plaintiffs' case. For instance, we elicited first-hand accounts from Swift's witnesses regarding the difficulty of getting restful sleep in a moving sleeper berth.

65.     Our hard work on the Motion for Conditional Certification was well worth the effort. On August 30, 2017, the Court issued an order granting the motion, equitably tolling the statute of limitations, and ordering that notice of the case be distributed to the putative collective. Order, Dkt. 103.

66.     Thereafter, the parties met and conferred regarding the procedural details of the notice process. We advocated for a website-based platform to allow individuals to opt-in electronically upon receiving the notice by email, given the likelihood that many truck drivers would be away from home and unable to retrieve the paper opt-in form and mail it. We also advocated for a text message notice, for the same reasons.  On October 16, 2017, the Court approved the parties' stipulation regarding the procedures for sending notice to the putative collective, which included our proposal for the website portal and text message notice. Order, Dkt. 120.  Our efforts in meet and confer proved effective.  By close of the 60-day opt-in period on January 16, 2018, approximately 9,578 Trainees had submitted consents to join this action as party plaintiffs.

67.     During this third stage of the case, Plaintiffs' Counsel billed approximately **880 hours**, for a lodestar of approximately **$560,026**.

*Cross-Motions for Summary Judgment and Related Discovery: January 19, 2018 to December 28, 2018*

68.     After the opt-in period, the parties shifted their focus to the motions for summary judgment.  Plaintiffs faced significant risk on the merits of their sleeper berth claims leading up to the cross-motions for summary judgment. While Plaintiffs' motion for conditional certification was pending, the Ninth Circuit affirmed the District Court's ruling in the analogous case *Nance*, *supra*, holding that sleeper berth time is not compensable under 29 C.F.R. § 785.41, without limitation. *Nance v. May Trucking Co.*,

685 Fed. Appx. 602, 605 (9th Cir. 2017).  While *Nance* is unpublished and distinguishable, it still posed a challenge for our position at summary judgment, which argued for limitations on the amount of sleeper berth time that could be deducted. Nonetheless, we proceeded with their summary judgment preparations.

69.    In January 2018, we continued our meet and confer regarding Plaintiffs' requests for further merits discovery, including timekeeping records, DOT driver logs, compensation data, and materials pertaining to the first day of Swift's orientation program. Following extensive meet and confer, including an in-person conference at defense counsel's offices, Swift produced more than a thousand pages of additional documents, as well as driver log and compensation data covering most of the opt-in Plaintiff Collective. Our efforts in meet and confer proved valuable, as the compensation data and driver log records were critical to Plaintiffs' success on the forthcoming motions for summary judgment and damages.

70.    On May 23, 2018, Mr. Piller traveled to Memphis, Tennessee to take the deposition of Mike Jackson, Swift's Corporate designee witness on the subjects of dispatching, routing and trip planning. We prepared extensively for the deposition by reviewing numerous documents, conducting legal research, and compiling a detailed outline.  This was time well-spent, as Mr. Jackson provided testimony pertinent to the question of whether trainees were "on duty" under applicable DOL regulations even if they were logged as "off duty" or "sleeper berth" under DOT regulations, also was central to Plaintiffs' summary judgment arguments. Mr. Jackson also testified that Swift does not schedule a fixed window of time for sleep, which was directly relevant Plaintiffs' claim that Swift failed to provide bona-fide, regularly scheduled sleeping periods.

71.    On May 31, 2018, we disclosed Plaintiffs' expert witnesses: a forensic accountant (David Breshears) to provide testimony regarding damages and trucking industry professional (John Levickas) to provide testimony on the merits.  We spent extensive time communicating with Mr. Breshears and Mr. Levickas regarding

1
2
3

Defendants' policies, procedures, and timekeeping and compensation data, and providing them with the evidence relevant to their evaluation. On July 13, 2018, Swift disclosed an expert in rebuttal to Mr. Levickas (Timothy Kvochick).

4
5
6
7
8

72.     Meanwhile, in the months leading up to the cross-motions for summary judgment, the parties filed a notice updating the court regarding discovery and settlement discussions. *See* Dkt. 129. In that update, the parties explained that they had discussed mediation, but that Swift was not interested in mediating the case at that time. *See id.* at 4:9-10.

9
10
11
12
13

73.     On August 10, 2018, the parties filed their cross-motions for summary judgment. Dkt Nos. 157-167. Preparing the motion for summary judgment was a formidable undertaking that demanded the coordinated efforts our attorneys, paralegals, and other staff members alike. It encompassed an array of work tasks, including interviews with the opt-in plaintiffs, legal research, review of numerous documents, and a multi-step drafting process, among others.

14
15
16
17
18
19
20
21
22
23
24

74.     We argued that, even assuming a sleep period deduction on compensable time was permissible, it could not exceed 8 hours per day under 29 C.F.R. § 785.22. *See* Dkt. 159, at i. Swift sought a ruling that, *inter alia*, it did not have to pay for any "sleeper berth" time under 29 C.F.R. § 785.41. *See* Dkt. 157 at 1:24-2:8. The cross-motions presented difficult legal questions that required extensive legal research and precision in drafting and oral argument.  For instance, the cross-motions addressed the interplay of two DOL regulations (29 C.F.R. §§ 785.22 and 785.41) and their impact on the compensability of sleeper berth time, as well as whether DOL guidance interpreting these regulations was entitled to deference.  We submitted 35 exhibits with their opening briefing. Dkt. Nos. 159-2 to 159-3. Swift submitted 27 exhibits. Dkt. Nos. 161-1 through 167-12.

25
26

75.     While the parties were preparing their opposition briefs, Swift once again confirmed that it was not interested in mediation. Dkt. 174 at 3:19-21.

27

76.     In the same timeframe, Swift sought an extension of its deadline to file a motion for decertification (Dkt. 172), which Plaintiffs' opposed. Dkt. 173. The Court denied Swift's request on September 7, 2018. Dkt. 176. Swift ultimately did not bring a motion for decertification.

77.     On September 10, 2018, the parties submitted their opposition briefing. Dkt. Nos. 177-193.  Preparing the Opposition papers was a time-consuming project that involved legal research, document review, interviews with Collective Members, and a multi-step drafting process, among other tasks. We submitted 36 exhibits in opposition, Dkt. Nos. 192-3 through 192-38, as well as a compendium of illustrative declarations from 11 opt-in plaintiffs. Dkt. 192-1.  The parties submitted their respective reply briefs on September 25, 2018. Dkt. Nos. 197-198.  Plaintiffs also submitted a notice of recent authority addressing the relationship between DOT and DOL regulations and their impact on the legal issues presented by the cross-motions. *See* Dkt. 203.  The Court held argument on the cross-motions on December 19, 2018. We put in extensive time in advance of the hearing to prepare the oral arguments.

78.     Our extensive time spent conducting written discovery, taking and defending depositions, compiling declarations, conducting legal research, preparing memoranda, preparing for oral argument, and reviewing numerous documents produced by Defendants in discovery proved to be well worth the effort. On December 28, 2018, the Court granted Plaintiffs' motion for summary judgment in part, and denied Defendants' motion. *Julian v. Swift Transp. Co. Inc.*, 360 F. Supp. 3d 932, 952 (D. Ariz. 2018).  In granting Plaintiffs' motion in part, the Court cited Plaintiffs' evidence, including Swift policy documents and deposition testimony, and the illustrative opt-in Plaintiff declarations. *See id*. at 938 ("Declarations from certain plaintiffs paint a consistent picture of working, or being ready to be called upon to perform work, around the clock.").  Based on this and other evidence, the Court determined that 29 C.F.R. § 785.22 applied to the trainees because they were continuously on-duty, and concluded

that "Swift was entitled to deduct no more than eight hours per day as time Plaintiffs were allowed to sleep." *Id*. at 947, n.12, 952.

79.    During this fourth stage of the case, we billed approximately **1,403 hours**, for a lodestar of approximately **$724,385**.

*Plaintiffs' Further Motions for Summary Judgment and Damages; and Swift's Procedural Motions: December 29, 2018 to December 27, 2019*

80.    On January 18, 2019, Plaintiffs filed their second motion for summary judgment, seeking rulings that the first day of Swift's three-day orientation and time trainees spent studying in preparation for end-of-training examinations while in the sleeper berth were compensable. Dkt. 213.  This second motion for summary judgment also required extensive document review and drafting, which made for another substantial commitment of time and effort by our team. The motion also presented difficult legal issues regarding when orientation attendees can be considered "employees" under the FLSA, which required us to devote substantial time to legal research. We submitted 21 exhibits in support of the motion, including orientation schedules and PowerPoints that Swift produced only after our successful meet and confer efforts. *See* Dkt. Nos. 213-2 through 213-22.  The motion was fully briefed.

81.    On May 30, 2019, the Court issued an order granting Plaintiffs' motion as to the compensability of study time, but deferring the orientation pay claim to trial. *Julian v. Swift Transp. Co. Inc.*, 2019 U.S. Dist. LEXIS 90629, at *12, *18 (D. Ariz. May 30, 2019).

82.    On June 10, 2019, Plaintiffs filed their motion for award of damages for "sleeper berth" time in excess of 8 hours per day. Dkt. 223.  Preparing the motion required another substantial commitment of time from our team to conduct legal research regarding the award of damages on summary judgment, analyze Swift's DOT log and compensation data, communicate with Plaintiffs' expert witness on damages, Mr. Breshears, and draft the brief. In support, we submitted the report of Mr. Breshears, which presented damages calculations based on the DOT driver log and compensation

data produced by Swift following the parties' meet and confer. The motion was fully briefed. *See* Dkt. Nos. 234, 237.  Our work again proved worthwhile. On December 27, 2019, the Court granted Plaintiffs' motion, holding that Plaintiffs were entitled to damages attributable to unpaid sleeper berth time over 8 hours per day, in the amount of $7,839,834. *Julian v. Swift Transp. Co. Inc.*, 2019 U.S. Dist. LEXIS 221423, at *12-*18, *21 (D. Ariz. Dec. 27, 2019).

83.    Swift filed a motion for certification of an interlocutory appeal of the Court's order granting Plaintiffs' first motion for summary judgment regarding the compensability of sleeper berth time over 8 hours per day. Dkt. 221.  Plaintiffs opposed the motion. Dkt. 228. We again had to devote time to legal research and drafting in order to prepare the opposition briefing. The motion was fully briefed. *See* Ds' Reply, Dkt. 229.

84.    In the meantime, the DOL issued new regulatory guidance opining that sleeper berth time was not compensable. WHD Opinion Letter FLSA2019-10, 2019 WL 3345452 (July 22, 2019).  We prepared briefing regarding the impact the guidance, as well as recent Supreme Court precedent addressing deference to such opinions under the *Auer* doctrine. Dkt. Nos. 239, 240, 242.  On December 10, 2019, the Court ruled that there were not substantial grounds for difference of opinion, and holding that the new opinion letter was not entitled to deference. *See* Dkt. 245.

85.    Swift also moved the Court to require Plaintiffs to provide a trial plan regarding their orientation and study time pay claims. Dkt. 222.  The motion was fully briefed. Dkt. Nos. 230, 232.  In the same timeframe, Plaintiffs filed a statement regarding their trial plan for proving liability and damages for the first 8 hours of sleeper berth time. Dkt. 225.  That filing was fully briefed as well. Dkt. Nos. 231, 233.  This further briefing commanded still more of our time to review the evidentiary record and compile a detailed trial plan that demonstrated how FLSA violations would be adjudicated on a collective basis. These efforts paid off, as the Court issued an order

denying Swift's motion and holding that all the remaining issues would proceed to trial. *See* Dkt. 246, at 10:22-12:16.

86.     During this fifth stage of the case, Plaintiffs' Counsel billed approximately **634 hours**, for a lodestar of approximately **$392,683**.

*Trial Preparation and Pretrial Submissions: December 28, 2019 to May 8, 2020*

87.     Following the motion practice in 2019, the following issues remained for trial: liability and damages regarding the first 8 hours of sleeper berth time; liability and damages regarding the first day of orientation; damages regarding study time; and liquidated damages. *See Julian v. Swift Transp. Co.*, 2019 U.S. Dist. LEXIS 221423, at *18 (D. Ariz. Dec. 27, 2019); *see also* Dkt. Nos. 248, 249.  After the parties submitted a joint statement regarding the issues the remaining for trial, the Court issued an order that the first 8 hours of sleeper berth time would be compensable unless Swift carried its burden at trial to prove four elements of the exception for bona-fide, 8-hour sleeping periods. *Julian*, 2019 U.S. Dist. LEXIS 221423, at *18.

88.     On January 14, 2020, the Court held a status conference to address several complex and disputed issues concerning burdens of proof and the management of a collective action trial.  Swift contended that the case could not be tried on a collective basis because the Court had not finally certified the action for collective treatment. *See* Dkt. 250. This required us to devote more time to briefing Swift's "final certification" arguments. *See* Dkt. Nos. 251, 252.  On January 22, 2020, the Court issued an order rejecting Swift's arguments. Dkt. 254.

89.     Thereafter, the parties worked together to prepare their joint pretrial submissions. Preparing the pretrial submissions was a time-consuming task that required us to conduct legal research on evidentiary and merits issues pertaining to the motions *in limine*, the proposed jury instructions, and the trial memorandum of law; conduct numerous witness interviews to prepare their witness list; review the evidentiary record to prepare their exhibit list; and coordinate with counsel for Swift on the joint submissions. On April 20, 2020, the parties filed their joint pretrial order, proposed jury

DECLARATION OF JOSHUA KONECKY
ISO PLAINTIFFS' MOTION FOR REASONABLE ATTORNEYS' FEES AND COSTS

instructions, juror questionnaire, and verdict forms. Dkt Nos. 262, 264, 265, 270, 271. Plaintiffs' trial witness list included more than 100 opt-in plaintiffs with whom we had conducted thorough interviews in preparation for trial. *See* Appendix 1 to Joint PTO (Dkt. 262) at pp. 2-30.  In addition, the parties each filed their respective trial memoranda of law. Dkt. Nos. 267, 272.  Swift filed four motions *in limine*, *see* Dkt. Nos. 263, 266, 268, 273, and Plaintiffs filed eight motions *in limine* as an omnibus filing. Dkt. 269.

90.     During the parties' meet and confer regarding the joint proposed jury instructions, disputes arose regarding which party bears the burden of proof under 29 C.F.R. § 785.22 and the sufficiency of evidence required for proof on a collective basis. Thereafter, Swift requested that the Court permit further summary judgment briefing to address the dispute. *See* Dkt. 275.  Plaintiffs opposed Swift's request. *Id*.  On May 8, 2020, the Court denied Swift's request, and reiterated its prior holding that the burden at trial would be "on Swift to establish it was entitled to exclude the eight-hour sleeping period." Dkt. 276, at 1:21-27.  In the same order, the Court vacated the prior trail date of August 11, 2020 and reset it for October 6, 2020 to allow the parties to mediate the case. *Id*. at 3:2-3.

91.     During this sixth stage of the case, Plaintiffs' Counsel billed approximately **497 hours**, for a lodestar of approximately **$319,336**.

*Mediation and Settlement: May 9, 2020 to September 16, 2020*

92.     On August 10, 2020, the parties participated in a full-day mediation. We worked with Plaintiffs' forensic accounting expert Mr. Breshears to prepare a damages analysis using Swift's DOT log and compensation data, applying the same methodology as that previously approved by the Court.  We also prepared a comprehensive mediation brief, which we circulated with Defendants before the mediation.  In addition, we conducted further interviews with numerous opt-in plaintiffs who were on Plaintiffs' trial witness list in preparation for the mediation.  We worked with these individuals to prepare more than 20 sworn declarations, which we provided to the mediator, Mr.

Piazza, in advance of the mediation.  The case did not settle at the mediation, but the parties made significant progress in narrowing the gap between their positions.  At the close of the mediation, Mr. Piazza made a mediator's proposal.  On August 12, 2020, the Parties accepted Mr. Piazza's mediator's proposal.

93.     Thereafter, we have worked with defense counsel to prepare the long-form settlement agreement and drafted the Motion for Approval of Settlement, the instant motion, and the supporting papers.

94.     During this seventh and final stage of the case, we billed approximately **838 hours**, for a lodestar of approximately **$481,130**.

### COSTS

95.     We also have incurred costs of suit of approximately $308,153.88 to date. **Exhibit C** is a ledger identifying each individual charge. The date corresponding to each individual charge may reflect the date the charge was entered into our accounting system, rather than the date when the charge occurred.

96.     The expenses incurred by our firm consist of (1) travel expenses; (2) document production expenses (*e.g.*, scanning, bates numbering, OCR, hosting, *etc.*); (3) deposition fees and transcripts; (4) postage; (5) filing and miscellaneous fees; (6) copying and printing; (7) computer legal research; (8) delivery and freight; (9) expert witness fees; and (10) the fees and costs from the Administrator to perform the previous 216(b) opt-in notice administration in 2017 and 2018.

97.     The legal research charges correspond to the actual costs incurred in conducting legal research specific to this case, rather than a pro-rata or other share of our firm's generalized legal research costs.

98.     Litigating this case was costly, given its protracted nature, the steady defense, the extensive motion practice, substantial documentary evidence, sizeable number of witnesses and depositions (with attendant travel costs), and trial preparation.

DECLARATION OF JOSHUA KONECKY
ISO PLAINTIFFS' MOTION FOR REASONABLE ATTORNEYS' FEES AND COSTS

99.    For instance, there were 28 depositions in this case, which required Counsel to travel extensively, including to Utah, Tennessee, New Mexico, and Georgia. There were also several court hearings throughout this case.

100.    The largest cost was the previous opt-in notice administration, which was necessary because it notified thousands of current and former Swift trainee truck drivers of this case by mail, email and text message, and gave these individuals the opportunity to join.

101.    Another substantial cost was expert witness fees, which were critical to Plaintiffs' success on the motion for damages and in evaluating Swift's exposure during the settlement negotiations.

## CONTINGENT RISK

102.    Schneider Wallace Cottrell Konecky LLP takes its cases on a contingent fee basis.  We rely on awards of attorneys' fees and costs to continue our work for the enforcement of labor standards.  Indeed, we did not charge the Plaintiff or Collective Members any fees or costs to litigate and bring this case to a successful conclusion.  In addition, as referenced above, our offices have to date incurred approximately $308,153.88, in out-of-pocket costs, which we have not yet recouped.  During the course of this litigation, we also had to forego requests by other prospective clients to bring other cases with merit in order to ensure that we could continue to adequately and successfully represent the Plaintiffs and the Plaintiff class in this matter.

103.    This case carried a significant risk of no recovery at all for either the Collective or the attorneys representing them.  When we do succeed in vindicating statutory and employment rights on behalf a collective of employees, such as in this case, our firm depends upon the recovery of our full lodestar plus an appropriate multiplier.  Otherwise, we could not continue to represent employees who are denied wages, but whose cases may be time-consuming and difficult to prove.

104.    The road to success was far from certain. As discussed above, when we brought the case, the District Court in *Nance v. May Trucking Co.*, 2014 U.S. Dist.

DECLARATION OF JOSHUA KONECKY
ISO PLAINTIFFS' MOTION FOR REASONABLE ATTORNEYS' FEES AND COSTS

LEXIS 5520 (D. Or. Jan. 15, 2014), had already held that, "as a matter of law, time spent in the sleeper berth, simply because the truck is moving, is not compensable." *Id.* at *23. The *Nance* Court relied on the Department of Labor (DOL) Regulation 29 C.F.R. § 785.41, which provides that an employee is "working while riding, except during bona fide meal periods or when he is permitted to sleep in adequate facilities furnished by the employer." *Id.* at *21-23 (citing 29 C.F.R. § 785.41). Thus, we faced the risk that the courts would hold that sleeper berth time is not compensable as a matter of law under 29 C.F.R. § 785.41, following the approach taken *Nance*.

105. To make matters more complicated, the Ninth Circuit affirmed the District Court's ruling in *Nance* during the pendency of the case. In an unpublished decision, the Circuit held that sleeper berth time is not compensable under 29 C.F.R. § 785.41, without limitation. *Nance v. May Trucking Co.*, 685 Fed. Appx. 602, 605 (9th Cir. 2017). While we believe *Nance* is distinguishable, it still posed a challenge for us. In addition, the DOL issued new regulatory guidance opining that sleeper berth time was not compensable. WHD Opinion Letter FLSA2019-10, 2019 WL 3345452 (July 22, 2019). The same might be said for *Petrone v. Werner Enterprises, Inc.*, 2017 WL 510884, *5-11 (D. Neb. Feb. 2, 2017). These particular concerns added to the other risks and uncertainties inherent in collective action litigation, from maintaining collective action treatment to gathering the evidence necessary to prove the underlying claims.

106. In sum, from the beginning of the case, we faced the prospect of recovering nothing, despite investing thousands of hours and significant out-of-pocket costs to prosecute the minimum wage claims. In the face of this uncertainty, we remain committed to the cause and ultimately secured a substantial collective action settlement for the Collective.

## **EXHIBITS**

107. Attached as **Exhibit A** to this Declaration is a true and correct copy of a document entitled "Schneider Wallace Cottrell Konecky, LLP Firm Profile."

108.   Attached as **<u>Exhibit B</u>** to the Declaration is a true and correct copy of my resume and curriculum vitae.

109.   Attached as **<u>Exhibit C</u>** is a true and correct copy of a cost bill for the various costs that our firm has incurred in this case, which our office manager ran on February 19, 2019, based on our firm's accounting records.

110.   Attached as **<u>Exhibit D</u>** to this Declaration is a true and correct copy of the Declaration of Cole Schlabach in support of a motion for attorneys' fees, filed January 24, 2020. Dkt. No. 36-1. The case is known as in the case of *ThermoLife Int'l LLC v. Am. Fitness Wholesalers LLC*, No. 18-cv-04189-PHX-JAT (D. Ariz. Jan 24, 2020).

111.   Attached as **<u>Exhibit E</u>** to this Declaration are true and correct copies of the Declaration of Andrew Friedman in support of a motion for attorneys' fees, and Exhibit A to the Declaration of Luke Brooks in support of a motion for attorneys' fees, filed April 24, 2020. Dkt. Nos. 719, 718-1. The case is known as *Smilovits v. First Solar, Inc*., No. 2:12-cv- 00555 (D. Ariz. Apr. 24, 2020).

112.   Attached as **<u>Exhibit F</u>** to this Declaration is a true and correct copy of an Order from The Hon. David G. Campbell, United States District Court, District of Arizona, Dkt. No. 731, granting a motion for attorneys' fees, filed June 30, 2020. The case is known as *Smilovits v. First Solar, Inc*., No. 2:12-cv- 00555 (D. Ariz. June 30, 2020).

113.   Attached as **<u>Exhibit G</u>** to this Declaration is a true and correct copy of the Declaration of Johnston De F. Whitman, Jr. in support of a motion for attorneys' fees, filed September 20, 2020. Dkt. No. 411-3 at ¶ 6, Ex. A.  The case is known as *Donato v. Insys Therapeutics Inc*., No. 16-cv-00302-PHX-NVW (D. Ariz. Sept. 10, 2020).

114.   Attached as **<u>Exhibit H</u>** to this Declaration is a true and correct copy of an Order from The Hon. Lucy H. Koh, United States District Court, Northern District of California, filed July 23, 2020, granting our Motion for Attorneys' Fees and Costs. The case is known as:  *Nevarez v. Forty Niners Football Co., LLC*, Case No. 16-CV-07013-LHK (N.D. Cal. July 23, 2020).

115.     Attached as **Exhibit I** to this Declaration is a true and correct copy of an Order from The Hon. Joseph C. Spero, United States District Court, Northern District of California, filed May 31, 2019, granting our Motion for Attorneys' Fees and Costs. The case is known as:  *Shaw v. AMN Services LLC et al.*, No. 3:16-cv-02816-JCS (N.D. Cal. May 31, 2019).

116.     Attached as **Exhibit J** to this Declaration is a true and correct copy of an Order from The Hon. William H. Orrick, United States District Court, Northern District of California, filed October 24, 2018, granting our Motion for Attorneys' Fees and Costs. The case is known as:  *Knapp v. Art.com, Inc.*, Case No. 13-CV-00768-WHO, (N.D. Cal. 2018).

117.     Attached as **Exhibit K** to this Declaration is a true and correct copy of an Order from The Hon. Mary E. Wiss, Superior Court of California, County of San Francisco, filed September 26, 2018, granting our Motion Approval of Plaintiffs' Attorneys' Fees and Costs. The case is known as: *Janssen v. Square, Inc.*, Case No. CGC-16-549980.

118.     Attached as **Exhibit L** to this Declaration is a true and correct copy of this Court's Order granting Plaintiffs' Motion for Final Approval of Class Settlement in *Bartoni v. Am. Med. Response W.*, Alameda Superior Court, Case No. RG 08-382130 (Sept. 13, 2019)

119.     Attached as **Exhibit M** to this Declaration is a true and correct copy of an Order from The Hon. Winifred Y. Smith, Superior Court of California, County of Alameda, filed November 16, 2016, granting our Motion Approval of Plaintiffs' Attorneys' Fees and Costs. The case is known as: *Marine v. Interstate Distributor.*, Case No. RG07358277.

120.     Attached as **Exhibit N** to this Declaration is a true and correct copy of an Order from The Hon. Joseph C. Spero, United States District Court, Northern District of California, filed December 12, 2016, granting our Motion for Attorneys' Fees and Costs.

The case is known as:  *Villalpando v. Exel Direct, Inc.*, Case No. 3:12-cv-04137-JCS, (N.D. Cal. 2016).

121.    Attached as **<u>Exhibit O</u>** to this Declaration is a true and correct copy of an Order from The Hon. Vince Chhabria, United States District Court, Northern District of California, filed July 12, 2016, granting our Motion for an Award of Attorneys' Fees and Costs. The case is known as:  *Carnes v. Atria Senior Living Inc.*, Case No. 14-cv-02727-VC, (N.D. Cal. 2016).

122.    Attached as **<u>Exhibit P</u>** to this Declaration is a true and correct copy of an Order from The Hon. Thelton E. Henderson, United States District Court, Northern District of California, filed May 25, 2016, granting our Motion for Final Approval of Settlement. The case is known as:  *Meza v. S.S. Skikos, Inc.*, Case No. 3:15-cv-01889-TEH, ECF 58, at 4 (N.D. Cal. 2016).

123.    Attached as **<u>Exhibit Q</u>** to this Declaration is a true and correct copy of an Order from The Hon. Virginia A. Phillips, United States District Court, Central District of California, filed June 29, 2016, Approving Class Settlement and Attorneys' Fees and Costs. The case is known as:  *Jeter-Polk v. Casual Male Store, LLC*, Case No. EDCV 14-891-VAP (DTBx) (C.D. Cal. 2016).

124.    Attached as **<u>Exhibit R</u>** to this Declaration is a true and correct copy of an Order from The Hon. Timothy Volkmann, California Superior Court, County of Santa Cruz, filed March 22, 2013, granting our Motion for Attorneys' Fees and Costs in the case of *Perez, et al., v. rue21, inc.*, Case No. CISCV167815.

125.    Attached as **<u>Exhibit S</u>** to this Declaration is a true and correct copy of an Order from The Hon. Robert B. Freedman, California Superior Court, County of Alameda, filed November 8, 2012, approving our 2012 hourly rates in an overtime class action under California law.  The case is known as *Williams, et al. v. H&R Block Enterprises, Inc.*, Case No. RG08366506.

126.    Attached as **<u>Exhibit T</u>** to this Declaration is a true and correct copy of an Order from The Hon. Lucy H. Koh, United States District Court, Northern District of

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

California, San Jose Division, filed February 2, 2012, granting our Application for an Award of Attorneys' Fees and Costs. The case is known as: *Ortiz, et al., v. Home Depot U.S.A., Inc.*, Case No.: 5:09-cv-03485-LHK (N.D. Cal.).

127.   Attached as **Exhibit U** to this Declaration is a true and correct copy of an Order from The Hon. Richard Kramer, California Superior Court, In and For the County of San Francisco, Unlimited Civil Jurisdiction, filed April 28, 2011, granting our Motion for Attorneys' Fees and Costs. The case was known as: *Bond-Hatch v. Quest Diagnostics, Inc.*, Case No. CGC-06-450274 (California Superior Court, County of San Francisco).

128.   Attached as **Exhibit V** to this Declaration is a true and correct copy of an Order from the Hon. Joseph C. Spero, Northern District of California, filed April 1, 2011, approving our firm's 2010 rates in an off-the-clock and meal-period class and collective action brought under state and federal law.  The case is known as: *Wren, et al. v. RGIS*, Case Nos. 06-05778 and 07-00032 (N.D. Cal.).

129.   Attached as **Exhibit W** to this Declaration is an Order from the Hon. Marilyn Hall Patel, Northern District of California, filed August 3, 2009, approving our firm's rates in a contested fee motion in the case of *National Federation of the Blind v. Target Corporation*, Case No. C 06-01802 (N.D. Cal.).

130.   Attached as **Exhibit X** to this Declaration is an Order from the Hon. William H. Alsup, Northern District of California, filed April 13, 2006, approving our firm's rates in a motion for reasonable attorneys' fees and costs. The case is known as *Chery v. City College of San Francisco*, Case No. C 04-4981 WHA (N.D. Cal.)).

131.   Attached as **Exhibit Y** to this Declaration is the Memorandum of Points and Authorities in Support of the Motion for Final Approval of Settlement in the case of *Browne v. P.A.M. Transp.*, Case No. 5:16-cv-05366-TLB (W.D. Ark. July 31, 2020), Dkt. 298, filed July 7, 2020.

132.   Attached as **Exhibit Z** to this Declaration is a copy of the Declaration of Matthew Crimmins in Support of the motion for preliminary approval of the proposed

DECLARATION OF JOSHUA KONECKY
ISO PLAINTIFFS' MOTION FOR REASONABLE ATTORNEYS' FEES AND COSTS

settlement the case of *Haworth v. New Prime, Inc.*, Case No. 6:19-cv-03025-RK (W.D. Mo. 2020), Dkt. No. 100-3.

133.     Attached as **Exhibit AA** to this Declaration is a copy of the Order granting preliminary approval of the proposed settlement in the case of *Haworth v. New Prime, Inc.*, Case No. 6:19-cv-03025-RK (W.D. Mo. 2020), Dkt. 103.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and based on my personal knowledge.  Executed on September 18, 2020, in Berkeley, California.

/s/     *Joshua G. Koneky*
Joshua G. Konecky

DECLARATION OF JOSHUA KONECKY
ISO PLAINTIFFS' MOTION FOR REASONABLE ATTORNEYS' FEES AND COSTS

# EXHIBIT A

# SCHNEIDER WALLACE COTTRELL KONECKY LLP

# Firm Profile

Schneider Wallace Cottrell Konecky LLP is a national litigation law firm founded in 1993 that handles complex legal claims.  It has offices in the San Francisco Bay Area, Texas and Arizona. The firm maintains a nationwide practice and its attorneys have litigated throughout the country. The firm handles numerous class actions in the area of employment, disability access, civil rights and consumer protections.  It also specializes in ERISA and financial investment litigation on behalf of both individual and institutional investors.  The firm's class action practice focuses on impact litigation with a goal of remedying systemic violations of the law in employment, civil rights, public accommodations, consumer fraud, and breaches of fiduciary duties in ERISA and public retirement plan cases.

A partial list of class actions in which the firm and its attorneys have been appointed class counsel includes:

Disability Rights

- *Willits v. City of Los Angeles,* Case No. CV 10-05782 CBM (RZx) (C.D. Cal.) (disability access class action on behalf of people with mobility disabilities that resulted in class action settlement for $1.4 billion in injunctive relief for remedying physical access barriers in the City's pedestrian rights of way, the largest systemic disability access settlement in United States history).

- *Bates v. United Parcel Service*, 465 F.3d 1069 (9th Cir. 2006) (a first of its kind national disability discrimination class action on behalf of deaf employees of UPS, which resulted in a partial settlement of $5.8 million and, after a trial on the remaining claims, a liability verdict in favor of the Plaintiff class that was appealed and later settled).

- *Ortiz v. Home Depot USA, Inc.,* Case No. 5:09-cv-03485-LHK (N.D. Cal.) (an (innovative class action settlement creating new procedures for providing sign language interpreters, accessible technology and effective interactive process to deaf workers).

- *National Federation of the Blind, et al., v. Target Corp.*, 582 F.Supp.2d 1185 (N.D. Cal. 2007) (nationwide disability rights class action resulting in settlement for broad injunctive relief requiring Target Corporation to design its website to be accessible to blind individuals using screen access software and a class damages fund of $6 million, the largest damages fund in any class action brought on behalf of the blind).

- *Cherry v. The City College of San Francisco,* No. C 04-04981 WHA (N.D.Cal.) (disability access class action on behalf of people with mobility disabilities that resulted in a stipulated judgment requiring the College to make architectural and other access changes valued at over $20 million at numerous campuses of City

College).

- *Lopez, et al. v. San Francisco Unified School District*, Case No. C 99-3260 SI (N.D. Cal.) (disability access class action on behalf of mobility-impaired students in the San Francisco Unified School District, which resulted in a stipulated judgment requiring the District to make architectural and other access changes valued at over $400 million).

<u>Discrimination</u>

- *Satchell v. FedEx Express, Inc.*, Case No. 03-02659 SI (N.D. Cal.) ($55.5 million class action settlement addressing race discrimination within FedEx and covering nearly 24,000 class members).

- *Singleton v. Regents of the University of California* (gender discrimination class action against Lawrence Livermore National Laboratory for disparities in pay and promotion resulting in class action settlement of $10.6 million).

<u>Civil Rights</u>

- *Carlson v. eHarmony,* Case No. BC 371958 (Los Angeles County Superior Court) (class action settlement requiring Internet dating site to change policies and ensure equal access to gays and lesbians as well as establishing a damages fund of $2 million to pay full statutory damages to class members under the California Unruh Civil Rights Act).

<u>Minimum Wage and Overtime</u>

- *Villalpando v. Exel Direct, Inc.,* Case No. 3:12-cv-04137 JCS, 2015 WL 5179486 (N.D. Cal.) (class action settlement for $13,500,000 on behalf of 386 individuals alleging denial of employment rights and benefits achieved after court granted summary judgment in favor of the certified plaintiff class on the issue of whether they were misclassified as "independent contractors" instead of "employees").

- *Mitchel v. Acosta Sales & Marketing,* Case No. 2:11-CV-01796 GAF (OPx) (C.D.Cal.) (collective and class action settlement of $9,900,000 to resolve off-the-clock overtime claims on behalf of approximately 4,500 part time and 1,500 full time merchandisers under the Fair Labor Standards Act and California law).

- *Sosa v. Dreyer's Grand Ice Cream, Inc.,* Case No. RG08424366 (Alameda County Superior Court) (class action settlement of $13.5 million for unpaid donning and doffing time and noncompliant meal periods, resulting in average settlement awards of $8,500 each for the nonexempt workers at Dreyer's facility in Bakersfield, California).

- *Bond-Hatch v. Quest Diagnostics, Inc.,* Case No. CGC-06-450274 (California Superior Court, County of San Francisco) (class action settlement of $9 million for

off-the-clock and missed meal and rest breaks for approximately 4,000 phlebotomists).

- *Hollands v. Lincare,* Case No. CGC07-465052 (San Francisco County Superior Court) ($3.4 million class settlement providing average individual awards of over $10,000 for approximately 200 class members based on alleged misclassification for overtime).

- *Piper, et al. v. RGIS,* Case Nos. 06-05778 and 07-00032) (N.D. Cal.) (class settlement requiring injunctive relief and $27 Million settlement fund to remedy off-the-clock and meal period violations on behalf of FLSA opt-in and Rule 23 opt out class covering approximately 62,000 class members).

- *Chau v. CVS RX Services, Inc.*, Case No. BC349224) (Los Angeles County Superior Court) ($19.75 million class action settlement for failure to pay overtime and provide meal and rest periods to nearly 2,000 pharmacists).

- *Holliman v. Kaiser Foundation Health Plan* (Alameda Superior Court) (Fair Labor Standards Act class action on behalf of health plan employees for unpaid overtime wages that resulted in a $9 million class settlement).

- *Elkin v. Six Flags* (Los Angeles Superior Court) (California wage and hour class action on behalf of amusement park employees for failure to provide adequate breaks and failure to compensate for "off-the clock" work, which resulted in a $14 million settlement).

- *Herring v. Hewitt Associates, LLC*, Case No. 06-cv-00267 (D.N.J.) ($4.9 million class action settlement for overtime misclassification of over 1,000 benefits analysts).

- *Jimenez v. Perot Systems Corp.*, Case No. RG07335321 (Alameda County Superior Court) ($5.8 million class action settlement for miscalculation of overtime exemption on behalf of nearly 2,000 hospital technology workers).

- *Gomez v. Perot Systems Corp.,* Case No. CV0803337 (Alameda County Superior Court) (final approval of $3 million class action settlement for failure to pay on-call time to approximately 1,300 hospital technical workers).

- *Reed v. CALSTAR,* Case No. RG04155105 (Alameda County Superior Court) (final approval of $3.5 million class action settlement on behalf of a class of 113 flight nurses for improper on-duty meal periods and failure to pay overtime).

- *Lenahan v. Sears* (Alameda Superior Court) (Fair Labor Standards Act class action on behalf of product repair service technicians for unpaid wages, which resulted in a $15 million settlement).

<u>Consumer Fraud</u>

- *Labrador v. Seattle Mortgage Co* (statewide consumer fraud case alleging that defendant systematically violated federal reverse mortgage program consumer protection regulations by charging improper loan-related fees, resulting in $4 million settlement).

- *Rosa v. Morrison Homes* (statewide construction defect case, certified as a class action on behalf of more than 400 home owners alleging that Morrison Homes failed to construct their homes in compliance with applicable building codes and standards).

- *Syran v. Lexis Nexis* (nationwide class action brought for violations of the Fair Credit Reporting Act on behalf of individuals whose personal information was disclosed, which resulted in extensive changes to Lexis' security procedures in addition to a monetary settlement of $2.8 million).

- *Eagan v. AXA Equitable Life Insurance Co.* (nationwide class action under ERISA on behalf of a class of retired insurance agents and other employees seeking the restoration of retiree health care benefits. The case settled on a class wide basis for significant monetary relief and a limitation on the company's ability to amend the heath care benefit plan for retirees).

- *Glass Dimensions, Inc.  v. State Street Bank & Trust Co.* (ERISA class action brought on behalf of a nationwide class of 1,790 retirement plans alleging that State Street violated its fiduciary duties by setting and receiving excessive compensation in connection with its securities lending program).

- *Healy  v. Cox Communications, Inc.* (antitrust class action brought on behalf of Cox subscribers in the Oklahoma City metropolitan area alleging that Cox illegally tied rentals of its set top boxes to subscriptions to its digital cable services).

- *Bilewicz v. FMR LLC, et al.* and *Yeaw v. FMR LLC* (ERISA class action on behalf of a nationwide class of participants in the defendants' profit sharing plan, alleging that defendants' breached their fiduciary duties and engaged in ERISA-prohibited transactions in making decisions with respect to selecting, removing, replacing and monitoring the Plan's investments, resulting in a $12 million dollar settlement).

## PARTNERS' PROFILES

**Todd M. Schneider** – Mr. Schneider founded the firm in 1993.  Having received his J.D. degree in 1990, Mr. Schneider has spent his entire career representing plaintiffs in complex litigation.  He has litigated cases successfully around the country, in both trial and appellate courts.  He recently argued a case in the United States Supreme Court, and he has tried numerous consumer class actions to verdict.

Mr. Schneider is a national leader in the plaintiff's bar.  Named by his peers as a Trial Lawyer of the Year in California and a two-time finalist for Consumer Attorney of the Year, he is past President and serves on the Board of Directors of the San Francisco Trial Lawyers Association, and has served on the Board of Governors and was the Vice President of the Consumer Attorneys of California.

Mr. Schneider is a frequent lecturer and regularly appears as a panelist at continuing legal education seminars.  For each year that the list has been published, Mr. Schneider was been named a Super Lawyer in the area of "class actions and mass torts" by Northern California Super Lawyers magazine.

***Guy Wallace*** – Guy Wallace is a 1993 graduate of the Harvard Law School.  He began his career in public interest law, and was the recipient of a Skadden Arps Fellowship.  He has extensive experience in class action impact litigation on behalf of persons with disabilities and other protected classes, as well as consumer litigation.  He is a frequent lecturer on disability law issues and class action impact litigation, and he has authored various publications on those topics.  He has been named as a "Super Lawyer" by Northern California Super Lawyers magazine for every year since 2009.

Mr. Wallace serves as a member of the Board of Directors of The San Francisco Trial Lawyers Association.  He has also served as a member of the Board of Directors of the Bar Association of San Francisco, and on the Board of Directors of Disability Rights California.

Mr. Wallace practices in the areas of civil rights, employment and consumer rights.  He is a recognized specialist in class action litigation. His expertise includes both disability access and employment class action cases. Mr. Wallace lectures and writes extensively about the practice of impact litigation. Mr. Wallace received his B.A. from Harvard College in 1989.  He has been a wheelchair user since the age of 16 as the result of a spinal injury.  Mr. Wallace has been a partner at SWCKW since 2000.

***Carolyn Cottrell*** – Ms. Cottrell is a partner with Schneider Wallace Cottrell Konecky LLP and has been a member of the firm since 1995.  Ms. Cottrell has spent her legal career advocating for the rights of individuals who have been subjected to underpayment of wages, discrimination, harassment and retaliation.  She has litigated hundreds of class actions and individual claims including wage and hour, employment discrimination and civil rights actions.

In 2010, Ms. Cottrell was honored as a "Top Woman Litigator" by the Daily Journal.  In 2012 she was nominated for "Woman Trial Lawyer of the Year" by the Consumer Attorneys of California.  She also serves on the Board of Directors of the San Francisco Trial Lawyers Association.  Ms. Cottrell is a member of the State Bar of California, the San Francisco Trial Lawyers Association, Public Justice, the Consumer Attorneys of California and the California Employment Lawyers Association.  She earned her Bachelor's degree from the University of California and received her law degree from the University of Pacific, McGeorge School of Law.

***Joshua Konecky*** – Joshua Konecky is a litigator, mediator and partner at Schneider Wallace Cottrell Konecky LLP. He has litigated numerous class action cases in the areas of employment, disability, and consumer law.  In 2013, the Daily Journal named him as one of the top labor and employment attorneys in California.  In 2012, his firm was listed as one of the "top 10 go-to plaintiffs' employment firms in Northern California" by the Recorder Legal Paper.  Mr. Konecky has been on the Northern California Super Lawyers list every year since 2011.  He has authored publications on employment law, disability access and class actions, and lectures on these subjects as well.   He is a contributing editor to the Rutter Group "Claims and Defenses" treatise.

Mr. Konecky sits on the Board of Directors for Legal Aid at Work and Disability Rights Advocates.  He also serves on the Mandatory Settlement Conference Panel for the Superior Court of California in San Francisco.

Mr. Konecky holds a J.D. from New York University School of Law (1995), a B.A. from Haverford College (1990), and 42 hours of formal mediation training at the Straus Institute for Dispute Resolution at Pepperdine University School of Law (2011).

He is a former U.S. Fulbright Scholar, Skadden Public Interest Law Fellow, and judicial law clerk for U.S. District Court Judge Lawrence K. Karlton.

# EXHIBIT B

**JOSHUA KONECKY**
Schneider Wallace Cottrell Konecky LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
415.421.7100 (tel); 415.421.7105 (fax)
jkonecky@schneiderwallace.com

## EDUCATION & FELLOWSHIPS

**New York University School of Law**, New York, NY, J.D., May 1995
    Arthur Garfield Hays Fellow
    Constitutional Law Teaching Assistant

**Haverford College**, Haverford, PA, B.A., May 1990
    *Magna Cum Laude*
    Highest Honors in Major (Chemistry); Phi Beta Kappa Society; Phi Upsilon Society (National Chemistry Society)

**Fulbright Scholar**, Buenos Aires, Argentina, Spring & Summer 2002
    *Lecturing and Research Scholar.*  Presented lectures and seminars to lawyers, judges, scholars, students, government officials and community members regarding disability access and civil rights laws in the United States.  Conducted interviews and research concerning laws, policies and experiences of people with disabilities in Argentina.

**Straus Institute for Dispute Resolution, Pepperdine University School of Law**, August 2011
    Completion of 42 hours of training in Mediating the Litigated Case.

## LAW PARTNER

**Schneider Wallace Cottrell Konecky LLP**, San Francisco, CA             **5/04-Present**

    *Partner.* Manage class action litigation in federal and state court, including cases in wage and hour, disability access, employment discrimination, and other civil litigation; Daily Journal's top 75 employment attorneys in California (2013); "Super Lawyer" for Northern California (2011-2019); Finalist – Consumer Attorney of the Year, Consumer Attorneys of California (2010).

    *Settlement Conference Officer.*  Superior Court of California, County of San Francisco (October 2012-Present)

    *Board Memberships*:  Legal Aid at Work; Disability Rights Advocates

### Representative Cases

    *Shaw, et al., v. AMN Services, LLC & Kaiser Foundation Hospitals* (Case No. 3:16-cv-02816 JCS) (N.D. Cal.) (final approval of class action settlement for $20,000,000 on behalf of traveling nurses asserting claims for denial of overtime, meal periods, and rest breaks; settlement achieved after court granted contested motion for class certification).

    *Julian, et al., v. Swift Transportation Co. Inc.* (Case No. CV-16-00576 PHX-ROS;) (D. Ariz.) (summary judgment granted on liability, 36 F.Supp. 3d 932, and summary judgment subsequently awarded on damages to approximately 9,500 "opt-in" plaintiffs in collective action for unpaid minimum wage on behalf of trainees of a major trucking company).

*Helmick, et al., v. Air Methods Corporation* (Case No. RG13665373) (Superior Court of California) (Phase 2 court trial resulting in over $60,000,0000 in class-wide damages awarded to over 300 flight nurses and paramedics presenting claims for denial of daily overtime and meal and rest periods during 24-hr and 48-hr shifts).

*Bartoni, et al., v. American Medical Response* (Case No. RG08382130) (Superior Court of California) (final approval of class action settlement for $17,000,000 on behalf of paramedics and dispatches asserting claims for denial of meal and rest periods during 12-hour shifts; settlement achieved after court granted contested motion for class certification).

*Ortiz, et al., v. Valley Relocation and Storage, et al.* (Case No. CGC-14-542925) (Superior Court of California, County of San Francisco) (class action trial on behalf of workers asserting that employer denied them employment rights and benefits by misclassifying them as "independent contractors" rather than "employees," culminating in final statement of decision after trial on employee status in favor of the plaintiff class).

*Villalpando v. Exel Direct, Inc.* (Case No. 3:12-cv-04137 JCS, 2015 WL 5179486) (N.D. Cal.) (final approval of class action settlement for $13,500,000 on behalf of 386 individuals alleging denial of employment rights and benefits after court granted summary judgment in favor of the certified plaintiff class on the issue of whether they were misclassified as "independent contractors" instead of "employees").

*Mitchel v. Acosta Sales & Marketing* (Case No. 2:11-CV-01796 GAF (OPx) (C.D.Cal.) (final approval of collective and class action settlement of $9,900,000 to resolve off-the-clock overtime claims on behalf of approximately 4,500 part time and 1,500 full time merchandisers under FLSA and California law).

*Perez v. rue21, Inc.* (Case No. CISCV167815) (Santa Cruz Superior Court) (final approval of class action settlement of $2.75 million for missed meal and rest periods to retail store level employees working primarily on a part-time basis in approximately 30 stores in California).

*Ortiz v. Home Depot USA, Inc.* (Case No. 5:09-cv-03485-LHK) (N.D. Cal.) (final approval of innovative class action settlement achieved before significant litigation that created new procedures for providing sign language interpreters, accessible technology and effective interactive process to deaf workers).

*Sosa v. Dreyer's Grand Ice Cream, Inc.* (Case No. RG08424366) (Alameda County Superior Court) (final approval of class action settlement of $13.5 million for unpaid donning and doffing time and noncompliant meal periods, resulting in average settlement awards of $8,500 each for the nonexempt workers at Dreyer's facility in Bakersfield, California).

*Bond-Hatch v. Quest Diagnostics, Inc.* (Case No. CGC-06-450274) (California Superior Court, County of San Francisco) (final approval of $9 million settlement for off-the-clock and missed meal and rest breaks for approximately 4,000 phlebotomists).

*Hollands v. Lincare* (Case No. CGC07-465052) (San Francisco County Superior Court) (final approval granted for $3.4 million class settlement providing average individual awards of over $10,000 for approximately 200 class members based on alleged misclassification for overtime).

*Piper, et al. v. RGIS* (Case Nos. 06-05778 and 07-00032) (N.D. Cal.) (final approval of class settlement requiring injunctive relief and $27 Million settlement fund to remedy off-the-clock and meal period violations on behalf of FLSA opt-in and Rule 23 opt out class covering approximately 62,000 class members).

*National Federation of the Blind v. Target* (Case No. C 06-01802 MHP) (N.D. Cal) (final approval of class action settlement to make target.com website accessible to legally blind consumers in the United States and establishing a damages fund of $6 million).

*Carlson v. eHarmony* (Case No. BC 371958) (Los Angeles County Superior Court) (final approval of a class action settlement for Internet dating site to change policies and ensure equal access to gays and lesbians as well as establishing a damages fund of $2 million to pay full statutory damages to class members under the Unruh Civil Rights Act).

*Turner et al., v. Association of American Medical Colleges (AAMC)* (Case No. RG-166148) (San Francisco Superior Court) (class action bench trial on behalf of individuals with learning disabilities seeking reasonable accommodations on the MCAT for medical school admissions, culminating in trial court's statement of decision in favor of the plaintiff class, but reversed on appeal based on holding that underlying statute did not provide right of action).

*Chau v. CVS RX Services, Inc.* (Case No. BC349224) (Los Angeles County Superior Court) (final approval of $19.75 million class action settlement for failure to pay overtime to nearly 2,000 pharmacists).

*Satchell v. FedEx Express, Inc.* (Case No. 03-02659 SI) (N.D. Cal.) (final approval of $55.5 million class action settlement addressing race discrimination within FedEx and covering nearly 24,000 class members).

*Herring v. Hewitt Associates, LLC* (Case No. 06-cv-00267) (D.N.J.) (final approval of $4.9 million settlement for misclassification of approximately 1,000 benefits analysts).

*Bates v. United Parcel Service, Inc.* (2004 WL 2370633) (N.D. Cal.) (final approval of national class action settlement providing accommodations and equal opportunities to deaf employees of UPS).

*Jimenez v. Perot Systems Corp.* (Case No. RG07335321) (Alameda County Superior Court) (final approval of $5.8 million class action settlement for miscalculation of overtime on behalf of nearly 2,000 hospital technology workers).

*Gomez v. Perot Systems Corp.* (Case No. CV0803337) (Alameda County Superior Court) (final approval of $3 million class action settlement for failure to pay on-call time to approximately 1,300 hospital technical workers).

*Reed v. CALSTAR* (Case No. RG04155105) (Alameda County Superior Court) (final approval of $3.5 million class action settlement on behalf of a class of 113 flight nurses for improper on-duty meal periods and failure to pay overtime).

*Campos v. San Francisco State University,* C-97-02326 MCC (N.D. Cal) (final approval of class action settlement remedying disability access violations).

*Rogers v. AccentCare, Inc.* (Case No. RG05237683) (Alameda County Superior Court) (final approval of class action settlement for unpaid travel time on behalf of home caregivers).

*McMaster v. BCI Coca-Cola Bottling Co.* (Case No. RG04173735) (Alameda County Superior Court) (final approval of $3.9 million class action settlement for unpaid drive time for nearly 900 Coca-Cola account managers).

*Portugal v. Macy's West, Inc.* (Case No. BC 324247) (Los Angeles County Superior Court) (final approval of class action settlement of $3.25 million challenging misclassification of 154 security managers).

*Taormina v. Siebel Systems, Inc.* (Case No. RG05219031) (Alameda County Superior Court) (final approval of $2.7 million class action settlement for misclassification of Siebel's 92 inside sales employees).

*Joseph v. The Limited, Inc.* (Case No. CGC 04-437118) (San Francisco County Superior Court) (final approval of $450,000 class action settlement for failure to provide meal and rest periods to class of 180 employees of The Limited stores).

*Rios v. Siemens Corp.* (Case No. C05-04697 PJH) (N.D. Cal.) (final approval of $375,000 class action settlement for failure to pay accrued vacation pay upon end of employment).

*DeSoto v. Sears, Roebuck & Co.* (Case No. RG0309669) (Alameda County Superior Court) and *Lenahan v. Sears, Roebuck & Co.* (Case No. 3-02-CV-000045 (SRC) (TJB)) (final approval of $15 million class action settlement for failure to pay more than 16,000 Sears drivers for all hours worked).

*McClain et al., v. Lufkin Industries, Inc.* (Civil Action No. 9:97-CV-063) (E.D.Texas) (Title VII class action challenging discrimination in promotions and compensation on behalf of African-American and Latino employees, culminating in judgment in favor of the employees, which the Fifth Circuit affirmed in part, reversed in part and remanded for further proceedings. *See McClain v. Lufkin Industries,* 519 F.3d 264 (5th Cir. 2008)).

## PUBLICATIONS

Piller, N., Konecky, J., Joyner, L. "Power in Numbers." <u>Forum, Employment Law</u> Consumer Attorneys of California (2020).

Konecky, J. & Joyner, L. "How to resolve small damages claims:  Arbitration and the new normal." <u>Forum, Civil Rights</u> Consumer Attorneys of California (2018).

Contributing Editor, Unruh Civil Rights Act Chapter of the California Practice Guide, Civil Procedure Before Trial, "Claims and Defenses," (2012).

Konecky, J. "Facts and Myths About Learning Disabilities and Standardized Testing: Private Enforcement of the Legal Right to Reasonable Testing Accommodations." <u>The Verdict</u> (Summer 2004).

Wolinsky, S., Konecky, J. & Aubrejuan, A. "The Legal Rights of Students with Learning Disabilities in the United States." In Vogel, Susan A. (Ed.), <u>Learning Disabilities in Higher Education and Beyond,</u> York Press (2003).

Konecky, J. & Wolinsky, S. "Through the Maze: Legal Issues and Disability Rights." <u>Learning Disabilities: A Multi-Disciplinary Journal,</u> Vol. 10, No. 2 (2000).

## LECTURES & SEMINARS

**Mediation and Settlement of Wage-and-Hour Disputes,** San Francisco, CA                    **10/13**
Moderator of panel discussing approaches and considerations for ensuring fair and reasonable class action settlements (MCLE event).

**ACI 18th National Forum on Wage & Hour Claims and Class Actions,** New York, NY          **5/13**
Panel speaker addressing case law developments and practice points pertaining to class and collective actions in the wage and hour context (MCLE event).

**Class Action Litigation and Management,** Los Angeles, CA                                    4/13
  Panel speaker on "Changing Classes: Statistical Differences and Damages after Dukes" (MCLE event).

**Association of Business Trial Lawyers,** Fresno, CA                                          3/13
  Panel speaker with state appellate court justice, federal magistrate judge and practitioners providing update on
  class action law (MCLE event).

**Federal Practice Primer & Insights from the Bench,** San Francisco, CA                     10/12
  Chair of panel comprised of federal court practitioners and federal magistrate judge addressing practice and
  procedure in federal court; sponsored by San Francisco Trial Lawyers Association (MCLE event).

**Wage & Hour 101,** Costa Mesa, CA                                                          10/12
  Panel presentation on key aspects of State and federal wage and hour law; 25th Annual Employment Law
  Conference of the California Employment Lawyers Association (MCLE event).

**In House Counsel Webinar Series, Miller Law Group,** San Francisco, CA                     06/12
  "*Dukes v. Wal-Mart*: One Year Later." Webinar for in-house counsel on the status and changing landscape
  of class action litigation in both federal and state courts.

**Stanford University Law School,** Palo Alto, CA                                            03/08
  Guest lecturer on mediation strategies for Alternative Dispute Resolution law school class.

**Bridgeport Continuing Education,** San Francisco, CA                                       07/07
  "Wage and Hour Class Actions." Presentation on case developments applicable to wage and hour class and
  collective actions in state and federal court (MCLE event).

**San Francisco Trial Lawyers Speaker Series,** San Francisco, CA                            11/06
  "How to Spot a Wage and Hour Class Action." Presentation on recent trends in wage and hour class actions
  and how to identify potential class actions from within one's current case load. (MCLE event).

**Annual Employment Law Conference (CELA),** Long Beach, CA                                   9/06
  Moderator for panel addressing various legal and evidentiary issues in the representation of employees during
  minimum wage and overtime disputes (MCLE event).

**Developments in Wage and Hour Law (CELA),** San Francisco, CA                               7/06
  Moderated and presented on panels to employment attorneys on developing areas in wage and hour law,
  sponsored by the California Employment Lawyers Association (MCLE event).

**Latest Developments in Wage and Hour Law (CELA),** San Francisco, CA                        7/05
  Presentation to employment attorneys on developing areas in wage and hour law and cases pending before the
  Supreme Court, sponsored by the California Employment Lawyers Association (MCLE event).

**How to Spot a Wage and Hour Case – California Regional TLA Conference,** Santa Barbara, Cal. 7/05
  Presentation to California trial lawyers on wage and hour litigation in California (MCLE event).

**Critical Issues in Employment Litigation – Advanced Course of Study (CEB),** SF, Cal.       5/05
  Presentation to plaintiff and defense employment attorneys on developments in wage and hour law, including
  class actions, Proposition 64, meal and rest breaks, commissions, bonus plans and exemptions (MCLE event).

**Is Your Website Accessible?  Legal Ethical and Technical Considerations in Creating Greater Access For People With Disabilities (BASF)**, San Francisco, California.            **5/04**
> Seminar presented to attorneys and website designers regarding the legal requirements and disputes with respect to the accessibility of websites to people with disabilities, sponsored by the Disability Rights Committee of The Bar Association of San Francisco (MCLE event).

**Critical Issues in Employment Litigation – Advanced Course of Study (CEB)**, SF, Cal.            **5/04**
> Presentation to plaintiff and defense employment attorneys on current trends in minimum wage and overtime class actions, sponsored by the Continuing Education of the Bar (MCLE event).

**Seminar in Public Administration and the Law**, San Francisco State University, California            **3/04**
> Taught class to graduate students in School of Public Administration addressing separation of powers and federalism, including a discussion of the same-sex marriage debate and recent Supreme Court cases concerning enforcement of the Americans with Disabilities Act against State governments.

## OTHER LEGAL EXPERIENCE

**Legal Aid Society of San Francisco**, San Francisco, CA            **9/98-1/11**
> *Volunteer Supervising Attorney.*  Provide direction and supervision in employment and labor law to law students who serve as counselors to workers seeking legal advice and assistance on minimum wage and overtime, discrimination, disability and union issues.

**Saperstein, Goldstein, Demchak & Baller**, Oakland, CA            **8/02-5/04**
> *Associate.* Participated in all aspects of class action litigation on behalf of plaintiffs in federal and state court. Major practice areas were: race and gender employment discrimination; enforcement of minimum wage and overtime protections; and access for people with disabilities in public accommodations and government programs.

**Disability Rights Advocates**, Oakland, CA            **9/97-1/02**
> *Staff Attorney and Skadden Public Interest Law Fellow.*  Participated in all aspects of class action litigation in federal court seeking equal access and opportunities for people with disabilities.  Major practice areas included: access to school facilities and educational programs; policies for reasonable accommodations and accurate assessments on admissions tests and professional screening exams; reasonable accommodations in the employment setting; and access to public accommodations.

**Law Clerk to the Honorable Lawrence K. Karlton**, U. S. District Court, Sacramento, CA            **9/95-8/97**
Federal clerkship involving all aspects of the civil docket and various criminal matters.  Major tasks included: drafting orders, opinions, jury instructions and pretrial memoranda in civil and criminal matters; conducting extensive legal research; managing the civil docket; and supervising and teaching law students.

# EXHIBIT C



## CASE COSTS
## Julian v. Swift
**Matter No. 101159**
**Date: 09/11/2020**

| DATE | VENDOR | DESCRIPTION | AMOUNT |
|------|--------|-------------|--------|
| 03/14/2016 | Clerk, U.S. District Court | Request for COGS for KGB | $36.00 |
| 03/25/2016 | Clerk, U.S. District Court | 101159 - JGK PHV | $35.00 |
| 03/25/2016 | Clerk, U.S. District Court | 101159 - NBP PHV | $35.00 |
| 04/01/2016 | FedEx | to USDC | $22.19 |
| 04/01/2016 | West Payment Center (4005) | Research 03/01 - 03/31/16 | $24.84 |
| 04/04/2016 | Best Messenger Service | | $26.00 |
| 05/04/2016 | Pacer | Document retrieval / legal research 01/01 - 03/31/16 | $1.90 |
| 08/04/2016 | Pacer | Document retrieval / legal research 04/01 - 06/30/16 | $1.60 |
| 08/23/2016 | TVLINC | Julian v. Swift | $8.00 |
| 08/24/2016 | South West Airlines | JGK to scheduling conf. | $476.96 |
| 08/24/2016 | TVLINC | Julian v. Swift | $8.00 |
| 09/01/2016 | West Payment Center (4005) | Research 08/01 - 08/31/16 | $29.57 |
| 09/15/2016 | Konecky, Joshua G. | Taxi - Case Related:Court to airport:Lyft | $15.51 |
| 09/15/2016 | Konecky, Joshua G. | Taxi - Case Related:Airport to court:AAA full transport | $21.16 |
| 09/15/2016 | Konecky, Joshua G. | Breakfast - Case Related:Travel to Phoenix for cmc:Chelsea's kitchen | $13.55 |
| 09/15/2016 | Konecky, Joshua G. | Lunch - Case Related:Lunch during travel from Phoenix:Airport | $23.87 |
| 09/15/2016 | Konecky, Joshua G. | Parking - Case Related:Airport parking:Oak airport | $38.00 |
| 11/01/2016 | West Payment Center (4005) | Research 10/01 - 10/31/16 | $20.41 |
| 11/15/2016 | South West Airlines | NBP to depo / doc production | $695.96 |
| 11/15/2016 | TVLINC | Nathan Piller for Hilton booking | $8.00 |
| 11/27/2016 | American Airlines | JGK to depo | $716.20 |
| 11/27/2016 | TVLINC | Julian v. Swift | $8.00 |
| 11/30/2016 | Piller, Nathan (Vendor) | Breakfast | $4.21 |
| 11/30/2016 | Piller, Nathan (Vendor) | Dinner | $10.90 |
| 11/30/2016 | Piller, Nathan (Vendor) | Taxi | $11.71 |
| 11/30/2016 | Piller, Nathan (Vendor) | Taxi | $12.37 |
| 11/30/2016 | Piller, Nathan (Vendor) | Taxi | $21.17 |
| 11/30/2016 | Piller, Nathan (Vendor) | Dinner | $23.18 |
| 11/30/2016 | Piller, Nathan (Vendor) | Hotel | $249.63 |
| 12/01/2016 | West Payment Center (4005) | Research 11/01 - 11/30/16 | $10.12 |
| 12/01/2016 | West Payment Center (4005) | Research 11/01 - 11/30/16 | $14.73 |
| 12/02/2016 | South West Airlines | NBP to depo and doc production | $749.68 |
| 12/15/2016 | Konecky, Joshua G. | Taxi | $15.33 |
| 12/15/2016 | Konecky, Joshua G. | Lunch | $15.49 |
| 12/15/2016 | Konecky, Joshua G. | Breakfast | $17.13 |
| 12/15/2016 | Konecky, Joshua G. | Taxi | $20.00 |
| 12/15/2016 | Konecky, Joshua G. | Parking | $38.00 |
| 12/15/2016 | Konecky, Joshua G. | Dinner | $30.50 |
| 12/15/2016 | Piller, Nathan (Vendor) | Breakfast | $5.76 |
| 12/15/2016 | Piller, Nathan (Vendor) | Taxi | $6.58 |
| 12/15/2016 | Piller, Nathan (Vendor) | Lunch | $10.86 |
| 12/15/2016 | Piller, Nathan (Vendor) | Dinner | $17.50 |
| 12/15/2016 | Piller, Nathan (Vendor) | Taxi | $20.50 |



| DATE | VENDOR | DESCRIPTION | AMOUNT |
|---|---|---|---|
| 12/15/2016 | Piller, Nathan (Vendor) | Dinner | $29.00 |
| 12/15/2016 | Piller, Nathan (Vendor) | Parking | $48.00 |
| 12/15/2016 | Piller, Nathan (Vendor) | Hotel | $325.93 |
| 12/19/2016 | TSG Reporting, Inc. | Depo - C. Dicharo | $1,509.60 |
| 12/27/2016 | TSG Reporting, Inc. | Depo - V. Malchesky | $661.50 |
| 12/30/2016 | TSG Reporting, Inc. | Sarah Koogle & Joshua Grow Cert Depo | $1,046.00 |
| 12/30/2016 | TSG Reporting, Inc. | Depo - J. Workman | $1,061.55 |
| 01/01/2017 | West Payment Center (4005) | Research 1201 - 12/31/16 | $5.82 |
| 01/01/2017 | West Payment Center (4005) | Research 1201 - 12/31/16 | $143.92 |
| 01/13/2017 | FedEx | from J. Halaka | $10.28 |
| 01/13/2017 | FedEx | to M. Russ | $27.90 |
| 01/13/2017 | FedEx | to D. Leister | $32.26 |
| 01/13/2017 | FedEx | to E. Bames | $32.56 |
| 02/01/2017 | Best Messenger Service | Deliver P's motion to Judge R Silver | $46.00 |
| 02/01/2017 | Best Messenger Service | to USDC | $46.00 |
| 02/01/2017 | West Payment Center (4005) | Research 01/01 - 01/31/17 | $24.50 |
| 02/07/2017 | Pacer | Document retrieval / legal research 10/01 - 12/31/16 | $9.10 |
| 03/06/2017 | Pacer | Document retrieval / legal research JGK account - entered 12/1/17 | $1.00 |
| 03/06/2017 | Pacer | Document retrieval / legal research 10/01 - 12/31/17 | $9.90 |
| 03/06/2017 | South West Airlines | NBP | $1,250.98 |
| 03/07/2017 | South West Airlines | NBP to depo | $746.58 |
| 03/07/2017 | TVLINC | Julian v. Swift | $8.00 |
| 03/09/2017 | TVLINC | Julian v. Swift | $8.00 |
| 03/15/2017 | Piller, Nathan (Vendor) | Breakfast - Case Related:Breakfast before depo:Starbucks | $4.72 |
| 03/15/2017 | Piller, Nathan (Vendor) | Breakfast - Case Related:Breakfast before depo:Firewood cafe | $7.08 |
| 03/15/2017 | Piller, Nathan (Vendor) | Taxi - Case Related:Travel to airport after depo:Uber | $7.96 |
| 03/15/2017 | Piller, Nathan (Vendor) | Airline Fees - Case Related:Internet on flight to depo:Southwest Airlines | $8.00 |
| 03/15/2017 | Piller, Nathan (Vendor) | Taxi - Case Related:Travel from airport to depo:Aaa yellow cab | $20.00 |
| 03/15/2017 | Piller, Nathan (Vendor) | Lunch - Case Related:Lunch after depo before flight:Chelsea's kitchen | $25.18 |
| 03/15/2017 | Piller, Nathan (Vendor) | Dinner - Case Related:Meal after depo:Westin hotel | $25.91 |
| 03/15/2017 | Piller, Nathan (Vendor) | Dinner - Case Related:Dinner after depo:Nook kitchen | $31.06 |
| 03/20/2017 | TSG Reporting, Inc. | D. Willia Isca cert. depo | $1,208.30 |
| 03/31/2017 | TSG Reporting, Inc. | Larry Carlisle  - certified depo transcript | $1,021.05 |
| 04/01/2017 | West Payment Center (4005) | Research 03/01 - 03/31/17 | $180.77 |
| 04/02/2017 | Best Messenger Service | | $53.50 |
| 04/30/2017 | Piller, Nathan (Vendor) | Parking - Case Related:Parking at airport for day of Dominic isca deposition:Oakland airp | $48.00 |
| 05/05/2017 | Pacer | Document retrieval / legal research  01/01 - 03/31/17 | $5.30 |
| 05/09/2017 | Pacer | Document retrieval / legal research Q1 2017-GBW acct. | $14.00 |
| 06/01/2017 | West Payment Center (4005) | Research 05/01 - 05/31/17 | $3.66 |
| 07/01/2017 | West Payment Center (4005) | Research 06/01 - 06/30/17 | $2.96 |
| 07/13/2017 | American Airlines | P Julian to depo | $1,113.00 |
| 07/13/2017 | South West Airlines | Julian v. Swift | $769.95 |
| 07/13/2017 | TVLINC | Julian v. Swift | $8.00 |
| 07/14/2017 | FedEx | from P Julian | $24.69 |
| 07/17/2017 | South West Airlines | NBP return from P Julian depo | $374.98 |
| 07/28/2017 | Carrie Reporting, LLC | Pamela Julian Depo Transcript | $799.75 |
| 07/28/2017 | FedEx | to J. Konecky | $13.42 |
| 07/28/2017 | FedEx | to R. Stallworth | $30.29 |


**SCHNEIDER  WALLACE**
**COTTRELL  KONECKY**

| DATE | VENDOR | DESCRIPTION | AMOUNT |
|------|--------|-------------|--------|
| 07/31/2017 | Piller, Nathan (Vendor) | Breakfast - Case Related:Breakfast before depo prep:Jamba Juice | $9.99 |
| 07/31/2017 | Piller, Nathan (Vendor) | Taxi - Case Related:Travel from Julian depo prep to airport:Lyft | $11.15 |
| 07/31/2017 | Piller, Nathan (Vendor) | Taxi - Case Related:Travel from airport to home following Julian depo:Lyft | $30.08 |
| 08/01/2017 | West Payment Center (4005) | Research 07/01 - 07/31/17 | $32.46 |
| 08/01/2017 | West Payment Center (4005) | Research 07/01 - 07/31/17 | $139.95 |
| 08/04/2017 | FedEx | to Burns Barton LLP | $22.99 |
| 08/04/2017 | FedEx | to J. Halaka | $31.76 |
| 08/07/2017 | Esquire Deposition Solutions, l | David Leister depo | $609.35 |
| 08/11/2017 | Virgin America | NBP to M Simpson depo | $1,136.40 |
| 08/15/2017 | Konecky, Joshua G. | Taxi - Case Related:Lyft to airport in phx:Lyft | $10.31 |
| 08/15/2017 | Konecky, Joshua G. | Taxi - Case Related:Cab from airport to hotel for dep prep:Lyft | $13.40 |
| 08/15/2017 | Konecky, Joshua G. | Taxi - Case Related:Cab from hotel to dep:Saba's limo | $17.10 |
| 08/15/2017 | Konecky, Joshua G. | Breakfast - Case Related:Breakfast during travel to phx for dep | $25.02 |
| 08/15/2017 | Konecky, Joshua G. | Dinner - Case Related:Dinner during travel back from dep | $28.29 |
| 08/15/2017 | Konecky, Joshua G. | Lunch - Case Related:Lunch w client after dep | $49.72 |
| 08/15/2017 | Konecky, Joshua G. | Parking - Case Related:Airport parking for dep (2 days):Oak airport | $68.00 |
| 08/15/2017 | Konecky, Joshua G. | Dinner - Case Related:Dinner after depo prep | $31.11 |
| 08/15/2017 | Konecky, Joshua G. | Hotel - Case Related:Julian dep:Westin Hotel | $362.80 |
| 08/21/2017 | Esquire Deposition Solutions, l | J. Halaka depo transcript | $441.30 |
| 08/21/2017 | TVLINC | Julian v. Swift | $8.00 |
| 08/22/2017 | South West Airlines | LHJ from A Hunter depo | $517.58 |
| 08/22/2017 | TVLINC | Julian v. Swift | $8.00 |
| 08/22/2017 | TVLINC | Julian v. Swift | $27.00 |
| 08/23/2017 | Hyatt Hotels | LHJ for A. Hunt's depo | $127.67 |
| 08/23/2017 | South West Airlines | LHJ from A. Hunt depo | $58.97 |
| 08/23/2017 | TVLINC | Julian v. Swift | $27.00 |
| 08/23/2017 | United Airlines | NBP to P. K. Browder depo | $1,060.40 |
| 08/25/2017 | American Airlines | Michael Russ for depo | $1,124.11 |
| 08/25/2017 | Esquire Deposition Solutions, l | M. Simpson depo transcript | $305.95 |
| 08/25/2017 | Hilton Hotels | Anthony Hunt for depo | $120.73 |
| 08/28/2017 | United Airlines | Julian v. Swift | $29.00 |
| 08/29/2017 | United Airlines | LHJ travel for depo | $796.40 |
| 08/30/2017 | LM Red Top | Taxi to airport for M. Russ | $35.00 |
| 08/31/2017 | Joyner, Leslie (Vendor) | Taxi - Case Related:Deposition:Uber | $6.95 |
| 08/31/2017 | Joyner, Leslie (Vendor) | Internet/Online Fees - Case Related:Deposition:Southwest Airlines | $8.00 |
| 08/31/2017 | Joyner, Leslie (Vendor) | Taxi - Case Related:Deposition:Uber | $8.85 |
| 08/31/2017 | Joyner, Leslie (Vendor) | Taxi - Case Related:Deposition:Uber | $16.81 |
| 08/31/2017 | Joyner, Leslie (Vendor) | Dinner - Case Related:Deposition:airport restaurant | $21.09 |
| 08/31/2017 | Joyner, Leslie (Vendor) | Taxi - Case Related:Deposition:Taxi | $40.00 |
| 08/31/2017 | Piller, Nathan (Vendor) | Parking - Case Related:Parking at hearing on motion for preliminary injunction:Gsa parki | $3.00 |
| 08/31/2017 | Piller, Nathan (Vendor) | Breakfast - Case Related:Breakfast on day of depo:Starbucks | $4.14 |
| 08/31/2017 | Piller, Nathan (Vendor) | Breakfast - Case Related:Breakfast at airport before depo prep:Bienvenuti | $7.21 |
| 08/31/2017 | Piller, Nathan (Vendor) | Lunch - Case Related:Lunch at airport before depo:Panda Express | $7.45 |
| 08/31/2017 | Piller, Nathan (Vendor) | Breakfast - Case Related:Breakfast on day of depo:Starbucks | $8.12 |
| 08/31/2017 | Piller, Nathan (Vendor) | Lunch - Case Related:Lunch on day of depo:Chick fil a | $8.26 |
| 08/31/2017 | Piller, Nathan (Vendor) | Breakfast - Case Related:Breakfast before halaka depo:Peet's | $9.30 |
| 08/31/2017 | Piller, Nathan (Vendor) | Taxi - Case Related:Travel from airport to hotel:Uber | $10.87 |
| 08/31/2017 | Piller, Nathan (Vendor) | Taxi - Case Related:Taxi from depo to airport:Uber | $10.89 |



| DATE | VENDOR | DESCRIPTION | AMOUNT |
|------|--------|-------------|--------|
| 08/31/2017 | Piller, Nathan (Vendor) | Lunch - Case Related:Lunch on flight getting into Dallas before depo:Wakaba | $12.15 |
| 08/31/2017 | Piller, Nathan (Vendor) | Taxi - Case Related:Travel from hotel to depo prep dinner:Uber | $12.16 |
| 08/31/2017 | Piller, Nathan (Vendor) | Taxi - Case Related:Taxi from depo prep dinner to hotel:Uber | $16.09 |
| 08/31/2017 | Piller, Nathan (Vendor) | Taxi - Case Related:Travel from Dallas airport to depo prep:Uber | $16.32 |
| 08/31/2017 | Piller, Nathan (Vendor) | Parking - Case Related:Parking for client on day of depo:Olymbec parking | $18.00 |
| 08/31/2017 | Piller, Nathan (Vendor) | Dinner - Case Related:Dinner after depo:Rio grande brew pub | $28.62 |
| 08/31/2017 | Piller, Nathan (Vendor) | Taxi - Case Related:Travel from Dallas airport to home after depo:Uber | $29.56 |
| 08/31/2017 | Piller, Nathan (Vendor) | Lunch - Case Related:Depo prep lunch with joseph halaka:Chick's donuts | $32.00 |
| 08/31/2017 | Piller, Nathan (Vendor) | Taxi - Case Related:Travel to airport for flight to Dallas:Uber | $34.24 |
| 08/31/2017 | Piller, Nathan (Vendor) | Taxi - Case Related:Travel from sfo following depo to home:Uber | $36.70 |
| 08/31/2017 | Piller, Nathan (Vendor) | Dinner - Case Related:Client depo prep dinner:M'tucci's | $55.00 |
| 08/31/2017 | Piller, Nathan (Vendor) | Taxi - Case Related:Travel to airport for flight to Albuquerque:Lyft | $58.02 |
| 08/31/2017 | Piller, Nathan (Vendor) | Mileage (Personal Vehicle) - Case Related:Travel to home of joseph halaka before depo | $58.65 |
| 08/31/2017 | Piller, Nathan (Vendor) | Dinner - Case Related:Client depo prep dinner:Cbd provisions | $75.00 |
| 08/31/2017 | Piller, Nathan (Vendor) | Hotel - Case Related:Lodging on night of depo in Dallas:Hilton Hotels | $286.70 |
| 09/01/2017 | LM Red Top | Cab service for Michael Russ | $35.00 |
| 09/01/2017 | Marriott | Lodging for deponent Steve | $144.73 |
| 09/01/2017 | West Payment Center (4005) | Research 08/01 - 08//31/17 | $25.24 |
| 09/01/2017 | West Payment Center (4005) | Research 08/01 - 08//31/17 | $68.46 |
| 09/02/2017 | Hyatt Hotels | Michael Russ for depo | $356.78 |
| 09/02/2017 | Marriott | LHJ for Steve Elipulos depo | $629.42 |
| 09/02/2017 | Super Shuttle | M. Russ to SFO | $36.58 |
| 09/05/2017 | Esquire Deposition Solutions, L | Mary Ausbon depo transcript | $1,665.70 |
| 09/07/2017 | Esquire Deposition Solutions, L | Earl Barnes depo transcript | $591.30 |
| 09/07/2017 | Pacer | Document retrieval / legal research Q2 2017 | $10.50 |
| 09/07/2017 | TVLINC | Julian v. Swift | $8.00 |
| 09/07/2017 | TVLINC | Julian v. Swift | $8.00 |
| 09/07/2017 | United Airlines | NBP return from J. Costa depo | $358.20 |
| 09/09/2017 | TVLINC | Julian v. Swift | $8.00 |
| 09/09/2017 | TVLINC | Julian v. Swift | $15.00 |
| 09/09/2017 | United Airlines | NBP to J Costa depo | $358.20 |
| 09/13/2017 | Esquire Deposition Solutions, L | Kevin Browder depo transcript | $713.30 |
| 09/15/2017 | Joyner, Leslie (Vendor) | Taxi - Case Related:Deposition:Uber | $31.50 |
| 09/15/2017 | Joyner, Leslie (Vendor) | Incidentals - Case Related:Deposition:ATM | $54.00 |
| 09/15/2017 | Piller, Nathan (Vendor) | Parking - Case Related:Parking at airport to pick up Michael Russ:Sfo | $6.00 |
| 09/15/2017 | Piller, Nathan (Vendor) | Breakfast - Case Related:Breakfast before depo:Bienvenuti | $7.49 |
| 09/15/2017 | Piller, Nathan (Vendor) | Taxi - Case Related:Travel from depo location to Phoenix airport:Uber | $8.78 |
| 09/15/2017 | Piller, Nathan (Vendor) | Taxi - Case Related:Travel from Phoenix airport to depo location:Uber | $11.16 |
| 09/15/2017 | Piller, Nathan (Vendor) | Breakfast - Case Related:Breakfast before Michael Russ depo:Peet's | $12.18 |
| 09/15/2017 | Piller, Nathan (Vendor) | Lunch - Case Related:Lunch on day of depo:Grabbagreen | $13.03 |
| 09/15/2017 | Piller, Nathan (Vendor) | Lunch - Case Related:Lunch after Michael Russ depo:Koja kitchen | $25.65 |
| 09/15/2017 | Piller, Nathan (Vendor) | Taxi - Case Related:Travel from sfo after depo:Uber | $38.75 |
| 09/15/2017 | Piller, Nathan (Vendor) | Taxi - Case Related:Travel to sfo for flight to Phoenix:Uber | $41.15 |
| 09/15/2017 | Piller, Nathan (Vendor) | Dinner - Case Related:Depo prep dinner with Michael Russ:P.F. Chang's | $66.10 |
| 09/15/2017 | United Airlines | NBP to depo | $836.40 |
| 09/16/2017 | TVLINC | Julian v. Swift | $8.00 |
| 09/19/2017 | Neilson & MacRitchie | Services - 9/5/17 | $265.00 |
| 09/20/2017 | Esquire Deposition Solutions, L | Anthony Hunt Deposition | $687.05 |



SCHNEIDER WALLACE
COTTRELL KONECKY

| DATE | VENDOR | DESCRIPTION | AMOUNT |
|------|--------|-------------|--------|
| 09/21/2017 | South West Airlines | NBF to Bellow, Rabon & Cochran depos | $383.58 |
| 09/22/2017 | FedEx | to NWhite | $17.65 |
| 09/23/2017 | United Airlines | NBP from depo | $487.20 |
| 09/25/2017 | Esquire Deposition Solutions, L | Steve Eliopulos depo transcript | $255.75 |
| 09/25/2017 | TSG Reporting, Inc. | Scheduling Fee for Shannon Gridley depo | $150.00 |
| 09/25/2017 | TSG Reporting, Inc. | Felicia Otis depo transcript | $1,060.30 |
| 09/26/2017 | Esquire Deposition Solutions, L | Michael Russ depo transcript | $391.55 |
| 09/29/2017 | TSG Reporting, Inc. | John Crosby  depo transcript/ remote video stream charge | $1,560.70 |
| 09/30/2017 | Batten, Edward R. | Taxi - Case Related:Deposition:UBER | $5.00 |
| 09/30/2017 | Batten, Edward R. | Taxi - Case Related:Deposition:UBER | $14.36 |
| 09/30/2017 | Batten, Edward R. | Lunch - Admin:Stallworth Deposition:Deli Deluxe | $19.46 |
| 09/30/2017 | Konecky, Joshua G. | Lunch - Case Related:Deposition planning lunch w nbp:Trader Vic | $84.38 |
| 09/30/2017 | Piller, Nathan (Vendor) | Breakfast - Case Related:Breakfast before depo:Peet's | $3.06 |
| 09/30/2017 | Piller, Nathan (Vendor) | Breakfast - Case Related:Breakfast before depo:Bienvenuti | $4.16 |
| 09/30/2017 | Piller, Nathan (Vendor) | Breakfast - Case Related:Coffee before flight to Phoenix:Starbucks | $5.25 |
| 09/30/2017 | Piller, Nathan (Vendor) | Lunch - Case Related:Lunch before depo:McDonald's | $8.07 |
| 09/30/2017 | Piller, Nathan (Vendor) | Taxi - Case Related:Travel from depo location to Phoenix airport:Uber | $8.99 |
| 09/30/2017 | Piller, Nathan (Vendor) | Taxi - Case Related:Travel to airport from depo location:Uber | $9.87 |
| 09/30/2017 | Piller, Nathan (Vendor) | Lunch - Case Related:Lunch during depo:Five guys | $12.03 |
| 09/30/2017 | Piller, Nathan (Vendor) | Taxi - Case Related:Travel from airport to depo location:Uber | $12.60 |
| 09/30/2017 | Piller, Nathan (Vendor) | Taxi - Case Related:Trip from Phoenix airport to depo location:Uber | $12.99 |
| 09/30/2017 | Piller, Nathan (Vendor) | Dinner - Case Related:Dinner at airport after depo:Ohso | $27.15 |
| 09/30/2017 | Piller, Nathan (Vendor) | Parking - Case Related:Parking at airport during time in Phoenix:Sfo | $36.00 |
| 09/30/2017 | Piller, Nathan (Vendor) | Taxi - Case Related:Travel to sfo for flight to Phoenix:Uber | $41.92 |
| 09/30/2017 | Piller, Nathan (Vendor) | Taxi - Case Related:Travel from sfo after flight home from depo:Uber | $44.40 |
| 10/01/2017 | West Payment Center (4005) | Research 09/01 - 09/30/17 | $226.03 |
| 10/02/2017 | Esquire Deposition Solutions, L | Shannon Gridley depo | $1,118.85 |
| 10/06/2017 | Expert Institute, The | Julian v. Swift $2,000 paid via CC 0740 on 3/8/18.  Balance Paid 7/18/18 | $4,000.00 |
| 10/09/2017 | TSG Reporting, Inc. | Melinda Solana depo transcript | $569.10 |
| 10/13/2017 | FedEx | SGordon to Honorable Roslyn O Silver | $23.38 |
| 10/20/2017 | Esquire Deposition Solutions, L | Roderick Stallworth depo transcript | $267.29 |
| 10/26/2017 | TSG Reporting, Inc. | Travis Bellew deposition | $1,456.60 |
| 10/27/2017 | FedEx | to Christopher Newell | $28.01 |
| 10/27/2017 | TSG Reporting, Inc. | Amit Khatri depo | $778.70 |
| 10/27/2017 | TSG Reporting, Inc. | Jean Rabon depo transcript | $1,118.15 |
| 10/31/2017 | TSG Reporting, Inc. | Joe Costa | $644.80 |
| 11/01/2017 | West Payment Center (4005) | Research 10/01 - 10//31/17 | $162.95 |
| 11/04/2017 | Pacer | Document retrieval / legal research Q3 2017 | $25.60 |
| 11/30/2017 | TSG Reporting, Inc. | Karen Kraft certified depo transcript | $967.35 |
| 11/30/2017 | TSG Reporting, Inc. | Terry Meyers depo transcript | $1,067.50 |
| 12/08/2017 | Heffler Claims Group | Services thru 11/30/17 (FLSA opt in Notice & processing) | $77,226.45 |
| 02/27/2018 | Heffler Claims Group | Services 12/01/17 thru 1/31/18 (FLSA opt in Notice & processing) | $60,871.91 |
| 03/01/2018 | West Payment Center (4005) | Research 02/01 - 02/28/18 | $102.39 |
| 03/26/2018 | Heffler Claims Group | Services 03/01/18 thru 04/30/18 (FLSA opt in Notice & processing) | $13,184.25 |
| 05/09/2018 | Expert Institute, The | Julian v. Swift $2,000 paid via CC 0740 on 3/8/18.  Balance Due 5/9/18 | $2,000.00 |
| 05/15/2018 | Konecky, Joshua G. | Parking - Case Related:Meet w oc at their offices:Russ | $34.00 |
| 05/15/2018 | Konecky, Joshua G. | Parking - Case Related:NBP Parking for mtg w oc:Russ - NBP | $34.00 |
| 05/16/2018 | Heffler Claims Group | Services 02/01/18 thru 02/28/18 (FLSA opt in Notice & processing) | $5,511.75 |



| DATE | VENDOR | DESCRIPTION | AMOUNT |
| --- | --- | --- | --- |
| 05/25/2018 | John Levickas | Julian v. Swift -- expert witness | $600.00 |
| 05/31/2018 | Piller, Nathan (Vendor) | Taxi - Case Related | $6.90 |
| 05/31/2018 | Piller, Nathan (Vendor) | Internet/Online Fees | $8.00 |
| 05/31/2018 | Piller, Nathan (Vendor) | Lunch - Case Related | $10.18 |
| 05/31/2018 | Piller, Nathan (Vendor) | Lunch - Case Related | $15.59 |
| 05/31/2018 | Piller, Nathan (Vendor) | Taxi - Case Related | $21.99 |
| 05/31/2018 | Piller, Nathan (Vendor) | Taxi - Case Related | $23.26 |
| 05/31/2018 | Piller, Nathan (Vendor) | Lunch - Case Related | $24.00 |
| 05/31/2018 | Piller, Nathan (Vendor) | Parking - Case Related | $48.00 |
| 06/01/2018 | West Payment Center (4005) | Research 05/01 - 05/31/18 | $126.84 |
| 06/11/2018 | Hemming Morse, LLP | 05/18 Services | $36,105.80 |
| 06/14/2018 | TSG Reporting, Inc. | Julian v. Swift | $1,146.85 |
| 06/15/2018 | Heffler Claims Group | May 2018 services | $1,803.65 |
| 06/15/2018 | Piller, Nathan (Vendor) | Printing/Photocopying/Stationery | $82.98 |
| 07/01/2018 | West Payment Center (4005) | Research 06/01 - 06/30/18 | $66.17 |
| 07/04/2018 | CTC Constant Contact | Email Blast | $56.25 |
| 07/09/2018 | Hemming Morse, LLP | June 2018 service | $1,327.50 |
| 07/13/2018 | Heffler Claims Group | Services 06/01/18 thru 06/30/18 | $1,120.15 |
| 07/17/2018 | Heffler Claims Group | Services 7/1/18 thru completion | $2,100.00 |
| 08/01/2018 | West Payment Center (4005) | Research 07/01 - 07/31/18 | $324.84 |
| 08/03/2018 | Hemming Morse, LLP | 07/18 Services | $2,063.00 |
| 08/07/2018 | Pacer | Document retrieval / legal research Q2 2018 | $11.60 |
| 08/09/2018 | Pacer | Document retrieval / legal research Q2 2018 | $3.50 |
| 08/17/2018 | FedEx | to Hemming Morse | $10.25 |
| 08/17/2018 | FedEx | to USDC | $73.51 |
| 09/01/2018 | West Payment Center (4005) | Research 08/01 - 08/31/18 | $511.69 |
| 09/21/2018 | FedEx | to USDC | $24.65 |
| 10/01/2018 | West Payment Center (4005) | Research 09/01 - 09/30/18 | $293.35 |
| 10/05/2018 | FedEx | to UDSC | $36.69 |
| 10/08/2018 | Hemming Morse, LLP | professional accounting services | $4,851.25 |
| 11/03/2018 | CTC Constant Contact | Email Blast | $225.00 |
| 11/07/2018 | Pacer | Document retrieval / legal research Q3 2018 | $11.60 |
| 12/01/2018 | West Payment Center (4005) | Research 11/01 - 11/30/18 | $84.72 |
| 12/31/2018 | Piller, Nathan (Vendor) | Taxi | $11.92 |
| 12/31/2018 | Piller, Nathan (Vendor) | Taxi | $12.46 |
| 12/31/2018 | Piller, Nathan (Vendor) | Dinner | $18.46 |
| 12/31/2018 | Piller, Nathan (Vendor) | Parking | $48.00 |
| 12/31/2018 | Piller, Nathan (Vendor) | Hotel | $212.51 |
| 01/01/2019 | West Payment Center (4005) | Research 12/01 - 12/31/18 | $84.72 |
| 01/01/2019 | West Payment Center (4005) | Research 12/01 - 12/31/18 | $212.21 |
| 01/09/2019 | | To reclass postage to case costs | $166.60 |
| 01/15/2019 | Charlotte Powers | 51 pages | $61.20 |
| 02/01/2019 | West Payment Center (4005) | Research 01/01 - 01/31/19 | $298.97 |
| 02/05/2019 | Pacer | Document retrieval / legal research Q4 2018 | $7.40 |
| 02/12/2019 | Hemming Morse, LLP | 01/19 Services | $1,076.50 |
| 03/01/2019 | West Payment Center (4005) | Research 02/01 - 02/28/19 | $344.53 |
| 03/04/2019 | CTC Constant Contact | Email outreach to opt in plaintiffs | $225.00 |
| 03/08/2019 | Hemming Morse, LLP | 02/19 Expert Services | $3,092.00 |



| DATE | VENDOR | DESCRIPTION | AMOUNT |
|------|--------|-------------|--------|
| 03/13/2019 | One Legal LLC | Plaintiffs' Reply Memorandum In Support of Motion For Summary Adjudication | $290.00 |
| 04/01/2019 | West Payment Center (4005) | Research 03/01 - 03/31/19 | $459.98 |
| 05/01/2019 | West Payment Center (4005) | Research 04/01 - 04/30/19 | $14.04 |
| 05/06/2019 | Pacer | Document retrieval / legal research Q1 2019 | $5.90 |
| 06/01/2019 | West Payment Center (4005) | Research 05/01 - 05/31/19 | $70.47 |
| 06/14/2019 | Liddy Legal Support Services | P/U & Del. | $63.90 |
| 07/01/2019 | West Payment Center (4005) | Research 06/01 - 06/30/19 | $137.02 |
| 07/19/2019 | Hemming Morse, LLP | 06/19 services | $768.75 |
| 07/29/2019 | Liddy Legal Support Services | P/U & Delivery Reply to in Support of Mtn & Dec to Hon Silver | $25.00 |
| 07/31/2019 | 101159 - Julian v. Swift | AZ Office Postage | $3.50 |
| 08/01/2019 | West Payment Center (4005) | Research 07/01/19 - 07/31/19 | $121.48 |
| 08/05/2019 | Pacer | Document retrieval / legal research Q2 2019 | $8.90 |
| 08/06/2019 | Hemming Morse, LLP | 07/01/19-07/31/19 Professional Services - 100% - Paid $1200.42 11/11/19 part of larger | $10,381.25 |
| 09/01/2019 | West Payment Center (4005) | Research 08/01/19 - 08/31/19 | $24.09 |
| 11/04/2019 | CTC Constant Contact | Email blast | $225.00 |
| 11/08/2019 | Pacer | Document retrieval / legal research Q3 2019 | $31.70 |
| 12/31/2019 | CopyTrack | Copies and Printing -01/28/16 thru 12/31/19 | $7,223.75 |
| 12/31/2019 | | To reclass postage to case costs | $2.65 |
| 01/01/2020 | South West Airlines | Status Conference w/ Court on 1/14/20 | $391.96 |
| 01/01/2020 | TVLINC | Agent fee | $8.00 |
| 01/05/2020 | South West Airlines | Additional charge for 1/1/20 flight | $25.00 |
| 01/06/2020 | TVLINC | Agent Fee Southwest | $8.00 |
| 01/06/2020 | TVLINC | Agent Fee - Hotel Booking | $8.00 |
| 01/19/2020 | Liddy Legal Support Services | P/U & Del Re: Short List of Cases to Hon. Silver | $27.50 |
| 01/31/2020 | Konecky, Joshua G. | Snacks/Beverages - Case Related:Snack during travel to Phoenix for hrg:Oak Airport | $6.33 |
| 01/31/2020 | Konecky, Joshua G. | Taxi - Case Related:Lyft from court to airport:Lyft | $13.23 |
| 01/31/2020 | Konecky, Joshua G. | Taxi - Case Related:Lyft from airport to hotel:Lyft | $18.33 |
| 01/31/2020 | Konecky, Joshua G. | Lunch - Case Related:Lunch for NBP and JGK in Phoenix for hrg:Blue Hound | $42.92 |
| 01/31/2020 | Konecky, Joshua G. | Parking - Case Related:Airport parking for trip to Phoenix for hrg:OAKLAND Airport | $51.00 |
| 01/31/2020 | Konecky, Joshua G. | Hotel - Case Related:Lodging in phoenix for hrg:Blue Hound | $333.46 |
| 01/31/2020 | Piller, Nathan (Vendor) | Lunch - Case Related:1/17/20 Lunch after hearing:Cartel coffee lab | $17.10 |
| 01/31/2020 | Piller, Nathan (Vendor) | Parking - Case Related:1/17/20 Parking at airport:Oakland airport | $48.00 |
| 01/31/2020 | Piller, Nathan (Vendor) | Hotel - Case Related:1/17/20 Lodging on night before hearing:kimpton palomar | $366.05 |
| 02/03/2020 | Patricia Lyons | Transcripts for 01/14/20 Status Conference - No Split | $40.50 |
| 02/06/2020 | Pacer | Document retrieval / legal research QTR 4 2019 | $27.00 |
| 02/08/2020 | Hemming Morse, LLP | Professional Fees - No Split | $768.75 |
| 03/10/2020 | Courts / USDC-AZ | KGB application to appear Pro Hac Vice in the USDC of Arizona Phoenix Division | $100.00 |
| 03/25/2020 | Courts / USDC-AZ | LHJ application to appear Pro Hac Vice | $100.00 |
| 04/13/2020 | Hemming Morse, LLP | Professional Fees - No Split | $2,675.00 |
| 04/29/2020 | Mediated Negotiations | 08/10/20 Mediation (Antonio Piazza) - 50% Due in Advance - No Split | $12,000.00 |
| 05/07/2020 | Pacer | Document retrieval / legal research QTR 1 2020 | $51.30 |
| 07/31/2020 | FedEx | 07/27/20 FedEx to Antonio Piazza from Onyebuchi Okeke | $13.92 |
| 07/31/2020 | FedEx | 07/27/20 FedEx to Stephanie S. Chow from Onyebuchi Okeke | $75.81 |
| 08/05/2020 | Hemming Morse, LLP | Professional Fees - No Split | $3,912.00 |
| 08/10/2020 | Pacer | Document retrieval / legal research  QTR 2 2020 | $27.60 |
| 09/09/2020 | CopyTrack | Copies and Printing - 01/01/20 thru 09/09/20 | $113.25 |
| | | | **$308,153.88** |



| DATE | VENDOR | DESCRIPTION | AMOUNT |
| --- | --- | --- | --- |



| DATE | VENDOR | DESCRIPTION | AMOUNT |
| --- | --- | --- | --- |



| DATE | VENDOR | DESCRIPTION | AMOUNT |
|------|--------|-------------|--------|



| DATE | VENDOR | DESCRIPTION | AMOUNT |
|------|--------|-------------|--------|

# EXHIBIT D

# EXHIBIT A

1    Cole J. Schlabach (Bar No. AZ-026364)
     cole.schlabach@us.dlapiper.com
2    **DLA PIPER LLP (US)**
     2525 East Camelback Road Suite 1000
3    Phoenix, Arizona 85016-4232
     Tel: 480.606.5100
4    Fax: 480.606.5101
     DLAPHX@us.dlapiper.com
5
     Christopher George Oprison (*pro hac vice*)
6    chris.oprison@us.dlapiper.com
     Jordan Allyn Ziegler (*pro hac vice*)
7    jordan.ziegler@us.dlapiper.com
     **DLA Piper LLP (US)**
8    200 South Biscayne Boulevard, Suite 2500
     Miami, Florida 33131-5341
9    Tel: 305.423.8558
     Fax: 305.513.5728
10   *Attorneys for Defendant*
     *American Fitness Wholesalers, L.L.C.*
11
                    **UNITED STATES DISTRICT COURT**
12
                      **FOR THE DISTRICT OF ARIZONA**
13

14   ThermoLife International, LLC, an
     Arizona limited liability company,
15                                              Case No. 2:18-cv-04189-PHX-JAT
16                          Plaintiff,
17   v.                                         **AFFIDAVIT IN SUPPORT OF MOTION
                                                FOR ATTORNEYS' FEES**
18   American Fitness Wholesalers, L.L.C.,
     doing business as A1Supplements, a
19   Tennessee corporation,
20                          Defendant.
21
22

23          I, Cole J. Schlabach, of full age, hereby affirm and state as follows:

24          1.      I am an attorney licensed to practice law in the State of Arizona. I am over

25   the age of 18 years and am, in all respects, competent to make this affidavit. I submit this

26   Affidavit in Support of American Fitness Wholesalers, L.L.C., doing business as

27   A1Supplements' ("A1") Motion for Attorneys' Fees. This affidavit is based upon my

28

personal knowledge and, if called upon to testify, I could and would competently testify to the following:

2.  I am an attorney at DLA Piper LLP (US) ("DLA"), attorney for A1 in the above-captioned litigation (the "Litigation").

3.  In my capacity as an attorney for A1, I am familiar with the nature of the Litigation, the pleadings and other papers filed in the Litigation, and I have reviewed all of the time entries billed to A1 in the Litigation by DLA.

4.  I, Cole J. Schlabach, am an associate with DLA practicing out of the firm's office in Phoenix, Arizona. I received my Bachelor of Arts, *summa cum laude*, from Arizona State University in 2005, graduated *summa cum laude*, Order of the Coif, from Arizona State University Sandra Day O'Connor College of Law in 2008. I practice in the area of commercial litigation. I have been practicing at DLA since November 2011; prior to that time, I was an attorney at the law firm of Snell & Wilmer, LLP. I have performed work on A1's behalf in the Litigation as described in the attached **Exhibit 1**, an Itemized Statement of Attorneys' Fees. My hourly billing rate charged to A1 for services provided in connection with this Litigation is $690.00 per hour, which reflects a discount from my standard rate. A1 has agreed to pay these rates for my services.

5.  Christopher G. Oprison is a partner with DLA, and is a litigator practicing out of the firm's office in Miami, Florida and Washington, DC. Mr. Oprison's practice focuses on bet-the-company complex commercial litigation and government enforcement work. He received his Bachelor of Arts, with honors, from UCLA in 1994, and graduated with honors from the George Washington University Law School in 1997. Prior to joining DLA in 2017, Mr. Oprison practiced litigation at Akerman LLP, in Miami, Florida and Washington D.C., and with Skadden, Arps, Slate, Meagher & Flom, LLP in Washington, DC. Mr. Oprison has also served in various branches of the federal government, including as a presidential appointee. From 2006 through 2008, Mr. Oprison served as an Associate Counsel and Special Assistant to President George W. Bush. Mr. Oprison also held

1

1  clerkships for the late-Judge Fred I. Parker of the US Court of Appeals for the Second

2  Circuit (2002-2003), and then-Chief Judge Terrence W. Boyle of the US District Court for

3  the Eastern District of North Carolina (1997-1998). He also served in the United States

4  Marine Corps as a Judge Advocate/Prosecutor (1998-2002). Mr. Oprison performed work

5  on A1's behalf in the Litigation as described in **Exhibit 1**. Mr. Oprison' hourly billing rate

6  charged to A1 for services provided in connection with this litigation is $890 per hour.[1]

7  A1 has agreed to pay these rates for Mr. Oprison's services.

8      6.     Kate Benveniste is an associate with DLA, and has been licensed to practice

9  law in Arizona for more than eight years. Ms. Benveniste received her J.D. from Arizona

10  State University Sandra Day O'Connor College of Law in 2009. She practices in the area

11  of commercial litigation. Ms. Benveniste performed work on A1's behalf in the Litigation

12  as described in **Exhibit 1.** Her hourly billing rate charged to A1 for services provided in

13  connection with this Litigation is $650.00 per hour. A1 has agreed to pay these rates for

14  her services.

15      7.     Jordan Ziegler is an associate with DLA, and is a litigator practicing out of

16  the firm's office in Miami, Florida. Mr. Ziegler received his J.D. from the University of

17  Florida in 2015. Mr. Ziegler performed work on A1's behalf in the Litigation as described

18  in **Exhibit 1.** His hourly billing rate charged to A1 for services provided in connection

19  with this Litigation is $350.00 per hour. A1 has agreed to pay these rates for his services.

20      8.     Debra Rutschman is a former senior paralegal with DLA, having joined the

21  firm in 2007. Prior to that time, Ms. Rutschman was a paralegal with the firms Squire,

22  Sanders and Dempsey LLP and, prior to that, Mohr Hackett. Ms. Rutschman has

23  performed services on A1's behalf as described in the attached **Exhibit 1.** Her hourly

24  billing rate charged to A1 for services provided in connection with this Litigation is

---

[1] Mr. Oprison's rate of $890.00 reflects a mid-year increase in his rate. While the original fee agreement with A1 reflects a rate for Mr. Oprison as $755.00, the increased rate was reflected in all invoices sent to A1 during the relevant time period from September, 2019. If requested by the Court, A1 and DLA will provide copies of any relevant invoices for the Court's *in camera* review.

2

1   $355.00 per hour. A1 has agreed to pay these rates for Ms. Rutschman's services.

2       9.    Attached as **Exhibit 1** to this Affidavit is an Itemized Statement of Fees,

3   which contains a detailed description of the services provided by DLA's attorneys in

4   connection with successfully defending Counts 1 and 3 of the Plaintiff's Amended

5   Complaint in this litigation, including time incurred by Mr. Ziegler and Ms. Benveniste

6   researching issues related to dismissal of Counts 1 and 3 of the Plaintiff's original

7   complaint, which were necessarily utilized in dismissing Counts 1 and 3 of the Plaintiff's

8   Amended Complaint.

9       10.    **Exhibit 1** states the date the work was performed, identifies the individual

10  who performed it, describes the work performed, and states the amount of time the

11  attorneys spent on the work performed. The information for this exhibit was taken from

12  the billing statements DLA has submitted to A1, and all of it reasonably relates to A1's

13  efforts to dismiss Counts 1 and 3 of the Amended Complaint. The billing statements were

14  prepared from the contemporaneous time records of the various timekeepers identified

15  herein and accurately reflect the fees incurred relating to DLA's efforts to successfully

16  defend the Litigation.

17      11.    A1 agreed to pay the hourly rates that DLA charges to A1 for DLA's

18  services, which are discounted from DLA's standard hourly rates.

19      12.    As an attorney practicing at DLA in the Phoenix area, I am familiar with the

20  prevailing market rates in Phoenix, Arizona. I have consulted with other attorneys with

21  regard to the prevailing market rates in Phoenix, Arizona, and have reviewed fee

22  applications submitted by various law firms in Phoenix, Arizona.

23      13.    The United States District Court for the District of Arizona has previously

24  recognized the rates charged by DLA's Phoenix office as reasonable, and has awarded

25  similar fees to those charged by DLA's attorneys here. For example, Judge David G.

26  Campbell, in *Federal Nat. Mortg. Assoc. v. Home*, No. CV-11-01277-PHX-DGC, 2012

27  WL 10685 (D. Ariz. Jan. 3, 2012), issued an order awarding attorneys' fees of $70,192.50

28                                                       3

1   (for the successful prosecution of a case resulting in a default judgment) based on a motion

2   filed by attorneys from DLA, and finding "the requested fees and costs to be reasonable

3   and appropriate." I reviewed the Motion for Attorneys' Fees in that matter, which was

4   submitted over eight years ago, and the hourly attorney rates charged by DLA and awarded

5   in that case were between $525 and $665 per hour, as well as $280 per hour for paralegal

6   time. *See* Order, No. CV-11-01277-PHX-DGC [Doc. 52], attached hereto as **Exhibit 2**.

7       14.    Similarly, DLA was awarded $221,451.17 in "reasonable attorneys' fees" on

8   February 17, 2012 by Judge Neil V. Wake of the United States District Court for the

9   District of Arizona, in *Veolia Transportation Services, Inc. v. Lydia Evanson and Greg*

10  *Evanson*, No. CV 10-01392-PHX-NVW (D. Ariz., Feb. 17, 2012). The Order awarding

11  attorneys' fees in that matter is attached hereto as **Exhibit 3**. I reviewed the Motion for

12  Attorneys' Fees in that matter as well. Rates charged by lead counsel Mark Nadeau in that

13  matter was $750 per hour. Rates for senior-level associates with similar experience to

14  myself ranged between $459.38 and $520 per hour during that same time-frame.

15      15.    Based on my knowledge and review of orders issued by the United States

16  District Court for the District of Arizona, I believe the rates charged by DLA for services

17  performed on A1's behalf in the Litigation are reasonable for the services provided and

18  success obtained and are within the range of reasonable rates in the Phoenix market.

19      16.    The summary attached as **Exhibit 1** states the date the work was performed,

20  identifies the individual who performed the work, describes the work performed, and states

21  the amount of time each DLA attorney and paralegal spent on the work performed.

22      17.    The summary attached as **Exhibit 1** was prepared from contemporaneous

23  time records of the DLA attorneys identified herein, and accurately reflect the fees incurred

24  relating to DLA's efforts on A1s behalf in the Litigation.

25      18.    The summary attached as **Exhibit 1** does not include attorneys' fees incurred

26  on A1's behalf in this Litigation by DLA attorneys and paralegals for which A1 does not

27  seek to recover from Plaintiffs, including over $100,000.00 incurred in connection with

28                                              4

1   preparing and arguing the Motion to Dismiss the original Complaint.

2       19.    I have reviewed the time records of the DLA attorneys identified herein,

3   which were used to prepare **Exhibit 1**. In connection with the review of these time records,

4   I removed unnecessary and excessive time and time spent on collateral matters from

5   **Exhibit 1** and A1 does not seek to recover herein unnecessary and excessive time or time

6   spent on collateral matters.

7       20.    The attorneys' and paralegals' fees that A1 seeks to recover from Plaintiffs

8   were incurred beginning in August 2019 in connection with the following tasks: (i)

9   reviewing and analyzing the order dismissing the original Complaint; (ii) communications

10  and attempted negotiations with opposing counsel concerning filing of the Amended

11  Complaint; and (iii) drafting and filing the Motion to Dismiss the Amended Complaint

12  (Doc. 31) and the Reply in Support of the Motion to Dismiss the Amended Complaint

13  (Doc. 33), and related legal research in support of those filings. A1 also seeks to recover

14  $5,840 in attorneys' fees incurred in February 2019 related to researching issues

15  concerning dismissal of the original Complaint that were necessary for dismissal of Counts

16  1 and 3 of the Amended Complaint.

17      21.    A1 does not request an attorneys' fee award for the following: (i) preparing

18  the Motion to Dismiss Plaintiff's original Complaint; (ii) time incurred in determining the

19  existence of insurance coverage related to this Litigation; (iii) time incurred by A1's

20  counsel clearing conflicts; (iv) time incurred by paralegals related to document/file

21  management; and (v) time incurred on administrative tasks by project assistants, time not

22  billed to A1, and/or time unrelated to this matter.

23      22.    The total amount of attorneys' fees billed to and that has been and will be

24  paid by A1 in this matter thus far will exceed $184,000; thus, the amount sought includes

25  a reduction of over 61% in the amount of fees that will actually be paid in this matter. The

26  total amount of attorneys' fees and costs for which A1 seeks recovery in the Motion for

27  Attorneys' Fees and Costs is $70,073.

28

Case 2:16-cv-54169-ART Document 30-1 Filed 09/18/20 Page 8 of 14



# EXHIBIT 1

| FEES | | | |
|---|---|---|---|
| **DATE** | **TIME (hours)** | **VALUE ($$)** | **DESCRIPTION** |
| 2/19/2019 | 5 | $3,250.00 | Conduct legal research re: Lanham Act and False Marking claims. |
| 2/21/2019 | 3 | $1,050.00 | Conduct legal research re: pleading issues, Lanham Act, and False Marking claims. |
| 2/22/2019 | 1.7 | $595.00 | Conduct additional legal research re: Lanham Act. |
| 2/24/2019 | 2.7 | $945.00 | Conduct legal research re: standing issue. |
| 8/15/2019 | 0.6 | $414.00 | Review Order granting Motion to Dismiss; confer with team re: same. |
| 8/16/2019 | 0.2 | $138.00 | Written communications with opposing counsel re: dismissal. |
| 8/20/2019 | 0.7 | $623.00 | Prepare for and participate in meet and confer call with opposing counsel re: dismissal and potential resolution. |
| 8/20/2019 | 0.5 | $345.00 | Prepare for and participate in meet and confer call with opposing counsel re: dismissal and potential resolution. |
| 9/13/2019 | 0.6 | $414.00 | Review Response to Motion to Extend Deadline and finalize same for filing; correspondence from opposing counsel re: extension request; strategize re: potential resolution. |
| 9/13/2019 | 1.7 | $1,513.00 | Draft, revise Response to Motion for Extension of Time and coordinate filing of same; meet and confer call with opposing counsel. |
| 9/18/2019 | 1.6 | $1,104.00 | Review, analyze Plaintiff's Amended Complaint; analyze issues; make recommendations re: Motion to Dismiss. |
| 9/20/2019 | 2 | $1,780.00 | Review, analyze Plaintiff's Amended Complaint and modifications/alerations from origianl complaint; strategize re: Motion to Dismiss; update client. |
| 9/20/2019 | 5.8 | $4,002.00 | Conduct supplemental legal research re: Lanham Act and False Marking claims; prepare detailed outline for Motion to Dismiss. |
| 9/23/2019 | 5.8 | $4,002.00 | Draft Motion to Dismiss Amended Complaint. |
| 9/24/2019 | 1.7 | $1,173.00 | Conduct supplemental legal research re: Lanham Act and False Marking claims. |
| 9/25/2019 | 1 | $690.00 | Continue drafting Motion to Dismiss Amended Complaint. |
| 9/27/2019 | 4.8 | $4,272.00 | Review, revise early draft Motion to Dismiss; confer with Cole Schlabach re: Motion, edits. |
| 9/27/2019 | 10.2 | $7,038.00 | Continue drafting, revising Motion to Dismiss Amended Complaint; confer with Chris Oprison re: same. |
| 9/28/2019 | 0.8 | $552.00 | Revise Motion to Dismiss Amended Complaint. |

| Date | Hours | Amount | Description |
|------|-------|--------|-------------|
| 9/30/2019 | 4.8 | $4,272.00 | Review, revise Motion to Dismiss Amended Complaint; confer with Cole Schlabach re edits to brief; provide update to client. |
| 9/30/2019 | 4.6 | $1,633.00 | Legal cite check and review of Motion to Dismiss Amended Complaint and incorporate edits re: same. |
| 9/30/2019 | 1.4 | $966.00 | Revise Motion to Dismiss Amended Complaint; confer with Chris Oprison re: issues related to dismissal. |
| 10/1/2019 | 5.7 | $5,073.00 | Review, revise updated Motion to Dismiss; update client and litigation team re same; prepare for, participate in meet/confer call with opposing counsel. |
| 10/1/2019 | 4.7 | $3,243.00 | Participate in meet/confer with opposing counsel re: Motion to Dismiss; revise Motion to Dismiss Amended Complaint; confer with Chris Oprison re: same. |
| 10/2/2019 | 0.8 | $552.00 | Finalize and file Motion to Dismiss Amended Complaint; advise client re: same. |
| 10/8/2019 | 0.3 | $207.00 | Review correspondence from opposing counsel re: patent trolling allegations; strategize re: response to same. |
| 10/9/2019 | 0.5 | $445.00 | Written communications with opposing counsel; provide status update to client. |
| 10/10/2019 | 0.2 | $138.00 | Strategize regarding potential response to opposing counsel inquiry re: patent troll allegations. |
| 11/1/2019 | 1 | $890.00 | Review, analyze Plaintiff's Response to Motion to Dismiss; confer with Cole Schlabach re: same. |
| 11/1/2019 | 0.4 | $276.00 | Review, analyze Plaintiff's Response to Motion to Dismiss; confer with Chris Oprison re: same. |
| 11/5/2019 | 3.7 | $2,553.00 | Prepare outline of Reply in Support of Motion to Dismiss. |
| 11/6/2019 | 6 | $4,140.00 | Draft Reply in Support of Motion to Dismiss; conduct supplemental research re: legal arguments. |
| 11/7/2019 | 2.8 | $1,932.00 | Continue drafting Reply in Support of Motion to Dismiss. |
| 11/11/2019 | 4.9 | $3,381.00 | Continue drafting Reply in Support of Motion to Dismiss; conduct supplemental research re: zone of interest issue. |
| 11/12/2019 | 2.5 | $1,725.00 | Revise Reply in Support of Motion to Dismiss. |
| 11/13/2019 | 2.4 | $1,656.00 | Continue revising Reply in Support of Motion to Dismiss; confer with Chris Oprison re: same. |
| 11/15/2019 | 0.2 | $138.00 | Confer with Chris Oprison re: Reply in Support of Motion to Dismiss; confer with client re: same |
| 11/18/2019 | 2 | $1,780.00 | Review, revise Reply in Support of Motion to Dismiss. |
| 11/18/2019 | 1.7 | $1,173.00 | Revise, finalize and coordinate filing of Reply in Support of Motion to Dismiss; confer with client re: same. |
| **TOTAL** | **88.6** | **$70,073.00** | |

# EXHIBIT 2

1    **WO**

2

3

4

5

6                IN THE UNITED STATES DISTRICT COURT

7                     FOR THE DISTRICT OF ARIZONA

8

9    Federal National Mortgage Association,        No. CV11-01227-PHX-DGC

10                         Plaintiff,              **ORDER**

11   vs.

12   Marshall  E.  Home;  Independent  Rights
     Party,

13                         Defendants.

14

15          Plaintiff Federal National Mortgage Association ("Fannie Mae") brought its

16   complaint (Doc. 1) after Defendants Marshall E. Home and Independent Rights Party

17   used the name "Federal National Mortgage Association" to execute special warranty

18   deeds transferring a number of Fannie Mae-owned properties to Defendants.    On

19   September 22, 2011, the Court entered default judgment against Defendants on all seven

20   counts, found Plaintiff entitled to statutory damages in the amount of $141,200, entered a

21   permanent injunction against Defendants, invalidated the special warranty deeds filed by

22   Defendants, and cancelled Home's registration of the trade name "Federal National

23   Mortgage Association" with the Arizona Secretary of State.  Doc. 50.  The Court granted

24   Plaintiff's request to seek attorneys' fees in accordance with Local Rule of Civil

25   Procedure 54.2.  *Id.* at 5.

26          Plaintiff has filed a motion for attorneys' fees and costs.  Doc. 51.  No response

27   has been filed, and the time for filing one has passed.  *See* LRCiv 54.2(b)(3).

28

Plaintiff seeks $70,192.50 in attorneys' fees and $1,219.00 in costs against Defendants pursuant to A.R.S. § 33-420(A). That section provides:

> A person purporting to claim an interest in, or a lien or encumbrance against, real property, who causes a document asserting such claim to be recorded in the office of the county recorder, knowing or having reason to know that the document is forged, groundless, contains a material misstatement or false claim or is otherwise invalid is liable to the owner or beneficial title holder of the real property . . . reasonable attorney fees and costs of the action.

A.R.S. § 33-420(A).

Given the default judgment against Defendants on all counts in the complaint, including count three which alleged Defendants' wrongful efforts to claim an interest in and purport to hold title to the property evidenced by the special warranty deeds in violation of A.R.S. § 33-420(A), Plaintiff clearly is entitled to a fee award under that section. *See Allied Mortg. Group, Inc. v. Peter Strojnik, P.C.*, No. CV-08-0376, 2009 WL 2581400 at *5 (Ariz. App. Aug. 20, 2009). Having reviewed Plaintiff's supporting memorandum (Doc. 51, at 3-11) and counsel's declaration and statement of fees and costs (Docs. 51-1, 51-2, 51-3), the Court finds the requested fees and costs to be reasonable and appropriate.

**IT IS ORDERED:**

1.    Plaintiff's motion for attorneys' fees and costs (Doc. 51) is **granted**.

2.    Plaintiff is awarded attorneys' fees in the amount of **$70,192.50** and costs in the amount of **$1,219.00**.

Dated this 3rd day of January, 2012.

David G. Campbell
United States District Judge

- 2 -

# EXHIBIT 3

Case 2:16-cv-00578-ROS   Document 283-1   Filed 09/18/20   Page 78 of 402
Case 2:18-cv-04176-DJH   Document 36-1   Filed 09/24/20   Page 16 of 11
Case 2:10-cv-01392-NVW   Document 120   Filed 02/17/12   Page 1 of 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Veolia Transportation Services, Inc., | No. CV 10-01392-PHX-NVW |
| Plaintiff, | **ORDER** |
| vs. | |
| Lydia Evanson and Greg Evanson, husband and wife; John Does I-VII, | |
| Defendants. | |

     The Court, having granted Plaintiff Veolia Transportation Services, Inc.'s Motion for Sanctions against Defendants Lydia Evanson and Greg Evanson (Doc. 97) and finding Evanson willfully destroyed evidence and otherwise acted in bad faith, having entered Default against the Evanson Defendants (Doc. 98), having reviewed Veolia's Motion for Attorneys' Fees and Costs, having reviewed the Affidavit of Aaron Goodman and Declaration of Kenneth Westbrook in Support of Plaintiff's Application for Default Judgment and Motion for Attorneys' Fees and Costs, having considered the evidence and argument of counsel at the default judgment hearing on February 16, 2012, and for good cause appearing,

     IT IS ORDERED ADJUDGED, AND DECREED that judgment is granted against Defendant Lydia Evanson and against the marital community of Lydia and Greg Evanson in favor of Plaintiff in the following amounts:

Case 2:16-cv-00576-ROS Document 288-1 Filed 09/18/20 Page 79 of 402
Case 2:18-cv-04185-ROS Document 36-1 Filed 09/24/20 Page 79 of 102
Case 2:10-cv-01392-NVW   Document 120   Filed 02/17/12   Page 2 of 2

1. $154,678.50 for damages relating to fees charged to Veolia by McMahon Berger.

3. $40,579.68 for damages relating to fees charged to Veolia by Porter-Novelli.

4. $323,490.74 for damages relating to Veolia's strike costs.

5. $50,000.00 for punitive damages.

6. $221,451.17 in reasonable attorneys' fees and $21,711.95 in costs pursuant to A.R.S. § 12-341.01(A) and the inherent power of the Court.

For a total sum of $811,912.04, plus interest from the date of this judgment at the rate of .12% per annum until paid in full.

IT IS FURTHER ORDERED ADJUDGED, AND DECREED that Defendants Lydia Evanson and Greg Evanson are permanently enjoined:

1. From publishing or distributing any of Veolia's electronic or other documents, files, or data (in any format).

2. From publishing or distributing any of Veolia's confidential business information to which Lydia Evanson became privy because of her employment position with Veolia.

2. To return to Veolia by February 27, 2012, any and all of Veolia's electronic or other documents, files, or data (in any format) within their possession or control.

The Clerk shall terminate this case.

Dated this 17th day of February, 2012.

_____

Neil V. Wake
United States District Judge

- 2 -

# EXHIBIT E

1  ROBBINS GELLER RUDMAN & DOWD LLP
   Daniel S. Drosman (CA SBN 200643) (Admitted *pro hac vice*)
2  Luke O. Brooks (CA SBN 212802) (Admitted *pro hac vice*)
   Ellen Gusikoff Stewart (CA SBN 144892) (Admitted *pro hac vice*)
3  Jessica T. Shinnefield (CA SBN 234432) (Admitted *pro hac vice*)
   Darryl J. Alvarado (CA SBN 253213) (Admitted *pro hac vice*)
4  Christopher D. Stewart (CA SBN 270448) (Admitted *pro hac vice*)
   Hillary B. Stakem (CA SBN 286152) (Admitted *pro hac vice*)
5  J. Marco Janoski Gray (CA SBN 306547) (Admitted *pro hac vice*)
   Ting H. Liu (CA SBN 307747) (Admitted *pro hac vice*)
6  655 West Broadway, Suite 1900
   San Diego, CA 92101
7  Telephone: 619/231-1058
   619/231-7423 (fax)
8  dand@rgrdlaw.com
   lukeb@rgrdlaw.com
9  elleng@rgrdlaw.com
   jshinnefield@rgrdlaw.com
10 dalvarado@rgrdlaw.com
   cstewart@rgrdlaw.com
11 hstakem@rgrdlaw.com
   mjanoski@rgrdlaw.com
12 tliu@rgrdlaw.com

13 Lead Counsel for Plaintiffs

14                    UNITED STATES DISTRICT COURT

15                         DISTRICT OF ARIZONA

16

17 Mark Smilovits, Individually and on Behalf ) No. 2:12-cv-00555-DGC
   of All Others Similarly Situated,          )
18                                            ) CLASS ACTION
                              Plaintiff,      )
19                                            ) DECLARATION OF ANDREW S.
              vs.                             ) FRIEDMAN FILED ON BEHALF OF
20                                            ) BONNETT FAIRBOURN FRIEDMAN &
   First Solar, Inc., Michael J. Ahearn, Robert ) BALINT, PC IN SUPPORT OF
21 J. Gillette, Mark R. Widmar, Jens          ) APPLICATION FOR AWARD OF
   Meyerhoff, James Zhu, Bruce Sohn and       ) ATTORNEYS' FEES AND EXPENSES
22 David Eaglesham,                           )
                                              )
23                            Defendants.     )
   _____)

24

25

26

27

28

4828-3152-0695.v1

I, Andrew S. Friedman, declare as follows:

1. I am a shareholder in the law firm of Bonnett Fairbourn Friedman & Balint, PC ("BFFB"). I am submitting this declaration in support of my firm's application for an award of attorneys' fees and expenses/charges ("expenses") in connection with services rendered in the above-entitled action.

2. This firm is liaison counsel of record for Lead Plaintiffs Mineworkers' Pension Scheme and British Coal Staff Superannuation Scheme, and the Class.

3. The information in this declaration regarding BFFB's time and expenses is taken from time and expense printouts and supporting documentation prepared and/or maintained by BFFB in the ordinary course of business. I am the partner who oversaw and/or conducted the day-to-day activities in the litigation and I reviewed these printouts (and backup documentation where necessary or appropriate) in connection with the preparation of this declaration. The purpose of this review was to confirm both the accuracy of the entries on the printouts as well as the necessity for, and reasonableness of, the time and expenses committed to the litigation. As a result of this review, reductions were made to BFFB's time in the exercise of billing judgment. As a result of this review and the adjustments made, I believe that the time reflected in the firm's lodestar calculation and the expenses for which payment is sought as set forth in this declaration are reasonable in amount and were necessary for the effective and efficient prosecution and resolution of the litigation. In addition, I believe that the expenses are all of a type that would normally be charged to a fee-paying client in the private legal marketplace.

4. After the reductions referred to above, the number of hours spent on this litigation by my firm is 19.9. The lodestar amount for attorney/paraprofessional time based on the firm's current rates is $6,670.00. A breakdown of the lodestar is as follows:

| NAME | | HOURS | RATE | LODESTAR |
|---|---|---|---|---|
| Andrew S. Friedman | (P) | 2.9 | $750.00 | $2,175.00 |
| Francis J. Balint, Jr. | (P) | 0.6 | $750.00 | $450.00 |
| Kevin R. Hanger | (A) | 15.4 | $250.00 | $3,850.00 |

- 1 -

4828-3152-0695.v1

| NAME | | HOURS | RATE | LODESTAR |
|---|---|---|---|---|
| Rose K. Creech | (PL) | 0.5 | $200.00 | $100.00 |
| David J. Streyle | (PL) | 0.5 | $190.00 | $95.00 |
| *TOTAL:* | | **19.9** | | ***$6,670.00*** |

(P) Partner

(A) Associate

(PL) Paralegal

5. My firm seeks an award of $61.70 in expenses and charges in connection with the prosecution of the litigation. Those expenses are summarized below:

| CATEGORY | AMOUNT |
|---|---|
| Photocopies (174 pages @ $0.20/page) | $34.80 |
| Research (PACER) | $26.90 |
| *TOTAL* | *$61.70* |

6. The following is additional information regarding certain of these expenses:

(a) Photocopies: $34.80. In connection with this case, the firm made 174 copies, charging $0.20 per copy for a total of $34.80. Each time an in-house copy machine is used, our billing system requires that a case or administrative billing code be entered and that is how the 174 copies were identified as related to this case.

(b) Research: $26.90. This category includes charges for access to the federal court's PACER case and docket information. This expense represents the expense incurred by BFFB for use of this service in connection with this litigation.

7. The expenses pertaining to this case are reflected in the books and records of this firm. These books and records are prepared from receipts, expense vouchers, check records and other documents and are an accurate record of the expenses.

8. The identification and background of my firm and its partners is attached hereto as Exhibit A.

- 2 -

4828-3152-0695.v1

1       I declare under penalty of perjury that the foregoing is true and correct. Executed

2 this 3rd day of April, 2020, at Phoenix, Arizona.

3                            *s/ Andrew S. Friedman*

4                            Andrew S. Friedman

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on April 24, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

<u> s/ Luke O. Brooks </u>
LUKE O. BROOKS

ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: lukeb@rgrdlaw.com

EXHIBIT A

## EXHIBIT A

*Smilovits v. First Solar, Inc., et al.*
Case No. 2:12-cv-00555-DGC
Robbins Geller Rudman & Dowd LLP
Inception through February 28, 2020

| *NAME* | | *HOURS* | *RATE* | *LODESTAR* |
|---|---|---|---|---|
| Alexander, Susan K. | (P) | 809.65 | 1,150 | $    931,097.50 |
| Alvarado, Darryl J. | (P) | 3,526.25 | 820 | 2,891,525.00 |
| Brooks, Luke O. | (P) | 3,251.15 | 945 | 3,072,336.75 |
| Burkholz, Spencer A. | (P) | 31.80 | 1,200 | 38,160.00 |
| Daley, Joseph D. | (P) | 19.65 | 970 | 19,060.50 |
| Drosman, Daniel S. | (P) | 4,303.71 | 1,100 | 4,734,081.00 |
| Forge, Jason A. | (P) | 888.45 | 1,100 | 977,295.00 |
| Gronborg, Tor | (P) | 274.50 | 1,100 | 301,950.00 |
| Gusikoff Stewart, Ellen A. | (P) | 44.00 | 1,080 | 47,520.00 |
| Isaacson, Eric A. | (P) | 11.00 | 885 | 9,735.00 |
| Kowalewski, Catherine J. | (P) | 44.00 | 650 | 28,600.00 |
| Love, Andrew S. | (P) | 46.15 | 1,150 | 53,072.50 |
| Melamed, Matthew S. | (P) | 63.20 | 800 | 50,560.00 |
| Myers, Danielle S. | (P) | 108.30 | 840 | 90,972.00 |
| Robbins, Darren J. | (P) | 235.50 | 1,325 | 312,037.50 |
| Shinnefield, Jessica T. | (P) | 871.75 | 850 | 740,987.50 |
| Solomon, Mark | (P) | 422.60 | 1,150 | 485,990.00 |
| Abel, Lawrence A. | (A) | 332.10 | 630 | 209,223.00 |
| Browne, Lonnie A. | (A) | 353.25 | 560 | 197,820.00 |
| Caringal, Jennifer N. | (A) | 203.50 | 580 | 118,030.00 |
| George, John H. | (A) | 87.00 | 560 | 48,720.00 |
| Janoski Gray, J. Marco | (A) | 914.60 | 520 | 475,592.00 |
| Lacomb, Timothy Z. | (A) | 103.40 | 525 | 54,285.00 |
| Lejeune, Cody R. | (A) | 1,220.75 | 555 | 677,516.25 |
| Liu, Ting H. | (A) | 1,108.10 | 520 | 576,212.00 |
| Pfeffer-Gillett, Alexi H. | (A) | 8.80 | 475 | 4,180.00 |
| Stakem, Hillary B. | (A) | 1,504.55 | 580 | 872,639.00 |
| Stewart, Christopher D. | (A) | 4,496.70 | 580 | 2,608,086.00 |
| Bays, Lea M. | (OC) | 26.00 | 775 | 20,150.00 |
| Dowd, Michael J. | (OC) | 44.15 | 1,325 | 58,498.75 |
| Prado, Svenna | (OC) | 142.00 | 775 | 110,050.00 |
| Walton, David C. | (OC) | 69.50 | 1,080 | 75,060.00 |
| Cho, Grace | (SA) | 967.50 | 415 | 401,512.50 |
| Hierholzer, Jesse J. | (SA) | 1,041.15 | 415 | 432,077.25 |

| NAME | | HOURS | RATE | LODESTAR |
|---|---|---|---|---|
| Lin, David X. | (SA) | 1,221.45 | 375 | 458,043.75 |
| Feldman, James C. | (FA) | 17.00 | 600 | 10,200.00 |
| Jennette, Heather J. | (FA) | 7.70 | 600 | 4,620.00 |
| Koelbl, Terry R. | (FA) | 2,643.50 | 600 | 1,586,100.00 |
| Rudolph, Andrew J. | (FA) | 3,847.55 | 750 | 2,885,662.50 |
| Jesse, Danielle M. | (FAI) | 7.50 | 75 | 562.50 |
| Milne, Matthew J. | (FAI) | 7.00 | 65 | 455.00 |
| Barhoum, Anthony J. | (EA) | 32.05 | 430 | 13,781.50 |
| Uralets, Boris | (EA) | 48.20 | 415 | 20,003.00 |
| Vue, Chong | (EA) | 16.00 | 335 | 5,360.00 |
| Roelen, Scott R. | (RA) | 37.80 | 295 | 11,151.00 |
| Wilhelmy, David E. | (RA) | 17.45 | 295 | 5,147.75 |
| Brandon, Kelley T. | (I) | 54.00 | 290 | 15,660.00 |
| Browning, Aaron C. | (LS) | 5.20 | 290 | 1,508.00 |
| Camozzi, Miranda C. | (LS) | 15.70 | 220 | 3,454.00 |
| Freer, Brad C. | (LS) | 102.20 | 290 | 29,638.00 |
| Guyer, Nicole | (LS) | 140.50 | 290 | 40,745.00 |
| Lee, Alexander J. | (LS) | 43.20 | 220 | 9,504.00 |
| Lewis, Bradley P. | (LS) | 609.66 | 150 | 91,449.00 |
| Milliron, Christine | (LS) | 6.50 | 375 | 2,437.50 |
| Torres, Michael | (LS) | 774.65 | 375 | 290,493.75 |
| Ulloa, Sergio | (LS) | 7.15 | 290 | 2,073.50 |
| Frazier, Joshua E. | (LC) | 43.00 | 170 | 7,310.00 |
| Paralegals | | 2,264.44 | 275-350 | 772,457.75 |
| Document Clerks | | 1,827.65 | 100-150 | 273,797.50 |
| Shareholder Relations | | 341.45 | 100-150 | 34,745.00 |
| TOTAL | | 41,713.21 | | $ 28,300,992.00 |

(P) Partner
(A) Associate
(OC) Of Counsel
(SA) Staff Attorney
(FA) Forensic Accountant
(FAI) Forensic Accounting Intern
(EA) Economic Analyst
(RA) Research Analyst
(I) Investigator
(LS) Litigation Support
(LC) Law Clerk

# EXHIBIT F

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Smilovits, Individually and on Behalf of All Others Similarly Situated, | No. CV-12-00555-PHX-DGC |
| Plaintiff, | CLASS ACTION |
| vs. | ORDER AWARDING ATTORNEYS' FEES AND EXPENSES AND AWARD TO LEAD PLAINTIFFS PURSUANT TO 15 U.S.C. §78u-4(a)(4) |
| First Solar, Inc., Michael J. Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James Zhu, Bruce Sohn and David Eaglesham, | |
| Defendants. | |

Lead Counsel seek an award of attorneys' fees and expenses incurred in the Litigation and an award to Lead Plaintiffs. A hearing was held on June 30, 2020.

IT IS ORDERED:

1.     This order incorporates by reference the definitions in the Stipulation of Settlement, dated February 14, 2020 (the "Stipulation"), and all capitalized terms in this order shall have the same meanings as set forth in the Stipulation.

2.     This Court has jurisdiction over the subject matter of this application and all matters related to it, including all Class Members who have not timely and validly requested exclusion.

3.     Notice of Lead Counsel's request for attorneys' fees and expenses was given to all Class Members who could be located with reasonable effort. The form and method

1  of notifying the Class met the requirements of Rule 23 of the Federal Rules of Civil

2  Procedure and 15 U.S.C. § 78u-4(a)(7), the Securities Exchange Act of 1934, as amended

3  by the Private Securities Litigation Reform Act of 1995, and due process, constituted the

4  best notice practicable under the circumstances, and constituted due and sufficient notice

5  to all persons and entities entitled to notice.

6         4.     The Court awards Lead Counsel attorneys' fees of $65,905,000.00 (18.83%

7  of the Settlement Amount), plus expenses in the amount of $5,263,516.69, together with

8  the interest earned on both amounts for the same time period and at the same rate as earned

9  on the Settlement Fund until paid.  The Court finds that the amount of fees awarded is fair,

10  reasonable, and appropriate under the "percentage-of-recovery" method.

11        Plaintiffs' counsel correctly note that 25% is the benchmark for percentage fees in

12  common fund cases in the Ninth Circuit.  *See Paul, Johnson, Alston & Hunt v. Graulty*,

13  886 F.2d 268, 272-73 (9th Cir. 1989); *Six (6) Mexican Workers v. Ariz. Citrus Growers*,

14  904 F.2d 1301, 1311 (9th Cir. 1990) ("In *Graulty*, we established 25 percent of the fund as

15  the 'benchmark' award that should be given in common fund cases."); *Roberts v. Heim*,

16  No. C 84-8069 TEH, 1991 WL 427888, at *6 (N.D. Cal. Aug. 28, 1991) ("It is . . . well-

17  established that the percentage of total recovery is an appropriate method to determine

18  attorney fees in securities class actions. . . .  According to the Ninth Circuit, attorney fees

19  should generally be between 20% and 30% of the settlement fund, with the bench mark

20  being 25%.") (citing *Graulty*); *Hilsley v. Ocean Spray Cranberries, Inc.*, No. 3:17-CV-

21  2335-GPC-MDD, 2020 WL 520616, at *7 (S.D. Cal. Jan. 31, 2020) ("[T]he 'benchmark'

22  for attorneys' fees in the Ninth Circuit is typically 25% of the common fund[.]") (citing *In

23  re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011)); *Marshall v.

24  Safeco Ins. Co. of Ill.*, No. CV 19-82-BLG-TJC, 2020 WL 773420, at *6 (D. Mont. Feb.

25  18, 2020) ("The Ninth Circuit has recognized that the benchmark for attorney fees in class

26  actions is typically 25% of the plaintiff's damages.") (citing *Hanlon v. Chrysler Corp.*, 150

27  F.3d 1011, 1029 (9th Cir. 1998)).

28

1   The amount awarded Lead Counsel is substantial, but well below the Ninth Circuit's

2   25% benchmark. The Court finds it reasonable in light of the risk assumed by Lead

3   Counsel in litigating this case for some eight years while investing more than $5 million of

4   their own money and incurring more than $28 million in attorney time, as well as by the

5   substantial and favorable result achieved for Lead Plaintiffs and the Class. The Court also

6   notes that the precise amount of the recovery – 18.83% of the settlement – is dictated by

7   the fee agreement negotiated at the beginning of this case between Lead Counsel and Lead

8   Plaintiffs, which are sophisticated entities.

9   Larger amounts have been approved by Courts in this Circuit in comparable

10  securities fraud class actions. In *Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST,

11  2018 WL 6619983 (N.D. Cal. Dec. 18, 2018), for example, the court found that "awarding

12  $95.9 million in attorneys' fees is reasonable . . . [b]ecause the 20 percent award requested

13  is below the 'benchmark' percentage for a reasonable fee award in the Ninth Circuit." *Id.*

14  at *13. The court relied in part on a report "document[ing] a median attorneys' fee of 22

15  percent in settlements of $100-500 million and 17 percent in settlements of $500 million-

16  $1 billion[.]" *Id.* (citing NERA Economic Consulting, Recent Trends in Securities Class

17  Action Litigation: 2017 Full-Year Review at 42 (2018)). These numbers confirm the

18  reasonableness of the fee request in this case.

19  5.   In making this award of fees and expenses, the Court finds that:

20  (a)   the Settlement has created a fund of $350,000,000 in cash that is

21  already on deposit, and numerous Class Members who submit, or have submitted, valid

22  Proof of Claim and Release forms will benefit from the Settlement created by Lead

23  Counsel;

24  (b)   over 848,000 copies of the Notice were disseminated to potential

25  Class Members indicating that Lead Counsel would move for attorneys' fees in an amount

26  not to exceed 19% of the Settlement Amount and for expenses in an amount not to exceed

27  $6,000,000, plus interest on both amounts, and no substantive objections were made;

28

(c)     Lead Counsel have pursued the Litigation and achieved the Settlement with skill, perseverance, and diligent advocacy;

(d)     Lead Counsel have expended substantial time and effort pursuing the Litigation on behalf of the Class;

(e)     Lead Counsel pursued the Litigation on a contingent basis, having received no compensation during the Litigation, and any fee amount has been contingent on the result achieved;

(f)     the Litigation involved complex factual and legal issues and, in the absence of settlement, would have involved lengthy proceedings whose resolution would be uncertain;

(g)     public policy concerns favor the award of reasonable attorneys' fees and expenses in securities class action litigation; and

(h)     the attorneys' fees and expenses awarded are fair and reasonable and consistent with awards in similar cases within the Ninth Circuit.

6.     The awarded attorneys' fees and expenses and interest shall be paid to Lead Counsel immediately upon execution of the Order and Final Judgment and this order, and subject to the terms, conditions and obligations of the Stipulation, and in particular the terms of ¶6.2, which terms, conditions and obligations are incorporated herein.  After considering the method for distribution of the Settlement to the Class, and the declaration of Ross D. Murray (Doc. 721), the Court finds that the entirety of the Settlement Fund, except for a small holdback for taxes and related expenses, will be paid to the Class.  The Court therefore finds that the fees awarded Lead Counsel will not exceed a reasonable percentage of the amount "actually paid to the class."  15 U.S.C. § 78u-4(a)(6).

7.     Any appeal or any challenge affecting this Court's approval regarding the Fee Motion shall in no way disturb or affect the finality of the Order and Final Judgment entered with respect to the Settlement.

8.     Pursuant to 15 U.S.C. § 78u-4(a)(4), the Court awards $42,591.42, plus interest, to Lead Plaintiffs Mineworkers Pension Scheme and the British Coal Staff

1 | Superannuation Scheme in order to reimburse them for their time and expenses directly
2 | related to their representation of the Class.

3 |         9. In the event that the Settlement is terminated or does not become Final or the
4 | Effective Date does not occur in accordance within the terms of the Stipulation, this order
5 | shall be rendered null and void to the extent provided in the Stipulation and shall be vacated
6 | in accordance with the Stipulation.

7 |        10. The Court has reviewed the letters submitted by Katherine A. Vinceri and
8 | Jeanne I. Levesque, and finds that they raise no substantive objection to this motion.

9 |        Dated this 30th day of June, 2020.

David G. Campbell
Senior United States District Judge

# EXHIBIT G

# EXHIBIT 3

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Andrew L. Zivitz
azivitz@ktmc.com
Johnston de F. Whitman, Jr.
jwhitman@ktmc.com
Jonathan F. Neumann
jneumann@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

-and-

Jennifer L. Joost
jjoost@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Lead Counsel for Lead Plaintiff, Class*
*Representative, and the Class*

**BONNETT, FAIRBOURN,**
**FRIEDMAN & BALINT, P.C.**
Francis J. Balint, Jr.
fbalint@bffb.com
Andrew S. Friedman
afriedman@bffb.com
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Telephone: (602) 274-1100
Facsimile: (602) 274-1199

*Liaison Counsel for Lead Plaintiff,*
*Class Representative, and the Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Richard Di Donato, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>Insys Therapeutics, Inc.; Michael L. Babich; Darryl S. Baker; and John N. Kapoor,<br><br>Defendants. | No. 16-cv-00302-NVW<br><br>**CLASS ACTION**<br><br>**DECLARATION OF JOHNSTON DE F. WHITMAN, JR. IN SUPPORT OF CLASS COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES FILED ON BEHALF OF KESSLER TOPAZ MELTZER & CHECK, LLP** |

I, Johnston de F. Whitman, Jr., pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.    I am a partner of the law firm of Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz"), Court-appointed Class Counsel in the above-captioned action ("Action").[1] I submit this Declaration in support of Class Counsel's motion for an award of attorneys' fees in connection with services rendered by Plaintiffs' Counsel in the Action. Unless otherwise stated herein, I have personal knowledge of the facts set forth below and, if called upon, could and would testify thereto.

2.    Kessler Topaz, as Court-appointed Lead Counsel and Class Counsel, was involved in all aspects of the prosecution of the Action and its resolution with Defendant John N. Kapoor ("Defendant Kapoor"), as set forth in my accompanying Declaration in Support of (I) Class Representative's Motion for Final Approval of Settlement with Defendant John N. Kapoor and Plan of Allocation; and (II) Class Counsel's Motion for an Award of Attorneys' Fees.

3.    The information in this Declaration regarding Kessler Topaz's time is documented and reflected in time printouts and supporting documentation prepared and maintained by my firm in the ordinary course of business. I am the partner who conducted the day-to-day activities in the Action, and I have reviewed and/or supervised the review of these printouts (and backup documentation where necessary or appropriate) in connection with the preparation of this Declaration. The purpose of this review was to confirm both the accuracy of the time entries, as well as the necessity for, and reasonableness of, the time committed to the Action, including the elimination of time that was unnecessary or duplicative.[2] As a result of this review, reductions were made,

---

[1]    Capitalized terms that are not defined herein shall have the meanings set forth in the Stipulation and Agreement of Settlement Between Lead Plaintiff and Defendant John N. Kapoor, dated July 1, 2020. Doc. 371-1.

[2]    In addition, all time by attorneys and professional support staff employees at Kessler Topaz ("Timekeepers") who devoted ten (10) or fewer hours to the Action as well as all time expended on Class Counsel's motion for an award of attorneys' fees has been excluded.

where appropriate, in the exercise of billing judgment. As a result of this review and the adjustments made, I believe that the time reflected in Kessler Topaz's lodestar calculation is reasonable in amount and was necessary for the effective and efficient prosecution of the Action and its resolution.

4.      After the reductions referred to above, the total number of hours spent on the Action by Kessler Topaz, from inception through July 1, 2020 is 22,224.10.[3] The total lodestar for my firm, as reflected in **Exhibit A**, is $11,486,524.75, consisting of $10,813,009.50 for attorneys' time and $673,515.25 for professional support staff time. The chart set forth as **Exhibit A** was prepared from daily time records of the firm, which are available at the request of the Court.

5.      Attached hereto as **Exhibit B** is a chart breaking down Kessler Topaz's time by litigation category, showing the work performed by each Timekeeper by litigation category. The litigation categories set forth in **Exhibit B** are: (1) Investigation and Factual Research; (2) Lead Plaintiff Motion; (3) Complaints; (4) Lead Plaintiff Document Review; (5) Defendant and Non-Party Document Review; (6) Discovery; (7) Depositions and Preparation; (8) Motions to Dismiss; (9) Class Certification; (10) Court Appearances and Preparation; (11) Litigation Strategy and Case Management/Administration; (12) Mediation, Settlement, and Settlement Administration; (13) Experts and Expert Motions; (14) Summary Judgment; (15) Trial Preparation; and (16) Communications with Class Representative.

6.      The hourly rates for the Timekeepers, as set forth in **Exhibits A and B**, are their standard rates. My firm's hourly rates are based upon a combination of the title, cost to the firm, and the specific years of experience for each attorney and professional support staff employee, as well as market rates for practitioners in the field. These hourly rates are the same as, or comparable to, rates submitted by Kessler Topaz and accepted by courts in other complex class actions for purposes of "cross-checking" lodestar against a

---

[3]      July 1, 2020 is used as the cut-off, as it was the date Class Representative filed his motion for preliminary approval of the settlement with Defendant Kapoor. Doc. 371.

proposed fee based on the percentage of the fund method, as well as determining a reasonable fee under the lodestar method. For Timekeepers who are no longer employed by Kessler Topaz, the hourly rate used is the hourly rate for such employee in his or her final year of employment by my firm.

7.     In connection with the Baker Settlement, my firm documented its out-of-pocket expenses incurred through May 22, 2020. Doc. 407-3. As set forth below, Kessler Topaz has incurred an additional $59,317.58 in out-of-pocket expenses in connection with the prosecution of the Action and its resolution which were not previously documented (or sought for reimbursement) in the Baker Settlement submission. This amount includes: (i) expenses that were incurred after the May 22, 2020 cut-off used for the Baker Settlement through July 1, 2020; and (ii) mediation costs incurred exclusively in connection with Class Counsel's settlement efforts with Defendant Kapoor, including the July 15, 2019 mediation with Michelle Yoshida of Phillips ADR. Class Counsel's additional expenses are provided in the below chart:

| CATEGORY | | AMOUNT |
|---|---|---|
| Service of Process[4] | | $314.00 |
| Postage & Express Mail | | $93.33 |
| On-Line Legal / Factual Research[5] | | $1,320.99 |
| Internal Reproduction Costs ($0.10 per copy) | | $229.40 |
| Document Hosting / Management | | $36,779.86 |
| Experts / Consultants | | $8,260.00 |
|    Intelligent Management Solutions, LLC | $8,260.00 | |
| Mediation | | $12,320.00 |
| | | |
| **TOTAL:** | | **$59,317.58** |

8.     The foregoing expenses are documented and reflected in expense printouts and supporting documentation prepared and maintained by my firm in the ordinary course

---

[4]     This amount, owed to Keating & Walker Attorney Service, Inc., was incurred for the service of a subpoena on Alec Burlakoff on May 24, 2020.

[5]     The total amount of $1,320.99 for on-line research is broken down by vendor as follows: (i) Lexis Nexis: $1,243.99; (ii) IDI Database: $12.00; and (iii) TransUnion Risk & Alternative Data Solutions Inc.: $65.00.

of business. I have reviewed and/or supervised the review of these expense printouts (and backup documentation where necessary or appropriate) and, as a result of this review, I believe the expenses set forth herein are reasonable in amount and were necessary for the effective and efficient prosecution of the Action and its resolution. In addition, I believe that the expenses are those that would normally be charged to a fee-paying client in the private legal marketplace.

9.      Attached hereto as **Exhibit C** is a firm résumé, which includes information about my firm and biographical information concerning the firm's attorneys.

I declare, under penalty of perjury, that the foregoing facts are true and correct to the best of my knowledge.

DATED this 10th day of September 2020.

_____
Johnston de F. Whitman, Jr.

# EXHIBIT A

**EXHIBIT A**

*Di Donato v. Insys Therapeutics, Inc., et al.*
No. CV-16-00302-NVW (D. Ariz.)

**KESSLER TOPAZ MELTZER & CHECK, LLP**

**TIME REPORT**

From Inception Through July 1, 2020

| NAME | BAR DATE YEAR | HOURLY RATE | HOURS | LODESTAR |
|---|---|---|---|---|
| **Partners** | | | | |
| Amjed, Naumon | 2003 | $850.00 | 36.10 | $30,685.00 |
| Degnan, Ryan | 2010 | $780.00 | 53.40 | $41,652.00 |
| Jarvis, Geoffrey C. | 1985 | $850.00 | 38.10 | $32,385.00 |
| Joost, Jennifer | 2006 | $820.00 | 1,833.60 | $1,503,552.00 |
| Kessler, David | 1994 | $920.00 | 194.20 | $178,664.00 |
| Topaz, Marc A. | 1991 | $920.00 | 38.25 | $35,190.00 |
| Whitman, Jr., Johnston de F. | 1995 | $850.00 | 3,559.30 | $3,025,405.00 |
| Zivitz, Andrew | 1995 | $920.00 | 580.95 | $534,474.00 |
| **Counsel / Associates** | | | | |
| Cook, Rupa Nath | 2014 | $425.00 | 194.30 | $82,577.50 |
| Enck, Jennifer | 2003 | $690.00 | 210.45 | $145,210.50 |
| Gerard, Eric | 2010 | $690.00 | 201.40 | $138,966.00 |
| Islam, Farzana | 2016 | $425.00 | 753.60 | $320,280.00 |
| Kaskela, Seamus | 2006 | $550.00 | 66.30 | $36,465.00 |
| Koneski, Megan | 2012 | $450.00 | 199.90 | $89,955.00 |
| Lambert, Meredith | 2010 | $450.00 | 227.40 | $102,330.00 |
| McEvilly, James | 1994 | $690.00 | 549.70 | $379,293.00 |
| Neumann, Jonathan | 2012 | $505.00 | 1,665.80 | $841,229.00 |
| Prifti, Ardit | 2015 | $400.00 | 66.00 | $26,400.00 |
| **Staff Attorneys** | | | | |
| Chapman Smith, Quiana | 2007 | $385.00 | 213.20 | $82,082.00 |
| Tomich, Alexandra | 2006 | $385.00 | 92.70 | $35,689.50 |
| **Contract Attorneys** | | | | |
| Asadoorian-Radell, Jodi | 1997 | $350.00 | 1,369.70 | $479,395.00 |
| Carlson, Matthew  H. | 2006 | $350.00 | 1,482.90 | $519,015.00 |
| Durante, Maria | 1992 | $350.00 | 1,566.50 | $548,275.00 |
| Hegedus, Candice | 1979 | $350.00 | 2,008.10 | $702,835.00 |

| Kuchler, Joseph J. | 2004 | $350.00 | 992.70 | $347,445.00 |
|---|---|---|---|---|
| Palenscar, Lynn | 1977 | $350.00 | 1,581.60 | $553,560.00 |
| **Paralegals / Law Clerks** | | | | |
| Bigelow, Emily | | $305.00 | 264.50 | $80,672.50 |
| Cashwell, Amy | | $250.00 | 158.90 | $39,725.00 |
| Hankins, Andrew | | $275.00 | 36.60 | $10,065.00 |
| Hindmarsh, Lisa | | $255.00 | 103.60 | $26,418.00 |
| Longley, Henry | | $85.00 | 49.30 | $4,190.50 |
| Paffas, Holly | | $260.00 | 796.20 | $207,012.00 |
| Sim, Joan | | $275.00 | 493.70 | $135,767.50 |
| Swift, Mary R. | | $305.00 | 252.20 | $76,921.00 |
| **Investigators** | | | | |
| Jeffrey, Carolyn | | $300.00 | 19.00 | $5,700.00 |
| Maginnis, Jamie | | $325.00 | 53.35 | $17,338.75 |
| Molina, Henry | | $325.00 | 130.80 | $42,510.00 |
| Righter, Caitlyn | | $300.00 | 55.40 | $16,620.00 |
| Seidel, Kerry | | $325.00 | 10.20 | $3,315.00 |
| Young, Eric K. | | $300.00 | 24.20 | $7,260.00 |
| **TOTALS** | | | **22,224.10** | **$11,486,524.75** |

# EXHIBIT B

**Exhibit 1**
*Di Donato v. Insys Therapeutics, Inc., et al.*
**No. CV-16-00302-NVW (D. Ariz.)**
**KESSLER TOPAZ MELTZER CHECK, LLP**
**TIME CATEGORIZED BY LITIGATION CATEGORY**

FIRM NAME:   Kessler Topaz Meltzer & Check, LLP

REPORTING PERIOD:   Inception through July 1, 2020

**Litigation Categories:**

| | |
|---|---|
| (1) Investigation and Factual Research | (9) Class Certification |
| (2) Lead Plaintiff Motion | (10) Court Appearances and Preparation |
| (3) Complaints | (11) Litigation Strategy and Case Management/Administration |
| (4) Lead Plaintiff Document Review | (12) Mediation, Settlement, and Settlement Administration |
| (5) Defendant and Third Party Document Review | (13) Experts and Expert Motions |
| (6) Discovery | (14) Summary Judgment |
| (7) Depositions and Preparation | (15) Trial Preparation |
| (8) Motions to Dismiss | (16) Communications with Class Representative |

**Status:**

| | |
|---|---|
| (P) Partner | (PL) Paralegal |
| (C) Counsel | (I) Investigator |
| (A) Associate | (LC) Law Clerk |
| (SA) Staff Attorney | |
| (CA) Contract Attorney | |

| NAME | STATUS | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | Hourly Rate | Cumulative Hours | Cumulative Lodestar |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Attorneys:** | | | | | | | | | | | | | | | | | | | | |
| Amjed, Naumon | P | 0.40 | 10.80 | 13.40 | | | | | 1.80 | | | 9.70 | | | | | | $850.00 | 36.10 | $30,685.00 |
| Degnan, Ryan | P | 6.50 | 26.60 | 16.60 | | | | | 0.50 | | | 3.20 | | | | | | $780.00 | 53.40 | $41,652.00 |
| Jarvis, Geoffrey C. | P | | | | | | | 33.70 | | | | | | 4.40 | | | | $850.00 | 38.10 | $32,385.00 |
| Joost, Jennifer | P | 164.60 | | 328.00 | 1.00 | 41.80 | 124.50 | 263.40 | 85.10 | 19.20 | 75.90 | 54.70 | 23.80 | 210.40 | 49.20 | 392.00 | | $820.00 | 1,833.60 | $1,503,552.00 |
| Kessler, David | P | 3.50 | | | | | | | | 6.70 | | 15.40 | 164.60 | 3.00 | | 1.00 | | $920.00 | 194.20 | $178,664.00 |
| Topaz, Marc A. | P | 21.30 | | | | | | | | | | 16.45 | | | | | 0.50 | $920.00 | 38.25 | $35,190.00 |
| Whitman, Jr., Johnston de F. | P | 96.80 | | 366.70 | 6.70 | | 285.50 | 576.60 | 353.60 | 224.80 | 427.10 | 80.60 | 196.20 | 203.60 | 166.40 | 561.10 | 13.60 | $850.00 | 3,559.30 | $3,025,405.00 |
| Zivitiz, Andrew | P | 19.10 | | 52.15 | 3.70 | | 62.45 | 49.50 | 15.00 | 14.00 | 20.00 | 75.20 | 194.05 | 60.50 | 4.10 | 6.70 | 4.50 | $920.00 | 580.95 | $534,474.00 |
| Enck, Jennifer | C | | | | | | | | | 34.00 | | 1.60 | 174.85 | | | | | $690.00 | 210.45 | $145,210.50 |
| Gerard, Eric | C | 8.50 | | | | | 98.10 | 21.90 | 25.80 | | | 2.40 | 4.50 | 1.30 | | 38.90 | | $690.00 | 201.40 | $138,966.00 |
| McEvilly, James | C | 36.70 | | | | 31.10 | 132.80 | 283.20 | | | | 20.00 | | 45.90 | | | | $690.00 | 549.70 | $379,293.00 |
| Cook, Rupa Nath | A | 6.50 | | 109.80 | | | 8.10 | | 55.80 | | | 14.10 | | | | | | $425.00 | 194.30 | $82,577.50 |
| Islam, Farzana | A | 4.00 | | | | | 111.70 | 72.00 | 10.00 | 18.70 | | 58.10 | 9.70 | 153.60 | 108.50 | 207.30 | | $425.00 | 753.60 | $320,280.00 |
| Kaskela, Seamus | A | 19.35 | 24.10 | 3.50 | | | | | | | | 10.50 | | | | | 8.85 | $550.00 | 66.30 | $36,465.00 |
| Koneski, Megan | A | 28.70 | | 62.90 | | | | | 94.20 | | | 14.10 | | | | | | $450.00 | 199.90 | $89,955.00 |
| Lambert, Meredith | A | 3.50 | | 77.20 | | | | | 144.90 | | | 1.80 | | | | | | $450.00 | 227.40 | $102,330.00 |
| Neumann, Jonathan | A | 8.70 | | | 8.60 | 149.80 | 278.50 | 259.60 | | 137.60 | 2.20 | 28.60 | 129.00 | 156.80 | 97.50 | 408.90 | | $505.00 | 1,665.80 | $841,229.00 |
| Prifti, Ardit | A | 9.60 | 34.10 | 18.80 | | | | | | | | 3.50 | | | | | | $400.00 | 66.00 | $26,400.00 |
| Chapman Smith, Quiana | SA | 6.90 | | | | 25.40 | | 67.70 | | 81.50 | | | 31.70 | | | | | $385.00 | 213.20 | $82,082.00 |
| Tomich, Alexandra | SA | 5.20 | | | | 2.00 | | 85.50 | | | | | | | | | | $385.00 | 92.70 | $35,689.50 |
| Asadoorian-Radell, Jodi | CA | | | | | 982.50 | 4.75 | 288.80 | | | | 26.00 | | 67.65 | | | | $350.00 | 1,369.70 | $479,395.00 |
| Carlson, Matthew H. | CA | 24.00 | | | | 1,106.90 | | 209.85 | | | | 27.75 | | 114.40 | | | | $350.00 | 1,482.90 | $519,015.00 |
| Durante, Maria | CA | 16.50 | | | | 1,520.00 | | | | | | 29.25 | | 0.75 | | | | $350.00 | 1,566.50 | $548,275.00 |
| Hegedus, Candice | CA | 6.50 | | | | 1,642.50 | 2.00 | 236.45 | | | | 33.15 | | 87.50 | | | | $350.00 | 2,008.10 | $702,835.00 |
| Kuchler, Joseph J. | CA | 23.35 | | | | 906.60 | | 46.75 | | | | 16.00 | | | | | | $350.00 | 992.70 | $347,445.00 |
| Palenscar, Lynn | CA | 8.50 | | | | 1,385.45 | 10.00 | 14.90 | | | | 30.00 | | 132.75 | | | | $350.00 | 1,581.60 | $553,560.00 |
| **Subtotal Attorneys:** | | **528.70** | **95.60** | **1,049.05** | **20.00** | **7,794.05** | **1,118.40** | **2,509.85** | **786.70** | **536.50** | **525.20** | **572.10** | **928.40** | **1,242.55** | **425.70** | **1,615.90** | **27.45** | | **19,776.15** | **$10,813,009.50** |
| | | | | | | | | | | | | | | | | | | | | |
| **Professional Staff:** | | | | | | | | | | | | | | | | | | | | |
| Bigelow, Emily | PL | | | | | | | 15.40 | | | | 7.80 | 40.30 | | 13.90 | 187.10 | | $305.00 | 264.50 | $80,672.50 |
| Cashwell, Amy | PL | 68.40 | 3.20 | 25.60 | | | | | 38.40 | | | 23.30 | | | | | | $250.00 | 158.90 | $39,725.00 |
| Hankins, Andrew | PL | | | | | | 22.40 | | 0.50 | | | | | | 13.70 | | | $275.00 | 36.60 | $10,065.00 |
| Hindmarsh, Lisa | PL | 37.60 | | | | | | | | | | 65.80 | | | | 0.20 | | $255.00 | 103.60 | $26,418.00 |
| Paffas, Holly | PL | 0.50 | 0.50 | 39.80 | 3.70 | | 98.90 | 92.70 | 18.60 | 66.90 | 3.00 | 237.90 | 37.00 | 36.20 | 43.20 | 117.30 | | $260.00 | 796.20 | $207,012.00 |
| Sim, Joan | PL | 175.05 | | 91.60 | | 23.80 | 31.70 | | 34.25 | | | 127.30 | 10.00 | | | | | $275.00 | 493.70 | $135,767.50 |
| Swift, Mary R. | PL | | 1.00 | 13.20 | | | | 20.80 | 10.80 | 0.40 | | 13.20 | | | 1.00 | 191.80 | | $305.00 | 252.20 | $76,921.00 |
| Longley, Henry | LC | | | | | 49.30 | | | | | | | | | | | | $85.00 | 49.30 | $4,190.50 |
| Jeffrey, Carolyn | I | 19.00 | | | | | | | | | | | | | | | | $300.00 | 19.00 | $5,700.00 |
| Maginnis, Jamie | I | 53.35 | | | | | | | | | | | | | | | | $325.00 | 53.35 | $17,338.75 |
| Molina, Henry | I | 130.80 | | | | | | | | | | | | | | | | $325.00 | 130.80 | $42,510.00 |
| Righter, Caitlyn | I | 55.40 | | | | | | | | | | | | | | | | $300.00 | 55.40 | $16,620.00 |
| Seidel, Kerry | I | 10.20 | | | | | | | | | | | | | | | | $325.00 | 10.20 | $3,315.00 |
| Young, Eric K. | I | 24.20 | | | | | | | | | | | | | | | | $300.00 | 24.20 | $7,260.00 |
| **Subtotal Professional Staff:** | | **574.50** | **4.70** | **170.20** | **3.70** | **23.80** | **179.90** | **151.30** | **102.05** | **67.80** | **3.00** | **475.30** | **87.30** | **36.20** | **58.10** | **510.10** | **0.00** | | **2,447.95** | **$673,515.25** |
| | | | | | | | | | | | | | | | | | | | | |
| **TOTALS:** | | **1,103.20** | **100.30** | **1,219.25** | **23.70** | **7,817.85** | **1,298.30** | **2,661.15** | **888.75** | **604.30** | **528.20** | **1,047.40** | **1,015.70** | **1,278.75** | **483.80** | **2,126.00** | **27.45** | | **22,224.10** | **$11,486,524.75** |

# **EXHIBIT C**



**280 King of Prussia Road, Radnor, Pennsylvania 19087 • 610-667-7706 • Fax: 610-667-7056 • info@ktmc.com**
**One Sansome Street, Suite 1850, San Francisco, CA 94104 • 415-400-3000 • Fax: 415-400-3001 • info@ktmc.com**

**www.ktmc.com**

---

# FIRM PROFILE

Since 1987, Kessler Topaz Meltzer & Check, LLP has specialized in the prosecution of securities class actions and has grown into one of the largest and most successful shareholder litigation firms in the field. With offices in Radnor, Pennsylvania and San Francisco, California, the Firm is comprised of 94 attorneys as well as an experienced support staff consisting of over 80 paralegals, in-house investigators, legal clerks and other personnel. With a large and sophisticated client base (numbering over 180 institutional investors from around the world -- including public and Taft-Hartley pension funds, mutual fund managers, investment advisors, insurance companies, hedge funds and other large investors), Kessler Topaz has developed an international reputation for excellence and has extensive experience prosecuting securities fraud actions. For the past several years, the National Law Journal has recognized Kessler Topaz as one of the top securities class action law firms in the country. In addition, the Legal Intelligencer recently awarded Kessler Topaz with its Class Action Litigation Firm of The Year award. Lastly, Kessler Topaz and several of its attorneys are regularly recognized by Legal500 and Benchmark: Plaintiffs as leaders in our field.

Kessler Topaz is serving or has served as lead or co-lead counsel in many of the largest and most significant securities class actions pending in the United States, including actions against: Bank of America, Duke Energy, Lehman Brothers, Hewlett Packard, Johnson & Johnson, JPMorgan Chase, Morgan Stanley and MGM Mirage, among others. As demonstrated by the magnitude of these high-profile cases, we take seriously our role in advising clients to seek lead plaintiff appointment in cases, paying special attention to the factual elements of the fraud, the size of losses and damages, and whether there are viable sources of recovery.

Kessler Topaz has recovered billions of dollars in the course of representing defrauded shareholders from around the world and takes pride in the reputation we have earned for our dedication to our clients. Kessler Topaz devotes significant time to developing relationships with its clients in a manner that enables the Firm to understand the types of cases they will be interested in pursuing and their expectations. Further, the Firm is committed to pursuing meaningful corporate governance reforms in cases where we suspect that systemic problems within a company could lead to recurring litigation and where such changes also have the possibility to increase the value of the underlying company. The Firm is poised to continue protecting rights worldwide.

# NOTEWORTHY ACHIEVEMENTS

*During the Firm's successful history, Kessler Topaz has recovered billions of dollars for defrauded stockholders and consumers. The following are among the Firm's notable achievements:*

## Securities Fraud Litigation

### *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation,* Master File No. 09 MDL 2058:

Kessler Topaz, as Co-Lead Counsel, brought an action on behalf of lead plaintiffs that asserted claims for violations of the federal securities laws against Bank of America Corp. ("BoA") and certain of BoA's officers and board members relating to BoA's merger with Merrill Lynch & Co. ("Merrill") and its failure to inform its shareholders of billions of dollars of losses which Merrill had suffered before the pivotal shareholder vote, as well as an undisclosed agreement allowing Merrill to pay up to $5.8 billion in bonuses before the acquisition closed, despite these losses. On September 28, 2012, the Parties announced a $2.425 billion case settlement with BoA to settle all claims asserted against all defendants in the action which has since received final approval from the Court. BoA also agreed to implement significant corporate governance improvements. The settlement, reached after almost four years of litigation with a trial set to begin on October 22, 2012, amounts to 1) the sixth largest securities class action lawsuit settlement ever; 2) the fourth largest securities class action settlement ever funded by a single corporate defendant; 3) the single largest settlement of a securities class action in which there was neither a financial restatement involved nor a criminal conviction related to the alleged misconduct; 4) the single largest securities class action settlement ever resolving a Section 14(a) claim (the federal securities provision designed to protect investors against misstatements in connection with a proxy solicitation); and 5) by far the largest securities class action settlement to come out of the subprime meltdown and credit crisis to date.

### *In re Tyco International, Ltd. Sec. Litig.*, No. 02-1335-B (D.N.H. 2002):

Kessler Topaz, which served as Co-Lead Counsel in this highly publicized securities fraud class action on behalf of a group of institutional investors, achieved a record $3.2 billion settlement with Tyco International, Ltd. ("Tyco") and their auditor PricewaterhouseCoopers ("PwC"). The $2.975 billion settlement with Tyco represents the single-largest securities class action recovery from a single corporate defendant in history. In addition, the $225 million settlement with PwC represents the largest payment PwC has ever paid to resolve a securities class action and is the second-largest auditor settlement in securities class action history.

The action asserted federal securities claims on behalf of all purchasers of Tyco securities between December 13, 1999 and June 7, 2002 ("Class Period") against Tyco, certain former officers and directors of Tyco and PwC. Tyco is alleged to have overstated its income during the Class Period by $5.8 billion through a multitude of accounting manipulations and shenanigans. The case also involved allegations of looting and self-dealing by the officers and directors of the Company. In that regard, Defendants L. Dennis Kozlowski, the former CEO and Mark H. Swartz, the former CFO have been sentenced to up to 25 years in prison after being convicted of grand larceny, falsification of business records and conspiracy for their roles in the alleged scheme to defraud investors.

As presiding Judge Paul Barbadoro aptly stated in his Order approving the final settlement, "[i]t is difficult to overstate the complexity of [the litigation]." Judge Barbadoro noted the extraordinary effort required to pursue the litigation towards its successful conclusion, which included the review of more than 82.5 million pages of documents, more than 220 depositions and over 700 hundred discovery requests and responses. In addition to the complexity of the litigation, Judge Barbadoro also highlighted the great risk undertaken by

Co-Lead Counsel in pursuit of the litigation, which he indicated was greater than in other multi-billion dollar securities cases and "put [Plaintiffs] at the cutting edge of a rapidly changing area of law."

In sum, the Tyco settlement is of historic proportions for the investors who suffered significant financial losses and it has sent a strong message to those who would try to engage in this type of misconduct in the future.

*In re Tenet Healthcare Corp. Sec. Litig.,* **No. CV-02-8462-RSWL (Rx) (C.D. Cal. 2002):**

Kessler Topaz served as Co-Lead Counsel in this action. A partial settlement, approved on May 26, 2006, was comprised of three distinct elements: (i) a substantial monetary commitment of $215 million by the company; (ii) personal contributions totaling $1.5 million by two of the individual defendants; and (iii) the enactment and/or continuation of numerous changes to the company's corporate governance practices, which have led various institutional rating entities to rank Tenet among the best in the U.S. in regards to corporate governance. The significance of the partial settlement was heightened by Tenet's precarious financial condition. Faced with many financial pressures — including several pending civil actions and federal investigations, with total contingent liabilities in the hundreds of millions of dollars — there was real concern that Tenet would be unable to fund a settlement or satisfy a judgment of any greater amount in the near future. By reaching the partial settlement, we were able to avoid the risks associated with a long and costly litigation battle and provide a significant and immediate benefit to the class. Notably, this resolution represented a unique result in securities class action litigation — personal financial contributions from individual defendants. After taking the case through the summary judgment stage, we were able to secure an additional $65 million recovery from KPMG – Tenet's outside auditor during the relevant period – for the class, bringing the total recovery to $281.5 million.

*In re Wachovia Preferred Securities and Bond/Notes Litigation,* **Master File No. 09 Civ. 6351 (RJS) (S.D.N.Y.):**

Kessler Topaz, as court-appointed Co-Lead Counsel, asserted class action claims for violations of the Securities Act of 1933 on behalf of all persons who purchased Wachovia Corporation ("Wachovia") preferred securities issued in thirty separate offerings (the "Offerings") between July 31, 2006 and May 29, 2008 (the "Offering Period"). Defendants in the action included Wachovia, various Wachovia related trusts, Wells Fargo as successor-in-interest to Wachovia, certain of Wachovia's officer and board members, numerous underwriters that underwrote the Offerings, and KPMG LLP ("KPMG"), Wachovia's former outside auditor. Plaintiffs alleged that the registration statements and prospectuses and prospectus supplements used to market the Offerings to Plaintiffs and other members of the class during the Offerings Period contained materially false and misleading statements and omitted material information. Specifically, the Complaint alleged that in connection with the Offerings, Wachovia: (i) failed to reveal the full extent to which its mortgage portfolio was increasingly impaired due to dangerously lax underwriting practices; (ii) materially misstated the true value of its mortgage-related assets; (iii) failed to disclose that its loan loss reserves were grossly inadequate; and (iv) failed to record write-downs and impairments to those assets as required by Generally Accepted Accounting Principles ("GAAP"). Even as Wachovia faced insolvency, the Offering Materials assured investors that Wachovia's capital and liquidity positions were "strong," and that it was so "well capitalized" that it was actually a "provider of liquidity" to the market. On August 5, 2011, the Parties announced a $590 million cash settlement with Wells Fargo (as successor-in-interest to Wachovia) and a $37 million cash settlement with KPMG, to settle all claims asserted against all defendants in the action. This settlement was approved by the Hon. Judge Richard J. Sullivan by order issued on January 3, 2012.

*In re Initial Public Offering Sec. Litig.,* **Master File No. 21 MC 92(SAS):**

This action settled for $586 million on January 1, 2010, after years of litigation overseen by U.S. District Judge Shira Scheindlin. Kessler Topaz served on the plaintiffs' executive committee for the case, which was based upon the artificial inflation of stock prices during the dot-com boom of the late 1990s that led to

the collapse of the technology stock market in 2000 that was related to allegations of laddering and excess commissions being paid for IPO allocations.

*In re Longtop Financial Technologies Ltd. Securities Litigation*, No. 11-cv-3658 (S.D.N.Y.):
Kessler Topaz, as Lead Counsel, brought an action on behalf of lead plaintiffs that asserted claims for violations of the federal securities laws against Longtop Financial Technologies Ltd. ("Longtop"), its Chief Executive Officer, Weizhou Lian, and its Chief Financial Officer, Derek Palaschuk. The claims against Longtop and these two individuals were based on a massive fraud that occurred at the company. As the CEO later confessed, the company had been a fraud since 2004. Specifically, Weizhou Lian confessed that the company's cash balances and revenues were overstated by hundreds of millions of dollars and it had millions of dollars in unrecorded bank loans. The CEO further admitted that, in 2011 alone, Longtop's revenues were overstated by about 40 percent. On November 14, 2013, after Weizhou Lian and Longtop failed to appear and defend the action, Judge Shira Scheindlin entered default judgment against these two defendants in the amount of $882.3 million plus 9 percent interest running from February 21, 2008 to the date of payment. The case then proceeded to trial against Longtop's CFO who claimed he did not know about the fraud - and was not reckless in not knowing – when he made false statements to investors about Longtop's financial results. On November 21, 2014, the jury returned a verdict on liability in favor of plaintiffs. Specifically, the jury found that the CFO was liable to the plaintiffs and the class for each of the eight challenged misstatements. Then, on November 24, 2014, the jury returned its damages verdict, ascribing a certain amount of inflation to each day of the class period and apportioning liability for those damages amongst the three named defendants. The Longtop trial was only the 14th securities class action to be tried to a verdict since the passage of the Private Securities Litigation Reform Act in 1995 and represents a historic victory for investors.

*Operative Plasterers and Cement Masons International Association Local 262 Annuity Fund v. Lehman Brothers Holdings, Inc.*, No. 1:08-cv-05523-LAK (S.D.N.Y.):
Kessler Topaz, on behalf of lead plaintiffs, asserted claims against certain individual defendants and underwriters of Lehman securities arising from misstatements and omissions regarding Lehman's financial condition, and its exposure to the residential and commercial real estate markets in the period leading to Lehman's unprecedented bankruptcy filing on September 14, 2008. In July 2011, the Court sustained the majority of the amended Complaint finding that Lehman's use of Repo 105, while technically complying with GAAP, still rendered numerous statements relating to Lehman's purported Net Leverage Ration materially false and misleading. The Court also found that Defendants' statements related to Lehman's risk management policies were sufficient to state a claim. With respect to loss causation, the Court also failed to accept Defendants' contention that the financial condition of the economy led to the losses suffered by the Class. As the case was being prepared for trial, a $517 million settlement was reached on behalf of shareholders --- $426 million of which came from various underwriters of the Offerings, representing a significant recovery for investors in this now bankrupt entity. In addition, $90 million came from Lehman's former directors and officers, which is significant considering the diminishing assets available to pay any future judgment. Following these settlements, the litigation continued against Lehman's auditor, Ernst & Young LLP. A settlement for $99 million was subsequently reached with Ernst & Young LLP and was approved by the Court.

*Minneapolis Firefighters' Relief Association v. Medtronic, Inc. et al.* Case No. 0:08-cv-06324-PAM-AJB (D. Minn.):
Kessler Topaz brought an action on behalf of lead plaintiffs that alleged that the company failed to disclose its reliance on illegal "off-label" marketing techniques to drive the sales of its INFUSE Bone Graft ("INFUSE") medical device. While physicians are allowed to prescribe a drug or medical device for any use they see fit, federal law prohibits medical device manufacturers from marketing devices for any uses not specifically approved by the United States Food and Drug Administration. The company's off-label marketing practices have resulted in the company becoming the target of a probe by the federal government

which was revealed on November 18, 2008, when the company's CEO reported that Medtronic received a subpoena from the United States Department of Justice which is "looking into off-label use of INFUSE." After hearing oral argument on Defendants' Motions to Dismiss, on February 3, 2010, the Court issued an order granting in part and denying in part Defendants' motions, allowing a large portion of the action to move forward. The Court held that Plaintiff successfully stated a claim against each Defendant for a majority of the misstatements alleged in the Complaint and that each of the Defendants knew or recklessly disregarded the falsity of these statements and that Defendants' fraud caused the losses experienced by members of the Class when the market learned the truth behind Defendants' INFUSE marketing efforts. While the case was in discovery, on April 2, 2012, Medtronic agreed to pay shareholders an $85 million settlement. The settlement was approved by the Court by order issued on November 8, 2012.

*In re Brocade Sec. Litig.*, Case No. 3:05-CV-02042 (N.D. Cal. 2005) (CRB):

The complaint in this action alleges that Defendants engaged in repeated violations of federal securities laws by backdating options grants to top executives and falsified the date of stock option grants and other information regarding options grants to numerous employees from 2000 through 2004, which ultimately caused Brocade to restate all of its financial statements from 2000 through 2005. In addition, concurrent SEC civil and Department of Justice criminal actions against certain individual defendants were commenced. In August, 2007 the Court denied Defendant's motions to dismiss and in October, 2007 certified a class of Brocade investors who were damaged by the alleged fraud. Discovery is currently proceeding and the case is being prepared for trial. Furthermore, while litigating the securities class action Kessler Topaz and its co-counsel objected to a proposed settlement in the Brocade derivative action. On March 21, 2007, the parties in *In re Brocade Communications Systems, Inc. Derivative Litigation*, No. C05-02233 (N.D. Cal. 2005) (CRB) gave notice that they had obtained preliminary approval of their settlement. According to the notice, which was buried on the back pages of the Wall Street Journal, Brocade shareholders were given less than three weeks to evaluate the settlement and file any objection with the Court. Kessler Topaz client Puerto Rico Government Employees' Retirement System ("PRGERS") had a large investment in Brocade and, because the settlement was woefully inadequate, filed an objection. PRGERS, joined by fellow institutional investor Arkansas Public Employees Retirement System, challenged the settlement on two fundamental grounds. First, PRGERS criticized the derivative plaintiffs for failing to conduct any discovery before settling their claims. PRGERS also argued that derivative plaintiff's abject failure to investigate its own claims before providing the defendants with broad releases from liability made it impossible to weigh the merits of the settlement. The Court agreed, and strongly admonished derivative plaintiffs for their failure to perform this most basic act of service to their fellow Brocade shareholders. The settlement was rejected and later withdrawn. Second, and more significantly, PRGERS claimed that the presence of the well-respected law firm Wilson, Sonsini Goodrich and Rosati, in this case, created an incurable conflict of interest that corrupted the entire settlement process. The conflict stemmed from WSGR's dual role as counsel to Brocade and the Individual Settling Defendants, including WSGR Chairman and former Brocade Board Member Larry Sonsini. On this point, the Court also agreed and advised WSGR to remove itself from the case entirely. On May 25, 2007, WSGR complied and withdrew as counsel to Brocade. The case settled for $160 million and was approved by the Court.

*In re Satyam Computer Services, Ltd. Sec. Litig.*, No. 09 MD 02027 (BSJ) (S.D.N.Y.):

Kessler Topaz served as Co-Lead Counsel in this securities fraud class action in the Southern District of New York. The action asserts claims by lead plaintiffs for violations of the federal securities laws against Satyam Computer Services Limited ("Satyam" or the "Company") and certain of Satyam's former officers and directors and its former auditor PricewaterhouseCoopers International Ltd. ("PwC") relating to the Company's January 7, 2009, disclosure admitting that B. Ramalinga Raju ("B. Raju"), the Company's former chairman, falsified Satyam's financial reports by, among other things, inflating its reported cash balances by more than $1 billion. The news caused the price of Satyam's common stock (traded on the National Stock Exchange of India and the Bombay Stock Exchange) and American Depository Shares ("ADSs") (traded on the New York Stock Exchange ("NYSE")) to collapse. From a closing price of $3.67

per share on January 6, 2009, Satyam's common stock closed at $0.82 per share on January 7, 2009. With respect to the ADSs, the news of B. Raju's letter was revealed overnight in the United States and, as a result, trading in Satyam ADSs was halted on the NYSE before the markets opened on January 7, 2009. When trading in Satyam ADSs resumed on January 12, 2009, Satyam ADSs opened at $1.14 per ADS, down steeply from a closing price of $9.35 on January 6, 2009. Lead Plaintiffs filed a consolidated complaint on July 17, 2009, on behalf of all persons or entities, who (a) purchased or otherwise acquired Satyam's ADSs in the United States; and (b) residents of the United States who purchased or otherwise acquired Satyam shares on the National Stock Exchange of India or the Bombay Stock Exchange between January 6, 2004 and January 6, 2009. Co-Lead Counsel secured a settlement for $125 million from Satyam on February 16, 2011. Additionally, Co-Lead Counsel was able to secure a $25.5 million settlement from PwC on April 29, 2011, who was alleged to have signed off on the misleading audit reports.

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*, Case No. 07-CV-61542 (S.D. Fla. 2007):
On November 18, 2010, a panel of nine Miami, Florida jurors returned the first securities fraud verdict to arise out of the financial crisis against BankAtlantic Bancorp. Inc., its chief executive officer and chief financial officer. This case was only the tenth securities class action to be tried to a verdict following the passage of the Private Securities Litigation Reform Act of 1995, which governs such suits. Following extensive post-trial motion practice, the District Court upheld all of the Jury's findings of fraud but vacated the damages award on a narrow legal issue and granted Defendant's motion for a judgment as a matter of law. Plaintiffs appealed to the U.S. Court of Appeals for the Eleventh Circuit. On July 23, 2012, a three-judge panel for the Appeals Court found the District Court erred in granting the Defendant's motion for a judgment as a matter of law based in part on the Jury's findings (perceived inconsistency of two of the Jury's answers to the special interrogatories) instead of focusing solely on the sufficiency of the evidence. However, upon its review of the record, the Appeals Court affirmed the District Court's decision as it determined the Plaintiffs did not introduce evidence sufficient to support a finding in its favor on the element of loss causation. The Appeals Court's decision in this case does not diminish the five years of hard work which Kessler Topaz expended to bring the matter to trial and secure an initial jury verdict in the Plaintiffs' favor. This case is an excellent example of the Firm's dedication to our clients and the lengths it will go to try to achieve the best possible results for institutional investors in shareholder litigation.

*In re AremisSoft Corp. Sec. Litig.*, C.A. No. 01-CV-2486 (D.N.J. 2002):
Kessler Topaz is particularly proud of the results achieved in this case before the Honorable Joel A. Pisano. This case was exceedingly complicated, as it involved the embezzlement of hundreds of millions of dollars by former officers of the Company, one of whom remains a fugitive. In settling the action, Kessler Topaz, as sole Lead Counsel, assisted in reorganizing AremisSoft as a new company to allow for it to continue operations, while successfully separating out the securities fraud claims and the bankrupt Company's claims into a litigation trust. The approved Settlement enabled the class to receive the majority of the equity in the new Company, as well as their pro rata share of any amounts recovered by the litigation trust. During this litigation, actions have been initiated in the Isle of Man, Cyprus, as well as in the United States as we continue our efforts to recover assets stolen by corporate insiders and related entities.

*In re CVS Corporation Sec. Litig.*, C.A. No. 01-11464 JLT (D.Mass. 2001):
Kessler Topaz, serving as Co-Lead Counsel on behalf of a group of institutional investors, secured a cash recovery of $110 million for the class, a figure which represents the third-largest payout for a securities action in Boston federal court. Kessler Topaz successfully litigated the case through summary judgment before ultimately achieving this outstanding result for the class following several mediation sessions, and just prior to the commencement of trial.

***In re Marvell Technology, Group, Ltd. Sec. Lit., Master* File No. 06-06286 RWM:**

Kessler Topaz served as Co-Lead Counsel in this securities class action brought against Marvell Technology Group Ltd. ("Marvell") and three of Marvell's executive officers. This case centered around an alleged options backdating scheme carried out by Defendants from June 2000 through June 2006, which enabled Marvell's executives and employees to receive options with favorable option exercise prices chosen with the benefit of hindsight, in direct violation of Marvell's stock option plan, as well as to avoid recording hundreds of millions of dollars in compensation expenses on the Marvell's books. In total, the restatement conceded that Marvell had understated the cumulative effect of its compensation expense by $327.3 million, and overstated net income by $309.4 million, for the period covered by the restatement. Following nearly three years of investigation and prosecution of the Class' claims as well as a protracted and contentious mediation process, Co-Lead Counsel secured a settlement for $72 million from defendants on June 9, 2009. This Settlement represents a substantial portion of the Class' maximum provable damages, and is among the largest settlements, in total dollar amount, reached in an option backdating securities class action.

***In re Delphi Corp. Sec. Litig., Master* File No. 1:05-MD-1725 (E.D. Mich. 2005):**

In early 2005, various securities class actions were filed against auto-parts manufacturer Delphi Corporation in the Southern District of New York. Kessler Topaz its client, Austria-based mutual fund manager Raiffeisen Kapitalanlage-Gesellschaft m.b.H. ("Raiffeisen"), were appointed as Co-Lead Counsel and Co-Lead Plaintiff, respectively. The Lead Plaintiffs alleged that (i) Delphi improperly treated financing transactions involving inventory as sales and disposition of inventory; (ii) improperly treated financing transactions involving "indirect materials" as sales of these materials; and (iii) improperly accounted for payments made to and credits received from General Motors as warranty settlements and obligations. As a result, Delphi's reported revenue, net income and financial results were materially overstated, prompting Delphi to restate its earnings for the five previous years. Complex litigation involving difficult bankruptcy issues has potentially resulted in an excellent recovery for the class. In addition, Co-Lead Plaintiffs also reached a settlement of claims against Delphi's outside auditor, Deloitte & Touche, LLP, for $38.25 million on behalf of Delphi investors.

***In re Royal Dutch Shell European Shareholder Litigation*, No. 106.010.887, Gerechtshof Te Amsterdam (Amsterdam Court of Appeal):**

Kessler Topaz was instrumental in achieving a landmark $352 million settlement on behalf non-US investors with Royal Dutch Shell plc relating to Shell's 2004 restatement of oil reserves. This settlement of securities fraud claims on a class-wide basis under Dutch law was the first of its kind, and sought to resolve claims exclusively on behalf of European and other non-United States investors. Uncertainty over whether jurisdiction for non-United States investors existed in a 2004 class action filed in federal court in New Jersey prompted a significant number of prominent European institutional investors from nine countries, representing more than one billion shares of Shell, to actively pursue a potential resolution of their claims outside the United States. Among the European investors which actively sought and supported this settlement were Alecta pensionsförsäkring, ömsesidigt, PKA Pension Funds Administration Ltd., Swedbank Robur Fonder AB, AP7 and AFA Insurance, all of which were represented by Kessler Topaz.

***In re Computer Associates Sec. Litig., No.* 02-CV-1226 (E.D.N.Y. 2002):**

Kessler Topaz served as Co-Lead Counsel on behalf of plaintiffs, alleging that Computer Associates and certain of its officers misrepresented the health of the company's business, materially overstated the company's revenues, and engaged in illegal insider selling. After nearly two years of litigation, Kessler Topaz helped obtain a settlement of $150 million in cash and stock from the company.

***In re The Interpublic Group of Companies Sec. Litig., No.* 02 Civ. 6527 (S.D.N.Y. 2002):**

Kessler Topaz served as sole Lead Counsel in this action on behalf of an institutional investor and received final approval of a settlement consisting of $20 million in cash and 6,551,725 shares of IPG common stock. As of the final hearing in the case, the stock had an approximate value of $87 million, resulting in a total

settlement value of approximately $107 million. In granting its approval, the Court praised Kessler Topaz for acting responsibly and noted the Firm's professionalism, competence and contribution to achieving such a favorable result.

*In re Digital Lightwave, Inc. Sec. Litig.,* **Consolidated Case No. 98-152-CIV-T-24E (M.D. Fla. 1999):**
The firm served as Co-Lead Counsel in one of the nation's most successful securities class actions in history measured by the percentage of damages recovered. After extensive litigation and negotiations, a settlement consisting primarily of stock was worth over $170 million at the time when it was distributed to the Class. Kessler Topaz took on the primary role in negotiating the terms of the equity component, insisting that the class have the right to share in any upward appreciation in the value of the stock after the settlement was reached. This recovery represented an astounding approximately two hundred percent (200%) of class members' losses.

*In re Transkaryotic Therapies, Inc. Sec. Litig.,* **Civil Action No.: 03-10165-RWZ (D. Mass. 2003):**
After five years of hard-fought, contentious litigation, Kessler Topaz as Lead Counsel on behalf of the Class, entered into one of largest settlements ever against a biotech company with regard to non-approval of one of its drugs by the U.S. Food and Drug Administration ("FDA"). Specifically, the Plaintiffs alleged that Transkaryotic Therapies, Inc. ("TKT") and its CEO, Richard Selden, engaged in a fraudulent scheme to artificially inflate the price of TKT common stock and to deceive Class Members by making misrepresentations and nondisclosures of material facts concerning TKT's prospects for FDA approval of Replagal, TKT's experimental enzyme replacement therapy for Fabry disease. With the assistance of the Honorable Daniel Weinstein, a retired state court judge from California, Kessler Topaz secured a $50 million settlement from the Defendants during a complex and arduous mediation.

*In re PNC Financial Services Group, Inc. Sec. Litig.,* **Case No. 02-CV-271 (W.D. Pa. 2002):**
Kessler Topaz served as Co-Lead Counsel in a securities class action case brought against PNC bank, certain of its officers and directors, and its outside auditor, Ernst & Young, LLP ("E&Y"), relating to the conduct of Defendants in establishing, accounting for and making disclosures concerning three special purpose entities ("SPEs") in the second, third and fourth quarters of PNC's 2001 fiscal year. Plaintiffs alleged that these entities were created by Defendants for the sole purpose of allowing PNC to secretly transfer hundreds of millions of dollars worth of non-performing assets from its own books to the books of the SPEs without disclosing the transfers or consolidating the results and then making positive announcements to the public concerning the bank's performance with respect to its non-performing assets. Complex issues were presented with respect to all defendants, but particularly E&Y. Throughout the litigation E&Y contended that because it did not make any false and misleading statements itself, the Supreme Court's opinion in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164 (1993) foreclosed securities liability for "aiding or abetting" securities fraud for purposes of Section 10(b) liability. Plaintiffs, in addition to contending that E&Y did make false statements, argued that Rule 10b-5's deceptive conduct prong stood on its own as an independent means of committing fraud and that so long as E&Y itself committed a deceptive act, it could be found liable under the securities laws for fraud. After several years of litigation and negotiations, PNC paid $30 million to settle the action, while also assigning any claims it may have had against E&Y and certain other entities that were involved in establishing and/or reporting on the SPEs. Armed with these claims, class counsel was able to secure an additional $6.6 million in settlement funds for the class from two law firms and a third party insurance company and $9.075 million from E&Y. Class counsel was also able to negotiate with the U.S. government, which had previously obtained a disgorgement fund of $90 million from PNC and $46 million from the third party insurance carrier, to combine all funds into a single settlement fund that exceeded $180 million and is currently in the process of being distributed to the entire class, with PNC paying all costs of notifying the Class of the settlement.

*In re SemGroup Energy Partners, L.P., Sec. Litig.*, No. 08-md-1989 (DC) (N.D. Okla.):
Kessler Topaz, which was appointed by the Court as sole Lead Counsel, litigated this matter, which ultimately settled for $28 million. The defense was led by 17 of the largest and best capitalized defense law firms in the world. On April 20, 2010, in a fifty-page published opinion, the United States District Court for the Northern District of Oklahoma largely denied defendants' ten separate motions to dismiss Lead Plaintiff's Consolidated Amended Complaint. The Complaint alleged that: (i) defendants concealed SemGroup's risky trading operations that eventually caused SemGroup to declare bankruptcy; and (ii) defendants made numerous false statements concerning SemGroup's ability to provide its publicly-traded Master Limited Partnership stable cash-flows. The case was aggressively litigated out of the Firm's San Francisco and Radnor offices and the significant recovery was obtained, not only from the Company's principals, but also from its underwriters and outside directors.

*In re Liberate Technologies Sec. Litig.*, No. C-02-5017 (MJJ) (N.D. Cal. 2005):
Kessler Topaz represented plaintiffs which alleged that Liberate engaged in fraudulent revenue recognition practices to artificially inflate the price of its stock, ultimately forcing it to restate its earning. As sole Lead Counsel, Kessler Topaz successfully negotiated a $13.8 million settlement, which represents almost 40% of the damages suffered by the class. In approving the settlement, the district court complimented Lead Counsel for its "extremely credible and competent job."

*In re Riverstone Networks, Inc. Sec. Litig.*, Case No. CV-02-3581 (N.D. Cal. 2002):
Kessler Topaz served as Lead Counsel on behalf of plaintiffs alleging that Riverstone and certain of its officers and directors sought to create the impression that the Company, despite the industry-wide downturn in the telecom sector, had the ability to prosper and succeed and was actually prospering. In that regard, plaintiffs alleged that defendants issued a series of false and misleading statements concerning the Company's financial condition, sales and prospects, and used inside information to personally profit. After extensive litigation, the parties entered into formal mediation with the Honorable Charles Legge (Ret.). Following five months of extensive mediation, the parties reached a settlement of $18.5 million.

## Shareholder Derivative Actions

*In re Facebook, Inc. Class C Reclassification Litig.*, C.A. No. 12286-VCL (Del. Ch. Sept. 25, 2017):
Kessler Topaz served as co-lead counsel in this stockholder class action that challenged a proposed reclassification of Facebook's capital structure to accommodate the charitable giving goals of its founder and controlling stockholder Mark Zuckerberg. The Reclassification involved the creation of a new class of nonvoting Class C stock, which would be issued as a dividend to all Facebook Class A and Class B stockholders (including Zuckerberg) on a 2-for-1 basis. The purpose and effect of the Reclassification was that it would allow Zuckerberg to sell billions of dollars worth of nonvoting Class C shares without losing his voting control of Facebook. The litigation alleged that Zuckerberg and Facebook's board of directors breached their fiduciary duties in approving the Reclassification at the behest of Zuckerberg and for his personal benefit. At trial Kessler Topaz was seeking a permanent injunction to prevent the consummation of the Reclassification. The litigation was carefully followed in the business and corporate governance communities, due to the high-profile nature of Facebook, Zuckerberg, and the issues at stake. After almost a year and a half of hard fought litigation, just one business day before trial was set to commence, Facebook and Zuckerberg abandoned the Reclassification, granting Plaintiffs complete victory.

*In re CytRx Stockholder Derivative Litig.*, Consol. C.A. No. 9864-VCL (Del. Ch. Nov. 20, 2015):
Kessler Topaz served as co-lead counsel in a shareholder derivative action challenging 2.745 million "spring-loaded" stock options. On the day before CytRx announced the most important news in the Company's history concerning the positive trial results for one of its significant pipeline drugs, the Compensation Committee of CytRx's Board of Directors granted the stock options to themselves, their

fellow directors and several Company officers which immediately came "into the money" when CytRx's stock price shot up immediately following the announcement the next day. Kessler Topaz negotiated a settlement recovering 100% of the excess compensation received by the directors and approximately 76% of the damages potentially obtainable from the officers. In addition, as part of the settlement, Kessler Topaz obtained the appointment of a new independent director to the Board of Directors and the implementation of significant reforms to the Company's stock option award processes. The Court complimented the settlement, explaining that it "serves what Delaware views as the overall positive function of stockholder litigation, which is not just recovery in the individual case but also deterrence and norm enforcement."

*International Brotherhood of Electrical Workers Local 98 Pension Fund v. Black, et al.*, Case No. 37-2011-00097795-CU-SL-CTL (Sup. Ct. Cal., San Diego Feb. 5, 2016) *("Encore Capital Group, Inc.")*:
Kessler Topaz, as co-lead counsel, represented International Brotherhood of Electrical Workers Local 98 Pension Fund in a shareholder derivative action challenging breaches of fiduciary duties and other violations of law in connection with Encore's debt collection practices, including robo-signing affidavits and improper use of the court system to collect alleged consumer debts. Kessler Topaz negotiated a settlement in which the Company implemented industry-leading reforms to its risk management and corporate governance practices, including creating Chief Risk Officer and Chief Compliance Officer positions, various compliance committees, and procedures for consumer complaint monitoring.

*In re Southern Peru Copper Corp. Derivative Litigation,* Consol. CA No. 961-CS (Del. Ch. 2011):
Kessler Topaz served as co-lead counsel in this landmark $2 billion post-trial decision, believed to be the largest verdict in Delaware corporate law history. In 2005, Southern Peru, a publicly-traded copper mining company, acquired Minera Mexico, a private mining company owned by Southern Peru's majority stockholder Grupo Mexico. The acquisition required Southern Peru to pay Grupo Mexico more than $3 billion in Southern Peru stock. We alleged that Grupo Mexico had caused Southern Peru to grossly overpay for the private company in deference to its majority shareholder's interests. Discovery in the case spanned years and continents, with depositions in Peru and Mexico. The trial court agreed and ordered Grupo Mexico to pay more than $2 billion in damages and interest. The Delaware Supreme Court affirmed on appeal.

*Quinn v. Knight*, No. 3:16-cv-610 (E.D. Va. Mar. 16, 2017) ("*Apple REIT Ten*"):
This shareholder derivative action challenged a conflicted "roll up" REIT transaction orchestrated by Glade M. Knight and his son Justin Knight. The proposed transaction paid the Knights millions of dollars while paying public stockholders less than they had invested in the company. The case was brought under Virginia law, and settled just ten days before trial, with stockholders receiving an additional $32 million in merger consideration.

*Kastis v. Carter*, C.A. No. 8657-CB (Del. Ch. Sept. 19, 2016) ("*Hemispherx Biopharma, Inc.*"):
This derivative action challenged improper bonuses paid to two company executives of this small pharmaceutical company that had never turned a profit. In response to the complaint, Hemispherx's board first adopted a "fee-shifting" bylaw that would have required stockholder plaintiffs to pay the company's legal fees unless the plaintiffs achieved 100% of the relief they sought. This sort of bylaw, if adopted more broadly, could substantially curtail meritorious litigation by stockholders unwilling to risk losing millions of dollars if they bring an unsuccessful case. After Kessler Topaz presented its argument in court, Hemispherx withdrew the bylaw. Kessler Topaz ultimately negotiated a settlement requiring the two executives to forfeit several million dollars' worth of accrued but unpaid bonuses, future bonuses and director fees. The company also recovered $1.75 million from its insurance carriers, appointed a new independent director to the board, and revised its compensation program.

*Montgomery v. Erickson, Inc., et al.*, C.A. No. 8784-VCL (Del. Ch. Sept. 12, 2016):

Kessler Topaz represented an individual stockholder who asserted in the Delaware Court of Chancery class action and derivative claims challenging merger and recapitalization transactions that benefitted the company's controlling stockholders at the expense of the company and its minority stockholders. Plaintiff alleged that the controlling stockholders of Erickson orchestrated a series of transactions with the intent and effect of using Erickson's money to bail themselves out of a failing investment. Defendants filed a motion to dismiss the complaint, which Kessler Topaz defeated, and the case proceeded through more than a year of fact discovery. Following an initially unsuccessful mediation and further litigation, Kessler Topaz ultimately achieved an $18.5 million cash settlement, 80% of which was distributed to members of the stockholder class to resolve their direct claims and 20% of which was paid to the company to resolve the derivative claims. The settlement also instituted changes to the company's governing documents to prevent future self-dealing transactions like those that gave rise to the case.

*In re Helios Closed-End Funds Derivative Litig.*, No. 2:11-cv-02935-SHM-TMP (W.D. Tenn.):

Kessler Topaz represented stockholders of four closed-end mutual funds in a derivative action against the funds' former investment advisor, Morgan Asset Management. Plaintiffs alleged that the defendants mismanaged the funds by investing in riskier securities than permitted by the funds' governing documents and, after the values of these securities began to precipitously decline beginning in early 2007, cover up their wrongdoing by assigning phony values to the funds' investments and failing to disclose the extent of the decrease in value of the funds' assets. In a rare occurrence in derivative litigation, the funds' Boards of Directors eventually hired Kessler Topaz to prosecute the claims against the defendants on behalf of the funds. Our litigation efforts led to a settlement that recovered $6 million for the funds and ensured that the funds would not be responsible for making any payment to resolve claims asserted against them in a related multi-million dollar securities class action. The fund's Boards fully supported and endorsed the settlement, which was negotiated independently of the parallel securities class action.

*In re Viacom, Inc. Shareholder Derivative Litig.*, Index No. 602527/05 (New York County, NY 2005):

Kessler Topaz represented the Public Employees' Retirement System of Mississippi and served as Lead Counsel in a derivative action alleging that the members of the Board of Directors of Viacom, Inc. paid excessive and unwarranted compensation to Viacom's Executive Chairman and CEO, Sumner M. Redstone, and co-COOs Thomas E. Freston and Leslie Moonves, in breach of their fiduciary duties. Specifically, we alleged that in fiscal year 2004, when Viacom reported a record net loss of $17.46 billion, the board improperly approved compensation payments to Redstone, Freston, and Moonves of approximately $56 million, $52 million, and $52 million, respectively. Judge Ramos of the New York Supreme Court denied Defendants' motion to dismiss the action as we overcame several complex arguments related to the failure to make a demand on Viacom's Board; Defendants then appealed that decision to the Appellate Division of the Supreme Court of New York. Prior to a decision by the appellate court, a settlement was reached in early 2007. Pursuant to the settlement, Sumner Redstone, the company's Executive Chairman and controlling shareholder, agreed to a new compensation package that, among other things, substantially reduces his annual salary and cash bonus, and ties the majority of his incentive compensation directly to shareholder returns.

*In re Family Dollar Stores, Inc. Derivative Litig.*, Master File No. 06-CVS-16796 (Mecklenburg County, NC 2006):

Kessler Topaz served as Lead Counsel, derivatively on behalf of Family Dollar Stores, Inc., and against certain of Family Dollar's current and former officers and directors. The actions were pending in Mecklenburg County Superior Court, Charlotte, North Carolina, and alleged that certain of the company's officers and directors had improperly backdated stock options to achieve favorable exercise prices in violation of shareholder-approved stock option plans. As a result of these shareholder derivative actions, Kessler Topaz was able to achieve substantial relief for Family Dollar and its shareholders. Through Kessler Topaz's litigation of this action, Family Dollar agreed to cancel hundreds of thousands of stock options

granted to certain current and former officers, resulting in a seven-figure net financial benefit for the company. In addition, Family Dollar has agreed to, among other things: implement internal controls and granting procedures that are designed to ensure that all stock options are properly dated and accounted for; appoint two new independent directors to the board of directors; maintain a board composition of at least 75 percent independent directors; and adopt stringent officer stock-ownership policies to further align the interests of officers with those of Family Dollar shareholders. The settlement was approved by Order of the Court on August 13, 2007.

*Carbon County Employees Retirement System, et al., Derivatively on Behalf of Nominal Defendant Southwest Airlines Co. v. Gary C. Kelly, et al.* **Cause No. 08-08692 (District Court of Dallas County, Texas):**
As lead counsel in this derivative action, we negotiated a settlement with far-reaching implications for the safety and security of airline passengers.

Our clients were shareholders of Southwest Airlines Co. (Southwest) who alleged that certain officers and directors had breached their fiduciary duties in connection with Southwest's violations of Federal Aviation Administration safety and maintenance regulations. Plaintiffs alleged that from June 2006 to March 2007, Southwest flew 46 Boeing 737 airplanes on nearly 60,000 flights without complying with a 2004 FAA Airworthiness Directive requiring fuselage fatigue inspections. As a result, Southwest was forced to pay a record $7.5 million fine. We negotiated numerous reforms to ensure that Southwest's Board is adequately apprised of safety and operations issues, and implementing significant measures to strengthen safety and maintenance processes and procedures.

*The South Financial Group, Inc. Shareholder Litigation,* **C.A. No. 2008-CP-23-8395 (S.C. C.C.P. 2009):**
Represented shareholders in derivative litigation challenging board's decision to accelerate "golden parachute" payments to South Financial Group's CEO as the company applied for emergency assistance in 2008 under the Troubled Asset Recovery Plan (TARP).

We sought injunctive relief to block the payments and protect the company's ability to receive the TARP funds. The litigation was settled with the CEO giving up part of his severance package and agreeing to leave the board, as well as the implementation of important corporate governance changes one commentator described as "unprecedented."

# Options Backdating

In 2006, the Wall Street Journal reported that three companies appeared to have "backdated" stock option grants to their senior executives, pretending that the options had been awarded when the stock price was at its lowest price of the quarter, or even year.  An executive who exercised the option thus paid the company an artificially low price, which stole money from the corporate coffers.  While stock options are designed to incentivize recipients to drive the company's stock price up, backdating options to artificially low prices undercut those incentives, overpaid executives, violated tax rules, and decreased shareholder value.

Kessler Topaz worked with a financial analyst to identify dozens of other companies that had engaged in similar practices, and filed more than 50 derivative suits challenging the practice.  These suits sought to force the executives to disgorge their improper compensation and to revamp the companies' executive compensation policies.  Ultimately, as lead counsel in these derivative actions, Kessler Topaz achieved significant monetary and non-monetary benefits at dozens of companies, including:

*Comverse Technology, Inc.*: Settlement required Comverse's founder and CEO Kobi Alexander, who fled to Namibia after the backdating was revealed, to disgorge more than $62 million in excessive backdated option compensation. The settlement also overhauled the company's corporate governance and internal controls, replacing a number of directors and corporate executives, splitting the Chairman and CEO positions, and instituting majority voting for directors.

*Monster Worldwide, Inc.*: Settlement required recipients of backdated stock options to disgorge more than $32 million in unlawful gains back to the company, plus agreeing to significant corporate governance measures. These measures included (a) requiring Monster's founder Andrew McKelvey to reduce his voting control over Monster from 31% to 7%, by exchanging super-voting stock for common stock; and (b) implementing new equity granting practices that require greater accountability and transparency in the granting of stock options moving forward. In approving the settlement, the court noted "the good results, mainly the amount of money for the shareholders and also the change in governance of the company itself, and really the hard work that had to go into that to achieve the results…."

*Affiliated Computer Services, Inc.*: Settlement required executives, including founder Darwin Deason, to give up $20 million in improper backdated options. The litigation was also a catalyst for the company to replace its CEO and CFO and revamp its executive compensation policies.

## Mergers & Acquisitions Litigation

*City of Daytona Beach Police and Fire Pension Fund v. ExamWorks Group, Inc., et al., C.A. No. 12481-VCL (Del. Ch.):*
On September 12, 2017, the Delaware Chancery Court approved one of the largest class action M&A settlements in the history of the Delaware Chancery Court, a $86.5 million settlement relating to the acquisition of ExamWorks Group, Inc. by private equity firm Leonard Green & Partners, LP.

The settlement caused ExamWorks stockholders to receive a 6% improvement on the $35.05 per share merger consideration negotiated by the defendants. This amount is unusual especially for litigation challenging a third-party merger. The settlement amount is also noteworthy because it includes a $46.5 million contribution from ExamWorks' outside legal counsel, Paul Hastings LLP.

*In re ArthroCare Corporation S'holder Litig., Consol. C.A. No. 9313-VCL (Del. Ch. Nov. 13, 2014):*
Kessler Topaz, as co-lead counsel, challenged the take-private of Arthrocare Corporation by private equity firm Smith & Nephew. This class action litigation alleged, among other things, that Arthrocare's Board breached their fiduciary duties by failing to maximize stockholder value in the merger. Plaintiffs also alleged that that the merger violated Section 203 of the Delaware General Corporation Law, which prohibits mergers with "interested stockholders," because Smith & Nephew had contracted with JP Morgan to provide financial advice and financing in the merger, while a subsidiary of JP Morgan owned more than 15% of Arthrocare's stock. Plaintiffs also alleged that the agreement between Smith & Nephew and the JP Morgan subsidiary violated a "standstill" agreement between the JP Morgan subsidiary and Arthrocare. The court set these novel legal claims for an expedited trial prior to the closing of the merger. The parties agreed to settle the action when Smith & Nephew agreed to increase the merger consideration paid to Arthrocare stockholders by $12 million, less than a month before trial.

*In re Safeway Inc. Stockholders Litig., C.A. No. 9445-VCL (Del. Ch. Sept. 17, 2014):*
Kessler Topaz represented the Oklahoma Firefighters Pension and Retirement System in class action litigation challenging the acquisition of Safeway, Inc. by Albertson's grocery chain for $32.50 per share in cash and contingent value rights. Kessler Topaz argued that the value of CVRs was illusory, and Safeway's shareholder rights plan had a prohibitive effect on potential bidders making superior offers to acquire

Safeway, which undermined the effectiveness of the post-signing "go shop." Plaintiffs sought to enjoin the transaction, but before the scheduled preliminary injunction hearing took place, Kessler Topaz negotiated (i) modifications to the terms of the CVRs and (ii) defendants' withdrawal of the shareholder rights plan. In approving the settlement, Vice Chancellor Laster of the Delaware Chancery Court stated that "the plaintiffs obtained significant changes to the transaction . . . that may well result in material increases in the compensation received by the class," including substantial benefits potentially in excess of $230 million.

*In re MPG Office Trust, Inc. Preferred Shareholder Litig.*, Cons. Case No. 24-C-13-004097 (Md. Cir. Oct. 20, 2015):
Kessler Topaz challenged a coercive tender offer whereby MPG preferred stockholders received preferred stock in Brookfield Office Properties, Inc. without receiving any compensation for their accrued and unpaid dividends. Kessler Topaz negotiated a settlement where MPG preferred stockholders received a dividend of $2.25 per share, worth approximately $21 million, which was the only payment of accrued dividends Brookfield DTLA Preferred Stockholders had received as of the time of the settlement.

*In re Globe Specialty Metals, Inc. Stockholders Litig.*, C.A. 10865-VCG (Del. Ch. Feb. 15, 2016):
Kessler Topaz served as co-lead counsel in class action litigation arising from Globe's acquisition by Grupo Atlantica to form Ferroglobe. Plaintiffs alleged that Globe's Board breached their fiduciary duties to Globe's public stockholders by agreeing to sell Globe for an unfair price, negotiating personal benefits for themselves at the expense of the public stockholders, failing to adequately inform themselves of material issues with Grupo Atlantica, and issuing a number of materially deficient disclosures in an attempt to mask issues with the negotiations. At oral argument on Plaintiffs' preliminary injunction motion, the Court held that Globe stockholders likely faced irreparable harm from the Board's conduct, but reserved ruling on the other preliminary injunction factors. Prior to the Court's final ruling, the parties agreed to settle the action for $32.5 million and various corporate governance reforms to protect Globe stockholders' rights in Ferroglobe.

*In re Dole Food Co., Inc. Stockholder Litig.*, Consol. C.A. No. 8703-VCL, 2015 WL 5052214 (Del. Ch. Aug. 27, 2015):
On August 27, 2015, Vice Chancellor J. Travis Laster issued his much-anticipated post-trial verdict in litigation by former stockholders of Dole Food Company against Dole's chairman and controlling stockholder David Murdock. In a 106-page ruling, Vice Chancellor Laster found that Murdock and his longtime lieutenant, Dole's former president and general counsel C. Michael Carter, unfairly manipulated Dole's financial projections and misled the market as part of Murdock's efforts to take the company private in a deal that closed in November 2013. Among other things, the Court concluded that Murdock and Carter "primed the market for the freeze-out by driving down Dole's stock price" and provided the company's outside directors with "knowingly false" information and intended to "mislead the board for Mr. Murdock's benefit."

Vice Chancellor Laster found that the $13.50 per share going-private deal underpaid stockholders, and awarded class damages of $2.74 per share, totaling $148 million. That award represents the largest post-trial class recovery in the merger context. The largest post-trial derivative recovery in a merger case remains Kessler Topaz's landmark 2011 $2 billion verdict in *In re Southern Peru*.

*In re Genentech, Inc. Shareholders Lit.*, Cons. Civ. Action No. 3991-VCS (Del. Ch. 2008):
Kessler Topaz served as Co-Lead Counsel in this shareholder class action brought against the directors of Genentech and Genentech's majority stockholder, Roche Holdings, Inc., in response to Roche's July 21, 2008 attempt to acquire Genentech for $89 per share. We sought to enforce provisions of an Affiliation Agreement between Roche and Genentech and to ensure that Roche fulfilled its fiduciary obligations to Genentech's shareholders through any buyout effort by Roche. After moving to enjoin the tender offer, Kessler Topaz negotiated with Roche and Genentech to amend the Affiliation Agreement to allow a

negotiated transaction between Roche and Genentech, which enabled Roche to acquire Genentech for $95 per share, approximately $3.9 billion more than Roche offered in its hostile tender offer. In approving the settlement, then-Vice Chancellor Leo Strine complimented plaintiffs' counsel, noting that this benefit was only achieved through "real hard-fought litigation in a complicated setting."

*In re GSI Commerce, Inc. Shareholder Litig.*, Consol. C.A. No. 6346-VCN (Del. Ch. Nov. 15, 2011):
On behalf of the Erie County Employees' Retirement System, we alleged that GSI's founder breached his fiduciary duties by negotiating a secret deal with eBay for him to buy several GSI subsidiaries at below market prices before selling the remainder of the company to eBay. These side deals significantly reduced the acquisition price paid to GSI stockholders. Days before an injunction hearing, we negotiated an improvement in the deal price of $24 million.

*In re Amicas, Inc. Shareholder Litigation*, 10-0174-BLS2 (Suffolk County, MA 2010):
Kessler Topaz served as lead counsel in class action litigation challenging a proposed private equity buyout of Amicas that would have paid Amicas shareholders $5.35 per share in cash while certain Amicas executives retained an equity stake in the surviving entity moving forward. Kessler Topaz prevailed in securing a preliminary injunction against the deal, which then allowed a superior bidder to purchase the Company for an additional $0.70 per share ($26 million). The court complimented Kessler Topaz attorneys for causing an "exceptionally favorable result for Amicas' shareholders" after "expend[ing] substantial resources."

*In re Harleysville Mutual*, Nov. Term 2011, No. 02137 (C.C.P., Phila. Cnty.):
Kessler Topaz served as co-lead counsel in expedited merger litigation challenging Harleysville's agreement to sell the company to Nationwide Insurance Company. Plaintiffs alleged that policyholders were entitled to receive cash in exchange for their ownership interests in the company, not just new Nationwide policies. Plaintiffs also alleged that the merger was "fundamentally unfair" under Pennsylvania law. The defendants contested the allegations and contended that the claims could not be prosecuted directly by policyholders (as opposed to derivatively on the company's behalf). Following a two-day preliminary injunction hearing, we settled the case in exchange for a $26 million cash payment to policyholders.

## Consumer Protection and Fiduciary Litigation

*In re: J.P. Jeanneret Associates Inc., et al.,* No. 09-cv-3907 (S.D.N.Y.):
Kessler Topaz served as lead counsel for one of the plaintiff groups in an action against J.P. Jeanneret and Ivy Asset Management relating to an alleged breach of fiduciary and statutory duty in connection with the investment of retirement plan assets in Bernard Madoff-related entities. By breaching their fiduciary duties, Defendants caused significant losses to the retirement plans. Following extensive hard-fought litigation, the case settled for a total of $216.5 million.

*In re: National City Corp. Securities, Derivative and ERISA Litig,* No. 08-nc-7000 (N.D. Ohio):
Kessler Topaz served as a lead counsel in this complex action alleging that certain directors and officers of National City Corp. breached their fiduciary duties under the Employee Retirement Income Security Act of 1974. These breaches arose from an investment in National City stock during a time when defendants knew, or should have known, that the company stock was artificially inflated and an imprudent investment for the company's 401(k) plan. The case settled for $43 million on behalf of the plan, plaintiffs and a settlement class of plan participants.

*Alston, et al. v. Countrywide Financial Corp. et al.,* No. 07-cv-03508 (E.D. Pa.):
Kessler Topaz served as lead counsel in this novel and complex action which alleged that Defendants Countrywide Financial Corporation, Countrywide Home Loans, Inc. and Balboa Reinsurance Co. violated

the Real Estate Settlement Procedure Act ("RESPA") and ultimately cost borrowers millions of dollars. Specifically, the action alleged that Defendants engaged in a scheme related to private mortgage insurance involving kickbacks, which are prohibited under RESPA. After three and a half years of hard-fought litigation, the action settled for $34 million.

*Trustees of the Local 464A United Food and Commercial Workers Union Pension Fund, et al. v. Wachovia Bank, N.A., et al.*, No. 09-cv-00668 (DNJ):

For more than 50 years, Wachovia and its predecessors acted as investment manager for the Local 464A UFCW Union Funds, exercising investment discretion consistent with certain investment guidelines and fiduciary obligations. Until mid-2007, Wachovia managed the fixed income assets of the funds safely and conservatively, and their returns closely tracked the Lehman Aggregate Bond Index (now known as the Barclay's Capital Aggregate Bond Index) to which the funds were benchmarked. However, beginning in mid-2007 Wachovia significantly changed the investment strategy, causing the funds' portfolio value to drop drastically below the benchmark. Specifically, Wachovia began to dramatically decrease the funds' holdings in short-term, high-quality, low-risk debt instruments and materially increase their holdings in high-risk mortgage-backed securities and collateralized mortgage obligations. We represented the funds' trustees in alleging that, among other things, Wachovia breached its fiduciary duty by: failing to invest the assets in accordance with the funds' conservative investment guidelines; failing to adequately monitor the funds' fixed income investments; and failing to provide complete and accurate information to plaintiffs concerning the change in investment strategy. The matter was resolved privately between the parties.

*In re Bank of New York Mellon Corp. Foreign Exchange Transactions Litig.*, No. 1:12-md-02335 (S.D.N.Y.):

On behalf of the Southeastern Pennsylvania Transportation Authority Pension Fund and a class of similarly situated domestic custodial clients of BNY Mellon, we alleged that BNY Mellon secretly assigned a spread to the FX rates at which it transacted FX transactions on behalf of its clients who participated in the BNY Mellon's automated "Standing Instruction" FX service. BNY Mellon determining this spread by executing its clients' transactions at one rate and then, typically, at the end of the trading day, assigned a rate to its clients which approximated the worst possible rates of the trading day, pocketing the difference as riskless profit. This practice was despite BNY Mellon's contractual promises to its clients that its Standing Instruction service was designed to provide "best execution," was "free of charge" and provided the "best rates of the day." The case asserted claims for breach of contract and breach of fiduciary duty on behalf of BNY Mellon's custodial clients and sought to recover the unlawful profits that BNY Mellon earned from its unfair and unlawful FX practices. The case was litigated in collaboration with separate cases brought by state and federal agencies, with Kessler Topaz serving as lead counsel and a member of the executive committee overseeing the private litigation. After extensive discovery, including more than 100 depositions, over 25 million pages of fact discovery, and the submission of multiple expert reports, Plaintiffs reached a settlement with BNY Mellon of $335 million. Additionally, the settlement is being administered by Kessler Topaz along with separate recoveries by state and federal agencies which bring the total recovery for BNY Mellon's custodial customers to $504 million. The settlement was finally approved on September 24, 2015. In approving the settlement, Judge Lewis Kaplan praised counsel for a "wonderful job," recognizing that they were "fought tooth and nail at every step of the road." In further recognition of the efforts of counsel, Judge Kaplan noted that "[t]his was an outrageous wrong by the Bank of New York Mellon, and plaintiffs' counsel deserve a world of credit for taking it on, for running the risk, for financing it and doing a great job."

*CompSource Oklahoma v. BNY Mellon Bank, N.A.*, No. CIV 08-469-KEW (E.D. Okla. October 25, 2012):

Kessler Topaz served as Interim Class Counsel in this matter alleging that BNY Mellon Bank, N.A. and the Bank of New York Mellon (collectively, "BNYM") breached their statutory, common law and contractual duties in connection with the administration of their securities lending program. The Second Amended

Complaint alleged, among other things, that BNYM imprudently invested cash collateral obtained under its securities lending program in medium term notes issued by Sigma Finance, Inc. -- a foreign structured investment vehicle ("SIV") that is now in receivership -- and that such conduct constituted a breach of BNYM's fiduciary obligations under the Employee Retirement Income Security Act of 1974, a breach of its fiduciary duties under common law, and a breach of its contractual obligations under the securities lending agreements. The Complaint also asserted claims for negligence, gross negligence and willful misconduct. The case recently settled for $280 million.

*Transatlantic Holdings, Inc., et al. v. American International Group, Inc., et al.,* **American Arbitration Association Case No. 50 148 T 00376 10:**

Kessler Topaz served as counsel for Transatlantic Holdings, Inc., and its subsidiaries ("TRH"), alleging that American International Group, Inc. and its subsidiaries ("AIG") breached their fiduciary duties, contractual duties, and committed fraud in connection with the administration of its securities lending program. Until June 2009, AIG was TRH's majority shareholder and, at the same time, administered TRH's securities lending program. TRH's Statement of Claim alleged that, among other things, AIG breached its fiduciary obligations as investment advisor and majority shareholder by imprudently investing the majority of the cash collateral obtained under its securities lending program in mortgage backed securities, including Alt-A and subprime investments. The Statement of Claim further alleged that AIG concealed the extent of TRH's subprime exposure and that when the collateral pools began experiencing liquidity problems in 2007, AIG unilaterally carved TRH out of the pools so that it could provide funding to its wholly owned subsidiaries to the exclusion of TRH. The matter was litigated through a binding arbitration and TRH was awarded $75 million.

*Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase Bank, N.A.* – **Consolidated Action No. 09-cv-00686 (SAS) (S.D.N.Y.):**

On January 23, 2009, the firm filed a class action complaint on behalf of all entities that were participants in JPMorgan's securities lending program and that incurred losses on investments that JPMorgan, acting in its capacity as a discretionary investment manager, made in medium-term notes issue by Sigma Finance, Inc. – a now defunct structured investment vehicle. The losses of the Class exceeded $500 million. The complaint asserted claims for breach of fiduciary duty under the Employee Retirement Income Security Act (ERISA), as well as common law breach of fiduciary duty, breach of contract and negligence. Over the course of discovery, the parties produced and reviewed over 500,000 pages of documents, took 40 depositions (domestic and foreign) and exchanged 21 expert reports. The case settled for $150 million. Trial was scheduled to commence on February 6, 2012.

*In re Global Crossing, Ltd. ERISA Litigation,* **No. 02 Civ. 7453 (S.D.N.Y. 2004):**

Kessler Topaz served as Co-Lead Counsel in this novel, complex and high-profile action which alleged that certain directors and officers of Global Crossing, a former high-flier of the late 1990's tech stock boom, breached their fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA") to certain company-provided 401(k) plans and their participants. These breaches arose from the plans' alleged imprudent investment in Global Crossing stock during a time when defendants knew, or should have known, that the company was facing imminent bankruptcy. A settlement of plaintiffs' claims restoring $79 million to the plans and their participants was approved in November 2004. At the time, this represented the largest recovery received in a company stock ERISA class action.

*In re AOL Time Warner ERISA Litigation,* **No. 02-CV-8853 (S.D.N.Y. 2006):**

Kessler Topaz, which served as Co-Lead Counsel in this highly-publicized ERISA fiduciary breach class action brought on behalf of the Company's 401(k) plans and their participants, achieved a record $100 million settlement with defendants. The $100 million restorative cash payment to the plans (and, concomitantly, their participants) represents the largest recovery from a single defendant in a breach of fiduciary action relating to mismanagement of plan assets held in the form of employer securities. The

action asserted claims for breach of fiduciary duties pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") on behalf of the participants in the AOL Time Warner Savings Plan, the AOL Time Warner Thrift Plan, and the Time Warner Cable Savings Plan (collectively, the "Plans") whose accounts purchased and/or held interests in the AOLTW Stock Fund at any time between January 27, 1999 and July 3, 2003. Named as defendants in the case were Time Warner (and its corporate predecessor, AOL Time Warner), several of the Plans' committees, as well as certain current and former officers and directors of the company. In March 2005, the Court largely denied defendants' motion to dismiss and the parties began the discovery phase of the case. In January 2006, Plaintiffs filed a motion for class certification, while at the same time defendants moved for partial summary judgment. These motions were pending before the Court when the settlement in principle was reached. Notably, an Independent Fiduciary retained by the Plans to review the settlement in accordance with Department of Labor regulations approved the settlement and filed a report with Court noting that the settlement, in addition to being "more than a reasonable recovery" for the Plans, is "one of the largest ERISA employer stock action settlements in history."

### *In re Honeywell International ERISA Litigation,* No. 03-1214 (DRD) (D.N.J. 2004):

Kessler Topaz served as Lead Counsel in a breach of fiduciary duty case under ERISA against Honeywell International, Inc. and certain fiduciaries of Honeywell defined contribution pension plans. The suit alleged that Honeywell and the individual fiduciary defendants, allowed Honeywell's 401(k) plans and their participants to imprudently invest significant assets in company stock, despite that defendants knew, or should have known, that Honeywell's stock was an imprudent investment due to undisclosed, wide-ranging problems stemming from a consummated merger with Allied Signal and a failed merger with General Electric. The settlement of plaintiffs' claims included a $14 million payment to the plans and their affected participants, and significant structural relief affording participants much greater leeway in diversifying their retirement savings portfolios.

### *Henry v. Sears, et. al.,* Case No. 98 C 4110 (N.D. Ill. 1999):

The Firm served as Co-Lead Counsel for one of the largest consumer class actions in history, consisting of approximately 11 million Sears credit card holders whose interest rates were improperly increased in connection with the transfer of the credit card accounts to a national bank. Kessler Topaz successfully negotiated a settlement representing approximately 66% of all class members' damages, thereby providing a total benefit exceeding $156 million. All $156 million was distributed automatically to the Class members, without the filing of a single proof of claim form. In approving the settlement, the District Court stated: ". . . I am pleased to approve the settlement. I think it does the best that could be done under the circumstances on behalf of the class. . . . The litigation was complex in both liability and damages and required both professional skill and standing which class counsel demonstrated in abundance."


## Antitrust Litigation

### *In re: Flonase Antitrust Litigation,* No. 08-cv-3149 (E.D. Pa.):

Kessler Topaz served as a lead counsel on behalf of a class of direct purchaser plaintiffs in an antitrust action brought pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, alleging, among other things, that defendant GlaxoSmithKline (GSK) violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by engaging in "sham" petitioning of a government agency.  Specifically, the Direct Purchasers alleged that GSK unlawfully abused the citizen petition process contained in Section 505(j) of the Federal Food, Drug, and Cosmetic Act and thus delayed the introduction of less expensive generic versions of Flonase, a highly popular allergy drug, causing injury to the Direct Purchaser Class.  Throughout the course of the four year litigation, Plaintiffs defeated two motions for summary judgment, succeeded in having a class certified and conducted extensive discovery.  After lengthy negotiations and shortly before trial, the action settled for $150 million.

*In re: Wellbutrin SR Antitrust Litigation,* **No. 04-cv-5898 (E.D. Pa.):**

Kessler Topaz was a lead counsel in an action which alleged, among other things, that defendant GlaxoSmithKline (GSK) violated the antitrust, consumer fraud, and consumer protection laws of various states. Specifically, Plaintiffs and the class of Third-Party Payors alleged that GSK manipulated patent filings and commenced baseless infringement lawsuits in connection wrongfully delaying generic versions of Wellbutrin SR and Zyban from entering the market, and that Plaintiffs and the Class of Third-Party Payors suffered antitrust injury and calculable damages as a result. After more than eight years of litigation, the action settled for $21.5 million.

*In re: Metoprolol Succinate End-Payor Antitrust Litigation,* **No. 06-cv-71 (D. Del.):**

Kessler Topaz was co-lead counsel in a lawsuit which alleged that defendant AstraZeneca prevented generic versions of Toprol-XL from entering the market by, among other things, improperly manipulating patent filings and filing baseless patent infringement lawsuits. As a result, AstraZeneca unlawfully monopolized the domestic market for Toprol-XL and its generic bio-equivalents. After seven years of litigation, extensive discovery and motion practice, the case settled for $11 million.

*In re Remeron Antitrust Litigation,* **No. 02-CV-2007 (D.N.J. 2004):**

Kessler Topaz was Co-Lead Counsel in an action which challenged Organon, Inc.'s filing of certain patents and patent infringement lawsuits as an abuse of the Hatch-Waxman Act, and an effort to unlawfully extend their monopoly in the market for Remeron. Specifically, the lawsuit alleged that defendants violated state and federal antitrust laws in their efforts to keep competing products from entering the market, and sought damages sustained by consumers and third-party payors. After lengthy litigation, including numerous motions and over 50 depositions, the matter settled for $36 million.

## OUR PROFESSIONALS

## PARTNERS

**JULES D. ALBERT,** a partner of the Firm, concentrates his practice in mergers and acquisition litigation and stockholder derivative litigation. Mr. Albert received his law degree from the University of Pennsylvania Law School, where he was a Senior Editor of the *University of Pennsylvania Journal of Labor and Employment Law* and recipient of the James Wilson Fellowship. Mr. Albert also received a Certificate of Study in Business and Public Policy from The Wharton School at the University of Pennsylvania. Mr. Albert graduated *magna cum laude* with a Bachelor of Arts in Political Science from Emory University. Mr. Albert is licensed to practice law in Pennsylvania, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania.

Mr. Albert has litigated in state and federal courts across the country, and has represented stockholders in numerous actions that have resulted in significant monetary recoveries and corporate governance improvements, including: *In re Sunrise Senior Living, Inc. Deriv. Litig.*, No. 07-00143 (D.D.C.); *Mercier v. Whittle, et al.*, No. 2008-CP-23-8395 (S.C. Ct. Com. Pl., 13th Jud. Cir.); *In re K-V Pharmaceutical Co. Deriv. Litig.*, No. 06-00384 (E.D. Mo.); *In re Progress Software Corp. Deriv. Litig.*, No. SUCV2007-01937-BLS2 (Mass. Super. Ct., Suffolk Cty.); *In re Quest Software, Inc. Deriv. Litig.* No 06CC00115 (Cal. Super. Ct., Orange Cty.); and *Quaco v. Balakrishnan, et al.,* No. 06-2811 (N.D. Cal.).

**NAUMON A. AMJED,** a partner of the Firm, concentrates his practice on new matter development with a focus on analyzing securities class action lawsuits, direct (or opt-out) actions, non-U.S. securities and shareholder litigation, SEC whistleblower actions, breach of fiduciary duty cases, antitrust matters, data

breach actions and oil and gas litigation. Mr. Amjed is a graduate of the Villanova University School of Law, *cum laude*, and holds an undergraduate degree in business administration from Temple University, *cum laude*. Mr. Amjed is a member of the Delaware State Bar, the Bar of the Commonwealth of Pennsylvania, the New York State Bar, and is admitted to practice before the United States Courts for the District of Delaware, the Eastern District of Pennsylvania and the Southern District of New York.

As a member of the Firm's lead plaintiff practice group, Mr. Amjed has represented clients serving as lead plaintiffs in several notable securities class action lawsuits including: *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation*, No. 09MDL2058 (S.D.N.Y.) (settled -- $2.425 billion); *In re Wachovia Preferred Securities and Bond/Notes Litigation*, No. 09-cv-6351 (RJS) (S.D.N.Y.) ($627 million recovery); *In re Lehman Bros. Equity/Debt Securities Litigation*, No. 08-cv-5523 (LAK) (S.D.N.Y.) ($615 million recovery) and *In re JPMorgan Chase & Co. Securities Litigation*, No. 12-3852-GBD ("London Whale Litigation") ($150 million recovery). Additionally, Mr. Amjed served on the national Executive Committee representing financial institutions suffering losses from Target Corporation's 2013 data breach – one of the largest data breaches in history. The Target litigation team was responsible for a landmark data breach opinion that substantially denied Target's motion to dismiss and was also responsible for obtaining certification of a class of financial institutions. *See In re Target Corp. Customer Data Sec. Breach Litig.*, 64 F. Supp. 3d 1304 (D. Minn. 2014); *In re Target Corp. Customer Data Sec. Breach Litig.*, No. MDL 14-2522 PAM/JJK, 2015 WL 5432115 (D. Minn. Sept. 15, 2015). At the time of its issuance, the class certification order in Target was the first of its kind in data breach litigation by financial institutions.

Mr. Amjed also has significant experience conducting complex litigation in state and federal courts including federal securities class actions, shareholder derivative actions, suits by third-party insurers and other actions concerning corporate and alternative business entity disputes. Mr. Amjed has litigated in numerous state and federal courts across the country, including the Delaware Court of Chancery, and has represented shareholders in several high profile lawsuits, including: *LAMPERS v. CBOT Holdings, Inc. et al.*, C.A. No. 2803-VCN (Del. Ch.); *In re Alstom SA Sec. Litig.*, 454 F. Supp. 2d 187 (S.D.N.Y. 2006); *In re Global Crossing Sec. Litig.*, 02— Civ. — 910 (S.D.N.Y.); *In re Enron Corp. Sec. Litig.*, 465 F. Supp. 2d 687 (S.D. Tex. 2006); and *In re Marsh McLennan Cos., Inc. Sec. Litig.* 501 F. Supp. 2d 452 (S.D.N.Y. 2006).

**ETHAN J. BARLIEB,** a partner of the Firm, concentrates his practice in the areas of ERISA, consumer protection and antitrust litigation. Mr. Barlieb received his law degree, *magna cum laude*, from the University of Miami School of Law in 2007 and his undergraduate degree from Cornell University in 2003. Mr. Barlieb is licensed to practice in Pennsylvania and New Jersey.

Prior to joining Kessler Topaz, Mr. Barlieb was an associate with Pietragallo Gordon Alfano Bosick & Raspanti, LLP, where he worked on various commercial, securities and employment matters. Before that, Mr. Barlieb served as a law clerk for the Honorable Mitchell S. Goldberg in the U.S. District Court for the Eastern District of Pennsylvania.

**STUART L. BERMAN,** a partner of the Firm, concentrates his practice on securities class action litigation in federal courts throughout the country, with a particular emphasis on representing institutional investors active in litigation. Mr. Berman received his law degree from George Washington University National Law Center, and is an honors graduate from Brandeis University. Mr. Berman is licensed to practice in Pennsylvania and New Jersey.

Mr. Berman regularly counsels and educates institutional investors located around the world on emerging legal trends, new case ideas and the rights and obligations of institutional investors as they relate to securities fraud class actions and individual actions. In this respect, Mr. Berman has been instrumental in

courts appointing the Firm's institutional clients as lead plaintiffs in class actions as well as in representing institutions individually in direct actions. Mr. Berman is currently representing institutional investors in direct actions against Vivendi and Merck, and took a very active role in the precedent setting Shell settlement on behalf of many of the Firm's European institutional clients.

Mr. Berman is a frequent speaker on securities issues, especially as they relate to institutional investors, at events such as The European Pension Symposium in Florence, Italy; the Public Funds Symposium in Washington, D.C.; the Pennsylvania Public Employees Retirement (PAPERS) Summit in Harrisburg, Pennsylvania; the New England Pension Summit in Newport, Rhode Island; the Rights and Responsibilities for Institutional Investors in Amsterdam, Netherlands; and the European Investment Roundtable in Barcelona, Spain.

**DAVID A. BOCIAN**, a partner of the Firm, focuses his practice on whistleblower representation and False Claims Act litigation. Mr. Bocian received his law degree from the University of Virginia School of Law and graduated *cum laude* from Princeton University. He is licensed to practice law in the Commonwealth of Pennsylvania, New Jersey, New York and the District of Columbia.

Mr. Bocian began his legal career in Washington, D.C., as a litigation associate at Patton Boggs LLP, where his practice included internal corporate investigations, government contracts litigation and securities fraud matters. He spent more than ten years as a federal prosecutor in the U.S. Attorney's Office for the District of New Jersey, where he was appointed Senior Litigation Counsel and managed the Trenton U.S. Attorney's office. During his tenure, Mr. Bocian oversaw multifaceted investigations and prosecutions pertaining to government corruption and federal program fraud, commercial and public sector kickbacks, tax fraud, and other white collar and financial crimes. He tried numerous cases before federal juries, and was a recipient of the Justice Department's Director's Award for superior performance by an Assistant U.S. Attorney, as well as commendations from federal law enforcement agencies including the FBI and IRS.

Mr. Bocian has extensive experience in the health care field. As an adjunct professor of law, he has taught Healthcare Fraud and Abuse at Rutgers School of Law – Camden, and previously was employed in the health care industry, where he was responsible for implementing and overseeing a system-wide compliance program for a complex health system.

**GREGORY M. CASTALDO,** a partner of the Firm, concentrates his practice in the area of securities litigation. Mr. Castaldo received his law degree from Loyola Law School, where he received the American Jurisprudence award in legal writing. He received his undergraduate degree from the Wharton School of Business at the University of Pennsylvania. He is licensed to practice law in Pennsylvania and New Jersey.

Mr. Castaldo served as one of Kessler Topaz's lead litigation partners in *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation,* No. 09 MDL 2058 (S.D.N.Y.) (settled -- $2.425 billion). Mr. Castaldo also served as the lead litigation partner in *In re Tenet Healthcare Corp.*, No. 02-CV-8462 (C.D. Cal. 2002), securing an aggregate recovery of $281.5 million for the class, including $65 million from Tenet's auditor. Mr. Castaldo also played a primary litigation role in the following cases: *In re Liberate Technologies Sec. Litig.*, No. C-02-5017 (MJJ) (N.D. Cal. 2005) (settled — $13.8 million); *In re Sodexho Marriott Shareholders Litig.*, Consol. C.A. No. 18640-NC (Del. Ch. 1999) (settled — $166 million benefit); *In re Motive, Inc. Sec. Litig.*, 05-CV-923 (W.D.Tex. 2005) (settled — $7 million cash, 2.5 million shares); and *In re Wireless Facilities, Inc., Sec. Litig.*, 04-CV-1589 (S.D. Cal. 2004) (settled — $16.5 million). In addition, Mr. Castaldo served as one of the lead trial attorneys for shareholders in the historic *In re Longtop Financial Technologies Ltd. Securities Litigation*, No. 11-cv-3658 (S.D.N.Y.) trial, which resulted in a verdict in favor of investors on liability and damages.

**DARREN J. CHECK,** a partner of the Firm, concentrates his practice in the area of shareholder litigation and client relations. Mr. Check manages the Firm's Portfolio Monitoring Department and works closely with the Firm's Case Evaluation Department. Mr. Check received his law degree from Temple University School of Law and is a graduate of Franklin & Marshall College. Mr. Check is admitted to practice in numerous state and federal courts across the United States.

Currently, Mr. Check consults with institutional investors from around the world with regard to their investment rights and responsibilities. He currently works with clients in the United States, Canada, the Netherlands, Sweden, Denmark, Norway, Finland, United Kingdom, Italy, Germany, Austria, Switzerland, France, Australia and throughout Asia and the Middle East.

Mr. Check assists Firm clients in evaluating and analyzing opportunities to take an active role in shareholder litigation, arbitration, and other loss recovery methods. This includes U.S. based litigation and arbitration, as well as an increasing number of cases from jurisdictions around the globe. With an increasingly complex investment and legal landscape, Mr. Check has experience advising on traditional class actions, direct actions, non-U.S. opt-in actions, fiduciary actions, appraisal actions and arbitrations to name a few. Mr. Check is frequently called upon by his clients to help ensure they are taking an active role when their involvement can make a difference, and that they are not leaving money on the table.

Mr. Check regularly speaks on the subjects of shareholder litigation, corporate governance, investor activism, and recovery of investment losses at conferences around the world.

Mr. Check has also been actively involved in the precedent setting Shell and Fortis settlements in the Netherlands, the Olympus shareholder case in Japan, direct actions against Petrobras, BP, Vivendi, and Merck, and securities class actions against Bank of America, Lehman Brothers, Royal Bank of Scotland (U.K.), and Hewlett-Packard. Currently Mr. Check represents investors in numerous high profile actions in the United States, the Netherlands, Germany, Canada, France, Japan, and the United Kingdom.

**EMILY N. CHRISTIANSEN,** a partner of the Firm, focuses her practice in securities litigation and international actions, in particular. Ms. Christiansen received her Juris Doctor and Global Law certificate, *cum laude*, from Lewis and Clark Law School in 2012. Ms. Christiansen is a graduate of the University of Portland, where she received her Bachelor of Arts, *cum laude*, in Political Science and German Studies. Ms. Christiansen is currently licensed to practice law in New York and Pennsylvania.

While in law school, Ms. Christiansen worked as an intern in Trial Chambers III at the International Criminal Tribunal for the Former Yugoslavia. Ms. Christiansen also spent two months in India as foreign legal trainee with the corporate law firm of Fox Mandal. Ms. Christiansen is a 2007 recipient of a Fulbright Fellowship and is fluent in German.

Ms. Christiansen devotes her time to advising clients on the challenges and benefits of pursuing particular litigation opportunities in jurisdictions outside the U.S. In those non-US actions where Kessler Topaz is actively involved, Emily liaises with local counsel, helps develop case strategy, reviews pleadings, and helps clients understand and successfully navigate the legal process. Her experience includes non-US opt-in actions, international law, and portfolio monitoring and claims administration. In her role, Ms. Christiansen has helped secure recoveries for institutional investors in litigation in Japan against *Olympus Corporation* (settled - ¥11 billion) and in the Netherlands against *Fortis Bank N.V.* (settled - €1.2 billion).

**JOSHUA E. D'ANCONA,** a partner of the Firm, concentrates his practice in the securities litigation and lead plaintiff departments of the Firm. Mr. D'Ancona received his J.D., *magna cum laude*, from the Temple University Beasley School of Law in 2007, where he served on the Temple Law Review and as president

of the Moot Court Honors Society, and graduated with honors from Wesleyan University. He is licensed to practice in Pennsylvania and New Jersey.

Before joining the Firm in 2009, he served as a law clerk to the Honorable Cynthia M. Rufe of the United States District Court for the Eastern District of Pennsylvania.

**RYAN T. DEGNAN,** a partner of the Firm, concentrates his practice on new matter development with a specific focus on analyzing securities class action lawsuits, antitrust actions, and complex consumer actions. Mr. Degnan received his law degree from Temple University Beasley School of Law, where he was a Notes and Comments Editor for the Temple Journal of Science, Technology & Environmental Law, and earned his undergraduate degree in Biology from The Johns Hopkins University. While a law student, Mr. Degnan served as a Judicial Intern to the Honorable Gene E.K. Pratter of the United States District Court for the Eastern District of Pennsylvania. Mr. Degnan is licensed to practice in Pennsylvania and New Jersey.

As a member of the Firm's lead plaintiff litigation practice group, Mr. Degnan has helped secure the Firm's clients' appointments as lead plaintiffs in: *In re HP Sec. Litig.*, No. 12-cv-5090, 2013 WL 792642 (N.D. Cal. Mar. 4, 2013); *In re JPMorgan Chase & Co. Securities Litigation*, No. 12-3852-GBD ("London Whale Litigation") ($150 million recovery); *Freedman v. St. Jude Medical, Inc., et al.*, No. 12-cv-3070 (D. Minn.); *United Union of Roofers, Waterproofers & Allied Workers Local Union No. 8 v. Ocwen Fin. Corp*., No. 14 Civ. 81057 (WPD), 2014 WL 7236985 (S.D. Fla. Nov. 7, 2014); *Louisiana Municipal Police Employees' Ret. Sys. v. Green Mountain Coffee Roasters, Inc., et al.*, No. 11-cv-289, 2012 U.S. Dist. LEXIS 89192 (D. Vt. Apr. 27, 2012); and *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, No. 11-cv-3658, 2011 U.S. Dist. LEXIS 112970 (S.D.N.Y. Oct. 4, 2011). Additional representative matters include: *In re Bank of New York Mellon Corp. Foreign Exchange Transactions Litig*., No. 12-md-02335 (S.D.N.Y.) ($335 million settlement); and *Policemen's Annuity and Benefit Fund of the City of Chicago, et al. v. Bank of America, NA, et al*., No. 12-cv-02865 (S.D.N.Y.) ($69 million settlement).

**ELI R. GREENSTEIN** is managing partner of the Firm's San Francisco office and a member of the Firm's federal securities litigation practice group. Mr. Greenstein concentrates his practice on federal securities law violations and white collar fraud, including violations of the Securities Act of 1933 and the Securities Exchange Act of 1934. Mr. Greenstein received his J.D. from Santa Clara University School of Law in 2001, and his M.B.A. from Santa Clara's Leavey School of Business in 2002. Mr. Greenstein received his B.A. in Business Administration from the University of San Diego in 1997 where he was awarded the Presidential Scholarship. He is licensed to practice in California.

Mr. Greenstein also was a judicial extern for the Honorable James Ware (Ret.), Chief Judge of the United States District Court for the Northern District of California. Prior to joining the Firm, Mr. Greenstein was a partner at Robbins Geller Rudman & Dowd LLP in its federal securities litigation practice group. His relevant background also includes consulting for PricewaterhouseCoopers LLP's International Tax and Legal Services division, and work on the trading floor of the Chicago Mercantile Exchange, S&P 500 futures and options division.

Mr. Greenstein has been involved in dozens of high-profile securities fraud actions resulting in more than $1 billion in recoveries for clients and investors, including: *Nieman v. Duke Energy Corp*., 2013 U.S. Dist. LEXIS 110693 (W.D.N.C.) ($146 million recovery); *In re HP Secs. Litig*., 2013 U.S. Dist. LEXIS 168292 (N.D. Cal.) ($100 million recovery); *In re VeriFone Holdings, Inc. Sec. Litig*., 704 F.3d 694 (N.D. Cal) ($95 million recovery); *In re AOL Time Warner Sec. Litig. State Opt-Out Actions* (*Regents of the Univ. of Cal. v. Parsons* (Cal. Super. Ct.), *Ohio Pub. Emps. Ret. Sys. v. Parsons* (Franklin County Ct. of Common Pleas) ($618 million in total recoveries); *Minneapolis Firefighters' Relief Association v. Medtronic, Inc*., No. 08-cv-06324-PAM-AJB (D. Minn.) (settled -- $85 million); *In re MGM Mirage Securities Litigation*, Case No. 2:09-cv-01558-GMN-VCF (D. Nev.) ($75 million settlement); *In re Weatherford Int'l Securities*

*Litigation*, No. 11-cv-01646-LAK-JCF (S.D.N.Y.) (settled -- $52.5 million); *In re Sunpower Secs. Litig.*, 2011 U.S. Dist. LEXIS 152920 (N.D. Cal.) ($19.7 million recovery); *In re Am. Serv. Group, Inc.*, 2009 U.S. Dist. LEXIS 28237 (M.D. Tenn.) ($15.1 million recovery); *In re Terayon Communs. Sys. Sec. Litig.*, 2002 U.S. Dist. LEXIS 5502 (N.D. Cal.) ($15 million recovery); *In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217 (N.D. Cal.) ($8.9 million recovery); *In re Endocare, Inc. Sec. Litig.*, No. CV02-8429 DT (CTX) (C.D. Cal.) ($8.95 million recovery); *Greater Pa. Carpenters Pension Fund v. Whitehall Jewellers, Inc.*, 2005 U.S. Dist. LEXIS 12971 (N.D. Ill.) ($7.5 million recovery); *In re Am. Apparel, Inc. S'holder Litig.*, 2013 U.S. Dist. LEXIS 6977 (C.D. Cal.) ($4.8 million recovery); *In re Purus* Sec. Litig. No. C-98-20449-JF(RS) (N.D. Cal) ($9.95 million recovery).

**SEAN M. HANDLER,** a partner of the Firm and member of Kessler Topaz's Management Committee, currently concentrates his practice on all aspects of new matter development for the Firm including securities, consumer and intellectual property. Mr. Handler earned his Juris Doctor, *cum laude*, from Temple University School of Law, and received his Bachelor of Arts degree from Colby College, graduating *with distinction* in American Studies. Mr. Handler is licensed to practice in Pennsylvania, New Jersey and New York.

As part of his responsibilities, Mr. Handler also oversees the lead plaintiff appointment process in securities class actions for the Firm's clients. In this role, Mr. Handler has achieved numerous noteworthy appointments for clients in reported decisions including *Foley v. Transocean*, 272 F.R.D. 126 (S.D.N.Y. 2011); *In re Bank of America Corp. Sec., Derivative & Employment Ret. Income Sec. Act (ERISA) Litig.*, 258 F.R.D. 260 (S.D.N.Y. 2009) and *Tanne v. Autobytel, Inc.,* 226 F.R.D. 659 (C.D. Cal. 2005) and has argued before federal courts throughout the country.

Mr. Handler was also one of the principal attorneys in *In re Brocade Securities Litigation* (N.D. Cal. 2008)*,* where the team achieved a $160 million settlement on behalf of the class and two public pension fund class representatives. This settlement is believed to be one of the largest settlements in a securities fraud case in terms of the ratio of settlement amount to actual investor damages.

Mr. Handler also lectures and serves on discussion panels concerning securities litigation matters, most recently appearing at American Conference Institute's National Summit on the Future of Fiduciary Responsibility and Institutional Investor's The Rights & Responsibilities of Institutional Investors.

**GEOFFREY C. JARVIS**, a partner of the Firm, focuses on securities litigation for institutional investors. Mr. Jarvis graduated from Harvard Law School in 1984, and received his undergraduate degree from Cornell University in 1980. He is licensed to practice in Pennsylvania, Delaware, New York and Washington, D.C.

Following law school, Mr. Jarvis served as a staff attorney with the Federal Communications Commission, participating in the development of new regulatory policies for the telecommunications industry.

Mr. Jarvis had a major role in *Oxford Health Plans Securities Litigation, DaimlerChrysler Securities Litigation*, and *Tyco Securities Litigation* all of which were among the top ten securities settlements in U.S. history at the time they were resolved, as well as a large number of other securities cases over the past 16 years. He has also been involved in a number of actions before the Delaware Chancery Court, including a Delaware appraisal case that resulted in a favorable decision for the firm's client after trial, and a Delaware appraisal case that was tried in October, argued in 2016, which is still awaiting a final decision.

Mr. Jarvis then became an associate in the Washington office of Rogers & Wells (subsequently merged into Clifford Chance), principally devoted to complex commercial litigation in the fields of antitrust and

trade regulations, insurance, intellectual property, contracts and defamation issues, as well as counseling corporate clients in diverse industries on general legal and regulatory compliance matters. He was previously associated with a prominent Philadelphia litigation boutique and had first-chair assignments in cases commenced under the Pennsylvania Whistleblower Act and in major antitrust, First Amendment, civil rights, and complex commercial litigation, including several successful arguments before the U.S. Court of Appeals for the Third Circuit. From 2000 until early 2016, Mr. Jarvis was a Director (Senior Counsel through 2001) at Grant & Eisenhofer, P.A., where he engaged in a number of federal securities, and state fiduciary cases (primarily in Delaware), including several of the largest settlements of the past 15 years. He also was lead trial counsel and/or associate counsel in a number of cases that were tried to a verdict (or are pending final decision).

**JENNIFER L. JOOST,** a partner in the Firm's San Francisco office, focuses her practice on securities litigation. Ms. Joost received her law degree, *cum laude*, from Temple University Beasley School of Law, where she was the Special Projects Editor for the *Temple International and Comparative Law Journal.* Ms. Joost earned her undergraduate degree with honors from Washington University in St. Louis. She is licensed to practice in Pennsylvania and California and is admitted to practice before the United States Courts of Appeals for the Second, Fourth, Ninth, and Eleventh Circuits, and the United States District Courts for the Eastern District of Pennsylvania, the Northern District of California and the Southern District of California.

Ms. Joost has represented institutional investors in numerous securities fraud class actions including *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation,* No. 09 MDL 2058 (S.D.N.Y.) (settled -- $2.425 billion); *In re Citigroup Bond Litigation,* No. 08-cv-09522-SHS (S.D.N.Y.) ($730 million recovery); *David H. Luther, et al., v. Countrywide Financial Corp., et. al*., 2:12-cv-05125 (C.D.Cal. 2012) (settled -- $500 million); *In re JPMorgan Chase & Co. Securities Litigation,* No. 12-3852-GBD ("London Whale *Litigation*") ($150 million recovery); *Minneapolis Firefighters' Relief Association v. Medtronic, Inc.,* No. 08-cv-06324-PAM-AJB (D. Minn.) (settled -- $85 million); *In re MGM Mirage Securities Litigation,* Case No. 2:09-cv-01558-GMN-VCF (D. Nev.) ($75 million settlement); and *In re Weatherford Int'l Securities Litigation*, No. 11-cv-01646-LAK-JCF (S.D.N.Y.) (settled -- $52.5 million).

**STACEY KAPLAN**, a partner in the Firm's San Francisco office, concentrates her practice on prosecuting securities class actions. Ms. Kaplan received her J.D. from the University of California at Los Angeles School of Law in 2005, and received her Bachelor of Business Administration from the University of Notre Dame in 2002, with majors in Finance and Philosophy. Ms. Kaplan is admitted to the California Bar and is licensed to practice in all California state courts, as well as the United States District Courts for the Northern and Central Districts of California.

During law school, Ms. Kaplan served as a Judicial Extern to the Honorable Terry J. Hatter, Jr., United States District Court, Central District of California. Prior to joining the Firm, Ms. Kaplan was an associate with Robbins Geller Rudman & Dowd LLP in San Diego, California.

**DAVID KESSLER**, a partner of the Firm, manages the Firm's internationally recognized securities department. Mr. Kessler graduated with distinction from the Emory School of Law, after receiving his undergraduate B.S.B.A. degree from American University. Mr. Kessler is licensed to practice law in Pennsylvania, New Jersey and New York, and has been admitted to practice before numerous United States District Courts. Prior to practicing law, Mr. Kessler was a Certified Public Accountant in Pennsylvania.

Mr. Kessler has achieved or assisted in obtaining Court approval for the following outstanding results in federal securities class action cases: *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation,* No. 09 MDL 2058 (S.D.N.Y.) (settled -- $2.425 billion); *In re Tyco International, Ltd. Sec. Lit.*, No. 02-1335-B (D.N.H. 2002) ($3.2 billion settlement); *In*

*re Wachovia Preferred Securities and Bond/Notes Litigation*, No. 09-cv-6351 (RJS) (S.D.N.Y.) ($627 million recovery); *In re: Lehman Brothers Securities and ERISA Litigation*, Master File No. 09 MD 2017 (LAK) (S.D.N.Y) (settled - $516,218,000); *In re Satyam Computer Services Ltd. Sec. Litig.*, Master File No. 09 MD 02027 (BSJ) ($150.5 million settlement); *In re Tenet Healthcare Corp.*, 02-CV-8462 (C.D. Cal. 2002) (settled — $281.5 million); *In re Initial Public Offering Sec. Litig.*, Master File No. 21 MC 92(SAS) ($586 million settlement).

Mr. Kessler is also currently serving as one of the Firm's primary litigation partners in the Citigroup, JPMorgan, Hewlett Packard, Pfizer and Morgan Stanley securities litigation matters.

In addition, Mr. Kessler often lectures and writes on securities litigation related topics and has been recognized as "Litigator of the Week" by the American Lawyer magazine for his work in connection with the Lehman Brothers securities litigation matter in December of 2011 and was honored by Benchmark as one of the preeminent plaintiffs practitioners in securities litigation throughout the country. Most recently Mr. Kessler co-authored *The FindWhat.com Case: Acknowledging Policy Considerations When Deciding Issues of Causation in Securities Class Actions* published in Securities Litigation Report.

**JAMES A. MARO, JR.,** a partner of the Firm, concentrates his practice in the Firm's case development department. He also has experience in the areas of consumer protection, ERISA, mergers and acquisitions, and shareholder derivative actions. Mr. Maro received his law degree from the Villanova University School of Law, and received a B.A. in Political Science from the Johns Hopkins University. Mr. Maro is licensed to practice law in Commonwealth of Pennsylvania and New Jersey. He is admitted to practice in the United States Court of Appeals for the Third Circuit and the United States District Courts for the Eastern District of Pennsylvania and the District of New Jersey.

**JOSHUA A. MATERESE,** a partner of the Firm, concentrates his practice at Kessler Topaz in the areas of securities and consumer protection litigation. Mr. Materese received his Juris Doctor from Temple University Beasley School of Law in 2012, graduating with honors. He received his undergraduate degree from the Syracuse University Newhouse School of Communications. Mr. Materese is licensed to practice in Pennsylvania and admitted to practice before the United States Courts of Appeals for the Second and Third Circuits, and the United States District Courts for the Eastern District of Pennsylvania, the District of New Jersey, the District of Colorado, and the Northern District of Illinois.

**MARGARET E. MAZZEO,** a partner of the Firm, focuses her practice on securities litigation. Ms. Mazzeo received her law degree, *cum laude*, from Temple University Beasley School of Law, where she was a Beasley Scholar and a staff editor for the Temple Journal of Science, Technology, and Environmental Law. Ms. Mazzeo graduated with honors from Franklin and Marshall College. She is licensed to practice in Pennsylvania and New Jersey.

Ms. Mazzeo has been involved in several nationwide securities cases on behalf of investors, including *In re Lehman Brothers Securities Litigation*, No. 1:09-md-02017-LAK (S.D.N.Y.) ($616 million recovery); and *David H. Luther, et al., v. Countrywide Financial Corp., et. al.*, 2:12-cv-05125 (C.D. Cal. 2012) (settled -- $500 million). Ms. Mazzeo also was a member of the trial team who won a jury verdict in favor of investors in the *In re Longtop Financial Technologies Ltd. Securities Litigation*, No. 11-cv-3658 (S.D.N.Y.) action.

**JAMIE M. MCCALL,** a partner of the Firm, concentrates his practice on securities fraud litigation. Prior to joining the Firm, Mr. McCall spent twelve years with the Department of Justice in the U.S. Attorney's Offices for Miami, Florida and Wilmington, Delaware, where he oversaw complex criminal investigations ranging from securities, tax, bank and wire frauds, to the theft of trade secrets and cybercrime, among others.

Mr. McCall has successfully tried numerous jury trials, including: *United States v. Wilmington Trust Corp., et al.,* a seven-week securities fraud trial, which arose from financial conduct during the Great Recession, and resulted in both the conviction of four bank executives and a $60 million civil settlement to victim-shareholders; and *United States v. David Matusiewicz, et al.,* a five-week multi-defendant stalking-murder case, which stemmed from the 2013-shootout at the New Castle County Courthouse in Delaware, and resulted in first-in-the-nation convictions for "cyberstalking resulting in death" under the Violence Against Women Act. For his work on both of these cases, Mr. McCall was twice awarded the Director's Award for Superior Performance by the Department of Justice. Most recently, Mr. McCall served as the section chief for the National Security and Cybercrime Division for the Delaware U.S. Attorney's Office.

Mr. McCall also spent several years practicing civil law at Morgan, Lewis & Bockius in Philadelphia, where he worked on major, high-stakes litigation matters involving Fortune 250 companies. Mr. McCall began his legal career as a Judge Advocate in the Marine Corps, working primarily as a prosecutor and achieving the rank of Captain. In 2004, Mr. McCall served for nearly five months as the principal legal advisor to 1st Battalion, 5th Marine Regiment in and around Fallujah, Iraq, including during the First Battle of Fallujah.

**JOSEPH H. MELTZER,** a partner of the Firm, concentrates his practice in the areas of ERISA, fiduciary and antitrust complex litigation. Mr. Meltzer received his law degree with honors from Temple University School of Law and is an honors graduate of the University of Maryland. Honors include being named a Pennsylvania Super Lawyer. Mr. Meltzer is licensed to practice in Pennsylvania, New Jersey, New York, the Supreme Court of the United States, and the U.S. Court of Federal Claims.

Mr. Meltzer leads the Firm's Fiduciary Litigation Group which has excelled in the highly specialized area of prosecuting cases involving breach of fiduciary duty claims. Mr. Meltzer has served as lead or co-lead counsel in numerous nationwide class actions brought under ERISA. Since founding the Fiduciary Litigation Group, Mr. Meltzer has helped recover hundreds of millions of dollars for clients and class members including some of the largest settlements in ERISA fiduciary breach actions. Mr. Meltzer represented the Board of Trustees of the Buffalo Laborers Security Fund in its action against J.P. Jeanneret Associates which involved a massive, fraudulent scheme orchestrated by Bernard L. Madoff, No. 09-3907 (S.D.N.Y.). Mr. Meltzer also represented an institutional client in a fiduciary breach action against Wells Fargo for large losses sustained while Wachovia Bank and its subsidiaries, including Evergreen Investments, were managing the client's investment portfolio.

As part of his fiduciary litigation practice, Mr. Meltzer was actively involved in actions related to losses sustained in securities lending programs, including *Bd. of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank,* No. 09-00686 (S.D.N.Y.) ($150 million settlement) and *CompSource Okla. v. BNY Mellon,* No. 08-469 (E.D. OK) ($280 million settlement). In addition, Mr. Meltzer represented a publicly traded company in a large arbitration against AIG, Inc. related to securities lending losses, *Transatlantic Holdings, Inc. v. AIG,* No. 50-148T0037610 (AAA) ($75million settlement).

A frequent lecturer on ERISA litigation, Mr. Meltzer is a member of the ABA and has been recognized by numerous courts for his ability and expertise in this complex area of the law. Mr. Meltzer is also a patron member of Public Justice and a member of the Class Action Preservation Committee.

Mr. Meltzer also manages the Firm's Antitrust and Pharmaceutical Pricing Groups. Here, Mr. Meltzer focuses on helping clients that have been injured by anticompetitive and unlawful business practices, including with respect to overcharges related to prescription drug and other health care expenditures. Mr. Meltzer served as co-lead counsel for direct purchasers in the *Flonase Antitrust Litigation,* No.08-3149 (E.D. PA) ($150 million settlement) and has served as lead or co-lead counsel in numerous nationwide

actions. Mr. Meltzer also serves as a special assistant attorney general for the states of Montana, Utah and Alaska. Mr. Meltzer also lectures on issues related to antitrust litigation.

**MATTHEW L. MUSTOKOFF**, a partner of the Firm, is an experienced securities and corporate governance litigator. He has represented clients at the trial and appellate level in numerous high-profile shareholder class actions and other litigations involving a wide array of matters, including financial fraud, market manipulation, mergers and acquisitions, fiduciary mismanagement of investment portfolios, and patent infringement. Mr. Mustokoff received his law degree from the Temple University School of Law, and is a Phi Beta Kappa honors graduate of Wesleyan University. At law school, Mr. Mustokoff was the articles and commentary editor of the *Temple Political and Civil Rights Law Review* and the recipient of the Raynes, McCarty, Binder, Ross and Mundy Graduation Prize for scholarly achievement in the law. He is admitted to practice before the state courts of New York and Pennsylvania, the United States District Courts for the Southern and Eastern Districts of New York, the Eastern District of Pennsylvania and the District of Colorado, and the United States Courts of Appeals for the Eleventh and Federal Circuits.

Mr. Mustokoff is currently prosecuting several nationwide securities cases on behalf of U.S. and overseas institutional investors, including *In re JPMorgan Chase Securities Litigation (*S.D.N.Y.), arising out of the "London Whale" derivatives trading scandal which led to over $6 billion in losses in the bank's proprietary trading portfolio. He serves as lead counsel for six public pension funds in the multi-district securities litigation against BP in Texas federal court stemming from the 2010 Deepwater Horizon disaster in the Gulf of Mexico. He successfully argued the opposition to BP's motion to dismiss, resulting in a landmark decision sustaining fraud claims under English law for purchasers of BP shares on the London Stock Exchange.

Mr. Mustokoff also played a major role in prosecuting *In re Citigroup Bond Litigation* (S.D.N.Y.), involving allegations that Citigroup concealed its exposure to subprime mortgage debt on the eve of the 2008 financial crisis. The $730 million settlement marks the second largest recovery under Section 11 of the Securities Act in the history of the statute. Mr. Mustokoff's significant courtroom experience includes serving as one of the lead trial lawyers for shareholders in the only securities fraud class action arising out of the financial crisis to be tried to jury verdict. In addition to his trial practice in federal courts, he has successfully tried cases before the Financial Industry Regulatory Authority (FINRA).

Prior to joining the Firm, Mr. Mustokoff practiced at Weil, Gotshal & Manges LLP in New York, where he represented public companies and financial institutions in SEC enforcement and white collar criminal matters, shareholder litigation and contested bankruptcy proceedings.

**SHARAN NIRMUL,** a partner of the Firm, concentrates his practice in the area of securities, consumer and fiduciary class litigation, principally representing the interests of plaintiffs in class action and complex commercial litigation. Mr. Nirmul has represented clients in federal and state courts and in alternative dispute resolution forums. Mr. Nirmul received his law degree from The George Washington University Law School (J.D. 2001) where he served as an articles editor for the *Environmental Lawyer Journal* and was a member of the Moot Court Board. He was awarded the school's Lewis Memorial Award for excellence in clinical practice. He received his undergraduate degree from Cornell University (B.S. 1996). Mr. Nirmul is admitted to practice law in the Second and Seventh Circuit Court of Appeals, in the state courts of New York, New Jersey, Pennsylvania and Delaware, and in the U.S. District Courts for the Southern District of New York, District of New Jersey, and District of Delaware.

Mr. Nirmul has represented institutional investors in a number of notable securities class action cases. These include *In re Bank of America Securities Litigation*, a case which represents the sixth largest recovery for shareholders under the federal securities laws ($2.45 billion settlement) and which included significant corporate governance enhancements at Bank of America; *In re Global Crossing Securities Litigation*

(recovery of over $450 million); *In re Delphi Securities Litigation* ($284 million settlement with Delphi, its former officers and directors and underwriters, and a separate $38.25 million settlement with the auditors); and *Satyam Computer Services Securities Litigation*, ($150.5 million settlement).

Mr. Nirmul has also been at the forefront of litigation on behalf of investors who suffered losses through fraud, breach of fiduciary and breach of contract by their custodians and investment fiduciaries. In a matter before the American Arbitration Association, Mr. Nirmul represented a publicly traded reinsurance company in a breach of contract and breach of fiduciary suit against its former controlling shareholder and fiduciary investment manager, arising out of its participation and losses through a securities lending program and securing a $70 million recovery. Mr. Nirmul is also presently litigating breach of contract and Trust Indenture Act claims against the trustees of mortgage backed securities issued by Washington Mutual (Washington State Investments Board et al v. Bank of America National Association et al) on behalf of several state public pension funds. In connection with a scheme to manipulate foreign exchange rates assigned to its custodial clients, Mr. Nirmul is a member of the team litigating a consumer class action asserting contractual and fiduciary duty claims against BNY Mellon in the Southern District of New York (In re BNY Mellon Forex Litigation).

Mr. Nirmul regularly speaks on matters affecting institutional investors at conferences and symposiums. He has been a speaker and/or panelist at the annual Rights and Responsibilities of Institutional Investors in Amsterdam, The Netherlands and annual Evolving Fiduciary Obligations of Pension Plans in Washington, D.C.

**JUSTIN O. RELIFORD,** a partner of the Firm, concentrates his practice on mergers and acquisition litigation and shareholder derivative litigation. Mr. Reliford graduated from the University of Pennsylvania Law School in 2007 and received his B.A. from Williams College in 2003, majoring in Psychology with a concentration in Leadership Studies. Mr. Reliford is a member of the Pennsylvania and New Jersey bars, and he is admitted to practice in the Third Circuit Court of Appeals, the Eastern District of Pennsylvania, and the District of New Jersey.

Mr. Reliford has extensive experience representing clients in connection with nationwide class and collective actions. Most notably, Mr. Reliford, was part of the trial team *In re Dole Food Co., Inc. Stockholder Litig.*, C.A. No. 8703-VCL, that won a trial verdict in favor of Dole stockholders for $148 million. Mr. Reliford also obtained a favorable recovery for an institutional investor in a securities class action *In re Allergan, Inc. Proxy Violation Securities Litigation*, No. 8:14-cv-02004 (C.D. Cal. 2018), which challenged a brazen insider trading scheme by Valeant Pharmaceuticals to tip Bill Ackman's hedge fund Pershing Square Capital that it intended to launch a hostile takeover attempt to buy rival pharma company Allergan. After three years, the case settled weeks before trial for $250 million. He also litigated *In re GFI Group, Inc. Stockholder Litig.* Consol. C.A. No. 10136-VCL (Del. Ch.) ($10.75 million cash settlement); *In re Globe Specialty Metals, Inc. Stockholders Litig.*, Consol. C.A. No. 10865-VCG (Del. Ch.) ($32.5 million settlement); and *In re Harleysville Mutual* (CCP, Phila. Cnty. 2012) (an expedited merger litigation case challenging Harleysville's agreement to sell the company to Nationwide Insurance Company, which lead to a $26 million cash payment to policyholders). Prior to joining the Firm, Mr. Reliford was an associate in the labor and employment practice group of Morgan Lewis & Bockius, LLP. There, Mr. Reliford concentrated his practice on employee benefits, fiduciary, and workplace discrimination litigation.

**LEE D. RUDY**, a partner of the Firm, manages the Firm's mergers and acquisition and shareholder derivative litigation. Mr. Rudy received his law degree from Fordham University, and his undergraduate degree, *cum laude*, from the University of Pennsylvania. Mr. Rudy is licensed to practice in Pennsylvania and New York.

Representing both institutional and individual shareholders in these actions, he has helped cause significant monetary and corporate governance improvements for those companies and their shareholders. Mr. Rudy also co-chairs the Firm's qui tam and whistleblower practices, where he represents whistleblowers before administrative agencies and in court. Mr. Rudy regularly practices in the Delaware Court of Chancery, where he served as co-lead trial counsel in the landmark case of *In re S. Peru Copper Corp. S'holder Derivative Litig.*, C.A. No. 961-CS, a $2 billion trial verdict against Southern Peru's majority shareholder. He previously served as lead counsel in dozens of high profile derivative actions relating to the "backdating" of stock options. Mr. Rudy also obtained a favorable recovery for an institutional investor in a securities class action *In re Allergan, Inc. Proxy Violation Securities Litigation*, No. 8:14-cv-02004 (C.D. Cal. 2018), which challenged a brazen insider trading scheme by Valeant Pharmaceuticals to tip Bill Ackman's hedge fund Pershing Square Capital that it intended to launch a hostile takeover attempt to buy rival pharma company Allergan. After three years, the case settled weeks before trial for $250 million. In addition, Mr. Rudy represented stockholders in obtaining substantial recoveries in numerous shareholder derivative and class actions, many of which resulted in significant monetary relief, including: *In re Facebook, Inc. Class C Reclassification Litigation*, C.A. No. 12286-VCL (Del. Ch. Sept. 25, 2017) (KTMC challenged a proposed reclassification of Facebook's stock structure as harming the company's public stockholders. Facebook abandoned the proposal just one business day before trial was to commence; granting Plaintiffs complete victory); *City of Daytona Beach Police and Fire Pension Fund v. ExamWorks Group, Inc., et al.*, C.A. No. 12481-VCL (Del. Ch. Sept. 12, 2017) ($86.5 million settlement relating to the acquisition of ExamWorks Group, Inc. by private equity firm Leonard Green & Partners, LP.); *Quinn v. Knight*, No. 3:16-cv-610 (E.D. Va. Mar. 16, 2017) (class action settling just ten days before trial, with stockholders receiving an additional $32 million in merger consideration); *In re MPG Office Trust, Inc. Preferred Shareholder Litigation*, Cons. Case No. 24-C-13-004097 (Md. Cir. Oct. 20, 2015) (Kessler Topaz negotiated a settlement where MPG preferred stockholders received a dividend of $2.25 per share, worth approximately $21 million); *In re Harleysville Mutual* (CCP, Phila. Cnty. 2012) (an expedited merger litigation case challenging Harleysville's agreement to sell the company to Nationwide Insurance Company, which lead to a $26 million cash payment to policyholders); and *In re Amicas, Inc. Shareholder Litigation*, 10-0174-BLS2 (Suffolk County, MA 2010) (Kessler Topaz prevailed in securing a preliminary injunction against the deal, which allowed a superior bidder to purchase the Company for an additional $0.70 per share ($26 million)).

Prior to civil practice, Mr. Rudy served for several years as an Assistant District Attorney in the Manhattan (NY) District Attorney's Office, and as an Assistant United States Attorney in the US Attorney's Office (DNJ).

**RICHARD A. RUSSO, JR.**, a partner of the Firm, focuses his practice on securities litigation. Mr. Russo received his law degree from the Temple University Beasley School of Law, where he graduated *cum laude* and was a member of the Temple Law Review, and graduated *cum laude* from Villanova University, where he received a Bachelor of Science degree in Business Administration. Mr. Russo is licensed to practice in Pennsylvania and New Jersey.

Mr. Russo has represented individual and institutional investors in obtaining significant recoveries in numerous class actions arising under the federal securities laws, including *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation*, No. 09 MDL 2058 (S.D.N.Y.) (settled -- $2.425 billion), *In re Citigroup Bond Litigation*, No. 08-cv-09522-SHS (S.D.N.Y.) ($730 million recovery), *In re Lehman Brothers Securities Litigation*, No. 1:09-md-02017-LAK (S.D.N.Y.) ($616 million recovery).

**MARC A. TOPAZ**, a partner of the Firm, oversees the Firm's derivative, transactional and case development departments. Mr. Topaz received his law degree from Temple University School of Law,

where he was an editor of the *Temple Law Review* and a member of the Moot Court Honor Society. He also received his Master of Law (L.L.M.) in taxation from the New York University School of Law, where he served as an editor of the *New York University Tax Law Review*. He is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania.

Mr. Topaz has been heavily involved in all of the Firm's cases related to the subprime mortgage crisis, including cases seeking recovery on behalf of shareholders in companies affected by the subprime crisis, as well as cases seeking recovery for 401K plan participants that have suffered losses in their retirement plans. Mr. Topaz has also played an instrumental role in the Firm's option backdating litigation. These cases, which are pled mainly as derivative claims or as securities law violations, have served as an important vehicle both for re-pricing erroneously issued options and providing for meaningful corporate governance changes. In his capacity as the Firm's department leader of case initiation and development, Mr. Topaz has been involved in many of the Firm's most prominent cases, including *In re Initial Public Offering Sec. Litig.*, Master File No. 21 MC 92(SAS) (S.D.N.Y. Dec. 12, 2002); *Wanstrath v. Doctor R. Crants, et al.*, No. 99-1719-111 (Tenn. Chan. Ct., 20th Judicial District, 1999); *In re Tyco International, Ltd. Sec. Lit.*, No. 02-1335-B (D.N.H. 2002) (settled — $3.2 billion); and virtually all of the 80 options backdating cases in which the Firm is serving as Lead or Co-Lead Counsel. Mr. Topaz has played an important role in the Firm's focus on remedying breaches of fiduciary duties by corporate officers and directors and improving corporate governance practices of corporate defendants.

**MELISSA L. TROUTNER,** a partner of the Firm, concentrates her practice on new matter development with a specific focus on analyzing securities class action lawsuits, antitrust actions, and complex consumer actions. Ms. Troutner is also a member of the Firm's Consumer Protection group. Ms. Troutner received her law degree, Order of the Coif, *cum laude*, from the University of Pennsylvania Law School in 2002 and her Bachelor of Arts, Phi Beta Kappa, *magna cum laude*, from Syracuse University in 1999. Ms. Troutner is licensed to practice law in Pennsylvania, New York and Delaware.

Prior to joining Kessler Topaz, Ms. Troutner practiced as a litigator with several large defense firms, focusing on complex commercial, products liability and patent litigation, and clerked for the Honorable Stanley S. Brotman, United States District Judge for the District of New Jersey.

**JOHNSTON de F. WHITMAN, JR.**, a partner of the Firm, focuses his practice on securities litigation, primarily in federal court. Mr. Whitman received his law degree from Fordham University School of Law, where he was a member of the Fordham International Law Journal, and graduated *cum laude* from Colgate University. He is licensed to practice in Pennsylvania and New York., and is admitted to practice in courts around the country, including the United States Courts of Appeal for the Second, Third, and Fourth Circuits.

Mr. Whitman has represented institutional investors in obtaining substantial recoveries in numerous securities fraud class actions, including: (i) *In re Bank of America Securities Litigation*, a case which represents the sixth largest recovery for shareholders under the federal securities laws (settled --$2.425 billion); (ii) *In re Royal Ahold Sec. Litig.*, No. 03-md-01539 (D. Md. 2003) ($1.1 billion settlement); (iii) *In re DaimlerChrysler AG Sec. Litig.*, No. 00-0993 (D. Del. 2000) ($300 million settlement); (iv) *In re Dollar General, Inc. Sec. Litig.*, No. 01-cv-0388 (M.D. Tenn. 2001) ( $162 million settlement); and (v) *In re JPMorgan Chase & Co. Securities Litigation,* No. 12-3852-GBD ("London Whale Litigation") ($150 million recovery). Mr. Whitman has also obtained favorable recoveries for institutional investors pursuing direct securities fraud claims, including cases against Merck & Co., Inc., Qwest Communications International, Inc. and Merrill Lynch & Co., Inc. In addition, Mr. Whitman represented a publicly traded company in a large arbitration against AIG, Inc. related to securities lending losses, *Transatlantic Holdings, Inc. v. AIG*, No. 50-148T0037610 (AAA) ($75million settlement).

**ROBIN WINCHESTER,** a partner of the Firm, concentrated her practice in the areas of securities litigation and lead plaintiff litigation, when she joined the Firm. Presently, Ms. Winchester concentrates her practice in the area of shareholder derivative actions. Ms. Winchester earned her Juris Doctor degree from Villanova University School of Law, and received her Bachelor of Science degree in Finance from St. Joseph's University. Ms. Winchester is licensed to practice law in Pennsylvania and New Jersey.

Prior to joining Kessler Topaz, Ms. Winchester served as a law clerk to the Honorable Robert F. Kelly in the United States District Court for the Eastern District of Pennsylvania.

Ms. Winchester has served as lead counsel in numerous high-profile derivative actions relating to the backdating of stock options, including *In re Eclipsys Corp. Derivative Litigation,* Case No. 07-80611-Civ-MIDDLEBROOKS (S.D. Fla.); *In re Juniper Derivative Actions,* Case No. 5:06-cv-3396-JW (N.D. Cal.); *In re McAfee Derivative Litigation,* Master File No. 5:06-cv-03484-JF (N.D. Cal.); *In re Quest Software, Inc. Derivative Litigation,* Consolidated Case No. 06CC00115 (Cal. Super. Ct., Orange County); and *In re Sigma Designs, Inc. Derivative Litigation,* Master File No. C-06-4460-RMW (N.D. Cal.). Settlements of these, and similar, actions have resulted in significant monetary returns and corporate governance improvements for those companies, which, in turn, greatly benefits their public shareholders.

**ERIC L. ZAGAR,** a partner of the Firm, concentrates his practice in the area of shareholder derivative litigation. Mr. Zagar received his law degree from the University of Michigan Law School, *cum laude,* where he was an Associate Editor of the *Michigan Law Review,* and his undergraduate degree from Washington University in St. Louis. He is admitted to practice in Pennsylvania, California and New York. Mr. Zagar previously served as a law clerk to Justice Sandra Schultz Newman of the Pennsylvania Supreme Court.

Since 2001 Mr. Zagar has served as Lead or Co-Lead counsel in hundreds of derivative actions in courts throughout the nation. He was a member of the trial team in the landmark case of *In re S. Peru Copper Corp. S'holder Derivative Litig.,* C.A. No. 961-CS, a $2 billion trial verdict against Southern Peru's majority shareholder. Mr. Zagar has successfully achieved significant monetary and corporate governance relief for the benefit of shareholders, and has extensive experience litigating matters involving Special Litigation Committees.

**TERENCE S. ZIEGLER,** a partner of the Firm, concentrates a significant percentage of his practice to the investigation and prosecution of pharmaceutical antitrust actions, medical device litigation, and related anticompetitive and unfair business practice claims. Mr. Ziegler received his law degree from the Tulane University School of Law and received his undergraduate degree from Loyola University. Mr. Ziegler is licensed to practice law in Pennsylvania and the State of Louisiana, and has been admitted to practice before several courts including the United States Court of Appeals for the Third Circuit.

Mr. Ziegler has represented investors, consumers and other clients in obtaining substantial recoveries, including: *In re Flonase Antitrust Litigation; In re Wellbutrin SR Antitrust Litigation; In re Modafinil Antitrust Litigation; In re Guidant Corp. Implantable Defibrillators Products Liability Litigation* (against manufacturers of defective medical devices — pacemakers/implantable defibrillators — seeking costs of removal and replacement); and *In re Actiq Sales and Marketing Practices Litigation* (regarding drug manufacturer's unlawful marketing, sales and promotional activities for non-indicated and unapproved uses).

**ANDREW L. ZIVITZ,** a partner of the Firm, received his law degree from Duke University School of Law, and received a Bachelor of Arts degree, with distinction, from the University of Michigan, Ann Arbor. Mr. Zivitz is licensed to practice in Pennsylvania and New Jersey.

Drawing on two decades of litigation experience, Mr. Zivitz concentrates his practice in the area of securities litigation and is currently litigating several of the largest federal securities fraud class actions in the U.S. Andy is skilled in all aspects of complex litigation, from developing and implementing strategies, to conducting merits and expert discovery, to negotiating resolutions. He has represented dozens of major institutional investors in securities class actions and has helped the firm recover more than $1 billion for damaged clients and class members in numerous securities fraud matters in which Kessler Topaz was Lead or Co-Lead Counsel, including *David H. Luther, et al., v. Countrywide Financial Corp., et. al.*, 2:12-cv-05125 (C.D.Cal. 2012) (settled -- $500 million); *In re Pfizer Sec. Litig.*, 1:04-cv-09866 (S.D.N.Y. 2004) (settled -- $486 million); *In re Tenet Healthcare Corp.*, 02-CV-8462 (C.D. Cal. 2002) (settled — $281.5 million); *In re JPMorgan Chase & Co. Securities Litigation*, No. 12-3852-GBD ("London Whale Litigation") ($150 million recovery); *In re Computer Associates Sec. Litig.*, No. 02-CV-122 6 (E.D.N.Y. 2002) (settled — $150 million); *In re Hewlett-Packard Sec. Litig.*, 12-cv-05980 (N.D.Cal. 2012) (settled -- $100 million); and *In re Minneapolis Firefighters' Relief Association v. Medtronic, Inc.*, No. 08-cv-06324-PAM-AJB (D. Minn.) (settled -- $ 85 million).

Andy's extensive courtroom experience serves his clients well in trial situations, as well as pre-trial proceedings and settlement negotiations. He served as one of the lead plaintiffs' attorneys in the only securities fraud class action arising out of the financial crisis to be tried to a jury verdict, has handled a Daubert trial in the U.S. District Court for the Southern District of New York, and successfully argued back-to-back appeals before the Ninth Circuit Court of Appeals. Before joining Kessler Topaz, Andy worked at the international law firm Drinker Biddle and Reath, primarily representing defendants in large, complex litigation. His experience on the defense side of the bar provides a unique perspective in prosecuting complex plaintiffs' litigation.

## COUNSEL

**JENNIFER L. ENCK,** Counsel to the Firm, concentrates her practice in the area of securities litigation and settlement matters. Ms. Enck received her law degree, *cum laude*, from Syracuse University College of Law, where she was a member of the Syracuse Journal of International Law and Commerce, and her undergraduate degree in International Politics/International Studies from The Pennsylvania State University. Ms. Enck also received a Master's degree in International Relations from Syracuse University's Maxwell School of Citizenship and Public Affairs. She is licensed to practice in Pennsylvania and has been admitted to practice before the United States Court of Appeals for the Third and Eleventh Circuits and the United States District Court for the Eastern District of Pennsylvania.

Ms. Enck has been involved in documenting and obtaining the required court approval for many of the firm's largest and most complex securities class action settlements, including *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation,* No. 09 MDL 2058 (S.D.N.Y.) (settled -- $2.425 billion); *David H. Luther, et al., v. Countrywide Financial Corp., et. al.*, 2:12-cv-05125 (C.D. Cal. 2012) (settled -- $500 million); *In re: Lehman Brothers Securities and ERISA Litigation*, Master File No. 09 MD 2017 (LAK) (S.D.N.Y) (settled - $516,218,000); and *In re Satyam Computer Services Ltd. Sec. Litig.*, Master File No. 09 MD 02027 (BSJ) ($150.5 million settlement).

**ERIC K. GERARD**, counsel to the Firm, is a former federal prosecutor and experienced trial lawyer whose practice focuses on securities fraud, antitrust, and consumer protection litigation. Eric received his law degree from the University of Virginia School of Law, earning Order of the Coif honors while completing a master's degree in international economics at the Johns Hopkins University.

Before joining Kessler Topaz, Eric served an Assistant District Attorney at the Manhattan District Attorney's Office, as a civil litigator at an international law firm in Houston and a prominent boutique in New Orleans, and as an Assistant U.S. Attorney in Florida. He has tried a range of complex cases to verdict, including international money laundering, wire fraud conspiracy, securities counterfeiting, identity theft, obstruction of justice, extraterritorial child exploitation, civil healthcare liability claims, and murder-for-hire.

**LISA LAMB PORT**, Counsel to the Firm, concentrates her practice on consumer, antitrust, and securities fraud class actions. Ms. Lamb Port received her law degree, Order of the Coif, summa cum laude, from the Villanova University School of Law in 2003 and her Bachelor of Arts, cum laude, from Princeton University in 2000. Ms. Lamb Port is licensed to practice law in the Commonwealth Pennsylvania.

Prior to joining Kessler Topaz, Ms. Lamb Port was a partner at another class action firm, where she represented institutional and individual investors in securities fraud, breach of fiduciary duty, and shareholder derivative cases, as well as in litigation resulting from mergers and acquisitions.

**DONNA SIEGEL MOFFA,** Counsel to the Firm, concentrates her practice in the area of consumer protection litigation. Ms. Siegel Moffa received her law degree, with honors, from Georgetown University Law Center in May 1982 and a master's degree in Public Administration from Rutgers, the State University of New Jersey, Graduate School-Camden in January 2017. She received her undergraduate degree, *cum laude*, from Mount Holyoke College in Massachusetts. Ms. Siegel Moffa is admitted to practice before the Third Circuit Court of Appeals, the United States Courts for the District of New Jersey and the District of Columbia, as well as the Supreme Court of New Jersey and the District of Columbia Court of Appeals.

Prior to joining the Firm, Ms. Siegel Moffa was a member of the law firm of Trujillo, Rodriguez & Richards, LLC, where she litigated, and served as co-lead counsel, in complex class actions arising under federal and state consumer protection statutes, lending laws and laws governing contracts and employee compensation. Prior to entering private practice, Ms. Siegel Moffa worked at both the Federal Energy Regulatory Commission (FERC) and the Federal Trade Commission (FTC). At the FTC, she prosecuted cases involving allegations of deceptive and unsubstantiated advertising. In addition, both at FERC and the FTC, Ms. Siegel Moffa was involved in a wide range of administrative and regulatory issues including labeling and marketing claims, compliance, FOIA and disclosure obligations, employment matters, licensing and rulemaking proceedings.

Ms. Siegel Moffa served as co-lead counsel for the class in *Robinson v. Thorn Americas, Inc.*, L-03697-94 (Law Div. 1995), a case that resulted in a significant monetary recovery for consumers and changes to rent-to-own contracts in New Jersey. Ms. Siegel Moffa was also counsel in *Muhammad v. County Bank of Rehoboth Beach, Delaware,* 189 N.J. 1 (2006), U.S. Sup. Ct. cert. denied, 127 S. Ct. 2032(2007), in which the New Jersey Supreme Court struck a class action ban in a consumer arbitration contract. She has served as class counsel representing consumers pressing TILA claims, e.g. *Cannon v. Cherry Hill Toyota, Inc.,* 184 F.R.D. 540 (D.N.J. 1999), and *Dal Ponte v. Am. Mortg. Express Corp.*, CV- 04-2152 (D.N.J. 2006), and has pursued a wide variety of claims that impact consumers and individuals including those involving predatory and sub-prime lending, mandatory arbitration clauses, price fixing, improper medical billing practices, the marketing of light cigarettes and employee compensation. Ms. Siegel Moffa's practice has involved significant appellate work representing individuals, classes, and non-profit organizations participating as amicus curiae, such as the National Consumer Law Center and the AARP. In addition, Ms. Siegel Moffa has regularly addressed consumer protection and litigation issues in presentations to organizations and professional associations.

**MICHELLE M. NEWCOMER**, Counsel to the Firm, concentrates her practice in the area of securities litigation. Ms. Newcomer earned her law degree from Villanova University School of Law in 2005, and

earned her B.B.A. in Finance and Art History from Loyola University Maryland in 2002. Ms. Newcomer is licensed to practice law in the Commonwealth of Pennsylvania and the State of New Jersey and has been admitted to practice before the United States Supreme Court, the United States Court of Appeals for the Second, Ninth and Tenth Circuits, and the United States District Court for the Districts of New Jersey and Colorado.

Ms. Newcomer has represented shareholders in numerous securities class actions in which the Firm has served as Lead or Co-Lead Counsel, through all aspects of pre-trial proceedings, including complaint drafting, litigating motions to dismiss and for summary judgment, conducting document, deposition and expert discovery, and appeal. Ms. Newcomer also has been involved in the Firm's securities class action trials, including most recently serving as part of the trial team in the Longtop Financial Technologies securities class action trial that resulted in a jury verdict on liability and damages in favor of investors. Ms. Newcomer began her legal career with the Firm in 2005. Prior to joining the Firm, she was a summer law clerk for the Hon. John T.J. Kelly, Jr. of the Pennsylvania Superior Court.

Ms. Newcomer's representative cases include: *In re Longtop Financial Technologies Ltd. Sec. Litig*. No. 11-cv-3658 (SAS) (S.D.N.Y.) – obtained on behalf of investors a jury verdict on liability and damages against the company's former CFO; *re Lehman Brothers Securities Litigation*, No. 1:09-md-02017-LAK (S.D.N.Y.) ($616 million recovery); *In re Pfizer, Inc. Sec. Litig*., No. 04-9866-LTS (S.D.N.Y.) – represents three of the court-appointed class representatives, and serves as additional counsel for the class in securities fraud class action based on alleged misrepresentations and omissions concerning cardiovascular risks associated with Celebrex® and Bextra®, which survived Defendants' motion for summary judgment; *Connecticut Retirement Plans & Trust Funds et al. v. BP p.l.c. et al*. (S.D. Tex.) – represents several public pension funds in direct action asserting claims under Section 10(b) and Rule 10b-5, for purchases of BP ADRs on the NYSE, and under English law for purchasers of BP ordinary shares on the London Stock Exchange, which recently survived Defendants' motion to dismiss; litigation is ongoing.

## ASSOCIATES & STAFF ATTORNEYS

**ASHER S. ALAVI,** an associate of the Firm, concentrates his practice in the area of qui tam litigation. Mr. Alavi received his law degree, cum laude, from Boston College Law School in 2011 where he served as Note Editor for the Boston College Journal of Law & Social Justice. He received his undergraduate degree in Communication Studies and Political Science from Northwestern University in 2007. Mr. Alavi is licensed to practice law in Pennsylvania and Maryland. Prior to joining Kessler Topaz, Mr. Alavi was an associate with Pietragallo Gordon Alfano Bosick & Raspanti LLP in Philadelphia, where he worked on a variety of whistleblower and healthcare matters.

**SARA A. ALSALEH,** a staff attorney of the Firm, concentrates her practice in the area of securities litigation. Ms. Alsaleh earned her Juris Doctor degree from Widener University School of Law in Wilmington, Delaware, and her undergraduate degree from Pennsylvania State University. Ms. Alsaleh is admitted to practice in Pennsylvania and New Jersey.

During law school, Ms. Alsaleh interned at the U.S. Food and Drug Administration and the Delaware Department of Justice in the Consumer Protection & Fraud Division where she was heavily involved in protecting consumers within a wide variety of subject areas. Prior to joining the Firm, Ms. Alsaleh practiced in the areas of pharmaceutical & health law litigation, and was an Associate at a general practice firm in Bensalem, Pennsylvania.

**DANIEL M. BAKER,** an associate of the Firm, concentrates his practice in the areas of merger and acquisition litigation and shareholder derivative actions. Through his practice, Mr. Baker helps institutional and individual shareholders obtain significant financial recoveries and corporate governance reforms.

While in law school, Mr. Baker interned at the Securities Exchange Commission and the Financial Industry Regulatory Authority. Mr. Baker was also a member of the Villanova Law Review, and served as Online Articles Editor.

**LaMARLON R. BARKSDALE,** a staff attorney of the Firm, concentrates his practice in the area of securities litigation. Mr. Barksdale received his law degree from Temple University, James E. Beasley School of Law in 2005 and his undergraduate degree, cum laude, from the University of Delaware in 2001. He is licensed to practice law in Pennsylvania and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania.

Prior to joining Kessler Topaz, Mr. Barksdale worked in complex pharmaceutical litigation, commercial litigation, criminal law and bankruptcy law.

**ADRIENNE BELL,** an associate of the Firm, focuses her practice on case development and client relations. Ms. Bell received her law degree from Brooklyn Law School and her undergraduate degree in Music Theory and Composition from New York University, where she graduated *magna cum laude*. Ms. Bell is licensed to practice in Pennsylvania. Prior to joining the Firm, Ms. Bell practiced in the areas of entertainment law and commercial litigation.

**MATTHEW BENEDICT,** an associate of the Firm, concentrates his practice in the area of mergers and acquisitions litigation and shareholder derivative litigation. Mr. Benedict earned his law degree from Villanova University School of Law and his undergraduate degree from Haverford College. He is licensed to practice law in Pennsylvania and New Jersey.

**ELIZABETH WATSON CALHOUN,** a staff attorney of the Firm, focuses on securities litigation. She has represented investors in major securities fraud and has also represented shareholders in derivative and direct shareholder litigation. Ms. Calhoun received her law degree from Georgetown University Law Center (*cum laude*), where she served as Executive Editor of the Georgetown Journal of Gender and the Law. She received her undergraduate degree in Political Science from the University of Maine, Orono (*with high distinction*). Ms. Calhoun is admitted to practice before the state court of Pennsylvania and the U.S. District Court for the Eastern District of Pennsylvania. Prior to joining the Firm, Ms. Calhoun was employed with the Wilmington, Delaware law firm of Grant & Eisenhofer, P.A.

**KEVIN E.T. CUNNINGHAM, JR.** an associate of the Firm, and focuses his practice in securities litigation. Kevin is a graduate of Temple University Beasley School of Law. Prior to joining the Firm, Kevin served as a law clerk for the Hon. Judge Paula Dow of the New Jersey Superior Court, Burlington County - Chancery Division. Kevin also served as a law clerk to the Hon. Brian A. Jackson of the United States District Court for the Middle District of Louisiana. Kevin is licensed to practice in Pennsylvania.

**QUIANA CHAPMAN-SMITH,** a staff attorney of the Firm, concentrates her practice in the area of securities litigation. She received her law degree from Temple University Beasley School of Law in Pennsylvania and her Bachelor of Science in Management and Organizations from The Pennsylvania State University. Ms. Chapman-Smith is licensed to practice law in the Commonwealth of Pennsylvania. Prior to joining Kessler Topaz, she worked in pharmaceutical litigation.

**THERESA M. DEANGELIS,** an associate of the Firm, concentrates her practice in Whistleblower Litigation. Ms. DeAngelis received her law degree from Penn State Law in 2018 and her undergraduate degree from Penn State University in 2014. Ms. DeAngelis is licensed to practice in Pennsylvania.

**ELIZABETH DRAGOVICH,** a staff attorney of the Firm, concentrates her practice in the area of securities litigation. Ms. Dragovich received her law degree from the University of Pennsylvania Law School in 2002, and her undergraduate degree from Carnegie Mellon University in 1999. Ms. Dragovich is licensed to practice law in Pennsylvania. Prior to joining Kessler Topaz, Elizabeth was a staff attorney with the Wilmington, Delaware law firm of Grant & Eisenhofer, P.A.

**STEPHEN J. DUSKIN,** a staff attorney of the Firm, concentrates his practice in the area of antitrust litigation. Mr. Duskin received his law degree from Rutgers School of Law at Camden in 1985, and his undergraduate degree in Mathematics from the University of Rochester in 1976. Mr. Duskin is licensed to practice law in Pennsylvania.

Prior to joining Kessler Topaz, Mr. Duskin practiced corporate and securities law in private practice and in corporate legal departments, and also worked for the U.S. Securities and Exchange Commission and the Resolution Trust Corporation.

**DONNA EAGLESON,** a staff attorney of the Firm, concentrates her practice in the area of securities litigation discovery matters. She received her law degree from the University of Dayton School of Law in Dayton, Ohio. Ms. Eagleson is licensed to practice law in Pennsylvania.

Prior to joining Kessler Topaz, Ms. Eagleson worked as an attorney in the law enforcement field, and practiced insurance defense law with the Philadelphia firm Margolis Edelstein.

**PATRICK J. EDDIS,** a staff attorney of the Firm, concentrates his practice in the area of corporate governance litigation. Mr. Eddis received his law degree from Temple University School of Law in 2002 and his undergraduate degree from the University of Vermont in 1995. Mr. Eddis is licensed to practice in Pennsylvania.

Prior to joining Kessler Topaz, Mr. Eddis was a Deputy Public Defender with the Bucks County Office of the Public Defender. Before that, Mr. Eddis was an attorney with Pepper Hamilton LLP, where he worked on various pharmaceutical and commercial matters.

**KIMBERLY V. GAMBLE,** a staff attorney of the Firm, concentrates her practice in the area of securities litigation. She received her law degree from Widener University, School of Law in Wilmington, DE. While in law school, she was a CASA/Youth Advocates volunteer and had internships with the Delaware County Public Defender's Office as well as The Honorable Judge Ann Osborne in Media, Pennsylvania. She received her Bachelor of Arts degree in Sociology from The Pennsylvania State University. Ms. Gamble is licensed to practice law in the Commonwealth of Pennsylvania. Prior to joining Kessler Topaz, she worked in pharmaceutical litigation.

**GRANT D. GOODHART,** an associate of the Firm, concentrates his practice in the areas of mergers and acquisitions litigation and stockholder derivative actions. Mr. Goodhart received his law degree, cum laude, from Temple University Beasley School of Law and his undergraduate degree, magna cum laude, from the University of Pittsburgh. He is licensed to practice law in Pennsylvania and New Jersey.

**TYLER S. GRADEN,** an associate of the Firm, focuses his practice on consumer protection and whistleblower litigation. Mr. Graden received his Juris Doctor degree from Temple Law School and his undergraduate degrees in Economics and International Relations from American University. Mr. Graden is

licensed to practice law in Pennsylvania and New Jersey and has been admitted to practice before numerous United States District Courts.

Prior to joining Kessler Topaz, Mr. Graden practiced with a Philadelphia law firm where he litigated various complex commercial matters, and also served as an investigator with the Chicago District Office of the Equal Employment Opportunity Commission.

Mr. Graden has represented individuals and institutional investors in obtaining substantial recoveries in numerous class actions, including *Board of Trustees of the Buffalo Laborers Security Fund v. J.P. Jeanneret Associates, Inc.,* Case No. 09 Civ. 8362 (S.D.N.Y.) (settled - $219 million); *Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase Bank, NA.*, Case No. 09 Civ. 0686 (S.D.N.Y.) (settled - $150 million); *In re Merck & Co., Inc. Vytorin ERISA Litig.*, Case No. 09 Civ. 197 4 (D.N.J.) (settled - $10.4 million); and *In re 2008 Fannie Mae ERISA Litigation*, Case No. 09-cv-1350 (S.D.N.Y.) (settled - $9 million). Mr. Graden has also obtained favorable recoveries on behalf of multiple, nationwide classes of borrowers whose insurance was force-placed by their mortgage servicers.

**STACEY A. GREENSPAN,** an associate of the Firm, concentrates her practice in the areas of merger and acquisition litigation and shareholder derivative actions. Ms. Greenspan received her law degree from Temple University in 2007 and her undergraduate degree from the University of Michigan in 2001, with honors. Ms. Greenspan is licensed to practice in Pennsylvania.

Prior to joining Kessler Topaz, Ms. Greenspan served as an Assistant Public Defender in Philadelphia for almost a decade, litigating hundreds of trials to verdict. Ms. Greenspan also worked at the Trial and Capital Habeas Units of the Federal Community Defender Office of the Eastern District of Pennsylvania throughout law school. At Kessler Topaz, she has assisted the Firm in obtaining a substantial recovery in a large class action on behalf of an institutional client in *City of Daytona Beach Police and Fire Pension Fund v. ExamWorks Group, Inc., et al.*, C.A. No. 12481-VCL (Del. Ch. Sept. 12, 2017) ($86.5 million settlement relating to the acquisition of ExamWorks Group, Inc. by private equity firm Leonard Green & Partners, LP.). In addition, Ms. Greenspan served as co-lead counsel in *In re Ebix, Inc. S'holder Litig.*, Consol. C.A. No. 8526-VCS (Del. Ch. Apr. 5, 2019), a case that challenged an improper executive bonus worth $825 million for the company's CEO. After five years of hard fought litigation and a trial the case settled for corporate governance measures and an amendment to the CEO's stock appreciation rights agreement.

**KEITH S. GREENWALD,** a staff attorney of the Firm, concentrates his practice in the area of securities litigation. Mr. Greenwald received his law degree from Temple University, Beasley School of Law in 2013 and his undergraduate degree in History, summa cum laude, from Temple University in 2004. Mr. Greenwald is licensed to practice law in Pennsylvania.

Prior to joining Kessler Topaz, Mr. Greenwald was a contract attorney on various projects in Philadelphia and was at the International Criminal Tribunal for the Former Yugoslavia, at The Hague in The Netherlands, working in international criminal law.

**JOHN J. GROSSI**, a staff attorney at the Firm, focuses his practice on securities litigation. Mr. Grossi received his law degree from Widener University Delaware School of Law and graduated *cum laude* from Curry College. He is licensed to practice law in Pennsylvania. Prior to joining the Firm as a Staff Attorney, Mr. Grossi was employed in the Firm's internship program as a Summer Law Clerk, where he was also a member of the securities fraud department.

During his time as a Summer Law Clerk, Mr. Grossi conducted legal research for several securities fraud class actions on behalf of shareholders, including Bank of America related to its acquisition of Merrill Lynch, Lehman Brothers, St. Jude Medical and NII Holdings.

**NATHAN A. HASIUK**, an associate of the Firm, concentrates his practice on securities litigation. Mr. Hasiuk received his law degree from Temple University Beasley School of Law, and graduated *summa cum laude* from Temple University. He is licensed to practice in Pennsylvania and New Jersey and has been admitted to practice before the United States District Court for the District of New Jersey. Prior to joining the Firm, Mr. Hasiuk was an Assistant Public Defender in Philadelphia.

**EVAN R. HOEY**, an associate of the Firm, focuses his practice on securities litigation. Mr. Hoey received his law degree from Temple University Beasley School of Law, where he graduated *cum laude*, and graduated *summa cum laude* from Arizona State University. He is licensed to practice in Pennsylvania and is admitted to practice before the United States District Court for the Eastern District of Pennsylvania.

**SUFEI HU,** a staff attorney of the Firm, concentrates her practice in the area of securities litigation. She received her J.D. from Villanova University School of Law, where she was a member of the Moot Court Board. Ms. Hu received her undergraduate degree from Haverford College in Political Science, with honors. She is licensed to practice law in Pennsylvania and New Jersey, and is admitted to the United States District Court of the Eastern District of Pennsylvania. Prior to joining the Firm, Ms. Hu worked in pharmaceutical, anti-trust, and securities law.

**JORDAN JACOBSON**, an associate of the Firm, concentrates her practice in securities litigation. Ms. Jacobson received her law degree from Georgetown University in 2014 and her undergraduate degrees in history and political science from Arizona State University in 2011. Prior to joining the Firm, Ms. Jacobson clerked for the honorable Deborah J. Saltzman, United States Bankruptcy Judge, in the Central District of California. Ms. Jacobson was also previously an associate at O'Melveny & Myers LLP, and an attorney in the General Counsel's office of the Pension Benefit Guaranty Corporation in Washington, D.C. Ms. Jacobson is licensed to practice law in California and Virginia and will sit for the July 2020 Pennsylvania bar exam.

**RAPHAEL JANOVE,** an associate of the Firm represents investors and consumers in securities litigation and class actions. Mr. Janove started his career at Sullivan & Cromwell LLP in New York City, where he defended large financial institutions in antitrust class-actions, FINRA arbitrations, and government investigations. Most recently, he worked at a litigation boutique in Chicago, representing a major fossil-fuel refiner in nationwide global-warming nuisance lawsuits, defending one of the country's largest agricultural cooperatives in a billion dollar class action, and pursuing multimillion dollar claims on behalf of his clients in arbitrations before the International Chamber of Commerce and the London Maritime Arbitration Association.

In addition, Mr. Janove clerked for the Honorable Paul S. Diamond of the U.S. District Court of the Eastern District of Pennsylvania in Philadelphia, and for the Honorable Thomas L. Ambro of the U.S. Court of Appeals for the Third Circuit in Wilmington, Delaware.

During law school, Mr. Janove served as an Articles Editor on The University of Chicago Law Review and was a Kirkland & Ellis Scholar. At graduation, he received the Douglas Baird Prize in Commercial Law for his academic achievement in commercial and corporate law. Prior to law school, Mr. Janove taught English at a private school in Uijeongbu, South Korea.

**MARGARET E. JULIANO,** a staff attorney at the Firm, concentrates her practice in consumer fraud protection. She has a JD from Emory University School of Law, where she was Editor-in-Chief of the Emory Bankruptcy Developments Journal and a BA from Oberlin College. She is licensed to practice in Pennsylvania and New York, and previously practiced in the state and federal courts in Delaware.

Maggie has experience representing plaintiffs in consumer fraud cases concerning mold and other building envelop issues. She also represented manufacturers and distributors in mass tort and product liability cases. She clerked for Judge Walrath of the US Bankruptcy Court for the District of Delaware.

**NATALIE LESSER,** an associate of the Firm, concentrates her practice in the area of consumer protection. Ms. Lesser received her law degree from the University of Pittsburgh School of Law in 2010 and her undergraduate degree in English from the State University of New York at Albany in 2007. While attending Pitt Law, Ms. Lesser served as Editor in Chief of the University of Pittsburgh Law Review. Ms. Lesser is licensed to practice law in Pennsylvania and New Jersey.

Prior to Joining Kessler Topaz, Ms. Lesser was an associate with Akin Gump Strauss Hauer & Feld LLP, where she worked on a number of complex commercial litigation cases, including defending allegations of securities fraud and violations of ERISA for improper calculation and processing of insurance benefits.

**JOSHUA A. LEVIN,** a staff attorney of the Firm, concentrates his practice in the area of securities litigation. Mr. Levin received his law degree from Widener University School of Law, and earned his undergraduate degree from The Pennsylvania State University. Mr. Levin is licensed to practice in Pennsylvania and New Jersey. Prior to joining Kessler Topaz, he worked in pharmaceutical litigation.

**JOHN J. McCULLOUGH,** a staff attorney of the Firm, concentrates his practice in the area of securities litigation. In 2012, Mr. McCullough passed the CPA Exam. Mr. McCullough earned his Juris Doctor degree from Temple University School of Law, and his undergraduate degree from Temple University. Mr. McCullough is licensed to practice in Pennsylvania.

**LAUREN M. McGINLEY,** an associate of the Firm, concentrates her practice in the areas of securities and consumer protection. Ms. McGinley received her undergraduate degree from Temple University in 2013 and her law degree from Drexel University, Thomas R. Kline School of Law in 2017. While at Drexel, Ms. McGinley received the Dean's Scholar for Excellence in Civil Procedure in 2015.

Prior to joining the Firm, Ms. McGinley clerked for the honorable Judge Alia Moses in the Western District of Texas from September 2017-August 2019.

**STEVEN D. McLAIN,** a staff attorney of the Firm, concentrates his practice in mergers and acquisition litigation and stockholder derivative litigation. He received his law degree from George Mason University School of Law, and his undergraduate degree from the University of Virginia. Mr. McLain is licensed to practice in Virginia. Prior to joining Kessler, Topaz, he practiced with an insurance defense firm in Virginia.

**STEFANIE J. MENZANO,** a staff attorney of the Firm, concentrates her practice in the area of securities litigation. Ms. Menzano received her law degree from Drexel University School of Law in 2012 and her undergraduate degree in Political Science from Loyola University Maryland. Ms. Menzano is licensed to practice law in Pennsylvania and New Jersey.

Prior to joining Kessler Topaz, Ms. Menzano was a fact witness for the Institute for Justice. During law school, Ms. Menzano served as a case worker for the Pennsylvania Innocence Project and as a judicial intern under the Honorable Judge Mark Sandson in the Superior Court of New Jersey, Atlantic County.

**JONATHAN F. NEUMANN,** an associate of the Firm, concentrates his practice in the area of securities litigation and fiduciary matters. Mr. Neumann earned his Juris Doctor degree from Temple University Beasley School of Law, where he was an editor for the Temple International and Comparative Law Journal and a member of the Moot Court Honor Society. Mr. Neumann earned his undergraduate degree from the

University of Delaware. Mr. Neumann is licensed to practice in Pennsylvania and New York. Prior to joining the Firm, Mr. Neumann served as a law clerk to the Honorable Douglas E. Arpert of the United States District Court for the District of New Jersey.

Mr. Neumann has represented institutional investors in obtaining substantial recoveries in numerous cases, including *In re Bank of New York Mellon Corp. Foreign Exchange Transactions Litig.*, No. 12-md-02335 (S.D.N.Y.) ($335 million settlement); *Policemen's Annuity and Benefit Fund of the City of Chicago, et al. v. Bank of America, NA, et al.*, No. 12-cv-02865 (S.D.N.Y.) ($69 million settlement); *In re NII Holdings Sec. Litig.*, No. 14-cv-227 (E.D. Va.) (settled $41.5 million).

**ELAINE M. OLDENETTEL,** a staff attorney of the Firm, concentrates her practice in consumer and ERISA litigation. She received her law degree from the University of Maryland School of Law and her undergraduate degree in International Studies from the University of Oregon. While attending law school, Ms. Oldenetel served as a law clerk for the Honorable Robert H. Hodges of the United States Court of Federal Claims and the Honorable Marcus Z. Shar of the Baltimore City Circuit Court. Ms. Oldenetel is licensed to practice in Pennsylvania and Virginia.

**MELANIE A. RADER**, an associate of the Firm, focuses her practice in securities litigation and consumer protection.

Prior to joining the Firm, Ms. Rader served as a judicial law clerk to the Hon. Linda K. Caracappa, United States Magistrate Judge for the Eastern District of Pennsylvania. Ms. Rader received her Juris Doctorate from Temple University Beasley School of Law in 2018, and is a graduate of Gettysburg College, where she received her Bachelor of Arts in Economics. While in law school, Ms. Rader was a judicial intern to the Hon. Petrese B. Tucker, United States District Court Judge for the Eastern District of Pennsylvania.

**ALLYSON M. ROSSEEL**, a staff attorney of the Firm, concentrates her practice at Kessler Topaz in the area of securities litigation. She received her law degree from Widener University School of Law, and earned her B.A. in Political Science from Widener University. Ms. Rosseel is licensed to practice law in Pennsylvania and New Jersey. Prior to joining the Firm, Ms. Rosseel was employed as general counsel for a boutique insurance consultancy/brokerage focused on life insurance sales, premium finance and structured settlements.

**KARRISA J. SAUDER,** an associate of the Firm, concentrates her practice on new matter development with a focus on analyzing securities, consumer, and antitrust class action lawsuits, as well as direct (or opt-out) actions. Prior to joining the firm, Karissa was an associate with Berger Montague, where she litigated complex antitrust class action lawsuits, and served as a judicial law clerk to the Honorable Eduardo C. Robreno, United States District Judge for the Eastern District of Pennsylvania. Karissa received her law degree from Harvard Law School in 2014 and her undergraduate degree from Eastern Mennonite University in 2010. While in law school, Karissa served as Managing Editor of the Harvard Law Review.

**MICHAEL J. SECHRIST,** a staff attorney at the Firm, concentrates his practice in the area of securities litigation. Mr. Sechrist received his law degree from Widener University School of Law in 2005 and his undergraduate degree in Biology from Lycoming College in 1998. Mr. Sechrist is licensed to practice law in Pennsylvania. Prior to joining Kessler Topaz, Mr. Sechrist worked in pharmaceutical litigation.

**PENG SHAO,** an associate of the Firm, focuses his practice in complex securities litigation and consumer protection. Peng is a graduate of UC Davis School of Law. During law school, Mr. Shao served various leadership roles for UC Davis School of Law's Business Law Journal, Intellectual Property Law Association, and Immigration Law Clinic. Mr. Shao also represented UC Davis in various Moot Court

competitions and brought a case before the Ninth Circuit Court of Appeals. Mr. Shao received his B.S. in Biology with honors from University of Kentucky, and is published in The Journal of BioChemistry.

**IGOR SIKAVICA**, a staff attorney of the Firm, practices in the area of corporate governance litigation, with a focus on transactional and derivative cases. Mr. Sikavica received his J.D. from the Loyola University Chicago School of Law and his LL.B. from the University of Belgrade Faculty Of Law. Mr. Sikavica is licensed to practice in Pennsylvania. Mr. Sikavica's licenses to practice law in Illinois and the former Yugoslavia are no longer active.

Prior to joining Kessler Topaz, Mr. Sikavica has represented clients in complex commercial, civil and criminal matters before trial and appellate courts in the United States and the former Yugoslavia. Also, Mr. Sikavica has represented clients before international courts and tribunals, including – the International Criminal Tribunal for the Former Yugoslavia (ICTY), European Court of Human Rights and the UN Committee Against Torture.

**MELISSA J. STARKS,** a staff attorney of the Firm, concentrates her practice in the area of securities litigation. Ms. Starks earned her Juris Doctor degree from Temple University--Beasley School of Law, her LLM from Temple University--Beasley School of Law, and her undergraduate degree from Lincoln University. Ms. Starks is licensed to practice in Pennsylvania.

**MICHAEL P. STEINBRECHER,** a staff attorney of the Firm, concentrates his practice in the area of securities litigation. Mr. Steinbrecher earned his Juris Doctor from Temple University James E. Beasley School of Law, and received his Bachelors of Arts in Marketing from Temple University. Mr. Steinbrecher is licensed to practice in Pennsylvania and New Jersey. Prior to joining Kessler Topaz, he worked in pharmaceutical litigation.

**JULIE SWERDLOFF,** a staff attorney of the Firm, concentrates her practice in the areas of consumer protection, antitrust, and whistleblower litigation. She received her law degree from Widener University School of Law, and her undergraduate degree in Real Estate and Business Law from The Pennsylvania State University. She is licensed to practice law in Pennsylvania and New Jersey and has been admitted to practice before the United States District Courts for the Eastern District of Pennsylvania and the District of New Jersey.

While attending law school, Ms. Swerdloff interned as a judicial clerk for the Honorable James R. Melinson of the United States District Court for the Eastern District of Pennsylvania. Prior to joining Kessler Topaz, Ms. Swerdloff managed major environmental claims litigation for a Philadelphia-based insurance company, and was an associate at a general practice firm in Montgomery County, PA. At Kessler Topaz, she has assisted the Firm in obtaining meaningful recoveries on behalf of clients in securities fraud litigation, including the historic Tyco case (*In re Tyco International, Ltd. Sec. Litig*., No. 02-1335-B (D.N.H. 2002) (settled -- $3.2 billion)), federal and state wage and hour litigation (*In re FootLocker Inc. Fair Labor Standards Act (FLSA) and Wage and Hour Litig.,* No. 11-mdl-02235 (E.D. Pa. 2007) (settled – $7.15 million)), and numerous shareholder derivative actions relating to the backdating of stock options.

**BRIAN W. THOMER,** a staff attorney of the Firm, concentrates his practice in the area of securities litigation. Mr. Thomer received his Juris Doctor degree from Temple University Beasley School of Law, and his undergraduate degree from Widener University. Mr. Thomer is licensed to practice in Pennsylvania.

**ALEXANDRA H. TOMICH,** a staff attorney of the Firm, concentrates her practice in the area of securities litigation. She received her law degree from Temple Law School and her undergraduate degree from Columbia University with a B.A. in English. She is licensed to practice law in Pennsylvania.

Prior to joining Kessler Topaz, she worked as an associate at Trujillo, Rodriguez, and Richards, LLC in Philadelphia. Ms. Tomich volunteers as an advocate for children through the Support Center for Child Advocates in Philadelphia and at Philadelphia VIP.

**JACQUELINE A. TRIEBL,** a staff attorney of the Firm, concentrates her practice in the area of securities litigation. Ms. Triebl received her law degree, cum laude, from Widener University School of Law in 2007 and her undergraduate degree in English from The Pennsylvania State University in 1990. Ms. Triebl is licensed to practice law in Pennsylvania and New Jersey.

**KURT WEILER**, a staff attorney of the Firm, concentrates his practice in the area of securities litigation. He received his law degree from Duquesne University School of Law, where he was a member of the Moot Court Board and McArdle Wall Honoree, and received his undergraduate degree from the University of Pennsylvania. Mr. Weiler is licensed to practice law in Pennsylvania.

Prior to joining Kessler Topaz, Mr. Weiler was associate corporate counsel for a Philadelphia-based mortgage company, where he specialized in the area of foreclosures and bankruptcy.

**CHRISTOPHER M. WINDOVER,** an associate of the Firm, concentrates his practice in the areas of shareholder derivative actions and mergers and acquisitions litigation. Mr. Windover received his law degree from Rutgers University School of Law, *cum laude*, and received his undergraduate degree from Villanova University. He is licensed to practice in the Commonwealth of Pennsylvania and New Jersey. Prior to joining the Firm, Mr. Windover practiced litigation at a mid-sized law firm in Philadelphia.

**ANNE M. ZANESKI**\*, a staff attorney of the Firm, concentrates her practice in the area of securities litigation. Ms. Zaneski received her J.D. from Brooklyn Law School where she was a recipient of the CALI Award of Excellence, and her B.A. from Wellesley College. She is licensed to practice law in New York and Pennsylvania.

Prior to joining the Firm, she was an associate with a boutique securities litigation law firm in New York City and served as a legal counsel with the New York City Economic Development Corporation in the areas of bond financing and complex litigation.

\* Admitted as Anne M. Zaniewski in Pennsylvania.

## PROFESSIONALS

**WILLIAM MONKS**, CPA, CFF, CVA, Director of Investigative Services at Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz"), brings nearly 30 years of white collar investigative experience as a Special Agent of the Federal Bureau of Investigation (FBI) and "Big Four" Forensic Accountant. As the Director, he leads the Firm's Investigative Services Department, a group of highly trained professionals dedicated to investigating fraud, misrepresentation and other acts of malfeasance resulting in harm to institutional and individual investors, as well as other stakeholders.

William's recent experience includes being the corporate investigations practice leader for a global forensic accounting firm, which involved widespread investigations into procurement fraud, asset misappropriation, financial statement misrepresentation, and violations of the Foreign Corrupt Practices Act (FCPA).

While at the FBI, William worked on sophisticated white collar forensic matters involving securities and other frauds, bribery, and corruption. He also initiated and managed fraud investigations of entities in the manufacturing, transportation, energy, and sanitation industries. During his 25 year FBI career, William

also conducted dozens of construction company procurement fraud and commercial bribery investigations, which were recognized as a "Best Practice" to be modeled by FBI offices nationwide.

William also served as an Undercover Agent for the FBI on long term successful operations targeting organizations and individuals such as the KGB, Russian Organized Crime, Italian Organized Crime, and numerous federal, state and local politicians. Each matter ended successfully and resulted in commendations from the FBI and related agencies.

William has also been recognized by the FBI, DOJ, and IRS on numerous occasions for leading multi-agency teams charged with investigating high level fraud, bribery, and corruption investigations. His considerable experience includes the performance of over 10,000 interviews incident to white collar criminal and civil matters. His skills in interviewing and detecting deception in sensitive financial investigations have been a featured part of training for numerous law enforcement agencies (including the FBI), private sector companies, law firms and accounting firms.

Among the numerous government awards William has received over his distinguished career is a personal commendation from FBI Director Louis Freeh for outstanding work in the prosecution of the West New York Police Department, the largest police corruption investigation in New Jersey history.

William regards his work at Kessler Topaz as an opportunity to continue the public service that has been the focus of his professional life. Experience has shown and William believes, one person with conviction can make all the difference. William looks forward to providing assistance to any aggrieved party, investor, consumer, whistleblower, or other witness with information relative to a securities fraud, consumer protection, corporate governance, qui-tam, anti-trust, shareholder derivative, merger & acquisition or other matter.

Education
Pace University: Bachelor of Business Administration (cum laude)
Florida Atlantic University: Master's in Forensic Accounting (cum laude)

**BRAM HENDRIKS,** European Client Relations Manager at Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz"), guides European institutional investors through the intricacies of U.S. class action litigation as well as securities litigation in Europe and Asia. His experience with securities litigation allows him to translate complex document and discovery requirements into straightforward, practical action. For shareholders who want to effect change without litigation, Bram advises on corporate governance issues and strategies for active investment.

Bram has been involved in some of the highest-profile U.S. securities class actions of the last 20 years. Before joining Kessler Topaz, he handled securities litigation and policy development for NN Group N.V., a publicly-traded financial services company with approximately EUR 197 billion in assets under management. He previously oversaw corporate governance activities for a leading Amsterdam pension fund manager with a portfolio of more than 4,000 corporate holdings.

A globally-respected investor advocate, Bram has co-chaired the International Corporate Governance Network Shareholder Rights Committee since 2009. In that capacity, he works with investors from more than 50 countries to advance public policies that give institutional investors a voice in decision-making. He is a sought-after speaker, panelist and author on corporate governance and responsible investment policies. Based in the Netherlands, Bram is available to meet with clients personally and provide hands-on-assistance when needed.

<u>Education</u>

University of Amsterdam, MSc International Finance, specialization Law & Finance, 2010

Maastricht Graduate School of Governance, MSc in Public Policy and Human Development, specialization WTO law, 2006 Tilburg University, Public Administration and administrative law B.A., 2004

# EXHIBIT H

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

|  |  |
|---|---|
| ABDUL NEVAREZ, et al., <br><br> Plaintiffs, <br><br> v. <br><br> FORTY NINERS FOOTBALL COMPANY, LLC, et al., <br><br> Defendants. | Case No. 16-CV-07013-LHK <br><br> **ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; GRANTING MOTION FOR SERVICE AWARDS; AND GRANTING MOTION FOR ATTORNEY'S FEES, COSTS, AND EXPENSES** <br><br> Re: Dkt. No. 394, 395, 396, 408 |

Before the Court are Plaintiffs' (1) motion for final approval of a class action settlement, ECF No. 395; (2) motion for service awards, ECF No. 394; and (3) motion for reasonable attorney's fees, costs, and expenses, ECF No. 408.[1]  Having considered the parties' briefs, the relevant law, and the record in this case, the Court GRANTS Plaintiffs' motion for final approval, Plaintiffs' motion for service awards, and Plaintiffs' motion for attorney's fees, as set forth below. The Court considers each motion in turn.

---

[1] Plaintiffs originally filed the motion for attorney's fees on May 25, 2020, ECF No. 396, but Plaintiffs refiled their motion on June 25, 2020 to correct a number of errata, ECF No. 408.

United States District Court
Northern District of California

## I.  MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Plaintiffs have moved the Court for an order granting final approval of the class action Settlement Agreement and Release of Claims ("Settlement Agreement"), ECF No. 395, which was filed with the Court at ECF Nos. 375-2; 391.  The Court preliminarily approved the Settlement Agreement in this action by order entered on March 9, 2020.  *See* ECF No. 392 ("Preliminary Approval Order").  On July 16, 2020 the Court held a Final Approval hearing to consider final approval of the Settlement Agreement and to determine, among other things, whether the settlement is fair, reasonable, and adequate.  Having considered the motions, the oral arguments, the relevant law, and the record in this case, the Court GRANTS the Plaintiffs' motion for final approval of the class action settlement as follows:

1.  All terms used herein, unless otherwise defined, shall have the same meanings as set forth in the Settlement Agreement.

2.  The Court finds that the Parties complied with the Notice procedures set forth in the Court's Preliminary Approval Order and Settlement Agreement by disseminating the Court-approved long-form Notice (ECF No. 390-3) and Claim Form (ECF No. 390-3) to Class Members by mail and email; providing the long-form Notice to the agreed-upon membership and/or service organizations for individuals with mobility disabilities; posting the Court-approved short-form Notice (ECF No. 390-1) at conspicuous locations throughout Levi's Stadium and on websites controlled by Defendants; and creating and maintaining a Settlement website, email address, and toll-free telephone number.  The Court further finds that these methods:

a.  constituted the best practicable notice to members of the Plaintiff Classes under the circumstances of the Action;

b.  constituted reasonable, due, adequate and sufficient notice to all Persons entitled to receive notice; and

c.  constituted notice that met all applicable requirements of the Federal Rules of Civil Procedure, 28 U.S.C. § 1715, the Due Process Clause of the United States Constitution,

2

and any other applicable law, as well as this District's Procedural Guidance for Class Action Settlements.

3. The Court finds that the Claim Form distributed to the Damages Class met all applicable requirements of the Federal Rules of Civil Procedure, 28 U.S.C. § 1715, the Due Process Clause of the United States Constitution, and any other applicable law. The Court further finds that the Claims Process set forth in the Settlement Agreement provides Damages Class Members with a full and fair opportunity to submit claims for damages, an effective method of distributing monetary relief to the Damages Class, and provides for an equitable plan of allocation of money damages between Damages Class Members. *See* Rule 23(e)(2)(A)(ii), (D).

4. On March 9, 2020, the Court preliminarily certified the following classes for settlement purposes under Fed. R. Civ. P. 23(a) and (b)(3):

**Injunctive Relief Class:** All persons with mobility disabilities who use wheelchairs, scooters, or other mobility aids who will attempt to purchase accessible seating for a public event at Levi's Stadium and who will be denied equal access to the Stadium's facilities, services, accessible seating, parking, amenities, and privileges, including ticketing, from December 7, 2013 through the date of the Court's Order Granting Preliminary Approval of Class Action Settlement.

**Companion Injunctive Relief Class**: All persons who are companions of persons with mobility disabilities who use wheelchairs, scooters or other mobility aids and who have used or will use companion seating for public events located at Levi's Stadium from December 7, 2013 through the date of the Court's Order Granting Preliminary Approval of Class Action Settlement.

**Damages Class**: All persons with mobility disabilities who use wheelchairs, scooters or other mobility aids who have purchased, attempted to purchase, or for whom third parties purchased accessible seating and who have been denied equal access to Levi's Stadium's facilities, services, accessible seating, parking, amenities, and privileges at an event controlled by the Forty Niners Football Company, LLC; Forty Niners SC Stadium Company, LLC; or Forty Niners Stadium Management Company, LLC, from April 13, 2015 through the date of the Court's Order Granting Preliminary Approval of Class Action Settlement.

*See* ECF No. 392.

5. The Court finds that the Plaintiff Classes continue to meet the requirements for

3

United States District Court
Northern District of California

1    class certification under Federal Rule of Civil Procedure 23 and all other applicable laws and

2    rules.

3         6.    The Injunctive Relief Class and Companion Injunctive Relief Class are finally

4    certified under Fed. R. Civ. P. 23(b)(2). The Court concludes that: (a) joinder of all Class

5    Members in a single proceeding would be impracticable, if not impossible, because of their

6    numbers and dispersion; (b) there are questions of law and fact common to the Plaintiff Classes;

7    (c) Plaintiffs' claims are typical of the claims of the Plaintiff Classes that they seek to represent for

8    purposes of settlement; (d) Plaintiffs have fairly and adequately represented the interests of the

9    Classes and will continue to do so; (e) Plaintiffs and the Plaintiff Classes are represented by

10   qualified, reputable counsel who are experienced in preparing and prosecuting class actions,

11   including those involving the sort of practices alleged in the Complaint; and (f) Defendants acted

12   or refused to act on grounds that apply to the Injunctive Relief Class and Companion Injunctive

13   Relief Class as a whole.

14        7.    The Damages Class is finally certified under Fed. R. Civ. P. 23(b)(3). The Court

15   concludes that: (a) joinder of all Damages Class Members in a single proceeding would be

16   impracticable, if not impossible, because of their numbers and dispersion; (b) there are questions

17   of law and fact common to the Damages Class; (c) Plaintiff Abdul Nevarez's claims are typical of

18   the claims of the Damages Class that he seeks to represent for purposes of settlement; (d) Plaintiff

19   Abdul Nevarez has fairly and adequately represented the interests of the Damages Class and will

20   continue to do so; (e) Plaintiff Abdul Nevarez and the Damages Class are represented by qualified,

21   reputable counsel who are experienced in preparing and prosecuting class actions, including those

22   involving the sort of practices alleged in the Complaint; (f) questions of law or fact common to the

23   Damages Class predominate over any questions affecting only individual members; and (g) a class

24   action is superior to other available methods for fairly and efficiently adjudicating the controversy.

25        8.    Class certification is therefore an appropriate method for protecting the interests of

26   the Plaintiff Classes and resolving the common issues of fact and law arising out of the Plaintiffs'

27   Case No. 16-CV-07013-LHK

28   ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; GRANTING
     MOTION FOR SERVICE AWARDS; AND GRANTING MOTION FOR ATTORNEY'S FEES, COSTS, AND
     EXPENSES

United States District Court
Northern District of California

claims while also eliminating the risk of duplicative litigation. Accordingly, the Court hereby makes final its earlier certification of the Plaintiff Classes and confirms its appointment of Plaintiffs Abdul Nevarez and Sebastian DeFrancesco as Injunctive Relief Class Representatives; Plaintiff Priscilla Nevarez as the Companion Injunctive Relief Class Representative; Plaintiff Abdul Nevarez as the Damages Class Representative; and Guy Wallace of Schneider Wallace Cottrell Konecky LLP, Linda M. Dardarian of Goldstein Borgen Dardarian & Ho, and Adam Wolf of Peiffer Wolf Carr & Kane as Class Counsel.

9. The Court grants final approval of the Settlement and finds that it is fair, reasonable, adequate, and in the best interests of the Plaintiff Classes as a whole. First, the Settlement offers Class Members significant injunctive relief regarding all of the claims in the Fourth Amended Complaint, including Defendants' failure to provide physical access and Defendants' failure to make reasonable modifications in policy and practice to ensure equal access to the Stadium's facilities and services. Second, the non-reversionary damages fund offers substantial monetary relief to Damages Class Members. Third, as set forth below, the Court finds that Plaintiffs' requested attorneys' fees, costs, and expenses, and Class Representative service awards are reasonable and supported by applicable law, as modified by the Court. Finally, the absence of any objections or exclusions further supports final approval of the Settlement. In sum, when considered against the potential risks, expense, complexity and duration of further litigation, and the importance of the accessibility of the Stadium and its related facilities to the Class Members, the Court finds the relief secured by the Settlement to be more than adequate. *See* Fed. R. Civ. P. 23(e)(2)(C).

10. The Parties and Settlement Administrator are hereby directed to implement and consummate the Settlement according to its terms and provisions and the Court's Preliminary Approval Order. Class Counsel and Defendants shall take all steps necessary and appropriate to provide the Plaintiff Class Members with the benefits to which they are entitled under the terms of the Settlement.

Case No. 16-CV-07013-LHK
ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; GRANTING MOTION FOR SERVICE AWARDS; AND GRANTING MOTION FOR ATTORNEY'S FEES, COSTS, AND EXPENSES

United States District Court
Northern District of California

United States District Court
Northern District of California

11.     The Plaintiffs and all Plaintiff Class Members (and their respective heirs, assigns, successors, executors, administrators, agents and representatives) are conclusively deemed to have released and forever discharged the Released Parties from all released claims as set forth in Section XIII of the Settlement Agreement.  All members of the Injunctive Relief Class and Companion Injunctive Relief Class are bound by this Order.  All members of the Damages Class, except for those individuals who filed valid and timely Opt-Outs, are bound by this Order. Damages Class Members who submitted timely and valid Opt-Out requests are neither permitted to share in the benefits of the damages fund nor bound by this Final Order and Judgment as to claims for Unruh Act statutory minimum damages against the Forty Niners Defendants.  Damages Class Members who did not opt out of the case at the class certification stage were afforded a new opportunity to do so.  *See* Fed. R. Civ. P. 23(e)(4).  Throughout the Term of the Settlement Agreement, Plaintiff Class Members are enjoined from asserting or prosecuting any claims that are released by the Settlement Agreement.

12.     The Settlement Agreement and this Order are not admissions of liability or fault by Defendants or other Released Parties, or a finding of the validity of any claims in this action or of any wrongdoing or violation of law by Defendants or other Released Parties.  The Settlement Agreement is not a concession by the Parties and, to the fullest extent permitted by law, neither this Order, nor any of its terms or provisions, nor any of the negotiations connected with it, shall be offered as evidence or received in evidence in any pending or future civil, criminal, or administrative action or proceeding to establish any liability of, or admission by Defendants or other Released Parties.  Notwithstanding the foregoing, nothing in this Order shall be interpreted to prohibit the use of this Order to consummate or enforce the Settlement Agreement or Order, or to defend against the assertion of Released Claims in any other proceeding, or as otherwise required by law.

13.     Within 21 days after the distribution of the settlement funds and payment of attorneys' fees, expenses and costs, the Parties are ordered to file a Post-Distribution Accounting,

6

which provides the following information in accordance with the Northern District's Procedural Guidance for Class Action Settlements: The total settlement fund, the total number of class members; the total number of class members to whom notice was sent and not returned as undeliverable; the number and percentage of claim forms submitted; the number and percentage of opt-outs; the number and percentage of objections; the average and median recovery per claimant; the largest and smallest amounts paid to class members; the methods of notice and the methods of payment to class members; the number and value of checks not cashed; the amounts distributed to each *cy pres* recipient; the administrative costs; the attorneys' fees and costs; and the benefit conferred on the classes by the injunctive relief obtained. Within 21 days after the distribution of the settlement funds and award of attorneys' fees, the Parties should post the Post-Distribution Accounting, including an easy-to-read chart that allows for quick comparisons with other cases, on the settlement website. The Court may hold a hearing following submission of the parties' Post-Distribution Accounting.

14.     In accordance with the terms of the Settlement Agreement, the Court shall maintain continuing jurisdiction over Plaintiffs, the Class Members, Defendants, and the Settlement Agreement throughout the term of the Settlement Agreement, for the purpose of supervising the implementation, enforcement, construction, and interpretation of the Settlement Agreement and this Order, through the term of the Settlement Agreement. In that regard, any challenges to the Settlement Agreement's terms or implementation, whether under state or federal law, shall be subject to the exclusive and continuing jurisdiction of this Court.

15.     This Action is hereby dismissed on the merits and with prejudice as to the Released Claims, without fees or costs to any Party except as otherwise provided in the Court's Order on Plaintiffs' Motion for Reasonable Attorneys' Fees, Costs and Expenses, and the Settlement Agreement.

## II.     MOTION FOR SERVICE AWARDS

In addition, Plaintiffs filed a motion for service awards, ECF No. 394. The motion

7

1   requests $5,000 in service awards for each of three class representatives: Abdul Nevarez, Priscilla

2   Nevarez, and Sebastian DeFrancesco. *Id.* at 1. The motion is unopposed, and no Class members

3   have filed objections to the Settlement Agreement.

4           In order to evaluate the reasonableness of the size of a service award, the Ninth Circuit

5   looks to "the number of named plaintiffs receiving incentive payments, the proportion of the

6   payments relative to the settlement amount, and the size of each payment." *In re Online DVD-*

7   *Rental Antitrust Litig.*, 779 F.3d 934, 947 (9th Cir. 2015) (internal quotation marks omitted).

8   Here, the three class representatives, Abdul Nevarez, Priscilla Nevarez, and Sebastian

9   DeFrancesco, seek Service Awards of $5,000 each. ECF No. 394. The contemplated Service

10  Awards total to $15,000 out of the $24,000,000 Plaintiffs' settlement, which is less than .1% of the

11  $24 million Damages Fund. The number of service awards requested and the respective amounts

12  fall well below the levels that the Ninth Circuit has scrutinized in the past. *Id.* at 948 (finding

13  service awards to be reasonable in part because there were "nine class representatives" and

14  because "the $45,000 in incentive awards ma[de] up a mere .17% of the total settlement").

15  Moreover, the requested amount of $5,000 is considered "presumptively reasonable" in this

16  district. *See Villegas v. J.P. Morgan Chase & Co.*, No. CV 09-00261 SBA EMC, 2012 WL

17  5878390, at *7 (N.D. Cal. Nov. 21, 2012).

18          Thus, having considered the motion, Plaintiffs' declarations and exhibits thereto, the

19  arguments of counsel, and all files, records, and proceedings in this action, the Court finds that

20  good cause exists to approve the motion. All three Plaintiffs have diligently fulfilled their duties

21  as Class Representatives. All have expended significant effort and made personal sacrifices in

22  order to obtain an excellent result for the Classes they represent. The class representatives

23  participated in numerous aspects of the litigation, including responding to written discovery,

24  drafting declarations, preparing and sitting for depositions, advising counsel on factual

25  investigation and settlement, and class outreach. ECF No. 394 at 7–8. Over the course of over

26  three years, "Mr. Nevarez estimates that he has spent at least 72 hours working on this case; Ms.

27                                                          8

28

1   Nevarez estimates at least 90 hours; and Mr. DeFrancesco estimates at least 52 hours." ECF No.

2   394 at 7.

3       Accordingly, Plaintiffs' motion is GRANTED. The Court hereby approves: a service

4   award to Plaintiff Abdul Nevarez in the amount of $5,000; a service award to Plaintiff Priscilla

5   Nevarez in the amount of $5,000; and a service award to Plaintiff Sebastian DeFrancesco in the

6   amount of $5,000.

7   **III.    MOTION FOR ATTORNEY'S FEES, COSTS, AND EXPENSES**

8       Finally, Plaintiffs also filed a motion for reasonable attorney's fees, costs, and expenses.

9   ECF No. 408. Specifically, Plaintiffs move for $1,199,148.87 in out-of-pocket litigation costs and

10  expenses, and $12,258,003.53 in attorney's fees, which together amounts to the $13,457,152.40

11  cap on attorney's fees, costs, and expenses set forth in Section XIV.A of the Settlement

12  Agreement. The motion is unopposed, and no Class members have filed objections to the

13  Settlement Agreement. Below, the Court first considers the costs and expenses, before

14  considering the reasonableness of Plaintiffs' request for attorney's fees.

15      As the prevailing parties, Plaintiffs are entitled to recover their reasonable attorneys' fees,

16  costs and expenses. *See* 42 U.S.C. § 12205 (ADA) and Cal. Civ. Code § 52(a) (Unruh Civil

17  Rights Act). A party that obtains a judicially enforceable settlement agreement that provides

18  some of the relief sought is a "prevailing party" for purposes of fee-shifting statutes. *See, e.g., La*

19  *Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir.

20  2010); *Folsom v. Butte County Assn. of Govts.*, 32 Cal.3d 668, 671 (1982). Here, Plaintiffs have

21  prevailed under both federal and state law by achieving a global settlement that resolves all

22  federal and state law claims. The Settlement provides comprehensive injunctive relief to both

23  injunctive relief classes under both federal and state law and establishes a damages fund for the

24  damages class under California law. The factual and legal issues that were litigated would

25  reasonably be attributed to both federal and state law claims. Accordingly, both federal and state

26  law apply to Plaintiffs' application for fees, costs and litigation expenses.

27                                               9

**A. Costs and Expenses**

Plaintiffs' costs and out-of-pocket expenses, including expert witness fees, are recoverable. *See* 42 U.S.C. § 12205; *Lovell v. Chandler*, 303 F.3d 1039, 1058 (9th Cir. 2002). Through May 15, 2020, Class Counsel incurred $1,199,148.87 in litigation costs and expenses. Plaintiffs' costs and out-of-pocket expenses are well-documented. The Court finds that the declarations of Class Counsel and accompanying exhibits and the record in this case demonstrate that these costs and expenses were reasonable and necessary for the prosecution of this litigation. Accordingly, the Court GRANTS Class Counsel $1,199,148.87 in costs and out-of-pocket expenses.

**B. Attorney's Fees**

As discussed above, Section XIV.A of the Settlement Agreement caps Plaintiffs' request for attorney's fees, costs, and expenses at $13,457,152.40. Because Plaintiffs seek $1,199,148.87 in costs and expenses, which the Court awarded in full, Plaintiffs request the remaining $12,258,003.53 of the cap in attorney's fees. Although the Court grants Plaintiffs the full $12,258,003.53 amount in attorney's fees below, the Court's calculation of attorney's fees differs from that of Plaintiffs. The Court first discusses Plaintiffs' lodestar calculation before turning to the requested lodestar multiplier.

**1. Lodestar Calculation**

Plaintiffs state that their lodestar in the instant case is $11,605,473. ECF No. 408 at 13. The Court finds that the lodestar is reasonable and fair, with the exception of the hourly rate billed for contract attorneys, which the Court discusses below.

Specifically, Plaintiffs argue that their lodestar in the instant case was initially $12,994,251, which was then reduced by approximately 10.69% through the exercise of billing judgment[2] to arrive at the lodestar of $11,605,473. *See* ECF No. 408 at 20. The Court has reviewed the hours spent by Plaintiffs in litigating this case over the course of three-and-a-half years and finds that the hours

---

[2] Specifically, Plaintiffs explain that they "removed from their lodestar all time spent by attorneys and staff who billed less than 30 hours on the case . . . [and] exercised additional billing judgment as set forth in the declarations of counsel." ECF No. 408 at 20.

10

United States District Court
Northern District of California

expended are reasonable. This case involved over three years of contentious and extensive litigation, including the following:

- Three motions to dismiss filed by Defendants, which this Court largely denied;
- Eighteen joint discovery letters—for many of which the Court granted Plaintiffs full relief;
- Thirteen sets of document requests and interrogatories, fifteen sets of requests for admission, and propounding six sets of subpoenas for documents;
- Production of 3,400,000 pages of documents by Defendants and third parties;
- Fourteen days of inspections of the Stadium, parking lots, and connecting pedestrian rights of way, from which Plaintiffs identified over 2,600 physical barriers to access at the Stadium;
- 48 depositions, including depositions of 16 experts;
- Two sets of cross-motions for partial summary judgment;
- Eight formal mediations; and
- Many informal settlement discussions, several in-person with all counsel.

Thus, Plaintiffs' hours are amply justified in light of the extensive litigation that has occurred to date over the course of three and a half years.

Moreover, the Court has reviewed the billing rates for the attorneys, paralegals, and litigation support staff at each of the firms representing Plaintiffs and the Certified Classes in this case. The Court finds that these rates are reasonable in light of prevailing market rates in this district and that counsel for Plaintiffs have submitted adequate documentation justifying those rates, with the exception of the hourly rates billed by Schneider Wallace Cottrell Konecky LLP ("Schneider Wallace") for the use of staff attorneys.

However, as to the staff attorneys, the Court notes that Schneider Wallace requests a rate of $625 per hour for each of three staff attorneys. *See* ECF No. 408-1 ("Wallace Decl.") ¶ 117. However, at the July 16, 2020 Final Approval hearing, Mr. Wallace acknowledged that these attorneys are paid at an hourly rate substantially less than $625 per hour, which constitutes a markup

11

United States District Court
Northern District of California

of $595 per staff attorney per hour. Schneider Wallace requests $625 per hour for each of these three staff attorneys for a total of 1,811.9 hours of work, which the Court estimates to constitute a markup of $1,078,080.50 or about 15% of Schneider Wallace's lodestar. *See id.* Although the Court has historically declined to apply a "categorical rule that contract and staff attorneys must be billed at cost," the Court has previously rejected such a high markup on a contract attorney's hourly rate and instead awarded an hourly rate of $240.00. *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068, at *18–20 (N.D. Cal. Aug. 17, 2018). As in the Court's decision in *In re Anthem, Inc. Data Breach Litigation*, the Court will adopt the $240.00 hourly rate for Schneider Wallace's staff attorneys based on precedent and in the absence of any argument to justify a different markup on the staff attorney rate. *See id.* at *20 ("In future cases, the Court is willing to receive documentation justifying a lower or higher rate, but for purposes of the rough lodestar calculation here, the Court finds that $240.00 per hour for contract and staff attorney time is a reasonable rate."). At the July 16, 2020 Final Approval hearing, Mr. Wallace stated that he did not oppose the Court's adoption of the $240 hourly rate for these three staff attorneys. After adjusting Schneider Wallace's staff attorney rate to $240.00 per hour, the Court finds that the total lodestar of $11,605,473 is reduced to $10,907,891.50.

## 2. Lodestar Multiplier

Next, Plaintiffs argue that they are entitled to a positive lodestar multiplier of up to 1.5. However, the actual requested lodestar multiplier is significantly lower due to the $13,457,152.40 cap on attorney's fees, costs, and expenses. Specifically, to arrive at the requested attorney's fees amount of $12,258,003.53 from the lodestar of $10,907,891.50, Plaintiffs need only be entitled to a lodestar multiplier of approximately 1.124, which is a factor of four times less than the 1.5 lodestar multiplier they request.

The Court agrees that Plaintiffs are entitled to a lodestar multiplier of at least 1.124 in consideration of the following factors (1) contingent risk to counsel, (2) novelty and difficulty of the questions involved, (3) skill required to perform the legal service properly, (4) preclusion of

12

other employment by the attorneys, and (5) the result obtained and the importance of the lawsuit to the public. *See Ketchum v. Moses*, 24 Cal. 4th 1122, 1132 (2001); *Serrano v. Priest*, 20 Cal. 3d 25, 49 (1977).

In particular, the Court notes the outstanding result obtained for the class and the importance of the lawsuit to the public. Specifically, the Settlement Agreement "will remediate more than 2,600 barriers in [Levi's Stadium], the parking lots and the pedestrian rights of way that serve the Stadium," which is "over 99% of the barriers identified by Plaintiffs." ECF No. 408 at 23. Such relief will bring Levi's Stadium "into compliance with the 2010 [Americans with Disability Act Standards] or the 2019 [California Building Code], whichever provides greater access, thus dramatically improving accessibility and usability for person with mobility disabilities and their nondisabled companions." *Id.* The costs to remediate the over 2,600 barriers is estimated to cost Defendants at least $12.2 million. ECF No. 408-6 ¶ 67.

Moreover, the Settlement Agreement provides for a $24 million non-reversionary damages fund, which Plaintiffs believe to be "the largest such fund ever achieved in a case alleging claims under the public facilities and accommodations provisions of the ADA." *Id.* The Settlement Agreement prompted a participation rate of almost 94%. There were an estimated 5,779 potential Damages Class Members, and 5,418 claim forms were submitted. *See* ECF No. 395 at 5. Furthermore, there were no opt-outs and no objections. *See* ECF No. 411 at 2. At the July 16, 2020 Final Approval hearing, Plaintiffs estimated that the average recovery for each Damages Class Member would be at least $4,000, and on average over $4,400. The Court finds that the Settlement achieved by Plaintiffs' counsel provides considerable and substantial relief to the class members, which therefore justifies a lodestar multiplier of at least 1.124.

### 3. Percentage of Recovery Cross-Check

To guard against an unreasonable result, the Ninth Circuit generally encourages district courts to "cross-check[] their calculations against a second method." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 944 (9th Cir. 2011). However, the Ninth Circuit has explained

13

Case No. 16-CV-07013-LHK
ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; GRANTING MOTION FOR SERVICE AWARDS; AND GRANTING MOTION FOR ATTORNEY'S FEES, COSTS, AND EXPENSES

United States District Court
Northern District of California

United States District Court
Northern District of California

that in cases vindicating civil rights, "the relief sought—and obtained—is often primarily injunctive in nature and thus not easily monetized." *See id.* at 941.

In this case, the Court likewise finds that it would be difficult to monetize the extensive injunctive relief, which remediates over 2,600 access barriers at Levi's Stadium. Nonetheless, if the Court assumes that the approximately $12.2 million expected Stadium remediation cost is a good substitute to monetize the increased accessibility for the Stadium's patrons, ECF No. 408-6 ¶ 67, the amount of attorney's fees, including the 1.124 multiplier, would constitute about 24.7% of a "constructive common fund" in this case, which would be comprised of the $24 million Damages Fund, the approximately $12.2 million cost of injunctive relief, the $15,000 service awards, $12,258,003.53 attorney's fees, and $1,199,148.87 costs. *See In re Bluetooth*, 654 F.3d at 945 (calculating an analogous percentage-of-recovery using a "constructive common fund"). This result of 24.7% of the total recovery is below the 25% benchmark percentage and confirms that the requested $12,258,003.53 in attorney's fees is a reasonable amount. *See id.* at 945 ("If the lodestar amount overcompensates the attorneys according to the 25% benchmark standard, then a second look to evaluate the reasonableness of the hours worked and rates claimed is appropriate.") (quoting *In re Coordinated Pretrial Proceedings*, 109 F.3d 602, 607 (9th Cir.1997)).

Accordingly, based on the factors considered above and the applicable law, the Court finds that a lodestar multiplier of 1.124 is reasonable and justified.

**4. Total Attorney's Fees**

The Court finds that Plaintiffs are entitled to a lodestar of $10,907,891.50 and a multiplier of 1.124. Accordingly, the Court GRANTS Plaintiffs' full requested amount of $12,258,003.53 in attorney's fees.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' motion for final approval of the proposed class action settlement, GRANTS Plaintiffs' motion for service awards, and GRANTS

14

Plaintiffs' motion for attorneys' fees, costs, and expenses as follows:

- $15,000 in service awards, comprised of $5,000 for each of three class representatives: Abdul Nevarez, Priscilla Nevarez, and Sebastian DeFrancesco;

- $12,258,003.53 in attorneys' fees to Class Counsel; and

- $1,199,148.87 in costs and expenses to Class Counsel.

**IT IS SO ORDERED.**

Dated: July 23, 2020

_____
LUCY H. KOH
United States District Judge

Case No. 16-CV-07013-LHK
ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; GRANTING
MOTION FOR SERVICE AWARDS; AND GRANTING MOTION FOR ATTORNEY'S FEES, COSTS, AND
EXPENSES

United States District Court
Northern District of California

# EXHIBIT I

Joshua Konecky, Esq. (SBN 182897)
Nathan Piller, Esq. (SBN 300569)
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
Facsimile:  (415) 421-7105
jkonecky@schneiderwallace.com
npiller@schneiderwallace.com

Shanon Carson (admitted pro hac vice)
Sarah Schalman-Bergen  (admitted pro hac vice)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone:  (215) 875-3000
scarson@bm.net
Sschalman-bergen@bm.net

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT SHAW, et al., individually and on behalf of all others similarly situated, and as a proxy of the State of California on behalf of aggrieved employees<br><br>      Plaintiffs,<br><br>vs.<br><br>AMN SERVICES, LLC, KAISER FOUNDATION HOSPITALS, SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP, INC., and THE PERMANENTE MEDICAL GROUP, INC<br><br>      Defendants. | Case No. 3:16-cv-02816 JCS<br><br>[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR REASONABLE ATTORNEYS' FEES AND COSTS<br><br><br>Date: May 31, 2019<br>Time: 9:30 a.m.<br>Courtroom:  G, 15th Floor<br>Judge: Hon. Joseph C. Spero |

This matter came on for hearing before this Court on Plaintiffs' Counsel's Motion for Reasonable Attorneys' Fees and Cost pursuant to the Court's Order Re: Preliminary Approval of Class Action Settlement (Docket No. 159) on May 31, 2019.

Having considered the documents filed by the Parties in connection with the motion and the oral arguments of counsel, the Court finds as follows:

1.     Notice to the Class, including information regarding the requested award of attorneys' fees and costs, was directed to Class Members in a reasonable manner, and complied with Rule 23(h)(1) of the Federal Rules of Civil Procedure.

2.     Class Members have been given the opportunity to object in compliance with Fed. R. Civ. P. 23(h)(2).

3.     [No Class Member has objected to the requested fees and expenses.] OR [ ___ Class Members have submitted timely objections.  The overrules the objections for following reasons:]

4.     The settlement agreement provides that class counsel may seek up to $6,666,666.67 in attorneys' fees, plus their reasonably incurred litigation expenses. Plaintiffs' Counsel seeks $6,666,666.67 in attorneys' fees, plus their reasonably incurred litigation expenses, as provided in the settlement agreement. Defendants do not object to these amounts.

5.     Class counsel have substantiated their fee request with declarations describing their billing practices, billing rates, hours worked, work tasks performed and corresponding lodestar for the time invested into this case.  The declarations demonstrate a combined lodestar of approximately $2,770,526.50, as of February 24, 2019.  Counsel note that this does not include work performed on the motion for final approval, communicating with class members and the settlement administrator after February 24, 2019, preparing the case for final approval, and overseeing implementation of the settlement after final approval.

6.     Based on a fee request of $6,666,666.67, the declarations of class counsel documenting their lodestar shows that a fee award of this amount would result in a multiplier of

1    approximately 2.4 or less.  Class Counsel also seek reimbursement of actual out-of-pocket costs

2    of $185,850.01, which are documented in the declarations of class counsel as well.

3        7.    The declarations submitted in support of the motion demonstrate that the

4    attorneys representing the class have the experience and qualifications necessary to represent the

5    Class.

6        8.    A reasonable hourly rate is the prevailing rate charged by attorneys of similar skill

7    and experience in the relevant community. *Chalmers v. City of LosAngeles,* 796 F.2d 1205, 1210

8    (9th Cir. 1986).  The Court finds that the hourly rates charged by Plaintiffs' Counsel are within

9    the prevailing range of hourly rates charged by attorneys providing similar services in class

10   action, wage-and-hour cases in California, as shown by the Declarations of Joshua Konecky and

11   Richard Pearl.  The hourly rates of Class Counsel Schneider Wallace Cottrell Konecky Wotkyns

12   LLP also have consistently and recently been approved as reasonable by the courts. *See, e.g.,*

13   *Knapp v. Art.com, Inc.*, No. 3:16-cv-00768-WHO (N.D. Cal. October 24, 2018); *Janssen v.*

14   *Square, Inc*., Case No. CGC-16-549980, Superior Court of California, County of San Francisco,

15   Order dated September 26, 2018; *Villalpando v. Exel Direct Inc.*, 2016 WL 7740854, at *1 (N.D.

16   Cal. Dec. 12, 2016); *Winans v. Emeritus Corp.*, 2016 WL 107574, at *8 (N.D. Cal. Jan. 11,

17   2016); *Carnes v. Atria Senior Living Inc.*, Case No. 14-cv-02727-VC, Dkt. No. 115, at 4-5 (N.D.

18   Cal. July 12, 2016); *Meza v. S.S. Skikos, Inc.*, Case No. 3:15-cv-01889-TEH, Dkt. No. 58, at 4

19   (N.D. Cal. May 25, 2016).

20       9.    The Court further finds that the hourly rates of Class Counsel's co-counsel,

21   Berger Montague PC, also are within the prevailing range of hourly rates charged by attorneys

22   providing similar services in class action, wage-and-hour cases in California, as shown by the

23   Declaration of Shanon Carson.

24       10.   Generally, hours are reasonable if they were "reasonably expended in pursuit of

25   the ultimate result achieved in the same manner that an attorney traditionally is compensated by

26   a fee-paying client." *Hensley v. Eckerhart*, 461 U.S. 424, 431 (1983).  The Court finds that the

27

total hours worked by class counsel are reasonable, given the nature of the case and the defenses presented, the work Plaintiffs' Counsel had to undertake, the manner in which Plaintiffs' Counsel allocated their work, and the results achieved.

11.     Counsel also are entitled to a multiplier of their total lodestar.  *See Ketchum v. Moses*, 24 Cal.4th 1122, 1133-1132, 1138 (2001) (reasoning that contingency fees should be higher than fees for the same legal services paid concurrently with the provision of the services). The Court finds that the multiplier sought of 2.4 (as of the time of the filing of the motion) is reasonable and appropriate, given the documented lodestar, contingent risk, complexity, protracted nature of the case, the preclusion of counsel from other employment, and the favorable results achieved for class members.

12.     A common cross-check regarding the reasonableness of a fee award is its percentage of the total value of the benefits conferred on the class. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478-81 (1980).  Plaintiffs' fee request of $6,666,666.67 represents one-third (1/3) of the Gross Settlement Amount, which is reasonable under both applicable law, and in light of the contingent risk, Counsel's documented lodestar, the complex and protracted nature of the case, and strong result for the Class. *See id*. For example, the average net recovery in this case, even after awarding the full attorneys' fees and costs sought, is still approximately four times the per-workweek recovery (and approximately three times the per-person recovery) obtained in a previous class action settlement in this Court, involving a similar class and similar claims, against one of the same Defendants named in this litigation. *See O'Sullivan v. AMN Services, LLC*, 2014 WL 11514268 (N.D.Cal. 2014).

13.     Plaintiffs' Counsel are entitled to recover the out-of-pocket costs and litigation expenses they reasonably incurred in investigating, prosecuting, and settling this case. *In re Media Vision Tech. Sec. Litig.*, 913 F.Supp. 1362, 1366 (N.D. Cal. 1996).  The Court finds that Plaintiffs' Counsel's out-of-pocket costs and expenses of $185,850.01 are documented, and reasonable and necessary to the prosecution of this action, in light of the protracted nature of the

case, the vigorousness of Defendants' legal defense, the motion practice, amount of documentary evidence, witnesses and depositions, and the four mediations necessary to achieve the settlement.

14.     The Court therefore awards Plaintiffs' Counsel $6,666,666.67 in attorneys' fees and $185,850.01 in litigation expenses to be paid from the settlement fund pursuant to the terms and timeframe set forth in the settlement agreement.

IT IS SO ORDERED.

Dated: ___May 31___, 2019

_____
HON. JOSEPH C. SPERO
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION
FOR REASONABLE ATTORNEYS' FEES AND COSTS

# EXHIBIT J

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JAMES KNAPP, individually and on behalf of all others similarly situated, | Case No.: 3:16-CV-00768-WHO |
| Plaintiff, | |
| v. | **ORDER GRANTING PLAINTIFF'S RENEWED MOTION FOR ATTORNEYS' FEES AND COSTS** |
| ART.COM, INC., a California corporation; and DOES 1 through 50, inclusive, | |
| Defendants. | |

Plaintiff has moved for a second time for awards of attorneys' fees and costs to Class Counsel and has also moved to designate Public Justice Foundation and Public Counsel as substitute *cy pres* recipients. Dkt. No. 84. The Court heard argument regarding this motion on October 3, 2018 at 2:00 pm. Jason H. Kim appeared on behalf of Plaintiff. Yaas C. Hejazi appeared on behalf of Defendant. Timothy Mason Sandefur filed an objection, Dkt. No. 85, but did not appear. Based upon the documents filed with the Court and oral argument at the hearing, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. Proc. 52 as follows:

## FINDINGS OF FACT

1.      On June 30, 2017, Plaintiff filed his Unopposed Motion for Approval of Attorneys' Fees and Costs and Class Representative Service Award ("Motion"). Dkt. No. 69. The Motion was directed to Class members by posting the complete contents of the Motion and all supporting documents on the website established for this case, www.knappsettlement.com. The Class Notice informed Class members that the Motion would be so posted on this website.

2.      The Motion was based upon a Settlement preliminarily approved by the Court by Amended Order dated May 18, 2017. Dkt. No. 61. The Settlement Agreement provides that Plaintiff would seek an award of attorneys' fees and costs of $745,000 and to seek a service award to Plaintiff of $5,000. Settlement Agreement, Dkt. 53-1, ¶¶ 5.6, 5.7.

3.      The Settlement Agreement provides for injunctive relief in that Defendant Art.com has agreed that any regular price to which Art.com refers in any advertising will be the actual, bona fide price at which the item was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of business, honestly and in good faith. *Id.*, ¶ 5.1. Furthermore, pursuant to the terms of the Settlement Agreement, Defendant Art.com will implement a compliance program, which will consist of periodic (no less than once a year) monitoring, training and auditing to ensure compliance with relevant laws, for a period of at least four (4) years from the Effective Date of the Settlement. *Id.*

4.      The Settlement Agreement provides for monetary relief to the Class in the form of $10 vouchers,[1] which can be used for any product available on any of Defendant Art.com's e-commerce websites, including the taxes and shipping and handling associated with a product. Settlement Agreement, ¶ 3.19.  The vouchers are freely transferable and may be used multiple times until the amount is exhausted. The vouchers have an expiration date of 18 months after issuance. *Id.*

5.       On August 22, 2017, the Court filed its Order Granting Final Approval of Class Action Settlement and Granting in Part Motion for Attorney's and Costs, which finally approved the settlement and authorized payment of the class representative service award and Class Counsel's litigation costs. Dkt. No. 82; *Knapp v. Art.com, Inc.*, 283 F. Supp. 3d 823, 838 (N.D. Cal. Aug. 22, 2017) ("Final Approval Order").

6.      Pursuant to the Final Approval Order, the vouchers were distributed via email to all known class members and Art.com paid $61,242 to Class Counsel for litigation costs and $5,000 to Plaintiff for a service award.

7.      In the Final Approval Order, the Court also determined that the monetary relief provided to Class members constituted coupons within the meaning of the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1712. Based on this determination, the Court ordered that Class Counsel could refile a motion for attorneys' fees and costs after the voucher redemption rate had been determined.

8.      Plaintiff has now filed his Renewed Motion for Attorneys' Fees and Costs ("Renewed Motion") and provided information about the voucher redemption rate. As set forth in the Declaration of David Tjen, as of August 14, 2018, the total value of the vouchers redeemed pursuant to the Settlement is $142,940 and the vouchers were used in 14,567 transactions. Dkt. No. 84-7.

9.      To encourage the redemption of outstanding vouchers, Plaintiff contracted with the Settlement Administrator for a second email distribution on February 10, 2018 to remind

---

[1] The term "voucher" is used interchangeably with the term "coupon."

ORDER GRANTING RENEWED MOTION FOR ATTORNEYS' FEES AND COSTS
CASE NO. 3:16-CV-00768-WHO

1   Class members about the vouchers, at a cost of $22,858. Declaration of Jason H. Kim ("Kim

2   Decl."), Dkt. No. 84-1 at ¶ 7, and Exhibit A.

3          10.     Plaintiff has incurred additional costs since the first fee application in the total

4   amount of $1,858 for travel costs for the final approval hearing, filing and messenger costs for

5   various motions filed since Plaintiff's previous request for costs, and fees for computerized legal

6   research and Pacer. Kim Decl. at ¶ 30 and Exhibit E.

7          11.     The Renewed Motion and all supporting documents were posted on the website

8   established for this matter soon after it was filed. Kim Decl. at ¶ 39.

9                                    **CONCLUSIONS OF LAW**

10         1.      The Renewed Motion complies with the notice requirements of Fed. R. Civ. Proc.

11  23(h).

12         2.      Pursuant to *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1179 (9th Cir. 2013),

13  the Court performs the following calculation under 28 U.S.C. § 1712 based on information about

14  coupon redemptions:

15         The district court must perform two separate calculations to fully compensate class

16         counsel. First, under subsection (a), the court must determine a reasonable contingency

17         fee based on the actual redemption value of the coupons awarded. Second, under

18         subsection (b), the court must determine a reasonable lodestar amount to compensate

19         class counsel for any non-coupon relief obtained. This lodestar amount can be further

20         adjusted upwards or downwards using an appropriate multiplier. In the end, the total

21         amount of fees awarded under subsection (c) will be the sum of the amounts calculated

22         under subsections (a) and (b).

23         3.      Pursuant to subsection (a), the Court calculates a reasonable attorney fee of

24  $71,470 calculated as 50% of the $142,940 value of redeemed vouchers.

25         4.      Plaintiff has requested that this amount also include class administration expenses

26  and the anticipated *cy pres* distribution. The Court concludes that this amount should not include

27  either of these items. With respect to the *cy pres* distribution, the Court recognizes the substantial

28

1   amount of *cy pres* funding but notes it exists only because the claims rate was less than

2   anticipated.

3       5.    Pursuant to subsection (b), the Court calculates a reasonable attorney fee of

4   $280,754, which is approximately 50% of Class Counsel's total lodestar in this matter, because

5   the non-monetary relief was of material benefit to the class.

6       6.    The Court concludes that the hours expended by Class Counsel in this matter

7   were reasonable and that their hourly rates are reasonable based on the documentation provided

8   by Class Counsel. The detailed time reports of Class Counsel show that collectively they devoted

9   close to 1000 hours to this litigation and have a lodestar of $564,652. Kim Decl. at ¶ 16 and

10  Exhibits B & C; Declaration of Aubry Wand, Dkt. No. 84-8, at ¶ 17 and Exhibit A.

11      7.    The total fees awarded are $352,224, which is 62% of the lodestar amount, but

12  under the CAFA analysis demanded by 28 U.S.C. § 1712 and *In re HP Inkjet Printer Litigation*,

13  this amount is appropriate.

14      8.    In addition to attorneys' fees, Class Counsel requests reimbursement of litigation

15  costs in the amount of $24,716 for expenses that were not previously reimbursed. The Court is

16  satisfied that these costs are reasonable, and therefore, the Court grants Plaintiffs' request for

17  litigation costs in the amount of $24,716.

18      9.    Accordingly, the Court approves the award of attorneys' fees and costs in the

19  amount of $376,940 to Plaintiff from the $745,000 fund established pursuant to the Settlement

20  for Plaintiff's attorneys' fees and costs pursuant to Fed. R. Civ. Proc. Rule 23(h) based on the

21  findings of fact and conclusions of law set forth above.

22      10.    Plaintiff has additionally moved to substitute Public Justice Foundation and

23  Public Counsel as *cy pres* recipients in light of this Court's holding in the Final Approval Order

24  that the National Consumer Law Center was not an appropriate *cy pres* recipient due to its

25  current co-counsel relationship with one of Class Counsel. *Knapp*, 283 F. Supp. 3d at 835. The

26  Court finds that both entities are appropriate *cy pres* recipients. Class Counsel and counsel for

27  Art.com have disclosed their relationships with these two entities, Kim Decl., ¶¶ 35 & 37, and

28  the Court does not find that any of these relationships render either recipient conflicted.

11.     Thus, the Court orders that the amount of $306,818 be distributed in equal shares to the Public Justice Foundation and Public Counsel from the $745,000 fund established pursuant to the Settlement for Plaintiff's attorneys' fees and costs.

12.     In combination with the Final Approval Order, this Order resolves all claims and all the parties' rights and liabilities. Thus, upon entry of this Order, the Clerk of the Court is directed to enter Final Judgment pursuant to the Settlement Agreement, the Final Approval Order, this Order, and Fed. R. Civ. Proc. 58(b)(2).

**IT IS SO ORDERED.**

DATED:  October 24, 2018

_____
HONORABLE WILLIAM H. ORRICK
UNITED STATES DISTRICT COURT JUDGE

ORDER GRANTING RENEWED MOTION FOR ATTORNEYS' FEES AND COSTS
CASE NO. 3:16-CV-00768-WHO

# EXHIBIT K

E-SERVICE
62494084
Sep 26 2018
03:48PM
File & ServeXpress

**F I L E D**
Superior Court of California
County of San Francisco

SEP 2 6 2018

CLERK OF THE COURT
BY: _____
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

DEPARTMENT 305

|  |  |
|---|---|
| SPENCER JANSSEN, | No. CGC-16-549980 |
| Plaintiff, | |
| v. | ORDER GRANTING MOTION FOR APPROVAL OF PLAINTIFFS' ATTORNEYS' FEES AND COSTS |
| SQUARE, INC., a California Corporation doing business as trycaviar.com; and DOES 1 through 50, inclusive, | |
| Defendant. | |

Plaintiff Spencer Janssen ("Plaintiff") moved the Court for approval of attorneys' fees and costs, class representative service award, and settlement administration fees in connection with the settlement of the above matter with defendant Square, Inc. ("Defendant"). The motion came on for hearing on September 21, 2018, along with plaintiff's motion for final approval of the class action settlement. Appearances are noted in the record.

The Court has granted final approval of the settlement by separate written order (Final Approval Order), which provides for a cash Gross Settlement Amount of $2,200,000.00, permanent relief in the form of changed practices, and the payment by Defendant to the Settlement Administrator of all costs of administration currently estimated to be $34,260.00. (Unless otherwise indicated, capitalized terms correspond with those set forth in the Stipulation for Settlement.)

In the instant motion, Plaintiff seeks for Settlement Class Counsel $729,488.09 in attorneys' fees and $25,511.91 for reimbursement of out-of-pocket costs, for a total sum of $755,000.00. Plaintiff also

1

1  seeks a class representative service award in the amount of $7,500.00.  Defendant does not oppose

2  Plaintiff's motion, and the Court has received no objections to the requests from any Class Member.

3      Having fully considered the instant motion for fees, costs, and service award, the Court finds and

4  orders as follows.

5      1.    The Court awards Class Representative Spencer Janssen a service award in the amount of

6  $7,500.00 each.  This award is reasonable and justified in light of Plaintiff's contributions to the case and

7  the risks he undertook in serving as class representative.  This award is separate from and in addition to

8  any award to which Plaintiff may be entitled as a Class Member.  The service award shall be paid from

9  the Gross Settlement Amount.

10     2.    The Court awards Settlement Class Counsel reimbursement of their litigation costs and

11  expenses in the requested amount of $25,511.91.  The Court finds that the amount requested is reasonable

12  and was reasonably incurred in the prosecution of this action.  The award shall be paid from the Gross

13  Settlement Amount.

14     3.    The Court awards Settlement Class Counsel the requested $729,488.09 in attorneys' fees.

15  In awarding this amount, the Court considered the fact that courts typically award attorneys fees reflecting

16  one-third or 33.33% of the total recovery, and the fact that Settlement Class Counsel's requested fees is

17  less than this amount at 33.16% of the Gross Settlement Amount.  The Court also considered the risks and

18  potential value of the litigation, the contingent nature of the litigation, the novelty and complexity of the

19  issues, the skills shown by counsel, and counsel's number of hours worked and asserted hourly rates.

20  There was no objection to the settlement and no objection to the fee request.  Based on these factors, the

21  Court finds that the requested fee amount of $729,488.09 is reasonable in this case.  The award shall be

22  paid from the Gross Settlement Amount.

23     4.    Finally, pursuant to the terms of the Settlement Agreement, Defendant shall pay the

24  Settlement Administrator's costs, capped at $34,260.00, separately from the Gross Settlement Amount.

25     IT IS SO ORDERED.

26

27  Dated:  September 26, 2018

_____
Mary E. Wiss
Judge of the Superior Court

28

2

*Janssen v. Square, Inc.* CGC-16-549980  Order Granting Motion for Attorneys' Fees, Costs, and Service Award

# Superior Court of California
County of San Francisco

SPENCER JANSSEN,

        Plaintiff,

vs.

SQUARE, INC., a California Corporation
doing business as trycaviar.com; and DOES 1
through 50, inclusive,

        Defendants.

Case Number:  CGC-16-549980

**CERTIFICATE OF ELECTRONIC SERVICE**
(CCP 1010.6(6) & CRC 2.260(g))

    I, T. Michael Yuen, Clerk of the Superior Court of the County of San Francisco, certify that I am not a party to the within action.

    On September 26, 2018, I electronically served the ORDER GRANTING MOTION FOR APPROVAL OF PLAINTIFFS' ATTORNEYS' FEES AND COSTS via File & ServeXpress on the recipients designated on the Transaction Receipt located on the File & ServeXpress website.

Dated:  September 26, 2018

                T. Michael Yuen, Clerk

By: _____
                Sean Kane, Deputy Clerk

# EXHIBIT L

Kralowec Law, P.C.
Attn: Kralowec, Kimberley
750 Battery Street
Suite 700
San Francisco, CA   94111____

Kun, Michael S.
One California street
26th Floor
San Francisco, CA   94111-5427

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Bartoni<br><br>           Plaintiff/Petitioner(s)<br><br>VS.<br><br>American Medical Response<br>           Defendant/Respondent(s)<br>(Abbreviated Title) | No. <u>RG08382130</u><br><br>Order<br><br>Motion for Attorney Fees<br>Granted |

The Motion for Attorney Fees filed for Todd Wilhoyte and Heather Murray and Cameron Francis and Laura Bartoni was set for hearing on 07/12/2019 at 11:00 AM in Department 21 before the Honorable Winifred Y. Smith.  The Tentative Ruling was published and was contested.

The matter was argued and submitted, and good cause appearing therefore,

IT IS HEREBY ORDERED THAT:

The motion is granted.

See order filed September 13, 2019.

Dated:  09/17/2019

*Facsimile*

_Winifred Y. Smith_
Judge Winifred Y. Smith

Order

Superior Court of California, County of Alameda
Rene C. Davidson Alameda County Courthouse

Case Number:  RG08382130
Motion for Attorney Fees of 09/17/2019

## DECLARATION OF SERVICE BY MAIL

I certify that I am not a party to this cause and that a true and correct copy of the foregoing document was mailed first class, postage prepaid, in a sealed envelope, addressed as shown on the foregoing document or on the attached, and that the mailing of the foregoing and execution of this certificate occurred at
1225 Fallon Street, Oakland, California.

Executed on 10/16/2019.
Chad Finke  Executive Officer / Clerk of the Superior Court

By    C. W

_____
                                                      Deputy Clerk

| SHORT TITLE: Bartoni VS American Medical Response | CASE NUMBER: RG08382130 |
| --- | --- |

ADDITIONAL ADDRESSEES

Schneider Wallace Cottrell Konecky
Wotkyns LLP
Attn:  Schneider, Todd M.
2000 Powell St.
Suite 1400
Emeryville, CA    94608_____

Epstein Becker & Green, P.C.
Attn:  Kun, Michael S.
1925 Century Park East
Suite 500
Los Angeles, CA    90067-2506

Order

# EXHIBIT M

ENDORSED
FILED
ALAMEDA COUNTY

NOV 1 8 2016

CLERK OF THE SUPERIOR COURT
By
**CHRISTOPHER WRIGHT JR**

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ALAMEDA

| | |
|---|---|
| MARTIN MARINE, on behalf of himself and all others similarly situated, | Case No. RG07358277 |
| Plaintiffs, | [proposed] ORDER OF FINAL APPROVAL AND JUDGMENT |
| vs. | Date: November 18, 2016 |
| INTERSTATE DISTRIBUTOR CO., a Washington corporation doing business in California, and DOES 1 through 100, inclusive. | Time: 11:00 a.m.<br>Dept.: 21<br>Judge: Hon. Winifred Y. Smith<br>Reservation No. R-1778157 |
| Defendants. | |

1   PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

2   and MOTION FOR SERVICE AWARDS came on for hearing on November 18, 2016 at

3   11:00 a.m., in Department 21 of the Superior Court of California, County of Alameda.

4   Having considered the proposed class Settlement Agreement, the Parties' Motions for

5   Attorneys' Fees, Costs and Expenses, Plaintiffs' Motion for Final Approval of Class Action

6   Settlement and Plaintiffs' Motion for Service Awards, and the Memoranda of Points and

7   Authorities in support of those Motions, the Declaration of Guy B. Wallace in Support of

8   Plaintiffs' Motion for Preliminary Approval, the Declaration of David Breshears in Support of

9   Plaintiffs' Motion for Preliminary Approval and the Declaration of Martin Marine in Support of

10  Plaintiffs' Motion for Service Awards, as well as the Declaration of Derek Smith Regarding Notice

11  Procedures, the Court-approved notice, and the argument of counsel at the hearing thereon, the

12  Court hereby FINDS, ORDERS, ADJUDGES as follows:[1]

13  **I.      FINAL CERTIFICATION OF THE CLASS**

14  The Court granted class certification in this matter on August 13, 2012 of the following

15  class:

16      [A]ll persons employed by defendant Interstate Distributor Company as local
        hourly drivers in the State of California from November 28, 2003, through the
17      date of mailing the notice of certification and opportunity to opt out.

18  The parties have presented no new facts or changed circumstances that would disturb the

19  Court's findings on class certification.  Moreover, IDC does not oppose class certification for

20  purposes of settlement.  Accordingly, the Court finds that, consistent with its prior Order, the

21  requirements of Code of Civil Procedure § 382 are satisfied.  The Court hereby FINALLY

22  CERTIFIES the following class:

23

24

---

25  [1] The Court, for purposes of this Order of Final Approval and Judgment, adopts and incorporates
    the terms and definitions set forth on pages 6-21 of the Amended Joint Stipulation of Settlement
26  and Release Agreement (the "Settlement Agreement").  A true and correct copy of the Settlement
    Agreement may be found as Exhibit A to the Declaration of Guy B. Wallace in Support of
27  Amended Joint Stipulation of Class Action Settlement which was filed with this Court on July 14,
    2016.
28

---

1

Those individuals who are identified by IDC as having been employed by IDC as a "Local Hourly Driver" in the State of California at any time commencing from November 28, 2003 through the date the preliminary approval of the proposed settlement is ordered [July 6, 2016].

## II.   APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL

On August 13, 2012, the Court certified this matter as a class action, and appointed Named Plaintiff Martin Marine to represent the litigation class of California Local Hourly Drivers. The parties have presented no new facts or changed circumstances that would disturb the Court's previous findings with respect to Mr. Marine's adequacy, and therefore APPOINTS Mr. Marine as Class Representative of the above-referenced Class.

The Court previously appointed Schneider Wallace Cottrell Konecky Wotkyns LLP ("Schneider Wallace"), Keegan & Baker, LLP ("Keegan & Baker") and Advantage Law Group as Class Counsel due to their extensive experience in prosecuting wage and hour class actions.  The Court APPOINTS them as Class Counsel.

## III.   FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Pursuant to this Court's Preliminary Approval Order, the Claims Administrator, KCC, distributed the approved Class Notice to the Class. Based on review of the Declaration of Derek Smith re: Notice Procedures ("Smith Decl."), the Court is satisfied that compliance with the Court's preliminary approval Order was accomplished in all material respects.  The form and manner of notice constituted the best practicable notice under the circumstances, and fully met the requirements of procedural due process and California Rule of Court 3.769(f).

The Court has carefully reviewed the terms of the proposed Settlement, as well as the Declaration of Guy B. Wallace in Support of Preliminary Approval of Settlement describing Plaintiffs' investigation into the claims and defenses in this matter, the discovery conducted by the parties, and the settlement process.  The Court finds that the Settlement is the product of informed, non-collusive, and arm's-length negotiations.  The Court further finds that the Settlement confers a monetary benefit of approximately $1,467,500 on the Class in exchange for their release of claims, which is properly limited to any claims alleged in this matter, or could have been alleged based on

the facts contained in the pleadings. This is a good result for the Class in light of the significant risks of legislative preemption and the risks and delay of further litigation. Based on the papers submitted by the parties, the Court's familiarity with this matter, and the favorable response of the Class, the Court finds that the proposed Settlement is fair, reasonable, and adequate.

### A.    Response of the Settling Class

The response of the Class has been overwhelmingly positive. Notice was mailed to all 710 Class Members. KCC received zero requests for exclusion and zero objections from the Class Members. Smith Decl. ¶¶ 7-8. The lack of requests for exclusion and objections supports the Court's conclusion that the Settlement is fair, reasonable, and adequate.

Accordingly, the Court FINALLY APPROVES the proposed Settlement. In accordance with the terms of the Amended Joint Stipulation of Class Action Settlement and Release Agreement, except as to such rights or claims as may be created by the Settlement Agreement, Plaintiff Marine and the Marine Class Members and their successors in interest (the "Marine Releasors"), fully release and discharge Defendant and any and all parent, subsidiary and affiliated entities including any of their current and former directors, officers and employees (the "Releasees") from any and all claims, whether known or unknown, that were or could have been alleged or asserted in the Marine Action based on the facts alleged in the Marine Complaint for failure to provide and/or record meal or rest periods, as set forth in the Release of Claims in the Amended Joint Stipulation of Class Action Settlement and Release Agreement at Section II.6.

## IV.    DISTRIBUTION OF THE SETTLEMENT FUND

### A.    Appointment of the Claims Administrator

The Court APPROVES the appointment of KCC as the settlement Claims Administrator, and directs payment of $25,000 for services rendered by KCC as Claims Administrator. The Court finds this amount to be fair and reasonable.

### B.    Service Award to the Class Representatives

Plaintiffs seek a service award in the amount of $7,500 for Named Plaintiff and Class Representative Marine. Plaintiff Marine has submitted a Declaration detailing the time and effort he expended in furtherance of the class claims, and the risks he assumed in vindicating the rights

1    of the Class.  Specifically, Plaintiff Marine expended considerable time and effort reviewing

2    pleadings, responding to written discovery, appearing for deposition, advising Class Counsel

3    regarding IDC's policies and practices, and reviewing the Settlement Agreement herein.  *See*

4    Declaration of Martin Marine in Support of Motion for Service Awards ¶¶ 5-33.  The requested

5    service award is also supported by the risks associated with bringing this lawsuit, the protracted

6    nature of this litigation, and the important public policies underlying the Plaintiffs' claims.

7        The service award of $7,500 for Plaintiff Marine is hereby APPROVED.

8        **C.    Attorneys' Fees, Cost and Litigation Expenses**

9        Having considered the Motions of Schneider Wallace, Advantage Law Group and Keegan

10   & Baker for an Award of Reasonable Attorneys' Fees, Costs and Expenses; the Parties' proposed

11   Settlement Agreement; Schneider Wallace's Combined Opposition to Advantage Law Group and

12   Keegan & Baker's Motions for an Award of Reasonable Attorneys' Fees, Costs and Expenses;

13   Advantage Law Group and Keegan & Baker's Replies to same; Schneider Wallace's Sur-Reply to

14   same; the Memoranda of Points and Authorities in support of those Motions; the Declarations of

15   Guy B. Wallace, Barry Goldstein, Daniel B. Edelman, Marc Kroop and Patrick Keegan submitted

16   in support thereof; relevant legal authority; the record in this case; and the argument of Counsel at

17   the hearing thereon; the Court hereby FINDS, ORDERS, and ADJUDGES as follows:

18       The settlement in this case represents the resolution of nine years of litigation in multiple

19   different forums alleging violations of California Labor Code §§ 226, 226.7, and 512, Wage Order

20   9-2001, and Business and Professions Code §§ 17200-17208. .

21       Class Counsel seek an award of $1,150,000 in attorneys' fees, costs and litigation expenses.

22   The Court grants Class Counsel's request for reasonable attorneys' fees, costs and expenses, to be

23   apportioned among the Class Counsel firms as follows.  Following mediation before the Hon.

24   Edward A. Panelli (Ret.) at the Judicial Arbitration and Mediation Service ("JAMS") on

25   November 17, 2016, the parties were able to come to an agreement regarding the allocation of the

26   award of attorneys' fees, costs and litigation expenses.  The sum of $650,000 shall be allocated to

27   the firms of Schneider Wallace, Daniel B. Edelman, Esq., and Barry Goldstein, Esq. in full

28   satisfaction for their attorneys' fees, costs and expenses incurred in the above captioned matter.

1  The sum of $500,000 shall be allocated to the firms of Advantage Law Group and Keegan & Baker

2  in full satisfaction for their attorneys' fees, costs and expenses in the above-captioned matter.

3      "In California, the fee setting inquiry ordinarily begins with the 'lodestar,' i.e., the number

4  of hours reasonable expended multiplied by the reasonable hourly rate." *Building a Better*

5  *Redondo, Inc. v. City of Redondo Beach*, 203 Cal. App. 4th 852, 870 (2012).  As an initial matter,

6  the Court finds the hourly rates claimed by Class Counsel are reasonable.  Given their knowledge,

7  skill and expertise in complex class action cases such as this one, Class Counsel's partner and

8  associate rates fall within the range of rates charged by similarly experienced and qualified

9  attorneys practicing in this area.  Further, Class Counsel have shown that their hourly rates are

10  comparable to and in-line with the hourly rates charged by numerous firms practicing in the San

11  Francisco Bay Area on a non-contingency basis and which do similar work.

12      The Court has reviewed the Declarations of Guy B. Wallace, Marc Kroop, Patrick N.

13  Keegan, Daniel B. Edelman, and Barry Goldstein describing the work performed by Class Counsel

14  on this case, as well as the time records submitted in support of the application for an award of

15  fees.  The Court concludes that Class Counsel's fees are justified under the statutory fee

16  methodology.  As discussed above, Class Counsel's hourly rates fall within the range of hourly

17  rates charged by attorneys of comparable experience, qualifications, and ability who do complex

18  class action litigation in the Bay Area.  Moreover, considering the amount of discovery, motion

19  practice, and appellate litigation that occurred in this matter, the difficulty and risks associated with

20  the legal and factual claims that were litigated herein, and the aggressive defense mounted by

21  Interstate Distributor Co., the total maximum lodestar and costs t of $1,150,000.00 claimed by

22  Class Counsel is reasonable.

23

24      Accordingly, the Court APPROVES Class Counsel's requested attorneys' fees, costs and

25  expenses in the amount of $1,150,000, to be split amongst Class Counsel with the sum of $650,000

26  allocated to the firms of Schneider Wallace, Daniel B. Edelman, Esq., and Barry Goldstein and the

27  sum of $500,000 to the firms of Advantage Law Group and Keegan & Baker in full satisfaction for

28  all attorneys' fees, costs and litigation expenses in the above-captioned matter.  Consistent with

1   this Court's practice, 10% of this fee award shall be held by the Claims Administrator in an

2   interest-bearing account pending submission and approval of a final compliance status report after

3   completion of the distribution process.

4       A compliance hearing shall be scheduled for _June 29, 2017_. A

5   compliance status report must be filed with this Court at least 5 court days prior to the compliance

6   hearing.

7   **V.    JUDGMENT & CONTINUING JURISDICTION**

8       The parties are otherwise directed to comply with the terms and definitions set forth on

9   pages 6-21 of the Settlement Agreement, a true and correct copy of which may be found as Exhibit

10  A to the Declaration of Guy B. Wallace in Support of Amended Joint Stipulation of Class Action

11  Settlement which was filed with this Court on July 14, 2016.   Pursuant to California Rule of Court

12  3.769(h), the Court HEREBY MAKES AND ENTERS JUDGMENT, and shall retain jurisdiction

13  and oversight of the settlement proceedings.

14

15

16  Dated: November _18_, 2016

17                                          WINIFRED Y. SMITH
                                            JUDGE OF THE SUPERIOR COURT

18

19

20

21  Approved as to form:

22

23

24  David R. Ongaro
    Attorneys for Defendant IDC

25

26

27

28

---

6

# EXHIBIT N

2016 WL 7740854

Editor's Note: Additions are indicated by Text and deletions by ~~Text~~.

Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

Daniel Villalpando, individually and on behalf
of all others similarly situated, Plaintiff(s),

v.

Exel Direct Inc., et al., Defendant(s).
Tafiti Shekur, individually and on behalf
of all others similarly situated, Plaintiff,

v.

Exel Direct Inc., et al., Defendants.

Consolidated Cases: Case Nos. 3:12-
cv-04137-JCS, 4:13-cv-03091-JCS
|
Signed 12/09/2016
|
Filed 12/12/2016

**Attorneys and Law Firms**

Guy Burton Wallace, Todd Michael Schneider, Joshua Geoffrey Konecky, Nathan Bunnell Piller, Schneider Wallace Cottrell Konecky Wotkyns LLP, Emeryville, CA, Jennifer Lynn Connor, Cohelan Khoury & Singer, San Diego, CA, Denise Lissette Diaz, Ira Spiro, Spiro Law Corp., Jeffrey Durham Holmes, Holmes Law Group, APC, Los Angeles, CA, for Plaintiff(s).

Angela S. Cash, James H. Hanson, Ryan Wayne Wright, Scopelitis Garvin Light Hanson & Feary, Indianapolis, IN, Christopher Chad McNatt, Jr., Scopelitis Garvin Light Hanson & Feary, LLP, Pasadena, CA, Adam Carl Smedstad, Scopelitis Garvin Light Hanson & Feary, P.C., Camille Annette Olson, Kyle Ronald Hartman, Seyfarth Shaw LLP, Chicago, IL, Andrew J. Butcher, Scopelitis, Gavin, Light, Hanson & Feary, Washington, DC, Christopher Adam Crosman, David D. Kadue, Richard Burk Lapp, Seyfarth Shaw LLP, Los Angeles, CA, Robin Elizabeth Devaux, Seyfarth Shaw LLP, San Francisco, CA, for Defendant(s).

DHL Express (USA), Inc., pro se.

**[~~PROPOSED~~ ] ORDER GRANTING PLAINTIFFS'
NOTICE OF MOTION AND MOTION
FOR ATTORNEYS' FEES AND COSTS**

HON. JOSPEH C. SPERO, United States District Judge

**\*1** This matter came on for hearing before this Court on Class Counsel's Motion for an Award of Attorneys' Fees and Cost pursuant to the Court's Order Re: Preliminary Approval of Class Action Settlement (Docket No. 342) on December 9, 2016.

Having considered the documents filed by the Parties in connection with the motion and the oral arguments of counsel, the Court finds as follows:

1. Notice to the Class, including information regarding the requested award of attorneys' fees and costs, was directed to Class Members in a reasonable manner, and complied with Rule 23(h)(1) of the Federal Rules of Civil Procedure.

2. Class Members have been given the opportunity to object in compliance with Fed. R. Civ. P. 23(h)(2).

3. No Class Member has objected to the requested fees and expenses.

4. The settlement agreement provides that class counsel may seek up to $4,500,000.00 in attorneys' fees, plus their reasonably incurred litigation expenses. Class Counsel seeks $4,500,000.00 in attorneys' fees, plus their reasonably incurred litigation expenses, as provided in the settlement agreement. Defendant does not object to these amounts.

5. Class counsel have substantiated their fee request with declarations describing their billing practices, billing rates, hours worked, work tasks performed and corresponding lodestar for the time invested into this case. The declarations demonstrate a lodestar of approximately $4,309,338.50, as of August 5, 2016. Counsel note that this does not include work performed on the fee motion, communicating with class members and the settlement administrator after August 5, 2016, preparing the case for final approval, and overseeing implementation of the settlement after final approval.

6. Based on a fee request of $4,500,000.00, the declarations of class counsel documenting their lodestar shows that a fee award of this amount would result in a multiplier of less than 1.05, and perhaps no multiplier at all by the time the settlement is fully implemented. Class Counsel also seek reimbursement of actual out-of-pocket costs of $496,572.14, which are documented in the declarations of class counsel as well.

7. The declarations submitted in support of the motion demonstrate that the attorneys representing the class have the experience and qualifications necessary to represent the Class.

8. A reasonable hourly rate is the prevailing rate charged by attorneys of similar skill and experience in the relevant community. *Chalmers v. City of LosAngeles*, 796 F.2d 1205, 1210 (9th Cir. 1986). The Court finds that the hourly rates charged by class counsel are within the prevailing range of hourly rates charged by attorneys providing similar services in class action, wage-and-hour cases in California, as shown by the Declarations of Joshua Konecky and Richard Pearl. The hourly rates of Lead Counsel Schneider Schneider Wallace Cottrell Konecky Wotkyns, also have consistently and recently been approved as reasonable by the courts. *See, e.g., Winans v. Emeritus Corp.*, 2016 WL 107574, at *8 (N.D. Cal. Jan. 11, 2016); *Carnes v. Atria Senior Living Inc.*, Case No. 14-cv-02727-VC, Dkt. No. 115, at 4-5 (N.D. Cal. July 12, 2016); *Meza v. S.S. Skikos, Inc.*, Case No. 3:15-cv-01889-TEH, Dkt. No. 58, at 4 (N.D. Cal. May 25, 2016); *Wren v. RGIS Inventory Specialists*, 2011 WL 1230826, at *22 (N.D. Cal. Apr. 1, 2011), as well as the other orders cited by counsel in their motion.

**\*2** 9. Generally, hours are reasonable if they were "reasonably expended in pursuit of the ultimate result achieved in the same manner that an attorney traditionally is compensated by a fee-paying client." *Hensley v. Eckerhart*, 461 U.S. 424, 431 (1983). The Court finds that the total hours worked by class counsel are reasonable, given the nature of the case and the defenses presented, the work class counsel had to undertake, the manner in which class counsel allocated their work, and the results achieved.

10. Counsel also are entitled to a multiplier of their total lodestar. *See Ketchum v. Moses*, 24 Cal.4th 1122, 1133-1132, 1138 (2001) (reasoning that contingency fees

should be higher than fees for the same legal services paid concurrently with the provision of the services). The Court finds that the multiplier sought of 1.05 or less is reasonable and appropriate, given the documented lodestar, contingent risk, complexity, protracted nature of the case, the preclusion of counsel from other employment, and the favorable results achieved for class members.

11. A common cross-check regarding the reasonableness of a fee award is its percentage of the total value of the benefits conferred on the class. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478-81 (1980). Plaintiffs' fee request of $ 4,500,000 represents one-third of the Settlement Fund, which is reasonable under both applicable law, and in light of the contingent risk, Counsel's documented lodestar, the complex and protracted nature of the case, and strong result for the Class. *See id.* The fee request for one-third of the common fund also is reasonable when compared with Counsel's total lodestar. *See Laffitte v. Robert Half Int'l Inc.*, 2016 WL 4238619, at *15 (Cal. Aug. 11, 2016) (reasoning that courts may "double-check" the reasonableness of a percentage fee through a lodestar calculation).

12. Counsel are entitled to recover the out-of-pocket costs and litigation expenses they reasonably incurred in investigating, prosecuting, and settling this case. *In re Media Vision Tech. Sec. Litig.*, 913 F.Supp. 1362, 1366 (N.D. Cal. 1996). The Court finds that class counsel's out-of-pocket costs and expenses of $496,572.14 are documented, and reasonable and necessary to the prosecution of this action, in light of the protracted nature of the case, the vigorousness of Exel's legal defense, the motion practice, amount of documentary evidence, witnesses and depositions, and the extent of trial preparation necessitated by the timing of the settlement.

13. The Court therefore awards Class Counsel $4,500,000.00 in attorneys' fees and $496,572.14 in litigation expenses to be paid from the settlement fund pursuant to the terms and timeframe set forth in the settlement agreement.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2016 WL 7740854

**Villalpando v. Exel Direct Inc., Slip Copy (2016)**

2016 WL 7740854

---

**End of Document**                                   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

---

# EXHIBIT O

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS CARNES, | Case No. 14-cv-02727-VC |
| Plaintiff, | |
| v. | **ORDER GRANTING MOTION FOR ATTORNEYS' FEES, COSTS, AND SERVICE AWARD** |
| ATRIA SENIOR LIVING, INC., | Re: Dkt. No. 105 |
| Defendant. | |

## <u>INTRODUCTION</u>

Class Counsel's Motion for Attorneys' Fees, Costs, and Service Award ("Motion") came on for hearing on July 7, 2016, at 10:00 a.m., in Courtroom 4 of the United States District Court for the Northern District of California, San Francisco Division, with the Honorable Vince Chhabria presiding.

Class Counsel moved the Court for an award of $2,112,000.00 in attorneys' fees; $135,000.00 in litigation expenses and costs; and a service award in the amount of $3,500 to Named Plaintiff Juliana Clegg, as successor-in-interest to the Estate of Thomas Carnes.

Having considered the Parties' Stipulation of Settlement; Class Counsel's Motion for Attorneys' Fees, Costs, and Service Award ("Motion"); the briefings in support of the Motion; the Declarations and exhibits attached thereto of Kathryn Stebner, Chris Healey, Guy Wallace, Michael Thamer, Robert Arns, Timothy Needham, Richard M. Pearl, Kathleen Wyatt, and

Juliana Clegg; the relevant legal authority; the record in this case; and the argument of Counsel at the hearing thereon; the Court hereby FINDS, ORDERS, AND ADJUDGES as follows:[1]

## I. THE AGREED-UPON ATTORNEYS' FEE REQUEST IS FAIR, REASONABLE, AND JUSTIFIED

California law governs the attorneys' fee award here because Plaintiff's claims arise under California law. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002).

In this action, Plaintiff asserted jury claims under the Consumers Legal Remedies Act, Cal. Civil Code § 1750 *et seq.*, which requires mandatory payment of attorneys' fees and costs to successful plaintiffs. The attorneys' fees provision of the CLRA, Section 1780(e), states: "The court *shall* award court costs and attorney fees to a prevailing plaintiff in litigation filed pursuant to this section." Thus, some award of attorneys' fees is mandatory. *Kim v. Euromotors West*, 149 Cal.App.4th 170, 177 (2007).

Under California law, the Court is empowered to award reasonable attorneys' fees and costs when a litigant proceeding in a representative capacity has achieved a "substantial benefit" for a class of persons. *Serrano III v. Priest*, 20 Cal.3d 25, 38 (1977) ("*Serrano III*"). There are two methods of calculating attorneys' fees in civil class actions: (1) the lodestar/multiplier method, and (2) the percentage of recovery method. *Wershba v. Apple Computer, Inc.*, 91 Cal. App.4th 224, 254 (2001). While the Court has discretion, one recognized approach is to determine the plaintiffs' lodestar fees, determine whether a multiplier is warranted, and then "cross check" the propriety of that amount as a percentage of the overall recovery. *See Lealao v. Beneficial Cal., Inc.*, 82 Cal.App.4th 19, 49-50 (2000).

### A. Class Counsel's Fee Request is Reasonable Under the Lodestar Analysis

Under California law, "[t]he primary method for establishing the amount of reasonable attorney fees is the lodestar method." *In re Vitamin Cases*, 110 Cal.App.4th 1041, 1052 (2003),

---

[1] The Court, for purposes of this Order Granting Motion for Attorneys' Fees, Costs, and Service Award, adopts and incorporates the terms and definitions set forth in the Stipulation of Settlement ("SS").

(internal quotation marks and citations omitted).  *See also, Serrano III*, 20 Cal.3d at 49 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974)); *Lealao*, 82 Cal. App. 4th at 39; *In re Bluetooth Headset Products Liab. Lit.*, 654 F.3d 935, 941 (9th Cir. 2011) (citing *Cunningham v. County of Los Angeles*, 879 F.2d 481, 488 (9th Cir. 1988)).  Applicable precedents support the reasonableness of the fees requested here.

### 1.       Class Counsels' Lodestar Amounts Are Reasonable

The lodestar method requires the Court to determine a "touchstone" or lodestar figure based on a compilation of time spent and reasonable hourly compensation for each attorney. *See, e.g.*, *Graham v. DaimlerChrysler Corp.*, 34 Cal. 4th 553, 579 (2004); *Vo v. Las Virgenes Mun. Water Dist.*, 79 Cal.App.4th 440, 445 (2000); *Lealao*, 82 Cal.App.4th at 26; *Hanlon v. Chrysler Group, Inc.*, 150 F.3d 1011, 1029 (9th Cir. 1998).  Generally, hours are reasonable if they were "reasonably expended in pursuit of the ultimate result achieved in the same manner that an attorney traditionally is compensated by a fee-paying client." *Hensley v. Eckerhart*, 461 U.S. 424, 431 (1983).  *See also Ketchum v. Moses*, 24 Cal.4th 1122, 1133 (2001) (fee award should be "fully compensatory [and] absent circumstances rendering the award unjust, an attorney fee award should ordinarily include compensation for *all* the hours reasonably spent.") (emphasis in original); *Serrano III*, 20 Cal. 3d at 49 (counsel are entitled to compensation for all hours reasonably expended); *Hensley*, 461 U.S. at 435-36; *Caudle v. Bristow Optical Co., Inc.*, 224 F.3d 1014, 1028 (9th Cir. 2000); *Cabrales v. County of Los Angeles*, 935 F.2d 1050, 1052-53 (9th Cir. 1991).

Class Counsel attest that, in total, they have expended 5,601.8 hours for an unadjusted lodestar of $2,675,653.46.  The Court has reviewed the Declarations of Kathryn Stebner, Chris Healey, Guy Wallace, Michael Thamer, Robert Arns, and Timothy Needham describing the work performed by Class Counsel on this case.  The total hours claimed by Class Counsel are approved based on evidence presented of the work performed, including detailed summaries, and the results achieved.  The Court is also satisfied that Class Counsel have exercised appropriate and significant billing judgment by not requesting fees for unproductive or

duplicative work.

Accordingly, the Court finds the number of hours that Class Counsel devoted to this case is reasonable.

### 2. Class Counsel's Hourly Rates Are Well Within the Prevailing Rates for Similar Complex Civil Litigation in the Bay Area

The second step is determining the reasonable market value of the attorneys' services at an hourly rate. *Ketchum*, 24 Cal.4th at 1134; *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984); *PLCM Group, Inc. v. Drexler*, 22 Cal.4th 1084, 1094 (2000); *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008). This rule applies even when attorneys normally work on a contingent fee basis. *See, e.g., Robertson v. Fleetwood Travel Trailers of Cal., Inc.*, 144 Cal.App.4th 785, 818 (2006); *Blanchard v. Bergeron*, 489 U.S. 87, 96 (1989). Rates are reasonable if they are "within the range of reasonable rates charged by and judicially awarded comparable attorneys for comparable work." *Children's Hosp. and Med. Ctr. v. Bonta*, 97 Cal.App.4th 740, 783 (2002). A reasonable hourly rate is the prevailing rate charged by attorneys of similar skill and experience in the relevant community. *PLCM Group, Inc. v. Drexler*, 22 Cal.4th 1084, 1095 (2000). Declarations regarding the prevailing market rate in the relevant community are sufficient to establish a reasonable hourly rate. *See Widrig v. Apfel*, 140 F.3d 1207, 1209 (9th Cir. 1998).

In support of their motion, Settlement Class Counsel submitted a declaration from Richard M. Pearl, who opined on the reasonableness of the rates charged by counsel. (Declaration of Richard M. Pearl, ¶¶ 12-13). Mr. Pearl relies on rates that have been approved in other cases and refers to the rates charged by other firms within the Northern District that are similar to the rates charged by Settlement Class Counsel. Class Counsel also attested that the rates requested here are also similar or equal to Class Counsel's rates in class actions against operators of assisted living and skilled nursing facilities previously approved by U.S. District Judge Haywood Gilliam in *Winans v. Emeritus Corporation* (N.D. Cal. Jan. 19, 2016, case no. 3:13-cv-03962-HSG, dkt. 133), Chief Judge of the Northern District of California Claudia

Wilken in *Wehlage v. Evergreen at Arvin LLC*, 2012 U.S. Dist. LEXIS 144152 at *8 (N.D. Cal. Oct. 4, 2012), and by U.S. District Judge Jeffrey S. White in *Walsh v. Kindred Healthcare, et al.*, 2013 U.S. Dist. LEXIS 176319 (N.D. Cal. Dec. 16, 2013). Class Counsel also attested that rates similar or equal to Class Counsel's rates in this case were also previously approved in the Superior Court of California by Judge Robert Freedman in *Valentine v. Thekkek Health Services, Inc., et. al.* Alameda County Superior Court, Case No. RG-10546266; by Judge Wynne Carvill in *Shuts v. Covenant Holdco LLC*, Alameda County Superior Court, Case No. RG 10551807, *Dalao v. LifeHouse Holdings, LLC* Alameda County Superior Court, Case No. RG12660602, and *Correa v. SnF Management Company, LLC* Alameda County Superior Court, Case No. RG-13664498; by Judge Jane Johnson in *Montreuil v. The Ensign Group, Inc.* Los Angeles County Superior Court, Case No. BC449162; by Judge Richard Kramer in *Hernandez v. Golden Gate Equity Holdings, LLC*, San Francisco County Superior Court, Case No. CGC-10-505288); and by Judge George Hernandez, Jr., in *Regina v. Hycare, Inc.*, Alameda County Superior Court, Case No. RG-12647573. Class Counsel also attested that rates similar to those of Class Counsel have been approved in a wide range of litigation outside of the context of skilled nursing facility class actions. *Campbell v. Nat'l Passenger R.R. Corp.*, 718 F.Supp.2d 1093, 1099-1100 (N.D. Cal. 2010) (finding reasonable market rates from $380 to $775 for employment and civil rights attorneys in the Northern District; *In re: TFT-LCD (Flat Panel) Anti-Trust Litigation*, 3:07-md-1827 SI (N.D. Cal.), December 27, 2011 Order, Dkt. 4436 at 2 (finding lodestar amount reasonable in a cross-check analysis).

Accordingly, the Court finds the hourly rates requested by Class Counsel to be reasonable and in line with the market rates charged by skilled counsel in the Bay Area in similar complex civil litigation.

**B.     The Percentage Cross-Check Supports the Reasonableness of the Fee Request**

The Court will also conduct a cross-check regarding the reasonableness of a fee award by reviewing its percentage of the total value of the benefits conferred on the class. *Serrano III*,

20 Cal.3d at 34; *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478-81 (1980); *Lealao*, 82 Cal. App. 4th at 49-50; *Graciano*, 144 Cal.App.4th at 164; 3 *Newberg on Class Actions*, § 14.7.

Viewed from a "percentage of fund" perspective, the fee request here of $2,112,000.00 represents 33% of the Settlement Fund of $6,400,000.00.[2] California federal trial courts have approved fee requests within that range in comparable consumer class actions.[3] *See Knight v. Red Door Salons, Inc.*, No. 08-01520 SC, 2009 WL 248367, at \*5 (N.D. Cal. Feb. 2, 2009); *Singer v. Becton Dickinson and Company,* No. 08-CV-821–IEG (BLM), 2010 WL 2196104 at \*8 (S.D. Cal. June 1, 2010); *Ingalls v. Hallmark Mktg. Corp*., Case No. 08cv4342, Doc. No. 77 (C.D. Cal. Oct. 16, 2009); *Cicero v. Direct TV, Inc*., 2010 WL 2991486, at \*7 (C.D. Cal. July 27, 2010).

---

[2] In calculating the overall settlement benefit, the Court considers the total potential benefits made available. *Chavez v. Netflix, Inc.*, 162 Cal.App.4th 43, 46 (2008) (approving methodology that adds fees and class payments in the percentage of recovery cross-check). The overall settlement benefit includes items such as attorneys' fees, costs, class notice and administration costs and other settlement amounts that defendant has agreed to pay. *Id.*

Moreover, the settlement's non-monetary term further supports the reasonableness of the fee request given the overall settlement value. When awarding attorneys' fees, "[a] court should take into account any non-monetary benefits obtained for the class." 5-23 Moore's Federal Practice — Civil § 23.124(b)(i). "[I]t is important to recognize that in some class actions the monetary relief obtained is not the sole determinant of an appropriate attorney fees award." Advisory Committee Notes to Fed. R. Civ. P. 23(h) (2003 Amendments) (citation omitted). "Incidental or nonmonetary benefits conferred by the litigation are a relevant circumstance" in determining fee awards. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1049 (9th Cir. 2002), *cert. denied*, 537 U.S. 1018 (2002); *Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003); *Pokorny v. Quixtar, Inc.*, No. C 07-0201 SC, 2013 U.S. Dist. LEXIS 100791, at \*5 (N.D. Cal. July 18, 2013) (Conti, J.) ("The court may properly consider the value of injunctive relief obtained as a result of settlement in determining the appropriate fee."); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F.Supp.2d 503, 525 (E.D.N.Y. 2003); *Steiner v. Williams*, Nos. 99 Civ. 10186 (JSM), 99 Civ. 1479 (JSM), 2001 WL 604035, at \*4 (S.D.N.Y. May 31, 2001) ("[C]ounsel may recover a fee if the settlement conferred a substantial non-monetary benefit."); *Linney v. Cellular Alaska Partnership*, Nos. C-96-3008 DLJ, C-97-0203 DLJ, C-97-0425 DLJ, C-97-0457 DLJ, 1997 WL 450064, at \*6-7 (N.D. Cal. July 18, 1997) (court considers injunctive relief in evaluating fairness of overall settlement fee request); *Colgan v. Leatherman Tool Group, Inc.*, 135Cal.App.4th 663, 702-03 (2006) (upholding a fee award under section 1021.5 where the suit resulted in the end of an unfair and deceptive practice).

[3] In determining what constitutes a reasonable fee in ordinary common fund cases, Ninth Circuit courts apply a "benchmark" percentage of 25 percent of the total fund as the starting point for the analysis, adjusting that amount as appropriate based on many of the same "enhancement" factors considered in the lodestar-multiplier analysis. *See Vizcaino*, 290 F.3d at 1047-50.

Accordingly, the Court finds this percentage cross-check demonstrates the propriety of Class Counsel's requested fee.

The Court GRANTS Class Counsel's Motion for reasonable attorneys' fees in the amount of $2,112,000.00.

## II.  THE REIMBURSEMENT OF LITIGATION EXPENSES IS WARRANTED

Counsel are entitled to recover their reasonable out-of-pocket costs and litigation expenses. *Staton*, 327 F.3d at 974; *In re Media Vision Tech. Sec. Litig.*, 913 F.Supp. 1362, 1366 (N.D. Cal. 1996) (citing *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 391-92 (1970)). The CLRA provides for reimbursement of costs incurred. *Cal. Hous. Fin. Agency v. E. R. Fairway Assocs. I*, 37 Cal.App.4th 1508, 1514 (1995). Reimbursement of costs and litigation expenses is also necessitated under the common fund doctrine of *Trustees v. Greenough*, 105 U.S. 527, 533 (1881).

Class Counsel seek the reimbursement of costs in the amount of $135,000.00.

Upon review of Class Counsel's declarations and attached exhibits, the Court finds that the requested expenses are reasonable and should be reimbursed.

The Court GRANTS Class Counsel's Motion for reimbursement of reasonable litigation expenses and costs in the amount of $135,000.00.

## III.  THE SERVICE AWARD FOR THE NAMED PLAINTIFF IS FAIR

Pursuant to the Parties' Stipulation of Settlement, Class Counsel request the Court to approve services awards in the amount of $3,500.00 to Named Plaintiff Juliana Clegg, successor-in-interest to the estate of Thomas Carnes. (SS, ¶ X.B.3, p. 22.) The Court finds the amount requested here is within the range approved by trial courts in this Circuit. *See, e.g., Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW, 2010 U.S. Dist. LEXIS 49482, at *6 (N.D. Cal. Apr. 22, 2010) (approving $20,000 service award); *Singer v. Becton Dickinson and Co.*, No. 08-CV-821 IEG (BLM), 2009 WL 4809646, at *6 (S.D. Cal. Dec. 9, 2009) (approving $25,000 service award); *Razilov v. Nationwide Mut. Ins. Co*., No. 01-CV-1466-BR, 2006 WL 3312024 (D. Or. Nov. 13, 2006) (approving $10,000 service awards).

Class representatives play a crucial role in bringing justice to those who would otherwise be without a remedy. *See, e.g.*, *Bowens v. Atl. Maint. Corp.*, 546 F.Supp.2d 55, 80 (E.D.N.Y. 2008); *Clark* v. *Am. Residential Servs. LLC*, 175 Cal.App.4th 785, 804 (2009). The Ninth Circuit has recognized that named plaintiffs are eligible for reasonable incentive payments. *Staton*, 327 F.3d at 977; *Rodriguez v. West Pub'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009) (service awards "are fairly typical in class action cases."). Such awards are "intended to compensate class representatives for work done on behalf of the class [and] make up for financial or reputational risk undertaken in bringing the action." *Rodriguez*, 563 F.3d at 958-59. Relevant considerations include: the actions the class representatives took to protect the interests of the class; the degree to which the class benefited from those actions; the amount of time and effort the class representatives expended in pursuing the litigation; the risk to named plaintiff in commencing suit, both financial and otherwise; the notoriety and personal difficulties encountered by named plaintiff; the duration of litigation; and the personal benefit (or lack thereof) to the named as a result of the litigation. *See Cook v. Niedert*, 142 F. 3d 1004, 1016 (7th Cir. 1998); *Clark*, 175 Cal.App.4th at 804-07.

Here, Named Plaintiff Juliana Clegg served as the representative and Guardian ad Litem to Mr. Carnes in the prosecution of this lawsuit for over two years. After Mr. Carnes' death, Ms. Clegg continued the case prosecution as Mr. Carnes' legal successor. Named Plaintiff lent her name to this case and thus subjected herself to public attention. The Named Plaintiff her name to this case and thus subjected herself to public attention. Class Counsel and Named Plaintiff attests that Named Plaintiff had initial concerns about participating in a lawsuit and understood there was a risk she would be ordered to pay Defendant's costs should the litigation prove unsuccessful. Nonetheless, she agreed to become a class representative to stand up for vulnerable current and future residents. Named Plaintiff gave significant assistance to Class Counsel taking on the weighty responsibility of representing the Class, which was time-consuming and emotionally difficult. She made this case possible when many other potential class representatives were reluctant to step forward and represent the class. Her contributions

helped produce the substantial benefits now offered to the Settlement Class.

Accordingly, the Court finds the service award here is appropriate in light of the efforts and risks taken by the Named Plaintiff.

Accordingly, the Court GRANTS service awards in the amount of $3,500.00 to Named Plaintiff Juliana Clegg as successor-in-interest to the estate of Thomas Carnes.

**IT IS SO ORDERED.**

Dated: July 12, 2016

_____
VINCE CHHABRIA
United States District Judge

# EXHIBIT P

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JOSE MEZA,<br><br>    Plaintiff,<br><br>  v.<br><br>S.S. SKIKOS, INC., et al.,<br><br>    Defendants. | Case No. 15-cv-01889-TEH<br><br>**ORDER GRANTING FINAL<br>APPROVAL OF SETTLEMENT** |

   Plaintiff Jose Meza ("Plaintiff") alleges nine causes of action under the federal Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA"), the California Labor Code, applicable Industrial Welfare Commission ("IWC") Wage Order, Business and Professions Code §§ 17200, *et seq*. ("UCL"), and the California Labor Code Private Attorneys General Act of 2004 ("PAGA"). In his first cause of action, Plaintiff alleges, on behalf of an FLSA collective, that Defendants violated the FLSA by knowingly failing to maintain records of all hours worked, knowingly failing to compensate employees for all hours worked, and knowingly failing to compensate employees at a rate of one and one-half times their regular hourly rate for hours worked in excess of 40 hours per week.

   Plaintiff's remaining eight causes of action arise under California law: (1) failure to pay overtime and double time compensation; (2) failure to pay for all hours worked; (3) failure to provide meal periods, or compensation in lieu thereof; (4) failure to provide rest periods, or compensation in lieu thereof; (5) failure to furnish accurate itemized wage statements; (6) waiting time penalties; (7) violation of the UCL as a result of unfair, unlawful, and fraudulent business practices; and (8) civil penalties pursuant to PAGA.

   After extensive informal discovery, the Parties engaged in mediation before David Rotman on November 19, 2015. As a result of the mediation, the Parties reached a settlement. After the mediation, the Parties finalized a settlement agreement. The Parties

United States District Court
Northern District of California

United States District Court
Northern District of California

1    entered into a fully-executed Stipulation of Settlement and Release ("Stipulation of

2    Settlement" or "Settlement") on January 15, 2016.  Docket. No. 45-1.

3          The Court preliminarily approved the Settlement on February 24, 2016.  Docket No.

4    48.  Before the Court are two motions: Plaintiff's Unopposed Motion for Final Approval of

5    Settlement (Docket No. 54); and Plaintiff's Motion for Attorneys' Fees, Costs, and Service

6    Payment (Docket No. 50).  The Court held a hearing on the pending motions on May 23,

7    2016.  Having carefully considered the Parties' written and oral arguments and the record

8    as a whole, the Court HEREY ORDERS as follows:

9          1.    The Court finds that it has jurisdiction over the claims of the California Class

10   Members and California FLSA Class Members asserted in this proceeding and over all

11   Parties to the action.

12         2.    The Court finds that zero (0) California Class Members have objected to the

13   Settlement and zero (0) California Class Members have requested exclusion from the

14   Settlement.  Additionally, 108 Class Members have validly opted in to the California

15   FLSA Class.  *See* Gomez Decl. at 3 (Docket No. 56).

16         3.    The Court GRANTS Final Approval of the terms and conditions contained in

17   the Settlement (Docket No. 45-1).  The Court finds that the terms of the Settlement appear

18   to be within the range of possible approval, pursuant to Federal Rule of Civil Procedure 23

19   and applicable law.

20         4.    The Court finds that: (1) the settlement amount is fair and reasonable to the

21   Class Members when balanced against the probable outcome of further litigation relating

22   to class certification, liability and damages issues, and potential appeals; (2) significant

23   informal discovery, investigation, research, and litigation have been conducted such that

24   counsel for the Parties at this time are able to reasonably evaluate their respective

25   positions; (3) settlement at this time will avoid substantial costs, delay, and risks that

26   would be presented by the further prosecution of the litigation; and (4) the Settlement has

27   been reached as the result of intensive, serious, and non-collusive negotiations between the

28   Parties.  Accordingly, the Court finds that the Settlement was entered into in good faith.

United States District Court
Northern District of California

5.     The Court makes final its earlier conditional certification of the California Class for settlement purposes.  The "California Class" is defined to mean "all current and former Drivers employed by Defendants in California during the California Class Period."  The "California Class Period" is "the period beginning April 27, 2011 through the date of Preliminary Approval (February 24, 2016)."

6.     The Court makes final its earlier conditional certification of the California FLSA Class for settlement purposes.  The "California FLSA Class" is defined as "all current and former Drivers who were employed by Defendants in California during the California FLSA Class Period."  The "California FLSA Class Period" is "the period beginning April 27, 2012 through the date of Preliminary Approval (February 24, 2016)."

7.     The Court finds that the approved Notice Packet (Exs. 1-3, Docket No. 45-1) constituted the best notice practicable under the circumstances and is in full compliance with the applicable laws and the requirements of due process.  The Court further finds that the Notice fully and accurately informed the Class Members of all material elements of the Settlement, of their right to be excluded from the Settlement, and of their right and opportunity to object to the Settlement.  A full opportunity has been afforded to the Class Members to participate in this hearing and all Class Members and other persons wishing to be heard have been heard.  Accordingly, the Court determines that all California Class Members, since none timely and properly executed a request for exclusion, are bound by this Order and the Judgment.

8.     The Court FINALLY APPOINTS Simpluris, Inc. as the Settlement Administrator, and approves its reasonable administration costs not to exceed $12,000.00.

9.     The Court FINALLY APPOINTS Schneider Wallace Cottrell Konecky Wotkyns LLP and Villegas Carrera, LLP, as Class Counsel.

10.    The Court FINALLY APPROVES Class Counsel's request for attorneys' fees of one-third of the Maximum Settlement Amount, or $233,310.00.  This amount is justified under the common fund doctrine, the range of awards ordered in this District and Circuit, the excellent results obtained, substantial risk borne by Class Counsel in litigating

1  this matter, the high degree of skill and quality of work performed, financial burden

2  imposed by the contingency basis of Class Counsel' representation of Plaintiff and the

3  Class Members, and additional work required of them to bring this Settlement to

4  conclusion.  The Court finds the fees award further supported by the lodestar crosscheck,

5  whereby it finds that Schneider Wallace Cottrell Konecky Wotkyns LLP, and Villegas

6  Carrera, LLP's hourly rates are reasonable, the estimated hours expended are reasonable.

7  In fact, Class Counsel's total fees are $613,164.20.  Thus, the Court applies a negative

8  multiplier to Class Counsel's lodestar in issuing this fee award.

9        11.    The Court FINALLY APPROVES Class Counsel's request for costs in the

10  amount of $15,927.83.

11        12.    The Court FINALLY APPOINTS Plaintiff Jose Meza as the Class

12  Representative, and approves a service payment of $7,500.00 to Mr. Meza, finding that

13  this award is fair and reasonable for the work he provided to the Class Members and

14  considering the broad release he executed.

15        13.    The Court FINALLY APPROVES the $10,000.00 PAGA allocation.

16  $7,500.00 of that allocation shall be paid to the LWDA, and the remaining $2,500.00 shall

17  be disbursed to the Class.

18        14.    Good cause appearing, the Court APPROVES the following implementation

19  schedule:

20        A.    The Payment Obligation and Class Release Date shall be (a) the date

21  of this Final Approval Order, if there are no objectors; or (b) in the event that there are

22  objectors, 32 days after service of notice of entry of this Final approval Order and

23  Judgment on the Parties and all objectors to the Settlement without any appeals or requests

24  for review being taken; or (c) the date on which orders affirming this Final Approval Order

25  and Judgment or denying review after exhaustion of all appellate remedies issue, if appeals

26  or requests for review have been taken.

27        B.    Defendant shall provide the Settlement Administrator with the

28  Settlement Funds on or before May 31, 2016.

C. The Settlement Administrator shall mail or wire all required payments no later than 14 days after the Payment Obligations and Class Release Date.

D. The deadline to cash Individual Settlement Payment checks shall be 180 days after the checks are mailed.

15. With this Final Approval of the Settlement, all claims that are released as set forth in the Settlement are hereby barred.

16. The Court permanently enjoins all of the California Class Members who did not timely exclude themselves (opt-out) from the Settlement Agreement, California FLSA Class Members who submit a timely and valid Opt-In Form, and the LWDA from pursuing or seeking to reopen any "Released Claims" (as defined in the Settlement Agreement) against any of the "Released Parties" (also as defined in the Settlement Agreement).

17. The Court dismisses this action with prejudice and will enter Judgment consistent with the Settlement Agreement and this Order.

18. The Court shall retain jurisdiction to enforce the terms of the Settlement.

**IT IS SO ORDERED.**

Dated: 05/25/16

_____
THELTON E. HENDERSON
United States District Judge

United States District Court
Northern District of California

5

# EXHIBIT Q

Case 2:16-cv-02576-ROS Document 283-1 Filed 09/18/20 Page 219 of 402

JS-6

|  |  |
|---|---|
| Breana Jeter-Polk,<br><br>                    Plaintiff,<br><br>           v.<br><br>Casual Male Store, LLC et al.,<br><br>                    Defendants. | EDCV 14-891-VAP (DTBx)<br><br>**ORDER APPROVING CLASS<br>SETTLEMENT AND<br>ATTORNEYS' FEES AND COSTS** |

On May 16, 2016, Plaintiff Breana Jeter-Polk filed an unopposed Motion for Final Approval of Class Action Settlement and Attorneys' Fees and Costs ("Motion" or "Mot."), seeking judicial approval of an agreement to settle claims against Defendants Casual Male Store, LLC, and Destination XL Group, Inc. (Doc. Nos. 54, 55.)  After consideration of the papers filed in support of the Motion, the Court GRANTS the Motion.

## I.     BACKGROUND

Casual Male is a national men's clothing retailer with about 225 stores, some of which are in California.  (Mot. at 2.)  Casual Male employed Plaintiff as an assistant store manager at its Victorville location from December 2012 through April 2013.  (Id.)  Plaintiff and Class Members were and are nonexempt, hourly employees.  (Id.)

Plaintiff alleges that Causal Male's compensation and break policies violate California law because Plaintiff requires employees to work off the clock, during

1

meal and rest breaks, without proper compensation.  (FAC ¶ 3.)  These alleged violations cause derivative issues, including failure to pay premium pay for missed breaks, failure to provide accurate, itemized wage statements, and failure to pay all wages owed after termination of employment.  (Id.)  Plaintiff alleges also that each store performs similar services and is subject to the same policies and procedures. (Id.)  Casual Male denies these allegations, claiming that it has been, and is, in full compliance with California labor law.  (Answer ¶ 16-17.)

## A.  PROCEDURAL HISTORY

### 1.  Allegations

On April 2, 2014, Plaintiff filed this class action in San Bernardino County Superior Court.  (Cottrell Decl. at ¶ 6.)  The case was removed to the U.S. District Court, and Plaintiff filed her First Amended Complaint on July 11, 2104.  ("FAC" (Doc. No. 24).)  In her FAC, Plaintiff alleges the following causes of action and requests for relief under the California Labor Code and applicable Industrial Welfare Commission ("IWC") Wage Orders:

(1) failure to authorize, permit, and/or make available meal and rest periods;

(2) failure to compensate for all hours worked;

(3) failure to pay overtime wages;

(4) unpaid wages and waiting time penalties;

(5) failure to provide itemized wage statements;

(6) violation of California Business and Professions Code §§ 17200 ("UCL");

(7) penalties pursuant to § 2699(a) of the California Private Attorney General Act ("PAGA"); and

(8) penalties pursuant to § 2699(f) of the PAGA.

(FAC ¶¶ 11-37.)

## 2.  Discovery

The Parties contend that they engaged in extensive discovery focused on the relevant claims, policies, and practices at issue in this case, including written discovery, depositions, and document production.  (Cottrell Decl. ¶ 7.)  Plaintiff conducted interviews of approximately 90 Class Members, approximately 25% of the class membership.  (Id.)  The Parties contend also that Class Counsel researched thoroughly the legal principles related to the claims Plaintiff alleges against Defendant.  (Id.)

## 3.  Mediation

The Parties mediated this dispute on May 5, 2015, but were unable to reach a settlement.  (Cottrell Decl. ¶ 12.)  The Parties continued in arm's-length settlement talks in the months that followed and successfully reached a settlement on November 25, 2015.  (Id.)  The Parties filed a Notice of Settlement on December 11, 2015.  (Doc. No. 42.)

## 4.  Damages

Class Counsel calculated damages from data obtained during interviews with approximately 25% of the Class Members and by taking the payroll and timekeeping data from a random sample of 15% of the Class Members.  (Cottrell Decl. ¶ 8.)  In addition, Class Counsel analyzed averages and made assumptions from information in discovery.[1]  (Id.)  The evidence from the interviews and information provided by

---

[1] Specifically, there are 386 class members at issue, of whom 92 were current employees and 294 were former employees.  (Cottrell Decl. ¶ 8.)  The average wage was $9.15.  (Id.)  The total number of shifts worked by class members during the class period is 74,134.  Based on a projection of the 15% sample, there have been 69,680

Defendants appeared to show 90% non-compliant rest breaks, 75% non-compliant meal breaks, and that Class Members worked off the clock approximately 30 minutes a day.[2] (Id.)

After receiving more information from Defendant that affected the initial valuation, Class Counsel revisited the damages calculations. (Cottrell Decl. ¶ 10.) Defendant's timekeeping data showed that a majority of the meal breaks during the class period were compliant, which diminishes greatly the value of the meal break claims. (Id.) Class Counsel's interviews with additional Class Members revealed that the number of reported rest break violations were fewer than projected initially. (Id.) Similarly, the statistical averages from additional Class Members' interviews showed that the amount of time allegedly worked off-the-clock was lower than what was reported in the initial interviews. (Id.) Hence, the value of the substantive and derivative claims decreased greatly. (Id.)

Class Counsel calculated the high-end recovery for Class Members to be over $1,000,000.00, including both substantive and derivative claims. (Id. ¶ 11.) The evidence revealed a 20% non-compliant meal breaks rate, reducing Defendant's liability to approximately $60,000.00. (Id.) Similarly, the number of reported rest break violations decreased from the initial projected noncompliance rate, to a 50% rate, reducing Defendant's liability exposure to approximately $330,000.00. (Id.)

---

shifts worked by class members. In addition, Defendant's counsel informed Class Counsel that class members worked an additional 4,454 shifts.

[2] Relying on these statistics and further assuming that Plaintiff and the Class Members would certify all of their claims and prevail at trial, Class Counsel calculated total damages, including all penalties, to be $2,588,434.00. (Cottrell Decl. ¶ 11.)

The new averages from additional Class Members' interviews revealed that the amount of time worked off-the-clock was significantly lower than reported in the initial interviews.  (<u>Id.</u>)  These additional Class Members reported only working off-the-clock about 21 minutes each day.  (<u>Id.</u>)  Thus, the amount owing for uncompensated, off-the-clock work decreased to approximately $225,000.00.  (<u>Id.</u>)  Also, Class Counsel reduced Defendant's liability for statutory penalties after factoring in the risks of continued litigation and Defendant's good faith defenses.  (<u>Id.</u>)  Accordingly, with this additional information, Class Counsel negotiated a settlement for a lower amount, approximately 46% of the revised damages calculation. (<u>Id.</u>)

## B.  SETTLEMENT CLASS

An employee is a member of the Class if he or she fits within the following description:

> "all current and former hourly, non-store manager employees, including keyholders, sales associates, and assistant store managers, working at Casual Male's Casual Male XL anchor and/or outlet stores in California during the California class period, which is from April 2, 2010, through the date of the order granting preliminary approval, other than those excluded from the Class because (a) they participated in the settlement of the lawsuit entitled <u>Argam Iskandaryan, et al. v. Casual Male Retail Group, Inc.</u>, Los Angeles Superior Court Case No. BC452452 and (b) their employment with Defendant ceased on or before February 7, 2012."

(Cottrell Decl.¶ 16.)

## II.  LEGAL STANDARD

Under Rule 23(e) of the Federal Rules of Civil Procedure, "claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e).  A court must engage in a two-step process to approve a proposed class action settlement.  First, the court must determine whether the proposed settlement deserves preliminary approval.  Nat'l Rural Telecomms. Coop. v. DirecTV, Inc., 221 F.R.D. 523, 525 (C.D. Cal. 2004).  Second, after notice is given to Class Members, the Court must determine whether final approval is warranted.  Id.  A court should approve a settlement pursuant to Rule 23(e) only if the settlement "is fundamentally fair, adequate and reasonable." Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1375 (9th Cir. 1993); accord In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 458 (9th Cir. 2000) (citing Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998)).

A court must balance the following factors to determine whether a class action settlement is fair, adequate, and reasonable:

1.  the strength of the plaintiff's case;

2.  the risk, expense, complexity, and likely duration of further litigation;

3.  the risk of maintaining class action status throughout the trial;

4.  the amount offered in settlement;

5.  the extent of discovery completed and the stage of the proceedings;

6.  the experience and views of counsel;

7.  the presence of a governmental participant; and

8.  the reaction of the Class Members to the proposed settlement.

Torrisi, 8 F.3d at 1375; accord Linney v. Cellular Alaska Partnership, 151 F.3d 1234, 1242 (9th Cir. 1998); Hanlon, 150 F.3d at 1026.

"In addition, the settlement may not be the product of collusion among the negotiating parties." <u>In re Mego Fin. Corp. Sec. Litig.</u>, 213 F.3d at 458. These factors are not exclusive, and one factor may deserve more weight than the others depending on the circumstances. <u>Torrisi</u>, 8 F.3d at 1376. In some instances, "one factor alone may prove determinative in finding sufficient grounds for court approval." <u>Nat'l Rural Telecomms. Coop.</u>, 221 F.R.D. at 525–26 (citing <u>Torrisi</u>, 8 F.3d at 1376). In addition, "[t]he involvement of experienced class action counsel and the fact that the settlement agreement was reached in arm's length negotiations, after relevant discovery had taken place create a presumption that the agreement is fair." <u>Linney v. Cellular Alaska Partnership</u>, 1997 WL 450064, *5 (N.D. Cal. July 18, 1997), <u>aff'd</u>, 151 F.3d at 1234.

## III.  DISCUSSION

### A.  FINAL APPROVAL OF THE SETTLEMENT

#### 1. Approval of the Settlement Terms

As discussed below, after balancing the <u>Torrisi</u> factors, the Court grants final approval of the settlement.

##### a.  Strength of the Plaintiff's Case and Future Risks

As noted in the Court's Preliminary Approval Order, the claims under the California Labor Code are strong because resolution of Plaintiff's claims center around the uniform policies and practices of Casual Male, rather than any treatment Class Members experienced on an individual level. (Cottrell Decl. ¶ 32.) The alleged class claims would be resolved through common forms of proof, such as Casual Male's uniform policies, and would not require inquiries specific to individual Class Members. (<u>Id.</u>)

The Settlement Agreement provides each Class Member with the relief requested in Plaintiff's Complaint and available under the Labor Code.  (Id. ¶ 33.) The Settlement was reached after arm's-length negotiations.  It is likely that further lengthy and complex litigation would have taken place absent the Parties' agreement to settle the case because Casual Male could raise several defenses to Plaintiff's wage and hour claims. (Id.)

Given the relative strength of Plaintiff's claims, and the risks and costs associated with future complex litigation, the Settlement Agreement terms appear to be reasonable.  Hence, this factor favors final approval of the settlement.

### b.    Risk of Maintaining Class Action Status throughout Trial

The Court found previously that the risk of losing class action status in the future was low because all Class Members suffered the same type of injury in the same way.  The Court, however, may revisit the certification of the class at any time before entry of final judgment.  See Fed. R. Civ. P. 23(c)(1)(C).  Where there is a risk that class certification might not be maintained before entry of final judgment, this factor favors final approval of the settlement.

Given the risks, costs, and uncertainty involved in class action litigation, it is likely that Defendant would have contested certification had a motion been filed. Hence, the uncertainty regarding Plaintiff's ability to maintain class certification throughout the case favors final approval of the settlement.

### c.    Settlement Amount

The Settlement Agreement requires Casual Male to pay $499,999.00 to settle all aspects of the case. (Cottrell Decl. ¶ 23.) The Net Settlement Amount, which is the amount available to pay settlement awards to the approximately 400 Class Members, is defined as the Gross Settlement Amount less: any attorneys' fees and costs awarded to Class Counsel, any service payment awarded to the class representative, the payment made to the California Labor & Workforce Development Agency pursuant to PAGA, and the settlement administrator's fees and costs. (Id.) The Net Settlement Amount totals $281,245.96. (Id.) The average individual payment is $662.26. (Id. ¶ 23.)

Considering the present value of the settlement amount, the probability of litigation in the absence of a settlement, the risk that Plaintiff and the Class Members would not succeed at trial, and the risk that a jury could award no damages, the Settlement Amount is within the range of reasonableness. Hence, this factor favors final approval of the settlement.

### d.    Extent of Discovery Taken in the Case

The Parties engaged in extensive formal and informal information exchange and discovery to enable both sides to assess the claims and potential defenses in this case. (Cottrell Decl. ¶¶ 8, 31.) The Parties were able to assess accurately the legal and factual issues that would arise if the case proceeded to trial. (Id.) Class Counsel relied on their extensive litigation experience in similar wage and hour class actions. (Cottrell Decl. ¶¶ 3-5, 31.) Class Counsel's liability and damages evaluation was premised on a careful analysis of the effects of Defendant's compensation policies and practices on Class Members' pay. (Cottrell Decl. ¶¶ -12, 31.) The parties used

this information and discovery to resolve the litigation fairly. (Cottrell Decl. ¶¶ 13, 31.) Hence, this factor favors final approval of the settlement.

### e.    Experience and Views of Counsel

The Court accepts Class Counsel's representation that all attorneys representing the Class and representing Defendant are experienced in class action litigation. (Mot. at 20-21.) Based on this experience, the undisputed facts, and the legal research conducted regarding Plaintiff's claims, Class Counsel believes that the settlement "would provide a substantial benefit for the Class Members." Hence, this factor favors final approval of the settlement.

### f.    Class Members' Reaction to the Settlement

No Class Members have excluded themselves from the class, and no Class Members have objected to the settlement. Where "the overwhelming majority of the class willingly approved the offer and stayed in the class," there is "at least some objective positive commentary as to its fairness." Hanlon, 150 F.3d at 1027. Hence, this factor favors final approval of the settlement.

### g.    Whether the Settlement Appears Non-collusive

As the Court noted in the Preliminary Approval Order, the Settlement Agreement was reached after the parties exchanged enough factual information so that both sides had a fair opportunity to evaluate fully the factual and legal issues present in this case, as well as the risks associated with further litigation. (Mot. at 21.) As the Settlement Agreement appears to be the product of arm's-length negotiations with no indication of collusion, this factor favors final approval of the settlement.

When the <u>Torrisi</u> factors are balanced, all of the relevant factors favor settlement. Accordingly, the Court finds the Settlement Agreement to be fair, reasonable, and adequate.

## 2. Approval of the Notice Procedures

Rule 23 requires the Court to direct to Class Members "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). In addition, Rule 23(e)(1) requires the court to "direct notice in a reasonable manner to all Class Members who would be bound by the proposal." The notice must explain in easily understood language: the nature of the action, definition of the class, class claims, issues and defenses, ability to appear through individual counsel, procedure to request exclusion, and binding nature of a class judgment. Fed. R. Civ. P. 23(c)(2)(B). Plaintiffs must provide notice to potential opt-in Class Members that is "timely, accurate, and informative." <u>See</u> <u>Hoffmann-La Rouche Inc. v. Sperling</u>, 493 U.S. 165, 172 (1989). Likewise, claim forms must be informative and accurate. <u>Id.</u> at 172; <u>Churchill Village, L.L.C. v. Gen. Elec.</u>, 361 F.3d 566, 575 (9th Cir. 2004) (notice is satisfactory if it "generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard").

The Court accepted previously the proposed Notice Form. (Approval Order at 19-20.) The Court now evaluates whether the parties executed class notice in accordance with the Court's Preliminary Approval Order.

11

According to Carolyn Cottrell, Plaintiff's attorney, the Notice was disseminated in conformity with the Court's Preliminary Approval Order. (Cottrell Decl.¶ 14-17.) Given the representations made by Plaintiff's attorney that the Notice was disseminated in accordance with the Court's previous order and the number of Class Members who have responded to the Notice, the Court finds that the Notice was reasonable as to its content and the method of communication.

As the terms of the Settlement Agreement were fair, reasonable, and adequate, and because the procedures for dissemination of the Class Notice were reasonable, the Court finds that the Settlement Agreement should be approved.

## B. Attorneys' Fees, Costs, Incentive Payment, and Settlement Administration Costs

The Preliminary Approval Order approved allocation of settlement funds for attorneys' fees, costs, incentive award payments, and settlement administrative expenses. As noted above, Class Counsel now requests final approval of these expenditures. The Court addresses each. Staton v. Boeing Co., 327 F.3d 938, 963 (9th Cir. 2003) ("[T]o avoid abdicating its responsibility to review the agreement for the protection of the class, a district court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement.").

### 1. Attorneys' Fees

Notwithstanding an explicit agreement to shift attorneys' fees in a certified class action, "courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an

amount." <u>In re Bluetooth Headset Prods. Liab. Litig.</u>, 654 F.3d 935, 941 (9th Cir. 2011).

Class Counsel requests one-third of the Gross Settlement Amount, for a total of $166,649.00, plus reimbursement of costs totaling $28,104.04. (Cottrell Decl. ¶ 38.)

To calculate the reasonableness of an award of attorney's fees, the Court may use either the percentage-of-the-fund method[1] or the lodestar/multiplier method.[2] <u>In re Washington Pub. Power Supply Sys. Sec. Litig.</u>, 19 F.3d 1291, 1295 (9th Cir. 1994) ("[T]he district court has discretion to use either method in common fund cases."). Regardless of the method used, "the district court should be guided by the fundamental principle that fee awards out of common funds be "reasonable under the circumstances." <u>In re Washington Pub. Power Supply Sys. Sec. Litig.</u>, 19 F.3d at 1296 (quoting <u>State of Florida v. Dunne</u>, 915 F.2d 542, 545 (9th Cir. 1990)).

### a. Percentage-of-the-fund Method

"[A] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to reasonable attorney's fees from the fund as a whole." <u>Boeing Co. v. Van Gemert</u>, 444 U.S. 472, 478 (1980). The Ninth Circuit awards attorneys' fees under the common fund approach "[b]ecause

---

[1] Under the percentage-of-the-fund method, the court calculates the fee award by designating a percentage of the total common fund. <u>Six Mexican Workers v. Ariz. Citrus Growers</u>, 904 F.2d 1301, 1311 (9th Cir. 1990).

[2] Under the lodestar method, the court calculates the fee award by multiplying the number of hours reasonably spent by a reasonable hourly rate and then enhancing that figure, if necessary to account for the risks associated with representation. <u>Paul, Johnson, Alston & Hunt v. Graulty</u>, 886 F.2d 268, 272 (9th Cir. 1989).

the benefit to the class is easily quantified in common-fund settlements" and avoids the "often more time-consuming task of calculating the lodestar." In re Bluetooth v. Headset Prods. Liab. Litig., 654 F.3d 935, 942 (9th Cir. 2011). The common fund approach is an appropriate method for awarding attorneys' fees because it "ensures that each member of the winning party contributes proportionately to the payment of attorneys' fees." Staton v. Boeing Co., 327 F.3d 938, 967 (9th Cir. 2003).

Here, a common fund award of fees and costs is appropriate because there is an ascertainable common fund from which reasonable attorneys' fees can be recovered. (Cottrell Decl. ¶ 71.) The proposed Settlement creates a common fund of $499,999.00 to be distributed to approximately 423 Casual Male employees. (Id.) Since each participating Class Member will get a portion of the Settlement fund based on its distribution formula, equity requires that Class Members contribute a pro-rata share to the attorneys' fees. Thus, the award ensures that Class Counsel receive an appropriate fee award for the actual benefit conferred to Class Members.

Class Counsel's request for one-third of the Gross Settlement Amount is within the range approved by courts in comparable class actions. In the Ninth Circuit, a 25% award is the "benchmark" amount of attorneys' fees; courts may adjust this figure upwards if the record shows "'special circumstances' justifying a departure." Six Mexican Workers, 904 F.2d at 1311. When deciding if a departure from the 25% benchmark is appropriate, courts may consider "the result achieved, the risk involved in the litigation, the skill required and quality of work by counsel, the contingent nature of the fee, awards made in similar cases, and the lodestar crosscheck." Nwabueze v. AT&T Inc., CV 09-1529-SI, 2013 WL 6199596, at *10 (N.D. Cal. Nov. 27, 2013). In California, federal courts approve payments of

attorneys' fees amounting to one-third of the common fund in comparable class actions.[3]

### i. The monetary result for Class Members justify the fee request

The approximate net amount to be disbursed to Class Members is $281,245.96. (Cottrell Decl. ¶ 72.) The average individual payment is approximately $662.26. (Id.) The gross recovery represents approximately 46% of Plaintiff's revised damages calculation at the time of settlement. (Id.)

### ii. The risks associated with the litigation justify the fee request

Class Counsel undertook significant risk in litigating this matter because it took the case on a contingent basis and because Casual Male had several defenses to Plaintiff's claims, including that (1) Class Members did not perform work off-the-clock; (2) any off-the-clock work was *de minimis*; (3) Casual Male properly provided Class Members with compliant meal and rest breaks; (4) Casual Male paid Class Members for all hours worked; and (5) Casual Male provided Class Members with proper wage statements. (Cottrell Decl. ¶ 73.) Litigating this case as a class action

---

[3] See Williams v. MGMPathe Commc'n Co., 129 F.3d 1026, 1027 (9th Cir. 1997) (33% awarded); Van Vranken v. Atl. Richfield Co., 901 F. Supp. 294, 297-98(N.D. Cal. 1995) (citation to 73 district court opinions in which fees awarded ranged from 30 to 50%); Vandervort v. Balboa Capital Corp., 8 F.Supp.3d 1200, 1209-10 (C.D. Cal. 2014) (fees will commonly be under the benchmark in "megafund" cases, but in smaller cases – particularly where the common fund is under $10 million – awards more frequently exceed the benchmark); Cicero v. DirecTV, Inc., 2010 WL 2991486, at *6-*7 (C.D. Cal. July 27, 2010) (fees of one-third of the common fund is common in wage and hour settlements below $10 million; case survey of class action settlements demonstrate that "50% [of settlement fund] is the upper limit, with 30- 50% commonly awarded in cases in which the common fund is relatively small"); McDonald, et al. v. Airport Terminal Serv., Inc., et al., No. 5:11-cv-01946-VAP (SPx) (C.D. Cal. Nov. 19, 2013) (This Court awarded 33% of the settlement in fees in a wage and hour class action.)

would have required significant additional preparation and discovery. If this case were to go to trial as a class action, Class Counsel estimates that fees and costs would exceed $1,500,000.00. (<u>Id.</u> ¶ 74.)  (<u>Id.</u>)  Despite these risks, Class Counsel brought this case to a fast, efficient, and valuable resolution for the Class Members. (<u>Id.</u>)

### iii.  Class Counsel's skill and quality work justify the fee request

As noted previously in this Order, Class Counsel achieved a valuable monetary result for Class Members, and demonstrated skill, diligence, and high quality of work in achieving the Settlement.  (Cotrell Decl. ¶¶ 6-11, 55-70.)

### iv.  The contingency nature of the fee and financial burden carried by Class Counsel justify the fee request

Class Counsel prosecuted this case on a contingent basis with the risk of not being compensated for its work due to the risky nature of class action litigation.  The risks associated with the contingent nature of this case justify the requested fees.  As the Ninth Circuit has noted,"[i]t is an established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases." <u>Fischel v. Equitable Life Assurance Soc'y of U.S.</u>, 307 F.3d 997, 1008 (9th Cir. 2002).

### v.  Class Members' positive reaction to the settlement justify the fee request

No Class Member objected to, or opted out of, the Settlement after receiving notice of the amounts sought for attorneys' fees and costs.  (Cottrell Decl. ¶ 78.)

Thus, the absence of disapproval by Class Members is evidence of the reasonableness of the requested fee and cost award.

### b. The Lodestar Method

Class Counsel submitted detailed billing records along with the Motion. (Cottrell Decl., Exhs. 1-22.) The fees sought by Class Counsel are significantly less than the lodestar amount.[4] Class Counsel are entitled to the hourly rates charged by attorneys of comparable experience, reputation, and ability for similarly complex federal litigation. Camacho v. Bridgeport Fin., Inc., 523 F.3d 973, 979 (9th Cir. 2008). Here, Class Counsel's hourly rates are reasonable in light of their experience, expertise, and skill. (Cottrell Decl. ¶¶ 6-11, 55-70.)

Class Counsel's rates have been approved by other courts in the similar cases in the State. (Id. ¶ 81.) In March 2013, the California Superior Court for Santa Cruz County, approved Class Counsel's hourly rates as within the prevailing range of rates charged by attorneys providing similar services in class action, wage-and-hour cases. (See Cottrell Decl., Exh. 17.) In November 2012, the California Superior Court for Alameda County approved Class Counsel's hourly rates as reasonable in an overtime class action under California law. (See Id., Exh. 18.) In February 2012, the U.S. District Court for the Northern District of California approved Class Counsel's hourly rates as reasonable in two different employment class actions under the American with Disabilities Act. (See Id., Exh. 19, 20.)

---

[4] Class Counsel's lodestar amount currently exceeds $629,636.00. (See Cottrell Decl., Exh. 1-22.)

Thus, the Court finds that Class Counsel's rates are within the range of rates charged by similarly experienced and qualified attorneys practicing in this area.  (Id. at ¶¶ 79-83.)

### 2.    Attorneys' Costs

Class Counsel request the Court grant their request for taxable costs and other litigation-related expenses reasonably incurred in this litigation in the amount of $28,104.04.  (Mot. at 20.)

Reasonable litigation expenses may be included in an award of attorneys' fees pursuant to California wage and hour law.  Federal law, including 28 U.S.C. § 1920 and Federal Rule of Civil Procedure 54, directs the reimbursement of Class Counsel's costs and expenses.  Rule 54(d)(1) provides that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs – other than attorney's fees – should be allowed to the prevailing party."  Expenses such as reimbursement for travel, meals, lodging, photocopying, long-distance telephone calls, computer legal research, postage, courier service, mediation, exhibits, document scanning, and visual equipment are typically recoverable.  See Rutti v. Lojack Corp., Inc., 2012 WL 3151077, at *12 (C.D. Cal. July 31, 2012); see also Rulli, et al. v. Nielsen Co. LLC, No. 3:14-cv-01835-VC (N.D. Cal. May 21, 2015) (granting the reasonably incurred costs of Class Counsel in a wage and hour case). Here, all of the expenses set forth below were reasonable and necessary to the prosecution of the case.  (Cottrell Decl. ¶ 102.)

| Category | Costs |
|---|---|
| Filing Fees/Court Fees/Service of Process | $3,320.02 |
| Mediation | $5,500.00 |
| Class Administration | $670.91 |
| Legal Research | $1,621.46 |
| Expert | $7,950.00 |
| Depositions/Deposition Transcripts | $2,415.05 |
| Overnight and Bulk Mail | $48.71 |
| Travel and Travel Expenses | $2,417.38 |
| Copies and Postage | $4,160.51 |
| **Firm Totals** | **$28,104.04** |

### 3.    Incentive Award

The Plaintiff seeks $7,500.00 as a "service payment." (Mot. at 21.) Incentive awards, or service payments, are common in class action cases. Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 958 (9th Cir. 2009). These awards are "intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." Id. at 958-59.

District courts evaluate service payments using "relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, … the amount of time and effort the plaintiff extended pursuing the litigation … and reasonabl[e] fear[s of ] workplace retaliation." Staton, 327 F.3d at 977.

Here, a $3,000.00 service payment is fair and reasonable considering all of the relevant factors, and is consistent with awards approved in this District and throughout the State in similar cases. See Sandoval v. Tharaldson Employee Mgmt.,

Inc., No. EDCV 08-482-VAP (OPx), 2010 WL 2486346, at *10 (C.D. Cal. June 15, 2010); Espinoza v. Domino's Pizza, LLC, 2012 WL 5462550, at *4 (C.D. Cal. Nov. 7, 2012) (granting $10,000.00 service payments to two plaintiffs).

At the Motion hearing, Class Counsel argued that Class Members received a significant benefit from Plaintiff's efforts, which included passing on an out-of-state job opportunity, and the expenditure of approximately 100 hours of her time to litigate this case.[5] ( Jeter-Polk Decl. ¶ 27.)  The average settlement payment is approximately $662.26, and the highest is approximately $2,081.77.  Hence, a $3000 service payment is approximately 4.5 times the average settlement payment, 1.5 times the highest settlement payment, and 1.1% of the Net Settlement Award.

Accordingly, the Court finds that a service payment of $3,000 is fair and reasonable.

### 4.     Settlement Administration Costs

In accordance with the Court's Preliminary Approval Order, settlement administrator CPT received contact information from Defendant for the 423 Class Members.  (Shirinaian. Decl. ¶ 5.)  On March 24, 2016, CPT mailed the court approved Settlement Notices employing a National Change of Address search.  (Id. at ¶¶ 4-6.).  The cost incurred by CPT for settlement administration was $12,378.52, and CPT seeks $11,500 in fees and costs.  (Mot. at 9.)  Exhibit C of the Shirinaian Declaration itemizes CPT's fees and costs.  The Court has reviewed these fees and costs and finds that $11,500 is a fair and reasonable amount.

---

[5] The details of Plaintiff's assistance are described in the Motion and accompanying declaration.  (See Mot. at 23; Jeter-Polk Decl. ¶¶ 27-31.)

# IV.   CONCLUSION

For the reasons stated above, the Court:

(1) GRANTS final approval of the Settlement Agreement;

(2) CERTIFIES the California Class for settlement purposes;

(3) APPOINTS Schneider Wallace Cottrell Konecky Wotkyns, LLP as Class Counsel;

(4) APPOINTS named Plaintiff, Breana Jeter-Polk, as class representative;

(5) APPROVES $166,649.00 and $28,104.04 in attorneys' fees and costs to Class Counsel;

(6) APPROVES a $3,000.000 incentive award to Breana Jeter-Polk;

(7) APPROVES a $11,500.00 payment to CPT Group, Inc. as settlement administrator;

(8) APPROVES the implementation schedule;

(9) ENTERS a final judgment with the terms of the Settlement.

**IT IS SO ORDERED.**

Dated:     6/29/16                    _____

                                           Virginia A. Phillips
                                        United States District Judge

# EXHIBIT R

F I L E D

MAR 22 2013

ALEX CALVO, CLERK
BY DEBORAH ROJAS
DEPUTY, SANTA CRUZ COUNTY

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SANTA CRUZ**

| | |
|---|---|
| ELVA PEREZ, on behalf of herself and all others similarly situated, | Case No. CISCV167815 |
| Plaintiff, | |
| vs. | **[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS** |
| RUE21, INC., and DOES 1 through 50, | |
| Defendants. | Date:       March 22, 2013<br>Time:       8:30 a.m.<br>Dept.:       4<br>Judge:      Hon. Timothy Volkmann |

1    On March 22, 2013, this Court held a hearing on Plaintiff's motions for final approval of

2    the parties' proposed class action settlement and for attorneys' fees and costs.  Joshua Konecky of

3    Schneider Wallace Cottrell Konecky LLP appeared for Plaintiff and the Certified Class; and

4    _____ of Littler Mendelson PC appeared for Defendant rue21, inc.

5    The Court has ruled on the motion for final approval of the class action settlement

6    agreement by separate order.

7    Having received and considered the settlement agreement, the supporting papers filed by

8    class counsel and the evidence and argument received by the Court, the Court HEREBY GRANTS

9    the motion for an award of attorneys' fees and costs, and issues the following FINDINGS AND

10   ORDERS:

11   1.    The settlement agreement provides that class counsel may seek $916,667.67 in

12   attorneys' fees plus actual out-of-pocket costs.  Defendant does not object to these amounts.

13   2.    Plaintiff seeks fees in an amount of $916,667.67.  The declaration of class counsel

14   documenting their lodestar shows that a fee award of this amount would result in a multiplier of

15   1.16 or less.  Plaintiff also seek reimbursement of $81,956.70 in actual out-of-pocket costs, which

16   are documented in class counsel's declaration as well.

17   3.    Counsel's declaration submitted in support of the motion show that the attorneys

18   acting on behalf of the class from Schneider Wallace Cottrell Konecky LLP, have the experience

19   and qualifications necessary to represent the class.  The Court finds that the hourly rates charged

20   by class counsel are within the prevailing range of rates charged by attorneys providing similar

21   services in class action, wage-and-hour cases in California, as shown by the Declarations of Joshua

22   Konecky, filed in support of the motion.

23   4.    The Court also finds that the total hours worked by class counsel are reasonable,

24   given the nature of the case and the defense presented; the projects class counsel had to undertake,

25   the manner in which class counsel allocated their work, the billing judgment exercised by class

26   counsel, and the results achieved.

27

28

1      5.     The Court finds that the multiplier sought is reasonable and appropriate, given the

2  documented lodestar, contingent risk and complexity of the case, the preclusion of counsel from

3  other employment, and the favorable results achieved for class members.

4      6.     The Court further finds that class counsel's out-of-pocket costs and expenses are

5  documented, reasonable and necessary to the prosecution of this action.

6      7.     In accordance with the Court's Order granting preliminary approval of the proposed

7  class action settlement, the court-approved class notice was sent to approximately 2,370 class

8  members.  The class notice set forth the amounts of fees and costs that class counsel are seeking.

9  The Court finds that there were no objections to the fees and costs sought.

10      8.     The Court therefore awards class counsel 916,667.67 in attorneys' fees and

11  $81,956.70 in attorneys' costs to be paid from the settlement fund pursuant to the terms and

12  timeframe set forth in the settlement agreement.

13

     IT IS SO ORDERED.

14

15

16  Dated:  **MAR 22 2013**                   SAMUEL S. STEVENS

17                             The Honorable Timothy Volkmann

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS
*Perez, et al. v. Rue21, et al.*, Case No. CISCV167815

# EXHIBIT S

*10220617*

**ENDORSED
FILED
ALAMEDA COUNTY**

NOV 0 8 2012

CLERK OF THE SUPERIOR COURT
BY _____
                                    DEPUTY

1
2
3
4
5
6
7
8
9
10
11
12

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF ALAMEDA

13 | ALICE WILLIAMS, on behalf of herself, and on behalf of all others similarly situated,

Case No. RG08366506

14 |     Plaintiffs,

15 | vs.

16 | H&R BLOCK ENTERPRISES, INC.

17 |     Defendant.

18

[proposed] ORDER OF FINAL APPROVAL AND JUDGMENT

Date: November 8, 2012
Time: 2:00 p.m.
Dept.: 20
Judge: Hon. Robert B. Freedman
Reservation No. R-1338508

19
20
21
22
23
24
25
26
27
28

SCHNEIDER WALLACE
COTTRELL BRAYTON
KONECKY LLP

[PROPOSED] ORDER OF FINAL APPROVAL AND JUDGMENT
*Williams v. H&R Block, et al.*, Case No. RG08366506

1      PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

2 AND RESPONSE TO OBJECTION, MOTION FOR SERVICE AWARDS, and MOTION FOR

3 AN AWARD OF REASONABLE ATTORNEYS' FEES, COSTS AND EXPENSES came on for

4 hearing on November 8, 2012 at 2:00 p.m., in Department 20 of the Superior Court of California,

5 County of Alameda.

6      Having considered the proposed class Settlement Agreement, Plaintiffs' Motion for Final

7 Approval of Class Action Settlement and Response to Objection, Plaintiffs' Motion for Service

8 Awards, and Plaintiffs' Motion for an Award of Reasonable Attorneys' Fees, Costs and Expenses,

9 the Memoranda of Points and Authorities in support of those Motions, the Declarations of Guy B.

10 Wallace, David Borgen, Alexander Van Broek, Andrew P. Lee, Plaintiff Alice Williams, Plaintiff

11 Regina Bassett in support thereof, as well as the Declaration of Caroline Barazesh Regarding Due

12 Diligence and Proof of Mailing, the Court-approved notice and claim form, and the argument of

13 counsel at the hearing thereon, the Court hereby FINDS, ORDERS, ADJUDGES as follows:[1]

14    **I.**     **FINAL CERTIFICATION OF THE SETTLEMENT CLASS**

15     The Court granted class certification in this matter on March 24, 2011 of the following class:

16     All people employed by H&R Block Enterprises, Inc., or H&R Block Enterprises,
17     LLC during the tax season as seasonal, exempt Office Managers at any time
    between January 17, 2004 and the date of notice to the class that a class has been
18     certified.

19     The parties have presented no new facts or changed circumstances that would disturb the

20 Court's findings on class certification for purposes of certifying the Settling Class.  Moreover,

21 H&R Block does not oppose class certification for purposes of settlement.  Accordingly, the Court

22 finds that, consistent with its prior Order, the requirements of Code of Civil Procedure § 382 are

23 satisfied.  The Court hereby FINALLY CERTIFIES the following settlement class:

24     All people employed by H&R Block Enterprises, Inc., or H&R Block Enterprises,
    LLC during the tax season as seasonal, exempt Office Managers at any time
25     between January 17, 2004 and April 30, 2012 in California.

26

27    [1] The Court, for purposes of this Order of Final Approval and Judgment, adopts and incorporate the
28 terms and definitions set forth in the Settlement Agreement.

---

SCHNEIDER WALLACE
COTTRELL BRAYTON
KONECKY LLP

II.     APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL

On March 24, 2011, the Court certified this matter as a class action, and appointed Named Plaintiff Alice Williams to represent the litigation class of California Office Managers.  Similarly, in its Order Granting Preliminary Approval of Settlement, the Court appointed Plaintiff Alice Williams as representative of the provisionally certified settlement class.  The parties have presented no new facts or changed circumstances that would disturb the Court's previous findings with respect to Ms. Williams' adequacy, and therefore APPOINTS Ms. Williams as class representative of the above-referenced Settling Class.

By Order dated June 13, 2012, the Court permitted Plaintiffs leave to file a Second Amended Complaint, which added a claim pursuant to the Private Attorney General Act of 2004 ("PAGA"), as well as an additional Named Plaintiff, Regina Bassett.  Plaintiffs propose that Ms. Bassett represent the settlement class with respect to the PAGA claim.  Ms. Bassett has worked for H&R Block in California as an Office Manager for the 2009, 2010, 2011, and 2012 tax seasons.  Declaration of Regina Bassett in Support of Motion for Service Award ¶ 2.  Moreover, Ms. Bassett's claims are typical of those of the Settling Class, and she understands her duty to represent the best interests of the Settling Class Members.  *Id.* at ¶¶ 9-12.  H&R Block does not oppose the appointment of Ms. Bassett as class representative for the purpose of settlement.  Accordingly, the Court APPOINTS Ms. Bassett as class representative of the above-referenced Settling Class, including with respect to Plaintiffs' PAGA claim.

The Court finds that Schneider Wallace Cottrell Brayton Konecky LLP, Goldstein, Demchak, Baller, Borgen & Dardarian, and the Law Offices of Alexander Van Broek, have extensive experience in prosecuting wage and hour class actions, and APPOINTS them as Class Counsel for the Settling Class.

III.    FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Pursuant to this Court's Preliminary Approval Order, the Claims Administrator, BMC Group, distributed the approved Class Notice and Claim Form to the settlement class. Based on review of the Declaration of Caroline Barazesh ("Barazesh Decl.") of BMC Group, the Court is satisfied that compliance with the Court's preliminary approval Order was accomplished in all

1  material respects.  The form and manner of notice constituted the best practicable notice under the

2  circumstances, and fully met the requirements of procedural due process and California Rule of

3  Court 3.769(f).

4       The Court has carefully reviewed the terms of the proposed Settlement, as well as the

5  Declaration of Guy B. Wallace in Support of Preliminary Approval of Settlement describing

6  Plaintiffs' investigation into the claims and defenses in this matter, the discovery conducted by the

7  parties, and the settlement process.  The Court finds that the Settlement is the product of informed,

8  non-collusive, and arm's-length negotiations.  The Court further finds that the Settlement confers a

9  monetary benefit of approximately $3.8 million on the settlement class in exchange for their

10  release of claims, which is properly limited to any claims alleged in this matter, or could have been

11  alleged based on the facts contained in the pleadings.  This is a good result for the Settling Class in

12  light of the significant risks and delay of further litigation.  Based on the papers submitted by the

13  parties, the Court's familiarity with this matter, and the favorable response of the Settling Class,

14  the Court finds that the proposed Settlement is fair, reasonable, and adequate.

15       **A.    Response of the Settling Class**

16       The response of the Settling Class has been positive.  891 of the 1,529 Settling Class

17  Members filed timely and valid claim forms.  Barazesh Decl. ¶ 17.  These claims represent 65.72%

18  of the tax seasons worked by all Settling Class Members.  Two individuals have excluded

19  themselves from the Settlement, and one Settling Class Member has objected.  The high rate of

20  participation combined with the low number of opt outs (2) and objectors (1) further supports the

21  Court's conclusion that the Settlement is fair, reasonable, and adequate.

22       **B.    The Single Objection**

23       The lone objector, Lucila Cabrera, makes the following arguments in opposition to final

24  approval: 1) the claim form process may render the settlement benefits illusory; 2) the requested

25  attorneys' fees and costs may exceed the monetary damages going to the class; 3) the inclusion of a

26  "clear sailing" provision in the Settlement Agreement indicates that Class Council accepted an

27  unfair settlement on behalf of the Settling Class; 4) the claim form process, whereby unclaimed

28

1   settlement funds revert to H&R Block, is unjustified and designed to lower the amount of money

2   paid by H&R Block pursuant to the Settlement.

3          The Court is not persuaded by these arguments.  As discussed above, the Settling Class will

4   receive $3.8 million in total compensation pursuant to the proposed settlement.  This sum is not

5   illusory, nor is it exceeded by the amount of attorneys' fees, costs and expenses requested by Class

6   Counsel.  Even if the attorneys' fees were to exceed the class recovery, Class Counsel seeks their

7   fees on a lodestar basis pursuant to the fee shifting provisions of the California Labor Code.  It is

8   well-settled that an award of statutory attorneys' fees does not require proportionality between the

9   plaintiffs' recovery and the amount of the fee award.  *Harman v. City & County of San Francisco*,

10  158 Cal.App.4th 407, 419 (2007); *Graciano v. Robinson Ford Sales, Inc.*, 144 Cal.App.4th 140,

11  164 (2006); *see also City of Riverside v. Rivera*, 477 U.S. 561, 574 (1986).  These arguments are

12  without merit.

13         Ms. Cabrera also objects to the "clear sailing" provision that prohibits H&R Block from

14  opposing Class Counsel's application for an award of reasonable attorneys' fees, costs and

15  expenses so long as it does not exceed $2.6 million.  California Courts, however, have consistently

16  upheld such "clear sailing" provisions where the terms of the settlement are otherwise fair,

17  reasonable, and adequate.  *In re Consumer Privacy Cases*, 175 Cal. App. 4th 545, 554 (2009)

18  (collecting cases).  Moreover, Ms. Cabrera has provided no evidence of any collusion or

19  misconduct on the part of Class Counsel, nor has she objected to the hourly rates or the amount of

20  hours claimed by Class Counsel.  Similarly, Ms. Cabrera has not identified any specific hours

21  claimed by Class Counsel that are excessive or shown why those specific hours were not

22  reasonably expended.  Ms. Cabrera's objection to the "clear sailing" provision is without merit.

23         Finally, Ms. Cabrera objects to the claims made aspect of the Settlement and the resulting

24  reversion to H&R Block.  She argues that the claims process is unjustified and designed to reduce

25  H&R Block's liability pursuant to the Settlement.  Ms. Cabrera, however, overlooks the fact that

26  the Settlement requires H&R Block to pay a guaranteed amount of $1.8 million that will be

27  distributed *pro rata* to all Settling Class Members irrespective of whether they file a valid claim

28  form.  This amount is not subject to any reversion.

1    In addition, there is nothing inherently improper about the claims made process; rather, it is

2   the impact on the overall fairness, reasonableness, and adequacy that matters. *Harris v. Vector*

3   *Mktg. Corp.*, 2011 WL 1627973, at *13 (N.D. Cal. Apr. 29, 2011) (emphasis added); *see also*

4   *Lemus v. H&R Block Enters. LLC*, 2012 WL 3638550, at **3, 7-8; *Glass v. UBS Fin. Servs., Inc.*,

5   2007 WL 474936, at *8 (N.D. Cal. Jan. 17, 2007) aff'd. 331 F. App'x 452 (9th Cir. 2009).  Here,

6   the claims process has resulted in a monetary recover of $3.8 million and the submission of claim

7   forms representing 65.72% of the tax seasons worked by California Office Managers during the

8   limitations period.  As stated above, 891 members of the settlement class submitted valid and

9   timely claims forms, thus showing that the claims forms and process were comprehensible and

10  readily usable by the class members.  Taken as a whole, the claims process has resulted in a fair,

11  reasonable, and adequate settlement.

12    Finally, the parties implemented the claims made process because many class members

13  believed that they were not misclassified, and that they were exempt managers.  The Settlement

14  therefore takes these conflicting aspects of the record into account, permitting the Settling Class

15  Members to decide for themselves whether to accept the full benefits of the Settlement by making

16  a claim on the non-guaranteed settlement amount ("Non-Guaranteed NSV").  This was a fair and

17  reasonable compromise given the record evidence herein.

18    Accordingly, the Court FINALLY APPROVES the proposed Settlement, and OVERRULES

19  Ms. Cabrera's objection.

20  IV.    **DISTRIBUTION OF THE SETTLEMENT FUND**

21    A.    **Appointment of the Claims Administrator**

22    The Court APPROVES the appointment of BMC Group as the settlement Claims

23  Administrator, and directs payment of $25,846.50 for services rendered by BMC Group as Claims

24  Administrator. The Court finds this amount to be fair and reasonable.

25    B.    **Service Awards to the Class Representatives**

26    Plaintiffs seek service awards in the amount of $7,500 for Plaintiff Williams and $5,000 for

27  Plaintiff Bassett. Both Plaintiffs have submitted Declarations detailing the time and effort

28  expended by them in furtherance of the class claims, and the risks assumed by these individuals in

1   vindicating the rights of the settlement class.  Specifically, each Plaintiff expended considerable

2   time and effort reviewing pleadings, responding to written discovery, appearing for deposition,

3   advising Class Counsel regarding H&R Block's policies and practices, and reviewing the

4   settlement agreement herein.  *See* Declaration of Alice Williams and Declaration of Regina

5   Bassett in Support of Motion for Service Awards.  The requested service awards are also

6   supported by the risks associated with bringing this lawsuit, the protracted nature of this litigation,

7   and the important public policies underlying the Plaintiffs' claims.

8        The service awards of $7,500 for Plaintiff Williams, and $5,000 for Plaintiff Bassett, are

9   hereby APPROVED.

10       **C.    William Kindred**

11       William Kindred, who worked for H&R Block as a California Office Manager during the

12   applicable class period, chose to exclude himself from this matter pursuant to the class certification

13   notice distributed in July 2011.  Mr. Kindred contacted Class Counsel and requested to be included

14   in the settlement.  Based on the parties' non-opposition to this request, the Court APPROVES Mr.

15   Kindred's request to withdraw his opt out form and participate fully in the Settlement.

16       **D.    Attorneys' Fees, Costs and Expenses**

17       Class Counsel seek an award of $2,198,775.33 in attorneys' fees, and $401,224.67 in costs

18   and litigation expenses, for a total award of $2.6 Million in fees, costs and expenses. The Court

19   grants Class Counsel's request for reasonable attorneys' fees, costs and expenses. "In California,

20   the fee setting inquiry ordinarily begins with the 'lodestar,' i.e., the number of hours reasonably

21   expended multiplied by the reasonable hourly rate." *Building a Better Redondo, Inc. v. City of*

22   *Redondo Beach*, 203 Cal.App.4th 852, 870 (2012).  A court may also "cross-check" the lodestar-

23   based award against the percentage-of-the-fund method for purposes of ensuring that the fee award

24   is reasonable. *Wershba v. Apple Computer, Inc.*, 91 Cal.App.4th 224, 253 (2001).

25       As an initial matter, the Court finds that the hourly rates claimed by Class Counsel are

26   reasonable. Given their knowledge, skill and expertise in complex class action cases such as this

27   one, Class Counsel's partner and associate rates fall within the range of rates charged by similarly

28   experienced and qualified attorneys practicing in this area.  Further, Class Counsel have shown that

SCHNEIDER WALLACE
COTTRELL BRAYTON
KONECKY LLP

their hourly rates are comparable to and in-line with the hourly rates charged by numerous firms practicing in the San Francisco Bay Area on a non-contingency basis and which do similar work.

Accordingly, the Court finds that the following 2012 hourly rates requested by Class Counsel to be reasonable and to be in-line with market rates in the Bay Area for attorneys with similar qualifications and experience who do similar work:

### Schneider Wallace Cottrell Brayton Konecky LLP

| Attorney | Law School Grad. Date | 2012 Hourly Rate |
|---|---|---|
| Guy B. Wallace | 1993 | $700.00 |
| Clint J. Brayton | 1997 | $650.00 |
| Joshua Konecky | 1995 | $650.00 |
| Carolyn Cottrell | 1993 | $650.00 |
| Andrew Lee | 2006 | $475.00 |
| Megan Lewis | 2006 | $450.00 |
| Juliana Poindexter | 2008 | $400.00 |
| Kiran Prasad | 2007 | $450.00 |
| Monica Quivey | 2006 | $450.00 |
| Drew Teti | 2009 | $350.00 |
| Michael Thomas | 1997 | $500.00 |
| William Willson | 2004 | $500.00 |

### Goldstein Demchak Baller Borgen Dardarian LLP

| Attorney | Law School Grad. Date | 2012 Hourly Rate |
|---|---|---|
| Teresa K. Demchak | 1976 | $775.00 |
| David A. Borgen | 1981 | $750.00 |
| Laura L. Ho | 1994 | $650.00 |
| Barry L. Goldstein | 1970 | $785.00 |
| James Kan | 2005 | $470.00 |
| Jason Tarricone | 2006 | $445.00 |

### Law Offices of Alexander Van Broek

| Attorney | Law School Grad. Date | 2012 Hourly Rate |
|---|---|---|
| Alexander Van Broek | 1980 | $395.00 |

ORDER OF FINAL APPROVAL AND JUDGMENT
*Williams v. H&R Block, et al.*, Case No. RG08366506

SCHNEIDER WALLACE
COTTRELL BRAYTON
KONECKY LLP

1  The Court has reviewed the Declarations of Guy B. Wallace, David Borgen, and Alexander

2  Van Broek describing the work performed by Class Counsel on this case, as well as the time

3  records submitted in support of the application for an award of fees.  The total hours claimed by

4  Class Counsel are approved based on evidence presented of the work performed and the results

5  achieved. Class Counsel has presented the Court with detailed billing records of their work

6  performed in this matter. These records are adequate and describe the nature of the work performed

7  by each firm and the attorneys therein.  The Court is also satisfied that Class Counsel have

8  exercised appropriate and significant billing judgment by not requesting fees for unproductive or

9  duplicative work.

10  The Court concludes that Class Counsel's fees are justified under the statutory fee

11  methodology.  Class Counsel seeks a fee award of $2,198,775.33, which amounts to approximately

12  85% of Class Counsel's actual lodestar of $2,590,296.84.  As discussed above, Class Counsel's

13  hourly rates fall within the range of hourly rates charged by attorneys of comparable experience,

14  qualifications, and ability who do complex class action litigation in the Bay Area. Moreover,

15  considering the amount of discovery, motion practice, and trial preparation that occurred in this

16  matter, the difficulty and risks associated with the legal and factual claims that were litigated

17  herein, and the aggressive defense mounted by H&R Block, the number of hours claimed by Class

18  Counsel is reasonable as well and is amply supported by the record.

19  Cross-checking the lodestar amount of $2,198,775.33 against the total amount of funds to be

20  paid out pursuant to the settlement, which is $6,440,621.39 as stated in the Declaration of the

21  Claims Administrator Caroline Barazesh at ¶ 22, the Court finds that the amount of fees sought by

22  Class Counsel would amount to approximately 34% of the total funds to be distributed pursuant to

23  the Settlement.  This percentage is reasonable, and is consistent with that approved in numerous

24  other wage and hour class action settlements in California.  *See, e.g., Martin v. Ameripride Servs.,*

25  *Inc.*, 2011 WL 2313604, at *8 (S.D. Cal. June 9, 2011) ("More particularly, courts may award

26  attorneys' fees in the 30-40% range in wage and hour class actions that result in recovery of a

27  common fund under $10 million."); *Cicero v. DirectTV, Inc.*, 2010 WL 2991486, at * 6 (C.D. Cal.

28  July 27, 2010) ("[A] review of California cases in other districts reveals that courts usually award

SCHNEIDER WALLACE
COTTRELL BRAYTON
KONECKY LLP

1    attorneys' fees in the 30-40% range in wage and hour class actions that result in recovery of a

2    common fund under $10 million.") (collecting authorities).

3        The Court also finds that the costs and expenses incurred by Class Counsel are reasonable

4    and necessary based on detailed evidence presented of costs and expenses incurred.

5        Accordingly, the Court APPROVES Class Counsel's requested fees in the amount of

6    $2,198,775.33, and costs and expenses in the amount of $401,224.67.  Consistent with this Court's

7    practice, 5% of this fee award shall be held by the Claims Administrator in an interest bearing

8    account pending submission and approval of a final compliance status report after completion of

9    the distribution process.

10       A compliance hearing shall be scheduled for _OCTOBER 10, 2013  AT  2:00 pm_.
     _IN DEPT 20.  STATUS REPORT TO BE FILED BY OCTOBER 7, 2013_

11   **V.    JUDGMENT & CONTINUING JURISDICTION**

12       The parties are otherwise directed to comply with the terms of the Settlement. Pursuant to

13   California Rule of Court 3.769(h), the Court HEREBY MAKES AND ENTERS JUDGMENT, and

14   shall retain jurisdiction and oversight of the settlement proceedings.

17   Dated: _Nov 9, 2013_

18                                      ROBERT B. FREEDMAN
                                        JUDGE OF THE SUPERIOR COURT

# EXHIBIT T

1   Claudia Center, State Bar No. 158255
    Jinny Kim, State Bar No. 208953
2   Rachael Langston, State Bar No. 257950
    THE LEGAL AID SOCIETY-EMPLOYMENT LAW CENTER
3   180 Montgomery St., Suite 600
    San Francisco, CA  94104
4   Telephone:  (415) 864-8848
    Facsimile:  (415) 593-0096
5   Emails:  ccenter@las-elc.org; jkim@las-elc.org; rlangston@las-elc.org

6

7   Joshua Konecky, State Bar No. 182897
    SCHNEIDER WALLACE COTTRELL BRAYTON KONECKY, LLP
8   180 Montgomery St., Suite 2000
    San Francisco, CA  94104
9   Telephone:  (415) 421-7100
    Facsimile:  (415) 421-7105
10  Email: jkonecky@schneiderwallace.com

11
    Attorneys for Plaintiffs
12

13                  UNITED STATES DISTRICT COURT

14                 NORTHERN DISTRICT OF CALIFORNIA

15                        SAN JOSE DIVISION

16

17  GABRIEL ORTIZ, ANDREW GONZALES,     )  Case No.:  5:09-cv-03485-LHK
    LANDON MICKEY MILLER, AND JOE       )
18  HUYNH,                              )  [Proposed] ORDER GRANTING
                                        )  PLAINTIFFS' APPLICATION FOR AN
19            Plaintiffs,               )  AWARD OF ATTORNEYS' FEES AND
                                        )  COSTS
20                                      )
         v.                             )
21                                      )  DATE: February 2, 2012
                                        )  TIME:  1:30 p.m.
22  HOME DEPOT U.S.A., INC.,            )  LOCATION:  Courtroom 8
                                        )  The Honorable Lucy H. Koh
23            Defendant.                )
                                        )
24                                      )
                                        )
25                                      )
                                        )
26

27

28

29

The Court having considered Class Counsel's Motion for an Award of Attorneys' Fees and

Costs, and the supporting declarations, and being familiar with this action, HEREBY FINDS AS

FOLLOWS:

     1.     Notice of the requested award of attorneys' fees and costs was directed to Class

Members in a reasonable manner, and complied with Rule 23(h)(1) of the Federal Rules of Civil

Procedure;

     2.     Class Members and any party from whom payment is sought have been given the

opportunity to object in compliance with Fed. R. Civ. P. 23(h)(2);

     3.     No Class Member has objected to the requested fees and expenses;

     4.     The attorneys' fees and costs in the Class Action Settlement Agreement were

negotiated after the class injunctive relief and monetary relief were negotiated;

     5.     The time spent by Class Counsel on this case, as described in the Declarations of

Jinny Kim and Joshua Konecky and documented by the billing records attached to those

declarations, was reasonable;

     6.     The rates claimed by the Legal Aid Society – Employment Law Center and

Schneider Wallace Cottrell Brayton Konecky LLP, as described in the Declarations of Jinny Kim

and Joshua Konecky, are consistent with the prevailing market rates in the Bay Area legal

community for attorneys and professional staff of comparable skill and experience doing

comparable work, and are reasonable;

     7.     The equitable relief in the Class Action Settlement Agreement is meaningful and

socially beneficial, and will greatly benefit Class Members;

     8.     The attorneys' fees requested are commensurate with Class Counsel's current

lodestar.  Moreover, Class Counsel's lodestar will most likely be less than the fees requested

after they complete all their work in connection with this case over the 30-month settlement

term;

Case5:09-cv-    85-LHK   Document87   Filed02/0    Page3 of 3

1    9.    The costs and expenses incurred by Class Counsel are documented and

2    reasonable;

3    10.  .   The requested award of $500,000.00 for attorneys' fees and reimbursement of

4    costs and expenses is fair and reasonable.

5    Accordingly, IT IS HEREBY ORDERED as follows:

6    Class Counsel are hereby awarded attorneys' fees in the amount of $500,000.00 and costs

7    in the amount of $71,295.54 for work performed and costs and expenses incurred through the
hearing on final approval, plus any future costs incurred in connection with monitoring the

8    Agreement up to a total maximum of $85,000.00 for costs.

9

10    Dated: February  2 , 2012                        *Lucy H. Koh*

11                                                   The Hon. Lucy H. Koh
                                                    United States District Judge
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

# EXHIBIT U



# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF SAN FRANCISCO

# Document Scanning Lead Sheet

Apr-28-2011 2:21 pm

Case Number: CGC-06-450274

Filing Date: Apr-28-2011 2:21

Juke Box: 001    Image: 03196903

ORDER

DIANA BOND-HATCH VS. QUEST DIAGNOSTICS, INC. et al

001C03196903

**Instructions:**
Please place this sheet on top of the document to be scanned.

**F I L E D**
San Francisco County Superior Court

APR 2 8 2011

CLERK OF THE COURT
BY: _Alicia Green_
Deputy Clerk

RECD APR 2 1 2011

# IN THE SUPERIOR COURT FOR THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SAN FRANCISCO

### UNLIMITED CIVIL JURISDICTION

| | |
|---|---|
| DIANNA BOND-HATCH and MARCIA PAULEY, individually, and on behalf of all others similarly situated; <br><br> Plaintiffs, <br><br> v. <br><br> QUEST DIAGNOSTICS, INC.; and DOES 1 through 30, inclusive; <br><br> Defendants. | Case No. CGC-06-450274 <br><br> [~~proposed~~] **ORDER GRANTING PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS** <br><br> Date: None Set <br> Time: None Set <br> Dept.: 304 <br> Judge: The Hon. Richard Kramer |

ORIGINAL

SCHNEIDER WALLACE
COTTRELL BRAYTON
KONECKY LLP

1   This matter first came before the Court for hearing on April 18, 2011, on Plaintiffs' Unopposed
2   Motion for Final Approval of Class Action Settlement, Service Awards, Administration Costs and
3   Payment of Attorneys' Fees and Costs.  Joshua G. Konecky of Schneider Wallace Cottrell Brayton
4   Konecky LLP appeared for Plaintiffs; and Max C. Fischer of Sidley Austin appeared for Defendant
5   Quest Diagnostics, Inc. ("Quest Diagnostics").  At that hearing, the Court granted final approval of the
6   class action Settlement Agreement, and directed class counsel to submit additional information
7   regarding their motion for attorneys' fees and costs.  On April 21, 2011, Plaintiffs submitted a
8   Supplemental Brief in Support of Plaintiffs' Motion for Attorneys Fees and Costs and a Supplemental
9   Declaration of Joshua G. Konecky in support of the Motion.

10   Having granted final approval of the Class Action Settlement Agreement, and having received
11   and considered the Settlement Agreement, the supporting papers filed by the Parties—including the
12   supplemental papers filed since the April 18, 2011 hearing—and the evidence and argument received
13   by the Court before entering the Preliminary Approval Order and at the final approval hearing, the
14   Court HEREBY GRANTS the award of Attorneys Fees, enters this Order, and HEREBY ORDERS
15   and ~~MAKES DETERMINATION~~S as follows:

16   1.   The attorneys acting on behalf of the class from Schneider Wallace Cottrell Brayton
17   Konecky LLP, have the experience and qualifications necessary to represent the class. The parties have
18   represented to the Court that at all times, including during negotiation of the Settlement Agreement,
19   they have fairly and adequately protected the interests of the Class. The Court finds the hourly rates
20   charged by Class Counsel are within the prevailing range of rates charged by attorneys providing
21   similar services in class action, wage-and-hour cases in the City and County of San Francisco, and are
22   supported by evidence of the knowledge, skill and experience of Class Counsel and nature of the
23   services performed. The Total hours claimed by Class Counsel are approved as reasonable based on evidence presented of
24   the work performed and the results achieved.

25   2.   The Court finds that Class Counsel's out-of-pocket costs and expenses are ~~fair and~~
26   reasonable and were necessary to the prosecution of this action. The Court therefore awards Class
27   Counsel $144,039.85, in actual costs to be paid from the Common Settlement Fund pursuant to the
28   terms of the Settlement Agreement.

3.     The Settlement Agreement also provides that Class Counsel may seek up to one-third of the $9,000,000 Common Settlement Fund, and Defendant will not object to this amount.  The Class Notice informed Class Members of the amount of fees and costs sought by Class Counsel, and no Class Member objected to payment of these amounts.  The Court finds this amount is reasonable and appropriate given the quality of work, the hotly contested litigation, the preclusion of Class Counsel from other employment, and the favorable results achieved for class members. This amount is also reasonable when cross checked against Class Counsel's lodestar. Class Counsel are awarded $3,000,000 in attorneys' fees. This amount shall be paid from the Common Settlement Fund pursuant to the terms and timeframe set forth in the Settlement Agreement.

IT IS SO ORDERED

DATED: __4 · 27__ , 2011

HON.   **RICHARD A. KRAMER** , JUDGE
SUPERIOR COURT

# EXHIBIT V

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TRISHA WREN, *et al*.,

            Plaintiffs,

   v.

RGIS INVENTORY SPECIALISTS,

            Defendant.

_____/

No. C-06-05778 JCS

**ORDER RE: (1) PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT [Docket No. 912]; (2) PLAINTIFFS' MOTION FOR AN AWARD OF REASONABLE ATTORNEYS' FEES, COSTS AND EXPENSES [Docket No. 909]; AND (3) PLAINTIFFS' MOTION FOR SERVICE AWARDS [Docket No. 869]**

## I.  INTRODUCTION

Pending before the Court are: (1) Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement [Docket No. 912]; (2) Plaintiffs' Motion for an Award of Reasonable Attorneys' Fees, Costs and Expenses [Docket No. 909]; and (3) Plaintiffs' Motion for Service Awards to Named Plaintiffs[1] and Opt-In Plaintiff Lund [Docket No. 869].  Defendant RGIS, LLC does not oppose the motions and therefore has not filed any briefs in response.  On January 28, 2011, the Court held a tentative fairness hearing, during which time it addressed issues relating to these motions and objections from class members filed before the hearing.  On March 25, 2011, the Court held a final fairness hearing, at which time it addressed all remaining issues relating to the settlement and Plaintiffs' Motions.  Notice of both the January 28, 2011 and March 25, 2011 fairness hearings was provided to all class members.  No class members appeared at either hearing.

After careful consideration of the pending Motions and a thorough review of the materials

---

[1]  The Named Plaintiffs are: Trisha Wren; Kevin Barnes; Brent Whitman; Kathlene Feige; Lisa Cunningham-Gibson; Cynthia Piper; Tephine Saites; Margaret Cruz Boze; Michelle Pease; Kimberly Cassara; Rabecka Sheldranti; Victoria Thompson; Melanie Manos; Norma Garcia; Cheryl Pierson; Sally Rosenthal; Nicole Verbick; Tammy Schnars; Margaret Martinez; Carol Molmen; Joan Johnson; Latonia Williams; Jewell Gatlin; and Michele Zustak.

United States District Court
For the Northern District of California

1    submitted in support, the Court now rules as follows.

2         The Court finds that the Settlement Agreement is fundamentally fair, adequate, and

3    reasonable and therefore **GRANTS** Plaintiffs' Motion for Final Approval of Class Action

4    Settlement.

5         As to Plaintiffs' request for an award of attorneys' fees and costs authorized under the

6    Settlement Agreement, the Court **GRANTS** Plaintiffs' Motion and awards $11,307,449.62 in

7    attorneys' fees, and awards $1,598,589.41 in costs and expenses incurred by Schneider Wallace.

8    The Court **RESERVES** ruling on Plaintiffs' request for awards of costs incurred by Grady

9    Schneider, Goldtsein Demchak, and Bailey Pinney pending Plaintiffs' submission of supplemental

10   documentation from these firms substantiating the costs they incurred.

11        With respect to Plaintiffs' request for service awards to the Named Plaintiffs and opt-in

12   Plaintiff Verne Lund, the Court **GRANTS** Plaintiffs' request for service awards to all Named

13   Plaintiffs and Mr. Lund and awards the amounts specified in Section VI.D of this Order.

14                              **II. BACKGROUND**

15        This consolidated action began as two separate putative class actions: (1) *Wren v. RGIS

16   Inventory Specialists*, Case No. C-06-05778, filed on September 20, 2006; and (2) *Piper v. RGIS

17   Inventory Specialists*, Case No. C-07-00032, filed on January 4, 2007. On June 6, 2007, the Court

18   consolidated the two actions. *See* Docket No. 86. Subsequently, on June 26, 2007, Plaintiffs filed

19   their First Amended Consolidated Complaint, asserting twenty-six claims for relief under the Fair

20   Labor Standards Act ("FLSA") and various wage-and-hour laws of California, Oregon, Washington,

21   and Illinois. Docket No. 88.

22        Thereafter, in July 2007, Plaintiffs filed a Motion to Facilitate Notice Pursuant to 29 U.S.C. §

23   216(b), which RGIS opposed. *Piper*, C 07-00032, Docket No.125 (Motion); *Wren*, C 06-05778,

24   Docket No. 121 (Opposition). On December 19, 2007,the Court issued its order on the motion,

25   conditionally certifying two FLSA opt-in classes proposed by Plaintiffs:

26        1. All non-exempt hourly employees of RGIS Inventory Specialists, now operating
          as RGIS, LLC, who were, are, or will be employed as auditors during the period of
27        three years prior to the commencement of this action through the date of judgment of
          this action.

28

2.  All non-exempt hourly employees of RGIS Inventory Specialists, now operating as RGIS, LLC, who were, are, or will be employed as assistant [] team leaders, team leaders, and assistant or associate area managers of RGIS during the period of three years prior to the commencement of this action through the date of judgment of this action.

*See* Order Granting Motion to Facilitate Notice Pursuant to 29 U.S.C. § 216(b) [Docket No. 216].

Additionally, the Court found that Plaintiffs had met the requirements for conditional certification as to the claims for: (1) time spent donning required RGIS equipment; (2) time spent "engaged to wait" for inventories to begin; (3) time spent waiting for transportation to an inventory even after the work day has begun; and (4) time spent in work-related transportation to and from inventory sites in a single work day. *Id.* at 9.

In July 2008, Plaintiffs moved pursuant to Federal Rule of Civil Procedure 23(b)(3) to certify four classes of auditor employees asserting wage-and-hour claims under California, Oregon, Washington, and Illinois law, which RGIS also opposed. *See* Docket Nos. 403 (Motion to Certify), 451 (RGIS Opposition). Additionally, in October 2008, RGIS moved to decertify the FLSA collective action. *See* Docket No. 569. On February 6, 2009, the Court issued its order on Plaintiffs' Motion to Certify and RGIS's Motion to Decertify, granting the motions in part and denying them in part. In its Order, the Court certified the following classes under Rule 23:

1.  California Class:  All hourly Auditors, Assistant Team Leaders, Team Leaders and Assistant Area Managers employed by RGIS in California on or after January 1, 2005 with respect to the claims asserted in the Consolidated Complaint arising out of (1) donning and related waiting time from the time that equipment is made available for donning, (2) unpaid travel time on company provided travel for the first hour of travel to and the first hour of travel from an inventory site, and (3) the alleged failure to comply with the requirements of California Labor Code section 226 that employers must provide properly itemized wage statements.

2.  Oregon Class:  All hourly auditors, Assistant Team leaders, Team Leaders and Assistant Area Managers employed by RGIS in Oregon on or after September 20, 2000 with respect to the claims asserted in the Consolidated Complaint arising out of donning and related waiting time from the time that equipment is made available for donning.

3.  Washington Class:  All hourly Auditors, Assistant Team Leaders, Team Leaders and Assistant Area Managers employed by RGIS in Washington on or after September 20, 2003 with respect to the claims asserted in the Consolidated Complaint arising out of donning and related waiting time from the time that equipment is made available for donning.

3

United States District Court
For the Northern District of California

4. Illinois Class: All hourly Auditors, Assistant Team Leaders, Team Leaders and Assistant Area Managers employed by RGIS in Illinois on or after January 4, 2000, with respect to the claims asserted in the Consolidated Complaint arising out of donning and related waiting time from the time that equipment is made available for donning.

Docket No. 694 at 50-51. The Court further denied RGIS's motion to decertify the FLSA classes "except to the extent that claims of the FLSA plaintiffs purported to sweep more broadly" than the claims of the Rule 23 classes. *Id.* at 23. Following the Court's ruling, class notice was sent to approximately 47,000 current and former employees of RGIS in California, Oregon, Washington, and Illinois.

Subsequently, on November 21, 2008, RGIS moved for summary judgment with respect to Plaintiffs' travel/commute time claim under the FLSA and California and Illinois law; meal period claims under California, Oregon, and Washington law; and donning and waiting claim pursuant to the FLSA. *See* Docket No. 648. On August 24, 2009, the Court issued its Order granting RGIS's motion with respect to Plaintiffs' travel time claims, but denying RGIS's motion for summary judgment as to Plaintiffs' donning and waiting time claims. Docket No. 775. With respect to Plaintiffs' meal period claims, the Court noted that it did not certify any Rule 23 classes based on the alleged meal break violations, and accordingly, considered RGIS's motion for summary judgment on those claims only as they related to the Named Plaintiffs. The Court then granted summary judgment in favor of RGIS on the Named Plaintiffs' claims under Oregon and Illinois law, but denied RGIS's motion without prejudice as to the meal claims asserted under California and Washington law. *Id.*

On November 13, 2009, the Court held a further case management conference, at which time it addressed outstanding discovery, settlement status, pretrial filings, and the trial date. *See* Further Case Management and Pretrial Order, Docket No. 805. Pursuant to the Court's order, the parties filed a status report on November 25, 2009, informing the Court that they had agreed to appear before retired Judge Edward A. Infante for mediation, but had not agreed upon a date. *See* Docket No. 806. On April 2, 2010, the Court held a further case management conference, where it addressed several issues raised by the parties regarding the scope of the claims going to trial and denied RGIS's motion to sever trial on federal and state claims. *See* Minute Entry, Docket No. 829.

Case 3:06-cv-05778-JCS Document 932 Filed 04/01/11 Page 5 of 36

**United States District Court**
For the Northern District of California

1    Thereafter, on April 28, 2010, the parties filed a joint mediation report indicating that on April 22,

2    2010, they participated in a full day of mediation with Judge Infante and had agreed to reconvene on

3    May 7, 2010 for further mediation.  *See* Docket No. 831.  On May 19, 2010, the parties filed a

4    Notice of Settlement, indicating they had reached a settlement and were preparing a settlement

5    agreement.  Docket No. 833.

6           On July 9, 2010, Plaintiffs filed an unopposed Motion for Order Granting Preliminary

7    Approval of Class Action Settlement, seeking: (1) preliminary approval of the proposed class action

8    settlement; (2) certifying the proposed settlement classes; (3) approving and directing dissemination

9    of notice to the class; and (4) setting a date for a fairness hearing.  Docket No. 840.  On July 29,

10   2010, the Court held a hearing on the motion, at which time it directed Plaintiffs to file supplemental

11   briefing on the scope of the FLSA release and on the class certification of the state law meal and rest

12   period claims.  *See* July 10, 2010 Minute Entry, Docket No. 842.  Following further hearing on

13   September 3, 2010, the Court issued an order granting preliminary approval of the proposed

14   settlement, conditionally certifying the settlement class and subclasses, appointing class

15   representatives and class counsel, and approving the form and manner of distributing class notice.

16   Docket No. 851.  Additionally, the Court set a fairness hearing for January 28, 2011, and set

17   deadlines for class members to submit written and signed requests to opt out of the settlement to the

18   claims administrator, and deadlines for Class Counsel's petition for attorneys' fees and costs,

19   petition for approval of service payments to Plaintiffs, class members' objections to the settlement,

20   and Plaintiffs' motion for final approval of the settlement.  *Id.* at 10.

21          On December 6, 2010, Plaintiffs' filed the pending Motion for an Award of Reasonable

22   Attorneys' Fees, Costs and Expenses Pursuant to F.R.C.P. 23(h), and Motion for Service Awards to

23   Named Plaintiffs and Opt-In Plaintiff Lund.  Docket Nos. 869, 871, 909 (Amended Motion for

24   Attorneys' Fees).  Thereafter on January 18, 2010, Plaintiffs filed the pending Unopposed Motion

25   for Final Approval of Class Action Settlement and Response to Objections.  Docket No. 912.

26          In the interim, on December 27, 2010, the parties filed a joint motion requesting that the

27   Court convert the scheduled fairness hearing to a hearing for tentative final approval of the proposed

28   class action settlement because 1,872 individuals had been inadvertently omitted from the mailings

5

**United States District Court**
For the Northern District of California

1   notifying class members of the proposed settlement.  Docket No. 900.  Because the deadlines set in

2   the order granting preliminary approval would not provide sufficient opportunity for these class

3   members to request exclusion from the settlement, file objections, or indicate their intention to

4   appear at the scheduled fairness hearing, the parties requested that the Court proceed with the

5   hearing scheduled for January 28, 2011, but make any determinations based on that hearing

6   tentative, and schedule a new hearing date to allow for consideration of any objections from the

7   1,872 omitted opt-ins received after the January 28, 2011 hearing.  *Id.* at 1-4.  On January 3, 2011,

8   the Court granted the parties' joint motion, converting the January 28, 2011 hearing to one for

9   tentative final approval of settlement, and setting a further hearing for final approval of settlement

10  for March 25, 2011.  Docket No. 904.

11          On January 28, 2011, the Court held the tentative fairness hearing, at which time it addressed

12  specific issues relating to the pending Motions with counsel and directed Plaintiffs to file

13  supplemental materials documenting their requests for awards of service payments, attorneys' fees,

14  and costs.  Following the hearing, the Court received only one additional request for exclusion from

15  a class member.  *See* Docket No. 926.

16                    **III.  OVERVIEW OF THE SETTLEMENT AGREEMENT**

17          On July 9, 2010, the parties finalized and executed a Stipulation of Settlement (the

18  "Settlement Agreement").  *See* Exhibit A to Plaintiffs' Unopposed Motion for Final Approval of

19  Class Action Settlement [Docket No. 912-1].  The parties thereafter executed a Supplemental

20  Agreement Regarding Stipulation of Settlement ("Supplemental Agreement") in September 2010,

21  modifying certain provisions and deadlines set forth in the Settlement Agreement.  *See* Exhibit B to

22  Mot. for Final Approval [Docket No. 912-2].  The key terms of the Settlement Agreement, as

23  amended, are as follows.

24          In full settlement of the claims asserted in this lawsuit, RGIS has agreed to pay a gross

25  settlement amount of $27,000,000 (the "Settlement Amount").  *See* Settlement Agreement ¶¶ 2.1.S,

26  2.2.  The Settlement Amount includes: (1) class damages to compensate class members for unpaid

27  overtime and liquidated damages pursuant to the FLSA, unpaid straight-time, overtime, and

28  prejudgment interest pursuant to the laws of California, Illinois, Oregon, and Washington, and

United States District Court
For the Northern District of California

1  Plaintiffs' California meal period claims; (2) service awards to the Named Plaintiffs and certain class

2  representatives; (3) Plaintiffs' attorneys' fees and expenses; and (4) expenses incurred in

3  administering the settlement. *See* Settlement Agreement ¶ 2.1.S. Pursuant to the Settlement

4  Agreement, the amount remaining after payment of attorneys' fees and expenses, service awards,

5  and tax withholdings is to be distributed to settlement class members who are deemed to be

6  Authorized Claimants according to a plan of allocation devised by Class Counsel *Id*. ¶ 2.8.

7  Additionally, the Settlement Agreement provides for equitable relief in the form of RGIS's

8  agreement to revise its corporate policies, including its Team Member Handbook and Field Policy

9  Manual for the United States, to clearly indicate that employees are to put on required audit

10  equipment after scanning in for purposes of receiving pay. *Id*. ¶ 2.6.B. Concurrently, RGIS agreed

11  to provide training to its employees regarding these policies, including training for newly-hired

12  hourly auditing employees. *Id*.

13  In exchange for the monetary damages and equitable relief, this action will be dismissed with

14  prejudice and class members who do not opt out will fully release RGIS from any and all claims

15  asserted in the lawsuit.[2] Settlement Agreement ¶ 2.9; Supplemental Agreement ¶ 3.B.[3]

16  

---

17  [2]Specifically, the release provision, as modified by ¶ 3.B of the Supplemental Agreement, provides

18  <u>Release Of Claims By Named Plaintiffs and Settlement Class Members</u>
       For and in consideration of the mutual promises contained herein, Plaintiffs and the

19  Settlement Class Members fully and finally release Defendant from any and all liability for all claims that were asserted, or that could have been asserted, in the instant action.

20  This includes any and all claims, actions or causes of action, demands, obligations, guarantees, expenses, attorney's fees, damages, or costs, alleged in or based upon the

21  First Amended Consolidated Complaint in this action from the maximum applicable limitations period for each claim through the date that the Court enters a final order

22  granting final approval of the settlement, including, but not limited to: (1) the alleged failure to pay straight time wages for all off-the-clock work and all on-the-clock work

23  under any state, local, or federal law; (2) the alleged failure to pay the required minimum wage for all off-the-clock work and all on-the-clock work under any state, local, or

24  federal law; (3) the alleged failure to pay overtime compensation for all off-the-clock work and all on-the-clock work under any state, local, or federal law; (4) the alleged

25  failure to provide proper and adequate meal periods and rest breaks under California or federal law; (5) the alleged failure to provide all wages required as a matter of contract;

26  (6) the alleged failure to pay all wages due upon termination under any state, local, or federal law; (7) the alleged failure to pay penalties under California Labor Code sections

27  203 and 2698 *et seq*. (Private Attorney General Act) and Oregon Revised Statutes section 652.150; (8) the alleged failure to issue proper itemized wage statements under

28  California Labor Code section 226; (9) all claims for restitution and/or other relief under

United States District Court
For the Northern District of California

1    The Settlement Agreement also sets forth procedures for notifying class members of the

2    settlement (¶ 2.11C-I), opting out of the settlement (¶ 2.10); allocation of settlement payments (¶

3    2.8), and submitting the Settlement Agreement to the Court for preliminary and final approval (¶¶

4    2.11A, K).

5    ## IV.  MOTION FOR FINAL APPROVAL OF SETTLEMENT

6    **A.    Overview of Plaintiffs' Motion**

7    Following the Court's September 16, 2010 Order granting preliminary approval of the

8    Settlement Agreement and approving the proposed Notice of Class Settlement, Plaintiffs now move

9    for final approval of the Settlement Agreement and Supplemental Agreement.  Motion for Final

10   Approval [Docket No. 912].

11   **B.    Legal Standard**

12   Pursuant to Federal Rule of Civil Procedure 23(e), "[t]he claims, issues, or defenses of a

13   certified class may be settled, voluntarily dismissed, or compromised only with the court's

14   approval."  As the Ninth Circuit explained, "[t]he purpose of Rule 23(e) is to protect the unnamed

15   members of the class from unjust or unfair settlements affecting their rights."  *In re Syncor ERISA*

16   *Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008).  Toward this end, before a court approves a settlement it

17   must conclude that the settlement is "fundamentally fair, adequate and reasonable."  *In re Heritage*

18   *Bond Litig.*, 546 F.3d 667, 674-75 (9th Cir. 2008).  To determine if a settlement satisfies these

19   criteria, the trial court examines: (1) the strength of the plaintiffs' case; (2) the risk, expense,

20   complexity, and likely duration of further litigation; (3) the risk of maintaining class action status

21   throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and

22   

23   California Business and Professions Code section 17200 et seq. as a result of or based
     upon the foregoing alleged legal violations; (10) all claims for injunctive relief based
24   upon the foregoing alleged legal violations; (11) all claims for liquidated damages based
     upon the foregoing alleged legal violations; (12) the alleged failure to pay pre-judgment
25   interest on any unpaid wages, liquidated damages, penalties, or any other damages based
     on the foregoing alleged violations; (13) litigation costs and attorney's fees in connection
26   with the instant action; and (14) any other claims of any kind alleged in the instant
     action.

27   [3] The Supplemental Settlement Agreement amended ¶ 2.9.A to limit the release of meal period
28   claims to those arising under California law and federal law.

8

**United States District Court**
For the Northern District of California

1   the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a

2   governmental participant; and (8) the reaction of class members to the proposed settlement.

3   *Churchill Village v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (citing *Hanlon v. Chrysler Corp.*,

4   150 F.3d 1011, 1026 (9th Cir. 1998)).  "This list is not exhaustive, and different factors may

5   predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376

6   (9th Cir. 1993) (citing *Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615,

7   625 (9th Cir. 1982)).  In addition to these factors, the Court may consider the procedure by which

8   the parties arrived at the settlement.  *See Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848,

9   851 (N.D. Cal. 2010) (citing Manual for Complex Litig. (Fourth) § 21.6 (2004)).

10         The burden of establishing the fairness of a settlement is on its proponents.  *See Riker v.*

11  *Gibbons*, No. 3:08-cv-00115, 2010 WL 4366012, at *2 (D. Nev. Oct. 28, 2010) (citing 4 Alba Conte

12  & Herbert B. Newberg, *Newberg on Class Actions* § 11:42 (4th ed. 2002)).  "An initial presumption

13  of fairness is usually involved if the settlement is recommended by class counsel after arm's-length

14  bargaining."  *Id.*  Further, the Ninth Circuit has recognized that underlying this analysis, "there is a

15  strong judicial policy that favors settlement, particularly where complex class action litigation is

16  concerned."  *In re Syncor ERISA Litig.*, 516 F.3d at 1101 (citing *Class Plaintiffs v. City of Seattle*,

17  955 F.2d 1268, 1276 (9th Cir. 1992)).  With the foregoing factors as guidance, the Court turns to

18  Plaintiffs' request for final approval of the Settlement Agreement.

19  **C.      Analysis**

20         **1. The Strength of the Plaintiffs' Case**

21         The initial factor the Court takes into consideration is the strength of Plaintiffs' case.  *See*

22  *Churchill Village*, 361 F.3d at 575.  In their Motion, Plaintiffs acknowledge that while their

23  donning/waiting time claims survived RGIS's motion for summary judgment, they still face some

24  challenges in establishing this claim, proving their damages, and overcoming RGIS's defenses.  In

25  its summary judgment order, the Court rejected RGIS's argument that the donning and associated

26  work time for which Plaintiffs seek compensation are not "work," but are merely preliminary

27  activities that are exempted from compensation under the Portal-to-Portal Act.  *See* August 24, 2009

28  Summary Judgement Order at 36 [Docket No. 775].  Further, as to RGIS's argument that it is not

1   required to compensate employees for time spent donning and waiting because the time is *de*

2   *minimis*, the Court noted that the record contained conflicting evidence on the factors it must

3   consider in determining whether the doctrine applied. *Id.* at 38-39. While RGIS bears the burden of

4   establishing that the time Plaintiffs seek compensation for is *de minimis* as a matter of law, Plaintiffs

5   acknowledge that they will have to defend against this argument at trial, which presents a potential

6   risk of a verdict in RGIS's favor. In the Court's view, this risk is substantial. Thus, the first factor

7   supports approval of the settlement.

8   **2. The Risk, Expense, Complexity, and Likely Duration of Further Litigation**

9   The second factor focuses on the risks, expense, complexity, and projected duration of the

10   litigation. *See Churchill Village*, 361 F.3d at 575. In their Motion, Plaintiffs recognize that even at

11   this stage of the case, they face numerous obstacles to recovery, including challenges to their expert

12   witnesses and damages calculations, defending against RGIS's assertion of the *de minimis* doctrine,

13   and pursuing their claims against skilled defense attorneys who have significant trial experience in

14   similar cases. Mot. for Final Approval at 8-9. Additionally, if this case was to proceed to trial, the

15   time and expenses associated with trial preparation would mount. In the upcoming months, the

16   parties would have to complete depositions of trial witnesses, prepare and defend against motions *in*

17   *limine* and *Daubert* motions, draft trial briefs, prepare deposition designations and trial exhibits,

18   appear for pre-trial conferences, and, ultimately, try the case to a jury in 19 days. The trial of a

19   federal opt-in class and multiple state Rule 23 classes could be a complex, expensive, and difficult

20   undertaking. Even if Plaintiffs obtain a favorable verdict on their claims, they acknowledge that

21   they could potentially face additional expenses and delay if RGIS appeals. Taken together, these

22   considerations support approval of the settlement.

23   **3. The Risk of Maintaining Class Action Status**

24   Under the third factor, the Court considers the risk of maintaining class action status through

25   the trial of this case. *See Churchill Village*, 361 F.3d at 575. As the record demonstrates, the parties

26   have vigorously litigated the issue of class action status, generally, and the types of claims certified

27   for class treatment, specifically. *See* Docket Nos. 216 (Dec. 19, 2007 Order Granting Motion to

28   Facilitate Notice Pursuant to 29 U.S.C. § 216(b)), 403 (RGIS's Motion to Decertify), 569 (Plaintiffs'

United States District Court

For the Northern District of California

1    Motion to Certify Under Rule 23), 694 (Feb. 6, 2009 Order Certifying Rule 23 Classes and Denying

2    Motion to Decertify).  Presently, there are no outstanding disputes regarding the classes and claims

3    that the Court has certified.  Plaintiffs, however, acknowledge that because they are asserting claims

4    pursuant to the FLSA and the laws of four states based on events occurring in over 300 RGIS

5    districts and thousands of inventory locations across the country, they may face renewed challenges

6    to class action status from RGIS.  Mot. for Final Approval at 9.  Thus, the risk of maintaining class

7    action status favors settlement.

8         **4. The Settlement Amount**

9         Fourth, the Court must analyze the amount offered in settlement.  *See Churchill Village*, 361

10   F.3d at 575.  To assess whether the amount offered is fair, the Court may compare the settlement

11   amount to the parties' estimates of the maximum amount of damages recoverable in a successful

12   litigation.  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459.  While settlement amounts that are

13   close to the plaintiffs' estimate of damages provide strong support for approval of the settlement,

14   settlement offers that constitute only a fraction of the potential recovery do not preclude a court from

15   finding that the settlement offer is fair.  *Id.* (finding settlement amount constituting one-sixth of the

16   potential recovery was fair and adequate); *see also Hanlon*, 150 F.3d at 1027 (holding that the

17   possibility that the settlement amount could have been greater "does not mean the settlement

18   presented was not fair, reasonable or adequate.").  "This is particularly true in cases . . . where

19   monetary relief is but one form of the relief requested by the plaintiffs."  *Officers for Justice v. Civil*

20   *Serv. Comm'n*, 688 F.2d 615, 628 (9th Cir. 1982).  Thus, district courts have found that settlements

21   for substantially less than the plaintiffs' claimed damages were fair and reasonable, especially when

22   taking into account the uncertainties involved with litigation.  *See, e.g., Glass v. UBS Fin. Serv.,*

23   *Inc.*, No. C-06-4068 MMC, 2007 WL 2216862, at *4 (N.D. Cal. Jan. 26, 2007) (finding settlement

24   of wage and hour class action for 25 to 35% of the claimed damages to be reasonable); *Williams v.*

25   *Costco Wholesale Corp.*, No. CV-02-2003 IEG, 2010 WL 2721452, at *4 (S.D. Cal. July 7, 2010)

26   (finding settlement amount constituting approximately 75.6% of the plaintiffs' claimed losses from

27   unpaid overtime pay to be adequate).

28

Here, under the terms of the Settlement Agreement RGIS will be required to pay a Settlement Amount of $27,000,000, with at least $12.43 million of that total being distributed *pro rata* to class members.  *See* Settlement Agreement, ¶ 2.1(S) [Docket. No. 912-1 at 8]; Mot. for Final Approval at 10.  Citing to the declaration of their expert statistician, Dr. Richard Drogin, Plaintiffs contend that $12.43 million represents an amount that is substantially equal to Plaintiffs' own estimate of the class members' compensatory damages arising from their pre-inventory donning and waiting claims.  Mot. for Final Approval at 10; Declaration of Dr. Richard Drogin In Support of Plaintiffs' Motion for Final Approval ¶ 4 [Docket. No. 875 at 1].  They explain that this estimate includes unpaid overtime and liquidated damages pursuant to the FLSA, and unpaid straight-time, overtime, and pre-judgment interest pursuant to California, Illinois, Oregon, and Washington law. *Id.*; Drogin Decl. ¶ 5.  The remainder of the damages Plaintiffs sought related to Plaintiffs' California meal period claims and the extension of the class period to September 16, 2010.  *Id.* Thus, the $12.43 million that will be distributed to the class members secures a substantial recovery that corresponds to Plaintiffs' own damages assessment.[4]

Moreover, the Settlement Agreement also includes injunctive relief in the form of changes to RGIS's corporate policies regarding donning of required audit equipment to ensure that the donning occurs *after* hourly auditing employees have scanned-in for purposes of receiving pay.  *See* Settlement Agreement, ¶ 2.6.B [Docket No. 912-1 at 13].  Significantly, because the FLSA does not authorize injunctive relief, Plaintiffs would not have been able to obtain this result on a class-wide basis even if they had prevailed at trial.  *See* Declaration of the Honorable Edward A Infante (Ret.)

---

[4] In their prior Motion for Preliminary Approval, Plaintiffs explained that Class Counsel devised an allocation plan based on a formula designed to compensate all class members who are entitled to receive settlement payments. *See* Docket No. 840 at 8.  Specifically, Plaintiffs explained that settlement payments will be calculated as follows: (1) all settlement class members will receive a pro rata share of the estimated $13 million fund based on their individual wage loss and interested as calculated by Plaintiffs' experts from records RGIS produced; (2) regardless of the individual wage loss calculated by Plaintiffs' experts, settlement class members who worked more than 30 days will receive a settlement payment of no less than $50; (3) regardless of their estimated individual wage loss, settlement class members who worked less than 30 days will receive a settlement payment of no less than $25.  *Id.* Additionally, the parties have agreed that $100,000 from the settlement amount will be allocated as penalties payable to the State of California pursuant to California's Private Attorney General Act, California Labor Code section 2699.  *Id.*; Settlement Agreement ¶ 2.8.

United States District Court

For the Northern District of California

1  in Support of Final Approval of Class Action Settlement ¶¶ 9-10, Ex. E to Motion for Final

2  Approval [Docket No. 912-5].

3        Taken together, the settlement award compensating the class for their backpay plus interest

4  and FLSA liquidated damages, in conjunction with changes to RGIS's national compensation

5  policies, support a finding that the relief obtained through the Settlement Agreement is fair and

6  reasonable.

7      **5. The Extent of Discovery Completed and the Stage of the Proceedings**

8        The fifth factor examines the extent of discovery the parties have completed and the current

9  stage of the litigation to evaluate whether "the parties have sufficient information to make an

10 informed decision about settlement." *Linner v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th

11 Cir. 1998). As Plaintiffs point out in their Motion, both parties conducted extensive discovery in

12 this case. With respect to written discovery, Plaintiffs propounded 11 sets of special interrogatories

13 and 17 sets of requests for production of documents, to which RGIS responded by producing

14 124,193 pages of documents, including policy-related documents, internal handbooks and training

15 materials, and personnel files for over 400 opt-in plaintiffs. Mot. for Final Approval at 10-11.

16 RGIS, in turn, propounded one set of approximately 25 special interrogatories on each of the Named

17 Plaintiffs and one set of approximately 65 requests for production of documents. *Id*. at 11. RGIS

18 also received responses to interrogatories and requests for production of documents from 390 of the

19 opt-in plaintiffs. *Id*. In addition to the written discovery, the parties took a total of 64 depositions

20 and had expert reports prepared. *Id*. Further, Plaintiffs indicate that during discovery they obtained

21 and conducted a statistical analysis of RGIS's time and payroll data for the FLSA opt-in and auditors

22 in the four states. *Id*.

23       Given the scope and amount of discovery completed, the parties had ample information

24 about the strengths and weaknesses of their positions to enable them and their counsel to make

25 informed decisions about the settlement. Thus, this factor supports final approval of the settlement.

26     **6. The Experience and Views of Counsel**

27       The sixth factor takes into account counsel's experience and their respective views of the

28 Settlement Agreement. The Court has previously evaluated Class Counsel's qualifications and

**United States District Court**
For the Northern District of California

1  experience and concluded that counsel is well-qualified to represent Plaintiffs' interests in this

2  action. *See* Feb. 6, 2009 Order Re Plaintiffs' Motion for Class Certification at 49 [Docket No. 694];

3  *see also* Declaration of Guy Wallace in Support of Motion for Preliminary Approval ¶¶ 3-9 [Docket

4  No. 840-2]. Likewise, the Court is confident in defense counsel's competency and experience and

5  their ability to represent RGIS in this action.

6        With respect to counsel's views of the proposed Settlement Agreement, Mr. Wallace has

7  filed a declaration stating that he believes the settlement amount and prospective injunctive relief

8  provide an "exceptional result" for the class. Wallace Decl. ¶ 42 [Docket No. 840-2 at 14]. He also

9  opines that the settlement "is in the best interest of the Class Members in light of all known facts and

10  circumstances, including the risk of significant delay and Defendant's asserted defenses." *Id.* ¶ 43.

11  While defense counsel have not filed any declaration expressing their perspective on the Settlement

12  Agreement, RGIS has not opposed the instant motion.

13        Courts have taken divergent views on the amount of weight to accord counsel's opinions.

14  *Compare Carter v. Anderson Merch., LP*, No. EDCV 08-0025-VAP, 2010 WL 1946784, at *8 (C.D.

15  Cal. May 11, 2010) ("Counsel's opinion is accorded considerable weight."); *Riker v. Gibbons*, No.

16  3:08-cv-00115-LRH, 2010 WL 4366012, at *4 (D. Nev. Oct. 28, 2010) ("The recommendation of

17  experienced counsel in favor of settlement carries a great deal of weight in a court's determination of

18  the reasonableness of a settlement.") (internal quotation omitted); *with Chun-Hoon v. McKee Foods

19  Corp.*, No. C 05-620 VRW, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010) ("[T]his court is reluctant to

20  put much stock in counsel's pronouncements, as parties to class actions and their counsel often have

21  pecuniary interests in seeing the settlement approved."). Here, given Class Counsel's extensive

22  experience with class actions, familiarity with the strengths and weaknesses of Plaintiffs' claims,

23  and assessment of the benefits of settlement and the risks associated with continued litigation, the

24  Court finds that Class Counsel's favorable opinion of the terms of the settlement supports approval

25  of the Settlement Agreement.

26        **7. The Presence of a Governmental Participant**

27        Because there is no governmental entity involved in this litigation, the seventh factor is

28  inapplicable.

United States District Court

For the Northern District of California

1    **8. The Reaction of Class Members to the Proposed Settlement.**

2    The final factor examines the class members' response to the proposed settlement. *See*

3    *Churchill Village*, 361 F.3d at 575. Plaintiffs explain that notice was sent via first class mail to the

4    last-known addresses of 62,594 class members. Mot. for Final Approval at 2 (citing Declaration of

5    Brendan McInerney, ¶ 10 [Docket No. 912-4 at 3]). In response, only 33 class members,

6    representing approximately 0.05% , have opted-out. Mot. for Final Approval at 2; McInerney Decl.

7    ¶ 16. Thus, the 99.95% class member participation rate is strong indicia that the class supports the

8    proposed settlement. *See Churchill Village*, 361 F.3d at 577 (affirming approval of settlement with

9    500 opt-outs from class of 90,000 class members, roughly .5%,); *Chun-Hoon*, 716 F. Supp. 2d at 852

10   (finding that 16 opt-outs in a class of roughly 329 members, amounting to 4.86%, strongly supported

11   settlement); *Glass*, 2007 WL 221862, at *5 (approving settlement with opt-out rate of 2%).

12   The number of class member objections also is relevant to gauging class member reaction.

13   Generally, "the absence of a large number of objections to a proposed class action settlement raises a

14   strong presumption that the terms of a proposed class action settlement are favorable to the class

15   members." *Nat'l Rural Telecomm. Cooperative v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal.

16   2004); *see also Garner v. State Farm Mut. Auto. Ins. Co.*, No. C 08-1365 CW, 2010 WL 1687832, at

17   *14 (N.D. Cal. April 22, 2010) (citing *Nat'l Rural Telecomm. Cooperative*); *Riker*, 2010 WL

18   4366012, at *5 ("The small number of objections is an indication that the settlement is fair,

19   adequate, and reasonable."). Here, Plaintiffs proffer that only 16 class members – constituting

20   0.02% – have filed objections to the proposed settlement. Mot. for Final Approval at 2. In the

21   following section, the Court addresses the substance of each of the objections. For purposes of

22   assessing the overall reaction of the class, however, the Court finds that the minimal number of

23   objections filed strongly supports approval of the settlement.

24   **9. Class Members' Objections**

25   The following 16 class members have filed objections to the proposed settlement: (1) Bonita

26   Jones [Docket No. 868]; (2) Sharon Chysler [Docket No. 892]; (3) Kenneth Hobbs [Docket Nos.

27   893, 915]; (4) Emma Jean Jones [Docket No. 894]; (5) Mara Mary Kraguli [Docket No. 895]; (6)

28   Leslie T. King [Docket No. 896]; (7) Joyce Anderson [Docket No. 897]; (8) Dianne Roholt [Docket

United States District Court
For the Northern District of California

No. 898]; (9) Delia Hauser [Docket No. 899]; (10) Ricky Covington [Docket No. 905]; (11) Carlton K. McRoberts [Docket No. 906]; (12) Marion Elizabeth Williams-Jerome [Docket No. 910]; (13) Denise Bundy [Docket No. 911, 913]; (14) Kenneth Pertile [Docket No. 928, Ex. A]; (15) Shaniqua Smith [Docket No. 928, Ex. B]; and (16) Thomell Smith [Docket No. 928, Ex. C]. Because many of the class members raise similar objections, the Court will address them according to the substance of the challenge.

### a. Objections to the Settlement Amount

Ms. Anderson, Ms. Crysler, Mr. Covington, Ms. King, Mr. Pertile, and Ms. Smith each object to the settlement on the ground that the $12.43 million that is to be distributed to the class members *pro rata* is inadequate. However, as discussed above under the fourth factor, this amount is nearly equal to Plaintiffs' expert's calculation of damages associated with the class's pre-inventory donning claims. *See* Drogin Decl. ¶ 4. The $12.43 million is therefore meant to compensate the class for their unpaid overtime and liquidated damages under the FLSA and unpaid straight-time, overtime, and prejudgement interest under California, Illinois, Oregon, and Washington law. While those objecting to the settlement may believe that a higher amount is justified, they must bear in mind that if the case proceeds to trial, they face significant risks, including the possibility that a jury will find in RGIS's favor and the class will not recover any damages. Because the settlement agreement secures substantial monetary recovery for the class that roughly approximates their claimed damages for their donning time claims, the Court finds the objections to the settlement amount unpersuasive and declines to reject the settlement on this basis.

### b. Objections to the Amount of Individual Awards

Next, Ms. Anderson, Ms. Crysler, Mr. Covington, Ms. Jones, Ms. King, Mr. Pertile, and Ms. Smith each object to the settlement on the ground that their individual awards are insufficient. Plaintiffs, however, explain that their expert, Dr. Drogin calculated the estimated awards stated in the settlement notice according to the FLSA and hour laws of the class members' respective states. *See* Mot. for Final Approval at 14; *see also* Motion for Preliminary Approval at 8 [Docket No. 840]. Using RGIS's time and payroll records, Dr. Drogin credited each class member with 15 minutes of unpaid time for all local inventories, and all travel inventories for which the class member received

16

less than 30 minutes of travel pay. *See* Drogin Decl. ¶¶ 7-8 [Docket No. 875]. For state law class members, Dr. Drogin calculated the resulting unpaid straight-time and overtime wages according to the class members' respective state's wage and hour laws. *Id.* ¶¶ 11-14. For FLSA collective action members, Dr. Drogin calculated the unpaid overtime wages, as well as any straight-time wages. *Id.* ¶ 10. He then took the total for each class member and divided it by the total class damages to determine a percentage, which he multiplied by the total settlement fund to determine each individual's award. *Id.* ¶ 16. While the class members contend that their individual awards should be greater, they have not proposed any alternative method for calculating individual awards that would produce a more equitable result. Moreover, if any of the class members believed that he or she could obtain a greater recovery by individually asserting claims against RGIS, the Notice of Settlement informed them that they had the option of opting-out of the Settlement Class. *See* Official Notice of Settlement of Class Action, Ex. A to McInerney Decl. at 11. The Court therefore finds that the class members' challenges to the amount of their individual awards do not provide any grounds to reject the proposed settlement.

### c. Objections Based on Lack of Compensation for Unpaid Travel Time

The next category of objections concerns the scope of the settlement. Specifically, Ms. Crysler, Mr. Covington, Ms. Hauser, Ms. Jones, Ms. King, Mr. Pertile, and Ms. Smith each object to the settlement because it does not compensate class members for RGIS's practice of not paying auditor employees for the first hour of travel to and from travel inventories. The Court previously considered the class members' claim travel/commute time claims and granted summary judgment in favor of RGIS. *See* Aug. 24, 2009 Summary Judge Order at 13-21 [Docket No. 775]. Because any claim for unpaid travel or commute time is no longer at issue, the class members' argument that the settlement is deficient because it does not provide compensation for unpaid travel time lacks merit.

### d. Objections to Service Awards for Named Plaintiffs

Two class members – Ms. Hauser and Mr. Hobbs – object to the provision of service awards to the Named Plaintiffs in the proposed settlement. However, service awards, also known as incentive payments, to named plaintiffs in a class action are permissible and do not render a settlement unfair or unreasonable. *See Stanton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003);

*Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009). In section VI, below, the Court addresses Plaintiffs' request for service awards in detail and approves the awards. Thus, for purposes of these objections, the Named Plaintiffs' request for such awards does not undermine the fairness or adequacy of the proposed settlement.

Additionally, in his objection Mr. Hobbs requests that he be named a class representative for the state of Ohio and requests a service award. *See* Docket No. 893 at 2. He further states that if his request cannot be granted, he wishes to opt-out of the settlement. *Id.* However, as Plaintiffs point out, because no claims arising under the laws of Ohio were at issue in this case, Mr. Hobbs cannot represent an Ohio state class. Accordingly, the Court **GRANTS** Mr. Hobbs' request to opt-out of the Settlement Class.

### e. Objections Based on Request for Attorneys' Fees and Costs

Two class members – Ms. Anderson and Ms. Crysler – object to the proposed settlement on the ground that the attorneys' fees sought by Class Counsel are too high. In section V, below, the considers Plaintiffs' motion for an award of attorneys' fees and costs, and after a thorough review, concludes that the amount of fees and costs requested is reasonable. The class members' objections therefore do not preclude approval of the settlement.

### f. Objections to the Injunctive Relief Component

In her objection, Ms. Crysler contends that the proposed settlement is inadequate because the injunctive relief does not include any changes to RGIS's policy of not paying auditors for the first hour of travel to and from travel inventories. *See* Docket No. 892. However, as explained above, the Court granted summary judgment in RGIS's favor on the travel/commute time claims. Thus, while Ms. Crysler may oppose RGIS's policy regarding payment for travel time, the absence of any injunctive relief requiring changes to RGIS's policy is consistent with the Court's summary judgment ruling. This objection therefore does not provide any basis to deny approval of the proposed settlement.

### g. Miscellaneous Objections

Finally, certain class members raise other, individual challenges to the settlement agreement that do not fall within the foregoing categories.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

In her letter, Ms. Roholt indicates that she experienced hostile treatment during her employment and was then wrongfully terminated from her position at RGIS. *See* Docket No. 898. She objects to the settlement because it does not address her concerns relating to these incidents. Similarly, in her letter, Ms. Kraguli contends that she was wrongfully terminated and denied unemployment benefits and objects to the settlement on these bases. *See* Docket No. 895. These objections, however, do not relate to the wage and hour claims that are at issue in this case and do not raise any issues calling the fairness or adequacy of the proposed settlement into question.

Mr. McRoberts has filed a letter indicating that he objects to the settlement, but does not set forth the basis for his objection. Likewise, Mr. Smith has filed a letter containing his contact information, but omitting the basis for his objection.

Ms. Bundy and Ms. Williams-Jerome have filed letter indicating that they object to the settlement because they were excluded from the settlement classes.[5] These objections thus do not go to the fairness of the settlement.

**10. The Settlement Process**

In addition to the foregoing factors, the Court may also consider the procedure by which the parties arrived at their settlement. *See Chun-Hoon*, 716 F. Supp. 2d at 852. The parties first participated in a full-day mediation session before David Rotman on October 5, 2009, but were unable to reach an agreement. *See* Declaration of Guy B. Wallace in Support of Plaintiffs' Motion for Attorneys' Fees ¶ 102 [Docket No. 882]. The parties thereafter continued to litigate the case and conducted additional expert discovery. *Id*. In April 22, 2010, the parties participated in a second private mediation session, this time before retired United States Magistrate Judge Edward A. Infante, during which the parties reached compromises on several key issues. *Id*. ¶ 103; Infante Decl. ¶ 4. The parties returned for a second mediation session before Judge Infante on May 7, 2010, at which time they agreed to the basic terms that formed the basis of the Settlement Agreement, which they finalized on July 9, 2010. Wallace Decl. ¶ 103; Infante Decl. ¶ 14. Thus, the Settlement Agreement is the result of arms-length negotiations supervised by Judge Infante. This supports a finding that

---

[5] In response, Plaintiffs explain that both individuals were excluded because they did not work for RGIS during the three years preceding their opt-in dates.

United States District Court
For the Northern District of California

the parties reached the settlement in a procedurally sound manner and that it was not the result of collusion or bad faith by the parties or counsel. *See Hanlon*, 150 F.3d at 1027 (affirming trial court's approval of class action settlement where parties reached agreement after several months of negotiation and the record contained no evidence of collusion); *Chun-Hoon*, 716 F. Supp. 2d at 852; *see also Satchell v. Fed. Exp. Corp.*, No. C 03-2659 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive."); *Carter v. Anderson Mech., LP*, No. EDCV 07-0025-VAP, 2010 WL 1946784, at *7 (C.D. Cal. May 11, 2010) (citing *Satchell*).

**D.      Conclusion**

Taking the foregoing factors into consideration, the Court finds that the Settlement Agreement, as amended by the Supplemental Agreement, is fundamentally fair, adequate, and reasonable. The parties reached the agreement after intensive negotiations led by an experienced mediator. After years of litigation and extensive discovery, the parties have a clear understanding of the strengths and weaknesses of their respective positions and the risks and expenses inherent in taking the case to trial. The Settlement Agreement provides compensation for the class members unpaid wages that equates with Plaintiffs' own damages estimate, and, further, provides injunctive relief from RGIS in the form of amending its policies to ensure that employees are paid for such time in the future. Finally, the class member participation rate is extremely high and the few class member objections that have been filed do not raise meritorious challenges. On balance, these factors all support approval of the Settlement Agreement.

Accordingly, the Court **GRANTS** Plaintiffs' Motion for Final Approval of the Settlement.

## V.  MOTION FOR ATTORNEYS' FEES AND COSTS

**A.      Overview of Plaintiffs' Motion**

As indicated above, the Settlement Agreement authorizes Plaintiffs to seek an award of attorneys' fees and costs incurred during this litigation. Specifically, ¶ 2.12.B of the Settlement Agreement, as amended, provides in pertinent part:

> Application for approval of attorneys' fees and expenses. Plaintiffs will submit an application to the Court by December 2, 2010, for approval of attorney's fees and litigation expenses. Plaintiffs will request that the Court approve an award of

$11,380,000 as attorney's fees and approximately $2,200,000 as litigation expenses, which does not include the costs of the Claims Administrator. Defendant will not oppose the amounts sought by Plaintiffs for attorney's fees and litigation expenses. Plaintiffs' Attorney's Fees will not exceed the amount of their calculated lodestar. Plaintiffs' Attorney's Fees and Litigation Expenses will be paid solely from the Settlement Amount. In no event will Defendant be required to pay more than the Settlement Amount in full satisfaction of all its obligations under this Agreement, with the single exception that, as provided herein, Defendant will pay its share of employer payroll taxes associated the payments of back pay to Authorized Claimants pursuant to this Agreement.

Supplemental Agreement ¶ 3.E [Docket No. 912-2 at 3-4].

Consistent with this provision, Plaintiffs now seek approval of an award of $11,321,849.62 in attorneys' fees and $2,113,792.81 in costs and litigation expenses. *See* Mot. for Attorneys' Fees at 20, 34, & Appendix B (setting forth itemization of attorneys' fees and costs requested) [Docket No. 909]. RGIS has not opposed Plaintiffs' request.

**B.    Legal Standard**

**1.    Authority and Methodology for Awarding Attorneys' Fees, Expenses, and Costs**

Rule 23(h) of the Federal Rules of Civil Procedure provides that, "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). Here, in addition to the Settlement Agreement, Plaintiffs are eligible for an award of attorneys' fees under both federal and state law.

Pursuant to § 216(b) of the FLSA, the district court is authorized to award attorneys' fees and costs to plaintiffs prevailing in an overtime compensation action. 29 U.S.C. § 216(b) ("The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."). Concurrently, Plaintiffs' request for an award of attorneys' fees is authorized under California, Washington, Oregon, and Illinois law. *See* California (Cal. Lab. Code §§ 218.5, 218.6, 1194; Cal. Civ. Proc. Code § 1021.5); Washington (Wash. Rev. Code § 49.52.070); Oregon (Or. Rev. Stat. §§ 652.200(2), 653.055(4)); Illinois (820 Ill. Comp. Stat. 105/12(a)).

Having identified the authority for Plaintiffs' request, the Court must determine the proper methodology for assessing the reasonableness of the amount of fees Plaintiffs seek. While Class Counsel negotiated RGIS's payment of attorneys' fees and costs separately from the class damages,

United States District Court
For the Northern District of California

1   both figures were calculated into the $27,000,000 Settlement Amount RGIS agreed to pay and any

2   award of attorneys' fees will be paid from that general settlement fund.  Supplemental Agreement

3   ¶3.E.  The Settlement Agreement also caps the attorneys' fees Plaintiffs may seek at $11,380,000

4   and provides that if the Court does not approve the full amount of Plaintiffs' attorneys' fees

5   requested, "the non-appropriated amounts will be distributed to all Authorized Claimants on a pro

6   rata basis."  Supplemental Agreement ¶ 3.E; Settlement Agreement ¶ 2.12.F.  Thus, the Settlement

7   Agreement created a common fund consisting of the $27,000,000 Settlement Amount from which

8   the settlement class will recover damages and Class Counsel will be paid for their services in

9   prosecuting the classes' claims.

10      In cases where settlement of a class action creates a common fund, the Court has discretion

11  to award attorneys' fees using either the lodestar method or the percentage of the fund approach.

12  *Vicaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002); *Paul, Johnson, Alston & Hunt v.*

13  *Graulty*, 886 F.2d 268, 272 (9th Cir. 1989) (recognizing that, in the context of a specific case,  either

14  approach may "have its place in determining what would be reasonable compensation for creating a

15  common fund.").  Irrespective of which methodology the Court elects to employ, the court may not

16  apply it mechanically or formulaically, but must undertake an analysis that ensures that the fee

17  award is reasonable.  *In re Mercury Interactive Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010);

18  *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000).

19      In the context of this case, the Court finds that application of the lodestar method allows for a

20  more accurate assessment of the reasonableness of Plaintiffs' fee request.  First, as detailed

21  throughout this Order, the parties intensely litigated this action for over four years.  RGIS mounted a

22  particularly aggressive defense which, in turn, greatly increased the amount of time and resources

23  counsel had to devote to discovery and litigating issues surrounded class action status.  Utilizing the

24  lodestar approach captures the time counsel spent litigating such issues while still allowing the Court

25  to trim any excess time.  Similarly, the amount of discovery collected and exchanged was

26  substantial.  Because the claims in this case concerned RGIS's compensation policies and practices

27  at 300 districts throughout the country, Class Counsel was faced with a tremendous task of

28  marshaling evidence from employees at these locations and piecing that evidence together to show a

United States District Court

For the Northern District of California

uniform practice by RGIS of denying employees compensation for their work. Toward that end, Class Counsel obtained and submitted over 400 declarations and RGIS propounded written discovery on 390 opt-in Plaintiffs, which Class Counsel was responsible for organizing, tracking, and producing to RGIS. *See* Wallace Decl. ¶¶ 38, 46, 47. Again, by focusing on the amount of time actually billed on such tasks, the lodestar method allows the Court to account for the scale of discovery undertaken in this case. Finally, as Plaintiffs point out, because the amount of individual damages in wage-and-hour actions such as the instant case are relatively small, gauging the amount of attorneys' fees on the size of the settlement fund may not lead to a reasonable fee determination. *See* Mot. for Attorneys' Fees at 33. For these reasons, the Court will evaluate Plaintiffs' request for approval of attorneys' fees using the lodestar method.

### 2.    Calculating Fees Under the Lodestar Approach

The Court engages in a two-step process when determining the reasonable amount of attorneys' fees to award under the lodestar method. First, the court calculates the presumptive fee award, also known as the "lodestar figure," by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. *Grove v. Wells Fargo Financial Cal., Inc.*, 606 F.3d 577, 582 (9th Cir. 2010). Second, "in appropriate cases, the district court may adjust the 'presumptively reasonable' lodestar figure based upon the factors listed in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69-70 (9th Cir. 1975) . . . that are not subsumed into the initial lodestar calculation." *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 622 (9th Cir. 1993). Specifically, the *Kerr* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Kerr*, 526 F.2d at 70. "The lodestar amount presumably reflects the novelty and complexity of the issues, the special skill and experience of counsel, the quality of representation, and the results obtained from the litigation." *Intel Corp.*, 6 F.3d at 622; *see*

*also Perdue v. Kenny A.*, 130 S. Ct. 1662, 1673 (2010) (noting that the lodestar figure includes "most if not all of the relevant factors constituting a reasonable attorney's fee") (internal quotations omitted). Thus, in appropriate cases, the court may examine the remaining factors to determine whether an enhancement or decrease in the lodestar figure is warranted. *Clark v. City of Los Angeles*, 803 F.2d 987, 990 (9th Cir. 1986). However, there is a strong presumption that the lodestar figure represents a reasonable fee and any upward or downward adjustment of that figure is proper only in "rare and exceptional cases." *Van Gerwen v. Guar. Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000) (internal citation omitted); *see also Fischel v. Equitable Life Assur. Society of the United States*, 307 F.3d 997, 1007 (9th Cir. 2002).

**C.    Analysis**

**1.    Plaintiffs' Lodestar Figure**

To determine the presumptive amount of attorneys' fees Plaintiffs may recover, the Court must calculate the lodestar amount by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. *Intel Corp.*, 6 F.3d at 622. The Court will first review whether counsel's billing rates are reasonable and then will examine the reasonableness of the time billed.

*a. Counsel's Reasonable Hourly Billing Rates*

In calculating the lodestar figure, the district court must determine a reasonable hourly rate based on the experience, skill, and reputation of the attorneys requesting fees. *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986). As the Supreme Court has recognized, determining a reasonable or prevailing rate of compensation is "inherently difficult." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). To set the reasonable rate, the court does not refer to the rates counsel actually charged, but rather looks to the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation. *Chalmers*, 796 F.3d at 1210-11. The relevant community is typically the community in which the district court sits. *Schwarz v. Sec'y of Health & Human Servs.*, 73 F.3d 895, 906 (9th Cir. 1995). "To inform and assist the district court" in making this assessment, "the burden is on the fee applicant to produce satisfactory evidence – in addition to the attorney's own affidavits – that the requested rates are in

line with those in the community. *Blum*, 465 U.S. at 895 n.11*; see also Widrig v. Apfel*, 140 F.3d 1207, 1209 (9th Cir. 1998) (declarations of attorneys regarding the prevailing market rate in the community may be sufficient to establish reasonable hourly rate). An attorney's declaration regarding the reasonableness of his or her own rate, standing alone, is insufficient to meet the fee applicant's burden. *Jordan v. Multnomah County*, 815 F.2d 1258, 1263 (9th Cir. 1987).

Here, Plaintiffs have submitted declarations from their attorneys regarding the bases for their hourly rates, citations from other decisions analyzing the reasonableness of counsel's hourly rates, and declarations from other attorneys regarding market rates in the Northern District of California and comparing counsel's requested rates against those in the market. The Court has thoroughly reviewed the materials Plaintiffs submitted and will summarize the key points and its findings below.

      i. <u>Schneider Wallace Cottrell Brayton Konecky</u>

Plaintiffs seek approval of the following hourly rates charged by the Schneider Wallace Cottrell Brayton Konecky LLP ("Schneider Wallace") attorneys and paralegals.

| Attorney | Hourly Rate |
| --- | --- |
| Guy Wallace | $650.00 |
| Josh Konecky | $625.00 |
| Amanda Hugh | $350.00 |
| Andrew Lee | $400.00 |
| Camilia Robertson | $450.00 |
| Christian Schreiber | $400.00 |
| Jin Kim | $400.00 |
| Kelly Knapp | $350.00 |
| Michael Thomas | $475.00 |
| Nancy Park | $450.00 |
| Naomi Sunshine | $450.00 |
| Purvi Patel | $350.00 |
| Erica Smith | $325.00 |

| Paralegal/Legal Assistant | Hourly Rate |
|---|---|
| Erica Maloney | $150.00 |
| Jake Gould | $150.00 |
| Jennifer Hebard | $150.00 |
| Josie Marks | $150.00 |
| Kisha Charles | $150.00 |
| Nathan Koff | $125.00 |
| Sam Marks | $150.00 |

*See* Appendix B to Mot. for Attorneys' Fees at 1 [Docket No. 909-2].

With respect to Guy Wallace, who has served as lead Class Counsel, Plaintiffs contend that Mr. Wallace's hourly billing rate of $650 is reasonable. Mot. at 20. In his Declaration, Mr. Wallace states that graduated from Harvard Law School in 1993 and has been practicing law for 17 years. Wallace Decl. ¶¶ 4, 5 [Docket No. 882]. During this time, Mr. Wallace has gained substantial experience in complex litigation and has served as lead counsel, co-lead counsel, or class counsel in more than 20 class actions. *Id.* ¶ 5. Plaintiffs have also submitted declarations from several other attorneys who are familiar with both Mr. Wallace's experience and the hourly rates charged by attorneys in the San Francisco Bay Area. These attorneys attest that Mr. Wallace's hourly billing rate is consistent with those of attorneys with similar experience, skill, and reputation for comparable work in complex class actions in this community. *See* Declaration of Richard M. Pearl ¶¶ 7-9 [Docket No. 879]; Declaration of James M. Finberg ¶ 17 [876]; Declaration of Jonathan E. Gertler ¶¶ 15, 18 [Docket No. 877]. Additionally, Plaintiffs note that several other courts have approved Mr. Wallace's hourly rates, including his 2010 billing rate of $650 an hour. *See* Wallace Decl. ¶ 135 & Ex. F (Order Granting Final Approval of Class Action Settlement, *Rosa v. Morrison Homes, Inc.*, Case No. 373059, p. 6 (Cal. Sup. Ct. Oct. 27, 2010) (approving $650 hourly billing rate)) & Ex. G (Order Granting Final Approval of Class Action Settlement, *Chau v. CVS RX Servs., Inc.*, Case No. BC349224, p. 4 (Cal. Sup. Ct. Sept. 24, 2008) (approving 2008 hourly billing rate of $600)); *see also Lopez v. San Francisco Unified Sch. Dist.*, 385 F. Supp. 2d 981, 991 (N.D. Cal. 2005) (approving 2005 rate of $435 an hour).

26

Taken together, the Court finds that this evidence demonstrates that Mr. Wallace's hourly rate of $650 is reasonable.

As to the other Schneider Wallace attorneys and paralegals, Plaintiffs contend that each of their rates is in line with those of attorneys and paralegals of similar experience and skill in the Bay Area. Mot. for Attorneys' Fees at 21. In his initial and supplemental declarations, Mr. Wallace sets forth each of the attorneys' and paralegal's education and qualifications. *See* Wallace Decl. ¶¶ 138-146; Supplemental Declaration of Guy B. Wallace ¶ 2, 3-11 [Docket No. 925]. In support of the billing rates charged by each attorney, Plaintiffs proffer testimony from Kelly Dermody and Mr. Gertler, who have extensive experience in class actions and are familiar with the rates charged by firms representing plaintiffs in class actions. *See* Declaration of Kelly M. Dermody ¶¶ 7-9, 13-14 [Docket No. 874]; Gertler Decl. ¶¶ 7, 13; Supplemental Declaration of Jonathan E. Gertler ¶¶ 6-7 [Docket No. 927]. Both Ms. Dermody and Mr. Gertler state that, based on their review of the Schneider Wallace attorneys' qualifications, the Schneider Wallace attorneys' respective billing rates are consistent with those billed by attorneys with similar experience performing comparable work in the San Francisco Bay Area. *See* Dermody Decl. ¶ 15; Gertler Decl. ¶ 15; Gertler Suppl. Decl. ¶ 7.[6] Further, Mr. Gertler opines that, based on his review of the paralegals' educational background and experience, their hourly rates of $125 and $150 is within the market range for paralegals and legal assistants having similar qualifications and performing similar work in the San Francisco Bay Area. Gertler Suppl. Decl. ¶ 8. Based on the Court's review of these materials, it finds that the hourly rates charged by the Schneider Wallace attorneys and paralegals are reasonable.

  ii.  Goldstein, Demchak, Baller, Borgen & Dardarian

Next, Plaintiffs contend that the hourly billing rates for the Goldstein, Demchak, Baller, Borgen & Dardarian ("Goldstein Demchak") attorneys are "eminently reasonable." Mot. for

---

[6] Plaintiffs also contend that "[s]everal courts have approved the current hourly rates of [Schneider Wallace] associates," and cite to the final settlement approval orders in *Rosa* and *Chau*. Mot. for Attorneys' Fees at 21. While both orders expressly approve Mr. Wallace's hourly rate, they do not identify the other associates for which they were approving fees. As a result, those decisions do not support approval of the associate billing rates in this case.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Attorneys' Fees at 21.  The hourly rates are as follows:

| Attorney | Hourly Rate |
| --- | --- |
| Barry Goldstein | $725.00 |
| David Borgen | $675.00 |
| Joseph Jaramillo | $500.00 |
| Holly Herndon | $465.00 |
| Enrique Martinez | $440.00 |
| James Kan | $365.00 |
| Gordon Kaupp | $375.00 |

| Paralegals/Legal Assistants | Hourly Rate |
| --- | --- |
| Hillary Baker | $195.00 |
| Jacqueline Thompson | $195.00 |
| Wendy Whitt | $195.00 |
| Jonathan Bolton | $125.00 |

*See* Appendix B to Mot. for Attorneys' Fees [Docket No. 909-2].

David Borgen's hourly rate of $675 is reasonable.  Mot. for Attorneys' Fees at 21.  In his Declaration, Mr. Borgen states that he graduated from University of California, Hastings College of the Law in 1981, and has been exclusively practicing in the area of labor and employment law since that time.  Declaration of David Borgen ¶¶ 4-5 [Docket No. 873].  He states that since joining Goldstein Demchak in 1990, he has worked on some of the nation's largest employment class actions and has served as lead or co-lead counsel in numerous wage and hour class and collective actions.  *Id.* ¶¶ 6-7.  Additionally, he states that he has authored several articles on employment, wage and hour, and class action issues, and frequently lectures on the subjects.  *Id.* ¶¶ 9-10.  In 2008, he co-wrote and appeared in a training video on the FLSA produced by the Federal Judicial Counsel for federal district court clerks.  *Id.* ¶ 11.  In support of Mr. Borgen's rate Plaintiffs also proffer statements from several attorneys familiar with Mr. Borgen's skills and experience, who opine that Mr. Borgen's hourly rate falls within the range of market rates charged by attorneys in the Bay Area with comparable qualifications for work in complex litigation and class actions.  *See* Pearl

Declaration ¶¶ 7, 9; Finberg Decl. ¶ 17; Dermody Decl. ¶ 15; Gertler Decl. ¶ 29.  Additionally, Plaintiffs point out that several state and federal district courts have approved Mr. Borgen's previous hourly rates in other cases.  *See* Borgen Decl. ¶ 40.

Likewise, Plaintiffs contend that the other Goldstein Demchak attorneys' rates are also justified by their experience and skill.  Mot. for Attorneys' Fees at 21.  In his initial and supplemental declarations, Mr. Borgen sets forth each attorney's credentials and experience, as well as his or her role in the litigation.  *See* Borgen Decl. ¶¶ 17- 25; Supplemental Declaration of David Borgen ¶¶ 4-8 [Docket No. 924].  Mr. Borgen also describes the qualifications of the paralegals who worked on this case.  *See* Borgen Decl. ¶ 25; Borgen Suppl. Decl. ¶¶ 2-8.  In support of the reasonableness of the fees, he states that Goldstein Demchak examines its attorneys' hourly rates annually to ensure that they are consistent with those of similar-sized Bay Area law firms that handle complex and class action litigation and that its rates have been approved by several California trial courts and federal district courts.  Borgen Decl. ¶¶ 37-40.  As additional support, Plaintiffs proffer statements from Mr. Gertler and Ms. Dermody attesting that the rates charged by the Goldstein Demchak attorneys and paralegals are consistent with those charged by attorneys and paralegals with similar skill and experience in the Bay Area.  *See* Gertler Decl. ¶ 31; Gertler Suppl. Decl. ¶¶ 11,12; Dermody Decl. ¶ 15.  Taking this evidence into consideration, the Court finds that the rate charged by each of the Goldstein Demchak attorneys and paralegals to be reasonable.

iii.   Grady Schneider

Next, Plaintiffs seek approval of the hourly rates charged by attorneys and paralegals of Grady Schneider, LLP.  Mot. at 22.  Their hourly rates breakdown as follows:

| Attorney | Hourly Rate |
|---|---|
| Keith Grady | $650.00 |
| Peter Schneider | $650.00 |
| Bill Jones | $425.00 |
| Catherine Loving | $400.00 |

United States District Court
For the Northern District of California

| Paralegals/Legal Assistants | Hourly Rate |
|---|---|
| Natalie White | $200.00 |
| Lisandro Cortez | $175.00 |
| Lupina Paiz | $150.00 |
| Margie Fisch | $$150.00 |
| Brenda Vasquez | $100.00 |
| Johnnie McCray | $100.00 |

*See* Appendix B to Mot. for Attorneys' Fees [Docket No. 909-2].

In support, Plaintiffs have submitted the Declaration of Peter Schneider, a founding partner of Grady Schneider, who sets forth the education, qualification, and experience of each of the attorneys, paralegals, and legal assistants from his firm who worked on this case. *See* Declaration of Peter R. Schneider ¶¶ 4-6, 10-17 [Docket No. 881]. Mr. Schneider further explains that the firm sets its hourly rates to be consistent with the market rates for comparable law firms that specialize in complex class actions litigation nationally, including those in the Bay Area. Schneider Decl. ¶¶ 33, 34. As evidence that the rates are reasonable, Plaintiffs have also proffered statements from Mr. Gertler, who opines that, based on his review of the attorneys' qualifications as set forth in Mr. Schneider's Declaration, the rates charged by Grady Schneider attorneys' fall with the range of prevailing hourly rates charged by attorneys with similar credentials in the Bay Area. *See* Gertler Decl. ¶ 32. Mr. Gertler further states that he reviewed the educational background and experience levels of each of the paralegals and legal assistants and that their hourly rates are within the market rate for paralegals and legal assistants with similar qualifications working in the Bay Area. Suppl. Gertler Decl. ¶¶ 13-14. The Court has carefully considered these materials and finds that the rates charged by Grady Schneider attorneys and support staff are reasonable.

<div align="center">iv.     <u>Bailey Pinney</u></div>

Finally, Plaintiffs request that the Court approve the hourly rates of the Bailey Pinney attorneys who worked on this matter. Mot. at 22. The attorneys and their hourly rates are as follows:

United States District Court
For the Northern District of California

| Attorney | Hourly Rate |
|---|---|
| AE Bud Bailey | $495.00 |
| Angela Laidlaw | $350.00 |
| Bonnie MacFarlane | $400.00 |
| Gary Parks | $400.00 |
| J. Dana Pinney | $495.00 |
| Jacqueline Koch | $395.00 |
| Joele Farnham | $250.00 |
| Jose Mata | $480.00 |
| Karen Moore | $280.00 |
| Katie Maynard | $350.00 |
| Lisa Sloman | $300.00 |
| Meike Chase | $250.00 |
| Mikki Kelly | $300.00 |
| Samuel Epstein | $425.00 |
| Sara Eliot | $275.00 |
| Sharon Cousineau | $300.00 |
| Shelby Clark | $325.00 |
| Susan Nelson | $250.00 |
| Susan Seemiller | $480.00 |
| Valerie Inforzato | $425.00 |

| Paralegals/Legal Assistants | Hourly Rate |
|---|---|
| Aaron Coquet | $85.00 |
| Chelsey Embree | $85.00 |
| Gabe Tomko | $85.00 |
| Jessica Reynolds | $85.00 |
| Shari McBride | $85.00 |
| Sara Sawyer | $85.00 |

United States District Court
For the Northern District of California

*See* Appendix B to Mot. for Attorneys' Fees [Docket No. 909-2].

In support, Plaintiffs have proffered declarations from J. Dana Pinney, the manager and a shareholder of the Bailey Pinney law firm.[7]  Declaration of J. Dana Pinney [Docket No. 880]; Supplemental Decl. of J. Dana Pinney [Docket No. 918].  With one exception (addressed below), Mr. Pinney sets forth the credentials and experience of all of but one of the attorneys from Bailey Pinney who worked on this matter.  Pinney Decl. ¶¶ 11-16; Pinney Suppl. Decl. ¶¶ 4-23.  Plaintiffs have also submitted a supplemental declaration from Mr. Gertler, who reviewed the Baily Pinney attorneys' experience and backgrounds as set forth in Mr. Pinney's declarations.  Gertler Suppl. Decl. ¶ 16. [Docket No. 927].  Mr. Gertler opines that the attorneys' hourly rates are within, or in some instances below, the range of reasonable hourly rates charged by attorneys with similar qualifications and experience in the San Francisco Bay Area for comparable work.  Gertler Suppl. Decl. ¶ 16.  After consideration of these materials, the Court finds that the hourly rates charged by Bailey Pinney attorneys are reasonable.

In reviewing Ms. Pinney's declarations, the Court notes that Mr. Pinney has failed to provide information regarding the education and experience of Meike Chase.  Without such information, the Court cannot make an assessment of the reasonableness of his $250 hourly billing rate, and consequently, cannot award Plaintiffs fees for the 57.6 hours he billed, which amounted to $14,400.  *See* Appendix B to Plaintiffs' Motion for Attorneys' Fees.

Plaintiffs also seek approval of the $85 hourly rate charged by five Bailey Pinney paralegals and legal assistants who worked on this case: (1) Aaron Croquet; (2) Chelsey Embree; (3) Gabe Tomko; (4) Jessica Reynolds; and (5) Shari McBride.  *See* Docket No. 909-2 at 3.  Notably, Mr. Pinney fails to provide any information regarding the qualifications and experience for these individuals in either his initial or supplemental declaration.  Plaintiffs, however, have proffered statements from Mr. Gertler in support of these rates.  Gertler Suppl. Decl. ¶ 17.  Recognizing the lack of background information regarding for the five paralegals, Mr. Gertler nevertheless opines

---

[7]  At the January 28, 2011 hearing, the Court noted that Mr. Pinney's declaration lacked information about several of the Bailey Pinney attorneys, inhibiting the Court from assessing the reasonableness of their hourly rates.  Accordingly, the Court granted Plaintiffs leave to file a supplemental declaration from Mr. Pinney addressing those deficiencies.

that the $85 hourly rate is near the bottom of the market rate for paralegals and legal assistants in the Bay Area, if not below market rate. *Id*. He further opines that this rate would be appropriate for the most junior paralegals and legal assistants in the Bay Area working on class action litigation in a reputable law firm. *Id*. The Court has considered Mr. Gertler's opinions and has reviewed the time entries for the five individuals to ascertain the type of tasks their were completing. Notwithstanding the lack of background information, the Court is satisfied that the $85 hourly rate is a reasonable rate for the support staff services that these individuals performed.

  b. *Reasonableness of the Hours Expended in Litigating the Case*

  Having assessed the reasonableness of the hourly billing rates for the attorneys and paralegals who worked on this case, the Court turns to the second component of the lodestar calculation: evaluating the number of hours reasonably expended litigating this case. Generally, the party seeking fees bears the initial burden of establishing that the fees and costs taxed were associated with the relief requested and were reasonably necessary to achieve the results obtained. *See McMillon v. Hawaii*, No. 08-00578, 2011 WL 744900, at *7 (D. Haw. Feb. 22, 2011). Toward that end, the fee applicant must provide detailed time records documenting the tasks completed and the amount of time spent. *Hensley v. Eckerhard*, 461 U.S. 424, 424 (1983); *Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 945-46 (9th Cir. 2007). "Where the documentation of hours in inadequate, the district court may reduce hours accordingly." *Hensley*, 461 U.S. at 433. The district court may also exclude any hours that are excessive, redundant, or otherwise unnecessary. *Id*. at 434. After the fee applicant makes this initial showing, "[t]he party opposing the fee application has the burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its in its submitted affidavits." *Gates v. Deukmejian*, 987 F.2d 1392, 1397-98 (9th Cir. 1992). Here, RGIS has agreed not to oppose Plaintiffs' fee request. *See* Settlement Agreement ¶¶ 2.3(C), 2.12(B). Nevertheless, even if there is no objection, "the district court may not uncritically accept a fee request," but is obligated to review the time billed and assess whether it is reasonable in light of the work performed and the context of the case. *See Common Cause v. Jones*, 235 F. Supp. 2d 1076, 1079 (C.D. Cal. 2002) (citing *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1385 (9th Cir. 1984));

1  *see also McGrath v. County of Nevada*, 67 F.3d 248, 254 n.5 (9th Cir. 1995) (noting that a court may

2  not adopt a prevailing party's representations without conducting an independent review of the fee

3  application).

4          As indicated above, Plaintiffs seek to recover fees for 20,267.9 hours billed by attorneys, and

5  13,101.2 hours billed by paralegals and legal assistants. *See* Appendix B to Motion for Attorneys'

6  Fees [Docket No. 902-2]. Plaintiffs have submitted declarations from lead counsel from each of the

7  law firms involved in this case attesting to the reasonableness of the number of hours billed and have

8  submitted detailed time records for the Court's *in camera* review. Citing to this evidence, Plaintiffs

9  assert that the hours billed "are fully justified by the tremendous burdens of over four years of

10  intense, bitterly-contested litigation," as well as "RGIS's hyper-aggressive defense and refusal to

11  engage in any settlement discussions, counsel's heavy discovery/investigation burden, the time

12  requires to obtain and maintain class status in the face of adamant opposition and multiple motions

13  for decertification, and the demands of opposing summary judgment and preparing for trial . . ."

14  Mot. for Attorneys' Fees at 23.

15          Further, Plaintiffs explain that Class Counsel has exercised significant billing judgment by

16  deducting 5,082 hours of recorded time to eliminate inefficiencies and other time entries that should

17  not be claimed, thereby reducing the lodestar figure by $1,749,363.88, or 13.4%. *See* Wallace Decl.

18  ¶¶ 149-164. Specifically, in his Declaration, Mr. Wallace states that as lead Class Counsel, he

19  reviewed the billing records for all four firms that worked on this matter, and in the exercise of

20  billing judgment, excluded: (1) attorneys or paralegals who billed less than 50 hours on the case; (2)

21  time billed for clerical work that would not properly be billed by an attorney; (3) billing records

22  dated prior to December 2006; (4) vague or incomplete entries; (5) duplicative entries; (6) half of the

23  attorney travel time by using a "travel rate" of 50% of the attorney's regular billing rate. Wallace

24  Decl. ¶¶ 150-55, 160. Through this method, Mr. Wallace reduced the hours billed as follows:

25

26

27

28

**United States District Court**
For the Northern District of California

| Law Firm | Hours Originally Billed | Hours Reduced | Hours Submitted for Award | Resulting Reduction in Lodestar Amount | % |
|---|---|---|---|---|---|
| Schneider Wallace | 17,653 | 1,057 | 16,596 | $253,384.50 | 4% |
| Grady Schneider | 15,423 | 3,251.6 | 12,171.4 | $1,179,487.50 | 26% |
| Goldstein Demchak | 2,431.5 | 222.8 | 2,208.7 | $58,906.50 | 6% |
| Bailey Pinney | 2,944.5 | 551.5 | 2,393 | $226,763 | 23% |

Wallace Decl. ¶¶ 156, 161-163. In light of these reductions, Plaintiffs contend that the resulting 33,369.1 total hours represents time that would be billed to a client of means in a comparable case and should therefore be approved by the Court. Mot. for Attorneys' Fees at 23; Wallace Decl. ¶ 164.

Plaintiffs further contend that the total hours is justified when taking into account the history and nature of this case. First, Plaintiffs argue that national wage-and-hour class actions under the FLSA are rare, and even fewer involve multiple parallel state class actions such as this case. Mot. for Attorneys' Fees at 24-25. Plaintiffs also point out the broad scope of this lawsuit, which challenged the employment practices of an employer that was structured with over 300 local districts across the United States and involved complicated legal and factual issues, including the application of wage-and-hour laws of four states. *Id.*

Second, Plaintiffs argues that because the case focused on payment of wages to low-income workers, the stakes involved in the lawsuit were high. *Id*. at 25.

Third, Plaintiffs argue that the amount of time billed was fair in light of the challenge of presenting proof of RGIS's systemic violations of federal and state wage and hour laws. They assert that "RGIS's noncompliance with the FLSA and state laws was diffuse in nature and spread throughout its entire operations across the United States." *Id*. Counsel therefore had to investigate RGIS's national policies and training materials, as well as how RGIS applied those policies and materials at the local level in RGIS's 300 districts to deprive employees of their wages. *Id*. Additionally, Plaintiffs contend that, in order for its experts to complete a statistical analysis for use in a damages model, counsel had to investigate RGIS's time and payroll records and its procedures regarding how they were developed and maintained. *Id*. at 26. Plaintiffs explain that, "[e]ach of

United States District Court

For the Northern District of California

these major subject areas required its own set of written discovery, depositions, and expert testimony," which resulted in 64 depositions, over 124,000 pages of documents being produced, and declaration and testimony from several hundred auditors and dozens of former managers. *Id.*

Fourth, Plaintiffs contend that the amount of time billed was necessary in response to RGIS's aggressive litigation strategy. *Id.* According to Plaintiffs, RGIS opposed Plaintiffs' claims "in virtually every way short of trial, and were only willing to settle once trial was imminent." *Id.* Thus, Class Counsel not only had to respond to RGIS's motions, but given its resistance to settlement, had to be fully prepared to proceed to trial. *Id.* at 27.

Fifth, Plaintiffs assert that, although they were represented by multiple attorneys from four law firms, there was no unnecessary duplication of effort. *Id.* at 27. Citing to statements from Mr. Wallace, Mr. Borgen, and Mr. Schneider, Plaintiffs contend that the four firms had separate roles in litigating the case and coordinated their work effectively and efficiently. *Id.* (citing Wallace Decl. ¶¶ 121-133; Borgen Decl. ¶ 32-36; Schneider Decl. ¶¶ 21-32). Specifically, Schneider Wallace took the lead role in litigating the case and prepared the majority of Plaintiffs' motions and oppositions, including those relating to class certification and opposing RGIS's motion for summary judgment. Mot. for Attorneys' Fees at 27; Wallace Decl. ¶¶ 121, 124. Additionally, Schneider Wallace was responsible for taking and defending the majority of the depositions in the case and preparing for settlement and trial. Wallace Decl. ¶ 121.

Beginning in January 2008, Goldstein Demchak handled the preparation of class certification declarations and discovery responses for class members in New York and New Jersey. Mot. for Attorneys' Fees at 28; Borgen Decl. ¶ 32. After the failed mediation in October 2009, Goldstein Demchak took and increased role in the case by drafting the opposition briefs to RGIS's various motions, conducting the second stage of expert discovery, and working on trial preparation. *Id.*

Grady Schneider served as the primary contact for the opt-in class members following conditional certification of the national FLSA class and issuance of the notice. Mot. for Attorneys' Fees at 28; Schneider Decl. ¶¶ 24-26. Additionally, Grady Schneider took the deposition of RGIS's main Rule 30(b)(6) witness and prepared declarations and assisted with discovery responses of auditors who worked in the central and southern regions of the country. Schneider Decl. ¶¶ 22, 31.

Bailey Pinner was responsible for filing the initial complaint in the *Wren* matter. Wallace Decl. ¶ 133. After consolidation of the actions, Bailey Pinney assisted with preparation of discovery and auditor declarations for class members in the Pacific Northwest region. *Id*.

Plaintiffs assert that by coordinating responsibilities amongst the four firms, counsel was able to manage the extensive discovery and thoroughly investigate the facts needed to establish and maintain class certification and pursue the classes' federal and state claims, while at the same time minimizing duplication of efforts. Mot. for Attorneys' Fees at 29.

Sixth, Plaintiffs argue that the results counsel obtained for the class support the amount of time billed. Mot. for Attorneys' Fees at 29. As discussed above, the Settlement Agreement provides for a monetary relief that closely approximates the class members' lost wages, overtime pay, interest, and federal liquidated damages, as well as equitable relief. Citing *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008), as support, Plaintiffs' argue that because this was a contingency fee case, Class Counsel had little incentive to spend unnecessary time on tasks to inflate their fees. Mot. for Attorneys' Fees at 29. Rather, Plaintiffs maintain that the hours Class Counsel spent litigating the case were limited to that necessary to pursue Plaintiffs' claims and to respond to RGIS's relentless opposition and motion practice. *Id*. at 30.

Finally, Plaintiffs contend that the fee award in this case is comparable to fee awards in similar class actions. *Id*. In support, Plaintiffs proffer two decisions from California state court and two decisions from the Northern District as support: (1) *Duran v. U.S. Bank*, No. 2001-035537 (Alameda Sup. Ct. July 19, 2010) (granting plaintiffs $18.7 million in attorneys' fees in a wage-and-hour class action resulting in a class judgment of $15 million); (2) *Savaglio v. Wal-Mart*, No. C-835687-7 (Alameda Sup. Ct. Sept. 10, 2010) (awarding $52.5 million in fees in national wage-and-hour class action); (3) *Rosenburg v. IBM*, 2007 WL 2043857, at *1 (N.D. Cal. July 12, 2007) (awarding $16.25 million in fees and $250,000 in costs in wage-and-hour class action in which plaintiffs obtained a $65 million common fund); *Satchell v. FedEx*, 2007 WL 2343904, at *1 (N.D. Cal. Aug. 14, 2007) (finding $12,425,000 in attorneys' fees fair and reasonable under both lodestar and common fund methods).

Taking the foregoing arguments into consideration, and after carefully reviewing counsel's

1    timesheets submitted in conjunction with Plaintiffs' fee request, the Court finds that the 33,369.1

2    hours are a reasonable calculation of the time spent litigating this case.  As Plaintiffs point out, and

3    as the record in this case illustrates, the parties vigorously litigated this case for over four years.

4    From its initial stages, RGIS moved to dismiss the *Wren* action, opposed Plaintiffs' motions to

5    amend the First Amended Complaint and to consolidate the *Wren* and the *Piper* actions, opposed

6    certification of the FLSA collective action and the Rule 23 classes (and later moved to decertify

7    both), and repeatedly refused to produce discovery, necessitating numerous motions to compel by

8    Plaintiffs.  Thus, the amount of time Class Counsel billed is in large part a result of RGIS's

9    aggressive defense strategy.

10          Coupled with the legal battles between the parties, because this case involved both a national

11   FLSA class, as well as Rule 23 classes from four states, Class Counsel had to marshal and organize a

12   substantial amount of discovery from RGIS employees and potential class members around the

13   country.  Particularly, given the variations in RGIS's implementation of its policies, counsel had to

14   devote significant resources to investigating RGIS's practices in its local districts.  Thus, the

15   logistics of putting together evidence to support class certification, and later, to oppose RGIS's

16   summary judgment motion required substantial time from both attorneys and support staff.

17          It is against this backdrop that the Court has reviewed counsel's timesheets.  In undertaking

18   this review, the Court has found some instances of duplication of efforts among the firms, as well as

19   instances of overbilling for routine tasks.  Cognizant of these inefficiencies reflected in the

20   timesheets, and in the exercise of billing judgment, Class Counsel has reduced of the total amount of

21   time billed by 13.4%.  The Court finds that this reduction is not only warranted, but is commensurate

22   with the reduction the Court would have applied to bring the time billed in line with what would be

23   reasonable in this type of case.  Particularly, the significant reductions from Grady Schneider and

24   Pinney Bailey, both of which focused mainly on discovery, is consistent with the reductions the

25   Court finds are justified.  The only additional reduction the Court makes is to the 57.6 hours billed

26   by Bailey Pinney attorney Meike Chase.  With this exception, the Court finds that the hours billed

27   by the attorneys and paralegals in this case as itemized in Appendix B to Plaintiff's Motion [Docket

28   No. 909-2], which takes into account the 13.4% reductions, totaling 33,311.5 hours, are reasonable

United States District Court

For the Northern District of California

and will be used to calculate the lodestar amount.

### c. Calculation of Lodestar Figure

Having determined that counsel's hourly rates and the amount of time billed as set forth in Appendix B to Plaintiffs' Motion are reasonable, the Court calculates Class Counsel's lodestar figure to be $11,307,449.62.[8]

In the second stage of the lodestar analysis, the Court must decide whether to enhance or reduce the lodestar figure based on an evaluation of the *Kerr* factors that are not already subsumed in the initial lodestar calculation. Here, Plaintiffs have not argued for an enhancement of the baseline lodestar figure and the Court sees no basis to make such an enhancement. Further, because the Court finds that the lodestar figure yields a reasonable fee award, the Court sees no basis for a reduction in the lodestar figure. Accordingly, the Court concludes that Plaintiffs are entitled to an award of attorneys fees in the amount of $11,307,449.62.

### 2. Comparison with Percentage of Fund Calculation

Although the Court has chosen to analyze Plaintiffs' fee request using the lodestar method, it would reach the same result regarding the amount of reasonable attorneys' fees Plaintiffs are entitled to if it utilized the percentage of fund approach. In cases where the district court analyzes a fee request using the percentage of fund method, the Ninth Circuit has established 25% of the common fund as a "benchmark" for attorneys' fee. *Powers*, 229 F.3d at 1256; *Torrisi*, 8 F.3d at 1376. However, this "benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors." *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). In determining whether the standard 25% benchmark should be awarded or adjusted either upward or downward, courts may consider: (1) the result obtained for the class; (2) the effort expended by counsel; (3) counsel's experience; (4) counsel's skill; (5) the complexity of the issues; (6) the risks of non-payment assumed by counsel; (7) the reaction of the class; and (8) the comparison of the benchmark with counsel's lodestar. *See*

---

[8] The figure takes into account a deduction of $14,400 for time billed by Meike Chase.

1    *Craft v. County of San Bernardino*, 624 F. Supp. 2d 1113, 1116-17 (C.D. Cal. 2008); *Fernandez v.*

2    *Victoria Secret Stores, LLC*, No. CV 06-04149, 2008 WL 8150856, at *11 (C.D. Cal. July 21, 2008).

3            Here, taking the total settlement amount of $27,000,000, the $11,321,849.62 in attorneys'

4    fees that Plaintiffs seek amount to 42% of the total settlement payment.  Thus, the amount Plaintiffs

5    seek exceeds the 25% benchmark.  The Court must therefore consider whether the factors

6    enumerated above support an upward departure from the benchmark.

7            The first factor focuses on the result counsel obtained for the class.  As discussed in detail

8    above, the settlement agreement provides for both a monetary payment to class members that

9    approximates Plaintiffs' calculation of damages, as well as injunctive relief in the form of RGIS

10   amending its policies to clearly indicate that employees are to put on required audit equipment after

11   scanning in for purposes of receiving pay and providing training to its employees regarding the

12   changes.  As Plaintiffs correctly note, because the FLSA does not provide for injunctive relief, this

13   concession from RGIS exceeds what Plaintiffs could have obtained even if they had prevailed at

14   trial.  Thus, this factor supports an increase from the benchmark.

15           The second factor the Court may consider is the effort expended by counsel in litigating this

16   case.  Again, as described above, Class Counsel dedicated significant time and resources in pursuing

17   Plaintiffs' claims, particularly in light of the aggressive defense presented by RGIS.  Counsel

18   conducted extensive discovery, took and/or defended 64 depositions, responded to and propounded

19   written discovery, successfully moved to compel discovery withheld by RGIS, defended against

20   RGIS's motion to dismiss, successfully moved to certify the national FLSA class and Rue 23 classes

21   in four states, successfully opposed RGIS's motions to decertify the classes, opposed RGIS's

22   summary judgment motion, and participated in mediation sessions that ultimately led to the

23   settlement of this case and relief for the classes.  While wide-scale discovery, certification motions,

24   and dispositive motions are routine in class actions, the complexity and novelty of the legal and

25   factual issues raised in this matter made each of these components especially demanding.  Thus, this

26   factor supports an increase from the standard benchmark.

27           The third and fourth factors examine counsel's experience and skill.  As detailed in the

28   declarations of Mr. Wallace, Mr. Schneider, Mr. Borgen, and Mr. Pinney, both lead counsel and the

**United States District Court**
For the Northern District of California

attorneys from each firm who staffed the case have significant experience litigating class actions and wage-and-hour claims. Throughout the course of the litigation Class Counsel successfully defended against RGIS's attempts to dismiss Plaintiffs' claims and to decertify the classes and pursed Plaintiffs' claims until the point of settlement. Accordingly, these factors support an increase from the standard fee award.

The fifth factor focuses on the complexity of the issues raised in the action. Here, Plaintiffs asserted claims under both the FLSA and the laws of California, Washington, Oregon and Illinois regarding travel/ commute time and donning time and meal period breaks under California, Washington, and Oregon law. Each of these claims required analysis of federal and state regulations and raised highly-contested factual issues regarding RGIS's payment practices and the amount of wages class members were owed. Thus, this factor supports an increase from the benchmark.

The sixth factor evaluates the risks of non-payment counsel assumed in taking the case. Here, counsel assumed significant risk when accepting this case on a contingency fee basis. As counsel notes, few national FLSA collective actions and off-the-clock class actions have been certified. Thus, Counsel's decision to represent Plaintiffs and pursue their claims on a class-wide basis despite the paucity of precedent supporting such class actions, supports an increase in the benchmark.

Under the seventh factor, the Court considers the reaction of the class. As discussed above, to date only 33 class member have opted out of the settlement and only 16 class members have filed objections. The overwhelming participation in the settlement and the minimal number of objections suggest that counsel obtained a favorable result for the class and support an increase from the standard award.

Finally, the eighth factor compares the 25% benchmark with counsel's lodestar. Applying the standard 25% benchmark to the $27,000,000 settlement amount would result in an attorneys' fees award of $6,750,000. The difference between the $11,307,449.62 fee award using the lodestar and the $6,750,000 benchmark is $4,557,449.62. While the difference amounts to an approximate 17% increase in the benchmark, in light of the factors discussed above, the Court cannot say that this increase is unjustified.

United States District Court

For the Northern District of California

In sum, even if the Court were to analyze Plaintiffs' fee request under the percentage of fund analysis, there is ample support for adjusting the 25% presumptive benchmark upward to take into account the complexity and duration of the litigation, counsel's skill and experience, the results achieved that include both monetary and injunctive relief, and the positive reaction and low opt-out rate of the class. The Court therefore finds that Plaintiffs' request for an award of $11,307,449.62 in attorneys' fees – amounting to just under 42% of the settlement amount – is appropriate and reasonable in this case.

### 3. Costs and Fees

As indicated above, Rule 23(h) authorizes a court to award fees and nontaxable costs that are authorized by law or by the parties' agreement. Fed. R. Civ. P. 23(h). Pursuant to the Settlement Agreement, Plaintiffs may seek $2,200,000 in litigation expenses. *See* Settlement Agreement ¶ 212B. In their Motion, Plaintiff request that the Court award a combined total of $2,113,792.81 in costs and expenses incurred through November 1, 2010. Mot. for Attorneys' Fees at 34. Itemized by law firm, the costs are as follows:

| | |
|---|---|
| Schneider Wallace | $1,758,623.40 |
| Grady Schneider | $223,742.02 |
| Goldstein Demchak | $24,000 |
| Bailey Pinney | $107,427.39 |

*See* Appendix B. to Mot. for Attorneys' Fees [Docket No. 909-2].

In support their request for an award of $1,758,623.40 for costs incurred by Schneider Wallace, Plaintiffs have proffered testimony from Mr. Wallace setting forth a breakdown of the costs. *See* Wallace Decl. ¶¶ 180-192. Additionally, Plaintiffs have submitted an itemized list of the expenses, along with invoices and receipts. *See* Declaration of Eugenia Gueorguieva, Ex. A - Q [Docket No. 872]. Notably, in his Declaration, Mr. Wallace states that Schneider Wallace advanced $1,598,589.41 in litigation costs and expenses. He further states that, "[b]ecause of this extraordinary outlay of costs and expenses, [] Schneider Wallace respectfully requests that it be awarded 6% interest compounded annually . . . on the outlays that have been made," which would result in an additional $160,033.99. Wallace Decl. ¶ 194. In support of this request, Mr. Wallace

42

cites to language in the Supreme Court's decision in *Perdue*, 130 S. Ct. at 1674-75. The discussion upon which Mr. Wallace relies pertains to enhancements of attorneys' fee awards; it does not discuss whether a court should award interest on costs expended. It is therefore inapposite. Plaintiffs have not cited any other authority or language from the Settlement Agreement indicating that an award of interest on costs in available in this case. Accordingly, the Court will exclude $160,033.99 from Schneider Wallace's costs.

Reviewing the itemization of expenses attached to Ms. Gueorguieva's Declaration, Schneider Wallace's costs and expenses amount to $1,598,589.41. *See* Gueorguieva Decl. ¶ 4 & Ex. A. The Court has reviewed the expenses and costs Schneider Wallace advanced and finds that Schneider Wallace is entitled to repayment of these expenses in the amount of $1,598,589.41.

Next, Plaintiffs seek an award of $223,742.02 for costs and expenses incurred by the Grady Schneider law firm. In support of this request, Plaintiffs have submitted Mr. Schneider's statement that his firm incurred $223,742.02 in litigation-related costs and expenses. Schneider Decl. ¶ 36. While Mr. Schneider refers to an itemization of these expenses and copies of the receipts and invoices as an exhibit to his Declaration, these documents are not currently in the record. To enable the Court to assess whether these expenses are compensable, the Court directs Plaintiffs to file the itemization, along with receipts and invoices, within 10 days of the date of this Order. The Court will reserve $223,742.02 from the Settlement Amount, which it may award to Grady Schneider after reviewing the supplemental documentation of its expenses.

As to Goldstein Demchak, Plaintiffs request that the Court approve an award of costs and expenses in the amount of $24,000. In support of this request, Mr. Borgen has submitted an itemization of the expenses the firm advanced as an exhibit to his Declaration. *See* Borgen Decl. ¶ 52 & Ex. 4. The itemization identifies both the categories of expenses incurred and the total amounts paid. *Id*. However, there is currently no documentation of these expenses in the record for the Court to review.[9] The Court therefore directs Plaintiffs to file documentation of the expenses outlined in Exhibit 4 to Mr. Borgen's Declaration within 10 days of the filing date of this Order.

---

[9] Mr. Borgen indicates that he provided a more detailed itemization to Mr. Wallace for filing; however, Mr. Borgen does not indicate the docket entry for that filing. *See* Borgen Decl. ¶ 52.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  Further, the Court will reserve $24,000 from the Settlement Amount which it may award to

2  Goldstein Demchak, after reviewing this documentation.

3  Finally, Plaintiffs seek an award of $107,427.39 for costs and expenses Bailey Pinney

4  incurred in this litigation. In support of this request, Mr. Pinney has submitted a list of expenditures

5  and copies of receipts and invoices. *See* Pinney Decl. ¶ 20 & Ex. B. However, Exhibit B merely

6  lists expenses without explanation and does not include any categorical itemization of the expenses.

7  The Court therefore cannot assess the reasonableness of the costs. To allow the Court to assess

8  whether the expenses are reasonable, it directs Plaintiffs to file an itemization listing the expenses by

9  category and the total amount advanced for each category within 10 days of the filing date of this

10  Order. The Court will reserve $107,427.39 from the Settlement Amount which it may award to

11  Bailey Pinney after reviewing this supplemental material.

12  **4.  Fees for Settlement Administration**

13  Pursuant to the Settlement Agreement, Plaintiffs are authorized to seek approval of an award

14  of $11,380,000 in attorneys' fees and $2,200,00 in litigation expenses. In their Motion, Plaintiffs

15  have sought $11,321,849.62 in fees and $2,113,792.81 in costs. Thus, there is a difference of

16  $144,357.57 between the maximum fees and costs Plaintiffs were permitted to seek under the

17  Settlement Agreement, and those Plaintiffs actually sought in their Motion. Plaintiffs have

18  requested that this amount be available to compensate counsel for the time and expenses necessary

19  to complete implementation of the settlement. Specifically, Mr. Wallace estimates that

20  administration of the settlement will require at least $200,000 of attorney time to respond to class

21  member inquiries and to assist them in obtaining their damages payment. Wallace Decl. ¶ 203. The

22  Court has considered this request and finds that counsel has adequately demonstrated that they will

23  continue to oversee administration of the settlement and are therefore entitled to fees for such work.

24  To ensure that the remaining $144,357.57 is commensurate with the amount of additional time

25  counsel spends on this case, the Court **ORDERS** Class Counsel to file a declaration no later than

26  one year after final approval of the settlement indicating the hours billed in administering the

27  settlement and attach as exhibits all appropriate records documenting such time.

28

**D.    Conclusion**

In sum, afer careful consideration of Plaintiffs' arguments in support of its request for an award of attorneys' fees, a thoroughly reviewing the evidence proffered substantiating both the reasonableness of counsel's hourly rates and the amount of time billed, the Court **GRANTS** Plaintiffs' request for an award of $11,307,449.62 in attorneys' fees.

The Court further **GRANTS** Plaintiffs' request for an award of costs and expenses as follows.  The Court awards Schneider Wallace $1,598,589.41 in costs.  With respect to the request for an award of costs incurred by Grady Schneider, Goldstein Demchak, and Bailey Pinney, the Court reserves its ruling on this request and further reserves $355,169.41 from the Settlement Amount, which represents the total amount of costs requested from these firms, pending Plaintiffs' filing supplemental materials itemizing and documenting their expenditures.  After its review of the supplemental materials, the Court will issue an order regarding their requests for costs.

With respect to the $160,033.99 requested by Schneider Wallace for interest on its expenses, the Court **ORDERS** that this money shall be included in the Settlement Payments distributed to Authorized Claimants.  *See* Settlement Agreement ¶ 2.12.F

## VI.  MOTION FOR SERVICE AWARDS

**A.    Overview of Plaintiffs' Motion**

As indicated above, the Settlement Agreement authorizes the Named Plaintiffs to seek Court approval of a service award for their work in this case.  Specifically, section 2.12.D of the Settlement Agreement provides in pertinent part:

> Service Awards.  Plaintiffs will request Service Awards of not more than $5,000 each.  Such Service Awards will be paid from the Settlement Amount as described in this Agreement.  Defendant will not object to amounts sought for such awards.  The parties recognize that the Court may decide that different amounts are appropriate Service Awards.  Any such alternative amounts will be acceptable to the parties, provided that all such amounts must be paid solely from the Settlement Amount.

Pursuant to this provision, Plaintiffs now request that the Court approve service awards of $5,000 for each of the Named Plaintiffs and a service award of $2,500 for opt-in Plaintiff Verne

Lund.[10]  Motion for Service Awards at 4 [Docket No. 869].  Plaintiffs contend that they have been

actively involved in all stages of this litigation and that through their time and effort the class

members were able to secure a favorable settlement.  In the same vein, Plaintiffs assert that although

Mr. Lund is not a Named Plaintiff and the Settlement Agreement does not provide for such an

award, Mr. Lund made contributions to the prosecution of the class action that exceeded those of the

class members and therefore merit a service payment.

**B.      Legal Standard**

It is well-established in this circuit that named plaintiffs in a class action are eligible for

reasonable incentive payments, also known as service awards.  *See Stanton*, 327 F.3d at 977.  In fact,

the Ninth Circuit recently noted that incentive payments to named plaintiffs have become "fairly

typical" in class actions.  *Rodriguez*, 563 F.3d at 958 (citing 4 William B. Rubenstein *et al*.,

*Newberg on Class Actions* § 11:38 (4th ed.2008); Theodore Eisenberg & Geoffrey P. Miller,

*Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 U.C.L.A. L.Rev. 1303 (2006)

(finding that 28% of settled class actions between 1993 and 2002 included an incentive award to

class representatives)).  However, while incentive payments have become increasingly common,

there is no entitlement to an incentive payment.  Rather, "[s]uch awards are discretionary . . . and are

intended to compensate class representatives for work done on behalf of the class, to make up for

financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their

willingness to act as a private attorney general."  *Id.* at 958-59 (analyzing *ex ante* incentive

agreements between certain named plaintiffs and class counsel); *see also In re Mego Fin. Corp. Sec.*

*Litig.*, 213 F.3d at 463.  When incentive payments are part of a settlement, the court must carefully

consider the disparity created by incentive payments to named plaintiffs because "excessive

payments to named class members can be an indication that the agreement was reached through

fraud or collusion."  *Stanton*, 327 F.3d at 975.  Particularly, the Ninth Circuit has cautioned that, "if

class representatives expect routinely to receive special awards in addition to their share of the

recovery, they may be tempted to accept suboptimal settlements at the expense of the class members

---

[10]  In their Motion, Plaintiffs request conflicting award amounts for Mr. Lund.  At the January 28, 2011 hearing, counsel clarified that Plaintiffs are seeking an award of $2,500 for Mr. Lund.

United States District Court

For the Northern District of California

whose interests they are appointed to guard." *Id.* (quoting *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 720 (E.D.N.Y. 1989)).

When considering a request for an incentive payment, the court must evaluate each request individually, taking into account the following factors: (1) the actions the plaintiff has taken to protect the interests of the class; (2) the degree to which the class has benefitted from those actions; (3) the duration of the litigation and the amount of time and effort the plaintiff expended in pursing it; and (4) the risks to the plaintiff in commencing the litigation, including reasonable fears of workplace retaliation, personal difficulties, and financial risks. *See id.* at 977 (citing *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)); *see also In re Walmart Stores, Inc. Wage & Hour Litig.*, No. C 06-2069, 2010 WL 31266, at *3 (N.D. Cal. Jan. 5, 2011) (applying *Stanton* factors); *Singer v. Becton Dickinson & Co.*, No. 08-CV-821-IEG, 2009 WL 4809646, at *9 (S.D. Cal. Dec. 9, 2009) (same).[11]  Additionally, to ensure that an incentive payment is not excessive, the court must balance "the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment." *Stanton*, 327 F.3d at 977; *see also Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008).  With the foregoing factors as guidance, the Court turns to Plaintiffs' requests.

---

[11]  In assessing the reasonableness of an inventive award, several district courts in the Ninth Circuit have applied the five-factor test set forth in *Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995), which analyzes: (1) the risk to the class representative in commencing a class action, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation; and (5) the personal benefit, or lack thereof, enjoyed by the class representative as a result of the litigation.  *See, e.g., Carter v. Anderson Merch., LP*, No. EDCV 08-0025-VAP, 2010 WL 1946757, at *3 (C.D. Cal. May 11, 2010); *Williams v. CostCo Wholesale Corp.*, No. 02cv2003 IEG, 2010 WL 2721452, at *7 (S.D. Cal. July 7, 2010); *Fulford v. Logitech, Inc.*, No. C 08-2041 MMC, 2010 WL 807448, at *2 (N.D. Cal. Mar. 5, 2010).  While the five factors set forth in *Van Vranken* differ slightly from those articulated by the Ninth Circuit in *Stanton*, both sets of factors share the same aim: to thoroughly evaluate a named plaintiff's role in a class action to determine whether a proposed incentive payment is reasonable.  To the extent that the *Van Vranken* factors identify additional criteria that aids in the reasonableness inquiry, the Court has incorporated that criteria into its analysis applying the *Stanton* factors.

United States District Court

For the Northern District of California

**C.      Analysis**

     **1.      Actions Taken to Protect Class Interests & the Amount of Time and Effort Expended**

The first and third factors set forth in *Stanton* respectively examine the actions each of the Named Plaintiffs took to protect the interests of the class, and the amount of time and effort they expended in pursuing the litigation. *Stanton*, 327 F.3d at 977. Because both factors focus on the Named Plaintiffs' (and, in this case, Mr. Lund's) individual contributions to the litigation, the Court will consider both factors together.

In their Motion, Plaintiffs state that they have each devoted a significant amount of time and effort to fulfilling their obligations as class representatives by working extensively with Class Counsel to explain and develop the facts and issues involved in this case, respond to RGIS's defenses and challenges, prepare for mediation and trial, and evaluate what is fair and reasonable for the class as a whole. Mot. for Service Awards at 5-6. Plaintiffs proffer the following account of their participation in this litigation.

In the early stages of the litigation, Plaintiffs state that they met with Class Counsel to discuss the facts that formed the basis for their claims and provided counsel with background information about the type of work they and the other class members performed for RGIS, the hours that they worked, and RGIS's pay practices and procedures. *Id*. at 2; Declaration of Andrew P. Lee ¶ 5 [Docket No. 870]. Each of the Named Plaintiffs also reviewed the initial Complaint and the First Amended Consolidated Complaint and signed an agreement to serve as class representatives. Mot. at 2; Lee Decl. ¶¶ 5, 7.

Thereafter, the Named Plaintiffs contend that they were actively involved in discovery and provided information used in pre-trial motions. Mot. for Service Awards at 3. They state that each Named Plaintiff responded to a set of twenty-five interrogatories and a set of sixty-three requests for production of documents, which required them to spend substantial time communicating with Class Counsel to assist in preparing the responses and to gather and produce the responsive documents. *Id*. at 3; Lee Decl. ¶¶ 10-11. According to Mr. Lee, "the drafting, reviewing, editing, and verification of each set of interrogatories required on average six hours or more on the part of the

Case 3:08-cv-05778-JCS Document 281 Filed 04/01/19 Page 49 of 56

United States District Court

For the Northern District of California

1    Named Plaintiffs." Lee Decl. ¶ 11.

2         Additionally, Plaintiffs proffer that, with the exception of Ms. Sheldranti, Ms. Zustak, and

3    Ms. Feige, all of the Named Plaintiffs and Mr. Lund were deposed, which required hours of

4    preparation and for Ms. Manos, Ms. Schnars, Ms. Gatlin, and Mr. Lund required travel to San

5    Francisco to sit for their depositions. Mot. for Service Awards at 3; Lee Decl. ¶¶ 12, 14. Mr. Lee

6    estimates that each deponent spent an average of 12 hours preparing for and sitting for his or her

7    deposition. Lee Decl. ¶ 13.

8         With respect to the pre-trial motions filed, Plaintiffs state that each of them provided at least

9    one declaration in connection with Plaintiffs' motions or oppositions to RGIS's motions. Mot. for

10   Service Awards at 3. Particularly, Ms. Boze, Ms. Cunningham-Gibson, Ms. Garcia, Ms. Pease, Ms.

11   Pierson, Ms. Piper, Ms. Rosenthal, Ms. Saites, Ms. Verbick, and Ms. Wren, along with Mr. Lund,

12   submitted declarations in support of Plaintiff's Motion to Facilitate Notice and Motion for Class

13   Certification Pursuant to Rule 23. Lee Decl. ¶ 8. Likewise, Ms. Cassara, Ms. Manos, Ms. Martinez,

14   Ms. Schnars, and Ms. Thompson submitted declarations in support of Plaintiffs' Motion to Facilitate

15   Notice and Plaintiff's Opposition to RGIS's Motion for Decertification. *Id*. Plaintiffs contend that

16   "[t]hese declarations required additional time-consuming phone interviews, numerous follow-up

17   calls, and the exchange of drafts via facsimile and email." Mot. for Service Awards at 3. Mr. Lee

18   estimates that the drafting, reviewing, editing, and executing of the declarations took at least three

19   hours for each declarant. Lee Decl. ¶ 9.

20        Plaintiffs further proffer that they each participated in the settlement process. Mot. for

21   Service Awards at 4. With respect to the parties' first mediation session on October 5, 2009, Ms.

22   Wren, Mr. Barnes, and Ms. Cunningham-Gibson took time off of work and traveled to San

23   Francisco from out of state to attend the six-hour mediation, while the other Named Plaintiffs were

24   available by phone. Lee Decl. ¶ 16. During the subsequent mediation sessions on April 22, 2010

25   and May 7, 2010, all of the Named Plaintiffs made themselves available by phone so that Class

26   Counsel could contact them to evaluate mediation proposals. Lee Decl. ¶ 17. Once the parties

27   reached a settlement, the Named Plaintiffs reviewed multiple drafts of the Settlement Agreement and

28   discussed the proposed settlement over the phone with Mr. Lee, during which time he addressed

United States District Court
For the Northern District of California

their questions about the terms of the settlement, including the monetary and injunctive relief to the class, the amount of attorneys' fees, the scope of the release, the settlement approval process, and the timing for finalizing settlement. Mot. for Service Awards at 4; Lee Decl. ¶ 20.

Plaintiffs also proffer that throughout the course of the lawsuit, each of them was in constant communication with Class Counsel to discuss the progress of the case and to provide additional factual information. Mot. for Service Awards at 3. Mr. Lee attests that his billing records indicate that he spoke by phone with the Name Plaintiffs on numerous occasions, including 30 phone calls with Ms. Piper, 20 phone calls with Ms. Martinez, 16 phone calls and 8 emails with Mr. Lund, 15 phone contacts with Ms. Boze, 7 phone contacts and seven emails with Mr. Barnes, and 11 phone calls with Ms. Cassara. Lee Decl. ¶ 15.

Finally, Plaintiffs submit that, prior to the settlement, each of the Named Plaintiffs was involved in trial preparation. Mot. for Service Awards at 5. According to Mr. Lee, in late 2009 Class Counsel held a series meetings with the Named Plaintiffs to discuss trial preparation, their ability to testify at trial, and settlement. Lee Decl. ¶ 18. He states that each of the meetings lasted approximately thirty minutes and the Named Plaintiffs attended the meetings either in person or through teleconference. *Id*. Additionally, Ms. Martinez, Ms. Wren, Ms. Boze, and Mr. Barnes met in person with Plaintiffs' trial consultant in San Francisco, and Ms. Boze and Mr. Barnes provided mock testimony that was recorded in preparation for trial. Lee Decl. ¶ 19.

Based on the foregoing descriptions, Plaintiffs contend that throughout each stage of the case, they actively participated in the prosecution of this action and dedicated substantial time and effort toward fulfilling their roles as class representatives. They maintain that, as a result of such efforts, they were able to secure a significant financial recovery through the Settlement, which benefits the class as a whole. They therefore assert that in light of such efforts and recovery, the $5,000 service awards to each of the Named Plaintiffs and $2,500 service award to Mr. Lund are amply justified.

To assist the Court with assessing the role each of the Named Plaintiffs and Mr. Lund played in this litigation, the Court requested that the Named Plaintiffs and Mr. Lund submit detailed declarations describing the tasks they performed and the time expended. In response, all of the

Named Plaintiffs except Mr. Whitman, Ms. Molmen, and Ms. Williams filed declarations. *See* Appendix of Named Plaintiff and Class Representative Declarations [Docket No. 922]; Declaration of Michele Zustak [Docket No. 931]. The Court has thoroughly reviewed Plaintiffs' and Mr. Lund's declarations and finds that, with the exceptions discussed below, their individual accounts substantiate their representation that they have been actively involved in prosecuting this lawsuit. Working closely with Class Counsel, each of the Named Plaintiffs who filed declarations and Mr. Lund have assisted with marshaling facts and evidence, reviewed pleadings, provided declarations for motions and opposition briefs, responded to discovery, communicated with other class members, and participated in the settlement process. While the amount of time each Plaintiff invested in the litigation ranges between 36 hours and over 100 hours,[12] each Plaintiff invested significant time throughout each stage of this case which directly contributed to their ultimate recovery. Thus, the first and third *Stanton* factors support a service award to the Named Plaintiffs who filed declarations and Mr. Lund.

However, with respect to Ms. Feige, the Court must address her involvement separately. By her account, Ms. Feige spent a total of 9 hours assisting counsel in this case. Specifically, she states that she spoke with counsel on eight occasions, during which she answered questions regarding RGIS's wage and hour policies and practices and provided names of other auditor and team leader employees. Feige Decl. ¶¶ 10-11, Appendix, Ex. E. In addition, she indicates that she spent one hour reviewing the Settlement Agreement and discussing it with counsel. During the March 25 hearing, the Court asked counsel about the assistance Ms. Feige provided. Counsel indicated that Mr. Feige did provide some assistance in this case in her role as a Named Plaintiff. Thus, counsel's representation, along with Ms. Feige's statements in her Declaration provide sufficient evidence that

---

[12] As stated in their declarations, the total amount of time each Named Plaintiff and Mr. Lund spent in this case is as follows: Barnes Decl. ¶ 18 (191.5 hours); Boze Decl. (71 hours); Cassara Decl. ¶ 19 (49 hours); Cunningham-Gibson Decl. ¶ 15 (99 hours); Feige Decl. ¶ 14 (9 hours); Garcia Decl. ¶ 20 (77.5 hours); Gatlin Decl. ¶ 14 (47.5 hours); Johnson Decl. ¶ 16 (55 hours); Lund Decl. ¶ 16 (67 hours); Manos Decl. ¶ 19 (354 hours); Martinez Decl. ¶ 16 (113 hours); Pease Decl. ¶ 26 (99 hours); Pierson Decl. ¶ 20 (42 hours); Piper Decl. ¶¶ 9, 12, 13, 15-18, 22(78 hours); Rosenthal Decl. ¶ 20 (115 hours); Saites Decl. ¶ 17 (113.5 hours); Schnars Decl. ¶ 15 (86.5 hours); Sheldranti Decl. ¶ 13 (79 hours); Thompson Decl. ¶ 14 (40 hours); Verbick Decl. ¶ 12 (36 hours); Wren Decl. ¶ 19 (115 hours); Zustak Decl. ¶ 12 [Docket No. 931]; Molmen (5 hours), Williams (10.5 hours) [Wallace Suppl. Decl. ¶¶ 13-15, 17-19].

1   she expended some time and effort to assist the class meriting a service award.  However, given her

2   relatively limited involvement as compared to the other Named Plaintiffs, the Court will adjust the

3   amount of her award commensurate with the time she expended.

4         With respect to Mr. Whitman, counsel indicates that Mr. Whitman passed away during the

5   early stages of this case and had only minimal involvement with counsel.  Wallace Suppl. Decl. ¶ 20.

6   Plaintiffs therefore withdraw their request for a service award to Mr. Whitman.  *Id.*

7         As to Ms. Molmen and Ms. Williams, Class Counsel states that despite numerous attempts,

8   they have been unable to obtain declarations from these Plaintiffs.  Wallace Suppl. Decl. ¶¶ 12, 16.

9   Counsel, however, proffers descriptions of their involvement in the case and an estimate of the total

10   hours they expended.  Specifically, based on counsel's review of their billing records, Ms. Molmen

11   spent 5 hours assisting counsel (Wallace Suppl. Decl. ¶¶ 13-15), and Ms. Williams spent 13.5 hours

12   assisting counsel and sitting for her deposition (Wallace Suppl. Decl. ¶¶ 17-19).  As with Ms. Feige,

13   the Court finds that, while Ms. Molmen and Ms. Williams made contributions to this lawsuit beyond

14   those of the general class members, their involvement was less than those of the other Named

15   Plaintiffs.  Accordingly, the Court will adjust the amount of their awards commensurate with the

16   time they each expended.

17         **2.**     **Benefit to the Class**

18         The second factor that the Court must assess is the degree to which the class has benefitted

19   from the Named Plaintiffs' and Mr. Lund's participation in this case.  *Stanton*, 327 F.3d at 977.  In

20   their Motion, Plaintiffs contend that the time and effort they expended in this litigation provided

21   significant benefits to the class.  As detailed above, Mr. Lee has stated that in working with the

22   Named Plaintiffs and Mr. Lund, counsel was able to file a complaint against RGIS asserting the

23   class's claims, successfully defend against RGIS's motions to dismiss the case and to decertify the

24   classes, gather critical documents and information, respond to RGIS's discovery requests, and

25   ultimately reach a settlement with RGIS pursuant to which the class will recover millions of dollars.

26   Thus, there is a sufficient basis to find that the services the Named Plaintiffs and Mr. Lund

27   performed directly benefitted the class.

28

**United States District Court**
For the Northern District of California

### 3. Risks Associated with Serving as Named Plaintiffs

Under the next factor, the Court must evaluate whether the Named Plaintiffs and Mr. Lund faced any risks in commencing the litigation, including reasonable fears of workplace retaliation, personal difficulties, or financial risks. *Stanton*, 327 F.3d at 977. In their Motion, Plaintiffs argue that they assumed "substantial" risks by serving as named plaintiffs and pursuing this action against RGIS. Mot. at 8. In particular, they point out that Ms. Boze, Ms. Garcia, Ms. Martinez, Ms. Pierson, Ms. Pease, Ms. Piper, Ms. Saites, and Ms. Sheldranti, as well as Mr. Lund, were employed by RGIS at the time this lawsuit was filed and thus faced the possibility of retaliation as a result of their participation in the lawsuit. *Id.* In fact, Mr. Lee attests that counsel wrote three letters to RGIS complaining of retaliatory conduct against the Plaintiffs generally, and against Ms. Boze and Ms. Garcia, specifically. Lee Decl. ¶ 21; *see also* Boze Decl. ¶ 18, Appendix, Ex. B; [Docket No. 922]; Garcia Decl. ¶ 18, Appendix, Ex. F [Docket No. 922]. Additionally, in her Declaration, Ms. Zustak states that shortly after she became involved in this lawsuit, RGIS stopped scheduling her to work and effectively fired her. Zustak Decl. ¶ 11.

With respect to the Named Plaintiffs who were no longer employed by RGIS, Plaintiffs contend that it was possible that RGIS would retaliate against them by declining to rehire them for future employment or providing negative references to other potential employers. Mot. for Service Awards at 8. Finally, Plaintiffs contend that they faced the possibility that, if RGIS prevailed in this case, they would be liable for some portion of its litigation costs under both Federal Rule of Civil Procedure 54(c) and California Labor Code § 218. *Id.* at 8.

The Court has considered Plaintiffs' arguments and finds that Plaintiffs have demonstrated that they faced potential risks as a result of pursuing this lawsuit against their employer. Thus, this factor also supports an incentive award.

### 4. Amount of Incentive Payments in Comparison to the Settlement Fund

In addition to the foregoing factors, to ensure that the requested incentive payments are not excessive, the Court must consider the amount and number of incentive payments in relation to the settlement amount. *See Stanton*, 327 F.3d at 976; *Alberto*, 252 F.R.D. at 669; *Carter*, 2010 WL 1946757, at 4. Here, Plaintiffs seek incentive payments of $5,000 for each for the 24 Named

United States District Court

For the Northern District of California

1    Plaintiffs and $2,500 for Mr. Lund.

2         As Plaintiffs correctly note, there is ample case law finding $5,000 to be a reasonable amount

3    for an incentive payment.  *See e.g.*, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 463 (approving

4    incentive payments of $5,000 to the two class representatives in a settlement of $1.725 million);

5    *Hopson v. Hanesbrands Inc.*, 2009 WL 928133, at *10 (N.D. Cal. April 3, 2009) (finding $5,000

6    incentive award to sole named plaintiff reasonable); *Jacobs v. Cal. State Auto. Ass'n Inter-Ins. Bur.*,

7    2009 WL 3562871, at *5 (N.D. Cal. Oct. 27, 2009) (noting that in the Northern District of

8    California, a $5,000 payment is "presumptively reasonable"); *Williams*, 2010 WL 2721452, at *7

9    (approving incentive award of $5,000 and finding the amount "well within the acceptable range

10   awarded in similar cases."); *Chun-Hoon*, 716 F. Supp. 2d at 855 (approving $5,000 incentive awards

11   to two named plaintiffs).  Thus, the $5,000 payments Plaintiffs request are in line with that found to

12   be reasonable in other class actions in this district.  The question then becomes whether the incentive

13   payments are proportional to the Settlement Amount.

14        On this point, Plaintiffs contend that awards are proportional to both the range of settlement

15   awards to class members and the total settlement amount.  Mot. for Service Awards at 6-7.  First,

16   Plaintiffs submit that while the average award to class members is $207.69, there are 258 class

17   members who will receive individual awards greater than $5,000, including one class member whose

18   award will be $19,189.  *Id*. at 7.  Thus, although the $5,000 incentive payment amount is greater

19   than the average class member award, it is nonetheless within the range of settlement awards.

20   Plaintiffs further proffer that the total amount of the service awards requested is $122,500, which

21   represents only 0.45% of the $27,000,000 gross Settlement Amount.  *Id*.  This percentage is also in

22   line with those found to be acceptable in other recent class actions.  *See In re Mego Fin. Corp. Sec.*

23   *Litig*., 213 F.3d at 463 (approving incentive award of $5,000 to two plaintiff representatives in $1.75

24   million settlement, comprising only 0.56% of the total settlement amount); *Sandoval v. Tharaldson*

25   *Employee Mgmt, Inc.*., 2010 WL 2486346, at *10 (awarding $7,5000 incentive payment to named

26   plaintiff, comprising 1% of gross settlement amount); *Hopson*, 2009 WL 928133, at *10 (approving

27   $5,000 incentive award to one named plaintiff, comprising 1.25% of the settlement amount).

28        Taken together, the Court finds that the amount of the incentive payments is not excessive

**United States District Court**
For the Northern District of California

1   when considered in context with the total Settlement Amount, the range of awards to class members,

2   and the average class member award.

3   **D.    Summary**

4          Based on the foregoing factors, the Court finds that the Named Plaintiffs and Mr. Lund have

5   sufficiently demonstrated that they expended considerable time throughout each stage of this

6   litigation providing information for pleadings and motions, communicating with counsel and class

7   members, responding to discovery, and participating in the settlement process, which not only

8   protected the class's interests but ultimately led to a settlement benefitting the class.  Additionally,

9   each of the Named Plaintiffs and Mr. Lund assumed potential risks in participating in this lawsuit,

10  and in some cases experienced actual retaliation for their involvement.  Plaintiffs have also shown

11  that the service awards are not disproportionate to the settlement amount or class recovery.  The

12  Court therefore **GRANTS** Plaintiffs' request for service awards as follows.

13         The Court **GRANTS** Plaintiffs' request for service awards in the amount of $5,000 each to

14  Trisha Wren; Kevin Barnes; Lisa Cunningham-Gibson; Cynthia Piper; Tephine Saites; Margaret

15  Cruz Boze; Michelle Pease; Kimberly Cassara; Rabecka Sheldranti; Victoria Thompson; Melanie

16  Manos; Norma Garcia; Cheryl Pierson; Sally Rosenthal; Nicole Verbick; Tammy Schnars; Margaret

17  Martinez; Joan Johnson; Jewell Gatlin, and Michele Zustak.

18         The Court **GRANTS** Plaintiffs' request for a service award to Kathleen Feige, Carol

19  Molmen, and Latonia Williams.  However, because of their relatively limited involvement in this

20  case as compared to the other Named Plaintiffs, the Court awards Ms. Feige and Ms. Williams

21  service payments of $1,000 each, and awards Ms. Molmen a service payment of $500.

22         The Court **GRANTS** Plaintiffs' request for a service payment in the amount of $2,500 to

23  Verne Lund.

                                        **VII.  CONCLUSION**

25  For the reasons set forth above, the Court: (1) **GRANTS** Plaintiffs' Motion for Final

Approval of Class Action Settlement [Docket No. 912]; (2) **GRANTS** Plaintiffs' Motion for an

Award of Reasonable Attorneys' Fees, Costs and Expenses [Docket No. 909]; and **GRANTS**

Plaintiffs' Motion for Service Awards to Named Plaintiffs and Opt-In Plaintiff Lund [Docket No.

869].

      IT IS SO ORDERED.

Dated: April 1, 2011

_____
JOSEPH C. SPERO
United States Magistrate Judge

**United States District Court**
For the Northern District of California

56

# EXHIBIT W

United States District Court

For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NATIONAL FEDERATION OF THE BLIND,
et al.,

          Plaintiffs,

  v.

TARGET CORPORATION,

          Defendant.

_____/

No. C 06-01802 MHP

**<u>MEMORANDUM & ORDER</u>**

**Re: Attorneys' Fees and Costs**

      Plaintiffs filed the instant action in the Superior Court for the State of California, County of Alameda, in February 2006.  In March 2006, defendant removed the case to federal court.  A period of intense litigation followed, culminating in the certification of the plaintiff class in October 2007.  In April 2008, the parties reached a settlement and agreed, among other things, that defendant would pay plaintiffs' reasonable attorneys' fees and litigation costs in an amount to be determined by the court.  On March 9, 2009, the court held a fairness hearing and on March 10, 2009, the court granted final approval of the settlement.  As part of the briefing on the fairness issues plaintiffs moved for attorneys' fees and costs.  At the fairness hearing the court entertained arguments on the quantum of such fees and costs to which plaintiffs' counsel might be entitled.  Having considered the parties' argument and submissions, the court enters the following memorandum and order.

United States District Court

For the Northern District of California

BACKGROUND

Plaintiffs are a non-profit organization with the purpose of promoting the general welfare of blind persons, its California chapter, and individuals representing a national class and a California subclass of blind persons. Defendant Target Corporation operates approximately 1,400 retail stores nationwide, including 205 stores in California. Target.com is a website owned and operated by Target. By visiting target.com, customers can purchase many of the items available in Target stores.

Plaintiffs originally filed a class action in state court seeking certification of a class of California individuals. Plaintiffs alleged that Target.com was not accessible to blind persons, denying them full and equal access to Target stores in violation of California's Unruh Civil Rights Act, Cal. Civ. Code §§ 51, *et seq.*, and Disabled Persons Act, id. §§ 54, *et seq.* After defendant removed this action to federal court, plaintiffs amended their complaint to include a federal claim under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12181, *et seq.*

Defendant mounted a vigorous opposition. The court denied defendant's first motion to dismiss but also rejected plaintiffs' motion for a preliminary injunction. Plaintiffs filed a motion for class certification, which the court found partially deficient; the court granted plaintiffs leave to amend. Plaintiffs filed a corrected motion for certification, including numerous declarations of blind individuals from across the country documenting similar experiences with Target.com. Defendant deposed many of these persons, and, while the second motion for certification was pending, filed a motion for summary judgment. The court granted in part defendant's motion for summary judgment with respect to plaintiff Bruce F. Sexton's ADA claim but subsequently certified a national class and a California subclass. Plaintiffs replaced Sexton with James P. Marks and Melissa Williamson as representatives of the nationwide class.

Target sought an interlocutory appeal of the class certification before the Court of Appeals, which was denied. Target then filed a second motion to dismiss the ADA claim, which the court rejected as bordering on the frivolous. During this time, defendant had improved Target.com to make it more accessible using a plan submitted by plaintiffs prior to the commencement of this action.

**United States District Court**
For the Northern District of California

1    The parties settled in September 2008. Defendant agreed to modify its website to meet

2    accessibility guidelines and permit plaintiffs to monitor its continued compliance. Additionally,

3    defendant established a six million dollar settlement fund to compensate members of the California

4    subclass.

5

6    LEGAL STANDARD

7    A prevailing plaintiff may petition for attorneys' fees under the fee-shifting provisions of the

8    federal ADA, see 42 U.S.C. § 12205, the Unruh Act, see Cal. Civ. Code § 52(a), and the Disabled

9    Persons Act, see Cal. Civ. Code § 54.3(a). All three statutes provide that prevailing plaintiffs may

10   be entitled to reasonable attorneys' fees and costs, as determined by the court in its discretion.

11   Under federal law, to be considered a prevailing party the plaintiff must effect a "material alteration

12   of the legal relationship between the parties [whereby] the plaintiff becomes entitled to enforce a

13   judgment, consent decree, or settlement against the defendant." Farrar v. Hobby, 506 U.S. 103, 113

14   (1992). Defendant does not dispute that plaintiffs are a prevailing party for the purposes of

15   entitlement to fees and costs. While the statutes leave the award of attorneys' fees and costs to the

16   court's discretion, "a prevailing plaintiff should ordinarily recover an attorney's fee unless special

17   circumstances would render such an award unjust." Hensley v. Eckerhart, 461 U.S. 424, 429 (1983)

18   (citation omitted). The court must determine the amount in fees and costs to which plaintiffs are

19   reasonably entitled. See id. at 433.

20   When California law governs the claim, it also governs the award of fees. Vizcaino v.

21   Microsoft Corp., 290 F.3d 1043, 1047 (9th Cir. 2002). California allows courts to award attorneys'

22   fees under the following circumstances:

23       [A] court may award attorneys' fees to a successful party against one or more
         opposing parties in any action which has resulted in the enforcement of an important
24       right affecting the public interest if: (a) a significant benefit, whether pecuniary or
         nonpecuniary, has been conferred on the general public or a large class of persons, (b)
25       the necessity and financial burden of private enforcement, or of enforcement by one
         public entity against another public entity, are such as to make the award appropriate,
26       and (c) such fees should not in the interest of justice be paid out of the recovery . . . .

27

28

3

United States District Court
For the Northern District of California

1   Cal. Code Civ. Proc. § 1021.5.  To establish reasonable attorneys' fees, California employs the

2   lodestar method, which "multipl[ies] the number of hours reasonably expended by counsel by a

3   reasonable hourly rate.  Once the court has fixed the lodestar, it may increase or decrease that

4   amount by applying a positive or negative 'multiplier' to take into account a variety of other factors .

5   . . ."  Lealao v. Beneficial California, Inc., 82 Cal. App. 4th 19, 26 (Cal. Ct. App. 2000).

6

7   DISCUSSION

8   I.      The Lodestar

9           The "lodestar is the product of reasonable hours times a reasonable rate."  City of Burlington

10  v. Dague, 505 U.S. 557, 559 (1992) (citations omitted).  The Supreme Court has established a

11  "strong presumption" that lodestar fees are reasonable.  Id. at 562.  Plaintiffs' attorney bears the

12  burden of submitting detailed records documenting "the hours worked and rates claimed."  Hensley,

13  461 U.S. at 434.  The court may reduce those hours if the documentation is inadequate, the

14  submitted hours are duplicative or inefficient, or the requested fees appear excessive or otherwise

15  unnecessary.  Id.; see also Chalmers v. Los Angeles, 796 F.2d 1205, 1210 (9th Cir. 1986).

16

17          A.      Hourly Rates

18          Reasonable hourly rates are calculated by reference to "prevailing market rates in the

19  relevant community," with a special emphasis on fees charged by lawyers of "comparable skill,

20  experience, and reputation."  Davis v. City of San Francisco, 976 F.2d 1536, 1546 (9th Cir. 1992).

21  As a general rule, the forum district represents the relevant legal community.  See Gates v.

22  Deukmejian, 987 F.2d 1392, 1405 (9th Cir. 1992).  In this case, the forum district is the Northern

23  District of California.  Since these are market rates, and therefore subject to normal performance

24  expectations, they "d[o] not already reflect an expectation of excellent results."  Vizcaino, 290 F.3d

25  at 1051.  The court is satisfied that the plaintiffs' requested rates are in line with those billed by

26  attorneys in this district experienced in complex litigation, as analyzed and thoroughly discussed by

27  plaintiffs' attorneys' fees expert.  See Docket No. 191 (Pearl Dec.).

28
                                                        4

United States District Court

For the Northern District of California

1    While defendant does not dispute the rates charged by plaintiffs' lawyers, it does challenge

2    the rates of summer associates and paralegals. Defendant also objects to funding plaintiffs' practice

3    of using more expensive partner time for some drafting and research tasks. First, the court finds

4    plaintiffs' evidence of paralegal and summer associate rates in this judicial district convincing, see

5    id., and notes that defendant's own counsel charges similar rates for paralegals, see id. at 23.

6    Second, as this court has consistently held, the court may not condition fees on plaintiffs' counsel's

7    conformance to the typical commercial law firm's pyramidal staffing structure. See, e.g., Chabner v.

8    United of Omaha Life Ins. Co., No. C 95-0447, 1999 WL 33227443, at *5 (N.D. Cal. Oct. 12, 1999)

9    (Patel, J.). The legal profession is diverse enough to embrace a variety of ways of conducting

10   effective litigation, some of which may involve partners with relevant expertise conducting research

11   or preparing a witness. As this court noted in the past, the benefits of the pyramidal structure itself

12   have been a subject of debate within the profession for some time. See, e.g., United States v. San

13   Francisco, 748 F. Supp. 1416, 1432 (N.D. Cal. 1990) (Patel, J.). Plaintiffs' proposed hourly rates are

14   granted as requested.

15

16       B.    Reduction of Fees

17       Plaintiffs request that all hours be counted as part of the lodestar, regardless of whether the

18   hours were spent pursuing successful or unsuccessful motions. Defendant opposes paying any of the

19   hours spent on unsuccessful motions or media appearances.

20       Hours spent on unsuccessful motions are excluded when the motion is unrelated to the

21   prevailing plaintiff's successful claim. Hensley, 461 U.S. at 440. "Where a lawsuit consists of

22   related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced

23   simply because the district court did not adopt each contention raised. But where the plaintiff

24   achieved only limited success, the district court should award only that amount of fees that is

25   reasonable in relation to the results obtained." Id. The plaintiffs' attorney is entitled to reasonable

26   remuneration for hours spent on a claim that contributes to the ultimate success of plaintiff's main

27   goals. See Cabrales v. County of Los Angeles, 935 F.2d 1050, 1052 (9th Cir. 1991).

28

United States District Court

For the Northern District of California

1  In cases involving novel arguments or extensions of existing law, the proper test is whether it

2  was reasonable at the time to work on an ultimately unsuccessful motion rather than ask whether, in

3  hindsight, the plaintiff could have prevailed without it.  See Walsh ex rel. Walsh v. Tamalpais Union

4  High Sch. Dist., No. C-96-3037, 1998 U.S. Dist. LEXIS 22704 (N.D. Cal. Nov. 19, 1998) (Legge,

5  J.).  This was such a case.  Plaintiffs' unsuccessful pursuit of a preliminary injunction yielded parts

6  of the evidentiary record used to support their commonality argument at the certification stage.  The

7  plaintiffs are granted half of all hours spent litigating the unsuccessful preliminary injunction, in the

8  amount of $116,986.25.

9  Similar reasoning applies to plaintiffs' request for hours spent on their supplemental class

10  certification briefing.  This briefing should not be fully compensated, since it was necessitated by

11  deficiencies in plaintiffs' first round of briefing.  The plaintiffs are granted two-thirds of the hours

12  spent on the supplemental class certification briefing, i.e., $17,175.33, instead of the $25,763

13  requested.

14  When a plaintiff's attorney gives press conferences or performs other public relations work

15  directly and intimately connected to the successful representation of the client, he or she is entitled

16  to compensation.  See Davis, 976 F.2d at 1545.  However, "the district court should disallow any

17  hours claimed by [plaintiff's] counsel for public relations work which did not contribute, directly

18  and substantially, to the attainment of [plaintiff's] litigation goals."  Id.  In class actions, it is doubly

19  necessary to publicize plaintiffs' efforts in order to keep class members informed of the course of the

20  action and to help identify additional class members.  See United States v. San Francisco, 748 F.

21  Supp. at 1423.  While recognizing the important function of media work in class actions, the court

22  also notes that the class counsel's reputation also stands to gain considerably.  Accordingly,

23  plaintiffs' counsel are granted half of the hours spent on media work, in the amount of $13,969.75.

24

25  C.     Unmodified Fees

26  The following fees, requested by plaintiffs and opposed by defendant, are granted in their

27  entirety.  Defendant challenged a number of insufficiently documented time entries, which the

28

1    plaintiffs have agreed to offset by a five percent voluntary reduction in their merit-based fees. This

2    voluntary reduction is sufficient to offset the flawed time entries identified. Defendant also asserts

3    that preparation of an expert witness by two attorneys constituted unnecessarily duplicative billing.

4    In fact, it is often more efficient for lawyers with complementary skill sets to cooperate in

5    performing a task. The use of two attorneys for such a task is hardly extravagant.

6        Defendant also opposes awarding fees for travel time and time used to perform clerical tasks.

7    The Ninth Circuit has established that travel time and clerical tasks are reasonably compensated at

8    normal hourly rates if such is the custom in the relevant legal market. See Davis, 976 F.2d at 1543;

9    Trs. of the Constr. Indus. & Laborers Health & Welfare Trust v. Redland Ins. Co., 460 F.3d 1253,

10   1256 (9th Cir. 2006). Plaintiffs have documented this custom to the court's satisfaction. See Docket

11   No. 198 (Paradis Dec.) ¶ 6. The custom in this district of charging for word processing and other

12   clerical tasks has also been well-established. See, e.g., Finkelstein v. Bergna, 804 F. Supp. 1235,

13   1260 (N.D. Cal. 1992) (Conti, J.) (finding that "it has become the prevailing practice in firms in the

14   San Francisco area to bill clients separately for word processing support work").

15       Finally, defendant would exclude the time plaintiffs' counsel spent in connection with

16   individuals who turned out not to be class members. In class actions, the outer edges of the class are

17   often blurry and may require additional investigation to firmly establish class membership. This

18   task will sometimes involve contacting or deposing individuals who might end up outside of the

19   class definition. The test is the same as for unsuccessful motions: class counsel is entitled to

20   compensation for his reasonable efforts as long as they advanced the class's ultimate goals.

21   Cabrales, 935 F.2d at 1052. Here, the court finds it reasonable to compensate plaintiffs for these

22   hours.

23

24   II.    Multiplier

25       Plaintiffs' counsel has requested a 2.0 multiplier, and defendant has argued that no multiplier

26   whatsoever should be granted. There is a strong presumption that the lodestar—computed as the

27   product of hours billed times a reasonable hourly rate—represents a reasonable fee. See Dague, 505

28                                          7

U.S. at 562. A party that requests an augmentation of its lodestar figure through the use of a multiplier bears the burden of showing "that such an adjustment is necessary to the determination of a reasonable fee." Blum v. Stenson, 465 U.S. 886, 898 (1984); see also Ketchum, 24 Cal. 4th at 1138 (establishing that, under California law, "the party seeking a fee enhancement bears the burden of proof"). As a result, district courts will use a multiplier only in "rare and exceptional cases." Fischer v. SJB-P.D. Inc., 214 F.3d 1115, 1119 (9th Cir. 2000). This is such a case.

Federal law does not permit the use of multipliers in actions brought under fee-shifting statutes like the ADA, see Dague, 505 U.S. at 566, but California law does, see Ketchum, 24 Cal. 4th at 1138. "When a party prevails under both federal and state law, the district court may apply the more generous provisions of state law in calculating a fee award, such as including a multiplier for contingent fee risk." Fair Housing Council of San Diego v. Penasquitos Casablanca Owner's Ass'n, 523 F. Supp. 2d 1164, 1170 (S.D. Cal. 2007), citing Mangold v. Cal. Pub. Util. Comm'n, 67 F.3d 1470, 1479 (9th Cir. 1995). This action involved California claims and one federal claim. Under the circumstances of the case, it is reasonable for the court to consider applying a multiplier. A court may augment or reduce the lodestar figure in order to bring it in line with "the range of fees freely negotiated in the legal marketplace in comparable litigation." Lealao, 82 Cal. App. 4th at 50. In determining the exact quantum of the multiplier, California courts evaluate several factors, including: "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award." Ketchum, 24 Cal. 4th at 1132.[1] The total fee amount is then compared against lodestar multipliers in comparable cases.

A.    Factors Affecting the Multiplier

Exceptional results in the face of vigorous opposition and in the absence of supporting precedent militate in favor of higher multiplier values. See Vizcaino, 290 F.3d at 1048. As discussed below, plaintiffs' litigation strategy involved the extension of important areas of disability law into an emerging form of electronic commerce that promises to grow in importance. While

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  similar results in established areas of law might be less impressive or worthy of additional

2  encouragement, it takes exceptional creativity to establish the lawfulness of extending established

3  rights into uncharted legal territory. When successful, these efforts must earn a premium to

4  encourage novel legal arguments and a stringent examination of the accessability of new

5  technologies. The alternative is a stagnant legal landscape where advances in technology render

6  statutory protections ineffective or obsolete.

7       While every action enforcing a right sends a message to the losing party or others like it,

8  presumably affecting their future behavior, the public must benefit in a more tangible way to warrant

9  the award of a multiplier. See Flannery v. Cal. Highway Patrol, 61 Cal. App. 4th 629, 637 (Cal.

10  App. 1998). In Flannery, the state court found that a successful action, even when it sent a message

11  that sexual discrimination and harassment would not be tolerated, failed to register as a significant

12  public benefit. Id. The court found that the lawsuit's primary result was to secure a remedy for the

13  plaintiff, while the public received only the generic assurance that anti-discrimination laws will be

14  enforced. Id. Unlike the Flannery plaintiff, plaintiffs in this action have not only vindicated their

15  own rights, but have created a six-million dollar damages fund for a California class, prompted

16  defendant to effect substantial changes to its website enabling the plaintiff class to access it, and

17  established for the first time that equal access to internet commerce is guaranteed under California

18  law and partially protected by the ADA.

19       The scope and significance of plaintiffs' victory cannot be overlooked—nor has it been

20  ignored by the country's largest retailers, many of whom promptly revised their websites following

21  this lawsuit. See Docket No. 199 (Goldstein Dec.) ¶ 6 & Exh. C. As in Heritage v. Town of

22  Woodside, Nos. A120749 & A120757, 2008 WL 4868816 (Cal. Ct. App. 2008), a case in which the

23  state court awarded a 2.0 multiplier, the present action "added to the jurisprudence of California on

24  legal issues of public interest" by expanding important civil rights to the disabled, with the

25  assistance of little existing case law. See id. at 3. Plaintiffs have substantially achieved their goals.

26  In addition to securing a six million dollar settlement fund, they have compelled defendant, and

27

28

9

United States District Court

For the Northern District of California

1    influenced other corporations, to alter their respective web presences.  Plaintiffs have broken new

2    ground in an important area of law.

3        Class counsel's skill is also a factor to be considered.  In the court's estimation, and as

4    demonstrated by the result obtained above, class counsel has prosecuted the instant action with

5    exceptional skill.  Not every tactical decision was flawless, as is almost always true, but the court

6    has already reduced the lodestar to account for unsuccessful motions.  The skill of class counsel

7    supports a substantial multiplier.

8        Defendant does not dispute plaintiffs' counsel's representations that plaintiffs' counsel

9    turned down other potential cases in order to pursue the instant case.  The need to ensure a steady

10   supply of excellent lawyers advocating public causes militates in favor of awarding a multiplier

11   greater than one in this case.  That said, the record does not indicate that any of plaintiffs' attorneys

12   dedicated themselves exclusively to this case or document how many or what sort of opportunities

13   were turned down in order to continue with this action.  This factor militates in favor of a substantial

14   multiplier, though not necessarily 2.0.

15       Risk of non-payment is also an issue to be considered.  "A contingent fee must be higher

16   than a fee for the same legal services paid as they are performed.  The contingent fee compensates

17   the lawyer not only for the legal services he renders but for the loan of those services."  Ketchum, 24

18   Cal. 4th at 1132-1133, citing Posner, Economic Analysis of the Law, 534, 567 (4th ed. 1992).  After

19   careful consideration, the Ketchum court declined to adopt the Dague rule.  Id. at 1136-37.  "The

20   purpose of a fee enhancement, or so-called multiplier, for contingent risk is to bring the financial

21   incentives for attorneys enforcing important constitutional rights . . . into line with incentives they

22   have to undertake claims for which they are paid on a fee-for-services basis."  Id. at 1133.

23       Plaintiffs faced considerable risk in undertaking the present action.  Defendant is correct that

24   the risk of non-payment of any recovery was low considering Target's financial resources.

25   However, defendant makes a basic mathematical error by suggesting that risk should be discounted

26   because the work was divided among multiple firms.  Merely because the risk was spread around to

27

28                                        10

United States District Court

For the Northern District of California

1   more than one firm does not mean that the risk of losing the lawsuit was somehow diminished: the

2   amount at stake is less for each firm, but the risk of not getting paid remains the same.

3          In terms of the risk that plaintiffs would not prevail, it should be noted that defendant is a

4   large national corporation whose resources dwarfed those available to plaintiffs.  The arguments

5   were new, the law uncharted.  Defendant's arguments threatened to derail plaintiffs' strategy on

6   more than one occasion.  Without much legal precedent to guide their assessment of risk, plaintiffs'

7   attorneys can hardly be faulted for seeking a higher than usual return on their investment.  In

8   summary, this was a substantially risky case; it merits a substantial multiplier.

9

10         B.     Multipliers in Similar Cases

11         California state courts have awarded multipliers greater than one for successful cases brought

12   under the Unruh Act and federal law, placing special emphasis on the results obtained.  See, e.g.,

13   Donovan v. Poway Unified School Dist., 167 Cal. App. 4th 567, 628 (2008) (awarding a 1.25

14   multiplier in light of the case's difficulty and risk, but declining to grant the 1.7 multiplier plaintiffs

15   had requested).  When plaintiffs have been only partially successful in their claims or the lawsuit

16   proved unexceptional, the courts have on occasion reduced the multiplier to less than 1, reflecting

17   factors such as the fraction of the claims that plaintiffs failed to win or the quality of counsel's legal

18   representation.  See, e.g., Fair Hous. Council v. Penasquitos Casablanca Owner's Ass'n, 523 F.

19   Supp. 2d 1164, 1178 (S.D. Cal. 2007) (granting a 0.61 multiplier).

20         Courts have awarded 2.0 multipliers in those few exceptional cases where the risk of non-

21   payment was so overwhelming that it had to be offset by the expectation of substantial attorneys'

22   fees.  In Woodside, which plaintiffs cite in support of a 2.0 multiplier, the court noted that the 2.0

23   multiplier was generous but found it to be within the range of acceptability, given the uncertainty of

24   the outcome and protracted appellate litigation.  2008 WL 4868816 at *7.  Discussing the multipliers

25   generally awarded in the San Francisco area, this court previously underscored that 2.0 was usually

26   the upper limit for cases that involved novel issues, high risk, and low availability of comparable

27

28

11

1   counsel.  See United States v. San Francisco, 748 F. Supp. 1416, 1435-1436 (N.D. Cal. 1990) (Patel,

2   J.).

3          Even when courts have declined to grant multipliers of 2.0, they have adjusted multipliers

4   upward to reflect delays in expected payment and the counsel's effective loan of legal services to the

5   client class.  See, e.g., Stevens v. Vons Cos., 2d Civil Nos. B196755, B201528, 2009 WL 117902, at

6   *10 (Cal. Ct. App. 2009) (upholding 1.4 and 1.6 multipliers in light of three-year duration of the

7   lawsuit during which class counsel received no compensation); Donovan, 167 Cal. App. 4th at 628

8   (affirming a 1.25 multiplier where risk and novelty of arguments were factors but rejecting a 1.75

9   value as excessive).  Like the prevailing plaintiffs in Stevens, plaintiffs' victory came only after

10  multi-year litigation during which class counsel received no fees.

11         The instant case also resembles a previous decision of this court, involving the same counsel,

12  a similarly large retailer, and a comparable victory.  See Lieber v. Macy's West, Inc., 80 F. Supp. 2d

13  1065, 1066 (N.D. Cal. 1999) (Patel, J.).  The court emphasized the risk associated with the counsel's

14  decision to represent the class, ultimately resulting in a bench trial.  The attorneys' fee award

15  included a 1.75 multiplier.  Lieber v. Macy's West, Inc., No. C 96-2955 (N.D. Cal. Dec 18, 2000)

16  (Patel. J.).  Unlike the Lieber plaintiffs, plaintiffs in the present case settled before the trial stage

17  and, in the court's estimation, took on a somewhat smaller risk.

18         In light of these considerations, the court grants a multiplier of 1.65.

19         Defendant urges the court to cross-check the final fee award obtained through the multiplier

20  method against percentage awards in common fund cases.  It cites a Colorado district court decision

21  that cross-checked a lodestar total only against the part of the settlement that could be monetized

22  with certainty.  See Lucas v. Kmart Corp., No. 99-CV-01923, 2006 WL 2729260 (D. Colo. July 27,

23  2006).  In Lucas, the Colorado court relied upon a common fund case,  Vaszlavik v. Storage Tech.

24  Corp., No. 95-B-2525, 2000 U.S. Dist. LEXIS 21140 (D. Colo. Mar. 9, 2000), to cross-check the

25  lodestar against a thirteen million dollar damages fund while ignoring the admittedly

26  "comprehensive and far-reaching" injunctive relief the plaintiff had obtained.  Id. at *2.  The court

27  declines to follow this path in the instant case.  Here, the primary remedy sought by plaintiffs was

28

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1  injunctive relief, not monetary damages.  The court need not limit itself to monetary damages or

2  cash settlement funds in assessing the benefits of a litigation.  <u>Vizcaino</u>, 290 F.3d at 1049.  Some

3  important benefits are difficult to quantify, such as clarifying a certain area of law, <u>id.</u>, forcing

4  changes in corporate policies affecting thousands of individuals, <u>id.</u>, or educating the public that the

5  law requires them to accommodate persons with disabilities, <u>Fischer</u>, 214 F.3d at 1120.[2]  These are

6  more than merely "technical" victories; they are the very heart of what plaintiffs sought to

7  accomplish.  <u>See</u> <u>id.</u>

8

9  III.    Costs Other Than Attorneys' Fees

10       Plaintiffs, as the prevailing party, are entitled to costs other than attorneys' fees, unless

11  otherwise provided by federal statute.  Fed. R. Civ. P. 54(d)(1).  Defendant does not dispute

12  plaintiffs' requested total, which the court views as well-documented and reasonable.  Costs are

13  granted in their entirety, in the amount of $194,353.

14

15  IV.    Fees on Fees

16       "[T]ime spent by counsel in establishing the right to a fee award is compensable."  <u>Davis</u>,

17  976 F.2d at 1544.  California also allows the prevailing party's counsel to recover a "fee on fees,"

18  since otherwise the interminable litigation related to fees would frustrate the "purpose behind

19  statutory fee authorizations[, which are meant to] encourage attorneys to act as private attorneys

20  general and to vindicate important rights affecting the public interest."  <u>Ketchum v. Moses</u>, 24 Cal.

21  4th 1122, 1133-1134 (Cal. 2001).  After a review of the time records plaintiffs have submitted, the

22  court has determined that $125,000 constitutes a reasonable award of fees for time used litigating

23  fees and costs, rather than the requested $160,000.

24

25  V.    Calculation of Fees

26       The award of fees and costs is calculated as follows.  Plaintiffs' request for $2,321,050.50 in

27  attorneys' fees is reduced by $13,969.75 (media), $116,986.25 (preliminary injunction), and

28

                                                        13

$8,587.66 (supplemental class certification briefing). The total after these reductions is $2,181,506.83. Applying a 5% voluntary reduction in fees, the lodestar merit fees to which plaintiffs are entitled becomes $2,072,431.49. Applying a 1.65 multiplier to this amount yields a total merit-based fee of $3,419,511.96. Additionally, the court awards costs of $194,353 and fees on fees of $125,000.

CONCLUSION

Plaintiffs' motion for reasonable attorneys' fees and costs is GRANTED as described above. Attorneys' fees and costs shall be awarded in the amount of $3,738,864.96.

IT IS SO ORDERED.

Dated: August 3, 2009

_____
MARILYN HALL PATEL
United States District Court Judge
Northern District of California

14

**ENDNOTES**

1.      In Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 70 (9th Cir. 1975), the Ninth Circuit listed twelve factors courts should consider when evaluating attorneys' fees in federal cases. In addition to California's four factors, Kerr requires a district court to consider "the time and labor required, . . . the customary fee, . . . time limitations imposed by the client or the circumstances, the amount involved and the results obtained, the experience, reputation, and ability of the attorneys, the undesirability of the case, the nature and length of the professional relationship with the client, and awards in similar cases." Id. at 70. The court has already considered most of these factors in its determination of the lodestar amount, and now incorporates the remaining ones into its evaluation of the multiplier. Since the court is awarding the multiplier pursuant the more generous provisions of California law, it has structured the following discussion according to the four factors articulated by California precedent. See Ketchum, 24 Cal. 4th at 1132. To avoid double-counting, the court has excluded the factors already discussed in the lodestar from its evaluation of the multiplier. See Morales v. City of San Rafael, 96 F.3d 359, 363-364 (9th Cir. 1996) (only factors "that are not already subsumed in the initial lodestar calculation" are relevant).

2.      Plaintiffs' counsel contend that their work on this case has greatly increased access to target.com for tens of thousands of blind people. Defendants note that the accessibility of target.com was a disputed issue and that no conclusive finding was made. Yet there is ample evidence in the record of defendant's significant moves to upgrade the accessibility of its website.

15

# EXHIBIT X

1  Guy B. Wallace, (SBN 176151)
   Elisa P. Laird, (SBN 225563)
2  SCHNEIDER & WALLACE
   180 Montgomery Street, Suite 2000
3  San Francisco, CA 94104
   Telephone: (415) 421-7100
4  Facsimile: (415) 421-7015
   TTY: (415) 421-1655
5
   James C. Sturdevant (SBN 94551)
6  Mark T. Johnson (SBN 76904)
   THE STURDEVANT LAW FIRM
7  A Professional Corporation
   475 Sansome Street, Suite 1750
8  San Francisco, CA  94111
   Telephone:  (415) 477-2410
9  Facsimile:  (415) 477-2420

10 Attorneys for Plaintiffs

11

12              **UNITED STATES DISTRICT COURT**

13            **NORTHERN DISTRICT OF CALIFORNIA**

14

15 | MARGIE CHERRY and ESTORIA CHERRY, on behalf of themselves and all others similarly situated, | CASE NO. C 04-4981 WHA |
|---|---|
16 | | **CLASS ACTION** |
17 | | |
18 | Plaintiffs, | **[PROPOSED] ORDER GRANTING FINAL APPROVAL OF STIPULATED JUDGMENT AND PLAINTIFFS' MOTION FOR REASONABLE ATTORNEYS' FEES AND COSTS PURSUANT TO F.R.C.P. 23(H)** |
19 | vs. | |
20 | THE CITY COLLEGE OF SAN FRANCISCO ("City College"); LAWRENCE WONG, in his official capacity as President of the Board of Trustees; MILTON MARKS, III, in his official capacity as Vice-President of the Board of Trustees; DR. NATALIE BERG, JOHNNIE CARTER, JR., DR. ANITA GRIER, JULIO J. RAMOS, RODEL E. RODIS, in their official capacities as members of the Board of Trustees; and DR. PHILIP R. DAY, JR., in his official capacity as Chancellor, | Date:   April 13, 2006 Time:  11:00 a.m. Place: Courtroom 9

Hon. William H. Alsup |
21 | | |
22 | | |
23 | | |
24 | | |
25 | | |
26 | Defendants. | |

27

28

---

[PROPOSED] ORDER GRANTING FINAL APPROVAL OF STIPULATED JUDGMENT AND PLAINTIFFS' MOTION FOR REASONABLE ATTORNEYS' FEES AND COSTS PURSUANT TO F.R.C.P. 23(H)
Cherry, et al. v. City College of San Francisco, et al.   Case No. C-04-4981 WHA

The Final Approval of Stipulated Judgment and Motion for Reasonable Attorneys' Fees and Costs Pursuant to F.R.C.P. 23(h) filed by plaintiffs came on regularly for a Fairness Hearing on April 13, 2006, the Honorable William H. Alsup presiding. Guy B. Wallace of Schneider & Wallace and Mark T. Johnson of the Sturdevant Law Firm appeared on behalf of the plaintiffs and Louis A. Leone and Kathleen Lynn Armagnac of Stubby & Leone appeared for defendants. Prior to this Fairness Hearing, on March 16, 2006 the Court issued an Order Granting Preliminary Approval of Class Stipulated Judgment, Directing Notice to the Class of Settlement, and Setting Fairness Hearing. ("Preliminary Approval Order"). Under the terms of the Preliminary Approval Order, defendants were obligated to provide notice to class members of the proposed settlement on or before March 1, 2006. Under the Preliminary Approval Order, members of the plaintiff class who wished to submit written objections or comments to the proposed Class Action Settlement had to do so no later than March 31, 2006.

The Court finds that Defendants have complied with the notice requirements of the Preliminary Approval Order by providing notice to the class in the manner directed by the Court. No written objections to the proposed class action settlement were received by the Court or counsel prior to the March 31, 2006 deadline, and no such objections have been received prior to the April 13, 2006 Fairness Hearing.

The Court, having read and considered the Motions, Memoranda, Declarations and Exhibits submitted by the parties, including most importantly the proposed Stipulated Judgment itself, and there being no objections by any class members to the terms of the proposed Stipulated Judgment, hereby rules and adjudges that the proposed Class Action Settlement is fair, reasonable and comports with the requirements of Rule 23 of the Federal Rules of Civil Procedure and applicable case law. Accordingly, the Court hereby GRANTS Final Approval of the Class Stipulated Judgment. The Court shall retain jurisdiction over this Stipulated Judgment in accordance with its terms.

Additionally, the Court hereby directs the filing of the First Amended Complaint pursuant to the Parties' stipulation and the terms of the Stipulated Judgement.

Finally, the Court and GRANTS Plaintiffs' uncontested motion for attorneys' fees and costs for work up through March 16, 2006 and awards Class Counsel their reasonable attorneys fees in the full

1

amount of $1.66 million as agreed to by the parties in the Stipulated Judgment.   The Court finds that the hourly rates for the attorneys and other staff who worked on this case, as set forth in the Motion for Attorneys fees and the accompanying declarations and exhibits, are reasonable and within the market range charged by attorneys and law firms with similar levels of experience for work on similar types of cases.  The Court also finds that the amount of time expended on this case by class counsel was reasonable and that an award of the full amount of the loadstar identified by counsel in their moving papers would by justified.

**IT IS SO ORDERED.**

Dated: _____04/13_____, 2006  _____

Honorable William H. Alsup

2

# EXHIBIT Y

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| DAVID BROWNE, ANTONIO CALDWELL, and LUCRETIA HALL, *on behalf of themselves and those similarly situated,*<br><br>    PLAINTIFFS<br><br>  v.<br><br>P.A.M. TRANSPORT, INC., *et al.*<br><br>    DEFENDANTS. | **Civil Action No.**: 5:16-cv-05366 |

## PLAINTIFFS' BRIEF IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION

## FOR FINAL APPROVAL OF CLASS AND COLLECTIVE SETTLEMENT

Justin L. Swidler, Esq.
Richard S. Swartz, Esq.
Joshua S. Boyette, Esq.
**SWARTZ SWIDLER, LLC**
1101 Kings Hwy. N., Ste. 402
Cherry Hill, NJ 08034
Phone: (856) 685-7420

Robert D. Soloff, Esq.
**ROBERT D. SOLOFF, P.A.**
7805 S.W. 6th Court
Plantation, Florida 33324
Phone: (954) 472-0002

July 6, 2020

## **TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................. 1

II.  LEGAL ARGUMENT ......................................................................................... 3

A.   Final Approval is Appropriate. ................................................................... 3

B.   Valuation of Legal Claims ......................................................................... 5

C.   PAM's Ability to Pay ................................................................................ 6

D.   The Rule 23 Settlement Should be Approved. ........................................... 7

    1.   The Merits of Plaintiffs' Claims and the Legal and Factual Complexity of the Claims (Factors 1 and 3). ....................................................................................... 8

    2.   The Defendant's Financial Condition (Factor 2). ...................................... 9

    3.   The Amount of Opposition to the Settlement (Factor 4). ........................... 9

E.   The Court should Grant Final Approval to the FLSA Collective Action Settlement. ... 10

    1.   The Settlement is fair and reasonable based on the attendant risks of continued litigation. ....................................................................................... 11

    2.   The Settlement was reached as a result of arm's length bargaining in the midst of adversarial litigation and is not collusive. ............................................... 12

    3.   The reaction of class members has been positive. ...................................... 13

F.   The Attorney's Fee Request should be Approved. ...................................... 13

    1.   Time and Labor Required. ....................................................................... 16

    2.   Novelty and Difficulty of Questions Presented by the Case. ..................... 17

    3.   Skill Requisite to Perform the Legal Service Properly. ............................. 18

    4.   Preclusion of Other Employment by the Attorneys. .................................. 20

    5.   Customary Fee / Awards in Similar Cases. ............................................... 20

    6.   Whether the Fee is Fixed or Contingent. .................................................. 20

    7.   Amounts Involved and the Results Obtained. ........................................... 21

    8.   Experience, Reputation, and Ability of Class Counsel. ............................. 22

    9.   The "Undesirability" of the case. ............................................................. 24

    10.  The Nature and Length of the Professional Relationship Supports the Fee Request. 24

    11.  The Lodestar Cross-Check Confirms the Reasonableness of the Fee Request. ......... 24

G.   Class Counsel should be reimbursed for litigation costs they expended. ...................... 27

H.   The Claims Administrator should be provided its reasonable fee for facilitating notice of the preliminarily approved settlement, calculating allocations of the settlement, and distributing payments to opt-in plaintiffs. ...................................................................... 29

I.   This Court should award Named Plaintiffs and individuals who sat for deposition the requested service payments......................................................................................................... 29

J.   The Court should approve the provision requiring unclaimed funds to be donated to the St. Christophers Truckers Relief Fund. ....................................................................................... 32

III.   CONCLUSION ............................................................................................................... 34

# TABLE OF AUTHORITIES

Page(s)

Cases

*Allen v. Tobacco Superstore, Inc.,*
  475 F.3d 931 (8th Cir. 2007).................................................................................................. 16

*Ayala v. U.S. Xpress Enterprises, Inc.,*
  2019 WL 1581395 (C.D. Cal. Feb. 13, 2019)......................................................................... 26

*Blum v. Stenson,*
  465 U.S. 886 (1984)................................................................................................................. 14

*Boeing Co. v. Van Gemert,*
  444 U.S. 472 (1980)................................................................................................................. 14

*Bozak v. FedEx Ground Package Sys., Inc.,*
  2014 WL 3778211 (D. Conn. July 31, 2014).......................................................................... 11

*Brotherton v. Cleveland,*
  141 F. Supp. 2d 907 (S.D. Ohio 2001).................................................................................... 30

*Brown v. Phillips Petroleum Co.,*
  838 F.2d 451 (10th Cir. 1988).................................................................................................. 16

*Caligiuri v. Symantec Corp.,*
  855 F.3d 860 (8th Cir. 2017).................................................................................................... 32

*Campbell v. Transgenomic, Inc.,*
  2020 WL 2946989 (D. Neb. June 3, 2020)............................................................................... 8

*Churchill Vill., L.L.C. v. Gen. Elec.,*
  361 F.3d 566 (9th Cir. 2004)...................................................................................................... 4

*Cook v. Niedert,*
  142 F.3d 1004 (7th Cir. 1998).................................................................................................. 30

*Dewey v. Volkswagen of Am.,*
  728 F. Supp. 2d 546 (D.N.J. 2010).......................................................................................... 25

*Hernandez v. Tabak,*
  2013 WL 1562803 (S.D.N.Y. Apr. 10, 2013)......................................................................... 12

*Hillard,*
  88 F. Supp. 2d 1049 (D.S.D. 2000)...................................................................................... 8, 10

*In re AT & T Corp.,*
  455 F.3d 160 (3d Cir. 2006)..................................................................................................... 25
  218 F.R.D. 508 (E.D. Mich. 2003) .......................................................................................... 28

*In re Rite Aid Corp. Sec. Litig.,*
  396 F.3d 294 (3d Cir. 2005)................................................................................................ 25, 26

*In re Shell Oil Refinery,*
  155 F.R.D. 552 (E.D. La. 1993)............................................................................................... 24

*In re U.S. Bancorp Litig.,*
  291 F.3d 1035 (8th Cir. 2002)........................................................................................ 14, 16, 20

*In re UnitedHealth Grp. Inc. PSLRA Litig.,*
  643 F. Supp. 2d 1094 (D. Minn. 2009) ................................................................................... 25

*In re Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig.,*

716 F.3d 1057 (8th Cir. 2013) ................................................................. 3, 4, 8, 10

*In re Warfarin Sodium Antitrust Litig.*,
391 F.3d 516 (3d Cir. 2004) .................................................................................. 4

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
396 F.3d 922 (8th Cir. 2005) ................................................................................ 8

*In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*,
364 F. Supp. 2d 980 (D. Minn. 2005) .................................................. 25, 28, 30

*Johnson v. Georgia Highway Exp., Inc.*,
488 F.2d 714 (5th Cir. 1974) ....................................................................... 15, 16

*Kelly v. Phiten USA, Inc.*,
277 F.R.D. 564 (S.D. Iowa 2011) ................................................................. 14, 21

*Lane v. Lombardi*,
2014 WL 5394955 (W.D. Mo. Oct. 22, 2014) ...................................................... 9

*Little Rock Sch. Dist. v. Pulaski Cty. Special Sch. Dist. No. 1*,
921 F.2d 1371 (8th Cir. 1990) .............................................................................. 3

*Lizondro-Garcia v. Kefi LLC*,
300 F.R.D. 169 (S.D.N.Y. 2014) ........................................................................ 12

*Lliguichuzhca v. Cinema 60, LLC*,
948 F. Supp. 2d 362 (S.D.N.Y. 2013) ................................................................ 12

*Lynn's Food Stores, Inc. v. U.S. By & Through U.S. Dep't of Labor, Employment Standards
Admin., Wage & Hour Div.*,
679 F.2d 1350 (11th Cir. 1982) ..................................................................... 4, 10

*Marshall v. Nat'l Football League*,
787 F.3d 502 (8th Cir. 2015) ................................................................................ 8

*Maywalt v. Parker & Parsley Petroleum Co.*,
67 F.3d 1072 (2d Cir. 1995) ................................................................................. 4

*Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*,
688 F.2d 615 (9th Cir. 1982) ................................................................................ 4

*Petrone v. Werner Enterprises, Inc.*,
2017 WL 510884 (D. Neb. Feb. 2, 2017) .......................................................... 18

*Pollard v. Remington Arms Co., LLC*,
320 F.R.D. 198 (W.D. Mo. 2017) ......................................................................... 9

*Speed Shore Corp. v. Denda*,
605 F.2d 469 (9th Cir. 1979) ............................................................................... 4

*Stuart v. State Farm Fire & Cas. Co.*,
2020 WL 2892819 (W.D. Ark. June 2, 2020) ...................................................... 9

*Tuten v. United Airlines, Inc.*,
41 F. Supp. 3d 1003 (D. Colo. 2014) ................................................................. 28

*Van Horn v. Trickey*,
840 F.2d 604 (8th Cir. 1988) ............................................................................... 7

*Vizcaino v. Microsoft Corp.*,
290 F.3d 1043 (9th Cir. 2002) ........................................................................... 25

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005) .................................................................................. 4

*Yarrington v. Solvay Pharm., Inc.*,
697 F. Supp. 2d 1057 (D. Minn. 2010) ................................................. 15, 16, 25

Rules

Fed. R. Civ. P. 23(b)(3) ............................................................................................ 2
Fed. R. Civ. P. 23(e)(2) ............................................................................................ 4

Regulations

29 C.F.R. § 785.22 .......................................................................................... 10, 18

# I. INTRODUCTION

On February 18, 2020, this Court granted preliminary approval of the $16.5 million collective and class action settlement of this litigation. Now, following the notice period and with the benefit of the class's reaction to the settlement being known, Plaintiffs seek the Court grant final approval of the settlement.

As the Court is aware, the settlement, reached on the final business day before trial after more than 3.5 years of hard-fought litigation, provides significant concessions obtained from PAM which provide a large and substantial benefit to the class of 16,000 truck drivers. The settlement provides that PAM will pay $16,500,000 to a non-reversionary fund, and that PAM will cease charging usurious interest rates on employee advances. The results achieved in the settlement are substantial and demonstrate a fair and reasonable compromise considering the risks and delay inherent in continued litigation.

In moving for preliminary approval of the settlement, Plaintiffs discussed at length the issues the Court will consider for final approval, and Plaintiffs incorporate such argument into this brief but, in the interest of judicial economy and recognizing the Court's intimate familiarity with this litigation, Plaintiffs do not repeat such argument here. Rather, Plaintiffs here focus on the developments which have occurred since the proposed settlement was reached and preliminary approval was granted in February of 2020. Plaintiffs further provide additional information regarding the specific issues raised by the Court during the preliminary approval hearing. As discussed herein, the additional information and developments provide additional support for promptly approving the settlement and ordering that class members be provided the compensation due under the settlement.

This action was originally filed by David Browne, Lucretia Hall, and Antonio Caldwell on December 9, 2016. The Court conditionally certified the action as a collective action by stipulation

in 2017, resulting in more than 3,000 drivers filing consent forms to join the action. Class discovery followed, and in January of 2019, the Court granted, over objection by PAM, final collective certification to the FLSA claims, and certified pursuant to Fed. R. Civ. P. 23(b)(3), claims made under Arkansas law. Following certification, more than 1,000 additional drivers joined the FLSA collective. With the inclusion of Rule 23 class members, there are nearly 16,000 drivers who will immediately benefit financially from this settlement. The payments due to each class member range from $165 to more than $5,000, with drivers who worked for PAM for one year set to receive just under $1,000. Swidler Decl. at ¶ 6.

The Parties engaged in significant and costly litigation prior to reaching a settlement on the final business day before trial was to begin. Electronic and written discovery have been extraordinary.  Defendant produced, and Plaintiffs reviewed, over one billion datapoints, including HOS driver logs, pay data, Qualcomm messages, and GPS data. Similarly, the Parties took more than 50 depositions in locations scattered throughout the United States.  Significant motion practice was required at nearly every stage of the litigation. Data analysis and expert discovery was highly involved and expensive. The litigation involved legal matters of significance that were novel, as well as factually and legally complicated.

In January and February of 2020, the Court issued several rulings which narrowed the disputed issues and provided judgment to Plaintiffs on some of their claims.

The case was scheduled for a jury trial commencing February 18, 2020; nevertheless, on the final business day before trial, the Parties reached the proposed settlement, and the Court granted preliminary approval following briefing and a hearing held on February 18.

Pursuant to the Court's order preliminarily approving the settlement, notice of the settlement, which included an explanation of all the material terms of the settlement, was sent to

all 16,600 class members. Their reaction speaks volumes as to the fairness of the proposed settlement. Not a single objection was filed as to any term of the settlement, and only two individuals (representing .01% of the settlement class) opted out.

The overwhelming positive reaction of the class demonstrates that the class wants to receive their compensation now and that they are pleased with the compromise reached in this settlement. Additionally, and importantly, all of the relevant factors this Court is to examine when determining the reasonableness and fairness of the settlement heavily weigh in favor of approving the settlement.

Plaintiffs further seek this Court to approve the requested attorneys' fees and costs, and the requested service payments to the Named Plaintiffs and the opt-in Plaintiffs who sat for deposition in this matter. As briefed below, Class Counsel has litigated this matter for over 3 years, and has spent more than 4,500 hours litigating this action, and the requested fee is well in line with fees routinely awarded to class counsel in wage and hour class action settlements. Likewise, the service payments to the Named Plaintiffs and the opt-in deponents are well earned and in line with service payments approved in larger class settlements.

Thus, for the reasons stated above and fully briefed below, this Court should grant final approval to the settlement.

## II.    LEGAL ARGUMENT

### A.    <u>Final Approval is Appropriate.</u>

The law favors compromise and settlement of collective and class action suits. *Little Rock Sch. Dist. v. Pulaski Cty. Special Sch. Dist. No. 1*, 921 F.2d 1371, 1388 (8th Cir. 1990) (in a class action context, providing that "[a] strong public policy favors [settlement] agreements, and courts should approach them with a presumption in their favor"); *In re Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig.*, 716 F.3d 1057, 1063 (8th Cir. 2013) (in a class action context, providing

3

that "[a] settlement agreement is presumptively valid."); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) ("there is an overriding public interest in settling class action litigation, and it should therefore be encouraged"); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (noting the "strong judicial policy in favor of settlements, particularly in the class action context") (internal quotations omitted); *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982) ("[V]oluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation."); *Speed Shore Corp. v. Denda*, 605 F.2d 469, 473 (9th Cir. 1979) ("It is well recognized that settlement agreements are judicially favored as a matter of sound public policy. Settlement agreements conserve judicial time and limit expensive litigation."); NEWBERG ON CLASS ACTIONS § 11.41 (4th ed. 2002) ("The compromise of complex litigation is encouraged by the courts and favored by public policy.").

The approval of a proposed class action settlement is a matter of discretion for the trial court. *In re Uponor, Inc., F1807 Plumbing Fittings Products Liability Litigation*, 716 F.3d at 1063, 1065; *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004); *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995). In exercising this discretion, courts must determine whether the class action settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *In re Uponor, Inc., F1807 Plumbing Fittings Products Liability Litigation*, 716 F.3d at 1063. Similarly, collective action settlements under the FLSA must be approved by the district court. *Robles v. Brake Masters Sys.*, 2011 U.S. Dist. LEXIS 14432, *50 (D.N.M. Jan. 31, 2011) (*citing Lynn's Food Stores, Inc. v. U.S. By & Through U.S. Dep't of Labor, Employment Standards Admin., Wage & Hour Div.*, 679 F.2d 1350, 1354 (11th Cir. 1982)); *Peterson v. Mortg. Sources, Corp.*, 2011 U.S. Dist. LEXIS 95523, *17 (D. Kan. Aug. 24, 2011). In determining

whether approval is appropriate, courts consider whether the settlement "is a fair and reasonable resolution of a bona fide dispute over FLSA provisions." *Id.*

### B.    <u>Valuation of Legal Claims</u>

The Plaintiff class is composed of current and former over-the-road truck drivers who worked for and were paid by Defendant during the class period. Plaintiffs allege that they were paid under minimum wage, had unlawful deductions taken from their pay, and were charged unlawful interest rates on employee advances.

Prior to the trial, the Court held that Plaintiffs were entitled to judgment on their interest rate claims and on a part of their minimum wage claims. Specifically, the Court determined that DOT on-duty time and short-rest breaks of 20 minutes or less constituted compensable hours worked and must be paid at minimum wage. The Court also ruled that PAM's policy of charging $10 for employee advances was unlawful, and that advances made under such policy must be refunded to drivers. Finally, the Court ruled that PAM's practice of withholding pay due to paperwork not being submitted was unlawful, and accordingly instructed how minimum wage damages were to be computed and when so-called late payments were to be credited against minimum wages due.

Based on such rulings, Plaintiffs' damages models, which have been provided to the Court, showed that Plaintiffs were owed $2 million for wage advances, and another $2.7 million for the minimum wage claims in which they already prevailed. (ECF Doc. 259). If Plaintiffs prevailed on their 24-hour duty claims, Plaintiffs would have obtained a verdict of more than $25 million, with the potential for liquidated damages. Though Plaintiffs had alternatively sought damages alleging payment due for all sleeper berth time, the Court held that such claims could not be pursued on a class-wide basis in this litigation. (ECF Doc. 275).

The settlement provides a significant payment to the drivers of PAM, which naturally varies based on the length of their employment at PAM. Class members who were employed during the entire class period will receive approximately $5,130 each, after all costs/fees/service payments/admin costs which are requested in the motion are paid. The average employee, who worked for PAM for 1 year, will receive approximately $969.57. Swidler Decl. at ¶ 6. Additionally, PAM has agreed to change its practices, and no longer may withhold pay due to drivers due to incomplete paperwork, and similarly, no longer may charge $10 for employee advances. Settlement Agreement at § 3.5 (ECF Doc. No. 279-1).

Finally, the release contained in the Settlement is narrow, covering only the claims that were at issue in the litigation, and only for the time periods covered by the class period. Thus, Plaintiffs have agreed not to a general release but a release of wage and hour claims through December 31, 2019. The release further explicitly does not cover any period of time the driver was designated as an independent contractor. *See* Settlement Agreement, § 4.1 (ECF Doc. No. 279-1).

Accordingly, the $16.5 million settlement provides a fair value for the contested claims at issue. This is especially correct considering, as discussed immediately below, the settlement payment to be recovered from PAM stretched the outer limits of PAM's financial resources, and should Plaintiffs have succeeded at trial and obtained a judgment for significantly more than the settlement, PAM was likely to seek bankruptcy protection, which would have added significant risk to obtaining a better recovery, as well as significant delay.

## C. PAM's Ability to Pay

Even before the coronavirus shut down much of the United States and the world, including the automotive manufacturers that comprise nearly half of PAM's business, the amount of liability

that PAM faced in this case threatened the solvency of the company.[1] On February 11, 2020, just days prior to the Parties reaching the settlement, Defendant, a publicly traded corporation, filed in open court a declaration signed by Allen West, CFO of PAM Transport. In his declaration, Mr. West stated that PAM's operations "are in large part debt-financed and subject to various loan agreements that are secured by PAM's assets and that allow creditors to call the note and make other demands in the event of 'material adverse conditions.'" Decl. of Allen West, CFO at ¶ 5 (ECF Doc. 267-1). Mr. West testified that a judgment in Plaintiffs' favor in the amount they sought could "create conditions of financial distress that would" leave PAM unable to post a bond and could leave the company insolvent. *Id.* At ¶ 6.

To place the settlement amount in perspective, SEC disclosures filed by the company placed the settlement against its net profits for year 2019. Per the annual report, the company's net profit was $7.9 million.[2] The settlement thus represents more than double PAM's 2019 net income. In short, PAM's ability to pay a higher settlement was subject to a reasonable concern and further demonstrates the fairness of the settlement before the Court.

> ### D.  The Rule 23 Settlement Should be Approved.

In evaluating a class action settlement, courts in the Eighth Circuit generally consider the factors set forth in *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988), which include determining (1) the merits of the plaintiffs' case weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4)

---

[1] PAM's stock was trading at $51.70 per share in mid-February, when this matter was scheduled for trial and the settlement was reached. Today, the stock trades at $30.90 per share, a reduction of 40%, reducing the company's market valuation from $300 million to $177 million. *See* Yahoo! Finance PTSI Stock, https://finance.yahoo.com/quote/PTSI/ (last visited July 6, 2020).

[2] PAM's 10k Report is available at https://finance.yahoo.com/quote/PTSI/financials?p=PTSI (last visited July 6, 2020).

the amount of opposition to the settlement. "The single most important factor is a balancing of the strength of the plaintiff's case against the terms of the settlement." *IMarshall v. Nat'l Football League*, 787 F.3d 502, 509 (8th Cir. 2015)*ody v. Hillard*, 88 F. Supp. 2d 1049, 1057 (D.S.D. 2000). Nevertheless, a class action settlement is a private contract negotiated between the parties. *Marshall*, 787 F.3d at 509; *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 934 (8th Cir. 2005). And a settlement agreement is presumptively valid. *In re Uponor, Inc., F1807 Plumbing Fittings Products Liability Litigation*, 716 F.3d at 1063; *Campbell v. Transgenomic, Inc.*, No. 4:17-CV-3021, 2020 WL 2946989, at *2 (D. Neb. June 3, 2020).

Here, all factors demonstrate that the Court should enter an order approving the settlement and directing Defendant to fund the settlement fund and the administrator to issue payment to class members and class counsel, in accordance with the settlement agreement.

### 1. The Merits of Plaintiffs' Claims and the Legal and Factual Complexity of the Claims (Factors 1 and 3).

This case involves unpaid minimum wage claims, unlawful wage deduction claims, and wage advance claims for a class of approximately 16,000 individuals, who are over-the-road truck drivers assigned to different loads and routes throughout their employment. As the Court is aware, the law regarding the compensability of certain rest time for over-the-road drivers continues to develop. Additionally, there remains a dispute whether certain payments provided to class members could be used to offset minimum wage obligations. Though Plaintiffs remain confident in their legal position, that the Eighth Circuit nor any other appellate court has ruled directly on the most important legal issues in this litigation creates inherent risk in pursuing these claims through judgment.

Accordingly, the legal issues presented in case presents makes it an ideal candidate for settlement.

8

Hence, these factors weigh in favor of approval of the proposed settlement.

### 2. The Defendant's Financial Condition (Factor 2).

As discussed *supra* under the section "PAM's Ability to Pay," PAM could not afford a judgment or settlement significantly beyond the amount obtained in the instant settlement.

Thus, Defendant's financial condition thus supports approving the proposed settlement.

### 3. The Amount of Opposition to the Settlement (Factor 4).

Following the Court's preliminary approval order, the Claims Administrator mailed the Court-ordered notice discussing the terms of the settlement to all 16,000 class members, including the more than 4,000 individuals who had previously opted in to the litigation and thus have demonstrated that they are willing and able to respond to a class notice if they felt it was in their best interest to do so.

As provided in the Declaration of Steve Gianatti, not a single class member objected to any portion of the settlement, and only 2 class members opted out. In the context of such a large class, including a large opt-in collective, that is an extraordinary result and heavily weighs in favor of approving the settlement. *See, e.g. Stuart v. State Farm Fire & Cas. Co.*, No. 4:14-CV-4001, 2020 WL 2892819, at *5 (W.D. Ark. June 2, 2020) (where no objections were filed and "only 16 [p]ersons requested exclusion" in a class of 17,809, the lack of objections "strongly support[ed] the fairness, reasonableness, and adequacy of the settlement"); *Lane v. Lombardi*, No. 12-4219-CV-C-NKL, 2014 WL 5394955, at *3 (W.D. Mo. Oct. 22, 2014) (lack of significant opposition from class members weighed in favor of settlement where "[j]ust over a dozen objections were filed—many of which were entirely irrelevant to the claims in this case or were resolved by providing supplemental notice…"); *Pollard v. Remington Arms Co., LLC*, 320 F.R.D. 198, 220 (W.D. Mo. 2017), *aff'd,* 896 F.3d 900 (8th Cir. 2018) ("[t]he Court finds the small amount of opposition from purported class members weighs in favor of approving the settlement"); *Cody*, 88

F. Supp. 2d at 1059 (approving settlement where "only approximately three percent" of class members objected).

Accordingly, all four *Van Horn* factors weigh in favor of granting final approval to the proposed Rule 23 settlement.

**E.      The Court should Grant Final Approval to the FLSA Collective Action Settlement.**

Additionally, the Court should approve the settlement of the FLSA Collective Action. With respect to a court-authorized settlement of FLSA claims, the court must determine that the settlement is a "fair and reasonable resolution of a bona fide dispute over FLSA provisions." *Lynn's Food Stores, Inc.*, 679 F.2d at 1355.  If a settlement in an employee FLSA suit reflects "a reasonable compromise over issues," such as FLSA coverage or computation of back wages that are "actually in dispute," the court may approve the settlement "in order to promote the policy of encouraging settlement of litigation." *Id.* at 1354.

The settlement fully pays for the claims which the Court has already determined Plaintiffs are entitled to relief. The remaining claim brought by the opt-in Plaintiffs under the FLSA, specifically that pursuant to 29 C.F.R. § 785.22, PAM was required to compensate its over-the-road drivers for at least 16-hours of minimum wage pay each day, was subject to a bona fide dispute. Indeed, the Court found that such dispute exists when it denied summary judgment to Plaintiffs on such claim earlier this year. *See* ECF Doc. No. 216 at 10-11 ("The Court finds that PAM has made a sufficient showing of specific facts establishing a genuine dispute for trial…").

Thus, because the settlement resolves a bona fide dispute over FLSA provisions, the Court should approve the settlement provided the terms of the settlement are "fair and reasonable." For the reasons that follow, the proposed settlement meets such requirements and should be approved.

1. **The Settlement is fair and reasonable based on the attendant risks of continued litigation.**

The $16.5 million settlement is fair and reasonable considering the risks of continued litigation. The legal issues involved in this litigation have not been vetted by the Eighth Circuit or the United States Supreme Court, meaning that both sides faced risks if the case were tried and went to appeal. Additionally, while Plaintiffs had secured approximately $4.5 million from the Court's summary judgment holdings, the remaining claims were to be tried before a jury. Jury trials by their nature involve significant risk and delay.

Additionally, "[t]he Settlement Agreement was reached as a result of a contested litigation to resolve bona fide disputes—both factual and legal disputes that remain unresolved." *Forauer v. Vt. Country Store, Inc*., 2015 U.S. Dist. LEXIS 5604, *15-16 (D. Vt. Jan. 16, 2015) (upholding fairness of settlement where the parties were represented by counsel, there was a bona fide dispute, and the settlement was fair and reasonable); *see also Bozak v. FedEx Ground Package Sys., Inc.*, No. 3:11-CV-00738-RNC, 2014 WL 3778211, at *3 (D. Conn. July 31, 2014) (approving FLSA settlement and noting that settlement was reached after negotiations concerning "the uncertain legal and factual issues involved").

Furthermore, Plaintiffs faced risks of non-payment by PAM even if they prevailed. Following significant discussion with PAM and a review of publicly filed SEC documents, Plaintiffs recognized that even if they obtained a judgment for an amount beyond $16.5 million, PAM would likely seek bankruptcy protection. And if PAM had ended up filing for bankruptcy, class members would not have been paid for years, and the amount they would have recovered would have involved significant risks.

 Thus, the settlement before the Court which provides substantial payments to class members and does so *now*, when many drivers find themselves out of work due to the COVID-19

crisis, is fair, reasonable, and in the best interest of the class. The Court should accordingly approve the settlement.

      **2.**      **The Settlement was reached as a result of arm's length bargaining in the midst of adversarial litigation and is not collusive.**

      The Settlement Agreement here was entered into "after an investigation of the claims and defenses," *Lizondro-Garcia v. Kefi LLC*, 300 F.R.D. 169, 180 (S.D.N.Y. 2014), and after the Parties engaged in "extensive discovery and damages calculations." *Flores v. One Hanover, LLC, 2014 U.S. Dist. LEXIS 78269*, at *6 (S.D.N.Y. June 9, 2014). The Settlement Agreement is "the product of negotiation between represented parties," which supports a finding that it "did not come about because of 'overreaching' by the employer." *Lliguichuzhca v. Cinema 60, LLC*, 948 F. Supp. 2d 362, 365–66 (S.D.N.Y. 2013) ("Arm's length bargaining between represented parties weighs in favor of finding a settlement reasonable."); *accord Hernandez v. Tabak*, No. 12 CIV. 1402 PKC, 2013 WL 1562803, at *1 (S.D.N.Y. Apr. 10, 2013) (concluding settlement "negotiated at arm's length [was] not the product of coercion"); *see also Forauer v. Vt. Country Store, Inc.*, 2015 U.S. Dist. LEXIS 5604, *15-16 (D. Vt. Jan. 16, 2015).

      As the Court found during the preliminary approval hearing: "this is a hard fought, arm's length [settlement], negotiated with the risks of ongoing litigation being fully illuminated to each side; the good, the bad and the ugly." (Preliminary Approval Hearing Transcript at 30:2-30:5).

      Additionally, Plaintiffs are represented by counsel who are well informed and practiced in collective wage and hour litigation, and who are realistic about and knowledgeable of the risks and benefits of the settlement. Plaintiffs' counsel has substantial experience litigating complex wage and hour actions, including class actions and certified collective actions with tens of thousands of class members. Swidler Decl. at ¶ 9. *See also Campbell v. C.R. England, Inc.*, 2015 U.S. Dist.

LEXIS 134235, *18 (D. Utah Sept. 30, 2015) (Swartz Swidler, LLC "has a reputation in the trucking industry as being one of the prominent firms to engage in FLSA litigation on behalf of truck drivers."); *Keller v. T.D. Bank, N.A.*, 2014 U.S. Dist. LEXIS 155889 14 (E.D. Pa. 2014) (finding that Mr. Swartz and Mr. Swidler "have considerable experience handling class and collective action disputes" and noting that they "represented the Named Plaintiffs and the prospective class competently, diligently, and with professionalism throughout the course of this litigation."); *McGee v. Annes Choice*, 2014 U.S. Dist. LEXIS 75840 (E.D. Pa. 2013) (finding Mr. Swartz and Mr. Swidler to be "well-versed in FLSA cases and skilled in litigating and settling wage-and-hour litigation"); *Stoneback v. Artsquest, Inc.*, 2013 U.S. Dist. LEXIS 86457 (E.D. Pa. 2013) (finding that Mr. Swidler and Mr. Swartz have "handled numerous class action lawsuits" and that their firm "is qualified to represent the class as class counsel"). Plaintiffs' counsel has further been certified as class counsel in similar litigation wherein they represent tens of thousands of over-the-road drivers for alleged violations of state and federal minimum wage laws. *See Petrone v. Werner Enters.*, 2013 U.S. Dist. LEXIS 96375 (D. Neb. July 10, 2013); *Baouch v. Werner Enters.,* 2014 U.S. Dist. LEXIS 64981 (D. Neb. May 12, 2014).

### 3.  The reaction of class members has been positive.

As discussed above, the reaction to the class has been extremely positive, with no objections and only two opt-outs. Accordingly, the Court should grant approval of the FLSA Collective Action Settlement.

### F.  <u>The Attorney's Fee Request should be Approved.</u>

Class Counsel is entitled to a fee paid out of the common fund for the benefit of the Class. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478–79 (1980). In class action suits where a fund is recovered and fees are awarded therefrom by the court, the Supreme Court has indicated that computing fees as a percentage of the common fund recovered is a proper approach. *Blum v.*

*Stenson*, 465 U.S. 886, 900 n.16 (1984). The Eighth Circuit recognizes the propriety of the percentage-of-the fund method when awarding fees. *See In re U.S. Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002) (affirming percentage-of-the fee fund recovery for 36% of the fund plus out-of-pocket litigation costs); *see also Barfield v. Sho-Me Power Elec. Coop.,* 2015 U.S. Dist. LEXIS 70166 (W.D. Mo. June 1, 2015) (approving fee award of 33 1/3 percentage of fund and finding that "[a] one-third of the value of the KAMO Settlement as a whole, the fee-and-expense award falls within the range of percentage-fee awards found reasonable in the Eighth Circuit."); *In re Iowa Ready-Mix Concrete Antitrust Litig.*, 2011 U.S. Dist. LEXIS 130180, at *18 (N.D. Iowa Nov. 9, 2011) (awarding attorneys 36.04% of $18.5 million common fund in fees, plus separate reimbursement from settlement fund of over $900,000 in expenses); *West v. PSS World Med., Inc.*, 2014 U.S. Dist. LEXIS 57150, at *4 (E.D. Mo. Apr. 24, 2014) ("In this case, the court believes that 33 percent is a reasonable percentage for attorney's fees. It is appropriate to apply a reasonable percentage to the gross settlement fund."); *Wiles*, 2011 U.S. Dist. LEXIS 64163, at *10-11 (W.D. Mo. June 9, 2011) (awarding attorneys one-third of common fund); *Ray v. Lundstrom*, 2012 U.S. Dist. LEXIS 160089, at *11-12 (D. Neb. Nov. 8, 2012) (awarding one-third of fund in fees, plus separate reimbursement from the settlement fund of $77,900 in expenses); *Brehm v. Engle*, 2011 U.S. Dist. LEXIS 35127, at *6 (D. Neb. Mar. 30, 2011) (awarding one-third plus expenses); *Kelly v. Phiten USA, Inc.*, 277 F.R.D. 564, 571 (S.D. Iowa 2011) (awarding 33% of the settlement award in fees); *Yarrington v. Solvay Pharm., Inc.*, 697 F. Supp. 2d 1057, 1061, 1067–68 (D. Minn. 2010) (awarding one-third of $16 million settlement fund, plus separate reimbursement of expenses).

During the Preliminary Approval Hearing, the Court found that the request of Class Counsel for a fee of one-third of the settlement fund was "likely appropriate," though the Court requested a lodestar analysis during the final hearing, which is provided below.

> There are lots of other situations where the Court would think that a
> 1/3ʳᵈ attorney fee would be too high. But of all of the hypotheticals
> that the Court could imagine, the facts before the Court here would
> not be on that list. The Court believes that the last three years,
> counsel has not only invested extraordinary amounts of time
> pushing the litigation forward, but that it has provided top-quality
> representation along the way and was fully prepared to take this case
> all the way to trial and beyond.
>
> The risk of not prevailing, the risk of prevailing, but having an
> uncollectible judgment, just all of the various factors that the Court
> would go down in a checklist fashion, whether it's using what we
> call in Arkansas the *Chrisco* factors, and under federal law, there's
> some other factors that the Eighth Circuit has recognized, but more
> or less, they're the same sets of factors. But just doing a mental
> checklist, the Court doesn't -- the Court believes that a 1/3rd attorney
> fee here is something that the Court can't say is too high. In fact, the
> Court thinks that it is likely appropriate.

Although the Eighth Circuit "has not formally established fee-evaluation factors, it has approved consideration of the twelve factors set forth in *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 719–20 (5th Cir. 1974), *abrogated by Blanchard v. Bergeron*, 489 U.S. 87 (1989)." *In re Iowa Ready-Mix Concrete*, 2011 U.S. Dist. LEXIS 130180, at *15 (N.D. Iowa Nov. 9, 2011); *Barfield*, 2015 U.S. Dist. LEXIS 70166, at *13. Those factors are as follows: (1) time and labor required; (2) novelty and difficulty of question presented by the case; (3) skill requisite to perform the legal service properly; (4) preclusion of other employment by the attorneys due to acceptance of the case; (5) customary fee, (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client or circumstances; (8) amount involved and results obtained; (9) experience, reputation and ability of the attorneys; (10) "undesirability" of the case; (11) nature and length of the professional relationship with the client; and (12) awards in similar cases. *Allen v. Tobacco Superstore, Inc.*, 475 F.3d 931, 944 n.3 (8th Cir. 2007) (*citing Johnson*, 488 F.2d at 717–19). Courts also look to the number of objectors to the settlement and the attorney's fees request in determining the reasonableness of the settlement. *In re U.S. Bancorp Litigation*, 291 F.3d at 1038.

15

Although the Court may consider any or all of the *Johnson* factors, "rarely are all of the *Johnson* factors applicable," particularly in common fund cases. *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 456 (10th Cir. 1988); *see also Yarrington*, 697 F. Supp. 2d at 1062 ("Many of the factors to be considered by the Court overlap.  Further, not all of the individual factors will apply in every case, affording the Court wide discretion in the weight to assign each factor.") (internal citations omitted).

Additionally, Class Counsel has provided a lodestar analysis for this Court to have a full understanding of the reasonableness of the fee request. However, in common fund cases, while a lodestar analysis can be useful to "double-check the result of the percentage-of-the-benefit method[,] . . . [it] is not necessary if the fee does not seem excessive as a percentage of the recovery." *Ramsey v. Sprint Communs., Co.*, 2012 U.S. Dist. LEXIS 171145 (D. Neb. Dec. 3, 2012).

### 1.    Time and Labor Required.

As the Court is well aware, this matter settled after 3.5 years of hard-fought litigation. Nearly every stage of the litigation has been subject to significant disputes, including the scope and amount of opt-in written discovery and depositions, the appropriateness of class certification, the qualifications of the Parties' respective experts, and the proper scope of Plaintiffs' 30(b)(6) deposition request (ultimately culminating in this Court assigning Magistrate Judge Wiedemann to directly over the deposition. Of course, beyond the procedural arguments, the merits of the litigation were highly contested as well, with both sides arguing for differing substantive interpretations of the FLSA and state law.

There were also significant discovery issues which the Court was only partially involved but which required significant time and effort from Plaintiffs' counsel. The most significant of these involved Plaintiffs' reverse-engineering Defendants' own Qualcomm data, which allowed

Plaintiffs significant evidence to determine witnesses and to obtain valuable admissions during depositions. Such evidence ultimately allowed Plaintiffs to demonstrate with specific evidence the work duties of Plaintiffs and class members while over-the-road despite being logged in an "off duty" status. To successfully reverse engineer such data, Plaintiffs' counsel signed up for online classes at Udacity for SQL and Python and using such knowledge, ultimately successfully built a platform that could search through nearly one billion text messages in quick fashion, and provide such information visually by plotting truck locations on a map. Access and utilization of such data gave Plaintiffs an edge in the litigation, as was apparent during depositions and trial preparation.

### 2. Novelty and Difficulty of Questions Presented by the Case.

The legal issues presented in this case are both novel and difficult. In this litigation, the largest issue was whether, and under what circumstances, over-the-road truck drivers were entitled to minimum wage for time spent in a truck's sleeper berth.

The law regarding the compensability of sleeper berth time for over-the-road drivers continues to develop, but remains subject to significant uncertainty and risk to both sides. The most significant case to address this issue, prior to the instant case, was *Petrone v. Werner Enterprises*, a case from the District of Nebraska, which alleged that trainee drivers failed to receive minimum wage because the defendant failed to pay them for, *inter alia,* sleeper berth time in excess of 8 hours per day. The procedural history of that case alone emphasizes the risks and uncertainty to all Parties should this case not resolve.

In 2015, the *Petrone* court entered summary judgment in the plaintiffs' favor, holding that the DOL guidance, and specifically 29 C.F.R. § 785.22, the DOL Field Operations Handbook, and two opinion letters issued by the DOL, were entitled to *Auer* deference and compel trucking companies to pay over-the-road drivers for sleeper berth time in excess of 8 hours per day. 121 F.Supp.3d 860 (D. Neb. 2015) (Strom, J.). But the *Petrone* court then certified its holding for

interlocutory appeal to the Eighth Circuit. The Eighth Circuit, however, denied the petition, and the case was sent to the trial court for a trial on damages.

Prior to that trial, a new judge was assigned to the case, and Werner filed a motion for reconsideration, requesting the court reverse the summary judgment grant provided to plaintiffs and instead hold that Werner was entitled to judgment as a matter of law on the sleeper berth claims. The new judge *partially* granted Werner's motion, reversed the plaintiffs' summary judgment award, but held that the issue of sleeper berth compensability was a mixed question of law and fact that required a jury to resolve. *Petrone v. Werner Enterprises, Inc.*, No. 8:11CV401, 2017 WL 510884 (D. Neb. Feb. 2, 2017) (Smith Camp, J.) (vacating summary judgment award and holding that whether sleeper berth time is compensable must be determined by jury). Thus, in *Petrone*, the *same* court – without appellate review – reached inconsistent results, demonstrating the novel issues that undermined the instant litigation.

Thus, the legal issues presented in this case were not easily resolved nor routine. Instead, Plaintiffs' counsel has sought recovery under novel legal theories which require significant legal analysis.

Thus, this factor weighs in favor of the fee request.

### 3.    Skill Requisite to Perform the Legal Service Properly.

Class Counsel demonstrated skill in analyzing the potential claims under the Arkansas Minimum Wage Act, the FLSA, and the DOL regulatory framework and in prosecuting these claims with diligence and zeal for more than two years. Given the complexities and the unresolved legal nature of the claims asserted, highly skilled counsel was required to achieve the benefit obtained for the class.

Here, Class Counsel has substantial experience in litigating class action wage and hour cases. As discussed in the accompanying declaration, Justin Swidler and Richard Swartz have

litigated more than 90 putative federal wage and hour class actions. Class Counsel has been previously recognized by other federal courts as being particularly skilled in this area of the law. *See, e.g. Campbell v. C.R. Eng., Inc.*, 2015 U.S. Dist. LEXIS 134235, *19-20 (D. Utah Sept. 30, 2015) (finding that Mr. Swartz and Mr. Swidler "litigated [the FLSA collective action] for more than two years with competence, diligence, and professionalism . . . [and finding] that [Swartz Swidler, LLC] has significant experience in litigating wage and hour cases"); *Keller v. T.D. Bank, N.A.*, 2014 U.S. Dist. LEXIS 155889, *14 (E.D. Pa. 2014) (Restrepo, J.) (finding that Mr. Swartz and Mr. Swidler "have considerable experience handling class and collective action disputes" and noting that they "represented the Named Plaintiffs and the prospective class competently, diligently, and with professionalism throughout the course of this litigation"); *McGee v. Anne's Choice, Inc.,* 2014 U.S. Dist. LEXIS 75840 (E.D. Pa., June 4, 2014) (Schiller, J.) (finding Mr. Swartz and Mr. Swidler to be "well-versed in FLSA cases and skilled in litigating and settling wage-and-hour litigation"); *Stoneback v. ArtsQuest*, 2013 U.S. Dist. LEXIS 86457 (E.D. Pa. June 19, 2013) (Gardner, J.) (finding that Mr. Swidler and Mr. Swartz have "handled numerous class action lawsuits" and that their firm "is qualified to represent the class as class counsel").

Additionally, Robert Soloff, who entered his appearance in January and was to co-chair the trial with Mr. Swidler, has significant class and trial experience. Soloff Declaration at ¶¶6-10. Mr. Soloff has practiced employment law for more than 35 years and is Board Certified in Labor & Employment Law. *Id.* at ¶ 7. Mr. Soloff has defended more than 50 wage and hour claims against employers, including collective and class claims, though since 2013 he has focused on represented plaintiffs in class and collective claims. *Id.* at ¶¶ 9-10. Thus, the Court should find that Mr. Soloff has significant wage and hours experience and possesses the necessary skill to litigate this action for the best interests of the class.

Thus, this factor also weighs in favor of granting approval of the fee request here.

### 4. Preclusion of Other Employment by the Attorneys.

As discussed above and provided in the attached declaration of Mr. Swidler, Class Counsel dedicated well over 4,000 hours to this case over the last three plus years. The majority of that time was dedicated by attorneys of Swartz Swidler, who were also required to travel cross-country on numerous occasions to fulfill their duties as Class Counsel.

As a result of the time spent on this matter, Class Counsel's ability to accept and work on other cases was significantly impeded.

Thus, this factor also weighs in favor of the fee request.

### 5. Customary Fee / Awards in Similar Cases.

Class Counsel seeks to be paid 1/3 of the settlement fund as its contingent fee and as reimbursement of its costs in this matter. In contingent class action cases, a 1/3 contingent fee is normal and routine in this circuit. *See, e.g., In re U.S. Bancorp Litigation*, 291 F.3d at 1038 (36% plus out-of-pocket litigation costs); *Barfield,* 2015 U.S. Dist. LEXIS 70166 (W.D. Mo. June 1, 2015) (33 1/3%); *In re Iowa Ready-Mix Concrete Antitrust Litig.*, 2011 U.S. Dist. LEXIS 130180, at *18 (N.D. Iowa Nov. 9, 2011) (36.04% plus out-of-pocket litigation costs); *West v. PSS World Med., Inc.*, 2014 U.S. Dist. LEXIS 57150, at *4 (E.D. Mo. Apr. 24, 2014) (33 1/3%); *Wiles*, 2011 U.S. Dist. LEXIS 64163, at *10-11 (W.D. Mo. June 9, 2011) (same); *Ray v. Lundstrom*, 2012 U.S. Dist. LEXIS 160089, at *11-12 (D. Neb. Nov. 8, 2012) (same); *Brehm v. Engle*, 2011 U.S. Dist. LEXIS 35127, at *6 (D. Neb. Mar. 30, 2011) (same); *Kelly*, 277 F.R.D. at 571 (same).

Thus, this factor weighs in favor of approving the fee request.

### 6. Whether the Fee is Fixed or Contingent.

The risk of nonpayment to Plaintiffs and the Class was high in this case. As discussed above, this case poses a number of factual and legal issues, which created risks as to both liability and damages.

Despite these risks, Class Counsel took this case on a pure contingency, and would have received no compensation if they did not obtain a positive result for the Class. The class notice provided to class members in 2017, after this matter was conditionally certified as a collective action, was very clear on this issue:

> Plaintiffs' attorneys have taken this case on a contingency fee. . . **If there is a recovery, Plaintiffs' attorneys will apply to receive 1/3 of any settlement obtained… If there is no recovery or judgment in Plaintiffs' favor, Plaintiffs' attorney will not seek attorneys' fees or costs from anyone.**

(Ex. A of May 8, 2017 Order, ECF Doc. No. 19-1 at p. 4) (emphasis added).

As of the date of this filing, Class Counsel has expended more than 4,000 hours on the instant matter, without having received any compensation for such work or promise of compensation for such work. In addition, Class Counsel incurred more than $600,000 in litigation costs, none of which would have been reimbursed to Class Counsel in the event of a loss. (Swidler Decl. at ¶¶ 7,10).

Thus, there was substantial risk of Class Counsel receiving no compensation for their time, as well as substantial risk the significant expenses incurred for the benefit of class members would go unreimbursed. Thus, the contingent nature of Class Counsel's representation also weighs in favor of awarding the requested fee.

### 7.    Amounts Involved and the Results Obtained.

The total fund created equals sixteen million, five-hundred thousand dollars ($16,500,000). The settlement further requires PAM to change some of its challenged practices. The Claims

Administrator has performed initial distribution calculations, and has advised that depending on the length of employment of each class member, class members will receive payments, after reducing for all costs/fees/service payments requested herein, of amounts between $165 and more than $5,000, with an employee who worked for PAM for one year receiving nearly $1,000. Swidler Decl at ¶ 6.

The recovery is a fair result for class members, who faced risks of non-payment or recovery of less than the current settlement provided. The settlement further permits class members to recover compensation today rather than be subject to the delays of an unpredictable appeal and additional risk that PAM could pursue bankruptcy protection rather than pay drivers if a judgment against PAM was issued.

Moreover, as discussed above, there is no guarantee that Plaintiffs would recover more than $16,500,000 at trial, as it is unclear who would have prevailed on the sleeper berth claim in light of the facts of this case, and the immediate settlement provides a significant value on these claims.

The settlement provides for immediate payment (without any "claims made" or similar procedure designed to reduce the amount of individuals who will be paid) to all Plaintiffs and class members. There is no reversionary amount, and Defendants will be responsible for the payment of all employer-side payroll taxes associated with making payments under the Agreement.

Accordingly, the result obtained in this matter is very favorable to class members and weighs in favor of the fee request.

8.      **Experience, Reputation, and Ability of Class Counsel**.

As discussed above, Class Counsel has been recognized by numerous federal courts as being experienced wage and hour class action attorneys. *See, e.g. Keller,* 2014 U.S. Dist. LEXIS 155889, *14 (finding that Mr. Swartz and Mr. Swidler "have considerable experience handling

class and collective action disputes" and noting that they "represented the Named Plaintiffs and the prospective class competently, diligently, and with professionalism throughout the course of this litigation"); *McGee,* 2014 U.S. Dist. LEXIS 75840 (finding Mr. Swartz and Mr. Swidler to be "well-versed in FLSA cases and skilled in litigating and settling wage-and-hour litigation"); *Stoneback,* 2013 U.S. Dist. LEXIS 86457 (finding that Mr. Swidler and Mr. Swartz have "handled numerous class action lawsuits" and that their firm "is qualified to represent the class as class counsel"); *Baouch v. Werner Enters.,* 2014 U.S. Dist. LEXIS 64981, *9 (D. Neb. May 12, 2014) (finding that Swartz Swidler, LLC, Justin Swidler, and Richard Swartz have "experience in class actions [and] knowledge of the law" in an FLSA and state law minimum wage case). As stated above, Class Counsel currently represents more than 100,000 workers nationwide in various wage and hour litigation.

Additionally, Class Counsel "has a reputation in the trucking industry as being one of the prominent firms to engage in FLSA litigation on behalf of truck drivers." *See Campbell,* 2015 U.S. Dist. LEXIS 134235 at *18. Recently, an article was published by Transport Topics, the Newspaper of Trucking and Freight Transportation, which is published by the American Trucking Association. The article discussed legal challenges facing the trucking industry with respect to pay practices and specifically, concerns relating to the failure to pay the federal minimum wage. The article discusses six separate certified minimum wage lawsuits, and notes that Class Counsel is counsel to plaintiffs in each of the six cited cases. *See* Gilroy, Roger, *Drivers, Fleets Embroiled in Lawsuits over Wages*, Transport Topics, September 7, 2015, *available online at* http://www.ttnews.com/articles/petemplate.aspx?storyid=39369.

This Court has also determined that Class Counsel has provided exceptional legal services to the class. During the preliminary approval hearing, the Court found that "counsel has not only

invested extraordinary amounts of time pushing the litigation forward, but … has provided top-quality representation along the way and was fully prepared to take this case all the way to trial and beyond." (Preliminary Approval Hearing Transcript at 30:22-31:2).

Thus, this factor also weighs in favor of the fee request.

### 9. The "Undesirability" of the case.

A case is undesirable when it requires a significant time and financial investment coupled with risk of no payment. *See In re Shell Oil Refinery*, 155 F.R.D. 552, 572 (E.D. La. 1993). Here, Class Counsel spent north of 4,000 hours litigating this case over more than three years. Class Counsel has also spent more than $600,000 in out-of-pocket costs litigating this matter. Due to the contingent nature of Class Counsel's representation, such cost and time would have been lost if there was no recovery for the class.

Thus, this factor also weighs in favor of the fee request.

### 10. The Nature and Length of the Professional Relationship Supports the Fee Request.

The instant matter was filed in December of 2016 and was certified as a collective action in May of 2017.

Accordingly, Class Counsel has had a relatively lengthy professional relationship providing services on behalf of the Named and Opt-in Plaintiffs as well as the class. Thus, this factor also supports the fee request.

### 11. The Lodestar Cross-Check Confirms the Reasonableness of the Fee Request.

While not required, courts which award attorney's fees based upon the percentage of the fund may crosscheck the requested fee award by the lodestar amount. "[W]hile the primary basis of the fee award remains the percentage method, the lodestar may provide a useful perspective on

the reasonableness of a given percentage award." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002).

"The lodestar cross-check need entail neither mathematical precision nor bean counting but instead is determined by considering the unique circumstances of each case. The resulting multiplier need not fall within any pre-defined range, so long as the court's analysis justifies the award, such as when the multiplier is in line with multipliers used in other cases." *Yarrington*, 697 F. Supp. 2d at 1065. In applying the crosscheck multipliers in common fund cases, courts in this circuit and beyond have approved fees which result in multipliers in the four (4) to six (6) times range. *See, e.g. In re UnitedHealth Grp. Inc. PSLRA Litig.*, 643 F. Supp. 2d 1094, 1106 (D. Minn. 2009) (approving multiplier of 6.5); *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 999 (D. Minn. 2005) (finding lodestar multiplier of 4.7 reasonable); *In re St. Paul Travelers Sec. Litig.*, 2006 U.S. Dist. LEXIS 23191, at *1 (D. Minn. Apr. 25, 2006) (approving multiplier of 3.9); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005), *as amended* (Feb. 25, 2005) (*citing Task Force Report*, 108 F.R.D. at 243) (approving a lodestar multiplier of 4.07).

In determining the lodestar for cross-check purposes, the Court need not engage in a "full-blown lodestar inquiry," *In re AT & T Corp.*, 455 F.3d 160, 169 n.6 (3d Cir. 2006), or "mathematical precision," *In re Rite Aid Corp. Securities Litigation*, 396 F.3d at 306–07. A court need not involve itself with "a review of actual [attorney] time sheets." *Dewey v. Volkswagen of Am.*, 728 F. Supp. 2d 546, 592–93 (D.N.J. 2010), *rev'd and remanded sub nom. Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012). Additionally, while lodestar multipliers can be a relevant consideration in determining if the fee request is reasonable, "the

lodestar cross-check does not trump the primary reliance on the percentage of common fund method." *In re Rite Aid Corp. Securities Litigation*, 396 F.3d at 307.

"In performing the lodestar cross-check, the district courts should apply blended billing rates that approximate the fee structure of all the attorneys who worked on the matter." *In re Rite Aid Corp. Securities Litigation*, 396 F.3d at 306. Here, Class Counsel requests the Court utilize a blended rate of $500 per hour for all hours performed by Class Counsel and a rate of $125/hour for all paralegal work. As discussed below, the rates are reasonable considering the experience and expertise of all Class Counsel.

Six years ago, in 2014, the Eastern District of Pennsylvania found that $500 per hour was a reasonable hourly rate for partners of Swartz Swidler. *Keller*, 2014 U.S. Dist. LEXIS 155889, *42. More recently, the Central District of California, over a contested motion, found a reasonable rate for Mr. Swidler in a trucking wage and hour case to be $600/hour. *Ayala v. U.S. Xpress Enterprises, Inc.*, No. EDCV 16-137-GW (KKX), 2019 WL 1581395, at *3 (C.D. Cal. Feb. 13, 2019).

These rates are in line with hourly rates provided in other wage and hour cases across the country. *See Aguayo v. Bassam Odeh, Inc.*, No. 3:13-CV-2951-B, 2016 U.S. Dist. LEXIS 169702, at *47 (N.D. Tex. Dec. 8, 2016) ($700/hour for named partner; $400/hour for senior attorney; and $267-$350 per hour for associates); *Fox v. Tyson Foods, Inc.,* No. 4:99-CV-1612-VEH, 2009 U.S. Dist. LEXIS 133215, at *47 (N.D. Ala. Feb. 17, 2009) (finding that national market applied and finding rates for FLSA litigation of $550/hour for partners and $200-$400/hour for associates reasonable); *Guallpa v. NY Pro Signs Inc.,* 2014 U.S. Dist. LEXIS 77033, at *29 (S.D.N.Y. May 27, 2014) (approving rates of $500-$600 per hour for partners and $325 for associate); *McClean v. Health Sys.*, No. 6:11-CV-03037-DGK, 2015 U.S. Dist. LEXIS 181213, at *7 (W.D. Mo. Aug.

4, 2015) ($350-400/hour reasonable for FLSA attorney in collective action, approving $1,250,275

fee request where recovery was $1,567,186); *Morales v. Farmland Foods, Inc.*, No. 8:08CV504,

2013 U.S. Dist. LEXIS 56501, at *10 (D. Neb. Apr. 18, 2013) (approving Chicago rate for wage-

and-hour class action attorneys and providing up to $700/hour for senior partners, approving

$2,008,142 in fees on a $275,000 settlement).

Based on these rates, and recognizing that the vast majority of all the attorney hours

worked in this case were performed by partners, Plaintiffs here request the Court approve a

blended rate of $500 per hour for all attorney time and $125 per hour for all paralegal time for

purposes of its lodestar cross-check. Such rates produce a raw lodestar of $1,856,050, which

is calculated by summing the twom computations below:

1. Multiplying the number of hours performed by counsel (3,074 for Swartz Swidler and
   330.1 for Robert Soloff) by $500 to arrive at: $1,702,050; and

2. Multiplying the number of hours performed by paralegals (1,232) by $125 to arrive at:
   $154,000.

Plaintiffs request an attorney fee award representing 1/3 of the monetary compensation

provided in the settlement, totaling $5,500,000. Such an award provides a lodestar multiplier of

2.96, which is well below the amounts regularly provided in this circuit. *See supra* at 26.

Thus, the lodestar cross-check further confirms the reasonableness of the fee request.

Accordingly, Class Counsel respectfully requests this Court award the requested fee as it is

reasonable upon consideration of the relevant *Johnson* factors, and the lodestar cross-check

confirms the reasonableness of the request.

### G.      Class Counsel should be reimbursed for litigation costs they expended.

"Under the common fund doctrine, class counsel is entitled to reimbursement of all

reasonable out-of-pocket litigation expenses and costs in the prosecution of claims and in

obtaining settlement, including expenses incurred in connection with document production,

consulting with experts and consultants, travel and other litigation-related expenses." *Newby v. Enron Corp.* (*In re Enron Corp. Sec., Derivative & ERISA Litig.*), 2008 U.S. Dist. LEXIS 52932, *56 (S.D. Tex. July 10, 2008), quoting *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 535 (E.D. Mich. 2003); *see also Tuten v. United Airlines, Inc.*, 41 F. Supp. 3d 1003, 1009 (D. Colo. 2014), quoting *Vaszlavik v. Storage Tech. Corp.*, 2000 U.S. Dist. LEXIS 21140, at *4 (D. Colo. Mar. 9, 2000); *In re Xcel Energy, Inc., Securities, Derivative & "ERISA" Litigation*, 364 F. Supp. 2d at 999.

Here, Class Counsel has incurred out-of-pocket costs exceeding $617,000, including, expert fees, fees relating to distributing two class notices, transcript costs, ESI consultants, travel costs and filing fees. Swidler Decl. at ¶ 10.

When Plaintiffs moved for preliminary approval, they informed the Court that due to the time limitations in providing the motion to the Court and the possibility of several outstanding invoices still to be received from experts, including Dr. Speakman, they were unsure on their actual costs but believed they would be under $600,000.

Unfortunately, out-of-pocket costs exceeded $600,000. The initial estimates Plaintiffs created during the preliminary approval hearing failed to consider the costs of the initial notice, and also did not include the trial invoices from any of Plaintiffs' experts. As a result, Plaintiffs have incurred more in costs than they estimated. Though Mr. Swidler's declaration discloses all such litigation costs for purposes of the Court's evaluation, Class Counsel only seek to recover $600,000 in out-of-pocket costs, as Class Counsel represented they would during the preliminary approval hearing. The Court should consider, however, that Class Counsel's agreement to waive recovery of some of its costs makes its request for reimbursement more reasonable.

**H.** **The Claims Administrator should be provided its reasonable fee for facilitating notice of the preliminarily approved settlement, calculating allocations of the settlement, and distributing payments to opt-in plaintiffs.**

The Settlement Agreement provides that the costs of administering the settlement shall be paid from the Settlement Fund. (*See* Settlement Agreement, at p. 4). Where a settlement agreement calls for the costs of administration to be borne by the settlement fund, the Court should approve same. *See, e.g., In re High-Tech Emple. Antitrust Litig.*, 2013 U.S. Dist. LEXIS 180530, *19 (N.D. Cal. Oct. 30, 2013) ("[a]ll costs incurred in disseminating Notice and administering the Settlement shall be paid from the Settlement Fund pursuant to the Settlement Agreement").

The Court previously appointed Angeion as the Settlement Administrator and has confirmed that its estimate is reasonable.

Thus, Plaintiffs respectfully request that the Court order the Settlement Fund to compensate Angeion for its services in administrating the settlement not to exceed $124,500. (ECF Doc. 292).

**I.** **This Court should award Named Plaintiffs and individuals who sat for deposition the requested service payments.**

The Named Plaintiffs, Plaintiffs David Browne, Antonio Caldwell, and Lucretia Hall, each seek a service award of $50,000 for the risks and work they performed on behalf of the class. In addition, Plaintiffs have requested modest service payments of $1,000 each for each opt-in plaintiff who sat for a deposition and have requested $2,500 for each Plaintiff who intended to travel to Arkansas to testify at the February trial.

"The purpose of [service] payments is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation, and to reward the public service of contributing to the enforcement of mandatory laws." *Bredbenner v. Liberty Travel, Inc.*, 2011 U.S. Dist. LEXIS 38663, 63-64 (D. NJ. Apr. 8, 2011). By bringing suit against

a large company and having documents publicly filed with their names on them, named plaintiffs who assist in class action litigation "[take] on certain risks. By bringing suit against a major company[,]… they risk their good will and job security in the industry for the benefit of the class as a whole." *Id.*; *see also Camp v. Progressive Corp.*, 2004 U.S. Dist. LEXIS 19172 (E.D. La. Sept. 23, 2004) (allowing incentive awards to named plaintiffs and other class members who participated in discovery); *In re Xcel Energy, Inc., Securities, Derivative & "ERISA" Litigation*, 364 F. Supp. 2d at 1000 ($100,000 award approved to lead plaintiffs); *Brotherton v. Cleveland*, 141 F. Supp. 2d 907, 913–14 (S.D. Ohio 2001) (awarding a $50,000 service payment to the class representative out of a $5.25 million common fund); *Cook v. Niedert*, 142 F.3d 1004, 1009, 1016 (7th Cir. 1998) (awarding a $25,000 incentive award to the class representative); *Austin v. Metro. Council*, 2012 U.S. Dist. LEXIS 41750, *32 (D. Minn. Mar. 27, 2012) (approving $20,000 award).

As provided in the attached declarations[3], all three Named Plaintiffs provided significant assistance in this litigation, participated in discovery, sat for deposition, intended to attend each day of trial in person, assisted counsel in prosecuting the case and bringing the case to its conclusion, and knowingly filed the case and rejected insufficient settlement offers despite their understanding that should Plaintiffs lose the litigation, or obtain a result less than that tendered in an offer of judgment, they could be on the hook for thousands of dollars of Defendant's litigation costs. All three took such risks despite each living on a fixed income where an unexpected bill of several thousand dollars would cause significant financial distress.

---

[3] Plaintiff Hall suffered a medical emergency and was taken to the hospital on July 5, 2020. Though she is alert, she was not able to properly review her declaration for signing as of the filing date. Accordingly, Plaintiffs currently submit declarations from Mr. Caldwell and Mr. Browne. Plaintiffs wills submit a declaration from Ms. Hall when she is able to review and consider her declaration, which Plaintiffs expect will be possible prior prior to the hearing. *See* Declaration of David Browne at ¶ 17.

In this case, Named Plaintiffs were twice provided offers of judgment with warnings attached that should they not recover at least the amount provided in the offer, Defendants would seek all their litigation costs directly from the Named Plaintiffs. Rejecting these offers – both which were for far less than the $16.5 million ultimately obtained in settlement – meant that they could potentially be required to pay litigation costs if they did not obtain a better result.

Named Plaintiffs recognize that they each seek a service payment that, while within the contours of service awards provided in other cases, is higher than service awards that are regularly granted. Named Plaintiffs also recognize that the Court explicitly cautioned that it may partially deny the request, though it did not outright reject the request and instead directed that information on these service payments be provided to class members so that it could consider their reaction to the proposal in formulating its final decision.

The class notice explicitly informed all 16,000 class members that each Named Plaintiff (Plaintiffs David Browne, Antonio Caldwell, and Lucretia Hall) would seek an award of $50,000. Not a single class member objected to the requested award. The service awards requested by the Named Plaintiffs total less than 1% of the entire settlement fund, and accordingly do not significantly alter the amount of money any class member will receive in the settlement.

Additionally, 38 opt-in plaintiffs sat for deposition. Their collective testimony provided invaluable benefits to Plaintiffs in that it established representative testimony as to the experiences of drivers and pay practices of Defendant. Each individual deposed took time to prepare with Class Counsel and answered all questioned posed by Defendant without the need of judicial intervention. These individuals all assisted the litigation significant more than the rest of the class, and it is thus fair to award these individuals a modest service payment of $1,000 each for their efforts. (Settlement Agreement at 3.3(A). Individuals who sat for deposition and had volunteered to travel

to Arkansas to testify at trial – many of whom had already altered their work and personal schedules to accommodate such travel—seek a service award of $2,500 each. *Id.* This Court has already preliminarily determined that such amounts are fair in light of the services they performed for the class and the importance of their role in obtaining the result ultimately achieved which will provide financial benefits to more than 16,000 individuals.

For these reasons, the class has greatly benefited from the efforts of those seeking service awards, and Plaintiffs respectfully request the Court grant the requested service payments in full.

**J.**      **The Court should approve the provision requiring unclaimed funds to be donated to the St. Christophers Truckers Relief Fund.**

The Settlement Agreement states that after one-year elapses without any additional settlement checks being issued, any amounts remaining in the Fund should be donated to the St. Christopher Truckers Relief Fund. Settlement Agreement at 3.4(E) (ECF Doc. 279-1). The Eighth Circuit permits *cy pres* distribution of unclaimed settlement funds provided the recipient will utilize the funds "for purposes consistent with the nature of the underlying action." *Caliguiri v Caligiuri v. Symantec Corp.*, 855 F.3d 860, 867 (8th Cir. 2017).

Here, the chosen charity benefits truck drivers who find themselves in financial distress. The St. Christopher Truckers Relief Fund is a 501(c)(3) charity provides "temporary housing and living expenses to disabled professional drivers." *See* St. Christopher Fund Form 990 (2018) attached to Swidler Decl. as Ex. 1-B. More recently, they also provide outreach programs and vouchers for free flu, shingles, and pneumonia vaccines for uninsured truck drivers.[4]

---

[4] https://www.guidestar.org/profile/26-1544498 (last visited July 6, 2020)

The St. Christopher Truckers Relief Fund states on their website that 75 cents of every dollar goes directly to truck drivers.[5] This statement is confirmed in the tax filings of the charity. The 2018 IRS 990 form shows that in 2018, the organization received $1,123,300 in contributions and grants. IRS Form at 1. Of those contributions, $424,725 was provided in free advertising and $79,238 as free fundraising services. *Id.* at 34. After taking such amounts in consideration, the amount received by the charity from donations and grants totaled: $619,337. Of that, the Truckers Fund shows that it paid drivers $483,489 (78%) and utilized the remaining funds to pay for its administration, the largest expense being salaries to its employees and directors which totaled $162,697. *Id.*at 1. The highest paid position of anyone at the charity is the salary of the director, Dr. Donna Kennedy, Ph. D., who works 32 hours per week and is paid a salary of $72,408. *Id.* at 7.

Additionally, the charity is well respected in the community which further demonstrates its commitment and legitimacy. Since the pandemic has begun, the Trucker's Fund has been recognized by many large organizations as an extremely worthy and important organization helping truck drivers, who are necessary service workers and who have continued to work throughout the pandemic despite the obvious risks associated with cross-country travel. *See, e.g.* Pilot Company donates $100,000 to St. Christopher Truckers Fund (April 16, 2020)[6]; Love's

---

[5] https://truckersfund.org/ (last visited July 6, 2020)

[6] https://truckersfund.org/pilot-company-donates-100000-to-st-christopher-truckers-fund-to-help-professional-drivers-amid-covid-19-pandemic/ (last visited July 6, 2020)

Travel Stops donates $100,00 to St. Christopher Truckers Fund (April 9, 2020)[7]; St. Christopher Truckers Relief Fund Receives $100,000 Donation from Progressive Insurance (May 14, 2020)[8].

The Court should thus find that St. Christopher's is an appropriate charity to receive a *cy pres* distribution in this case. The money provided to the charity will be utilized to assist drivers who come into financial distress or who need vaccinations or other medical services which they could not otherwise obtain.

Thus, the Court should approve the provision in the settlement directing the administrator to donate all unclaimed funds to the St. Christopher Truckers Relief Fund.

## III. CONCLUSION

For the reasons as stated above, Plaintiffs request that the Court give final approval to the settlement, and award the attorney's fees, expense reimbursement, and service payments as requested.

Respectfully Submitted,

*/s/ Justin L. Swidler*
Justin L. Swidler, Esq.
**SWARTZ SWIDLER, LLC**
1101 Kings Hwy N. Ste. 402
Cherry Hill, NJ 08034
Phone: (856) 685-7420
Fax: (856) 685-7417

---

[7] https://truckersfund.org/loves-travel-stops-donates-100000-to-st-christopher-truckers-fund/ (last visited July 6, 2020)

[8] https://truckersfund.org/st-christopher-truckers-relief-fund-receives-100000-donation-from-progressive-insurance/ (last visited July 6, 2020)

# EXHIBIT Z

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| **ROCKY L. HAWORTH, on behalf of himself and all other similarly situated persons,** | |
| **Plaintiffs,** | **Case No. 6:19-cv-03025-RK** |
| **vs.** | |
| **NEW PRIME, INC.,** | |
| **Defendants.** | |

**DECLARATION OF MATTHEW R. CRIMMINS IN SUPPORT OF UNOPPOSED
MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

I, Matthew R. Crimmins, declare as follows:

      1.      I am a member in good standing of the State Bars of Missouri, Kansas and Illinois. I, along with Virginia Stevens Crimmins, both attorneys with the Crimmins Law Firm LLC, represent the Plaintiff, Rocky Haworth, in the above-referenced matter.  We were joined in representing the Plaintiffs by co-counsel Garrett Hodes, of Hodes Law Firm, LLC, and Hillary Schwab, of Fair Work, P.C.

      2.      On January 22, 2019, Named Plaintiff Rocky Haworth filed a Federal Rule of Civil Procedure 23 class action pursuant to Missouri state law and a collective action under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*., ("FLSA"), to recover unpaid minimum wages against Defendant on behalf of himself and other similarly situated B/C Seat Class Members. *See* Complaint [Doc. 1]. Named Plaintiff and the proposed class are truck drivers who worked for Defendant and drove as a part of a team with more senior truck drivers.  All B/C Seat Class Members were compensated based upon the greater of a per mile rate or a flat, weekly rate, regardless of the number of hours worked.  Complaint at ¶¶ 14-15.

3.      Defendant filed its Answer on March 27, 2019, asserting, among other defenses, that Named Plaintiff and other drivers were not similarly situated, and that Defendant had properly paid Named Plaintiff and all B/C Seat Class Members under the applicable wage and hour laws. *See* Answer [Doc. 17].

4.      Following the filing of this lawsuit, the parties embarked upon significant discovery, including Defendant's production of millions of rows of electronic data related to work performed by B/C Seat Class Members, and compensation paid, the exchange of thousands of pages of documents, as well as depositions of the parties.

5.      On August 15, 2019, Named Plaintiff moved for conditional certification of an FLSA collective action.

6.      On March 4, 2015, Dominic Oliveira filed a Federal Rule of Civil Procedure 23 putative class action complaint pursuant to Missouri and Maine state law and a putative collective action under the FLSA, to recover unpaid minimum wages against Defendant on behalf of himself and other similarly situated individuals who had participated in Defendant's truck driver training program and/ or drove for Defendant as a B/C seat driver, A seat driver, or independent contractor driver.   *See Oliveira v. New Prime, Inc.*, Case No. 1:15-CV-10603, Complaint (D. Mass.) [Massachusetts Doc. 1]. Defendant filed an Answer denying these claims on September 26, 2017. [Massachusetts Doc. 117].

7.      Defendant litigated and defended these matters separately until September 11, 2019, when it asked this Court to stay this matter and allow the *Oliveira* matter to proceed.  *See* [Doc. 61-62].  Following this request, Plaintiff's counsel in *Oliveira* entered an appearance in this case on behalf of Named Plaintiff in an effort to minimize any inefficiencies between the two matters.  This Court denied Defendant's motion to stay.  [Doc. 84 at p.2-4].

8.      On March 23, 2020, the Court granted the Named Plaintiffs' Motion for conditional certification of this matter as a collective action.  *See* Order [Doc. 84].

9.      Following this Court's Order conditionally certifying this case, in connection with the *Oliveira* matter, the parties began active, arm's length discussions regarding a possible global resolution of these cases.  To facilitate these discussions, the parties engaged in remote negotiations through the mediator D. Charles Stohler, Esq. (who had also presided over an in-person full-day mediation session in the *Oliveira* matter previously).[1]   These negotiations, occurring through experienced counsel on both sides, transpired over several months and culminated in a global agreement in principle to resolve this matter and the *Oliveira* matter shortly before the collective action notice was to be sent to the B/C Seat Class Members.   The Court stayed the sending of the FLSA collective action notice so that the parties could present this proposed settlement for the Court's review.  [Doc. 92].

10.     The lawyers in this case are experienced in FLSA collective action litigation and Rule 23 wage and hour cases, and all aspects of class action litigation, and effectively represented their respective clients' interests. The parties reached a compromise only after extensive exchange of information, litigation, and spirited arm's-length settlement negotiations. The exchanged information provided the Named Plaintiff and Plaintiff's Counsel with ample knowledge of the valuation of damages, as well as strengths and weaknesses of Class Members' claims.  The global settlement reached in this complex wage and hour action and class action lawsuit constitutes a reasonable compromise of a bona fide dispute involving a myriad of vigorously contested legal and factual issues.

---

[1] The parties had also previously mediated this matter with John Phillips, Esq., with Jay Daugherty Mediation Services in June 2019 as a part of the Court's MAP program, and it is the undersigned's understanding that the parties in *Oliveira* had previously had an in-person mediation session with Mr. Stohler in November 2019.

11.     Specifically, under the terms of the parties' executed Agreement, Defendant will provide Eight Million Five Hundred Thousand Dollars ($8,500,000.00) to the B/C Seat Settlement Class who worked for Defendant from October 2, 2012 to May 8, 2020, relating to the claims asserted in this case.[2]  Defendant has agreed to a total settlement fund of Twenty-Eight Million Dollars ($28,000,000.00) to globally resolve the litigation in both this Court and in the *Oliveria* matter. Agreement at ¶ A.  Of this amount, the parties separately negotiated that Eight Million Five Hundred Thousand Dollars ($8,500,000.00) would be allocated to the B/C Seat Settlement Class.  Agreement at ¶ B.2.[3]

12.     The proposed settlement provides substantial relief to the B/C Seat drivers.  After amounts are set aside for reasonable litigation and administration costs, attorneys' fees and service awards, the remaining $5,563,750.00 will be available to the 26,476 B/C Seat Class Members, and the average per capita settlement of the B/C Seat Claim is approximately $210.14 per Class Member.  B/C Seat Class Members spent on average 11.71 weeks driving as a B/C Seat Driver. The average award for time spent as a B Seat Driver plus their minimum allocation is $266.99 or $22.80 per week driven as a B Seat Driver.[4]  For B/C seat Class Members who were employed the longest during the class period, and worked the most number of weeks and drove the most miles, individual settlement amounts related to B/C seat driving exceed $1,000.00 with a high of $7,036.64.

---

[2] Of the Eight Million Five Hundred Thousand Dollars allocated to the claims of the B/C Seat Class Members, Three Million Five Hundred Thousand Dollars shall be non-reversionary. Agreement at ¶ B.2.

[3] The remaining Nineteen Million Five Hundred Thousand Dollars ($19,500,000.00), which the parties propose will be reviewed and finally approved in the *Oliveira* matter, was allocated to cover the orientation/training claims, as well as the claims of the A Seat and independent contractor drivers.  Agreement at ¶ B. Many of the B/C Seat Drivers will also receive an additional allocation under these funds.

[4] This average number differs from the per capita average due to the minimum awards each B/C Seat Class Member will receive.

13.     The claims in this case focused upon whether Class Members were paid minimum wage for all hours worked, which was a disputed fact, including whether certain hours were compensable work under the FLSA and under Missouri law.  However, the amounts recovered in this settlement on behalf of B/C Seat drivers are significant. Based on an average rate of pay and an average number of weeks worked as a B/C Seat driver, the settlement reached will result in each Class Member receiving on average approximately 3.14 hours of minimum wage pay for each week worked.  By way of example, as argued in the motion for class certification, the Code of Federal Regulations (29 C.R.F. § 785.22) provides that an employer does not have to compensate employees for time sleeping of up to eight hours a night under certain circumstances. If Defendant was successful in making an argument that this limitation applied here, during the week of September 14, 2016, Mr. Haworth received $7.18 an hour (or an underpayment of seven cents an hour).  The average settlement award of $22.80 a week would compensate Mr. Haworth three times this amount.  Similarly, if Defendant prevailed on all of its arguments, Mr. Haworth, and other B/C Seat Drivers would be faced with zero recovery.

14.     In addition to these settlement amounts, B/C Seat Drivers will also receive sums relating to the other claims in the *Oliveira* matter, to the extent that they participated in orientation and/or drove as an A seat driver and/or an independent contractor driver.

15.     B/C Seat Drivers will also receive significant non-monetary relief.  Specifically, upon the effective date, Defendant agrees to release entitlement to and shall not pursue collection efforts relating to any money allegedly owed to Defendant by any B/C Seat Class Member (e.g., Opt-in Class Members or Minimum Allocation Class Members) who at the time of their departure

from Defendant was in orientation, a B/C seat position, or an A seat company position[5]. Agreement at ¶ G.4.  After final approval, Defendant has further agreed to use its best efforts to request that the national credit reporting agencies delete any trade line(s) with respect to participating B/C Seat Class Member's accounts with Defendant.  Participating B/C Seat Class Members will also have the right to request that records of any alleged default be corrected/rescinded.  In total, this settlement reflects what Plaintiff and the proposed class could expect at a trial and it avoids the costs, risks, and delay of a trial and appeal.

16.     I also believe that the proposed service payment to Named Plaintiff of $25,000 is reasonable, as a successful resolution of this matter would not have been possible without his efforts.  Mr. Haworth spent a substantial amount of time and effort related to this matter and his assistance was invaluable.  Mr. Haworth participated in written discovery, an 8 ½ hour deposition in Iowa, an all-day mediation in Kansas City, Missouri, and helped counsel prepare several Declarations throughout the course of the Haworth proceedings and assisted in the final settlement negotiations. His participation in the Haworth matter was vital to protecting the interests of the B and C seat drivers, and the Class as a whole.  At all times, Mr. Haworth demonstrated the utmost integrity and responsibility in representing the interests of the putative class over his own financial self-interests, making strategic decisions, responding to various issues raised by Defendant, and assisting with mediation.  In exchange for this service payment, Named Plaintiff has also agreed to a full and general release of all of his claims against Defendant.

17.     Plaintiff's counsel has significant experience in prosecuting class actions and complex cases.  The undersigned has served as class counsel in wage and hour matters and has

---

[5] Defendant has also agreed to release entitlement to and has agreed not to pursue collection efforts against participating class members who were independent contractors at the time of their departure from Defendant under two conditions:  (1) the class member submits a timely and valid claim form; and (2) the class member has not destroyed, damaged, or stolen Prime property.  *See* Agreement at ¶ G.5.

extensive experience in class actions and complex litigation, and my co-counsel have served as co-lead counsel in wage and hour MDLs, as well as represented numerous individuals in class and collective action litigation.  *See* Exhibit A (Professional Bio Matthew Crimmins and Virginia Stevens Crimmins with the Crimmins Law Firm); *see also* Exhibit B (Professional Bio of Garrett Hodes with the Hodes Law Firm); Exhibit C (Professional Bio of Hillary Schwab with Fair Work P.C.).

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 4th  day of August 2020.

By:_____
     Matthew Crimmins

EXHIBIT A

# Crimmins Law Firm LLC

The Crimmins Law Firm, LLC is a boutique law firm based in Independence Missouri with big firm experience.  Founded in 2012, the Crimmins Law Firm has built its practice on providing quality litigation and dispute resolution services to both individuals and businesses. With lawyers licensed in Missouri, Kansas, and Illinois, the Crimmins Law Firm represents clients in the areas of wage and hour law, business litigation, intellectual property, employment matters, and have been involved in complex, multi-district and class action lawsuits during their respective careers.

### Wage and Hour Cases

Throughout their respective careers, the lawyers at the Crimmins Law Firm have represented thousands of workers in their quest to recover their hard-earned wages.  Prosecuting these cases as both individual and collective or class actions, the lawyers at the Crimmins Law Firm have recovered millions in unpaid minimum and overtime wages. Examples of these cases, include *Shockley v. PrimeLending, Sylvester v. Wintrust National Bank, Rottman v. Old Second Bancorp, Inc.*, *Kafka v. Melting Pot, et al., Boldridge v. Bryon's Auto Sales, et al., Carson v. Bank of Blue Valley, Davis v. Novastar*, *Gieseke v. First Horizon Home Loan Corporation*, *Perry v. National City*, *Pixler v. Encompass Solutions, et al.,* and *Hernandez v. Texas Capital Bank* and *West v. First Franklin*.

### Complex and Class Action Litigation

The attorneys at the Crimmins Law firm have been involved in numerous complex multi-district, class and collective action lawsuits serving as defense, plaintiff and co-lead MDL counsel. This class action work includes cases concerning wage and hour matters, as well as products liability and consumer fraud claims.

In *Perry v. National City*, the United States District Court for the Southern District of Illinois conditionally certified an FLSA collective action case on behalf of approximately 4,500 loan originators employed by National City. See 2007 WL 1810472 (S.D. Il. 2007). A court-approved settlement was reached in 2008. After significant discovery and extensive summary judgment briefing, the parties reached a Court-approved class settlement in the amount of $27.5 million.

In re *Bank of America Employment Practices Litigation*, MDL No. 2138: While at Stueve Siegel Hanson, Ginnie served as co-lead counsel of this nationwide multi-district litigation. In this case, the JPML consolidated more than 30 different cases across the country brought by retail banking center and call center employees seeking recovery of unpaid overtime wages. On September 27, 2012 the Court certified the case as an FLSA collective action of more than 175,000 retail banking center employees employed by the Bank.

### Business Litigation and Consultation

The attorneys at the Crimmins Law Firm also have extensive experience in business litigation. This representation has included consultation with business partners, shareholders and executives, as well as prosecuting and defending claims for breach of contract, breach of fiduciary duty and fraud claims arising out of a variety of business transactions.



**Matthew R. Crimmins'** primary focus over the course of his legal career has been in litigation. He has litigated on behalf of a wide variety of clients, from individuals to large corporations, and has handled cases involving contract disputes to the prosecution and defense of complex and class lawsuits in state and federal courts across the country. He has successfully represented clients in cases related to contracts, personal injury, employment, insurance, product liability, and class actions representing clients at all levels of the litigation process, from trial to various stages of appeal. Matt also serves as an arbitrator on the National Panel of Arbitrators, as well as the Panel of Employment Arbitrators with the American Arbitration Association.

After his graduation from law school in 2001, Matt began his legal practice at Shook, Hardy & Bacon, LLP. There, his practice primarily involved the defense of class actions in state and federal courts across the country, while also taking on some smaller disputes assisting Legal Aid of Western Missouri. Matt received the Robert C. Welch Volunteer Attorney Project Award in 2003 for his work in obtaining a recovery for a woman who was the victim of a negligent/fraudulent home repair scam. In 2005, Matt joined the firm of Walters Bender Strohbehn & Vaughan, PC, where he expanded his litigation experience to matters involving contracts, personal injury, and insurance bad faith, while still continuing an emphasis in complex and class litigation, including unpaid wage litigation. Among his many successful representations, Matt recovered over $11.5 million for a young girl who was sexually abused by her coach after a trial and five years of post-judgment litigation against insurers for coverage/bad faith. This result was ranked in Missouri Lawyers Weekly as a Top Win in the State of Missouri, ranking 13th in overall recovery that year. Matt began work at the Crimmins Law Firm in 2016 and has continued to represent both individuals and businesses in litigation matters.

**Bar Admissions**: Missouri, 2001; Kansas, 2002; Illinois, 2002; U.S. District Court Western District of Missouri; U.S. District Court District of Kansas; U.S. District Court Northern District of Illinois, 8th Circuit, U.S. Supreme Court

**Education:**
Georgetown University Law Center, Washington, DC, 2001 J.D., *cum laude*
University of Illinois at Urbana-Champaign, 1998 B.A. in Philosophy and Political Science

**Professional Associations and Memberships:** Kansas City Metropolitan Bar Association; Missouri Bar Association; Kansas Bar Association; Illinois Bar Association

**Published Works:**
Trial Practice Don'ts, 96 Illinois Bar Journal 360 (July 2008)

**Community Involvement:**
Truman Heritage Habitat for Humanity, President of the Board of Directors, 2012 to 2015, Vice Chair 2015-2016

**Past Employment Positions:**
Shook, Hardy & Bacon, LLP, 2001-2005

Walters Bender Strohbehn & Vaughan, PC, 2005-2016



**Virginia Stevens Crimmins** ("Ginnie") has substantial experience representing both individuals and businesses in state and federal courts. After graduation from Georgetown University Law Center in 2001, Ginnie and her husband Matt returned to Kansas City where she began practicing with the law firm of Spencer Fane in the general litigation group. Ginnie's practice focused on education as well as business litigation, including cases involving business torts, intellectual property disputes, contract claims, and insurance issues. In 2004, Ginnie joined the law firm of Stueve Siegel Hanson LLP and in July 2008, Ginnie was elected as a partner. At Stueve Siegel Hanson, Ginnie continued handling business litigation cases, and also began taking on unpaid wage claims, as well as class and collective actions. In December 2012, Ginnie opened the Crimmins Law Firm where she continues to provide dispute resolution services for both business and individuals. Ginnie is an approved mediator in the U.S. District Court for the Western District of Missouri early mediation program, and is a volunteer mediator for Clay County, Missouri Small Claims Court. In addition to serving as a volunteer arbitrator for the Better Business Bureau, Ginnie serves on the National Panel of Arbitrators, as well as the Panel of Employment Arbitrators with the American Arbitration Association and serves as an arbitrator with FINRA.

**Bar Admissions:** Missouri, 2001; Kansas, 2002; Illinois, 2002; U.S. District Court Western District of Missouri; U.S. District Court District of Kansas; U.S. District Court Northern District of Illinois; U.S. District Court Central District of Illinois; U.S. District Court Southern District of Illinois; 8th Circuit; 10th Circuit; U.S. Supreme Court

**Education**:
Georgetown University Law Center, Washington, DC, 2001 J.D.

Agnes Scott College, Decatur, Georgia, 1998, B.A. in French and International Relations, Phi Beta Kappa

**Professional Associations and Memberships:** American Bar Association; Lawyers Association of Kansas City; Kansas City Metropolitan Bar Association, Kansas Bar Association, 2010-2011 KBA Employment Law Section Past President Committee Member, 2009-2010 KBA Employment Law Section President, Illinois Bar Association; Association for Women Lawyers of Greater Kansas City

**Published Works:**
Authored Delegating Questions of Whether A Case Can Be Arbitrated on A Class-Wide Basis – The Fight Over Who Decides Continues, AAA Dispute Resolution Journal (2019)

Co-Authored, Missouri Chapter of Wage and Hour Laws, A State-by-State Survey, Second Edition, supplements (2013, 2014, 2015), Third Edition, 2016 and supplements (2017, 2018, 2019), published by Bloomberg BNA and the ABA Section of Labor and Employment Law

**Community Involvement**:
Sustainable Hope International, 2012 – 2017 Board Member; Board Chair (2015 – 2017)

DAR, Independence Pioneers Chapter, 2002 – 2004, Librarian and Board Member

**Past Employment Positions:**
Spencer Fane Britt and Browne, General Litigation Group, 2001 - 2004

Stueve Siegel Hanson LLP, Associate, 2004 – 2008; Partner, 2008-2012

EXHIBIT B



# Garrett M. Hodes

**900 Westport Road, 2nd Floor**
**Kansas City, Missouri 64111**
garrett@hodeslawfirm.com
www.hodeslawfirm.com

**Hodes Law Firm, LLC,** Kansas City, Missouri
Managing Member, December 2017 to Present

The Hodes Law Firm, LLC is a Kansas City, Missouri law firm specializing in civil litigation and trial practice. Garrett Hodes is an experienced trial attorney with over 22 years of expertise in all aspects of civil litigation, including class action and complex litigation involving violations of state and federal laws on behalf of millions of class members nationwide. He has mentored under and worked alongside some of top trial attorneys and class action attorneys in the Kansas City area and nationwide and has earned an AV-Preeminent rating from Martindale-Hubbell.

His practice areas primarily include commercial and business litigation, class actions, labor and employment matters, including wage and hour litigation, personal injury and civil rights litigation, and tort claims. Garrett Hodes also currently serves as Co-Chair for the Employment Law Committee for the Kansas City Missouri Bar Association

In the class action and complex litigation area, Garrett Hodes has experience in all aspects of case management, from initial investigation, preparation and presentation, discovery, as well as trials, appeals, arbitrations, and settlements. He has litigated as co-counsel with exceptional attorneys, and against the best defense firms, both locally and nationwide.  He has been appointed as class counsel in several notable class action matters, is one of the few attorneys in the area who has tried a class action to both a jury and to an arbitration panel, and has helped to achieve some truly extraordinary results for millions nationwide.

## – PRIOR EMPLOYMENT –

**Walters, Bender, Strohbehn & Vaughan, P.C.,** Kansas City, Missouri
Of Counsel, May 2001 – December 2017

At WBSV I served as class counsel in numerous class actions and other complex and civil litigation matters that were resolved by way of trial and settlement, including mediations and arbitrations. My work on class action matters with WBSV contributed to more than $880 million in settlements and verdicts recovered for thousands nationwide over the last two decades. I am one of a few trial lawyers who has actually tried a class action case and was a core part of a trial team that won a $105 million jury verdict, which included a $99 million punitive damages award against several secondary market purchases of mortgage loans. I also represented classes of consumers victimized by subprime motor vehicle lenders and loan servicers, resulting in over $3.6 million in settlements for violations of Missouri's Merchandising Practices Act and Uniform Commercial Code.

I was also on a trial team that was co-lead class counsel in a multidistrict proceeding pending in the United States District Court for the Western District of Pennsylvania involving 44,535 borrowers on more than 22,000 mortgage loans made in violation of the Truth in Lending Act, the Home Ownership and Equity Protection Act, the Real Estate Settlement Procedures Act, and the Racketeer Influenced and Corrupt Organizations Act. This series of long-running complex class actions was resolved by way of a class action settlement and arbitration, resulting in a $28 million class arbitration award, after numerous successful appeals to the United States Court of Appeals for the Third Circuit and a petition for writ of certiorari to the United States Supreme Court.

**Humphrey, Farrington & McClain, P.C.,** Independence, Missouri
Associate Attorney, June 1998 - April 2001

My practice was focused primarily on representing plaintiffs in litigation matters, including complex and class action litigation in state, appellate, and federal courts. I was one of 47 attorneys and special assistant attorneys general representing the State of Missouri on its successful cost recovery lawsuit against the tobacco industry ($6.1 billion recovery for the State of Missouri). I also served as class counsel in national class actions, resulting in settlement, against manufacturers of water heaters on behalf of an estimated 14 million class members and defective hardboard siding, and in other cases of substantial magnitude. My caseload

also included workers' compensation, personal injury, criminal defense, domestic and family court appointments.  I was also a presenter and lecturer at Continuing Legal Education seminars.

**The Douglas County Legal Aid Society, Inc.,** Lawrence, Kansas
Intern, August 1997 - May 1998

**The Accurso Law Firm**, Kansas City, Missouri
Law Clerk, May 1996 - August 1997

<div align="center">

– SIGNIFICANT REPRESENTATIONS –

</div>

- **Class counsel on trial team that obtained $105 million jury verdict in a class action** involving violations of Missouri's Second Mortgage Loans Act.

- **Class counsel on teams that obtained over $350 million in settlements** for violations of Missouri's Second Mortgage Loans Act, for thousands of class members in Missouri state and federal courts.

- **Class counsel on trial team that recovered a $28 million arbitration award** for violations of federal lending laws and regulations on behalf of over 44,000 class members.

- **Class counsel in class actions that recovered over $3.6 million in settlements** for consumers whose subprime motor vehicle loans were originated and serviced in violation of Missouri's Merchandising Practices Act and Commercial Code.

- **Successful appeals before the United States Court of Appeals for the Third Circuit and United States Supreme Court** of class certification decisions involving predatory lending, violations of federal laws, and racketeering.

- **Class counsel in national class action settlements for defective water heater components parts and hardboard siding**, with a settlement class of over an estimated 14 million members.

<div align="center">

–REPRESENTATIVE CASES–

</div>

*Baker v. Century Financial Group, Inc.,*
Circuit Court of Clay County, Missouri, Case No. CV100-4294
Missouri Second Mortgage Loans Act – Co-lead counsel for class of plaintiffs.

*Beaver, et al. v, U.S. Bank, National Association, et al.,*
Circuit Court of Jackson County, Missouri, Case No. 1216-CV21345
Missouri Second Mortgage Loans Act – Co-lead counsel for class of plaintiffs.

*Couch v. SMC Lending, Inc.,*
Circuit Court of Clay County, Missouri, Case No. CV100-4332
Missouri Second Mortgage Loans Act – Co-lead counsel for class of plaintiffs.

*Drennen, et al., vs. Certain Underwriters at Lloyd's of London, et al.,*
United States Bankruptcy Court for the Southern District of New York, Case Number: 15-01025-shl
Insurance coverage action against domestic and foreign liability insurers following settlement of Class Proofs of Claim and confirmation of Chapter 11 Plan in *In re Residential Capital, LLC.* Representing Plaintiff Classes certified in *Mitchell v. Mortgage Capital Resources, et al.* and in *In re Residential Capital, LLC,* based upon assignment of the rights of Residential Funding Company, LLC under General Motors Corp.'s insurance policies – Co-lead counsel for class claimants.

*Foster, et al. v. ABTCo., Inc., et al.,*
Circuit Court of Choctaw County, Alabama, Case No. CV95-151-M
Products liability – Co-lead class counsel for class of plaintiffs.

*Gilmor v. Preferred Credit Corp.,*
Circuit Court of Clay County, Missouri, Case No. CV 100-4263
Missouri Second Mortgage Loans Act – Co-lead counsel for class of plaintiffs.

*Hall v. America West Financial, et al.,*
Circuit Court of Jackson County, Missouri, Case No. 00CV218553-01
Missouri Second Mortgage Loans Act – Co-lead counsel for class of plaintiffs.

*Haworth v. New Prime Inc.*
United States District Court for the Western District of Missouri, Case No. 6:19-cv-03025-RK
Fair Labor Standards Act – Hodes Law Firm, LLC is Co-Lead Counsel for Conditionally Certified Class

*Heilman, et al. v. Perfection Corp., et al.,*
United States District Court for the Western District of Missouri, Case No. 99-0679-CW-W-6
Products liability/Magnuson-Moss – counsel for class of plaintiffs.

*Hopkins v. Kansas Teachers Community Credit Union,*
United States District Court for the Western District of Missouri, Case No. 08-5052-CV-SW-GAF
Uniform Commercial Code and Missouri Merchandising Practices Act – counsel for class of plaintiffs.

*In re Community Bank of Northern Virginia Mortgage Practices Lending Litigation,*
United States District Court for the Western District of Pennsylvania, MDL No. 1674
Predatory lending, violations of federal laws, racketeering – counsel for plaintiffs and objectors in multidistrict litigation – co-lead counsel for class of plaintiffs.

*In re Residential Capital, LLC, et al.,*
Bankruptcy Court for the United States District Court for the Southern District of New York,
Case No. 12-12020 (MG)
Violations of Real Estate Settlement Procedures Act, Truth in Lending Act, Home Ownership and Equity Protection Act, and Racketeer Influenced and Corrupt Organizations Act – Co-lead counsel for class claimants.

*Landrum v. Meadows Credit Union,*
United States District Court for the Western District of Missouri, Case No. 08-441-CV-W-DW
Uniform Commercial Code and Missouri Merchandising Practices Act – Counsel for class of plaintiffs.

*McLean v. First Horizon Home Loan Corporation f/k/a McGuire Mortgage Company,*
Circuit Court of Jackson County, Missouri, Case No. 00 CV 228530
Missouri Second Mortgage Loans Act – Co-lead counsel for class of plaintiffs.

*Mitchell v. Residential Funding Corp., et al.,*
Circuit Court of Jackson County, Missouri, Case No. 03CV220489
Missouri Second Mortgage Loans Act – Co-lead counsel for class of plaintiffs.

*Salas-Romero, et al. v. Smithfield Foods, Inc.*
United States District Court for the Western District of Missouri, Case No. 4:19-CV-00139-BCW
Fair Labor Standards Act – Hodes Law Firm, LLC is Co-lead Counsel for Conditionally Certified Class

*Shokere, et al v. Residential Funding Company, et al.,*
Circuit Court of Jackson County, Missouri, Case No. 1116-CV30478
Missouri Second Mortgage Loans Act – Co-lead counsel for class of plaintiffs.

*Smith v. Premier Associates Mortgage Company, et al.,*
Circuit Court of Jackson County, Missouri, Case No. 01CV201263
Missouri Second Mortgage Loans Act – Co-lead counsel for class of plaintiffs.

*Strube v. American Equity Investment Life Insurance Co. and Creative Marketing International Corp.*,
United States District Court, Middle District of Florida, Case No. 6:01-CV-1236-Orl-19DAB
Fraud and Unfair Business Practices – Counsel for Defendant, Creative Marketing International Corp.

*Thomas, et al. v. U.S. Bank, N.A., et al.*,
Circuit Court of Jackson County, Missouri, Case No. 1216-CV20561
Missouri Second Mortgage Loans Act – Co-lead counsel for class of plaintiffs.

*Thompson vs. Sovereign Bank, N.A.*,
Circuit Court of Jackson County, Missouri, Case No. 1216-CV09804
Missouri Second Mortgage Loans Act – Co-lead counsel for class of plaintiffs.

### –REPRESENTATIVE DECISIONS–

*Gilmor v. Preferred Credit Corp.*, 10-0189-CV-W-ODS, 2012 WL 2735348 (W.D. Mo. July 9, 2012)

*Haworth v. New Prime, Inc.,* 6:19-03025-CV-RK, 2020 WL 1430478 (W.D. Mo. Mar. 23, 2020)

*Heilman v. Perfection Corp.*, 99-0679-CV-W-HFS, 93 F. Supp. 2d 1311 (W.D. Mo. May 1, 2000)

*Hopkins v. Kansas Teachers Community Credit Union*, 08-05052-CV-SW-GAF, 2010 WL 3398767 (W.D. Mo. Aug. 24, 2010)

*Hopkins v. Kansas Teachers Community Credit Union*, 08-05052-CV-SW-GAF, 2010 WL 11508849 (W.D. Mo. Mar. 8, 2010)

*Hopkins v. Kansas Teachers Community Credit Union*, 265 F.R.D. 483 (W.D. Mo. 2010)

*In re Community Bank of Northern Virginia Mortgage Lending Practices Litigation*, 795 F.3d 380 (3d Cir. 2015)

*In re Community Bank of Northern Virginia Mortgage Lending Practices Litigation*, 622 F.3d 275 (3d Cir. 2010)

*In re Community Bank of Northern Virginia Mortgage Lending Practices Litigation*, 418 F.3d 277 (3d Cir. 2005)

*In re Residential Capital, LLC*, 15-CV-2712 (JPO), 2015 WL 9302834 (S.D. N.Y. Dec. 21, 2015)

*In re Residential Capital, LLC*, 575 B.R. 29, 42 (Bankr. S.D.N.Y. 2017)

*Landrum v. Meadows Credit Union*, 08-441-CV-W-DW, 2010 WL 11509206 (W.D. Mo. Aug. 4, 2010)

*Landrum v. Meadows Credit Union*, 08-441-CV-W-DW, 2012 WL 12957387 (W.D. Mo. Mar. 16, 2012)

*Mitchell v. Residential Funding Corp.*, 334 S.W.3d 477 (Mo. App. W.D. 2010), *as modified* (Feb. 1, 2011)

*Thomas v. U.S. Bank N.A., N.D.*, 11-6013-CV-SJ-SOW, 2012 WL 12897284 (W.D. Mo. Sept. 27, 2012)

*Washington v. Countrywide Home Loans, Inc.*, 655 F.3d 869 (8th Cir. 2011)

### – EDUCATION –

**University of Kansas School of Law**, J.D., May 1998
- *Associate Editor*, University of Kansas Law Review (1996-98)
- *Legal Aid Clinic* (1997-1998)
- *Publications*:
  - *Ex Parte Contacts with Organizational Employees in Missouri,* 54 Journal of the Missouri Bar 83 (1998)
  - *Terrorist Threats: The Friendly Skies Aren't Too Friendly About Notification,* 46 Univ. of Kansas Law Review 365 (1998)
- *Recipient:* Mary Anne Chambers Service Award (1998) - Awarded annually to the student devoted to public service who best exemplifies a dedication to professionalism while representing the disadvantaged.

**University of Kansas**, B.A., Psychology, May 1995
- Kansas Honor Scholar, Golden Key National Honor Society, Psi Chi Psychology Honor Society

### – PROFESSIONAL MEMBERSHIPS AND ASSOCIATIONS –

Admitted to practice in Missouri and Kansas state and federal courts,
United States Court of Appeals for the Eighth Circuit, and *pro hac vice* in state and federal courts nationwide.
Member of the Missouri Bar Association, Kansas Bar Association, and the Kansas City Metropolitan Bar Association.

Co-Chair, Employment Law Committee - Kansas City Missouri Bar Association

### – FAMILY AND INTERESTS –

My wife, Jodi is a teacher in the North Kansas City, Missouri School District.
We have two children, three dogs and one cat and reside in Kansas City, Missouri.
I am also a well-known, high-level practitioner of Brazilian Jiu Jitsu and Judo.

### – CONTACT –

HODES LAW FIRM, LLC
900 Westport Road, 2nd Floor
Kansas City, Missouri 64111
www.hodeslawfirm.com
garrett@hodeslawfirm.com
(816) 931-1718 (Office)
(855) 635-7890 (Toll Free)
(816) 668-3903 (Mobile / Text)
(816) 992-6276 (Facsimile)



**EXHIBIT C**

**Hillary Schwab, Esq.**
**Fair Work, P.C.**
**Boston, Massachusetts**

Hillary has represented employees in a variety of contexts for over 15 years. Prior to forming Fair Work P.C., she was a partner at a nationally recognized employment class action firm, where she helped pioneer cases against restaurants, caterers, and other companies concerning their misappropriation of tips and service charges. In 2008, Massachusetts Lawyers Weekly named Hillary an "Up and Coming Lawyer," an award that recognizes attorneys who have been licensed for less than 10 years, but who have already distinguished themselves in their field. Hillary has also been rated a "Super Lawyer" every year since 2013.

Hillary has extensive experience litigating and resolving all types of employment matters. Since 2008, she has helped recover millions of dollars on behalf of wait staff and service employees whose employers have improperly retained or distributed tips, gratuities, and service charges. She has also successfully pursued class action cases involving claims that companies have misclassified their workers as independent contractors, and class actions involving claims for unpaid wages, unpaid and underpaid work time, failure to pay the minimum wage, and failure to pay overtime. In addition to her class action practice, Hillary has also represented numerous individual clients on claims involving allegations of whistleblower retaliation and race, sex, and disability discrimination. Hillary has served as trial counsel in several cases at both the state and federal level. She has also handled appeals before the Massachusetts Appeals Court, the Massachusetts Supreme Judicial Court, and the United States First Circuit Court of Appeals on issues ranging from arbitration, federal preemption, recoverable damages for misclassified workers and service employees.

Earlier in her career, Hillary worked for several years in civil rights and the public sector. After graduating from Columbia Law School, she was a law clerk for Judge Robert P. Patterson, Jr. in the United States District Court for the Southern District of New York and then for Judge Leonard I. Garth for the United States Court of Appeals for the Third Circuit. Hillary then spent a year at the Center for Reproductive Rights in New York as a Blackmun Fellow, litigating cases concerning reproductive rights in state and federal courts all over the country. She then practiced law in Wisconsin for several years, where she first worked representing victims of domestic violence in a rural community and then served as an Assistant Attorney General in the Environmental Protection Unit at the Wisconsin Department of Justice.

**Bar Admissions:**
Massachusetts, 2005
New York, 2000
United States Supreme Court (2018)
Circuit Courts of Appeals for the First Circuit (2007), Third Circuit (2001), Fifth Circuit (2002), Seventh Circuit (2003), Eleventh Circuit (2002)
United States District Courts for the District of Massachusetts (2007), Southern District of New York (2002), Eastern District of Wisconsin (2003), Western District of Wisconsin (2003)

**Education:**
Columbia Law School, J.D., 1999
Brown University, A.B. in Classics:  Greek and Latin, 1995

# EXHIBIT AA

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| ROCKY L. HAWORTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:19-03025-CV-RK |
| | ) | |
| NEW PRIME, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING PLAINTIFF'S UNOPPOSED MOTION FOR**
**PRELIMINARY SETTLEMENT APPROVAL AND TRANSFER**

Before the Court is Plaintiff's unopposed motion for preliminary approval of settlement and to transfer this case to the United States District Court for the District of Massachusetts. (Doc. 100.)  For the reasons stated in the motion (Doc. 101), in the suggestions in support thereof (Doc. 101), and during the hearing held before this Court on August 6, 2020 (Doc. 102, Minute Entry), and upon the good cause shown, the Court **ORDERS** as follows:

1.      Plaintiff's motion (Doc. 100) is **GRANTED**, and the terms of the Settlement Agreement and Release of Claims ("Settlement Agreement") attached as Exhibit 1 to the motion (Doc. 100) are preliminarily approved as fair, reasonable, and adequate.

2.      Solely for purposes of settlement, a Class is hereby certified pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure and pursuant to 29 U.S.C. § 216(b) of the Fair Labor Standards Act ("FLSA"), defined as follows:

> All similarly situated current and former "B" or "C" Seat Drivers who worked for New Prime from October 2, 2012 to May 8, 2020, except for the named plaintiffs in *Montgomery v. New Prime, Inc.*, C.D. Cal. Civil Action No. 8:17-cv-00321.

Excluded from the Class are any Class Members who timely and validly request exclusion from the Class pursuant to the Notice disseminated in accordance with this Order.

3.      The Court provisionally, and only for the purposes of this settlement, finds that:

(a)   the Class Members consist of 26,476 individuals employed by Defendant as B/C seat drivers, and the requirement of numerosity is satisfied;

(b)     the litigation and proposed settlement raise questions of law and fact common to the Class, and these common questions predominate over any questions affecting only individual Class Members;

(c)     the claims of Rocky Haworth (the "Class Representative"), a former B/C seat driver employed by Defendant, are typical of the claims of the Class;

(d)     in assisting with the litigation and negotiating and entering into the proposed settlement, the Class Representative and his counsel have fairly and adequately protected the interests of the Class, and will adequately represent the Class in connection with the proposed settlement; and

(e)     a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

4.       Pursuant to Rule 23(c)(1)(B) and (g), the Court appoints the Class Representative and his counsel of record, the Crimmins Law Firm LLC, Hodes Law Firm, LLC, and Fair Work, P.C. to act on behalf of the Class in connection with the proposed settlement.

5.       The Court further approves the Notice attached as Exhibits A through C to the Settlement Agreement for approval for distribution to the B/C Seat Class, and finds that the proposed notice process constitutes the best notice practicable under the circumstances and is in full compliance with the requirements of applicable law, including due process under the United States Constitution.

6.       Pursuant to the parties' Settlement Agreement, the Court further finds that this case should be and hereby is **TRANSFERRED** to the United States District Court for the District of Massachusetts and consolidated with the case styled *Oliveira v New Prime, Inc.*, 1:15-cv-10603-PBS (D. Mass.), for the purposes of disseminating Notice, administering the settlement, handling any opt-outs or objectors and conducting a Final Fairness Hearing in accordance with the terms of the Settlement Agreement.  Given that many of the Putative Class Members are members of both the *Haworth* and *Oliveira* matters, transferring this matter for purposes of settlement administration will decrease litigation costs, and further the interests of justice.  The Court further notes that United States District Judge Patti B. Saris is willing to accept transfer of this action.

7.       If the proposed settlement is not finally approved, or the settlement is terminated or fails to become effective in accordance with the terms of the Settlement Agreement, this settlement certification order shall be vacated without further order of the Court and without prejudice to the

right of any party to seek or oppose class certification. Thereafter, this case shall be transferred back to the United States District Court for the Western District of Missouri for further proceedings.

     **IT IS SO ORDERED**.

<div style="margin-left:40%">

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

</div>

DATED:  August 10, 2020

3